UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Gary Aguirre, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 06-1260 (ESH) |
| ) | |
| Securities and Exchange ) | |
| Commission, ) | |
| ) | |
| Defendant. ) | |
| ) | |

DECLARATION OF GARY J. AGUIRRE

I, Gary J. Aguirre, declare:

1) I was a trial attorney in California from October 1967 through early 1995. When I left the practice in 1995, I had no intention of returning to the full-time practice of law. I thought I had achieved my professional and financial goals. Five years later, I looked back on that career and felt it had a missing chapter. Very little of it had been devoted to public service. I decided it was not too late to write that chapter and returned to law school to retool for that purpose.

2) To prepare for a new career, I applied and was admitted in 2001 to the LL.M. program at Georgetown University Law Center ("Georgetown"). I was a full-time student in the LL.M. program at Georgetown from August 2001 through June 2003, with the exception of the spring of 2001 due to an illness and the summer break.

3) After I started at Georgetown, I became interested in the LL.M. program in securities and financial regulation and the possibility of a career at the Securities and Exchange Commission ("SEC"). I was impressed by the SEC's primary mission, described on its website as follows: "to

protect investors and maintain the integrity of the securities markets." Most of the courses in that program were taught by current or former staff of the SEC. I focused on courses that would prepare me for a career at the SEC. In October of 2003, I received an LL.M. in Private Studies which focused primarily on securities regulation. My GPA placed me near the top of the class.

4) With the encouragement and support of several Georgetown professors who were current or former SEC staff, I applied to the SEC for a position in May 2003. Fourteen months later, the SEC offered me in July 2004 as a Senior Counsel with a "superior qualifications appointment."

5) I was employed from September 7, 2004, through September 2, 2005, as a Senior Counsel in the SEC's Enforcement Division. From September 9, 2004, through my last day at the SEC, I had primary responsibility for the SEC's investigation of suspected insider trading by Pequot Capital Management ("Pequot"). The investigation was later expanded to include suspected market manipulation by Pequot. On August 21, 2005, the SEC raised by pay level two grades, a step recommended or approved by every SEC official my supervisory chain from my immediate supervisor to the Director of Enforcement. The same chain of command fired me eleven days later.

6) On my last day at the SEC, September 2, 2005, I sent a letter to SEC Chairman Christopher Cox, with copies to the Commissioners, informing him of facts which, in my judgment, constituted a violation of federal regulations prohibiting the SEC from giving preferential treatment to a suspect under investigation. The letter also informed Chairman Cox that I had been fired for questioning my supervisors' decision to give that suspect preferential treatment. A true and correct copy of that letter is attached hereto as Exhibit 1. I never received a response from Chairman Cox.

7) On December 5, 2006, I testified before the second time before the Senate Judiciary Committee in connection with the SEC's investigation of Pequot Capital Management (Pequot) and my firing. A true and correct copy of my written testimony of December 5, 2006, is attached hereto as Exhibits 2A, 2B and 2C. These correlate to the publication of my testimony for December 5, 2005, in three parts on the Senate judiciary committee's website. I testified about the flawed SEC's handling of the Pequot investigation and my firing in the context of the SEC's failure to protect the capital markets and investors from hedge fund abuse.

8) On August 3, 2007, the Senate Finance Committee and the Senate Judiciary Committee released their report, The Firing of an SEC Attorney and the Investigation of Pequot Capital Management (Senate Report). That report along with exhibits and the appendix (707 pages) is available on the Finance Committee website at: http://finance.senate.gov/sitepages/leg/LEG%202007/Leg%20110%20080307%20SEC.pdf (last visited November 27, 2007). The Senate Hearing record (1,318 pages) of those proceedings is available at the Government Printing Office website at: http://frwebgate.access.gpo.gov/cgibin/getdoc.cgi?dbname=109_senate_hearings&docid=f:35458.pdf. The Senate Finance Committee has also released nineteen transcripts of the testimony of fifteen witnesses along with the exhibits to those examinations, which may be read at its offices.

9) I have attached true and correct copies of emails I sent to my supervisors on June 27, 2005, and August 4, 2005, as Exhibits 3 and 4, which summarize the status of investigation of Arthur Samberg and John Mack as the suspected tippee and tipper of information relating to the public announcement of the merger of General Electric ("GE") and Heller Financial (Heller") on July 30, 2001. The bates-stamp numbers on the emails are those placed by the SEC when it released the records to the Senate. True and correct copies of Figures 1 and 2 to the Senate Report are

3

attached hereto as attached as Exhibits 26 and 27 respectively. These figures describe Pequot's actual purchases in Heller Financial stock and the amounts it tried to purchase in July 2001 before the public announcement of the merger on July 30 2001.

10) On September 20, 2005, I met with Derek Childress ("Childress"), an official with the SEC's Office of Human Resources, in a conference room at the SEC's Virginia office to review my personnel records. On that same day, Childress permitted me to inspect and obtain copies of the records from my personnel file which were maintained by the office of Human Resources, including a memorandum of July 14, 2005, prepared by Stephen M. Cutler ("Cutler"), then Director of the SEC's Division of Enforcement. A true and correct copy of the Cutler memorandum is attached hereto as Exhibit 5. During the meeting, I asked Childress why my performance evaluations were not in the personnel records which he had shown me. He told me that Division of Enforcement ("Enforcement") also maintained a personnel file, called an Enforcement Performance File ("EPF"), and that I should contact Darcel Smith ("Smith"), a lower level administrative staff person with Enforcement if I wished to obtain copies of my performance evaluations and related records.

11) I sent an email to Smith, on September 20, 2005, asking to "review" my EPF. Later that day by phone, I scheduled an appointment with her to inspect my EPF. A true and correct copy of my September 20, 2005, email to Smith is attached hereto as Exhibit 6.

12) On September 20, 2005, I went to the SEC's headquarters in Washington, D.C., to review my EPF and make copies of pertinent records. To my surprise, she met me downstairs and informed me that I could not see the original of the EPF in its folder and the she could only provide me with copies. She then handed me two envelopes. One was an eight by ten envelope which contained a copy of my EPF, according to Smith. The other envelope was letter-sized: Smith

explained this second envelope contained the Human Resources final approval of my merit rating increase which she said had just arrived in her office. I had encountered Smith on several routine administrative matters over the past year. On this occasion, she acted as if her conduct had been scripted.

13) When I reviewed the records in the envelope that Smith described as a copy of my EPF, I did not find any of the evaluations that should have been in the file. This was contrary to the information which Childress had provided to me about the EPF. I sent an email to Michael Clampitt ("Clampitt"), president of the SEC's employee's union, and asked if he could help obtain copies of my evaluations. A true and correct copy of my email of September 21, 2005, to Clampitt is attached hereto as Exhibit 7. Clampitt later informed me that he had requested Charles Staiger (Staiger), the Enforcement administrative official handling my separation, to make the records available to me, but he could not obtain a commitment when that would happen. I sent an email on September 27, 2005, to Staiger asking him about the missing records and confirming his contact with Clampitt. A true and correct copy of my September 27, 2005, email to Staiger is attached hereto as Exhibit 8. As before, I asked for "copies" of the missing files. My letter read in part: "I am also concerned that other documents were not included in the files. Would you kindly advise me when I might obtain copies of the above documents and any other documents that should have been included in my personnel files?"

14) When I did not hear back from Mr. Staiger, I sent him a second email on October 4, 2005, inquiring about the same records. A true and correct copy of my October 4, 2005, email to Staiger is attached hereto as Exhibit 9. On October 6, 2005, Staiger sent an email stating that he had sent me the following evaluations: my performance plan and evaluation, my contribution

5

statement, Hanson's summary, and Kreitman's summary. A true and correct copy of Staiger's October 6, 2005, email is attached hereto as Exhibit 10.

15) A day or two later, I received Staiger's letter with the above enclosures. Three of the four documents included in Staiger's letter, including "Hanson's summary," were routine forms which all enforcement employees received in connection with the end of the year evaluations. True and correct copies of the following are attached: Staiger's cover letter of October 7, 2007, as Exhibit 11, "Hanson's summary" as Exhibit 12, and "Kreitman's summary" as Exhibit 13. Staiger's letter contained the odd comment that Kreitman's summary "mistakenly did not go to the compensation committee."

16) "Kreitman's summary" (Exhibit 13) was an anomaly. Enforcement followed a procedure in evaluating the performance of its staff attorneys. The staff attorney, as I was at the time, would submit his "statement of contributions" to his supervisor, which in my case was Hanson. Hanson's evaluation (Exhibit 12), which in my case was positive, would be forwarded to the compensation committee. It was obvious that the compensation committee had accepted Hanson's positive review since it had given me a two-step merit increase, which the Chairman and Human Resources had all approved. The union president, Clampitt, told me had kept track of thousands of employee performance evaluations and had never heard of an employee receiving two evaluations, much less two conflicting evaluations. He also told me that the standard procedure was for the immediate supervisor, Hanson in my case, to do the employee's evaluation in connection with the merit review process, not the assistant director, such as Kreitman.

17) For these reasons, I sent my second letter to Chairman Cox on October 11, 2005, with copies to the other commissioners. A true and correct copy of my October 11, 2005, letter is hereto

attached as Exhibit 22. I reminded Chairman Cox of my September 2, 2005, letter describing the preferential treatment my supervisors had given Mack.

I went on to discuss the Kreitman evaluation:

> But another putative evaluation of my work for the same time period has found its way into in my Enforcement personnel file during the past week. This one was prepared by my Assistant Director, Mark Kreitman, at the suggestion of Associate Director Paul Berger. According to Enforcement's transmittal memorandum, Mr. Kreitman's evaluation "mistakenly did not go to the compensation committee." Curiously, Mr. Kreitman's evaluation is dated September 26, 2005, three months after my Branch Chief submitted his evaluation to the compensation committee, more than a month after the compensation committee acted, more than three weeks after Enforcement fired me, and one week after I requested my personnel file. In short, it was not prepared in the ordinary course of events.

I also expressed my concern for other records relating to the termination of my employment:

> I am therefore requesting that you instruct Linda Thomsen, as the Director of Enforcement, to direct Enforcement staff to preserve all memorandums, emails and other documents, as that term is used by Enforcement, relating to my employment and work with the Commission. These records will be critical for the courts and other governmental agencies to determine if Enforcement violated federal law by firing me.

18) As with my September 2, 2005, letter, I received no response from anyone regarding my October 11, 2005, letter to Chairman Cox.

19) During the Senate investigation, Senate investigators sorted out how and when the "Kreitman summary" came into existence. The Senate Report made these findings:

> **The SEC fired Gary Aguirre after he reported his supervisor's comments about Mack's "political connections," despite positive performance reviews and a merit pay raise.** Just days after Aguirre sent an e-mail to Associate Director Paul Berger detailing his allegations, his supervisors prepared a negative re-evaluation outside the SEC's ordinary performance appraisal process. They prepared a negative re-evaluation of only one other employee. Like Aguirre, that employee had recently sent an e-mail complaining about a similar situation where he believed SEC managers limited an investigation following contact between outside counsel and the Director of Enforcement.

SENATE REPORT NO. 110-28 (2007), at 6.

20) The email to Berger referred in the quote from the Senate Report above was my email of July 27, 2005, to Assistant Director Kreitman and Associate Director Paul Berger. This was the first time

7

I stated my concerns in writing that Mack's subpoena had been blocked because of his political connections. On this point, the email read:

> I had different and more troubling input why it was difficult to move ahead with the second CSFB subpoena *and the Mack testimony*. I sent two e-mails to Bob during the week of June 20 (see attachments 3 and 8) proposing that we proceed with the Mack testimony and broaden the CSFB subpoena
> Bob told me 1) that these decisions were for Mark to make and 2) *it would be an uphill battle because Mack had powerful political connections*. Bob also mentioned this concern during a meeting with Mark and me. Bob's comment about Mack's political influence became more real when I learned on June 27 that documents I had subpoenaed from Morgan Stanley were faxed by Mary Jo White (who had never represented anyone in the investigation) directly to Linda Thompson (see attachment 15), before Morgan Stanley produced them in the investigation. On the preceding Friday, June 24, Bob also met privately with Paul about the investigation I was handling. Likewise, Mark and Bob did not invite me to participate in the meeting on June 27 when they discussed Mack's possible testimony. This combination of events suggests to me that the issue whether Mack's testimony would be taken was being handled differently than the same issue for other witnesses in this investigation and different from the same issue in other investigations. *Further, I do not believe that treating Mack differently is consistent with the Commission's mission, at least as I understand it* (emphasis added).
> S. HRG. 109-898, at 760-1.

21) On December 30, 2005, I sent a letter to the SEC FOIA office requesting the following information relating to my employment with the SEC:

> 7) All records relating to Aguirre's merit pay increase for the 2004 through 2005 evaluation period, including (but not limited to) electronic or hard copy documents to or from his supervisors, electronic or hard copy documents to or from the committee members who authorized Aguirre's merit pay increase, transmittal letters, memorandums, emails, notes of the compensation committee, and all other documents generated in implementing such merit pay increase;
> 8) All records containing information regarding Aguirre's evaluation or performance as an employee or the purported reasons for the termination of his employment including (but not limited to) employee performance files, personnel security files, compensation review files, personnel discipline files, personnel termination files, or any other file;
> 9) All records including (but not limited to) employee performance files, personnel security files, compensation review files, personnel discipline files, personnel termination files, or any other file containing information regarding Aguirre's performance as an employee or the purported causes of his termination;10)All written or electronic communications or record of any communications relating to Aguirre's merit pay increase for the 2004 through 2005 evaluation period to or from Christopher Cox, Linda Thomsen, Paul Berger, James Clarkson, Richard Humes,

> Deborah Balducchi, Mark Kreitman, Robert Hanson, Richard Grime, Charles Cain or any other SEC staff member; 11) All records relating to the SEC's termination of Aguirre's employment, including (but not limited) to electronic or hard copy documents to or from his supervisors, transmittal letters, memorandums, emails, notes or memorandums of any meeting during which such possibility was discussed, and all other documents generated in carrying out such termination;
> 12) All records relating to the SEC's termination of Aguirre's employment to or from Christopher Cox, Linda Thomsen, Paul Berger, James Clarkson, Richard Humes, Deborah Balducchi, Mark Kreitman, Robert Hanson, Richard Grime, and Charles Cain.

22) In early January 2006, I received a letter from the SEC FOIA office, dated January 4, 2006. The letter acknowledged receipt of my amended FOIA and Privacy Act requests contained in my December 30, 2005, letter, stated it had only one responsive record, and added: "we are consulting with Commission staff regarding the remaining items of your request." A true and correct copy of the FOIA letter of January 4, 2006, is attached hereto as Exhibit 14. Shortly after receiving this letter, to the best of my recollection, I contacted the FOIA office to inquire why there would be any delay in releasing my EPF. I was told that my EPF had been transferred to a federal records facility. On January 24, 2006, I sent a letter to the Federal Records Center ("FRC") requesting a copy "of any personnel file" relating to my employment with the SEC from September 6, 2004, through September 2, 2005. I later received a response from an FRC staff person stating the FRC had no records of my employment with the SEC. A true and correct copy of my letter of January 24, 2006, is attached hereto as Exhibit 15.

23) On April 11, 2006, I sent an email to three SEC staff members with whom I had prior contact regarding my personnel files: Teresa Simpson, a Research Specialist at the FOIA office, Staiger at Enforcement, and Childress at Human Resources. It read in part as follows:

> I am requesting that you provide me with the current location of my EPF file maintained by the Division of Enforcement as well as my personnel file maintained by Human Resources. I was previously informed that some of my records were sent to the Federal Records, but its staff has informed me that it has no records of my employment with the SEC.

Accordingly, would you kindly advise me whether the SEC has copies or the originals of those files? If so, which files? Has either my EPF or any other personnel file been sent to another facility for storage? If so, which files? Which facility? Which location?

A true and correct copy of my email of April 11, 2006, is attached hereto as Exhibit 16.

24) On April 24, 2006, I received a letter from Simpson in which she responded to my April 21 email in two ways. She offered this statement: "Commission staff has advised you that you have been provided with the original EPF file and the Division of Enforcement does not maintain a copy, nor does any other Commission office." A true and correct copy of Simpson's letter of April 24, 2006, is attached hereto as Exhibit 17. Simpson's letter of April 24, 2006, showed a "bcc" to Noelle Frangipane, also a counsel of record in this case.

25) I responded to Simpson's April 24, 2006, letter with my email of April 27, 2006, objecting. A true and correct copy of my email of April 27, 2006, is attached hereto as Exhibit 18. I received no response from anyone to this email.

26) I have identified a number of false or misleading statements made by SEC staff regarding my personnel records. They include:

    a) Simpson's statement in her letter of April 24, 2006, (Ex. 17) that "Commission staff has advised that you have been provided with the original EPF file…" I was never told by anyone that I had been given the original EPF, nor had anyone ever given me the original EPF.

    b) Simpson's statement "that the division of Enforcement does not maintain a copy (of my EPF) nor does any other Commission office" is misleading, since Enforcement provided many of my personnel records from my EPF to the two Senate Committees conducting the investigation.

    c) Staiger's statement to me that the "Kreitman summary" "was mistakenly not sent to the compensation committee" was also false. The Senate Report refers to the "Kreitman summary" as the "re-evaluation" and describes how various drafts were circulated among my supervisors, down to the minute, on August 1, 2005 (S. REP. at 497-502; Ex. 48). This was two weeks after the compensation committee met and approved my two-step merit increase (S. REP. at 58). In discussing the OIG's failure to investigate the re-evaluation, the Senate Report discussed its irregularities:

> Our investigation confirmed that the negative re-evaluation was prepared outside the regular process, after the Compensation Committee met, and referred to incidents outside the rating period. More importantly, we found that it was prepared at the same time and within the same document as John Smith's irregular re-evaluation. Why were they handled together? What did these two employees have in common? We learned that both had recently complained about roadblocks in their investigations following direct contacts between outside counsel and the Director of Enforcement. Determining why these two evaluations were prepared together, outside the normal processes is emphatically an investigative issue, not an audit issue.

    S. REP. at 100 (footnotes omitted).

27) Staiger's statement that the "Kreitman summary" "mistakenly did not get to the compensation committee" was not his idea. It was suggested to him by an attorney in the SEC's Office of Human Resources, Linda Borostovik. This is what Borostovik told Staiger to tell me:

> I discussed this with Dave Cuningham and it is fine to give Gary his own contribution statement, and his supervisor's statement, including the statement below. I suggest that you print the message from Kreitman and note something to the effect that although it mistakenly did not go to the compensation committee, you are giving it to Gary as Berger/Kreitman have requested it be part of the record.

A true and correct copy of Linda Borostovik's email of October 6, 2005, is attached hereto as Exhibit 19. An electronic version of the Borostovik email, which may be magnified for easier reading, is available at http://frwebgate.access.gpo.gov/cgibin/getdoc.cgi?dbname=109_senate_hearings&docid=f:3545

8.pdf at 853 (last visited November 28, 2007). A true and correct copy of Linda Borostovik's email of October 6, 2005, is attached hereto as Exhibit 19A.

28) The Senate also released records which shed light on Simpson's statement that the original EPF was given to me. Those records show my letter of September 2, 2005, to Chairman Cox was transmitted to the Office of the Inspector General ("OIG") on September 7, 2005. A true and correct copy of this transmittal sheet is attached hereto as Exhibit 20. Records from the SEC's Office of the Inspector General (OIG) were among those released by the Senate the Senate, which include notes by an OIG attorney. These notes indicate the OIG attorney spoke with Staiger on October 19, 2005. S. HRG. 109-898, at 934. Directly under the name "Chuck Staiger" the notes read: "Gary Aguirre personnel file" and then state: "gave GA him everything in person…don't keep anything…HR—asked sect write what in email (Darcel Smith)." *Id*. Later, the notes appear to summarize several topics in outline form and list as point 2(c) "Enf didn't keep a copy after given to Aguirre." *Id*. at 941. The notes continue on the next page "Enf. Didn't keep a copy of EPF given to Aguirre, only noted what was contained in it." *Id*. at 942. These notes appear to record multiple statements by Staiger to an OIG attorney, who was supposed to be conducting an investigation of the allegations contained in my September 2, 2005, letter to Chairman Cox. Staiger's statement that I was given the original EPF is completely false.

29) I found a document among the redacted records released by the SEC which appears to be Darcel Smith's email referred to in the notes above, which was sent more than two weeks after our brief encounter on September 200, 2005. A true and correct copy of the redacted document produced by the SEC is attached hereto as Exhibit 23. Smith's email incorrectly states, among other things, the date of our encounter, the nature of my request, and that she gave me the "EPF folder."

12

30) There is evidence that the SEC destroyed or improperly withheld one record which was included in the Human Resources file when I inspected it on September 20, 2005. On that date, September 20, Childress provided me with a copy of a July 24, 2004, memorandum ("Memorandum") (Ex. 5) prepared by then Director of Enforcement Cutler summarizing my background for a superior qualifications appointment. This record was never released to me in the FOIA proceedings. It does not appear on the SEC's Vaughn index. Further, the SEC failed to identify this record when it told the court that "The only information the Commission is now withholding are …[three types of information]" described at the top of page four of its memorandum. I mentioned Exhibit 5 to Senate investigators during the investigation and they called me back and asked me for a copy, saying they could not find it in the records the SEC had released to the Senate. The record was released as Exhibit 36 to the Senate Report. S. REP at 439-40.

31) The OGC has multiple roles in representing the SEC in relation to my firing and my efforts obtain records through the FOIA process to obtain the release of relevant records.

   a) The OGC appears to supervise the FOIA office in the details of processing my FOIA request. A true and correct copy of my December 28, 2005, email to Brenda Fuller is attached hereto as Exhibit 21. That email related to the FOIA office's compliance with a FOIA request which I made in January 2005, which is not before the court. However, the email does illuminate the extent to which the SEC OGC directs the SEC's FOIA office. In relevant par it reads:

   This email confirms my understanding of your responses to my questions and comments regarding your December 2, 2005, letter. That letter was the last SEC communication in a series that began on January 26, when the SEC initially replied to my FOIA request on January 12, 2005.
   First, I questioned why the SEC has failed to respond in any way to many of my requests. Second, I questioned why the SEC was again asserting an objection based on 17 CFR 200.80(b)(5). …

> I understand from our telephone conference that the General Counsel delivered to you the documents that were to be produced, made the decision which documents would be produced, decided what would be redacted, and made the decision what objections would be asserted.

b) The OGC, in particular Associate General Counsel Humes ("Humes"), has decided all appeals which I have taken from the decisions of the FOIA Office; his signature block on these appeals reads: "For the Commission by delegated authority Richard M. Humes, Associate General Counsel."

c) OGC Attorney Melinda Hardy advised senior SEC officials how they should execute my firing. A true and correct copy of the SEC redacted version of Kreitman's September 1, 2005, chain of emails is attached hereto as Exhibit 28. A true and correct copy of the un-redacted September 1, 2005, email chain between Kreitman and Melinda Hardy is attached hereto as Exhibit 29.

d) Juanita Hernandez advised one of my supervisors to retroactively paper my personnel file with a sham evaluation to justify my firing. This advice is confirmed by Kreitman's email to Berger on October 24, 2005. A true and correct copy of Kreitman's October 24, 2005, email to Berger is attached hereto as Exhibit 24. The SEC released a redacted version of this email. A true and correct copy of the SEC's redacted version of Kreitman's October 24, 2005, email to Berger is attached hereto as Exhibit 25.

32) In 2005, Melinda Hardy was an Assistant General Counsel in the SEC's Office of the Associate General Counsel for the Litigation and Administrative Practice, which is headed by Richard M. Humes. Recent correspondence from Humes and Hardy attached to Hardy's declaration in support of the SEC's summary judgment motion indicates Humes and Hardy still hold those positions, as indicated on Defendant's Exhibit 15 (Hardy) and Exhibit 4 (Humes).

33) As alleged in the complaint, I seek the release of the information sought in this case because it will shed light on how the SEC has used the power entrusted to it by various acts of Congress. Section 200.53 of Title 17 of the United States Code of Federal Regulations spells out that trust:

> Members of the Securities and Exchange Commission are entrusted by various enactments of the Congress with powers and duties of great social and economic significance to the American people. It is their task to regulate varied aspects of the American economy, within the limits prescribed by Congress, to insure that our private enterprise system serves the welfare of all citizens. Their success in this endeavor is a bulwark against possible abuses and injustice which, if left unchecked, might jeopardize the strength of our economic institutions.

34) My testimony before the Senate Judiciary Committee on December 5, 2006, which is attached as Plaintiff's Exhibit 2, contains my statement why I believe there is a high level of public interest in the SEC's handling of the Pequot case. As stated there, I see the SEC's mishandling of the Pequot case as powerful evidence of a broader problem that threatens the capital markets and the investing public. My earlier testimony before the Senate Judiciary Committee on June 28, 2006, dealt with the same themes, which is available at http://judiciary.senate.gov/testimony.cfm?id=1972&wit_id=5485 (last visited December 4, 2007). I expect to use records obtained through this proceeding in further comments before Congress, in talks at financial conferences, and in connection with my plans to write on the same subjects for public dissemination. I intend to make the records available to the media as requested.

35) The public interest in the SEC's handling of its Pequot investigation is also reflected by the media coverage of that matter as indicated by the following:

   a) A Lexis search on Lexis "Meganews" source yields approximately 500 hits relating to the SEC's Pequot investigation.

   b) There have been approximately 20 articles, editorials or commentaries in both The New York Times and The Wall Street Journal relating to this subject over the past 18 months.

15

    c) Coverage in foreign media

36) The order of exhibits listed in the partial transcript of Mack testimony indicate that he was likely questioned about exhibits 150 and 151, which are his calendars, in the portion of the transcript that the Senate did not release. It is unlikely that the three attorneys conducting this examination, Senior Counsel James Eichner, Branch Chief Robert Hanson, and Deputy Director Bresnan would have these two records marked as exhibits if they did not have some postings relating to Mack's possible connections with CSFB or CSFB officials. These would likely reveal Mack's other contacts with CS and CSFB officials before and after his trip to Switzerland. This information will also shed on the SEC's diligence or lack thereof in its investigation whether Mack provided Samberg updated information regarding the progress of the GE-Heller merger.

37) I have reviewed all of the communications described in Appendix II (Correspondence) to the Senate Report which includes correspondence between the Senate members and staff and the SEC members and staff. I could find no SEC response to the letters of Senator Grassley dated August 24, 2006, and the joint letter of Senators Specter and Grassley dated September 8, 2006, requesting a list of SEC officials who had recused themselves in connection with the Senate investigation of my allegations relating to the Pequot investigation and my firing.

Dated: December 4, 2007                            Respectfully Submitted,

                                                                 _____/s/_____
                                                                   Gary J. Aguirre, CA Bar#38927
                                                                   402 West Broadway, Suite 400
                                                                   San Diego, CA 92101
                                                                   619-595-3197

                                                                   Plaintiff