FEDEX KINKO'S PAC. BEACH       ⓘ002

ES113595



UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
DIVISION OF ENFORCEMENT
100 F ST., N.E.
WASHINGTON, D.C. 20549

WRITER'S DIRECT DIAL LINE

(202) 551-4437

September 2, 2005

Via Facsimile to 202-772-9200 and Regular Mail

Chairman Christopher Cox
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20037

Re: In the Matter of Trading in Certain Securities; HO-9818

Dear Chairman Cox:

    I am compelled to write to you today, my last day with the Commission, out of a sense of duty to the Commission's mission—to maintain the integrity of the financial markets and to protect the investor. Unfortunately, my supervisors—as far up the chain as I can see—have lost sight of that mission in the above matter. I state the facts briefly below, though there is much more to be said.

    I have been the staff attorney in the above matter from mid-September 2004 through today. It is an investigation of suspected insider trading by one of the largest hedge funds in the nation, Pequot Capital Management ("PCM"), arising out of eighteen SRO referrals. Staff who worked on this matter from the beginning—Hilton Foster, Eric Ribelin, Thomas Conroy, and I—believe that PCM engages in an institutionalized form of insider trading that corrupts the financial markets and creates an un-level playing filed for honest investors.

    As the investigation progressed, one matter dwarfed all others, suspected insider trading by PCM's CEO, Arthur Samberg, during July 2001, just before the General Electric Company ("GE") acquired Heller Financial, Inc. ("Heller"). Mr. Samberg bought $44 million in Heller stock and shorted $36 million in GE stock shortly before the public announcement of the acquisition on July 30, 2001, making an $18 million profit. On the two occasions I took Mr. Samberg's testimony, he could offer no credible explanation for these trades. Everyone involved in this investigation has informed me of their belief Mr. Samberg obtained material non-public information prior to these trades. The only question is: from whom?

    Only one person meets the tipper's profile: John Mack, the current CEO of Morgan Stanley. I began informing my supervisors of this evidence in early June. Later in the month, I suggested that Mr. Mack's testimony be taken. On approximately June 23, my Branch Chief, Robert Hanson, told me that it would be very difficult to obtain approval to take Mr. Mack's testimony because of his powerful political connections. Mr. Hanson later repeated the same

AGUIRRE 000694

statements to me on several other occasions. Some are confirmed by e-mails. Assistant Director Kreitman participated in one of these discussions.

Other events also suggest the decision to take Mr. Mack's testimony has not been handled in the normal course. For example, I have issued approximately 100 subpoenas in this matter and all responsive documents came directly to me. When I served a subpoena on Morgan Stanley seeking documents relating to contacts between Messrs Mack and Samberg, its counsel did not initially send them to me. Rather, she first sent them to Linda Thomsen. Likewise, Morgan Stanley's counsel, Mary Jo White, bypassed the normal protocol of dealing with the staff attorney. Instead, she dealt directly with Ms. Thomsen by correspondence and phone. Of hundreds of contacts with defense counsel, this is the first time any defense counsel began discussions at the top of the chain of command. Further, at the same time, my supervisors excluded me from the discussions involving Mr. Mack.

To avoid any misunderstanding, from late June through late August, I sent multiple e-mails to my Branch Chief Robert Hanson, Assistant Director Mark Kreitman, and Associate Director Paul Berger, as well as a brief e-mail to Linda Thomsen, expressing my concerns. I had no success in obtaining their approval to take Mr. Mack's testimony. Instead, they fired me. Immediately prior to the Mack controversy arising, my Branch Chief and Assistant Director congratulated me for the excellent job I was doing in this investigation. Indeed, Mr. Kreitman gave what he called his highest "Perry Mason award" in mid-June.

I bring these facts to your attention in hopes that you will take whatever steps are appropriate to put this investigation back on track, consistent with the Commission's mission.

I must add that other improper motives also led to my termination, but there is no productive reason to discuss them here.

Sincerely,

Gary J. Aguirre
Senior Counsel

CC:  Commissioner Paul S. Atkins
     Commissioner Roel C. Campos
     Commissioner Cynthia A. Glassman
     Commissioner Annette L. Nazareth
     (By fax and Regular Mail)

AGUIRRE 000695