**From:** Aguirre, Gary J.
**Sent:** Monday, June 27, 2005 7:42 AM
**To:** Hanson, Robert
**Cc:** Kreitman, Mark J.; Ribelin, Eric
**Subject:** Samberg's trading in HF and GE:

This memo summarizes the evidence, *especially Samberg's own testimony*, suggesting that he acted on confidential information in making his trading decisions on GE and HF. This memo supplements but does not repeat the information contained in the Excel spreadsheet that chronicles the events leading up to the public announcement of the GE-HF acquisition.

*A) Samberg's wanted to buy more HF and short more GE*

On July 30, 2001, General Electric announced its acquisition of Heller Financial ("HF") at approximately a 50 per cent premium to its last trading price. From July 2 through July 27, 2001, Samberg purchased 1,148,200 shares of Heller for a purchase price of $43,839,784.43. His profit on HF, according to PCM records, was $16,939,578.52.

Samberg wanted to buy significantly larger blocks of HF during July 2001, particularly during the week before the public announcement. On July 2, the first day he directed in PCM, he directed the purchase 223,700 shares; only 100,000 shares were filled. The total trading volume on that day was 388,900 shares. On July 10, 2001, Samberg directed his PCM trader to purchase 455,300 shares; only 100,000 shares were filled; trading volume was 375,600 shares. On July 11, Samberg's order was for 336,500 shares; only 56,500 shares were filled; volume that day was 158,200 shares. During the week of July 23, 2001, the week before the public announcement, Samberg directed his traders to purchase 480,400 on Monday, 418,500 on Tuesday, 373,000 shares on Wednesday, 302,900 shares on Thursday, and 243,900 on Friday. His trader purchased only 10,000 on Monday, 18,500 on Tuesday, 10,000 on Wednesday, 20,000 on Thursday, and 10,000 shares on Friday. On July 30, 2001, the day of the announcement, Samberg had a standing order to purchase 233,500 shares. Later that day, after the announcement, he sold his entire holdings of 1,148,200 shares.

Likewise, Samberg engaged in heavy short sales of GE beginning on July 25, five days before the public announcement of the acquisition. On July 25, he directed his trader to short sell 766,600 shares of GE. It was fully executed. On July 26, he directed his trader to short sell an addition 385,200 shares of GE; only 50,000 were executed. On July 27, Samberg instructed his trader to short sell an additional 385,500 shares of GE; only 20,000 were executed.

The point is this: Samberg risked $80,000,000 of PCM assets belonging to sophisticated institutional investors. He wanted to risk much more. This suggests that he had extraordinary confidence in PCM's research in GE and HF or that for some other reason he believed HF's price would go up and GE's would fall. This memo next takes a look at PCM's research on both sides Samberg's GE-HF bet.

**B) *Samberg's explanation why he bought Heller Financial (HF) is not credible.***

1) Samberg regurgitated information during his testimony why he purchased HF that was spoon fed him by his attorneys.
    a) Samberg identifies six reasons he purchased HF's stock: (1) credit climate that existed in 2001 was favorable for HF; (2) HF's strong financial model; (3) speculation that HF would be involved in a consolidation; (4) analysts' reports described the attractiveness of the HF franchise; (5) the relative performance of HF vs. other financial stocks; and (6) analysts' reports that HF was growing at ten percent and was projected to continue that growth (RT II, p. 67, l. 2 – p. 69, l. 22).
    b) Each data point was described in the materials shown to Samberg by his counsel shortly before he testified (RT II, p. 75, ll. 25 – p. 80, l. 19).[1]
    c) Five of the six items above were contained in Legg Mason report that Samberg did not see *until months after he purchased HF*.
    d) Samberg claims he saw an analysts report in July 2001 like the one his attorneys showed him. PCM has produced no such report. No is there a hint of one in the PCM production. Here's Samberg's testimony on the report shown to him by his attorneys:
        Q   Have you seen this report in any e-mail dated before July 30, 2001?
        A   I don't recall seeing it.
        Q   Do you have a high regard for sell side analysts?
        A   I have a high regard for them as people. I don't have a high regard for using their reports to make investment decisions.
        Q   It would have been very unusual for you to rely on a sell side report, would it not, in making an investment decision?
        A   Historically, that is true.
        Q   In fact, isn't it true, sir, that you don't think they're worth a damn?
        A   In general, I don't think their reports are worth a damn. The people can be, but not the reports.
        Q   Right. And you've made that statement publicly, have you not?
        A   I have.
        Q   So this is -- Exhibit 19A is sell side research, is it not, sir?
        A   Sure is.
        Q   Exactly what you said isn't worth a damn. Correct?
        A   You bet.
        Q   So is it fair to say that the research you saw in July 2001 about Heller Financial also wasn't worth a damn?
        A   I really don't know what I saw.

2) Samberg consulted with no one, contrary to PCM practices, before and during his trading in HF.
    a) Samberg did not communicate with anyone at PCM before buying HF. (RT I, p. 70-71).
    b) No one assisted Samberg in making the HF trading decisions in July 2001. Samberg made a decision not to seek the help of any of the 250

---

[1] When it was established that Samberg was spoon-fed information by his attorneys as reasons he purchased HF, he attempted to create fussy new reasons for his trading decisions (RT II, p. 81, ll. 2-25).

SEC 00016

people who worked at PCM in connection with his decision to buy HF (RT I p.112, ll. 16-23).
  c) Samberg can recall no discussions with anyone at PCM regarding his decision to purchase HF (RT I, p. 71, p. 81, l. 9-15).
  d) Samberg has no recollection of speaking with anyone employed with HF before making the decision to purchase HF (RT I, p. 71).
  e) Samberg can recall no discussions with any financial services firms or brokerage firms or consultants before making his decision to invest in HF (RT I, p. 81, l. 22 – p. 83, l. 4).
  f) Samberg does not recall speaking to any analyst about HF when he was purchasing the stock (RT II, p. 55, l. 23 p. 56, l. 6).
  g) Samberg does not recall speaking with anyone about HF before or during the period the period he purchased it (RT II, p. 56, l. 14-17).
  h) All the above is inconsistent with patterns apparent in PCM documents relating to trading decisions on other stocks. [See PCM "due diligence" section below.]

3) No PCM documents were generated when Samberg purchased HF except trade blotter.
  a) Samberg maintained no hard copy or electronic files relating to his decision to buy HF (RT I p. 69 ll. 11-14).
  b) No one prepared any files regarding Samberg's decision to trade in HF (RT I, p. 79, l. 24 – p. 80, l. 4).
  c) Samberg could not identify any analyst report that he claims to have read before his decision to buy HF in July 2001 (RT I p. 70, ll.18-22) [Hard to understand why Samberg would consider any analyst report because, according to him, "analysts' reports aren't worth a dam."
  d) Samberg also testified at the second session that he does not recall seeing any analyst report before or during the time he was purchasing HF's stock (RT II, p. 56, l. 7-13).
  e) PCM produced only two documents relating to Samberg's decision to purchase HF stock. One is an e-mail dated July 11, 2001, from Samberg to his chief trader which states "where are we on HF?" The second is also an e-mail sent from Samberg after the July 30 announcement of the acquisition. It contains only the following symbols: :) :) :) :) :) :) Samberg can recall no other e-mails (RT I p. 108 ll. 23-25).
  f) Samberg has no recollection of seeing any newspaper articles about HF before buying the stock (RT I, p. 72).
  g) All the above is inconsistent with patterns apparent in PCM documents relating to trading decisions on other stocks. [Also, see PCM "due diligence" section below.]

4) Samberg did no home work on HF before purchasing $44 million of its stock.
  a) Samberg did not closely follow HF "in the way people follow stocks before it was purchased" (RT I, p. 72).

SEC 00017

      b) Samberg had "no recollection specifically of how I started the Heller investment other than to know that I had been doing this for many years and recognized these opportunities when they come up" (RT I, p. 74).
      c) Samberg's decision to purchase HF in July 2001 had "nothing to do with Heller (RT I, p. 74-75)." Rather, "it was everything to do with the charge I had, which was to manage an important piece of money for clients" (RT I, p. 75).
      d) All the above is inconsistent with patterns apparent in PCM documents relating to trading decisions on other stocks. Also, see PCM "due diligence" section below.

5) HF was not in an industry that Pequot covered in 2001.
      a) PCM and its Core Group, which Samberg managed, focused on technology, media, telecom and healthcare in July 2001 (RT I, p. 59-60).
      b) HF was in the "financial services industry" (RT I, p. 75-76).
      c) Samberg could not recall purchasing securities in this industry before July 2001 (RT I, p. 76, ll. 12-18).
      d) PCM had no one who specialized in financial stocks when Samberg bought HF (RT I, p. 75-76).

**C) Samberg could offer no explanation why he began a $36 million short of GE stock five days before the public announcement GE was buying HF.**

Here's the transcript:

```
1  Q  Now, two months later, almost two months later,
2     there is a short by you, sir, on July 25, 2001 in the amount
3     of 756,000 shares or just shy of $33 million.

4        Do you see that, sir? [I was showing Samberg GE trade blotter]
5     A  I do.

6  Q  Now, can you tell us the reasons that you felt that
7     GE should be shorted at that particular time?

8     A  No, I can't.

9  Q  Do you recall whether you were relying on technical
10    analysis or fundamental analysis?

11    A  I can't remember anything about the trade.

12 Q  Now, I notice that that was the largest trade made
13    in GE except for the sale -- or, excuse me, the -- well, that
14    was the largest trade in GE up until that point in time.
```

SEC 00018

15   A   There was a larger one in August.

16   Q   Right. That's when it was covered, sir. I said up
17   until that point in time.

18   A   Okay.

19   Q   You have no understanding at this point why you
20   made that trade?

21   A   No.

22   Q   Do you know why you made it just --

23   A   Do you know how many trades I made that year?

24   Q   Do you know why you made it five days before the
25   public announcement on Heller Financial?

1    A   No idea.

2    Q   The next day, I notice the -- excuse me, two days
3    later, on July 27th, you shorted another 34,000 shares of GE.

4    Correct, sir?

5    A   That appears to be the case.

6    Q   Do you know why you shorted it on that date?

7    A   No.

8    Q   Do you have any recollection whatsoever?

9    A   None.

10   Q   Have you attempted to ascertain from any records
11   what caused you to trade --

12   A   Well, first I have to realize that I did do it. So
13   no, I made no ascertations.

14   Q   Now, do you have any explanation why you had
15   $80 million invested in GE and Heller Financial a few days
16   before a public announcement of the --

SEC 00019

17   A   $80 million in what?

18   Q   You had 44 million in Heller Financial. You had
19  36 million in GE.

20   A   You're linking the two. I'm not willing to do
21  that. That's -- I don't understand that at all.

22   Q   Thank you. So they weren't linked in your mind?

23   A   They were or were not?

24   Q   They were not linked in your mind at that time?

25   A   No.

[Samberg's above testimony that his GE and HF trades were not related is inconsistent with his testimony (see below) that he bought because there was speculation of a merger. Since he is lying, it's hard for him to keep his story straight.]

**D) *Samberg's $80 million trades in HF and GE cannot be reconciled with his description of PCM's due diligence procedures in 2001 for making such trading decisions.***

Samberg's testimony below follows his identification of a pamphlet delivered to PCM investors describing PCM's "due diligence" procedures in making trading and investment decisions. Samberg's decision to buy HF without consulting with any of PCM's 250 employees, without speaking at HF, without following HF, and without researching HF cannot be reconciled with PCM's customary "due diligence" before making such decisions. Two points: he didn't need to do a "due diligence" because he had the info; he violated PCM's practices or he's lying about how he made the decision.

9   Q   And in the first sentence, it says, "This due

10  diligence package was created by Pequot Capital Management,

11  Inc. for current and prospective investors and their

12  immediate affiliates."

13     Is that correct, sir?

14   A   Yes.

15   Q   Now I'd like to ask you to turn over to page 8,

16    PCM-081626. And under Roman numeral V, "Investment Style and

17    Strategy," I'd like you to focus on item 1. And I'm going to

18    read it, the first sentence, and I'm going to ask you if it's

19    a true statement.

20        "Describe the development of your investment

21    approach and how investment ideas are generated." So this

22    is -- the statement follows. "Pequot Capital's investment

23    process begins with an intensive research of a company's

24    underlying fundamentals."

25        Is that a correct statement, sir?

1    A    Yes.

2    Q    Was that correct in 2001?

3    A    Yes.

4    Q    "Investment ideas are generated as a result of

5    meetings directly with company senior management teams."

6        Is that a correct statement?

7    A    Uh-huh. Yes.

8    Q    Is that correct in 2001?

9    A    Yes.

10   Q    "This allows the investment team to understand a

11   company's management structure, thought process, strategic

12   direction, and products."

13       Is that a correct statement?

14   A   Yes.

15   Q   Was it a correct statement in 2001?

16   A   Yes, it was.

17   Q   "In-depth meetings and industry research provides

18   the research to prospective fund's analysts with an overview

19   of a particular industry as well as the individual company,

20   and allows for comparisons to be made within that specific

21   industry."

22        Is that a correct statement?

23   A   Yes.

24   Q   Was it a correct statement in 2001?

25   A   Yes.

1    Q   "The investment staff visits thousands of companies

2    each year, conducts extensive interviews with management as

3    well as competitors, suppliers, distributors, and customers."

4         Is that a correct statement?

5    A   Yes.

6    Q   Was it a correct statement in 2001?

7    A   Yes.

8    Q   "Based on research, the investment analyst is able

9    to formulate business models and discuss their ideas with

10   other members of the investment staff and the respective

11   fund's portfolio manager prior to a position being included

SEC 00022

12  within the portfolio."

13      Is that a correct statement, sir?

14  A  Yes, it is.

15  Q  Was it a correct statement in 2001?

16  A  Yes, it was.

17  Q  "The portfolio manager makes the ultimate decision

18  as to whether or not a position will be added to the

19  portfolio."

20      Is that a correct statement?

21  A  Yes.

22  Q  Was it a correct statement in 2001?

23  A  Yes, it was.

24  Q  "The investment approach is consistent across all

25  funds managed by Pequot Capital."

1       Is that a correct statement?

2   A  Yes, it is.

1       Is that a correct statement?

2   A  Yes, it is.

3   Q  Was it a correct statement in 2001?

4   A  Yes, it is.

E) *What does [    ]-MSFT tell us about Samberg?*.

As you know, however, there is a missing link in GE/HF: If Samberg traded on material nonpublic information (MNI), where did it come from? There are no e-mails to or from Samberg referring to any contacts with GE, HF, or any of the investment bankers

involved in the acquisition. The Samberg-[    ] e-mails show how Samberg operates. They again and again show Samberg using [    ] to get MNI from Microsoft. One shows Samberg asking [    ] "those [MSFT] contacts have any views on the direct tv – Murdoch –rumored msft possible deal?" This does not prove the GE-HF case, but does it suggest why Samberg's explanation makes no sense on HF and why he has none on GE? Beyond a reasonable doubt on GE-HF? Not yet. Meet the preponderance of the evidence burden? I'll get back to you after Samberg testifies on [    ] I have also asked [    ] to do an Excel spreadsheet on the Samberg-[    ]MSFT trades.

### F) Was John Mack the tipster?

You have the Excel spreadsheet. I will get the revised, edited version to you by tomorrow. In summary, Mack likely had the GE-HF info sources, he had contacts with Samberg during the period, there was *quid pro quo*, mutual trust existed, and Samberg needed a huge favor. Samberg's need for a big favor is a new idea. His company was splitting a part. [    ] was a younger and brighter light. [    ] performance was demonstrably superior to Samberg's. Samberg was [                      ] [    ] was leaving with at least half the company. Samberg was looking at even bigger staff losses to [    ] He testified that he was concerned at this time that more of his executive committee "might walk." A big hit on GE-HF would illustrate that his fast ball had not slowed. Regarding GE-HF, Mack was just the guy to do his old friend a big favor, one that would also benefit him.

Regarding Samberg's situation during this time frame, he testified at the first session:

> The company was about to split, it was about to split. In September '00, I [
> ] and I was trying to reestablish the franchise value of Pequot and the core funds. I was actively looking for help, and *I did things in a manner that was expedient at the time given my expertise in this area.*

In a similar vein, he testified at the second session:

> My firm was going to split in three months. These people were my other managing director partners. *Times were fragile.* I needed their approval to do whatever I wanted to do *or they might walk*. So I wanted them to meet anybody that I was interested in talking to to building out the platform.

SEC 00024