UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Gary Aguirre, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.:  06-1260 (ESH) |
| | ) | |
| Securities and Exchange | ) | |
| Commission, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

Plaintiff seeks records from the Securities and Exchange Commission ("SEC") relating to its investigation of Pequot Capital Management ("Pequot") and John Mack ("Mack"), the current CEO of Morgan Stanley, for insider trading. Those records demonstrate that the SEC has engaged in conduct that violates the core of its statutory charges.[1] *From the top down*, the most senior officials in the SEC's Division of Enforcement (Enforcement) derailed an insider trading investigation, because the suspected tipper (Mack) was well connected and then fired the lead investigator when he questioned their decision.  The SEC's conduct harmed the very persons, systems, and institutions it is entrusted to protect:  investors, the capital markets, and the public.[2]

---

[1] As alleged in ¶5 of the complaint, Section 200.53 of Title 17 of the United States Code of Federal Regulations spells out that trust:

> Members of the Securities and Exchange Commission are entrusted by various enactments of the Congress with powers and duties of great social and economic significance to the American people.  It is their task to regulate varied aspects of the American economy, within the limits prescribed by Congress, to insure that our private enterprise system serves the welfare of all citizens.  Their success in this endeavor is a bulwark against possible abuses and injustice which, if left unchecked, might jeopardize the strength of our economic institutions.

[2] *Id.*

The Senate Committee on the Judiciary and the Senate Committee on Finance ("Senate Committees") released a report, *The Firing of an SEC Attorney and the Investigation of Pequot Capital Management, Senate Report No.110-28 (2007)* ("Senate Report"),[3] on August 3, 2007, which reached conclusions on the core facts alleged in this case. Plaintiff was the fired SEC attorney; he led the Pequot investigation. In many ways, the Senate investigation was exhaustive: it spanned eighteen months;[4] Senate staff reviewed "about 10,000 pages of documents" and conducted "over 30 witness interviews."[5] This was not a partisan political investigation. All key participants—those conducting the investigation and those being investigated—were from the same political party.[6] But the Senate investigation did have limits. Its focus was on the SEC's Enforcement Division and, to a lesser extent, the Office of the Inspector General ("OIG"). It left open whether other SEC offices were involved.

At one point the SEC investigation included eighteen cases of suspected insider trading by Pequot involving millions of shares of stocks and other securities. Of those eighteen, seventeen had been investigated by Self-Regulatory Organizations ("SROs"), such as the New York Stock Exchange, and then forwarded to the SEC for further investigation.[7] There was a second prong

---

[3] Senate Report No. 110-28 (2007), ("S. Rep.") is available at: http://finance.senate.gov/sitepages/leg/LEG%202007/Leg%20110%20080307%20SEC.pdf (last visited November 27, 2007).

[4] "April 17, 2006. Finance Committee sends its first letter to the SEC requesting a briefing on the Pequot investigation, cosigned by the Banking Committee Chair." S. REP., at 4. The Senate Report was issued fifteen months later.

[5] S. REP., at 1. See note 3 for the website address of the Senate Report.

[6] Republican Senator Arlen Specter, Chairman of the Senate Committee on the Judiciary and Republican Senator Charles E. Grassley, Chairman of the Senate Committee on Finance, initiated the investigation in 2006. The primary allegation involved John Mack, a major fundraiser for President Bush: "When Mr. Bush began raising money [in 2003], one of his first stops was New York, where he collected $4 million at an event organized in part by Mr. Paulson and Mr. Mack." See: Glen Justice, Patrick McGeehan and Landon Thomas Jr., *Once at Arm's Length from Bush, Wall Street Is Now Biggest Donor*, N.Y. TIMES, Oct. 23, 2003, at A1. Former Republican Congressman Christopher Cox was Chairman of the SEC when it fired Plaintiff on September 2, 2005, and when Senator Grassley and Specter initiated the investigations by the Senate Finance Committee and Senate Judiciary Committee in January 2006 and June 2006 respectively.

[7] "GE-Heller represented just one of at least 17 sets of suspicious transactions involving Pequot brought to the SEC's attention by organizations like the NYSE and NASD." S. REP. at 5. The eighteenth matter, Pequot's

to the investigation: Pequot's suspected manipulation of stock prices.[8]  This investigation grew as staff uncovered evidence of Pequot's use of both wash trades[9] and naked shorting[10] involving millions of shares of publicly traded stocks to manipulate the market.[11]  The SEC abandoned all aspects of the investigation in November 2006 without filing an administrative or civil case against anyone.[12]

The Senate Report is critical of the SEC's investigation of all eighteen insider trading matters[13] as well as the SEC investigation of Pequot's suspected market manipulation.[14]  It also addressed the broader implications of the SEC's failures with the Pequot investigation in relation to the SEC's mission:

> The investigation of Pequot Capital Management could have been an ideal opportunity for the SEC to develop expertise and visibility into the operations of a major hedge fund while deterring institutional insider trading and market manipulation through vigorous enforcement.  Instead, the SEC squandered this opportunity through a series of missteps, including (1) unnecessary delays, (2) understaffing, (3) excluding many of the suspicious transactions, (4) allowing inadequate and untimely document production, (5) disclosing case information to John Mack's prospective employer, Morgan Stanley, and (6) preventing the staff from questioning Mack until after the statute of limitations had expired.[15]

In this case, Plaintiff seeks two classes of records under the provisions of the Freedom of Information Act ("FOIA") and the Privacy Act. One class of records relates almost exclusively to *one* of the eighteen insider trading matters included in the SEC investigation:  Pequot's trading

---

suspected insider trading in Microsoft options, was uncovered by Plaintiff.  S. REP., at 20. See note 3 for the website address of the Senate Report.

[8] *Id.* at 18-20.

[9] *Id.*

[10] *Id.* at 196-200 (Ex. 8).

[11] *Id.* at 194 (Ex. 7).

[12] SEC Case Closing Report, Nov. 30, 2006, at 1.  Available at http://www.sec.gov/news/testimony/2006/ts120506lct.pdf (last visited November 27, 2007).

[13] S. REP., at 5, 44-5.  See note 3 for the website address of the Senate Report. Most of the Senate report focused on the SEC's numerous missteps in the investigation of Pequot's trading in General Electric and Heller Financial.

[14] *Id.* at 46.

[15] *Id.*

in the common stocks of General Electric ("GE") and Heller Financial ("Heller") during the month before the announcement of the GE-Heller merger. Plaintiff also seeks the records that shed light on the internal SEC processes that resulted in the SEC's decision SEC to award him a two-step pay raise and then fire him eleven days later. The allegations in this case are the same as those which Plaintiff placed before the two Senate committees. The Senate Report validates point by point the core allegations in the complaint in this case.  As the complaint alleges,[16] the Senate Report found that senior SEC officials gave preferential treatment to the suspected tipper (Mack) in a major insider trading investigation.[17]  As the complaint alleges,[18] the Senate Report found that the same senior SEC officials fired Plaintiff in a "process of reprisal" for questioning their decision to give Mack preferential treatment.[19]  As the complaint alleges,[20] the Senate Report also found that Plaintiff's immediate supervisor repeatedly cited Mack's "'political connections,' 'political clout,' or words to that effect" during the summer of 2005 when he blocked the subpoena Plaintiff intended to issue to Mack.[21]  Indeed, there are few meaningful differences between the Senate Report and the allegations in the Complaint in this case in the broad areas the two overlap.[22]

---

[16] Complaint ¶6.

[17] S. REP., at 4- 6, 37. See note 3 for the website address of the Senate Report.

[18] Complaint ¶22-25.

[19] S. REP., at 81. See note 3 for the website address of the Senate Report.

[20]  Specifically:

The investigation of the Suspect's role in Primary Matter progressed until approximately June 23, 2005, when, out of nowhere, Hanson told Plaintiff that it would be difficult to obtain approval to take the Suspect's testimony because he had powerful political connections.  Events over the next week corroborated Hanson's statement.

Complaint, ¶12.

[21]  S. REP., at 62. See note 3 for the website address of the Senate Report.

[22] The Senate Report findings and the allegations in the complaint differ on two issues.  The first deals with *why* the SEC gave Mack preferential treatment.  On this point, the Senate Report reads: "the reluctance to question Mack represents a much more subtle and pervasive problem than an individual partisan political favor.  SEC officials were overly deferential to Mack—not because of his politics—but because he was an 'industry captain' who could hire influential counsel to represent him." *Id*. at 37.  The other issue involves the date on which Plaintiff's supervisors created an undated "supplemental evaluation" of his performance for 2004 and 2005. *Id*. at 81.

Plaintiff also seeks records of the SEC's cover up of the Pequot affair, which reached deeper and wider than the original misconduct.  Its scope broadened over time as circumstances dictated.  The cover-up could not have been successful without the complicity of the SEC's Office of the Inspector General ("OIG").  Inspector General Walter Stachnik departed the SEC within a day[23] of the release of the Senate Committees blasting (1) the SEC for its handling of the Pequot investigation[24] and for Plaintiff's firing[25] and (2) the OIG for its investigation of both matters.[26]  Some of the Senate Committees' harshest words were reserved for the OIG.[27] Though the Senate Report did not use the word, its description of the OIG's investigation of Plaintiff's allegations may be accurately described as a "whitewash".[28]

As discussed in the next section, the scope of the records sought has been significantly narrowed. This is primarily due to the release of internal SEC records by the Senate Committees. But there are significant issues for the court to resolve, including the adequacy of the search. We discuss next how the scope of the issues has been narrowed and what issues are now joined for the court to decide. We address the adequacy of the SEC's search in the last section because the discussion of the other open issues provides helpful context in approaching that issue.

---

[23] The Senate report was issued on August 3, 2007. S. REP. "Mr. Stachnik has since retired from his post as inspector general, and that office said on Monday [Aug. 6] that there has been no new appointee." HedgeWorld Daily News, August 7, 2007.

[24] S. REP., at 15-54. See note 3 for the website address of the Senate Report.

[25] *Id.* at 55-92.

[26] *Id.* at 93-108.

[27] The Senate Report observed:

The OIG investigation into Aguirre's allegations was flawed from the beginning and hindered by missteps during the entire process.  Every step seems to have been based on a desire to go through the motions and close the case.  How the OIG could assess Aguirre's credibility without ever speaking to him remains a mystery. *Id.* at 104.

[28] The Senate Report stated:

One area in need of attention is the OIG's independence from SEC management. The SEC/OIG's investigation of Aguirre's allegations was conducted by Kelly Andrews, who told Committee staff, "We don't second-guess management decisions.*"  Indeed, the OIG's closing memo was based only on representations or explanations from Aguirre's supervisors and documents selectively forwarded to the OIG by those same individuals* (emphasis added).  …  These facts and circumstances do not suggest a sufficient degree of independence.

*Id*. at 104.

## II. THE SCOPE OF THE RECORDS SOUGHT HAS BEEN NARROWED

The scope of Plaintiff's original requests has been sharply narrowed by events. First, and most significantly, the Senate Committees publicly released approximately 4,200 pages of documents, including SEC internal records, sixteen transcripts of current and former SEC employees, and the transcript of the attorney whose call derailed the Mack investigation. The records were released in three sets: the first set of 1,318 pages was released in late May 2007;[29] the second set of 599 pages was released on August 3, 2007;[30] a third set of approximately 2,200 pages was released in approximately October.[31] The SEC has also released approximately 2,800 pages of records, but its redactions have consumed much of the text discussing events that would shed light on whether the SEC gave preferential treatment to Mack.[32]

Second, as the SEC states in its moving papers, the parties have entered into an agreement which narrows the scope of the records sought and the scope of the search the SEC must conduct to locate those records relating to the Pequot investigation.[33] The issue boils down to this: Were the records produced to the Senate pursuant to the Senate's August 2 request for Pequot related records? If so, does a FOIA exemption apply to the records?

Plaintiff's agreement with the SEC does not affect requests 2 through 5 (relating to ethics regulations) and 7 through 12 (relating to his employment) of his letter of December 30, 2005.[34] However, these requests have also been narrowed. The SEC has recently provided Plaintiff with

---

[29] S. HRG. 109-898. Available at:
http://frwebgate.access.gpo.gov/cgibin/getdoc.cgi?dbname=109_senate_hearings&docid=f:35458.pdf (last visited November 28, 2007).

[30] These documents are available at
http://finance.senate.gov/sitepages/leg/LEG%202007/Leg%20110%20080307%20SEC.pdf (last visited November 27, 2007).

[31] This is approximately when Plaintiff learned from the Finance Committee staff that these records were available for review at the Committee's offices.

[32] As stated in note 2 at page 5 of the Memorandum of the Securities and Exchange Commission in Support of Motion for Summary Judgment (hereinafter "SEC Memorandum"), these records were released in batches during the period from May 1, 2007, through September 29, 2007.

[33] SEC Memorandum at 4.

[34] Aguirre Decl. ¶21. See also Complaint, ¶37.

records satisfying requests 2 through 5, and, therefore, Plaintiff is not pursuing any issue associated with those requests. Further, the SEC has withdrawn Exemption 5 as to records relating to Plaintiff's employment,[35] with the exception of one record discussed below.

There are sixth categories of records which remain in dispute. First the SEC has withheld the testimony of five witnesses, a total of seven transcripts, in their entirety. Any reasonable period for withholding these records has expired and the SEC has yet to state an exemption.

Second, the SEC has erroneously relied on Exemption 7(C) in redacting information from two transcripts which refute the SEC's contention it diligently investigated Mack.

Third, the SEC erred by withholding records under Exemption 7(C) produced by Mack which again refute the SEC's contention it diligently investigated him.

Fourth, the SEC has erred in withholding under Exemption 7(C) the names of the Enforcement staff attorneys who continued the Pequot investigation and the names of the senior Enforcement officials who participated in the decision to give Mack preferential treatment.

Fifth, the SEC has erred in withholding information under Exemption 6 defining the extent to which SEC offices were involved in Plaintiff's firing.

Sixth, the SEC should release the original of Plaintiff's Enforcement Personnel File or admit it has been destroyed.

### III. THE SEC CONTINUES TO WITHHOLD
### SEVEN TRANSCRIPTS WITHOUT INVOKING AN EXEMPTION

Plaintiff seeks seven transcripts that the SEC provided Senate investigators which it continues to withhold in this case for more than a year without stating an exemption. For these records, the Vaughn index merely states: "being processed for CT."[36]

---

[35] See Defendant's Ex. 10, attached to Second Declaration of Melinda Hardy.
[36] See Defendant's Vaughn Index items 39, 40, 68, 69, and 260, attached as Defendant's Ex. 14 to Second Declaration of Melinda Hardy.

These seven transcripts and two others (discussed in the next section) record testimony upon which the SEC relies in public statements to defend its decision to drop the investigation of Mack, Pequot, and Arthur Samberg (Pequot's CEO) for suspected insider trading in the stocks of GE and Heller.[37]  These records lie at the heart of this case. In essence, Samberg directed Pequot traders during July 2001 to place an $80 million bet that GE would acquire Heller.[38]  When GE announced its tender offer for Heller on July 30, 2001, Pequot made an $18.9 million profit on its bet.[39] Mack was suspected of tipping Samberg about the merger.

The SEC's protracted delay in processing confidentiality requests cannot be squared with the timeline implied in the regulation (17 CFR §200.83) cited by the SEC in its moving papers.[40] Subsection 200.83(c) requires the submitter to "take all steps reasonably necessary to ensure" that the request for confidentiality is submitted simultaneously with the records delivered to the SEC.  By definition, this requirement is designed to prevent delay. Likewise, subsection 200.83(d) contemplates that the next two steps in the process occur in rapid succession: the FOIA officer must "promptly notify the submitter" if he or she must submit substantiation and the submitter must provide that substantiation within ten days.  Again, this language would avoid delay in the processing of confidentiality requests, thereby allowing the agency to timely respond to a FOIA request from a member of the public, such as the Plaintiff.  Yet, despite of subsection 200.83, the SEC has delayed its decision on these transcripts for at least one year.

---

[37] See SEC Case Closing Report, available at http://www.sec.gov/news/testimony/2006/ts120506lct.pdf (last visited November 27, 2007).

[38] "First, in 2001, Pequot purchased approximately $44 million in Heller Financial stock and sold short approximately $37 million in General Electric stock shortly before a public announcement that GE would acquire Heller." Memorandum from Walter G. Ricciardi to file (June 15, 2006). S. REP., at 132-3 (Ex. 2). See note 3 for the website address of the Senate Report.

[39] See SEC Case Closing Report at 2 available at http://www.sec.gov/news/testimony/2006/ts120506lct.pdf (last visited November 27, 2007).  SEC staff suspected that Mack had tipped Samberg about GE-Heller merger.  *Id.*

[40] SEC Memorandum at 7.

The SEC defends its delay with a rationale that could as well defend an infinite delay. It claims it cannot release these transcripts because "several confidential treatment requesters have appealed the FOIA Office's decision to the Commission's *Office of the General Counsel, and those appeals are pending* (emphasis added)."[41] The lawyers representing the SEC in this matter work out of the same office, the Office of the General Counsel ("OGC"), as the lawyer sitting on the submitters' appeals, Associate Director Richard Humes ("Humes").  Indeed, they report to him.[42] This creates a remarkable opportunity for the SEC's attorneys: by sitting on the appeal, they can manufacture their own cause for seeking a delay of the court's decision on these records.  This is a win-win situation for the submitters, who wish the records withheld, and for the SEC leadership that engaged in the misconduct, was involved in the cover-up, or authorized the release of the SEC's Case Close Report which misled the public about the whole affair. But there are some losers such as market participants and the public, who have a need and a right to know that the SEC has lost sight of its mission. In view of the SEC's failure to timely release these records pursuant to 5 U.S.C. § 552 and agency regulations, Plaintiff requests this Court to order the SEC to immediately release these seven transcripts.

## IV. THE SEC MUST RELEASE INFORMATION
## WITHHELD UNDER EXEMPTION 7(C)

The information sought by Plaintiff and withheld by the SEC under Exemption 7(C) has a common thread. It all sheds light on the core issues: how senior SEC officials gave Mack preferential treatment and how the SEC tried to cover up that fact.  Exemption 7(C) requires the court to balance the privacy interests of third parties mentioned in the records against the public interest in disclosure of the records. *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171 (2004); *United States DOJ v. Reporters Comm. for Freedom of Press,* 489 U.S. 749, 773-75

---

[41] *Id*.
[42] Aguirre Decl., ¶32.

(1989).  In *ACLU v. FBI*, 429 F. Supp. 2d 179, 192 (2005), this court addressed the burdens of proof that apply to the parties on this issue:

> The Defendant bears the burden of establishing that the balance tips in favor of privacy, thereby justifying the withholding of the requested material under the asserted exemptions. 5 U.S.C. § 552(a)(4)(B).  However, it is plaintiff's burden to support its claim that disclosure of withheld information advances the public interest. *King*, 830 F.2d at 234. With respect to disclosure under FOIA, the public interest is limited to that which "sheds light on an agency's performance of its statutory duty" in order to inform the citizens "about what their government is up to." *United States DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773, 103 L. Ed. 2d 774, 109 S. Ct. 1468 (1989)

### The compelling public interest at issue in this case

A convergence of factors have created a compelling "public interest" precisely as that phrase was used in *Reporters Comm. for Freedom of Press* in the disclosure of information about the SEC's handling of its Pequot investigation and its related decision to fire Plaintiff.[43]  To begin with, the most senior officials in the SEC's Enforcement Division engaged in the original misconduct, the entire chain of command—from Plaintiff's Branch Chief through the Director. Each participated in the decision to give John Mack preferential treatment.[44] "The public interest in learning of a government employee's misconduct increases as one moves up an agency's hierarchical ladder." *Trentadue v. Integrity Comm.*, 501 F.3d 1215 (10th Cir. 2007).   As discussed below, the records sought in this case will place a beam of light on that conduct.

The OIG's whitewash of this misconduct means the structure which Congress created to guard against misconduct, waste, abuse, and gross mismanagement also failed at the SEC. See *Nasa v. Fed. Labor Rels. Auth.*, 527 U.S. 229 (1999);[45]  That the Enforcement Division and the OIG, supposedly independent of each other, suffered simultaneous failures—from the top down—is a remarkable coincidence. That both abruptly reopened their respective investigations

---

[43] See Aguirre Dec. ¶¶32, 34 and 35 and  for his statement regarding the high level of public interest raised by the allegations in this case.

[44] S. REP., at 6. See note 3 for the website address of the Senate Report.

[45] S. Rep. No. 95-1071, at 1, 5-7, 9 (1978); H. R. Rep. No. 95-584, at 2, 5-6 (1977).

shortly after Congress started sniffing around is yet another remarkable coincidence.[46] The perfectly choreographed on again off again investigations by Enforcement and the OIG raises the question whether any other offices of the SEC were also involved in the original misconduct or the cover-up of that conduct. The more offices and divisions involved in either the conduct or the cover-up, the greater the possibility that the agency has been captured by the industry whose potential uses the SEC was created to prevent.[47] This was one of the concerns that drove the Senate investigation.[48] This case selectively seeks records that shed a light on that precise issue.

And then there is the nature of the conduct involved—law enforcement giving preferential treatment to suspects with connections.  Branch Chief Robert Hanson told Plaintiff why the Mack subpoena had been blocked: Mack had "political clout," and "powerful political connections" and his counsel will have "juice" He was a "captain of industry" and on and on.[49] Days after the lead investigator (Plaintiff) sent an email to senior SEC officials suggesting Mack was receiving preferential treatment, those same officials promptly concocted a sham

---

[46] *Id*. at 13, 102-3, and 13.

[47] Congress created the SEC when it enacted the 4(a) of the Act, which provides: "There is hereby established a Securities and Exchange Commission (hereinafter referred to as the ''Commission'') to be composed of five commissioners to be appointed by the President by and with the advice and consent of the Senate." The need to create a federal agency to protect the nation's capital markets grew out of the Senate Banking Committee investigation of causes of the market collapse that began in 1929. The Banking Committee that sponsored the bill that became the securities acts and created the SEC. (See Section 4(a) of Securities Exchange Act of 1934). The investigation was lead by its Chief Counsel, Ferdinand Pecora. The Committee that conducted the investigation was later named after him, the Pecora Committee. In his book 1939 book, WALL STREET UNDER OATH: THE STORY OF OUR MODERN MONEY CHANGERS, Pecora wrote about those who had engaged in the manipulative and fraudulent practices that exploited an unknowing public over the securities markets. In his words:

> Before it [Banking Committee] came, in imposing succession, the demigods of Wall Street, men whose names were household words, but whose personalities and affairs were frequently shrouded in deep, aristocratic mystery: J.P. Morgan, Tom Lamont and other partners of J.P. Morgan … and still others. Never before in history of the United States had so much wealth and power been required to render a public accounting.

> *Most of these witnesses were bankers of one sort or another…* (emphasis added) *Id*. at 3-4

[48] "By allowing the perception that 'going over the head' of SEC staff attorneys yields results, the SEC undermines public confidence in the integrity of its investigations and exacerbates the problems associated with 'regulatory capture.'" S. REP., at 37. (Footnotes omitted). See note 3 for the website address of the Senate Report.

[49] *Id*. at 6, 61-62.

reevaluation of his performance and then fired him a month later.[50] In this regard, the Complaint alleged: "Through this complaint, Plaintiff seeks SEC records that will demonstrate that the most senior SEC officials violated these mandates by giving favored, special and thus unlawful treatment to an individual ("Suspect"), who has powerful political connections, in an SEC investigation of significant importance to the nation's capital markets."[51] Few principles are more deeply engrained in Title 17 of the Code of Federal Regulations, which regulates the SEC's operation, than its mandates obligating the SEC to handle all of its affairs, including the enforcement of the securities laws, with impartiality.[52]

The harm to the capital markets, investors, and the public runs deep and wide. When senior SEC officials blocked the Mack subpoena, they derailed an investigation of suspected insider trading by, at that time, the world's largest hedge fund, and possibly involving one of the world's largest investment banks. Samberg and Mack stood at the top of two financial pyramids. If those at the top can get away with insider trading, what message does that send to the tens of thousands who operate at lower levels of the same and other financial pyramids and also have access to nonpublic information? In an editorial about the SEC's handling of the Pequot investigation, *Throwing Back the Big Fish*, The New York Times put it this way: "Among the worst

---

[50] *Id*. at 70-71.

[51] Complaint, ¶ 6.

[52] See 17 CFR 200.55 ("In the exercise of their judicial functions, members shall …impartially determine the rights of all persons under the law."); 17 CFR 200.58: ("A member should not be swayed by partisan demands…."); 17 CFR 200.61: ("A member should not, by his conduct, permit the impression to prevail that any person can improperly influence him, that any person unduly enjoys his favor or that he is affected in any way by the rank, position, prestige, or affluence of any person."); 17 CFR 200.64: ("Members [should] pursue and prosecute … fairly and impartially…all matters which they or others take to the courts for judicial review."); 17 CFR 200.67 ("[T]he necessary rules should be adopted …without fear or favor."); 17 CFR 200.69: ("Members should be …impartial when hearing the arguments of parties or their counsel. … The Commission should continuously assure that its staff follows the same principles in their relationships with parties and counsel."); and 17 CFR 200.735-2(a): ("In view of the effect which Commission action frequently has on the general public, it is important that members [and] employees …maintain unusually high standards of …impartiality…"). The regulations cited above are applicable to both the commissioners and the Staff (17 CFR 200.735-2(b); 17 CFR 200.50; 17 CFR 200.51).

impressions the Securities and Exchange Commission could foster is that it pulls punches on delicate matters involving the rich, powerful and politically connected."[53]

But Mack was not the only big fish the SEC threw back in. If there is no tipper, there is no case against the tippee who exploits the tip. That means the SEC tossed back Pequot and Samberg when it tossed back Mack.  All three swam away from the GE-Heller case without the SEC conducting a serious investigation. There were compelling reasons why Samberg and Pequot should not have gotten a pass on the GE-Heller investigation. Almost one year ago, Plaintiff testified before the Senate Judiciary Committee on this point:

> There were multiple reasons in 2005 to scrutinize Samberg's and PCM's trading over the prior few years for the use of illegal tips. Market surveillance officials of the NYSE told me that PCM and two other hedge funds, which they named, had most often been the subject of insider trading referrals to the SEC in recent years. One of those officials put it this way: "PCM was just too lucky." In the fall of 2004, I had located thirteen other insider trading matters which SROs had referred or highlighted to the SEC over the prior three years involving PCM. None had been investigated. SROs referred another four insider trading matters over the next few months. In response to an SEC subpoena, PCM produced records of yet other SRO referrals. The SEC's New York District Office was also conducting a separate investigation of PCM for possible insider trading arising out of a PIPE transaction. Independently, Hilton Foster (Foster), perhaps the most experienced SEC attorney at conducting insider trading investigations, told me that he had investigated PCM a decade earlier and suspected Samberg and PCM were "serial inside traders."[54]

The SEC's investigation continued to unravel after the decision to block the Mack testimony. Finally, in November 2006, the SEC abandoned the entire investigation without filing an enforcement action against Pequot, Samberg or anyone else. The Senate Report suggests that this

---

[53] *Throwing Back the Big Fish*, N.Y. Times, October 25, 2006, at A18.
[54] *Examining Enforcement of Criminal Insider Trading and Hedge Fund Activity: Hearings Before the U.S. Sen. Comm. On the Judiciary,* 19th Cong., available at http://judiciary.senate.gov/testimony.cfm?id=2437&wit_id=5485 (2006) (statement of Gary J. Aguirre, Former Investigator, U.S. Securities and Exchange Commission, Part I).

Pequot investigation imploded because of a combination of misconduct and poor management by senior SEC officials.[55]

The Senate Report's conclusion that the SEC squandered "an ideal opportunity for the SEC to develop expertise and visibility into the operations of a major hedge fund while deterring *institutional insider trading*" underscores the public interest in SEC's mishandling of the Pequot investigation (emphasis added).[56] Institutional insider trading was also the focus of the Pequot investigation. On his last day at the SEC, in his September 2 letter to Chairman Cox, Plaintiff described the Pequot investigation:

> It is an investigation of suspected insider trading by one of the largest hedge funds in the nation, Pequot Capital Management ("PCM"), arising out of eighteen SRO referrals. Staff who worked on this matter from the beginning—Hilton Foster, Eric Ribelin, Thomas Conroy, and I—believe that PCM engages in an institutionalized form of insider trading that corrupts the financial markets and creates an un-level playing filed (sic) for honest investors.[57]

The focus of the Pequot investigation on *investment banks and hedge funds* touched on a type of insider trading with global dimensions, institutional insider trading. In June 2005, the Federal Services Authority ("FSA"), the United Kingdom's counterpart to the SEC, recognized an "institutionalized" form of insider trading involving investment banks and hedge funds.[58] The FSA suspected that investment banks were giving illegal tips of pending mergers and acquisitions to their best hedge fund customers in return for lucrative hedge fund business.[59]

---

[55] S. REP., at 46. See note 3 for the website address of the Senate Report.

[56] *Id.*

[57] Plaintiff's Exhibit 1.

[58] Richard Fletcher, *Targeted: The Hedge Fund Insider Dealers*, SUNDAY TIMES (London) June 19, 2005, at Business 11.

[59] Martin Dickson, *Insider Trading*, FIN. TIMES (London) June 24, 2005, at 22. Gerard Wynn, *UPDATE 1-Reuters Summit-UK to Probe for Hedge Fund Market Abuse,* REUTERS NEWS, April 4, 2006.

More recently, the FSA, has "uncovered signs of insider dealing at almost a third of British M&A deals, with possible culprits including traders at hedge funds and investment banks."[60]

The same patterns have emerged in the US, except the percentage is higher. A study commissioned by the New York Times and also testimony taken by the Senate Judiciary Committee in September 2006 indicated possible insider trading in advance of forty-one percent of the US mergers and acquisitions over a billion dollars in size during a recent one year period.[61] Indeed, in recent months, the SEC has finally admitted the scale of "insider trading, market manipulation, and illegal short selling" by hedge funds.[62] But the SEC tells the public the phenomenon has only happened over the past year[63] and the SEC is already on top of it.[64]

To sum up, each of the above factors converge to create compelling public interest in the release of information regarding the SEC's investigation of Pequot. It involved the highest levels of the SEC, the most powerful financial institutions, and the heads of those institutions. The only question is the scope and depth of the misconduct at the SEC. The conduct—law enforcement giving preferential treatment—undermines the integrity of the agency itself. Further, the investigation was looking into a species of fraud—institutional insider trading—that appeared to be infecting the capital markets at a global level. Plaintiff has established that a strong public interest in this matter.

---

[60] Gerard Wynn, *UPDATE 1-Reuters Summit-UK to Probe for Hedge Fund Market Abuse*, REUTERS NEWS, April 4, 2006.

[61] Illegal Insider Trading: How Widespread is the Problem and is there Adequate Criminal Enforcement? Hearing Before the U.S. Senate Comm. on the Judiciary, 109th Cong. (2006) (statement of Mr. Christopher K. Thomas, President, Measuredmarkets, Inc.).

[62] "The deputy director for enforcement at the Securities and Exchange Commission, Walter G. Ricciardi, said he has seen a surge in insider trading, market manipulation and illegal short-selling among hedge fund advisers in the last year." Janet Morrissey, *Life after Securities Fraud* N.Y. Times, Nov. 2, 2007, at C6.

[63] *Id.*

[64] "He attributes the increase to a new generation of people in the financial services sector who were not around to see traders like Ivan Boesky and Michael R. Milken 'led out in handcuffs.'" *Id*.

### *"An SEC impropriety might have occurred"*

According to a recent DC Circuit case, a submitter seeking to overcome a 7(C) Exemption based on improper government conduct must "produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred." *Boyd v. Crim. Div. of the United States DOJ,* 475 F.3d 381, 387 (D.C. Cir. 2007). The Senate Report, the documentary evidence cited in the Report, and Plaintiff's Declaration and exhibits, including his testimony before the Senate, all establish that an SEC "impropriety might have occurred."

The Senate investigation primarily focused on the SEC's handling of one case, Pequot's trading in the common stocks of GE and Heller. During July 2001, Pequot placed an $80 million bet that GE would make a tender offer for Heller.[65] That was an excellent bet. On July 30, 2001, GE announced its tender offer for Heller stock at a 50% premium. The Senate Report discussed the extraordinary trades Samberg made and the bigger ones he tried to make:

> When an acquisition is announced, the price of the purchasing company typically falls, and the price of the purchased company typically rises. …
> Samberg directed the purchase of "a little over a million shares" of Heller Financial stock in July 2001, before GE's acquisition was announced at an estimated cost between $34 and $38 million. He directed Pequot to short shares of GE during the same time period. Just after the acquisition was announced, Samberg sold the Heller stock and covered the GE short position, resulting in approximately $18 million in profits over a period of a few weeks.
> Pequot's trading in Heller and GE is summarized in Figure 1 and Figure 2 [[66]]… As illustrated in the figures, Samberg attempted to purchase many more shares of Heller than his traders could safely execute without driving up the price. On some days, he authorized purchases of well over 200% of the total daily volume of trading in Heller.[67]

---

[65]Aguirre Dec. ¶9. See also Plaintiff's Ex. 3. "Samberg risked $80,000,000 of PCM assets belonging to sophisticated institutional investors."

[66] Figures 1 and 2 are attached as Plaintiff's Exhibits 26 and 27 respectively.

[67] S. REP., at 15. (Footnotes omitted). See note 3 for the website address of the Senate Report.

Even though Pequot traders were unable to satisfy Samberg's "buys" of Heller stock, Pequot still bought more Heller stock than any other purchaser in the nation during the month before the announcement.[68]

According to the Senate report, Pequot normally employed "a research driven approach" to guide its investments in public companies.[69] It did not apply to the GE and Heller trades. The Senate Report described the lack of any supporting research for Samberg's extraordinary trades in GE and Heller:

> During the SEC investigation, Arthur Samberg testified that he decided to purchase Heller stock without any assistance, advice, or consultation with the fund managers he had hired to analyze possible investments for Pequot. Though he testified generally about outside analyst reports, Samberg did not ''have a clear recollection of reading any analyst's report in that time period.'' He could not identify even a single analyst's report upon which he relied in making the decision to purchase Heller Financial shares in July 2001.
>
> When asked how long he had been following Heller Financial stock prior to buying over one million shares, Samberg testified, ''I really had not [followed] Heller Financial closely in the way people follow stocks before it was purchased.'' Samberg's account described the trades in Heller and GE as being executed contrary to the regular process for investments at Pequot. Taken together, the timing of the trades, the lack of consultation or advice, the unsuccessful attempts to purchase even larger amounts of Heller stock prior to the acquisition, Samberg's evolving rationalizations for the trades, and the NYSE advisory all add up to circumstances that are, at the very least, suspicious. These transactions suggest that a thorough and wide-ranging investigation was needed.[70]

Still, at the first session of his testimony, Samberg tossed out six reasons why he had gone on the Heller buying spree. Those reasons vanished by the second session of Samberg's testimony a month later. Plaintiff testified to this point during his December 5, 2006, testimony before the Senate Judiciary Committee:

---

[68] *Examining Enforcement of Criminal Insider Trading and Hedge Fund Activity: Hearings before the U.S. Sen. Comm. On the Judiciary,* 19th Cong., statement of Gary J. Aguirre, Former Investigator, U.S. Securities and Exchange Commission, available at http://judiciary.senate.gov/hearing.cfm?id=2437 (last visited November 27, 2007).

[69] S. REP., at 15. See note 3 for the website address of the Senate Report.

[70] *Id*. at 16. (Footnotes omitted).

At the first session of [Samberg's] testimony in early May, Samberg gave six reasons for his decision to buy Heller stock. Before the second session, I subpoenaed the documents that his lawyers had shown Samberg before he testified. It turned out that Samberg's attorneys, and not Samberg, had done the research why Samberg bought Heller in 2001, but that research was done four years after Samberg had directed the trades. None of the records Samberg's attorneys had shown him came from PCM's or Samberg's files.[71] Nor could Samberg recall ever seeing these records before. In short, his attorneys had spoon-fed him his testimony.[72]

The Senate Report summarized how this played out:

### 4. The Arthur Samberg Testimonies

The SEC took Arthur Samberg's testimony twice before Gary Aguirre was fired, and once afterward. In his first session of testimony on May 3, 2005, Arthur Samberg listed a number of specific reasons that he claimed motivated him to purchase Heller stock in July 2001. In his second session on June 7, 2005, it became clear that each of the reasons he had previously indicated was highlighted in a Legg Mason analyst report that Samberg had reviewed in preparation for his May 3 testimony. During cross-examination by Gary Aguirre, Samberg conceded that he did not recall reviewing the report before ordering the trades and probably would not have done so because it was "sell-side research,'' which Samberg had said publicly was not ''worth a damn." SEC investigators believed that given these circumstances, Samberg's initial story appeared to be an after-the-fact rationalization using the Legg Mason report as source material.[73]

On this point, Plaintiff's cross examination of Samberg at his second examination reads as follows:

> Q   Have you seen this report in any e-mail dated before July 30, 2001?
> A   I don't recall seeing it.
> Q   Do you have a high regard for sell side analysts?
> A   I have a high regard for them as people.  I don't have a high regard for using their reports to make investment decisions.
> Q   It would have been very unusual for you to rely on a sell side report, would it not, in making an investment decision?
> A   Historically, that is true.
> Q   In fact, isn't it true, sir, that you don't think they're worth a damn?

---

[71] "Q. In that regard. What have you done to try to find the analyst's report that you considered in making your decision to invest in Heller Financial? A. My attorneys did a literature search." *Id*. at 128 (Ex. 1, Samberg's May 3, 2005 testimony).

[72] *Examining Enforcement of Criminal Insider Trading and Hedge Fund Activity: Hearings before the U.S. Sen. Comm. On the Judiciary,* 19th Cong., available at http://judiciary.senate.gov/testimony.cfm?id=2437&wit_id=5485 (2006) (statement of Gary J. Aguirre, Former Investigator, U.S. Securities and Exchange Commission) (last visited November 27, 2007).

[73] S. REP., at 23. See note 3 for the website address of the Senate Report.

A   In general, I don't think their reports are worth a damn.  The people can be, but not the reports.

Q   Right.  And you've made that statement publicly, have you not?

A   I have.

Q   So this is -- Exhibit 19A is sell side research, is it not, sir?

A   Sure is.

Q   Exactly what you said isn't worth a damn.  Correct?

A   You bet.

Q   So is it fair to say that the research you saw in July 2001 about Heller Financial also wasn't worth a damn?

A   I really don't know what I saw.[74]

By mid-June 2005, Plaintiff's supervisors decided the evidence he had uncovered of Pequot's possible insider trading should be presented to criminal authorities in connection with a possible criminal investigation, including an investigation of possible insider trading by Samberg, Pequot and Mack for the trading in GE and Heller. Again, the Senate report tracks this development:

In mid-June, [Assistant Director] Kreitman told [Associate Director] Berger it was time to consider briefing criminal prosecutors about the case. Berger then called the chief of the Securities and Commodities Fraud Section at the U.S. Attorney's Office for the Southern District of New York. On June 14, 2005, Kreitman asked Aguirre to walk him through the evidence of Pequot's suspicious trades. Aguirre prepared a tabbed binder with hundreds of pages of documents including both blue sheet data reflecting Pequot's trades and Samberg's e-mail exchanges. The following day, Aguirre, Eric Ribelin, and an SEC intern traveled to New York to meet with two FBI agents and an Assistant U.S. Attorney.  Among other things, Aguirre briefed them on Pequot's suspicious trading (1) in advance of the GE acquisition of Heller, (2) in Microsoft stock, and (3) in AstraZeneca and Par Pharmaceuticals. On June 15, 2005, the SEC attempted to interest the Department of Justice in opening up a parallel proceeding to investigate Pequot.

The Report also tells how Plaintiff's supervisors perceived by his work to this point:

Aguirre's supervisors considered the presentation a success.  After Aguirre previewed the presentation for Kreitman, he gave Aguirre a motivational award in recognition of developing the case into a potentially criminal matter. The award was a photocopied picture of Raymond Burr, which Kreitman described as "the Big Perry" in reference to Burr's portrayal of the fictional, legendary attorney Perry Mason.[75]

Eight days later, the investigation hit a wall. Morgan Stanley's board retained Mary Jo White ("White"), a former US Attorney, to evaluate whether John Mack had any exposure in the SEC's

---

[74] S. HRG. 109-898, at 603 (SEC 871-80). See also Aguirre Decl. ¶9 and Plaintiff's Ex. 3.

[75] S. REP., at 24. See note 3 for the website address of the Senate Report.

Pequot investigation. Morgan Stanley had just lost its CEO and needed a new one in a hurry. White made direct contact with Enforcement Director Linda Thomsen ("Thomsen") regarding Morgan Stanley's the possibility of an insider trading case against Mack. The Senate Report also addresses White's contacts with Thomsen and their consequences.

> In June 2005, Morgan Stanley's Board of Directors hired former U.S. Attorney Mary Jo White to determine whether prospective CEO John Mack had any exposure in the Pequot investigation. White contacted Director of Enforcement Thomsen directly, and other Morgan Stanley officials contacted Associate director Paul Berger. Soon afterward, SEC managers prohibited the staff from asking John Mack about his connections with Arthur Samberg at Pequot.[76]

The report also indicates that both Thomsen and Berger misled Senate investigators about the information they provided White and a Morgan Stanley attorney just before its board decided to hire Mack. [77]

The Senate report details the reason Plaintiff's immediate supervisor gave for blocking the Mack subpoena: Mack's political clout. On this point, the executive summary to the Senate Report reads:

> **Staff Attorney Gary Aguirre said that his supervisor warned him that it would be difficult to obtain approval for a subpoena of John Mack due to his "very powerful political connections."** Aguirre's claim is corroborated by internal SEC emails, including one from his supervisor, Robert Hanson. Hanson also told Aguirre that Mack's counsel would have "juice," meaning they could directly contact the Director or an Associate Director of Enforcement.[78]

After a detailed discussion of the evidence, the Senate Report concludes:

> The weight of this evidence suggests that Hanson likely referenced Mack's "political connections," "political clout," or words to that effect. The evidence suggests Hanson did so on multiple occasions in conversations about taking Mack's testimony during the summer of 2005, beginning around the same time as Morgan Stanley's inquiries about the SEC's interest in Mack on June 23. However, the evidence also suggests Hanson was

---

[76] *Id*. at 5.
[77] *Id*. at 30-31.
[78] *Id*. at 5.

not referring to partisan political considerations, but rather to his prominence and his ability to hire counsel with direct access to senior SEC officials.[79]

The Senate Report also found that Mack received preferential treatment. On this point, the Report reads:

> The evidence suggests that the bar for taking other testimony in the Pequot investigation was considerably lower than it was for Mack. If he were a mid-level trader instead of the head of Morgan Stanley, it seems likely that a subpoena would have issued in short order with little or no interference from Aguirre's supervisors. Unfortunately, we have received anecdotal reports that the sort of deference Mack received is not uncommon. It is reportedly driven by a perception within the SEC, which Hanson alluded to in his e-mail, that investigations involving prominent individuals can be slowed or halted by contacts from outsiders with direct access to the most senior SEC officials. By allowing the perception that ''going over the head'' of SEC staff attorneys yields results, the SEC undermines public confidence the integrity of its investigations and exacerbates the problems associated with ''regulatory capture.''[80]

The executive summary to the Senate Report also explains how Plaintiff's email to Berger and Kreitman, Hanson's supervisors, questioning the decision to give Mack preferential treatment, led to his firing. On this point the Senate Report reads:

> **The SEC fired Gary Aguirre after he reported his supervisor's comments about Mack's ''political connections,'' despite positive performance reviews and a merit pay raise.** Just days after Aguirre sent an e-mail to Associate Director Paul Berger detailing his allegations, his supervisors prepared a negative re-evaluation outside the SEC's ordinary performance appraisal process. They prepared a negative re-evaluation of only one other employee. Like Aguirre, that employee had recently sent an e-mail complaining about a similar situation where he believed SEC managers limited an investigation following contact between outside counsel and the Director of Enforcement.[81]

The Senate Report tells how the SEC was alerted to Pequot's trading in Heller and its failure to look into that trading for three years: "The Heller transactions were initially highlighted in an advisory from the New York Stock Exchange (NYSE) to the SEC Enforcement Division as

---

[79] *Id*. at 62.
[80] *Id*. at 37.
[81] *Id*. at 6.

suspicious. Nearly three years later, the matter was investigated by SEC Enforcement Staff Attorney Gary Aguirre who also discovered that Pequot had shorted GE."[82]

The Report went into greater detail about this delay:

> It appears that the SEC did little to investigate these Trades [Pequot's Heller trades] until after Gary Aguirre joined the Commission over two years later on September 7, 2004. In fact, it is clear that Aguirre was the driving force behind the investigation of the GE-Heller trades that had otherwise remained dormant at the SEC. The original investigation of Pequot was opened on other suspect trades that were investigated prior to Aguirre's employment. It was not until Aguirre took over the case that the investigation made real progress in examining suspect trades in GE and Heller.[83]

And then there was the matter of Berger's career choice. In the words of the Senate Report:

> Associate Director Paul Berger contacted Debevoise & Plimpton about potential employment just days after he initialed Aguirre's termination notice. Even though Debevoise had represented Mack's employer, Morgan Stanley, Berger did not recuse himself until four months later, in early 2006. Although Robert Hanson testified that the SEC took Mack's testimony, ''as soon as we could,'' it appears that the SEC did very little to investigate Mack's potential role in the period between Aguirre's firing in September 2005 and Berger leaving the Commission in the spring of 2006.

Plaintiff submits that he has produced "evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred."

### *The information is likely to advance the public interest.*

The SEC released its own Case Closing Report on December 4, 2006, telling of its diligent investigation of Mack. According to its report, the SEC looked high and low for evidence that Mack had tipped Samberg.  It took testimony and obtained records from seven witnesses and interviewed one other. It scoured emails, calendars and other records, but ultimately could find

---

[82] *Id.* at 15.
[83] *Id*. at 16.

22

"no evidence" that Mack had tipped Samberg about the GE-Heller merger.  Finding none, it abandoned the investigation.[84]

The Senate Report and the SEC Case Closing Report cannot both be true. The SEC could not have "squandered" an "ideal opportunity" to deter "institutional insider trading" in conducting its investigation of Pequot's trading in GE-Heller, as the Senate Report found, yet have left no stone unturned in same investigation, as the SEC claims. Plaintiff offers a simple answer to this paradox: the SEC Case Closing Report is utter fiction. It is inaccurate on many points and misleading on the rest. The timing of its release and the explanation of the SEC official who released it tell its purpose: to assuage *public concern* about its handling of the Pequot investigation.

The SEC completed its report on November 30, 2006, and released it to the media four days later as an attachment to the testimony of Enforcement Director Linda Thomsen.[85] That was the day before Thomsen and other senior SEC officials were sworn in by the Senate Judiciary Committee to testify about their handling of the Pequot-Mack investigation.[86]  Plaintiff can find no evidence that the SEC has ever released a document called a "case closing report" to the public in its seventy-two year history.[87] So, why a singular exception for the Pequot investigation

---

[84] SEC Case Closing Report, Nov. 30, 2006, available at
http://www.sec.gov/news/testimony/2006/ts120506lct.pdf (last visited November 27, 2007).
[85] *Examining Enforcement of Criminal Insider Trading and Hedge Fund Activity: Hearings Before the U.S. Sen. Comm. On the Judiciary,* 19th Cong., available at http://www.sec.gov/news/testimony/2006/ ts1205 06lct.pdf (2006) (statement of Linda C. Thomsen, Director of Enforcement, U.S. Securities and Exchange Commission) at 33-39(last visited November 27, 2007).
[86] The Senate Report stated:
    On December 5, 2006, the Committee's third hearing focused on allegations that (1) the SEC mishandled its investigation of a major hedge fund, Pequot Capital Management, (2) the SEC fired its lead investigator in retaliation for reporting evidence of improper political influence on the investigation, and (3) the SEC's Office of Inspector General failed to conduct a serious, credible inquiry into the fired attorney's allegations.
S. REP. at 1. See note 3 for the website address of the Senate Report.
[87] Only one "case closing report" can be found on the SEC website, the one released by the SEC for Pequot on December 4, 2006. A Google search for "case closing report" and "Securities and Exchange Commission" pulls up only the same case closing report on the Pequot investigation. A search of the Lexis source "SEC Decisions, Orders

and who made the decision? Enforcement Director Thomsen solved this mystery in her written testimony of December 5, 2006. The decision was made at the top—by the five Commissioners. Thomsen testified: "Because of the *public attention* this case has received, the Commission has authorized the Division to make its closing memorandum available to the public, and it is attached to my testimony (emphasis added)."[88] If the release of the SEC Case Closing Report was warranted by the "public attention" on the SEC's handling of the Pequot investigation, the same "public attention" warrants the release of records that demonstrate the SEC Case Closing Report grossly misled the public it was intended to influence.

Within the limits of FOIA and his requests, Plaintiff seeks the records that will shed light on the SEC's own account of its investigation of Pequot's trading in GE and Heller. They are the following records:

1)  The seven transcripts the SEC refuses to release without citing an exemption (discussed in Section III of this memorandum);

2)  The transcripts of the examinations of two CSFB employees without redactions (discussed in this section);

3)  Mack's itinerary relating to his meetings with CS officials in Switzerland and the two calendars regarding his contacts with other CSFB officials.

4)  The records previously released by the SEC without redactions of the names and capacities of (1) SEC Enforcement staff (James Eichner and Liban Jama) who replaced

---

and Releases" produces a "No documents found" for the phrase "case closing report", which means the phrase has never been used since Lexis began electronically maintaining the SEC's decisions, releases and orders.

[88] *Examining Enforcement of Criminal Insider Trading and Hedge Fund Activity: Hearings before the U.S. Sen. Comm. On the Judiciary,* 19th Cong., available at http://www.sec.gov/news/testimony/2006/ ts1205 06lct.pdf (2006) (statement of Linda C. Thomsen, Director of Enforcement, U.S. Securities and Exchange Commission) at 5-6(last visited November 27, 2007).

Plaintiff on the Pequot investigation, (2) Supervisory Enforcement attorneys working on the Pequot investigation.

### The SEC erroneously withholds Mack's itinerary under Exemption 7(C)

One key issue in both the Senate Report and the SEC Case Closing Report was whether Mack could have learned about the GE-Heller merger during his negotiations to become CEO of Credit Suisse First Boston ("CSFB"). CSFB was advising Heller on the merger. The key date was Monday, July 2, 2001, when Samberg "sought to buy" almost sixty percent of the Heller stock sold that day.[89] What would have prompted Samberg's buying spree in Heller stock? The mystery grew when Samberg ultimately conceded he had no explanation.[90] And the mystery grew when no Pequot records hinted at a reason,[91] grew again when Samberg said he discussed his decision with no one, and grew again when Samberg testified he did not follow Heller.[92]

Emails did reveal, however, that Mack had called Samberg the prior Friday evening, June 29, 2001. Mack had recently left Morgan Stanley, advisor to GE on the merger, and was engaged in ongoing negotiations to become the CEO of CSFB,[93] advisor to Heller on the merger.[94] A tip on the GE-Heller merger that evening would explain Samberg's Heller buying spree the next trading day. A key question for SEC investigators was this: Did Mack meet with anyone shortly

---

[89] On, July 2, 2001, Samberg bought 118,000 shares of Heller stock and "sought to buy" 223,700 shares, which were 30.34 percent and 57.52 percent of the total sales volume of Heller stock on that day. Samberg's trading during July 2001is summarized at a table to the Senate Report as Figure 1, (S. REP., at 47, also attached as Plaintiff's Ex. 26) and graphically portrayed as a chart as Figure 2 to the Senate Report (S. REP., at 48, also attached as Plaintiff's Ex. 27). See note 3 for the website address of the Senate Report.

[90] S. HRG. 109-898, at 603-5 (SEC 872-4), also attached as Plaintiff's Ex. 10. See also S. REP., at 16, 23, 283-314 (Ex. 19) and *Id.* at 129 (Ex. 1).

[91] S. HRG. 109-898, at 603-7 (SEC 871-80), also attached as Plaintiff's Ex. 10. "Q. In that regard. What have you done to try to find the analyst's report that you considered in making your decision to invest in Heller Financial? A. My attorneys did a literature search." S. REP. at 128 (Ex. 1). See also *Id.*, at 129 (Ex. 1) and 284 (Ex. 19).

[92] "During the SEC investigation, Arthur Samberg testified that he decided to purchase Heller stock without any assistance, advice, or consultation with the fund managers he had hired to analyze possible investments for Pequot." *Id.* at 16. "I really had not [followed] Heller Financial closely in the way people follow stocks before it was purchased." *Id.*, at 130 (Ex. 1).

[93] *Id* at 11, 24.

[94] *Id*.

before his June 29 call to Samberg that could have mentioned the GE-Heller merger? Plaintiff's emails to his supervisors in the summer of 2005 explained the most probable path of the information flow on the GE-Heller merger: from CS or CSFB to Mack around June 29 and then from Mack to Samberg on June 29.[95] For that reason, Plaintiff was preparing to issue a subpoena to Mack for his testimony until his supervisors blocked those plans nine days after they green lighted Plaintiff to seek a criminal investigation of Mack.[96]

When the Senate began asking questions in April 2006, the SEC did not have many answers why it blocked the Mack subpoena the prior summer. The Senate Report puts it this way:

> As it became clear that the SEC would have to answer more detailed questions about its handling of the case, it took the testimony of two CSFB executives who had recruited John Mack. Taking their testimony was the SEC's first step toward preparing to take Mack's testimony in the nine months since Aguirre was fired.[97]

The SEC claims it got just what it needed from the two CSFB employees to deflate the theory that Mack had learned from them about the GE-Heller merger. The SEC Case Closing Report summed up these two examinations:

> On July 27, 2006, the staff took the testimony of two CSFB employees, a former CFO and a company lawyer, who were both involved in recruiting Mack. Both denied knowing about the merger before it was publicly announced, let alone telling Mack anything about it, and the documentary evidence did not contradict their denials.[98]

That sounds as if the SEC had buttoned up the point, but there were some holes: many holes and big holes.

The Senate Report noted a significant omission from the SEC's account who Mack met with just before his call to Samberg. It reads:

---

[95] Aguirre Dec. ¶9. See also Plaintiff's Ex. 3.

[96] *Examining Enforcement of Criminal Insider Trading and Hedge Fund Activity: Hearings Before the U.S. Sen. Comm. On the Judiciary,* 19th Cong., available at http://judiciary.senate.gov/testimony.cfm?id=2437&wit_id=5485 (2006) (statement of Gary J. Aguirre, Former Investigator, U.S. Securities and Exchange Commission, Part I).

[97] *Id.* at 40.

[98]    SEC    Case    Closing    Report,    Nov.    30,    2006,    at    2.    Available    at http://www.sec.gov/news/testimony/2006/ts120506lct.pdf (last visited November 27, 2007).

The case closing report concludes its analysis of the GE-Heller trades by finding, among other things, that ''it is extremely unlikely that Mack tipped Samberg about the merger between GE and Heller, having found no evidence that Mack knew about the merger before Samberg started purchasing Heller stock.'' *How hard did the SEC look for such evidence?* Significantly, the case closing report fails to mention Mack's trip to Switzerland on June 26-28, 2001, to meet with Credit Suisse officials about the prospect of Mack accepting a position as CEO of CSFB. This was the period just before he spoke with Samberg and was let in on the Fresh Start deal. During his August 1, 2006, testimony, Mack confirmed that a copy of *his Swiss trip itinerary indicated* that he met with other Credit Suisse personnel who may have had knowledge of the GE-Heller deal (emphasis added).[99]

The SEC asserts Exemption 7(C) in refusing to release Mack's trip itinerary referred to in the italicized language above.

The Senate Report offers further explanation regarding the significance of this record:

The most significant aspect of the Mack testimony is his acknowledgement that he went to Switzerland to discuss becoming CSFB's CEO from July 26-28, 2001. While there, Mack met with senior representatives of Credit Suisse—CSFB's parent company. In view of the fact that Mack also spoke with Samberg immediately upon his return to the United States on July 29, 2001, the trading day before Samberg began heavily betting on Heller Financial stock, and on the same night Mack was permitted into a lucrative deal, there was more than a sufficient basis to justify taking Mack's testimony in the summer of 2005.[100]

The failure of the SEC to investigate whether Mack learned of GE-Heller merger during his meeting in Switzerland cannot easily be dismissed as an oversight. In his July 25, 2005, email to Berger and Kreitman, Plaintiff explained why the SEC need to ask Mack about his Swiss contacts "during the critical period before July 2." On this point, the email reads:

"[A]ll communications regarding Mack's position at CSFB during the critical period before July 2 were between Mack and Credit Suisse Group Chairman Lukas Mühlemann **in Switzerland**, except for two meetings with CSFB CFO and a CSFB attorney. … When I ask about it, his underlings tell me Lynch is looking into it. Patalino [CSFB attorney] has politely suggested: "Why don't you get it from Mack?" (See attachment 14) *Until we talk to Mack, we don't know who he might have spoken with at CSFB before he was hired* (only italics added)."[101]

---

[99] S. REP., at 43. (Footnotes omitted). See note 3 for the website address of the Senate Report.
[100] *Id.* at 44.
[101] S. HRG. 109-898, at 758 (SEC 1324).

In short, the SEC took the wrong examinations. Neither the CSFB CFO nor the company lawyer, whose examinations were taken by the SEC, met with Mack during the critical period before July 2. Mack's key contacts were with the CS officials in Switzerland on June 26, 27, and 28, 2001. The SEC never questioned any of the CS officials with whom Mack met. Nor did they disclose in the Case Closing Report that Mack had met with these officials at the critical time. In short, the SEC gave the misleading impression that its staff had questioned the CS-CSFB officials who had met with Mack at the key time.

Ironically, it is Mack's itinerary and postings to his calendar that refute the SEC's contention that Mack could not have learned about the GE-Heller merger from CS or CSFB. His itinerary[102] establishes his meetings in Switzerland for three days with CS officials from whom he could have learned of the GE-Heller merger.[103] The three days of meetings finished on June 28, 2001, the day before his June 29, 2001, call to Samberg. The two Mack calendars[104] probably identified some of the same and other CS and CSFB officials with whom Mack met in June and early July 2001.[105] The SEC did not even question Mack about any of these meetings until the statute of limitations had run.[106]

The postings to Mack's calendar and the itinerary of his meetings with CS-CSFB officials shed light on the magnitude of the SEC's failure to diligently investigate Mack. Put differently, how many holes are there in the SEC's theory that it diligently investigated Mack and how big

---

[102] Identified in the Vaughn index as Ex. 52.

[103] "Mack confirmed that a copy of his Swiss trip itinerary indicated that he met with other Credit Suisse personnel who may have had knowledge of the GE-Heller deal." S. REP., at 43.

[104] Identified in the Vaughn index as Exs. 150 and 151.

[105] See Aguirre Decl. ¶36.

[106] The Senate Report reads:

The five-year statute of limitations for any Department of Justice criminal enforcement action against Pequot, Samberg, and Mack expired on or around July 27, 2006…[W]hen the SEC finally did take Mack's testimony on August 1, 2006, it did so five days *after* the  statute of limitations period applicable to civil and criminal penalties expired.

S. REP., at 41. See note 3 for the website address of the Senate Report.

are the holes? The number and size of these holes speaks to the degree of the SEC's failure to investigate the obvious. Those holes also demonstrate, as the Senate Report suggests, that the SEC's reopened investigation of Mack was not a serious one.[107] The public has a right to know that the SEC wastes its resources pretending to conduct investigations to salvage its public image, damaged by earlier misconduct, when real investigations need to be conducted to protect real investors and the nation's capital markets.[108]

### The SEC erroneously asserted exemption 7(C) in withholding information from the transcripts of the two CSFB officials

The SEC released the transcripts of the CSFB CFO and the company attorney who met with Mack, but redacted critical information: Mack's meetings with specific CS and CSFB officials during his trip to Switzerland from June 26 through June 28, 2001. The SEC also redacted the names of the individuals who spoke by phone with Mack during the same critical period. Redacting the names makes it impossible to determine how many CS officials met with Mack, how high they were in the CS hierarchy, what their connections were with CSFB and countless other factors which shed light on whether the SEC should have questioned these individuals. Again, these facts establish how many holes and how big the holes are in the SEC statement to the public that it eliminated CSFB as a source of the GE-Heller merger to Mack.

---

[107] The Senate Report reads:

How hard did the SEC look for such evidence? Significantly, the case closing report fails to mention Mack's trip to Switzerland on June 26-28, 2001, to meet with Credit Suisse officials about the prospect of Mack accepting a position as CEO of CSFB. This was the period just before he spoke with Samberg and was let in on the Fresh Start deal. During his August 1, 2006, testimony, Mack confirmed that a copy of his Swiss trip itinerary indicated that he met with other Credit Suisse personnel who may have had knowledge of the GE-Heller deal.

*Id.* (Footnotes omitted). See note 3 for the website address of the Senate Report.

[108] On its website, the SEC describes its mission as follows: "**The Investor's Advocate: How the SEC Protects Investors, Maintains Market Integrity, and Facilitates Capital Formation**. The mission of the U.S. Securities and Exchange Commission is to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation." About the SEC, available at http://www.sec.gov/about/whatwedo.shtml (Last visited November 28, 2007).

There were also other redactions from the transcripts that appear unwarranted. For example, the SEC attorney asked one of the witnesses: "In this period in 2001 to August 2001 did you have any investment in GE?"[109] The answer was two pages in length, all redacted. This was a CSFB witness whose examination was being taken on the theory he might have told Mack about the GE-Heller merger. The only relevance of the question was to ascertain whether the witness might have had a heightened interest in the GE merger.

There is little if any privacy interest at stake of the individuals whose names were mentioned in the CSFB transcript. The partial transcript of the Mack testimony, attached as Exhibit 35 to the Senate Report, includes the names of the CSFB and CS officials with whom Mack met during June and early July 2001.[110] Their titles and job descriptions are therefore available in multiple websites.[111] The two CSFB officials testified about their meetings with Mack, not anything related to their personal lives. The redaction of all names from the transcripts simply makes it impossible to link specific conversations between Mack and any specific CS-CSFB official. That tends to make the transcripts useless, which disserves FOIA's purpose. In sum, the compelling public interest in disclosure of this information far outweighs the minimal interest, if any, privacy interest of those mentioned in the transcripts. Hence, the transcripts should be released with no redactions, absent a compelling privacy interest which does not appear to be the case.

### *The SEC's has erroneously redacted the names of senior Enforcement attorneys and staff attorneys conducting the Pequot investigation*

---

[109] Unidentified CSFB witness testimony taken on July 27, 2006, at 20. SEC 0002321.

[110] Mack testified that he met with Walter Kielholz, Daniel Vasella, Lukas Muhlemann, Thomas Wellauer, Oswald Grubel and Peter Brabeck in Zurich between June 26 and June 28, 2001. He also testified he met with Aziz Syriani on July 2, 2001. Mack also disclosed possible contacts with Dick Thornburgh. S. REP., at 413-32 (Ex. 35, Testimony of John Mack, excerpt (Aug 1, 2006)) See note 3 for the website address of the Senate Report.

[111] For example, Credit Suisse's website provides a detailed resume with photo of Mr. Grubel (http://www.credit-suisse.com/governance/en/pop_s_cv_grubel.html); so does wikipedia.com with Mr. Brabeck (http://en.wikipedia.org/wiki/Peter_Brabeck-Letmathe), and Forbes.com lists a profile of Mr. Kielholz (http://www.forbes.com/finance/mktguideapps/personinfo/FromPersonIdPersonTearsheet.jhtml?passedPersonId=911174).

The question whether the SEC conducted a diligent investigation of Mack, as it contends, or gave him preferential treatment, as the Senate Report found, puts the focus directly on the attorneys who worked on the Pequot investigation. That would include Plaintiff's former chain of command, but also other senior Enforcement officials involved in the Pequot case after Plaintiff's departure, including Associate Directors Peter Bresnan ("Bresnan")[112] and Walter Ricciardi ("Ricciardi").[113] It would also include the staff attorneys who replaced Plaintiff after his departure, Liban Jama and James Eichner.

The SEC redacted the names of all Enforcement attorneys working in the Pequot investigation except Thomsen, Berger, Kreitman, and Hanson. Why these four and not others? The SEC has two rationales. First, the SEC correctly states that these are the four senior SEC officials who, according to Plaintiff's allegations, gave Mack preferential treatment.[114] Second, each of the four testified at a public hearing before the Senate Judiciary hearing on the Pequot investigation.[115] For the same reasons in logic and under FOIA law, however, the SEC should not have redacted the names of Jama and Eichner from the records it released.

Senior SEC officials would not normally conduct the day to day investigation of Mack, Samberg, and Pequot. That is the role of the staff attorney, including Plaintiff and the two attorneys who replaced him on the Pequot investigation. Thus, the records mentioning those staff attorneys would shed light, perhaps the brightest light, on whether the Pequot investigation was being diligently prosecuted by their supervisors. The staff attorneys' emails to each other and to and from their supervisors record events that speak directly to the SEC's diligence.

---

[112] Bresnan appeared as one of the attorneys representing the SEC at the examination of John Mack. Additionally, emails from Kreitman and Hanson indicate that they are likely communicating from time to time with more senior attorneys within Enforcement. S. REP., at 412 (Ex. 35). See note 3 for the website address of the Senate Report.

[113] According to his memo of June 15, 2006, Ricciardi became involved in the Pequot investigation on May 24, 2006. *Id.* at 132 (Ex. 2).

[114] SEC Memorandum at 18-9.

[115] *Id.* note 1 at 4.

The Senate Report offers an excellent example of this point.  It involves Assistant Director Kreitman's request—on short notice—to Jama that he take the examinations of the two CSFB officials discussed above.   According to the Senate Report, Jama responded by sending a "carefully worded email" to Kreitman saying:

> [G]iven the critical nature of the testimony that is to be taken, the lack of preparatory time for the testimony . . . and my lack [of] specific knowledge of the record regarding this portion of the investigation, I would not feel comfortable taking the testimony this Thursday. . . . [I]f I was given a sufficient period of time to familiarize myself with the documents . . . and sufficient preparatory time . . . I would be willing to pitch in. My goal, as always, is to do [a] complete and thorough job on any matter.[116]

As the Senate Report tells and the transcript confirms, Jama had reason to push back:

> He [Kreitman] said, "*You don't need to prepare that much for it*," which I found to be strange, and I relayed that to folks. So, yeah, he didn't feel like I needed to be prepped, . . . which I thought was unusual in my mind.
>
> * * *
>
> I just thought it was an unusual request to make of me—and, quite frankly, unfair.  I thought he put me in a difficult position (emphasis added).[117]

Jama was in a difficult position. He was a relative newcomer to the SEC. He had been a transaction attorney with little or no courtroom or deposition experience. By his own statement, he had little knowledge of the facts relevant to taking the examination of the two CSFB officials. Hence, Kreitman could not have expected Jama to take this "critical" examination without considerable preparation.

Further, Jama knew that he would have to do the near impossible with this examination to advance the case against Mack. There had to be *direct evidence* that Mack had knowledge of the GE-Heller merger.[118] That "prerequisite" did not exist for issuing a subpoena to any other

---

[116] S. REP., at 40. See note 3 for the website address of the Senate Report.
[117] *Id*. at 408 (Ex. 34).
[118] The Senate Report devotes two pages of discussion to Kreitman's unique prerequisite for the Mack subpoena which existed for no other subpoena and was eventually dropped for Mack after Plaintiff was fired. *Id*. at 32-4.

witness in the Pequot case.[119] Indeed, Kreitman's "prerequisite" set a higher burden for issuing

an administrative subpoena to a suspected tipper than an appellate court had set in affirming a

criminal conviction of a tipper for insider trading.[120] The options for satisfying Kreitman's

"prerequisite" were few.  Aside from Mack admitting knowledge, someone would have to say: I

told Mack about the GE-Heller merger. The CSFB employees were the most likely possibility,

but coaxing such a statement from the two CSFB executives, with sophisticated counsel at their

sides, would be no easy task. In this light, Kreitman told Jama: "You don't need to prepare that

much for it."[121] To his credit, Jama balked.

Kreitman's statement could be seen in a different light. For example, Kreitman could have

sent an email making the statement ("you don't have to prepare much) to a seasoned investigator

who had conducted thousands of examinations and who was steeped in the details of Mack's

contacts with the CSFB officials in June and July 2001. Then, perhaps, Kreitman's advice could

be interpreted as a friendly comment that only meant: I have every confidence that you can be

ready to take this testimony on short notice. But of course, those were not the facts with Jama.

The emails between Kreitman and Jama illustrate how the SEC can defeat any real

understanding how it handled the Pequot investigation by making all SEC staff anonymous. The

next exchange between Kreitman and Jama would be an exchange between Kreitman and an

unknown. Kreitman's request to the next attorney would also involve a request to an unknown

---

[119] "Moreover, SEC management did not generally impose any such hurdle to taking investigative testimony in other insider trading cases. Hilton Foster, a 30-year SEC veteran, was unaware of any such pre-requisite"*Id.* at 32-3.

[120] The First Circuit set a lower standard—"opportunity" or "access" to material, nonpublic information—in affirming an insider trading conviction in *United States v. Larrabee*, 240 F.3d 18, 21 (1st Cir. 2001) with these words:

   The defendant argues that proof of "opportunity" or "access" to material, nonpublic information is not the same as proving actual possession. That is correct, but does not carry the day. While the defendant is correct that opportunity alone does not constitute proof of possession, opportunity in combination with circumstantial evidence of a well-timed and well-orchestrated sequence of events, culminating with successful stock trades, *creates a compelling inference of possession by the tipper* (emphasis added).

[121] S. REP., at 13, 40-41. See note 3 for the website address of the Senate Report.

and a response from an unknown. How did that unknown handle the CSFB examinations on even shorter notice? Was Kreitman's next choice someone even less prepared to take the same examinations but lacked Jama's integrity? The most significant facts contained with the 2800 pages released by the SEC are lost because all attorney names are redacted except four. Kreitman's willingness to have a relatively inexperienced attorney take two critical examinations without adequate preparation speaks clearly that the SEC was still not serious about investigating Mack, even with two Senate committees poking around.  This level of agency malfeasance should not be lost in anonymity. Redacting the names of the Enforcement staff who worked on the Pequot investigation ends the public's ability to sort out what happened. It would be like reading a Russian novel where every character is named Ivan Ivanovich.

   The SEC also claims it did not redact records mentioning the four supervisors because they testified during the Senate proceedings. But so did Jama and Eichner. The four supervisors testified at a public hearing. Jama and Eichner were questioned by Senate investigators. Portions of their transcripts are attached to the Senate Report.[122] The full transcripts have been made publicly available at the offices of the Senate Finance Committee.[123] Their testimony and emails of both are integrated into the Senate Report.  Hence as a matter of logic, the same reasons that the SEC decided not to redact the names of four Enforcement attorneys would seem equally applicable to Eichner and Jama.

   The SEC cites numerous cases for the proposition that government employees have a privacy interest in not having their names released in investigative records. The SEC for example, cites *Beck v. Department of Justice, 997 F.2d 1489, 1493 (DC Cir 1993) for the proposition that "*The identity of one or two individual relatively low-level government wrongdoers**,** released in

---

[122] *Id*. at 222-237, 316-321, and 404-409, Exs. 12, 20 and 34.
[123] Aguirre Dec. ¶8.

isolation, does not provide information about the agency's own conduct." Neither that case nor any the other cited by the SEC support its assertion of Exemption 7(C) in this case for multiple reasons. First, this case does not seek records relating to the misconduct of two low-level employees released in isolation. Plaintiff seeks records that would demonstrate how an entire chain of command within the SEC's Enforcement Division gave preferential treatment to a member of Wall Street's elite and then, with the help of other SEC offices, did its best to cover up these facts. Understanding how that apparatus operates requires some transparency of each level of Enforcement—those that participated from the top down while Plaintiff led the investigation and that same chain that pretended to conduct the Mack investigation when Senate investigators asked for information. In sum, these records are sought to advance the confined public policy objectives at the heart of FOIA: to shed "light on an agency's performance of its statutory duty" in order to inform the citizens 'about what their government is up to." _United States DOJ v. Reporters Comm. for Freedom of Press_, 489 U.S. 749, 773, 103 L. Ed. 2d 774, 109 S. Ct. 1468 (1989).

Although the SEC cites numerous cases, it offers few facts to justify its claim that there are significant privacy issues at stake. It only argues that the media may learn the names and contact them. Yet, the roles of both Jama and Eichner are discussed at length in the Senate Report. Eichner's name is mentioned 30 times in the text of the report and Jama's nine times. For those wishing to know more about their roles in the investigation, transcripts of their complete testimony are available at Senate headquarters. Senate records also reveal the participation of Bresnan[124] and Riccardi,[125] two senior officials involved after Plaintiff's departure. Secondly, assuming arguendo the existence of some privacy, the SEC has failed to even argue why the

---

[124] S. REP., at 412 (Ex. 35). See note 3 for the website address of the Senate Report.
[125] _Id_. at 132-3 (Ex. 2).

privacy interests of Jama, Eichner, or any supervisory Enforcement attorney could *outweigh* the public interest in the disclosure of the information sought in this case.

## V. THE SEC'S HAS ERRONEOUSLY WITHHELD
## THE NAMES OF OTHER STAFF UNDER EXEMPTION 6.

There were two parts to the Senate Report: the Pequot investigation and Plaintiff's firing. The Senate Report sees the two events as integrally linked.[126] The firing of Plaintiff by an agency would, by itself, be of no interest to Congress. That Plaintiff's two-step pay increase morphed into a termination process within days of his email questioning Mack's special treatment also sheds light on how the SEC operates. The question that Plaintiff's firing raises, just as Mack's preferential treatment raised, is the scope and level of involvement of the different offices and divisions of the SEC. The Enforcement Division was involved from the top down in Plaintiff's firing. But what about outside Enforcement? What little that can be gleaned so far from the few records that Congress and the SEC have released about other offices and divisions is not a pretty picture. Other SEC attorneys and senior officials were involved in every step of Plaintiff's firing.[127]

A good place to start is with trial counsel in this case. Assistant Director Melinda Hardy, lead trial attorney in this case, guided Berger, Kreitman and Hanson on how to fire Plaintiff, despite red flags that should have prompted a question or two.[128] Another attorney, Linda Borostovik, counseled the Enforcement liaison handling Plaintiff's separation, Charles Staiger, to mislead Plaintiff regarding crucial facts relating to his termination in order to cover up the fact the "supplemental evaluation" of Plaintiff's performance had been retroactively created.[129]

---

[126] *Id.* at 78.
[127] Aguirre Dec. ¶10-29. See also Plaintiff's Exhibits5-23.
[128] Aguirre Dec. ¶31(c). See also Plaintiff's Ex. 28 and 29.
[129] Aguirre Dec. ¶27. See also Plaintiff's Ex. 19 and 19A.

Staiger followed her guidance.[130] Another attorney, Juanita Hernandez, counseled Kreitman to place a sham evaluation in Plaintiff's personnel file.[131]

The SEC has released each of these records, but in each case redacted the names, which made impossible any assessment regarding what SEC office was involved or the level of the official. For example, by redacting Hardy's name, the SEC not only eliminated her personal involvement, but also eliminated the involvement of the OGC and the involvement of a high official within the OGC. The point is this: anonymity does not merely protect privacy; it can also be used as a subterfuge to eliminate accountability of the high level officials and their offices and, in the aggregate, the SEC itself. Once again, the public interest in knowing how the SEC operates far outweighs the privacy interest, if any, of these individuals.

## VI . PLAINTIFF SEEKS AN ORDER DIRECTING THE SEC TO RELEASE HIS *ORIGINAL* ENFORCEMENT PERSONNEL FILE

This may seem to be an unusual request. Normally, releasing copies of records is sufficient. There are, however, extraordinary circumstances in this case which warrant an order directing the SEC to release the original folder and records comprising Plaintiff's Enforcement Personnel File ("EPF") or, if it does not exist, records relating to its fate. This folder would normally contain the most relevant records relating to Plaintiff's performance during his employment with the SEC. As the name implies, the EPF is the official record maintained by Enforcement of an employee's performance.

Plaintiff's discussion of his unsuccessful effort to obtain a complete copy of his EPF consumes twenty-one of the thirty-six paragraphs that comprise his declaration.[132] These paragraphs describe a journey that his now in its twenty-sixth month. It is a journey that began

---

[130] Aguirre Dec. ¶15. See also Plaintiff's Ex. 11.
[131] Aguirre Dec. ¶31(c). See also Plaintiff's Ex. 24 and 25.
[132] Aguirre Dec. ¶¶10-29.

with the Office of Human Resources and then directed to the Enforcement Division, from there to the Chairman's office, then on to the FOIA office, following directions to the Federal Records Center, then back to the FOIA office, then over to the OIG, where an attorney's notes led right back to Enforcement. All along long the way, the SEC flipped the road signs so they pointed in the opposite direction from the truth. But all this pales in comparison with the SEC's ultimate explanation what happened to Plaintiff's EPF. It is a tale that would make Pinocchio blush: Enforcement gave the original EPF to Plaintiff and kept no copy,[133] nor did any other SEC office.[134] The SEC story goes like this. Plaintiff instructed an Enforcement official to meet him at the reception area of the SEC and deliver to him the EPF. The official followed Plaintiff's instructions to the t and did not even keep a copy of the record. This was done at the outset of an OIG investigation of Enforcement for firing Plaintiff. The EPF would be the most probative evidence on this issue.

Plaintiff will not mince words; this evidence suggests that someone destroyed Plaintiff's EPF. There is evidence that another record maintained by Human Resources, also of high probative value, met the same fate.[135] Under these circumstances, Plaintiff's seeks an order directing the SEC to release the original EPF or, if it does not exist, records which describe its current location, destruction, or other disposition.

## VII. THE SEC HAS FAILED TO PROVE THAT IT CONDUCTED AN ADEQUATE SEARCH FOR RECORDS RELATING TO PLAINTIFF'S EMPLOYMENT

There is a preliminary issue that Plaintiff must address before turning to the adequacy of the SEC's search for records sought in this case—the conflict of interest within the OGC.

### *The elephant in the room: the OGC's admitted and potential conflicts*

---

[133] Aguirre Dec. ¶28. See also S. HRG. 109-898, at 934, and 941-2.
[134] Aguirre Dec. ¶24. See also Plaintiff's Ex. 17.
[135] Aguirre Dec. ¶10. See also Plaintiff's Ex. 5.

By all appearances, the SEC's Office of the General Counsel (OGC) has a wide and deep conflict of interest arising out of the allegations in this case. The existence of the conflict was disclosed by SEC Chairman Cox in his August 4, 2006, letter to Senator Charles Grassley, Chairman of the Senate Finance Committee at the time. Chairman Cox explained to Senator Grassley the SEC's choice of Associate Director Richard Humes (Humes) as the SEC's liaison in the Senate investigation with these words: "Mr. Humes is the senior SEC official in the Office of the General Counsel *who is not recused pursuant to government ethics rules or prudentially precluded from participating in these matters* (emphasis added)."[136]This implies that senior OGC officials above Humes's level had already been recused. Since the core allegations in this case are the same as those investigated by the Senate, it would seem those who recused themselves in the Senate investigation should also have done so in this case.

Just three weeks later, on August 24, Senator Grassley asked Chairman Cox to remove Humes and to "designate another individual to deal with my staff … [in relation to] the allegations of former SEC attorney Gary Aguirre."[137] Senator Grassley gave two reasons: Hume's "conflict" and his failure to be "candid and forthcoming." Senator Grassley continued, "[I]t is my understanding that a number of individuals have officially recused themselves from this matter at the SEC." Senator Grassley also requested "a list of all individuals that are recused and the stated reason for their recusal…"[138] Two weeks later, Senator Grassley and Specter again requested "A list of SEC employees/Commissioners who have recused themselves." No SEC response to the Senators' request was included among the records released by the Senate.[139]

---

[136] S. REP. at 672.
[137] *Id*. at 681.
[138] *Id*.
[139] Aguirre Dec. ¶37. Also *Id*. at 657-711.

Chairman Cox replaced Humes with Assistant General Counsel Samuel Forstein, an attorney who reports to Humes.[140]

The conflict runs deeper. Among the 4,000 plus pages of records released by the Senate are emails of the OGC's role in guiding senior officials how to fire Plaintiff and how to paper his file to retroactively justify the decision. One email was sent by lead trial counsel in this case, Melinda Hardy ("Hardy"), orchestrating how Plaintiff's supervisors (Berger, Kreitman, and Hanson) should go about firing Plaintiff. Her email reveals that she was aware of a unique circumstance relating to Plaintiff's firing that should have waived a red flag: his two-step pay *raise* on August 21, 2005, followed by his *firing* eleven days later on September 1. And the involvement of the OGC goes beyond Hardy. Her email mentioned discussions within the OGC about "including a sentence why [Plaintiff] received a two step increase but is now being fired." Hardy would normally report to Humes.[141]

But Hardy was not the only attorney within the OGC to become involved in "process of reprisal." According to the Senate Report, the "process of reprisal" began when Berger, Kreitman, and Hanson created a sham evaluation on August 1, 2005, five days after Plaintiff sent an email questioning Mack's preferential treatment.[142] Another OGC attorney, Juanita Hernandez, counseled Kreitman to place the sham evaluation in Plaintiff's personnel file.[143]

The OGC's involvement in the events surrounding Plaintiff's firing appear in conflict with its multiple and diverse roles related in this case: trial counsel for the SEC, counselor to the FOIA office, final FOIA appellate authority, and the source of the authenticating testimony

---

[140] *Id*. at 683-4.
[141] Aguirre Dec. ¶31. See also Plaintiff's Ex. 29
[142] S. REP. at 81.
[143] Aguirre Dec. ¶31(c). See also Plaintiff's Ex. 24 and 25.

regarding the Vaughn index and the adequacy of the search.[144] In each role, the OGC may decide or influence the scope and type of information that will be released to Plaintiff. Each role involves judgment. In exercising that judgment, it would be difficult for an OGC attorney not to consider whether the release of information may implicate the OGC, one of its attorneys, or that attorney personally in the "process of reprisal."

How the OGC handled the Hardy email highlights this conflict. The OGC released the Hardy email to Plaintiff, *but only after redacting any link to Hardy and the OGC*. Hardy's declaration demonstrates her active role in deciding which records the SEC will release, which it will not, and which will be redacted.[145] This dual role creates a conflict for an attorney who counseled an unlawful firing, decides which records about the firing will be released, and then serves as trial counsel defending that decision. The conflict comes to this: Does the attorney release the record thereby carrying out the SEC's responsibility under FOIA, but revealing he or she counseled unlawful conduct? Or does the attorney withhold the record thereby protecting him or her, but failing to carry out their client's responsibility under FOIA? Hardy's email suggests she has multiple roles in processing Plaintiff's FOIA and requests, including the possibility that she redacted her own email.

Rule 1.7 of District of Columbia Rules of Professional Conduct (Rules) weighs in on this dilemma: a lawyer shall not represent a client with respect to a matter if: … " The lawyer's professional judgment on behalf of the client will be or reasonably may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests,"  unless stringent client waiver requirements are met. Rule 1.7 applies to Hardy in this case since the SEC's filings show she is a member of the DC bar.

---

[144] Aguirre Dec. ¶31. See also Plaintiff's Exs. 21,24-5, and 28-9.
[145] Second Declaration of Melinda Hardy.

The OGC continues to face a potential conflict that arises with every record it decides to withhold or redact in dispute in this case. Would someone in Hardy's place be concerned about releasing records that further implicate the OGC in Plaintiff's firing or demonstrate the OGC knew even more about the process of reprisal when its attorneys counseled Berger, Kreitman, and Hanson to fire Plaintiff and then tamper with his personnel records? The question answers itself.

The conflict arises in every step the OGC has taken since December 30, 2005, through the present in exercising its authority in all its variations to decide which records will be released through this Plaintiff to the public. And it continues. The issue interjects itself in our next issue: Did the SEC conduct an adequate search?

### The SEC has failed to describe how it searched Plaintiff's employment records.

In *Neal v. Snow*, 2007 U.S. Dist. LEXIS 28803 (D. D.C. 2007), this court summarized the agency's burden in demonstrating its search for responsive records was adequate:

> The agency bears the burden of showing that its search was calculated to uncover all relevant documents. ... To meet its burden, the agency may submit affidavits or declarations that explain in reasonable detail the scope and method of the agency's search. ... If the record "leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper (citations omitted)."

The SEC offers Hardy's declaration to establish that it has conducted an adequate search of its files for records responsive to Plaintiff's requests. Neither the Hardy declaration nor the SEC's memorandum tells how the SEC searched for records responsive to paragraphs 7 through 12 of Plaintiff's December 30, 2005, which seek the release of six classes of records relating to Plaintiff's employment.[146]

---

[146] Aguirre Dec. ¶21.

To begin with, the SEC's apparent position that none of the Commissioners have any records relating to Plaintiff's firing, except two transmittal sheets, strains credulity. The Commission approved a subpoena enforcement action by the OIG to obtain the records Plaintiff provided to the two Senate Committees investigating his firing. This is not done without incoming and outgoing papers from the Commission. The SEC's OIG submitted four other "action memoranda" to the Commission relating to the Senate investigation. Since the Senate investigation focused in part in Plaintiff's firing, how would these multiple memoranda not even mention that issue?

A search of Lexis "Meganews" pulls up 500 stories linking the Plaintiff and the SEC, since his firing. Would not some of the commissioners have had a question or two for staff, e.g., why did the Senate "Interim Findings" in January conclude "The SEC's termination of Aguirre is Highly Suspect."[147]

Plaintiff also sent two letters to the SEC Commissioners informing them of his allegations relating to his termination before they were presented to the Senate, the OSC, or this court.[148] The Senate Report devotes considerable space to explaining why these two letters should have triggered a serious internal SEC investigation.[149] In August 2006, Chairman Cox described the allegations: "The allegations of improper conduct in this matter are utterly inconsistent with the mission and professionalism of the agency ..."[150] So what did Chairman Cox do to look into these allegations? Did his efforts begin and end when he received the OIG report that Senate Report all but called a whitewash?[151] There can be no question whether Plaintiff sought these records; Request 12 specifically asked for "All records relating to the

---

[147] *Id*. at S1384. CONGRESSIONAL RECORD—SENATE *January 31, 2007.*
[148] Aguirre Dec. ¶¶6 and 17. See also Plaintiff's Exs. 1 and 22.
[149] S. Rep. at 94-5.
[150] *Id*. at 684.
[151] *Id*. at 94-5.

SEC's termination of Aguirre's employment to or from Christopher Cox …"[152] This all boils down to two simple questions: Did the SEC conduct any search of the Commissioners' offices for responsive records? And, if so, how was it conducted so that it only turned up two transmittal sheets and not a single posting to the Vaughn index?

Likewise, the Hardy's declaration is silent about any search conducted at the OGC. It is clear that Hardy was involved in the orchestrating the firing and Hernandez in placing the sham re-evaluation in Plaintiff's EPF. Those two facts alone demonstrate the OGC may have generated records relating to Plaintiff's firing, but there is more. But there was more.

Another email to Hernandez tells how the OGC "launched an investigation [of Gary Aguirre], *prior to his departure* in Sept. 2005."[153] In what regard was the OGC investigating Plaintiff before he was fired? What event had triggered the OGC to launch this investigation? There is a clue in comment in the same email: It also tells how OGC "in preparation for his [Plaintiff's] … directed Mr. Staiger's office to 'freeze' the subject's information technology assets …"[154] Indeed that is exactly what happened. Plaintiff was in California on vacation when he got a phone call from Kreitman and Hanson terminating his employment.  When the call ended, Plaintiff tried to send an email to one of his colleagues through his remote access, but it had been disabled.  Why would the OGC block Plaintiff's access? What was the subject of the investigation the OGC was conducting just before Plaintiff was fired? Was there a link between that investigation and Plaintiff's firing? For what period of time had the OGC been engaged in this investigation? What prompted it? Was it prompted by the same email that prompted Enforcement's re-evaluation of Plaintiff's performance? The OGC's conduct suggests that it was

---

[152] Aguirre Dec. ¶21.
[153] S. HRG. 109-898, at 839.
[154] *Id*.

neck-deep in Plaintiff's firing.    Yet, the SEC has released no records relating to the OGC's investigation, nor has it specified any records relating to that investigation on the Vaughn index.

Other attorneys from the OGC also generated records relating to Plaintiff's termination. As discussed above, Hernandez decided what records should be added to Plaintiff's EPF after he was fired. Further, the Ethics Office within the OGC had discussions with Plaintiff regarding his termination as well emails and letters which were neither released nor specified in the Vaughn index. Beyond the OGC, Borostovik guided Staiger how to mislead Plaintiff about the sham re-evaluation. The FOIA office sent Plaintiff on a wild goose chase. A call from the chairman's office triggered yet another investigation; whether Plaintiff's email services were terminated with his employment. The participation of multiple offices in Plaintiff's firing sharpens one issue: to what extent did the SEC conduct an adequate search to locate records responsive to six requests seeking information relating to Plaintiff's employment and his termination? The SEC's filings with the Court are silent on this point. Accordingly, Plaintiff is entitled to a summary judgment on this basis alone.

Dated:  Nov. 30, 2007                    Respectfully Submitted,


_____/s/_____
Scott A. Hodes, D.C. Bar #430375
P.O. Box 42002
Washington, D.C.  20015
301-404-0502


_____/s/_____

Gary J. Aguirre, CA Bar#38927
402 West Broadway, Suite 400
San Diego, CA  92101
619-595-3197

Attorneys for Plaintiff