Testimony

*United States Senate Committee on the Judiciary*

**<u>Examining Enforcement of Criminal Insider Trading and Hedge Fund Activity</u>**

**December 5, 2006**

**Mr. Gary J. Aguirre**

Former Investigator , U. S. Securities and Exchange Commission

---

Testimony of Gary J. Aguirre, Esq.

Before the

U.S. Senate Committee on the Judiciary

Part I

December 5, 2006

Mr. Chairman, Senator Leahy, and Members of the Committee:

Thank you for inviting me to testify today regarding my allegations that senior SEC officials abused their authority in supervising the insider trading investigation of Pequot Capital Management (PCM).

The Favor

My testimony today will focus on a favor. Senior SEC officials gave it. Morgan Stanley and its CEO, John Mack (Mack), accepted it.

The favor was an invisible shield. It was put in place by senior officials within the SEC's Division of Enforcement. It shielded Mack from an SEC subpoena seeking his testimony and records in the PCM insider trading investigation. That evidence was a critical step in proving whether Mack had tipped PCM's CEO, Arthur Samberg (Samberg), of General Electric's (GE) pending acquisition of Heller Financial (Heller). Mack was the only suspect. Blocking the investigation of the

only suspect blocked the SEC's investigation of PCM's trading in GE-Heller. Without that investigation, the SEC would never be able to even consider the filing of insider trading charges arising out of PCM's trading in GE and Heller against Mack, Samberg, PCM or anyone else.

The favor had positive effects for some. It cleared the way for Mack's return on June 30, 2005, as Morgan Stanley's CEO. Without the favor, Mack would have faced the risk of an SEC lawsuit for insider trading over the next year. Without the favor, Morgan Stanley had two options: (1) it could pass on Mack as its new CEO and look for other candidates or (2) it could hire Mack and take the risk of an SEC insider trading case against him. According to Morgan Stanley's head of compliance, the risk of an insider trading case against Mack was one Morgan Stanley did not want to accept. The favor made that risk go away.

The timing of the favor was perfect. The search for the source of the GE-Heller tip began in May and began to point to Mack by mid-June. My supervisors authorized me to seek a criminal investigation of Mack and Samberg on June 14. An SEC subpoena for Mack's testimony and records was the next logical step in the investigation. That should have occurred during the week of June 20. But just then the shield appeared out of nowhere: one of my supervisors blocked the subpoena. Simultaneously, a Wall Street Journal article carried the headline, "Morgan Stanley May Reconsider Mack for CEO." 1

So, why would senior SEC officials give such a favor? My immediate supervisor, Branch Chief Robert Hanson, gave me the answer when he first blocked the Mack subpoena: Mack had powerful political connections.2 He made similar statements on other occasions. I questioned this decision up the chain of command, but only got back silence at first. Mack's political influence is of course indisputable fact.3

If Justice at the SEC has lost her blindfold, the capital markets are in trouble. The SEC regulates the securities markets. Its success "is a bulwark against possible abuses and injustice which, if left unchecked, might jeopardize the strength of our

economic institutions."4 Few principles are more deeply engrained in Title 17 of the Code of Federal Regulations, which regulates the SEC's operation, than the mandates obligating the SEC to handle all of its affairs, including the enforcement of the securities laws, with impartiality.5 No conduct would stray farther from those mandates than a double set of laws: one for the politically well connected and another for everyone else.

After my September 2, 2005, letter informed Chairman Cox of the favor, he directed his Inspector General (IG) to conduct an "investigation" of my allegations. The IG employed a unique investigatory method; his staff interviewed and took evidence from only those senior SEC officials who were the subject of my charges. The IG staff never contacted me. Not surprisingly, those charged with misconduct offered little evidence against themselves. The IG was therefore duty bound to find them blameless. This kind of an investigation has a name; it is called a "whitewash."

After your Committee and the Finance Committee began their own inquiry, the SEC came up with Plan B. It directed its IG to conduct a new "investigation" and its Enforcement Division to take Mack's testimony. The same IG who did the first whitewash would do the new one. The same senior officials who blocked Mack's testimony fourteen months earlier would take his testimony.

Both aspects of Plan B lack the same element as the original decision to block Mack's testimony: integrity. How hard would the IG look for evidence that Mack got a favor, when that same evidence would prove his first investigation was a whitewash? How hard would senior SEC officials search for clues that Mack tipped Samberg when those same clues would prove their misconduct fourteen months earlier? The outcome of the "reopened" IG investigation and the Mack testimony were scripted and choreographed before they began. When the IG finds Enforcement gave no favor to Mack, he will also validate his first investigation. When senior Enforcement officials "cleared" Mack last October, they effectively did the same for themselves.

Still, by taking Mack's testimony, the SEC conceded the necessity of this step. The SEC claims it was just following "established procedures" when it recently reversed its June 2005 decision and then took Mack's testimony.6 Would not those same "established procedures" call for Mack's testimony to be taken in June 2005 when it was originally sought by the staff person heading the investigation? Or did some new evidence recently surface? If so, what was that evidence? How was it overlooked before? Further, as discussed below, why would the SEC wait until two critical statutes of limitations had expired before taking Mack's testimony?

The SEC Favor to Mack Was No Favor to the Nation's Capital Markets

When senior SEC officials blocked the Mack subpoena, they derailed an investigation of suspected insider trading involving one of the world's largest investment banks and, at that time, the world's largest hedge fund.7 That focus on investment banks and hedge funds touched on a type of insider trading with global dimensions. In June 2005, the Federal Services Authority ("FSA"), the United Kingdom's counterpart to the SEC, recognized an "institutionalized" form of insider trading involving investment banks and hedge funds.8 The FSA suspected that investment banks were giving illegal tips of pending mergers and acquisitions to their best hedge fund customers in return for lucrative hedge fund business.9 More recently, the FSA, has "uncovered signs of insider dealing at almost a third of British M&A deals, with possible culprits including traders at hedge funds and investment banks."10

The same patterns have emerged in the US. Evidence taken by your Committee in September indicated possible insider trading in advance of forty-one percent of the US mergers and acquisitions over a billion dollars in size during a recent one year period.11

So how is the SEC doing in catching and civilly prosecuting hedge funds who engage in insider trading? How many cases has the SEC filed against hedge funds

for insider trading? What are the tangible results of those cases? That information is not readily available. It is true that the SEC frequently issues statistics to bolster its image as the cop on the street, strolling along with a vigilant eye on both hedge funds and insider trading. According to its statistics, the SEC has brought more than 300 insider trading cases over the past five years12 and some 90 cases against hedge funds since 1999.13 Yet, these two statistics conceal a disturbing fact: the SEC's actual record of enforcing insider trading laws against hedge funds.

What is that record? Aside from the PIPE cases,14 the SEC has recovered approximately $110,000 from hedge funds and their principals for all other types of insider trading. This includes trading on illegal tips before public announcements of any of the following events: mergers, acquisitions, negative and positive earnings surprises, government investigations (e.g., FDA approval or withdrawal of approval), CEO hirings or firings, or anything else that could affect the value of a public company. How could this be? The explanation is quite simple: the SEC has brought a total of six cases for insider trading against hedge funds.

Three of those cases15 involve a cookie cutter type of insider trading: the violator shorts a public company in advance of an announcement of a Private Investment in Public Entities (PIPE). The SEC's concentration of its resources on PIPE insider trading cases is curious. The PIPE market is relatively small: $20 billion in 2005.16 By comparison, the merger and acquisition market was $1.46 trillion over a recent twelve month period.17 Put differently, the PIPE market is 1.4% of the merger and acquisition market. So why do half the SEC insider trading cases against hedge funds arise out of PIPE transactions? One obvious answer: the cases are easier to prove. The facts are relatively simple and follow a cookie cutter fact pattern.18 Also, somebody did much of the spade work for the SEC. The cop on the street—the SEC—did not detect the PIPE insider trading. Rather, it was detected by a $100 billion mutual fund and the evidence was then handed over to the SEC.19

The SEC has brought three and only three cases against hedge funds or their principals for all other types of insider trading: SEC v. Kornman,20 SEC v. Tom,21 and SEC v. Obus.22 In two of those cases, Kornman and Tom, the SEC sued the principals of two mini hedge funds.23 In Kornman, the illegal profits were $142,000;24 the SEC has recovered nothing.25 In Tom, the illegal profits were $785,330 dollars;26 the SEC has recovered $110,000 from marginal defendants, but nothing from Tom.27 In Obus, the SEC sued a mid-sized hedge fund, its principal and two others.28 It has recovered nothing so far. The only remarkable feature of Obus was the length of the investigation: it took the SEC at least four years to file the case (not prove a case) against a hedge fund principal who repeatedly confessed his transgression to strangers.29 To sum up, aside from the PIPE cases, SEC efforts to enforce the insider trading laws against hedge funds who engage in insider trading come to this: two cases against the principals of two tiny hedge funds, one case against a mid-sized hedge fund, and a total of $110,000 recovered.

To put in perspective the SEC's $110,000 recovery, it must be contrasted with the scale of illegal insider trading by hedge funds. It is doubtful that anyone has an accurate grasp of the total profits hedge funds derive from all types of insider trading. But some broad brush strokes may be put to the canvas in one area: insider trading profits by hedge funds related to mergers and acquisitions. The study commissioned by The New York Times found evidence of insider trading in advance of 41% of the largest US mergers and acquisitions.30 The total dollar volume of US mergers and acquisitions was $1.46 trillion over a recent one-year period.31 The FSA believes that much of this illegal trading is done by hedge funds.32 Likewise, four of the witnesses who testified before your Committee on September 26, 2006, expressed a similar view.33 One of the witnesses, Professor John Coffee, put it this way:

[T]he more likely scenario is that information is leaked by their staffs [buy out and private equity firms] and by investment bankers to hedge funds and other active traders. These leaks are, however, not gratuitous; they are predictably in return for

some likely quid pro quo.  As hedge funds have come to dominate trading, they are often paying above  market brokerage commissions, at least in comparison to other  institutional investors. The funds paying these above-market commissions  expect many things in return: …hints about pending deals.34

All  this suggests that hedge funds likely derive illegal profits from insider  trading relating to mergers and acquisitions in the billions of dollars.  The SEC's track record—its recovery of $110,000—is not likely much of a  deterrent.

And then there was the PCM investigation. It involved  eighteen referrals by Self-Regulatory Organizations (SROs) and one insider  trading matter uncovered by staff. In the GE-Heller trades, PCM made a  profit of $18 million from suspected insider trading. In the Microsoft  trades, PCM made a profit of $12 million from suspected insider trading.  All but two of the remaining seventeen matters involved suspected illegal  profits in excess of $1 million. That investigation had begun to focus on  the flow of illegal information from investment banks to PCM in March  2005.35 That was months before the FSA expressed its concerns about  "institutionalized insider trading" in the U.K. and more than a year  before The New York Times raised the question whether the same thing was  happening in the US.

The SEC's handling of PCM's suspected insider  trading in GE-Heller fits the pattern of its overall handling of insider  trading cases. It goes for the low hanging fruit, amateur traders who make  stupid mistakes when they trade on illegal tips, but not the large,  sophisticated hedge funds who do not make easy statistics. The SEC  vigorously pursued an insider trading case against a low level GE  executive and a Taiwanese Kung Fu instructor who split a $157,000 profit  derived from trading Heller options.36 The Department of Justice jumped in  and exacted a guilty plea from one of the participants. The District Court  sentenced him to fifteen months in prison. 37

The NYSE likely  highlighted PCM's trading to the SEC within months of PCM's July 2001  trades. The minimum SEC inquiry into PCM's trading in Heller would

have raised one red flag after another. Simply checking PCM's trading in Heller for July 2001 would have revealed a $17 million profit, not the $5.97 million the NYSE found. Scratching a tad deeper would have revealed that PCM had bought more Heller stock ($44 million worth) than any individual or institution in the country during the four weeks before the announcement. Scratching a little deeper would have revealed that PCM had also sold shorted $36 million in GE stock, thereby positioning itself for the likely dip in GE's stock price when the tender offer was announced, which dip in fact occurred. The inescapable inference from these facts was that someone at PCM had a strong belief that GE would acquire Heller. By that point, the SEC would have to ask PCM one simple question: Why did you bet $80 million that GE would acquire Heller? That question would not be addressed to PCM and its CEO for another four years.

To sum up, the PCM investigation had focused on a new type of insider trading of global dimensions, "institutionalized insider trading." The investment bank under investigation was the third largest in the world at the time. The hedge fund was the largest in the world at the time and was suspected of routinely engaging in insider trading. Given the SEC's failure to look at this area before, it was critical to the capital markets that the investigation be thorough. Instead, senior Enforcement officials halted the investigation by blocking the issuance of any subpoenas to the only suspected tipper.

But it gets worse. The suspected tipper was the incoming CEO of the investment bank. The suspected tippee was the CEO of the hedge fund. If those at the top of these pyramids believe that insider trading is an acceptable business risk, their subordinates—everyone else in both companies—will not likely have higher standards. It is hard to imagine how the SEC could have given a favor more damaging to the capital markets.

The Status of the PCM Insider Trading by June 2005

The investigations of Samberg's and Mack's roles as the possible tippee and tipper in the GE-Heller matter were interdependent in two ways. First, as discussed below, the circumstances surrounding Samberg's trading in GE and Heller in July 2001 defined the profile of the person who likely tipped him. Only Mack fit the profile. Second, when senior SEC officials blocked the subpoena for the only person who met the tipper's profile, they rang the death knell on proving the case against Samberg and PCM. No insider trading case can be proved without establishing the source of the tip.

PCM's History of Suspected Insider Trading

There were multiple reasons in 2005 to scrutinize Samberg's and PCM's trading over the prior few years for the use of illegal tips. Market surveillance officials of the NYSE told me that PCM and two other hedge funds, which they named, had most often been the subject of insider trading referrals to the SEC in recent years. One of those officials put it this way: "PCM was just too lucky." In the fall of 2004, I had located thirteen other insider trading matters which SROs had referred or highlighted to the SEC over the prior three years involving PCM. None had been investigated. SROs referred another four insider trading matters over the next few months. In response to an SEC subpoena, PCM produced records of yet other SRO referrals. The SEC's New York District Office was also conducting a separate investigation of PCM for possible insider trading arising out of a PIPE transaction. Independently, Hilton Foster (Foster), perhaps the most experienced SEC attorney at conducting insider trading investigations, told me that he had investigated PCM a decade earlier and suspected Samberg and PCM were "serial inside traders."38

There was also the money PCM paid to its brokers-dealers: $226 million during the twelve month period in which it did the GE-Heller trades.39 PCM paid an "average commission rate" to its brokers of five cents a share.40 These trades could have been executed for as little as a penny a share electronically.41 PCM also paid many more millions in fees to its prime brokers. In return for these fees, hedge

funds in general,42 and PCM in particular,43 received favors and information. The key question is where the broker-dealers drew the line on the type of favors and information they gave PCM and where PCM drew the line in receiving them.

Then there was the obvious good-twin bad-twin comparison between PCM and Andor Capital Management (Andor). Andor was formed in September 2001 when PCM cofounders, Samberg and Daniel Benton (Benton), split up PCM's employees and its $15 billion in assets. Samberg would continue with PCM, but with half the assets to manage. Andor would go its separate way, with the other $7.5 billion to manage. I could find few SRO referrals of Andor in comparison with PCM from 2001 through 2005. I also asked Eric Ribelin (Ribelin), a branch chief in the SEC's Office of Market Surveillance, if he could get an exact number of the referrals on Andor. Ribelin responded: "The referrals are by issuer, not by account that traded, so there is no electronic way to key on it. Put it this way, before you mentioned Andor I'd never heard the name. I've seen and heard Pequot's name for years in referrals and in conversations with SROs."44

Finally, Samberg sought nonpublic information on another company shortly before he was suspected of obtaining the Heller tip from Mack. In April 2001, Samberg hired David Zilkha out of Microsoft, where he was employed as a product manager. The emails between Samberg and Zilkha show Zilkha obtaining nonpublic information from his contacts at Microsoft, on some occasions while Zilkha was still working at Microsoft, and passing it along to Samberg. When I left the SEC, gaps in the evidence prevented Enforcement from using these emails as a basis for a separate insider trading case against PCM and Samberg. However, we saw these emails as a window into how Samberg operated and thus they provided a clue to the mystery why he bet $80 million in July 2001 that GE would acquire Heller without any data supporting his bet.

Samberg began pumping Zilkha for information almost two months before he left Microsoft. Samberg's first email to Zilkha on February 28, 2001, asked: "Do you

have any current view [on Microsoft] that could be helpful? Might as well pick your brain before you go on the payroll!!"45 The reply did not appear to pass along material nonpublic information.46

Later, Samberg's emails became more direct. On April 30, after Zilkha had joined PCM, Samberg emailed Zilkha, asking: "those [MSFT] contacts have any views on the direct tv—Murdoch—rumored msft possible deal?"47 This email shows Samberg using Zilkha to confirm —through his Microsoft contacts—whether the rumor was true that Microsoft would participate in a joint acquisition of DIRECTV.

In another email, Zilkha reported back:

Just spoke to one of my buds in the company [Microsoft]. He had 2 data points.
1) Orlando Ayala, in charge of sales worldwide, told managers this week that the quarter looks to end on a strong note.
2) Bob McDowell, in charge of Microsoft Consulting, told my friend that MCS was having a blow out quarter.
I asked about negative data points and he said he hadn't heard of any.48

In another email, Samberg directed Zilkha that information obtained from Zilkha's contacts within Microsoft should not be shared with an analyst. Zilkha and Samberg had this edited exchange about Microsoft's expected earnings:

Zilkha: I told Sherlund [an analyst] on the call that MSFT [Microsoft ticker symbol] was anticipating beating earnings for the Q as of last Thursday. He asked if me whether he could put out a note talking up MSFT. I told him I'd let him know tomorrow after I heard back from my contact--and had gotten your take on what we would like we'd like him to do.49

Samberg: As to msft, I don't want to be associated with anything Sherlund [stock analyst] does. If, after talking to you he feels comfortable with the stock, fine, but we absolutely should not be relaying info to him about what you had learned

via contacts within the company. 50

Here is another Samberg-Zilkha exchange, while Zilkha was still employed by Microsoft, on April 7:

Samberg: I own some msft on the win2000 cycle, despite recurring indications from knowledgeable people that the company will either preannounce or take guidance down. Any tidbits you care to lob in would be appreciated.51

Zilkha: I will get back to you on MSFT ASAP.52

Zilkha did not reply by email, at least in no email that Enforcement staff could find, so there was no proof what he told Samberg. However, between April 9 and 11, Samberg bought 30,000 options contracts on the assumption that Microsoft would beat its earnings, the reverse of his belief stated in his email.53 On April 20, Microsoft did in fact beat its earnings. Samberg made a $12 million profit on his April 9-11 option trades.54

On April 23, Zilkha's first day at PCM, Samberg sent him an email: "I shouldn't say this, but you have probably paid for yourself already!"55 Samberg emailed two other PCM executives on the same day: "our new guy, david zilkha [sic], is in ct today. check [sic] him out. He's already got a great p&l [profit and loss] on his msft input."56 Zilkha had earned his "great p&l" with PCM while still an employee of Microsoft.57

In general, the Samberg-Zilkha emails were anomalous. The evidence suggests two reasons. First, Samberg likely used instant messaging when he did not wish to leave a trail, which would have been the case if he was soliciting or receiving material nonpublic information.58 Instant messaging left no telltale image in any server or computer. Second, Samberg was under pressure to perform after April 2001, when his partner announced he intended to leave with half of PCM's assets and thus Samberg may have taken greater risks than usual.59

Samberg's Testimony Advanced the Investigation of PCM's Trading in GE and Heller

The first subpoenas to PCM were issued in early February 2005. In April and May, PCM began producing significant volumes of its records.60 I took Samberg's testimony in early May and again in early June 2005. By early June 2005, the evidence suggested that Samberg had relied on an illegal tip in directing PCM's trades in GE and Heller. I summarized that evidence in my email of June 27, 2005, to Ribelin, who attended both sessions of Samberg's testimony, Assistant Director Mark Kreitman (Kreitman), and Hanson.61

The first aspect of Samberg's and PCM's trading in Heller and GE to attract our attention was its size. Samberg directed PCM to purchase $44 million in Heller stock from July 2 through July 27, 2001. That made PCM the largest purchaser of Heller stock in the nation during the four weeks just before the acquisition was announced.62 But even those purchases were not enough; Samberg was trying to buy larger blocks of Heller stock.63 This raised the obvious question: What did Samberg find so attractive about Heller that he was willing to outbid everyone else in the country to own it, including those who followed it closely?

The same was true of Samberg's trades in GE. Samberg directed $36 million in shorts on GE, but that was also not enough. He was trying to short even larger amounts.64 Again, why did Samberg have the conviction that GE was going to fall?

I was looking for answers to these questions when I took Samberg's testimony, but did not get them. At the first session of his testimony in early May, Samberg gave six reasons for his decision to buy Heller stock. Before the second session, I subpoenaed the documents that his lawyers had shown Samberg before he testified. It turned out that Samberg's attorneys, and not Samberg, had done the research why Samberg bought Heller in 2001, but that research was done four years after Samberg had directed the trades. None of the records Samberg's attorneys had

shown him came from PCM's or Samberg's files.65 Nor could Samberg recall ever seeing these records before. In short, his attorneys had spoon-fed him his testimony.66

Independently, Samberg eliminated any legitimate source of information for his decisions to buy Heller stock. Samberg said he spoke with no one regarding his decision to purchase Heller stock: not any of PCM's 250-person staff, not anyone at Heller (contrary to his practice),67 not anyone at any financial services company, and not any analyst or consultant. Nor did he recall seeing any newspaper articles about Heller.68 Samberg testified that Heller was in an industry outside the focus of his hedge fund, that he did not follow Heller "in the way people follow stocks before it [sic] was purchased."69 Samberg also said his decision to purchase Heller in July 2001 had "nothing to do with Heller."

Finally, in the millions of records PCM produced, only two had any reference to PCM's trading in Heller. In one, Samberg asked his trader, "where are we on HF?"70 In the other, Samberg replied to an email informing him the acquisition of Heller had just become public and the resulting 50% leap in its stock price. Samberg replied: :) :) :) :) :) :) Samberg could recall no other e-mails relating to Heller.71

Incidentally, the smiley face—:)—showed up in two other emails that caught our attention. Joseph Samberg, the president of his own hedge fund and son of Arthur Samberg,72 sent an email to his father on July 12, 2001, offering this insight about Mack stepping in as CSFB's new CEO:

If you read the front page of the C Section of the WSJ, you will see that our friend and latest investor [in Joseph Samberg's hedge fund], John Mack, is to become the new CEO of CFSB, the no.2 underwriter in the U.S.! It's nice to have friends in high places...:)73

On September 26, 2001, Samberg also sent this email to another prominent hedge

fund manager: "don't know most of the things — I'm buying. :-)"74 That was clearly true when Samberg directed PCM to buy — $44 million in Heller stock.

Samberg claimed he saw an analyst's — report in July 2001 like the one his attorneys showed him before he — testified in 2005. Neither PCM nor Samberg produced such a report. Nor was — there a hint of one in the documents PCM produced in response to SEC — subpoenas. Here is Samberg's testimony at the second session on (1) the — report shown to him by his attorneys before the first session of his — testimony and (2) the one he claimed he saw in July 2001:

Q Have — you seen this report in any e-mail dated before July 30, 2001?

A I — don't recall seeing it.

Q Do you have a high regard for sell side — analysts?

A I have a high regard for them as people. I don't have a — high regard for using their reports to make investment decisions.

Q It — would have been very unusual for you to rely on a sell side report, would — it not, in making an investment decision?

A Historically, that is — true.

Q In fact, isn't it true, sir, that you don't think they're — worth a damn?

A In general, I don't think their reports are worth a — damn. The people can be, but not the reports

Q Right. And you've made — that statement publicly, have you not?

A I have.

Q So this is -- — Exhibit 19A is sell side research, is it not, sir?

A Sure is.

Q — Exactly what you said isn't worth a damn. Correct?

A You bet.

Q So — is it fair to say that the research you saw in July 2001 about Heller — Financial also wasn't worth a damn?

A I really don't know what I — saw.75

Samberg also described a host of practices PCM normally — followed in making trading decisions in 2001.76 These practices included: —

1) "Pequot Capital's investment process begins with an intensive  research of a company's underlying fundamentals."

2) "Investment  ideas [were] generated as a result of meetings directly with company  senior management teams [and that] this [allowed] the investment team to  understand a company's management structure, thought process, strategic  direction, and products."

3) "In-depth meetings and industry  research provides the research to prospective fund's analysts with an  overview of a particular industry as well as the individual company, and  allows for comparisons to be made within that specific industry." 

4) "Based on research, the investment analyst is able to formulate  business models and discuss their ideas with other members of the  investment staff and the respective fund's portfolio manager prior to a  position being included within the portfolio."

5) "The investment  approach [quoted above] is consistent across all funds managed by Pequot  Capital."77

According to his testimony, Samberg followed none of  these practices in directing $80 million in trades in Heller and GE in  July 2001. Nor was there any clue in PCM's records that any of these  practices had been followed.78

Samberg also offered no explanation  for his decision to place $36 million in shorts on GE. He testified: 

Q Now, two months later, almost two months later, there is a short  by you, sir, on July 25, 2001 in the amount of 756,000 shares or just shy  of $33 million.
Q Do you see that, sir? [I was showing Samberg GE  trade blotter]
A I do.
Q Now, can you tell us the reasons that you  felt that GE should be shorted at that particular time?

A No, I can't.

Likewise, PCM produced no records that could explain Samberg's decision to short sell $36 million in GE stock.79

This was the status of the case against Samberg and PCM in early June 2005. I understood, and my supervisors told me, that no case could ever be filed against PCM and Samberg without proof who had tipped Samberg. Other staff and I began combing through the PCM records for any clue of the tipper's identity. During the second session of his testimony, I questioned Samberg whether he knew any of the individuals who had participated in the acquisition. That produced two weak leads which I later eliminated. In early June, evidence began to point to Mack. By August, the evidence indicated that Mack, and only Mack, met every element of the tipper's profile.80

The Decision to Take Testimony: The Standard for Everybody Other than Mack

Before discussing how my supervisors reacted to my request to subpoena Mack, I discuss first how they reacted to my request to subpoena everyone else. Those two reactions were as different as night and day. During the investigation, I issued over ninety subpoenas. Of those, I served approximately thirty subpoenas on PCM—five on PCM for records and the rest on officers, portfolio managers, traders and other staff. The other sixty or so were served on third parties, mostly public companies and investment banks.

From the standpoint of authority, I did not need my supervisors' approval or consent to issue a subpoena. The Commission's formal order in the PCM investigation provided: "Gary J. Aguirre [and others]…and each of them, be, and hereby …are empowered to administer oaths and affirmations, subpoena witnesses, compel their attendance, take evidence, require the production of books…"81 However, my superiors could of course override my decision to issue a particular subpoena.

Until Mack, I merely informed my superiors who I intended to subpoena and invited their feedback. For example, on February 18, 2005, I emailed Hanson and Kreitman informing them of my intention to subpoena twenty-seven individuals.82 Of those twenty-seven individuals, seventeen were employed by PCM, five were officers of public companies (including the CEO and CFO of one company), and another five were investment bankers. In general, the person subpoenaed was suspected of giving or receiving material nonpublic information. Neither Kreitman nor Hanson asked why I had decided to issue any of the subpoenas. Neither requested that I make any factual showing why the witness was believed to have received or provided material nonpublic information.83 Indeed, neither Hanson nor Kreitman even responded to my email.

Further, far more evidence implicated Mack than any of the twenty-seven individuals whose subpoenas Kreitman and Hanson approved by their silence. For example, no evidence indicated any of the five investment bankers even knew the PCM employee who did the suspected illegal trades. By contrast, in Mack's case, Mack and Samberg knew and trusted each other, had shared stock tips, and spoke just before Samberg began to direct the Heller trades. Then there was the fact that Mack met the tipper's likely profile.84 No comparable evidence existed for any of the other twenty-seven suspected tippers or tippees before Kreitman and Hanson authorized the twenty-seven subpoenas to be issued by their silence.

My supervisors approved the remaining seventy or so subpoenas in much the same way. I recall no occasion where my supervisors and I even discussed the need for a stronger factual showing before a subpoena could be issued. Only the Mack subpoena had that precondition and the required factual showing constantly changed.

But the issuance of subpoenas was not the only one way of obtaining information from witnesses or suspected tippers or tippees. A simpler way was to contact them by phone, usually done by two or more Enforcement staff members, and then

question them about the relevant facts. In February 2005, Kreitman gave carte blanche to two staff members working on the PCM investigation to contact all former PCM employees, officers, and directors—more than 200 individuals.

Notes:

1 Ann Davis, Morgan Stanley May Reconsider Mack for CEO, WALL ST. J., June 23, 2005, at C1.

2 See infra pp. 25-34.

3 Mack is a "Bush" Ranger, meaning he raised at least $200,000 for the President during the 2004 presidential campaign. See: John Helyar, A Record Year for Bigtime Donors, FORTUNE, April 19, 2004, at 46. But his fundraising went far beyond that level; he "reached elite status as a fund-raiser for President Bush" during the 2004 Presidential campaign. See: Landon Thomas Jr., Credit Suisse Parts Ways with a Chief, N.Y. TIMES, June 24, 2004, at C1. For example, "When Mr. Bush began raising money [in 2003], one of his first stops was New York, where he collected $4 million at an event organized in part by Mr. Paulson and Mr. Mack." See: Glen Justice, Patrick McGeehan and Landon Thomas Jr., Once at Arm's Length from Bush, Wall Street Is Now Biggest Donor, N.Y. TIMES, Oct. 23, 2003, at A1. Mack is also currently the CEO of Morgan Stanley, the largest contributor to the Bush 2004 Campaign. See: Rick Westhead, What U.S. Vote Means to Investors, Incumbents Often Have an Advantage, TORONTO STAR, Oct. 28, 2004, at L1 ("Morgan Stanley was tops through August with $527,030 (U.S.) worth of contributions to the Bush campaign.") According to Time Magazine's December 19, 2005, edition, Mack and one other candidate were "at the top of the list to replace Treasury Secretary John Snow." See: Karen Tumulty and Mike Allen, His Search for a New Groove, TIME, Dec. 19, 2005, at 38.

4 17 CFR 200.53.

5 17 CFR 200.55 ("In the exercise of their judicial functions, members shall …impartially determine the rights of all persons under the law."); 17 CFR 200.58: ("A member should not be swayed by partisan demands…."); 17 CFR 200.61: ("A member should not, by his conduct, permit the impression to prevail that any

person can improperly influence him, that any person unduly enjoys his favor or that he is affected in any way by the rank, position, prestige, or affluence of any person."); 17 CFR 200.64: ("Members [should] pursue and prosecute … fairly and impartially…all matters which they or others take to the courts for judicial review."); 17 CFR 200.67 ("[T]he necessary rules should be adopted …without fear or favor."); 17 CFR 200.69: ("Members should be …impartial when hearing the arguments of parties or their counsel. … The Commission should continuously assure that its staff follows the same principles in their relationships with parties and counsel."); and 17 CFR 200.735-2(a): ("In view of the effect which Commission action frequently has on the general public, it is important that members [and] employees …maintain unusually high standards of …impartiality…"). The regulations cited above are applicable to both the Commissioners and the Staff (17 CFR 200.735-2(b); 17 CFR 200.50; 17 CFR 200.51).

6 Siobhan Hughes, SEC's Cox Seen Letting Stand Court Hedge-Fund Ruling, DOW JONES NEWS SERVICE, July 24, 2006.

7 Danny Hakim, Hedge Fund Falls Victim to Tech Bear, N.Y. TIMES, May 24, 2001, at C1. ("The world's largest hedge fund group, Pequot Capital of Westport, Conn., is believed to have about $15 billion in assets …")

8 Richard Fletcher, Targeted: The Hedge Fund Insider Dealers, SUNDAY TIMES (London) June 19, 2005, at Business 11.

9 Martin Dickson, Insider Trading, FIN. TIMES (London) June 24, 2005, at 22. Gerard Wynn, UPDATE 1-Reuters Summit-UK to Probe for Hedge Fund Market Abuse, REUTERS News, April 4, 2006.

10. Gerard Wynn, UPDATE 1-Reuters Summit-UK to Probe for Hedge Fund Market Abuse, REUTERS News, April 4, 2006.

11 Illegal Insider Trading: How Widespread is the Problem and is there Adequate Criminal Enforcement? Hearing Before the U.S. Senate Comm. on the Judiciary, 109th Cong. (2006) (statement of Mr. Christopher K. Thomas, President, Measuredmarkets, Inc.).

12 Id., statement of Ms. Linda Thomsen, Director of Enforcement, U.S. Securities and Exchange Commission.

13  "The number of enforcement cases against hedge fund advisers has grown from just four in 2001 to more than 90 since then." Regulation of Hedge Funds, Hearing Before the U.S. Senate Comm. on Banking, Housing, and Urban Affairs, 109th Cong. (2006) (statement of Christopher Cox Chairman, U.S. Securities & Exchange Commission).

14 SEC v. Deephaven Capital Management, SEC Litigation Release No. 19683, (May 2, 2006); SEC v. Langley Partners, SEC Litigation Release No. 19607, (March 14, 2006); SEC v. Hilary L. Shane, SEC Litigation Release No. 19227 (May 18, 2005). The SEC has recovered approximately $26 million in these three case

15 Id.

16 Pipe Dreaming: Once the Domain of "Death Spirals," The Market for Private Investments in Public Equities, or Pipes, Is Going Mainstream. Institutional Investor Americas, October 2006, Vol. 40 No. 10, at 26

17 Belinda Cao, Corporate Bond Sales Hit a Record in U.S., The Int'l Herald Tribune, Nov. 6, 2006, at Finance 15.

18 The facts follow the same pattern. A public company decides to raise money by making a private placement of its stock with the intent to register the stock a few months later. This is commonly known as a private investment in public equity or PIPE. A hedge fund agrees to purchase stock through the placement. The hedge fund also knows that the public announcement of the PIPE will depress the market price of the stock. Knowing that, the hedge fund shorts the company's stock and covers it with the private placement for a quick and sure profit. In executing the short, the hedge fund acts on material nonpublic information and violates the securities laws.

19 "The focus on Pipes was prompted in part by complaints from a large mutual fund whose traders had noticed a pattern in which small-company stocks would decline in advance of a company's announcement of a Pipe deal, according to people familiar with the matter." Susan Pulliam, Stock-Trading Cheats Are in the Cross Hairs, WALL ST. J., July 8, 2004, at C1. "For Bradley, who gave the SEC a list about 18 months ago of companies whose stock might have traded irregularly after a PIPE deal, said there appeared to be a concerted effort to spread

information in the market in an unaudited way." Herbert □௳௳ Lash, Hedge Fund Instant Messaging Should Be Scrutinized, Reuters News May □௳௳ 24, 2005.

20 SEC v. Gary M. Kornman, SEC Litigation Release No. 18836 □௳௳ (August 18, 2004).

21SEC v. Michael K.C. Tom, SEC Litigation Release □௳௳ No. 19729 (June 15, 2006).

22SEC v. Nelson J. Obus, SEC Litigation □௳௳ Release No. 19667 (April 25, 2006).

23 See supra notes 20 and 21. □௳௳

24 SEC v. Gary M. Kornman, supra note 20.

25 The most recent order □௳௳ in the court's file, available on PACER, conditionally dismissed the SEC's □௳௳ complaint. There is a pending criminal case against Mr. Kornman.

26 □௳௳ SEC v. Michael K.C. Tom, supra, note 21.

27 SEC v. Michael K.C. Tom, □௳௳ et al., SEC Litigation Release No. 19729, (June 15, 2006). The court file, □௳௳ available on PACER, reveals that Michael K.C. Tom has not settled or gone □௳௳ to trial on the SEC allegations. However, Tom was convicted of insider □௳௳ trading and received a six-month sentence. "Tom did plead guilty to □௳௳ insider trading and was sentenced to six months "in a community □௳௳ confinement facility." See: Business in Brief, THE BOSTON GLOBE Nov. 30, □௳௳ 2006, at D2.

28 SEC v. Nelson J. Obus, SEC Litigation Release No. □௳௳ 19667 (April 25, 2006).

29 See paragraphs 21 and 30 of the complaint □௳௳ in SEC v. Obus, available at □௳௳ http://www.sec.gov/litigation/complaints/2006/comp19667.pdf.

30 See □௳௳ supra, note 11 and Gretchen Morgenson, Whispers of Mergers Set off Bouts □௳௳ of Suspicious Trading, N.Y. Times, Aug. 27, 2006, at A1.

31 See Cao, □௳௳ supra note 17.

32 See Fletcher, supra note 8, Dickson, supra note 9 □௳௳ and Wynn, supra note 10.

33 Illegal Insider Trading: How Widespread is □௳௳ the Problem and is there Adequate Criminal Enforcement? Hearing Before the □௳௳ U.S. Senate Comm. on the Judiciary, 109th Cong. (2006) (statements of □௳௳ Prof. James Cox, Prof. John Coffee, Mr. Robert Marchman, Executive Vice □௳௳ President of the NYSE, and Linda Thomsen, Director of the SEC Division of □௳௳ Enforcement).

34 Id., statement of Prof. John Coffee.

35All the □௳௳ emails referenced in the footnotes, to this testimony, including this one

have been previously provided to Committee staff. See my March 1, 2005, email to Robert Hanson (Hanson), Eric Ribelin (Ribelin), Hilton Foster (Foster) and Mark Kreitman (Kreitman). With this email I informed my supervisors and other staff working on the PCM investigation: "I think we should also serve subpoenas on key broker-dealers, such as Goldman and Morgan Stanley, whose ties to Pequot propitious timing seem to be frequent." I issued subpoenas to Goldman Sachs and Morgan Stanley later that month for records relating to their prime brokerage and trading relationships with PCM

36 Reuters, 2 Men Are Accused Of Insider Trading, N.Y. TIMES, July 30, 2002 at C1.

37 Reuters, Former Executive Pleads Guilty, N.Y. TIMES, October 23, 2002 at C2.

38 See my October 8, 2004, email to Cain and Grime.

39 A copy of this document was provided to Committee staff as Ex. 25 to my letter of August 21, 2006, to Senator Shelby

40 Id. During a phone interview, a senior Morgan Stanley trader told several staff members including me that PCM usually paid five cents a share for executing its trades

41 Ianthe Jeanne Dugan, In the Loop: How Inside Stock Tips Still Flow Despite Regulatory Crackdowns—Some Hedge Funds, Especially, Find Ways Around Efforts To Level the Playing Field—Heads-Up on a Rating Change, WALL ST. J., August 27, 2004.

42 Id.

43 Supra, note 39.

44 See Ribelin's February 3, 2005, email to me.

45 See Samberg's February 28, 2001, email to Zilkha.

46 Id.

47 See Samberg's April 30, 2001, email to Zilkha.

48 See Zilkha's June 15, 2001, email to Samberg.

49 See Zilkha's June 18, 2001, email to Samberg.

50 Id. On the same day, Reuters said there was "Mounting speculation about a profit warning from Microsoft." Eurostocks down, techs hit again by Microsoft talk, REUTERS News, June 15, 2001.

51 See Samberg's April 6, 2001, email to Zilkha.

52 Id.

53 A copy of this document, the timeline of events, was provided to Committee

staff as ex. 12 to my letter of August 21, 2006, to Senator Shelby.

54 Id.

55 See Samberg's April 20, 2001, email to Zilkha.

56 See Samberg April 23, 2001, email to Broach and Schendel.

57 I was fired before I had the opportunity to question Samberg about Zilkha.

58 See Shash Patel's March 14, 2003, email on instant messaging and Samberg's
May 23, 2001, email to Zilkha.

59 Gregory Zuckerman, Pequot Partners Split as Benton Plans to Launch His Own

Funds, WALL ST. J., April 4, 2001, at C1; See also my June 27, 2005, email to

Kreitman, Hanson and Ribelin.

60 See my May 9, 2005, email to Florschutz, Kreitman and Hanson.

61 See my June 27, 2005, email to Kreitman, Hanson and Ribelin.

62 See my August 4, 2005, email to Hanson.

63 See my June 27, 2005, email to Kreitman, Hanson and Ribelin.

64 Id.

65 Id.

66 Id.

67 Id. Samberg told Fortune Magazine in 1998 that he attributed PCM's high

returns to its practice of contacting public companies for information. He testified

that PCM had continued this practice in 2001. "The investment staff visits

thousands of companies each year, conducts extensive interviews with management

as well as competitors, suppliers, distributors, and customers." Lawrence A.

Armour, A Hedge Fund Winner; Ignoring Wall Street Research Pays Off,

FORTUNE, October 12, 1998, at 224.

68 See my June 27, 2005, email to Kreitman, Hanson and Ribelin.

69 Id.

70 Id.

71 Id.

72 Mark Veverka, The Games People Play II: A Winning Hand in Cellphone Poker,

BARRON'S, September 5, 2005, at 28.

73 See my June 3, 2005, email to Hanson, Kreitman, Ribelin, Foster, Jim Eichner (Eichner), Tom Conroy (Conroy), Stephen Glasco (Glasco) and Nancy Miller (Miller).

74 See Samberg's September 26, 2001 email to DiMenna.

75 See my June 27, 2005, email to Kreitman, Hanson, and Ribelin.

76 Id.

77 Id.

78 Id.

79 Id.

80 See my August 4, 2005, email to Hanson.

81 See my December 16, 2005, email to Richard Grime.

82 See my February 18, 2005, email to Hanson and Kreitman.

83 Id.

84 See infra p. 17-18.