UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Gary Aguirre,<br><br>    Plaintiff,<br><br>v.<br><br>Securities and Exchange<br>Commission,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)    Civil Action No.:  06-1260 (ESH)<br>)<br>)<br>)<br>)<br>)<br>) |

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S CROSS-
MOTION FOR SUMMARY JUDGMENT AND REPLY TO PLAINTIFF'S
OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**I.  INTRODUCTION**

Since Plaintiff filed his cross-motion in December, the Securities and Exchange
Commission (SEC) has reshuffled the deck and dealt itself a new hand. It has reshaped its
theories on two key issues defining the SEC's position in this case. First, the SEC decided its
FOIA office erred since March 2006 in relying on Exemption 7(C) to withhold key Pequot
records, including the transcripts of the John Mack (Mack) and Arthur Samberg (Samberg)
examinations.[1] Like magic, the SEC dealt itself two new cards: Exemptions 3 and 4. According
to the SEC, Exemption 3 allows the SEC to withhold all Pequot records, including the 2,832
pages it has already released. It also refuses to disclose what records it withholds under
Exemption 4.[2]  Both theories ignore controlling case law and rest on faulty factual theories. The
SEC also fails to address an obvious question: why did it reshape its case at the eleventh hour?

---

[1] See Exs. 1-4 to the Third Declaration of Melinda Hardy (Third Hardy Decl.).
[2] See Second Aguirre Decl. ¶14.

In a similar vein, the SEC finally tells how it searched for records relating to Plaintiff's employment and firing. Unfortunately, the more the SEC explains, the clearer it becomes that no genuine search has yet been conducted. We address below the gaps, irregularities, and conflicting statements the SEC has offered in connection with its search. All of which establishes that an order of this court will be necessary to obtain an adequate search.

The SEC's recent filing has added these new issues: (1) the withholding of 1,822 pages of Pequot records under Exemption 3, (2) the withholding of "commercial and financial information under Exemption 4, and (3) whether its *latest* description of the search for records relating to Plaintiff's employment was adequate. The SEC does not even try to defend its eleventh hour maneuvering. Instead, it employs a bold but venerable tactic: "the best defense is a good offense." The SEC cleverly accuses Plaintiff of doing exactly what the SEC has done: redesign its case at the eleventh hour. This is myth. Plaintiff has added no any new issues, nor abandoned any significant issues in this case.[3]

## II. The SEC May Not Withhold Pequot Records under Exemption 3(B)

### A. The SEC finds a silver bullet.

The SEC claims it found a silver bullet for withholding Pequot records: Exemption 3. According to the SEC, Exemption 3 allows the SEC to withhold every Pequot record: those subject to a confidential treatment request,[4] those cited by the SEC in its case closing report, and all 2,832 pages it has already released to Plaintiff.[5]  But that is only part of Exemption 3's charm for the SEC. According to the SEC, the application of Exemption 3 may be easily proved; the court need only read a phrase or two in the Commission's January 6, 2005, order.

---

[3] See Second Aguirre Decl. ¶17.
[4] See table at. 9 and 10 of the SEC Reply Memo.
[5] See Second Aguirre Decl., ¶¶13 and 19, and Ex. 31.

Despite its charm, one question about Exemption 3 seeks an answer: how did the SEC overlook this silver bullet for almost two years? It did not mention it in any letter to Plaintiff, in any filing, or in either Vaughn indices until Plaintiff filed his motion. More broadly, according to its website, the SEC has not asserted Exemption 3 for at least ten years in withholding *any* records obtained by its Enforcement Division through *any* investigation under *any* of the securities laws, including the Advisers Act.[6] Perhaps, that explains why the SEC's FOIA Office (1) rejected the requests for confidential treatment by Pequot, Morgan Stanley, Mack, and Samberg under Exemption 3[7] and (2) ignored Exemption 3 in releasing at least 2,832 pages of Pequot records on eight different occasions from May 1, 2007, through September 28, 2007.[8]

Senior Enforcement officials saw no reason to withhold details of the Pequot investigation when they testified before the Senate Judiciary Committee on December 5, 2006[9] or when they released the case closing report which describes the evidence relied upon by the SEC in halting the investigation.[10]

The SEC's refusal to release Pequot records also conflicts with its routine practice of releasing information obtained pursuant to an investigation under the Advisers Act. That practice is spelled out in SEC Form 1662 which the SEC routinely provides to every witness, including witnesses in the Pequot investigation, at the time he or she receives a subpoena.[11] Form 1662 tells the witness the "routine uses which may be made of the information furnished," which include providing it to bar associations, other professional associations, witnesses, private collection agencies,

---

[6] Second Aguirre Decl. ¶3, Ex. 33.

[7] In Associate Director Richard Humes's letters of Dec. 18, 2007, Exs. 1-4 to Third Hardy Decl., he states that he overruled the decision of his FOIA officer denying confidential requests under Exemption 3.

[8] Second Aguirre Decl., ¶28

[9] The Testimonies of Linda Thomsen, Paul Berger, Mark Kreitman and Robert Hanson are available at http://judiciary.senate.gov/hearing.cfm?id=2437 (last visited March 12, 2008).

[10] SEC Case Closing Report, Nov. 30, 2006, ("case closing report"), Ex. 31 to Second Aguirre Decl.

[11] Second Aguirre Decl., ¶2 and SEC Form 1662, Ex. 3.

consumer reporting agencies, members of Congress, other government agencies (local, state, national and foreign), the press, and the public.[12]

The SEC's silver bullet appeared for the first time in the December 18, 2007, letters from Associate Director Richard Humes (Humes) to the attorneys for Pequot, Morgan Stanley, Samberg, Mack, and others.[13] As discussed in Plaintiff's Memorandum in Support of Plaintiff's Cross-motion for Summary Judgment (Plaintiff's opening memo), Humes has multiple roles in this litigation. Both attorneys in this case report to him.[14] He also decides all FOIA appeals.[15] Humes served as the SEC's liaison during the Senate investigation until Senator Grassley objected that Humes had misled Senate staff and had a conflict of interest.[16] Humes's multiple roles lie at the heart of the Office of the General Counsel (OGC) conflict of interest in this case.[17]

For Humes, the silver bullet arrived in the nick of time. His letters to Pequot's and Mack's attorneys conceded that Exemption 7(C)—until then the SEC's workhorse in withholding Pequot records—was suffering fatigue. Humes wrote to Samberg's attorneys:

> In light of these disclosures, Mr. Samberg no longer has a privacy interest we can protect in not being associated with a law enforcement matter or in the specific facts disclosed in the Senate Report. … For these reasons, Exemption 7(C) does not provide a basis to withhold Mr. Samberg's identity, the focus of the Commission's investigation, or other matters specifically disclosed in the Senate Report.[18]

Humes took exactly the same position on Exemption 7(C) with Mack's attorneys.[19]

Absent the silver bullet, the SEC had run out of time and FOIA exemptions for withholding the Samberg and Mack transcripts and exhibits. And to take it a step further, Humes's concession

---

[12] *Id.*
[13] See Exs. 1-4 to Third Hardy Decl.
[14] See First Aguirre Decl., ¶¶ 31(b) and 32.
[15] Plaintiff's Opening Memo, pp. 9 and 38-40.
[16] *Id.*, pp. 39-40.
[17] *Id.*, pp. 38-42.
[18] Ex. 1 to Third Hardy Decl., p. 6.
[19] Ex. 2 to Third Hardy Decl., p. 6.

that Mack and Samberg have few if any privacy rights relating to the SEC's Pequot investigation by virtue of the Senate Report is a slippery slope for the SEC. The same Senate Report disclosed the involvement of others in Pequot's trading and the SEC investigation. Hence from the SEC's perspective, the Humes concession on Samberg and Mack could extend across the board. All this means 7(C) needed a replacement; Exemption 3 showed up just in time.

There appears to be a remarkable coincidence in the timing of the SEC's decision to pull back its reliance on Exemption 7(C) and assert Exemption 3(B) in its place. Twenty-one months passed from the date Plaintiff submitted his request to the SEC for the Pequot records and the Humes letters of December 18, 2007. During this entire period, the SEC never asserted Exemption 3. Yet, two weeks after Plaintiff served his Opening Memo, which focused on the SEC's misplaced reliance on Exemption 7(C),[20] Humes "reversed" the SEC's FOIA office on Exemptions 7(C) and 3.[21]

### B. The SEC's late maneuver violates SEC regulations, the court's order, and local rules.

By engaging in these maneuvers, the SEC violated applicable regulations and one of the court's orders. Section 200.80 of title 17 of Code of Federal Regulations provides that the SEC shall send a response to the requester "within 20 business days from the date" the SEC's FOIA office received the request, stating "the records are being withheld, in whole or in part, under a specific exemption or are being released." The SEC knew the key facts—the relevant language in the Commission's January 2005 order—when it received Plaintiff's March 21, 2006, request. Yet it failed to assert either exemption for another eighteen months.

The SEC passes off its dilatory tactics by claiming it could not make a decision until it had processed the requests for confidential treatment. This theory has multiple flaws. First, the SEC's

---

[20] Plaintiff's Opening Memo, pp. 9-35.
[21] Exs. 1-4 to Third Hardy Decl. and Second Aguirre Decl., ¶14.

assertion of Exemption 3 did not depend on any facts raised by the submitters. In asserting Exemption 3, the SEC relies exclusively on the text of a Commission order issued three years ago.[22] Likewise, the SEC asserts Exemption 4 on the theory that disclosure of financial information would impair the SEC's ability to obtain similar information in the future. Putting aside the other flaws in this theory, as discussed below, it does not rest on any new facts. Third, as discussed in Plaintiff's Opening Memo at 7-9, the SEC was also dilatory in processing the submitters' requests for confidential treatment.

On August 9, 2007, this court ordered: "On or before August 24, 2007, defendant must provide plaintiff with a draft Vaughn index." As ordered, the SEC timely provided a draft *Vaughn* index to Plaintiff. It later filed and served its final *Vaughn* index on October 1, 2007. Neither cited Exemption 3 as a basis for withholding any records. In *Citizens for Responsibility & Ethics v. U.S. Dep't of Homeland Sec.,* 514 F. Supp. 2d at 36, the court observed:

> Although there is no set form for a *Vaughn* index compiled in response to a FOIA request, our Circuit Court has identified three important components: "(1) that the index is one document; (2) the index must adequately describe the withheld documents or deletions; and (3) the index must state the particular FOIA exemption and explain why the exemption applies."

The SEC also ignored Local Rule 7(h). The SEC assertion of Exemptions 3 and 4 are not accompanied by a statement of material facts to which it contends there is no genuine issue. To sum up, the SEC's new grounds in the pending motions violate its own regulations, the court's August 9 order, and the Local Rules. For this reason alone, the court should reject the SEC's untimely reliance on Exemption 3 in withholding Pequot records.

### C.  Section 210(b) of the Advisors Act is not an exempting statute within Exemption 3.

Turning to the merits, the SEC's reliance on Exemption 3 is misplaced for two reasons. First, the notion that Section 210(b) of the Advisers Act is an Exemption 3(B) statute finds no support

---

[22] SEC Reply Memo, p. 12.

in case law since Congress amended it in 1976. Second, as discussed in the next section, the Pequot records sought by this lawsuit were obtained by the SEC pursuant to an investigation under the Exchange Act, *not the Advisers Act*, as SEC internal records indisputably establish.

The SEC hinges its argument on language in Exemption 3(B) which allows the withholding of matters "specifically exempted from disclosure by statute . . . provided that such statute … refers to particular types of matters to be withheld." The SEC claims that Section 210(b) of the Advisers Act "refers to particular types of matters to be withheld." If so, those "particular types of matters" must be found in the following language in Section 210(b):

> [T]he Commission, or any member, officer, or employee thereof, shall not make public the fact that any examination or investigation under this title is being conducted, or the results of or any facts ascertained during any such examination or investigation; and no member, officer, or employee of the Commission shall disclose to any person other than a member, officer, or employee of the Commission any information obtained as a result of any such examination or investigation except with the approval of the Commission.

The SEC explains how it shoehorned Section 210(b) into Exemption 3 with these words: "Thus, Section 210(b) limits disclosure of '*any* information obtained as a result of *any* examination or investigation' under the Investment Advisers Act … (emphasis added)"[23] Plaintiff submits that the SEC's contention is refuted by putting the language of the two statutes, Section 210(b) and Exemption 3(B), side by side; the broad language "any information obtained as a result of any examination or investigation" under the Advisers Act simply does not fit into Exemption 3(B)'s rubric: "particular types of matters to be withheld."

Significantly, the universe of information "obtained as a result of any examination or investigation" under the Advisers Act is potentially massive. The Advisers Act is one of the seven laws that "govern the securities industry," according to the SEC website.[24]  It is a 12,000-

---

[23] SEC Reply Memo, p. 11.
[24] http://www.sec.gov/about/laws.shtml (Last visited March 12, 2008).

word act with twenty-four sections. In essence, it is an enforcement statute which defines the scope of potential investigations and examinations in one way or another in most of its sections. This means that Section 210(b) would be a barrier to FOIA's sunshine at almost every step the SEC takes to enforce the Advisers Act, with the exception of court proceedings and possibly internal hearings. In short, Exemption 3(B) would consume FOIA as it applies to the Advisers Act and the SEC has absolute discretion to decide what will and will not be disclosed.

The SEC's theory that Section 210(b) is an exempting statute under Exemption 3 finds no support in case law since Congress overruled the Supreme Court's decision in *FAA Administrator v. Robertson*, 422 U.S. 255 (1975). In *Robertson*, *Id*. at 266, the Supreme Court concluded Exemption 3 was simply a mechanism Congress had employed "to permit numerous laws then extant to stand." From that policy perch, the Court held that Section 1104 of the Federal Aviation Act of 1958 was an Exemption 3 exempting statute. Section 1104 granted broad discretion to the FAA to withhold records,[25] but not as broad as Section 210(b)'s grant to the SEC. Congress overruled *Robertson* in 1976 by amending Exemption 3 to its present form.

One of the first D.C. Circuit cases to discuss amended Exemption 3 was *American Jewish Congress v. Kreps*, 574 F.2d. 624 (D.C. Cir. 1978). The court held that Section 7(C) of the Export Administration Act (EAA) was not an exempting statute within the scope of Exemption 3(B). In an analysis frequently cited within and without the D.C. Circuit, *Am. Jewish Cong.* offered these guidelines for applying amended Exemption 3(B):

> Subsection (B) does leave room for administrative discretion in two carefully defined situations, but its unmistakable thrust, like that of Subsection (A), is to assure that basic policy decisions on governmental secrecy be made by the Legislative rather than the Executive branch. To include within its sweep provisions reflecting no more than a vague apprehension that an agency might

---

[25] In *Robertson*, Section 1104 allowed the FAA to withhold the information where "disclosure would adversely affect the interests of [the submitter] and is not required in the interest of the public (emphasis added)." Section 210(b) gives the SEC unfettered discretion.

someday fall heir to sensitive information is obviously to frustrate that policy. *Nondisclosure is countenanced by Subsection (B) if, but only if, the enactment is the product of congressional appreciation of the dangers inherent in airing particular data and incorporates a formula whereby the administrator may determine precisely whether disclosure in any instance would pose the hazard that Congress foresaw* (Emphasis added).

The D.C. Circuit has applied the reasoning from *Am. Jewish Cong.* over four decades in deciding whether statutes satisfy Exemption 3's criteria. *Iron & Sears v. Dann*, 606 F.2d 1215 (D.C. Cir. 1979); *CNA Fin. Corp. v. Donovan*, 830 F.2d. 1132 (D.C. Cir, 1987); *Essential Info. v. U.S. Info. Agency,* 134 F.3d 1165, 1166 (D.C. Cir. 1998); *Wisconsin Project v. U.S. DOC*, 317 F.3d 275, 280 (D.C. 2003). *Public Citizen, Inc. v. Mineta*, 2006 U.S. Dist. LEXIS 52786 (D.D.C. 2006).

The Ninth Circuit applied the analysis from *Am. Jewish Cong.* in *Church of Scientology v. U.S. Postal Service*, 633 F.2d 1327 (9th Cir. 1980), *aff'd* at 484 U.S. 9. The case presented a legal issue nearly indistinguishable from the one before this court. As in this case, the statute in *Am. Jewish Cong.*, Subsection 410(c)(6) of the Postal Reorganization Act,[26] gave discretion to the agency, the Postal Service, to withhold investigatory files. The Ninth Circuit concluded that Section 410(c)(6) was not an Exemption 3(B) statute. The court cited *Am. Jewish Cong.* for establishing the applicable legal standard. *Church of Scientology*, 633 F.2d. at 1330. Applying *Am. Jewish Cong.*, the Ninth Circuit surveyed the legislative history for congressional intent whether "investigatory files" should be exempt from FOIA. To the contrary, the court found that Congress had "made strong statements about the hazards of agencies withholding, *carte blanche*, any information thrust into an 'investigatory file.'" (*Id*. at 1331) The court concluded "that Section 410(c)(6) provides insufficient specificity to take it out of the impermissible range of agency discretion to make decisions rightfully belonging to the legislature." (*Id*. at 1333) The opinion continued:

---

[26] The key language of the statute read: "Subsection (b)(1) of this section …shall not require the disclosure of … (6) investigatory files … compiled for law enforcement purposes … "

> Section 410(c)(6) permits the Postal Service total discretion to give or restrict any or all of its investigatory files. Thus, it is of no moment that (c)(6) narrows the range of documents to investigatory files "compiled for law enforcement purposes." Moreover, in amending Exemption 7 to read "investigatory records", Congress has already expressly decided that the term "investigatory files" allows too much agency discretion. *Therefore, we hold that section 410(c)(6) is not an Exemption 3 statute*. (Emphasis added). *Id*. at 1333.

The D.C. Court of Appeals cited *Church of Scientology* with approval in *Association of Retired R.R. Workers, Inc. v. U.S. R.R. Retirement Bd.*, 830 F.2d 331, 334 (D.C. Cir. 1987). Given the holding in *Church of Scientology*, it follows that Section 210(b) of the Advisers Act, which gives the same broad discretion to the SEC, also fails to come within the purview of Exemption 3(B).

In *CNA Fin. Corp. v. Donovan*, 830 F.2d. 1132 (D.C. Cir, 1987), the court concluded that the Trade Secret Act (18 U.S.C. §1905) was not an Exemption 3(B) statute. In language equally applicable to this case, the court in *CNA Fin. Corp.* observed: "Devoid of any normative content to steer the agency in determining when revelation of data would be deleterious, the Act is susceptible of invocation to bar disclosure at the whim of an administrator acting under such a regulation." 830 F.2d. at 1139. See also: *Public Citizen, Inc. v. Mineta*, 2006 U.S. Dist. LEXIS 52786 (D.D.C., July 30, 2006) ("The Secretary …is given wide latitude to determine whether the disclosure of any of the materials will, or will not, be helpful in the carrying out of certain enumerated sections. … Accordingly, the Court concludes that [statute] does not qualify under the second prong of FOIA Exemption 3.")

Nor do the decisions cited by the SEC support its contention that Section 210(b) qualifies as an exempting statute under Exemption 3(B). Three of the cases cited by the SEC involved exempting statutes which gave the agency *no or very narrow* discretion to withhold information. *Seymour v. Barabba*, 559 F.2d 806 (D.C. Cir. 1977); *Medina-Hincapie v. Dep't of State*, 700 F.2d 737 (D.C. Cir. 1983)*; Iron & Sears v. Dann*, 606 F.2d 1215 (D.C. Cir. 1979).

The SEC asserts that *Seymour* involves a comparable statute to Section 210(b). This is clearly inaccurate. *Seymour* and this case are polar opposites in relation to the critical factor the courts most often apply in deciding whether a statute comes within Exemption 3(B): the agency's *discretion*. The difference between *Seymour* and this case is the difference between no discretion under the *Seymour* statute and unfettered discretion under Section 210(b). The statute (13 U.S.C. §9) in *Seymour* reads: "Neither the Secretary nor any other officer . . . may, except as provided in §8 of this Title - (1) use the information furnished under the provisions of this Title for any purpose other than the statistical purposes for which it is supplied …" In context, the *Seymour* court had this to say about the exempting statute in that case:

> We think that this statute is a clear and strongly worded prohibition against disclosure which would qualify under Exemption 3. It is a flat barrier to disclosure with no exercise of discretion permitted. It refers to the particular type of matter to be withheld, using rather all-embracing language for the description to be sure, but emphatically including "the information furnished under the provisions of this Title" and forbidding its use "for any purpose other than the statistical purposes for which it is supplied." ( 559 F.2d at 807-808)

The year after the D.C. Circuit decided *Seymour*, it explained in *Am. Jewish Cong.* why the *Seymour* statute fit within Exemption 3 in words that would as well exclude Section 210(b). On this point, *Am. Jewish Cong.* read:

> Our recent application of amended Exemption 3 in *Seymour v. Barabba* illustrates this distinction. There we held that legislation prohibiting use of any "information furnished under [the census laws] for any purpose other than the statistical purposes for which it is supplied" satisfied the exemption's strictures. Noting that Congress had several times specifically considered the issue of the confidentiality of census data, we concluded that the statute delimited narrowly enough the form in which they might be opened to public view. *This amount of attention to the problem and this degree of precision in addressing it convinced us that Congress had itself made the basic decision, and had left to the administrator only the task of implementation* (footnotes omitted; emphasis added) (*Am. Jewish Cong.*, 574 F.2d. at 630).

Section 210(b) does exactly the opposite: it leaves the "basic decision" to the administrator what should or should not be released. Further, there is no recent legislative history regarding Section 210, which *was enacted twenty-eight years before FOIA*. The relevant legislative history discussed in *Church of Scientology* indicates that Congress has distaste for "withholding, *carte blanche*, any information thrust into an 'investigatory file.'" (633 F.2d. at 1331).

Likewise, the SEC's reliance on *Medina-Hincapie v. Dep't of State*, 700 F.2d 737 (D.C. Cir. 1983) is misplaced.  Once again, as in *Seymour*, the administrator in *Medina-Hincapie* had no discretion to release the information under the exempting statute. The D.C. Circuit noted that under section 222(f) the Secretary of State has no authority to disclose material to the public. In that sense the confidentiality mandate is absolute; *all* matters covered by the statute "shall be considered confidential." (*Id*. 700 F.2d at 741-742)  The absence of agency discretion brings the case squarely within the rationale of *Am. Jewish Cong*.

The last case cited by the SEC, *Iron & Sears v. Dann*, 606 F.2d 1215 (D.C. Cir. 1979), also involved a statute with a relatively narrow scope: patent applications. The D.C. Circuit held that Section 122 of the Patent Act was an exempting statute under Exemption 3(B). The court summarized its reasoning why Section 122 qualified under Exemption 3(B):

> In sum, we are simply not faced today with the kind of blanket authorization to keep secret which was at issue in *Robertson, supra*, and which under the Government in the Sunshine Act is clearly to yield to the FOIA's disclosure requirement. Instead we are presented with a statute that (1) affirmatively requires nondisclosure (2) of rather particular sorts of material (3) subject only to a discretionary but apparently narrow "special circumstances" exception which (4) has not historically been used to permit anything resembling general access to the materials in suit and (5) could not be so used without doing violence to the statutory scheme. In our judgment these are precisely the sorts of factors on which Congress intended the application of Exemption 3 to turn. *Id.,* 606 F.2d at 1221.

None of the *Iron & Sears* factors are present in this case.

Two of the cases cited by the SEC relied heavily on the legislative history of FOIA in relation to the specific exempting statutes at issue in those cases. In *CIA v. Sims*, 471 U.S. 159 (1985), the Supreme Court gave two grounds for its decision; neither of which help the SEC in this case. First, the Court discussed the "plain meaning" of the exempting statute, Section 102(d)(3) of the National Security Act. In this regard, the Court observed: "Section 102(d)(3) of the National Security Act of 1947, which calls for the Director of Central Intelligence to protect 'intelligence sources and methods,' clearly 'refers to particular types of matters,' 5 U. S. C. § 552(b)(3)(B)." *Id.*, at 167. Applied to the SEC theory, the *Sims* "plain meaning" analysis yields a *non sequitur*: Section 210(b), which calls for the SEC to withhold "any information obtained as a result of any such examination or investigation" clearly "refers to particular types of matters." In short, *Sims* reveals SEC's Exemption 3 theory is flawed at its core.

As a second ground, the Supreme Court repeatedly emphasized the legislative history demonstrating the need for the CIA Director to have discretion in protecting intelligence sources. The Court observed: "Moreover, the legislative history of the FOIA confirms that Congress intended § 102(d)(3) to be a withholding statute under Exemption 3." *Id.*, 471 U.S. at 167. The Court concluded the legislative history of § 102(d)(3) also indicates Congress gave "the Director of Central Intelligence broad power to protect the secrecy and integrity of the intelligence process" because "without such protections the Agency would be virtually impotent." *Id*. at 170. Ultimately, the Court explained the unique and "grim" reason why the CIA Director would need the discretion to decide which intelligence sources to protect: "Congress was also well aware of the importance of secrecy in the intelligence field. Both General Vandenberg and Allen Dulles testified about the grim consequences facing intelligence sources whose identities became known." *Id*. at 172.

Again, the relevant legislative history of FOIA suggests Congress would not intend Section 210(b) to be a withholding statute under Exemption 3. *Church of Scientology*, 633 F.2d. at 1331. Nor has the SEC suggested any reason why it would need broader discretion to withhold information of possible insider trading by a hedge fund under the Advisers Act than the Director of the CIA would need to protect intelligence sources under the National Security Act.

Finally, the SEC cites an Eleventh Circuit decision, *Times Publishing Co. v. U.S. Dep't of Commerce*, 236 F.3d 1286 (11th Cir. 2001). The court focused on the legislative history of Section 12(c)'s of the Export Administration Act: "The current version of the EAA confidentiality provision was enacted precisely to comply with the requirements of FOIA Exemption 3 following a finding that the predecessor confidentiality provision did not qualify to exempt information from public disclosure," citing similar holdings in *Lessner v. U.S. Dep't of Commerce*, 827 F.2d 1333, 1337 (9th Cir. 1987) and *Durnan v. U.S. Dep't of Commerce*, 777 F. Supp. 965, 966 (D.D.C. 1991).

### D. Plaintiff seeks no records obtained by the SEC under the Advisers Act.

The SEC has a second hurdle in withholding Pequot records under Section 210(b), since the application of Exemption 3 is a two-step process. In *Sims,* the Supreme Court explained, *"Our conclusion that § 102(d)(3) qualifies as a withholding statute under Exemption 3 is only the first step of the inquiry. Agency records are protected under § 102(d)(3) only to the extent they contain 'intelligence sources and methods' or if disclosure would reveal otherwise protected information"* (*Sims*, 471 U.S. at 168) See also: *Baldrige v. Shapiro*, 455 U.S. 345, 353 (1982); *Iron & Sears*, 606 F.2d at 1221 ("Having determined that Section 122 is an Exemption 3 nondisclosure provision, we now turn to the effect of that section on the documents in suit.")

Section 210(b) only permits information to be withheld if it was obtained through an investigation or examination under the Advisers Act. Hence, to satisfy the second step under

14

*Sims*, *Baldrige,* and *Iron & Sears,* the SEC must establish that the Pequot records were obtained through an investigation *under the Advisers Act*. The facts are to the contrary. Beyond any question, the Pequot records sought by Plaintiff in this case were obtained by the SEC during its investigation of Pequot *under Sections 10(b) and 14(e) of the Exchange Act*. The evidence before this court on this point could not be clearer or more credible.

By its own admission, the SEC obtained the Pequot records—the exact records sought by Plaintiff—through an investigation under the Exchange Act rather than the Advisers Act. The SEC made the admission in its case closing report.[27] With much fanfare, the SEC released that report to the Senate Judiciary Committee and the public when its Director of Enforcement, Linda Thomsen, and three other SEC officials testified on December 5, 2006, in connection with the Pequot investigation.[28] The six-page report describes two prongs to the Pequot investigation: possible market manipulation and insider trading. It also includes an "Investigation Summary" which describes the possible violations which the SEC investigated through the Pequot investigation: 34 §10B (Section 10(b) of the Exchange Act), fraud; and 34 §14(e) (Section 14(e) of the Exchange Act), tender offer fraud, and the relevant rules under both sections.[29] Conspicuously absent from the SEC's case closing report is any reference or allusion to a possible violation of Section 204A or any other provision of the Advisers Act. In short, the SEC's case closing report conclusively refutes the SEC's contention that it obtained these records pursuant to a violation under the Advisers Act.

To be specific, the case closing report identifies seven persons, including Samberg and Mack, who the SEC examined in connection with Pequot's trading in General Electric (GE) and Heller Financial (Heller). The report describes the specific reason each of their examinations was taken

---

[27] Case Closing Report, Ex. 31.
[28] *Supra*, ft. 9. Deputy Dir. Peter Bresnan, the Enforcement Division second highest official, signed the report.
[29] Case Closing Report, Ex. 31.

in relation to the SEC's *insider trading investigation*: Samberg's role as the possible tippee; Mack's role as the possible tipper; the two CSFB employees in relation to whether Mack knew about the GE-Heller merger; the role of the Pequot head trader and his assistant in executing GE and Heller trades; and a Stock analyst as a possible source of the merger tip.[30] It is these specific transcripts and records which Plaintiff seeks through this lawsuit. In short, the case closing report established that the specific records sought by Plaintiff were obtained by the SEC through its insider trading investigation of Pequot under Sections 10(b) and 14(e) of the Exchange Act.

The case closing report does not stand alone. Other compelling evidence establishes that Pequot was conducted as an insider trading investigation under the Exchange Act. The senior SEC officials who testified at the Senate Judiciary hearing on December 5, 2006, described Pequot as an insider trading investigation.[31] Likewise, the 108-page Senate Report describes Pequot as an SEC investigation of market manipulation and insider trading. Senate investigators conducted thirty interviews and examined over 10,000 pages of records produced by the SEC relating to the Pequot investigation.[32]

The SEC selectively quotes from the Commission's order, including the language relating to Section 204 of the Advisers Act out of context, but omitting the references to "possible violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated" and authorizing the investigation under both the Exchange Act and the Adviser's Act.[33] At its high water mark, the role of a possible 204A violation in the Pequot investigation was minor at most. As SEC records released by the Senate tell, Plaintiff "developed the factual and legal theory" for including possible violations of Section 204(A) and "drafted [the] formal order memorandum" in the

---

[30] *Id.*
[31] *Supra*, ft. 9.
[32] *The Firing of an SEC Attorney and the Investigation of Pequot Capital Management,* Senate Report No.110-28 (2007) (S. Rep.) p. 1, Ex. 48 to Second Aguirre Decl.
[33] Ex. 6 toThird Hardy Decl.

Pequot investigation.[34] One sentence of staff's nine-page memorandum dealt with a possible violation of Section 204A. The other eight plus pages dealt with Pequot's possible insider trading in three public companies.[35]

But even that minor role was dropped by April 2005. In early February 2005, as the Senate Report found, SEC senior staff instructed Plaintiff to narrow the scope of the Pequot investigation.[36] By the end of April, staff had focused the investigation exclusively on Pequot's trading in Heller.[37]  Later, the investigation was broadened to include Pequot's trading in Microsoft options.[38] The Senate released a large volume of internal SEC records generated from late April 2005 through August 2006. None describe an ongoing 204A violation. Almost all deal with the insider trading investigation of Pequot's trading in GE-Heller or, to a lesser extent, its trading in Microsoft securities.[39] The portions of the transcripts of Samberg, Mack, and the two CSFB officials focus on evidence related to insider trading. Finally, when the Senate investigation surfaced in 2006, Walter Ricciardi, a Deputy Director of Enforcement, interviewed SEC staff then handling Pequot. They told him Pequot was a two-pronged insider trading investigation involving Pequot's trading in GE-Heller stock and Microsoft securities.[40]

### E.  The impact of the SEC's theory would insulate it from FOIA scrutiny.

In subsection II(C), Plaintiff cited controlling case law holding that statutes like Section 210(b), granting agencies discretion to withhold information, do not come within Exemption 3. In subsection II(D), Plaintiff noted the role of the Advisers Act in the Pequot investigation: beginning as minor and quickly becoming nonexistent.  Considering these two concepts together

---

[34] Second Aguirre Decl., ¶6, Ex. 35.
[35]  The formal order memorandum contains the evidentiary basis for the Commission's issuance of an order Second Aguirre Decl., ¶6, Ex. 36.
[36] Ex. 48, p. 16-18, subsection titled "*Supervisors Order a Limited Inquiry.*"
[37] Second Aguirre Decl. ¶9, Ex. 37.
[38] *Id*.
[39] *Id*.
[40] Ex. 48, S. Rep., p. 132.

gives a third perspective on the SEC's contention. In essence, the SEC contends that a reference to the Advisers Act, no matter how minor its role, in a Commission order brings a multipronged investigation involving multiple securities acts within the scope of 210(b). This multiplies SEC discretion under 210(b), which is already too broad under controlling case law.

## III. THE PUBLIC INTEREST IN THE SEC'S PEQUOT INVESTIGATION

As discussed in our Opening Memo, Plaintiff has satisfied his burdens for overcoming the SEC's assertion of Exemption 7(C). He seeks records that shed "light on an agency's performance of its statutory duty." *United States DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 773 (1989), i.e., the specific records upon which the SEC publicly relied in closing the Pequot investigation. Plaintiff also satisfied the evidentiary burden under Exemption 7(C), as articulated by the Supreme Court in *Nat'l Archives & Records v. Favish*, 541 U.S. 157 (2004):

> We hold that, where there is a privacy interest protected by Exemption 7(C) and the public interest being asserted is to show that responsible officials acted negligently or otherwise improperly in the performance of their duties, the requester must establish more than a bare suspicion in order to obtain disclosure. Rather, the requester must produce evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred. *Id.*, 541 U.S. at 174.

The SEC did not address whether Plaintiff met this burden in its Reply Memo, except to say it was not addressing the issue. Relying on *Favish*, 541 U.S. at 174 (2004), the SEC contends: "Because the privacy interests outweigh public interests for all the information at issue, it is not necessary to consider whether Aguirre has produced evidence sufficient to justify obtaining documents on a claim of government misconduct ..."[41] This statement deserves a pause. The SEC is telling the court that it interprets Favish to mean it does not have to challenge Plaintiff's evidentiary showing before the court. According to the SEC, case law makes that showing irrelevant.

---

[41] SEC Reply Memo, p. 20, ft. 19.

Neither the holding nor any *dictum* in *Favish* supports the SEC's contention. In *Favish*, *id.* at 157, the Supreme Court explained why it did not engage in the balancing process: "We need not do so here, however. Favish has not produced any evidence that would warrant a belief by a reasonable person that the alleged Government impropriety might have occurred to put the balance into play." The SEC simply leapt over *Favish*. Once the court determines Plaintiff met his burden, which is not in dispute, it must then "balance the privacy interests of third parties mentioned in the records against the public interest in disclosure …" *Favish*, 541 U.S. at 171; *Reporters,* 489 U.S. at 773-75.

The SEC also complains the "wide-ranging and rambling discussions of public interest" in Plaintiff's opening memo are "difficult to decipher." To be sure, Plaintiff discussed in his opening memo at 9-35 how multiple factors converge to create a compelling public interest in disclosure. But those same factors can be stated simply. The SEC gives favors and then covers up its generosity. The givers and their protectors hold the highest levels of trust at the SEC. The receivers are well-connected Wall Street elite; they sit atop massive financial institutions. The favors entitle the receivers to take a pass on possible securities violations that randomly victimize other investors, including those with modest portfolios stashed away for retirement or college educations. It is a type of abuse—institutional insider trading—that has global implications. Congress had these abuses in mind, particularly insider trading, when it enacted the Exchange Act.[42] See also: *SEC v. Lum's, Inc.*, 365 F. Supp. 1046, 1059 (S.D.N.Y. 1973). The Exchange Act also created the SEC to protect the nation's capital markets from these types of abuses.[43] If

---

[42] The preamble stated to the Exchange Act reads: "An act to provide for the regulation of securities exchanges and of over-the-counter markets … to prevent inequitable and unfair practices on such exchanges and markets ..." (48 Stat. 881 (June 6, 1934), available at http://www.sec.gov/about/laws/sea34.pdf.)

[43] Section 4(a) of the Act reads: "There is hereby established a Securities and Exchange Commission …" As alleged in paragraph 5 of the complaint, Section 200.53(a) of Title 17 provides: It is their task (Commissioners) to regulate varied aspects of the American economy, within the limits prescribed by Congress, to insure that our private

the SEC fails, the same forces may again bring the nation's capital markets to their knees, along with its economy.[44] And then there is the damage done by the SEC's cover up.

Others easily grasp the public interest at stake when the SEC gives favored treatment to Wall Street elite and then covers its trail. Two committees of the United States Senate[45] understood the public interest when they spent eighteen months investigating the SEC's handling of Pequot. The media understood the public interest when it generated more than 500 articles about the SEC's handling of Pequot.[46] The SEC's new inspector general, David Kotz, also seemed to grasp that same public interest. Reuters News reported: "In addition to changes in the inspector general's office, Kotz said the SEC has started adopting congressional recommendations *to make sure that Wall Street's elite do not use their power to interfere with investigations* (emphasis added)."[47]

The Commissioners and Director Thomsen also grasped the public interest at stake, or so they said. Thomsen told Senator Grassley that Enforcement had taken Mack's testimony because of the "public interest in truth and full disclosure.[48] Likewise the Commissioners released the case closing report because of the "the public attention this case has received." Indeed, according to a CNBC TV reporter, with reliable credentials, Enforcement planned to ask "ask the full Commission to give the green light to release all the evidence in the [Pequot case, including]

---

enterprise system serves the welfare of all citizens. Their success in this endeavor is a bulwark against possible abuses and injustice which, if left unchecked, might jeopardize the strength of our economic institutions.

    [44] The Senate investigation, which produced the Exchange Act, was headed by Ferdinand Pecora (Pecora). Reflecting back on the cause of the 1929 Crash, Pecora wrote: Under the surface of the governmental regulation of the securities market, the same forces that produced the riotous speculative excesses of the "wild bull market" of 1929 still give evidences of their existence and influence. Though repressed for the present, it cannot be doubted that, given a suitable opportunity, they would spring back into pernicious activity.[44] F. Pecora, *Wall Street under Oath: The Story of Our Modern Money Changers*, at ix-x (1939).

    [45] Ex. 48, S. Rep., pp. 20 and 39.

    [46] First Aguirre Decl., ¶35, pp. 16-17.

    [47] Rachelle Younglai, *US SEC Inspector General Pledges Changes,* Reuters News, Feb. 20, 2008.

    [48] Linda Thomsen's testimony is available at http://judiciary.senate.gov/testimony.cfm?id=2437&wit_id=5777.

emails and other documents developed by Aguirre" in order to "clear [Enforcement staff's] name from charges that it pulled punches to protect a high-ranking CEO."[49]

The SEC misconceives the scope of the information that sheds light on the SEC's conduct in giving Mack preferential treatment. As the Senate Report makes clear, the evidence of preferential treatment does not begin and end when an influential attorney contacts the Enforcement Director and blocks the Mack subpoena.[50] Nor is it limited to the comforting statements Associate Director Berger and Director Thomsen gave Morgan Stanley, contrary to SEC policy, just before it hired Mack as CEO, about what evidence the SEC had against Mack.[51] That is merely the first phase. The Senate Report then tells how Berger, who also blocked the Mack subpoena, fired Plaintiff and, within days, sought a job with the law firm that intervened successfully to block the Mack subpoena,[52] a firm where he now works.[53] Berger and Director Thomsen later misled Senate investigators regarding the whole affair.[54] The Senate Report tells how Berger, while burdened with a conflict of interest,[55] and other senior SEC officials first guided the GE-Heller investigation away from Mack, immediately after Plaintiff was fired,[56] and then guided the investigation away from GE-Heller to Microsoft securities, placing its focus even further from Mack.[57] Finally, the SEC took it to a fourth phase when "the Pequot investigation became public," dropping the investigation of Microsoft securities and rushing back to GE-

---

[49] *Will the Mack-Pequot case be dismissed free of charges?*, Charles Gasparino, August 02, 2006; Ex. 34. Second Aguirre Decl., ¶4.
[50] Ex. 48, p. 5. "White contacted Director of Enforcement Linda Thomsen directly. … Soon afterward, SEC managers prohibited the staff from asking John Mack about his communications with Arthur Samberg …" See also email from White to Thomsen, at 7:46 PM, Sunday, June 26, 2005, Ex. 25 to S. Rep., p 345.
[51] Ex. 48, S. Rep., p. 31.
[52] *Id.*, p. 26
[53] See: http://www.debevoise.com/attorneys/detail.aspx?id=2ed80b37-5f7e-4080-9bc1-4984bf90568d, (last visited March 17, 2008).
[54] Ex. 48, S. Rep., p. 82-87.
[55] *Id.*, p. 84.
[56] *Id.*, pp. 38-39.
[57] *Id.*

Heller to investigate Mack.[58] Like a Keystone Kops comedy, the SEC conducted this last phase after the statute of limitations had run against the possible tipper, Mack. But this was no comedy.

The Senate Report paints a picture of an agency giving favors in the shadows, putting the nation's capital markets at risk, and believing it can get away with it. And that activity in the shadows speaks to why FOIA is so vital in this case: "A government by secrecy benefits no one. It injures the people it seeks to serve; it damages its own integrity and operation. It breeds distrust, dampens the fervor of its citizens and mocks their loyalty."[59] But the SEC claims it did not happen that way, pointing to its case closing report for its version of the truth. It there explains how it diligently investigated Mack, Samberg, and Pequot for insider trading, citing the examinations of those seven witnesses to prove its diligence.

The SEC also claims that the Senate has released all relevant records. It cites no support for this statement. Nor does the Senate record support this statement. Nor would it be relevant even if true. The Senate conducted an investigation and rendered its conclusions and findings. Its report cites the evidence which supports its conclusions. The Senate also released testimony of the witnesses at the hearing. All this required consensus among Senate staff and the approval of both Committees. Plaintiff seeks the records as a member of the public to take a new look at the facts. That two Senate committees issued a report does not diminish Plaintiff's rights to obtain the information under FOIA. It merely demonstrates a compelling public interest in knowing the facts surrounding the SEC's misconduct during the Pequot investigation.

Finally, the SEC confuses the issue by citing the holdings and language from many decisions that are not relevant to any issue in this case. Plaintiff informed the SEC in August 2006 that he was not seeking any "purely personal information," such as addresses, phone

---

[58] *Id.*, p. 39.
[59] Statement of Sen. Edward V. Long, 110 Cong. Rec. 17,087 (1964).

numbers, social security numbers, and birth dates.[60] Nor does Plaintiff seek "medical information," "intimate details of [individuals'] lives," "embarrassing disclosures," "personal financial information," or "information strictly about individuals' personal and family life." However, as discussed below, the SEC has used the "personal information" rubric to withhold records that demonstrate its senior officials ignored evidence requiring a diligent investigation of suspected insider trading by Pequot.

## IV.  THE SEC MAY NOT WITHHOLD PEQUOT RECORDS UNDER EXEMPTION 7(C)

### A.  *Plaintiff seeks a limited release of the names of third parties.*

The cases cited by the SEC, where courts have withheld the names of third parties, all differ on one key fact from the case before this court: plaintiffs sought information about third parties unrelated to whether the Government had engaged in misconduct. In *Ctr. for Nat'l Sec. Studies v. U.S. DOJ*, 331 F.3d 918, 947 (D.C. Cir. 2003), the court drew this same distinction, observing: "To begin with, this case does not implicate *SafeCard*'s concern that disclosure of names in law enforcement files will generally shed less light on the government's behavior than it does on the behavior of private citizens." On the other hand, the court concluded that the Plaintiff in *Nat'l Sec. Studies* sought "information relating to the government's conduct of its terrorism investigation and its treatment of the detainees," and, as such, the "request implicates precisely the kind of public interest lying at the heart of Exemption 7(C)'s balancing test." (*Id.* at 946)

In this case, Plaintiff seeks the release of some third party names on much the same theory as the Plaintiff did in *Nat'l Sec. Studies.* However, the issue is not whether the Government was too harsh; rather the issue is whether the Government played favorites. Plaintiff seeks the exact evidence which the SEC relies upon in denying this allegation in its case closing report, the examinations of seven witnesses.  That contention is sharply disputed by the findings of two

---

[60] Sep. 11, 2007, letter from Scott Hodes to Melinda Hardy, ¶2, p. 2, Ex. 13 to Second Hardy Decl.

Senate Committees. Hence, by definition, the evidence sought should "confirm or refute" the SEC's statements in its case closing report and the Senate findings in its report.  As in *Nat'l Sec. Studies* (id at 946), this "request implicates precisely the kind of public interest lying at the heart of Exemption 7(C)'s balancing test."

The Senate had to consider the same issue when it released its report and supporting evidence. It redacted many names. It gave one SEC staff attorney the pseudonym of John Smith. The Senate identified others in the report or did not redact their names from records which identified their roles in relation to the Pequot investigation. Plaintiff proposes the court use the same standard as the Senate did in deciding which names should not be redacted from the investigative records released by the SEC. The SEC implies that it has used a similar but more subjective method in deciding which names should be redacted in releasing investigative records. On this point, the Humes letter to Pequot's attorneys reads: "I have also determined that individuals who are either not mentioned at all in the Senate report or mentioned only briefly have a privacy interest in not being identified and associated with a law enforcement investigation."

As discussed below, the phrase used by Humes ("or mentioned only briefly") has been employed by the SEC to withhold critical names from investigative records. Therefore, Plaintiff proposes a more objective standard: names will not be redacted to the extent they are mentioned in the Senate Report or the names *and* roles in the investigation were disclosed in records released by the Senate or the SEC. Plaintiff offers examples of each category below.

### B.  The Samberg transcripts and exhibits

According to the Senate Report and the SEC, the Samberg examination tells a big piece of the story how the SEC handled the Pequot investigation, and, according to the SEC, why it

halted the investigation. Plaintiff took two of his examinations in May and June of 2005. Those examinations focused on Samberg's trading decision on GE-Heller.[61] One of Plaintiff's emails, released by the Senate and the SEC, tells in detail how Samberg's first and second examinations point to insider trading in GE-Heller and Mack's possible involvement as the tipper.[62] A second email tells in detail how Mack matched the profile for the tipper which was gleaned largely from Samberg's testimony.[63] The SEC closed the Pequot examination after taking Samberg's third examination.[64] Did his testimony support that decision, as the SEC claims, or did it point to misconduct? Either finding "sheds light on the SEC's performance of its statutory duties."

The SEC's Reply Memo does not spell out what information it is withholding from the Samberg transcripts. It can be found, however, in a letter from Associate General Counsel Richard Humes to Samberg's attorneys, filed as Exhibit 1 with the SEC's Reply Memo. The SEC appears to say Samberg has no privacy rights to the records sought by Plaintiff in this case.[65] Humes writes:

> In light of these disclosures [in the Senate Report], Mr. Samberg no longer has a privacy interest we can protect in not being associated with a law enforcement matter or in the specific facts disclosed in the Senate Report … For these reasons, Exemption 7(C) does not provide a basis to withhold Mr. Samberg's identity, the *focus of the Commission's investigation*, or other matters specifically disclosed in the Senate Report (emphasis added).[66]

The above language appears broad enough to include records relating to Samberg's trading decisions in Microsoft securities.[67] The Humes letter confirms this reading by identifying

---

[61] S. Rep., Ex. 48, p. 23.
[62] First Aguirre Decl., Ex. 3.
[63] August 4, 2005, email from Plaintiff to Branch Chief Robert Hanson, Ex. 4 to First Aguirre Decl.
[64] S. Rep., Ex. 48., p. 39; Ex. 31, p. 3.
[65] See Ex. 1 to Third Hardy Decl., letter of December 18, 2007, from Humes to Audrey Strauss, Matt T. Morley and Brian T. Sumner, attorneys at the law firm of Fried, Frank, Harris, Schriver & Jacobson LLP.
[66] *Id*.
[67] The Case Closing Report describes the SEC's investigation of Pequot's trading in Microsoft securities as a focus of the investigation. Ex. 31.

disclosures in the Senate Report that specifically refer to the third Samberg transcript and to Pequot's trading in Microsoft securities.[68]

Still, the SEC concession on disclosing the Samberg transcripts and exhibits goes a step further. The Humes letter reads at page 7: "Thus, testimony regarding Pequot's business practices, policies, or structure; the securities Pequot purchased; investment strategies for Pequot, financial information about Pequot and its funds; or the witnesses' business relationships cannot be withheld under Exemption 7(C)."

Humes narrowly defines Samberg's privacy interests as "other personal information such as medical information, complaints about their job performance, and personal finances."[69] Humes concludes that the "privacy interests identified above" outweigh the "public interest" in disclosure. This statement, at least on its face, has no relevance to this case; Plaintiff does not seek records relating to medical conditions, "personal finances," or Samberg's "job performance." In short, the Humes letter seems to withdraw Exemption 7(C) as a basis for withholding the information sought by Plaintiff in Samberg's transcripts and exhibits, with the exception of the privacy interests of third parties, which Plaintiff addresses in a separate section below. But this may not be the case. Humes withholds an unknown amount of information from the Samberg transcripts and exhibits.[70]

Further, the SEC has withheld records at the heart of the Senate investigation by claiming they are "personal" records. One such record was an email about the phone call when Mack was suspected of tipping Samberg. As the Senate Report points out, SEC staff suspected that

---

[68] Ft. 6 of Humes letter (Ex. 1 to the third Hardy Decl.) reads: "Information in the Senate Report also prevents much of the information in the January 23, 2006 Samberg transcript from being deemed private. *See, e.g.,* Senate Report at 20-21, 28-29, 44-45 & Ex. 13" The referenced pages (20-21 and 44-45) of the Senate Report discuss the SEC's investigation of Pequot's trading in Microsoft securities.

[69] *Id.,* p. 8.

[70] The Humes letter describes the withheld information as "the portions of the Samberg transcripts and exhibits attached hereto that are marked in yellow." *Id.*, p. 7.

Samberg and Mack exchanged favors during the call: (1) Mack tipped Samberg about GE-Heller merger and (2) Samberg arranged for Mack to triple a $5 million investment in eight months as a *quid pro quo* for the GE-Heller tip. The SEC withheld this critical information under Exemption 7(C) claiming: "Withheld in entirety to protect personal financial information." [71]

There is one clue in the Humes letter suggesting the SEC has broadly interpreted "personal information" to withhold records sought by Plaintiff. Humes writes: "Assuming *arguendo* there is a public interest, the possible public interest does not outweigh any of the privacy interests I have found because the information involved does *not pertain to whether Mr. Mack received any special treatment*."[72] Thus, the SEC may withhold a record as "personal information" because, in Humes's thinking, the record "does not pertain to whether Mr. Mack received any special treatment."

This theory has two flaws. First, Humes's statement about privacy interests outweighing public interests finds no evidentiary support or even argument in his letter or the SEC's motion papers. Second, Humes seems to take a constricted view which records relate to Mack's preferential treatment. Plaintiff seeks records relating *to each phase in the process,* as discussed above, which led to the SEC's decision to drop its investigation of Pequot's trading in GE-Heller. Plaintiff also seeks records relating to the SEC's cover up of that decision. The 108-page Senate Report necessarily addresses both issues—each phase and cover up—in reaching its conclusions regarding the SEC's misconduct.

### C.  The Mack transcript

The SEC applies Exemption 7(C) to the Mack examination transcripts and exhibits in almost the same way as it does to Samberg records. This time Humes's letter went to Mack's

---

[71] Ex. 48, S. Rep. p. 25; See Vaughn index, Ex. 14 to the Second Hardy Decl., doc. 89.
[72] Ex. 1 to Third Hardy Decl., p. 7.

attorneys.[73] Using the same language, Humes concludes: "For these reasons, Exemption 7(C) does not provide a basis to withhold Mr. Mack's identity, the focus of the Commission's investigation, or other matters specifically disclosed in the Senate Report."[74] The Humes letter continues: "I have determined that it is appropriate to recognize a privacy interest in matters other than those listed in the prior paragraph only to the extent that the transcript reveals personal views or opinion that could be deemed embarrassing and information strictly about Mr. Mack's personal and family life."[75]

There is even less reason to recognize the application of Exemption 7(C) or any other privilege to Mack's testimony. To begin with, the SEC did not even schedule the Mack testimony until the statute of limitations had expired.[76] But that should not be surprising because the SEC did not take Mack's testimony to determine whether he tipped Samberg about the GE-Heller merger. SEC director Linda Thomsen explained the unique purpose for taking Samberg's testimony in her statement to Senator Grassley: "Because of the public controversy and the *public interest in truth and full disclosure*, my Deputies decided that taking Mack's testimony would serve the best interests of the Division of Enforcement and the investing public (emphasis added)."[77] Likewise, Plaintiff submits the "public interest in truth and full disclosure" requires the disclosure of the Mack transcript.

The few facts known about Mack's testimony indicate that it did not justify the SEC's decision to close down the investigation of GE-Heller. Mack met with Credit Suisse (CS) officials just before his June 29 phone call to Samberg, just as Plaintiff had suggested to his

---

[73] December 18, 2007, letter from SEC Associate General Counsel Richard Humes to Neal A. Potischman, attorney at Davis Polk &Wardwell. Ex. 2 to Third Hardy Decl., p. 7.
[74] *Id.*
[75] *Id.*, p. 6.
[76] Ex. 48, S. Rep., pp. 6, 34, 41 and 46.
[77] Linda Thomsen's testimony, *supra*, ft. 48.

supervisors.[78] The SEC did not take any of these officials' testimony. Instead, it misled the public in its case closing report about Mack's contacts with CS-CSFB.[79] Likewise, the SEC also passed over critical testimony about Mack's profit on "Fresh Start," where Pequot watered down its interest to create a piece for Mack.[80] In short, Mack's testimony, whatever it is, will shed light "on the SEC's performance of its statutory duties."

The SEC has agreed to release the portions of Mack's itinerary relating to his meetings with CS officials,[81] since the names of these individuals were disclosed in the Senate Report.[82] Plaintiff has also narrowed his request to one posting to Mack's calendar: a meeting on July 2, 2001, with Aziz Syriani, a "member of the compensation and appointments committee of CSG." This meeting is also discussed by Mack in the portion of the transcript attached to the Senate Report.[83] Hence, this calendar posting should be released on the same rationale as the SEC releases the Mack itinerary.

### D.  The transcripts of the two CSFB officials and the Mack itinerary and calendar

These records raise the same issue as Mack's itinerary. All relate to Mack's meetings with CS officials just before Samberg began his heavy buying of Heller. The SEC has redacted the names of these same parties from the transcripts of the two CSFB officials and would likely do so from any other transcript it releases. Redacting the names makes it impossible to match any communication with these individuals. For example, a description of a phone call becomes Mr.

---

[78] Aguirre July 25, 2005, email to Berger and Kreitman, S. HRG. 109-898. Available at: http://frwebgate.access.gpo.gov/cgibin/getdoc.cgi?dbname=109_senate_hearings&docid=f:35458.pdf (last visited March 12, 2008) p. 758.

[79] Ex. 31, p. 2.

[80] *Id*., p. 41-2.

[81] "Initially, the Commission has determined that it cannot withhold most of the itinerary (Doc. No. 74) under Exemption 7(C) because most of the information from the itinerary is in the Senate Report." Reply Memo, p. 22.

[82] Ex. 48, S. Rep, ft. 190, p. 53: " *See generally* SEC 1845-64, Mack testimony (Aug. 1, 2006) (discussing Mack's meetings with Lukas Muhlemann, Walter Kielholz, Daniel Vasella, Thomas Wellauer, Oswald Grubel, Peter Brabeck, and Aziz Syriani—all Credit Suisse managers, directors or board members)."

[83] *Id*., p. 427-9.

Mack spoke with Mr. Blank or Mr. Blank spoke with Mr. Blank. Since the identities of the persons mentioned in the transcripts are public and since the transcripts themselves have been released, it serves no useful FOIA purpose for the names to be anonymous in the transcripts.

The SEC has also redacted the names of the two CSFB witnesses from the transcripts. The SEC effectively disclosed the identity of one of the witnesses when it described him in its case closing report as the CSFB *CFO* who negotiated with Mack in 2001.[84] A Lexis search for CSFB's CFO yields the name Richard Thornburg.[85] Thornburg was also linked to Mack at least in two places in records released by the Senate.[86] Mack testified he may have met Thornburg during the negotiations with CS-CSFB.[87] Plaintiff does not oppose the redaction of the name of the second CSFB official, only mentioned as "a company lawyer" in the case closing report.[88]

### E. The transcripts of Pequot's head trader and his assistant.

The SEC withholds the transcripts of the examinations of two Pequot employees on the theory that "their names have not been made public in connection with the Pequot investigation."[89] This is true as to one witness, but not the other. The SEC's case closing report identifies one as the "head trader at Pequot who executed the trades in both Heller and GE at Samberg's direction." The Senate Report cites Plaintiff's email, attached to the report, which identifies Peter Dartley (Dartley) as "Samberg's chief trader in 2001" who executed the GE-Heller trades.[90] Dartley was also mentioned during Plaintiff's testimony before the Senate

---

[84] "On July 27, 2006, the staff took the testimony of two CSFB employees, a former CFO and a company lawyer, who were both involved in recruiting Mack." Ex. 3, p. 2; Ex. 48, S. Rep., p. 432-33.

[85] "The chief financial officer of the combined banks will be Richard Thornburg" *CSFB/DLJ Appoint Senior Management For Combined Company*, Dow Jones, Aug. 31, 2000.

[86] Congressional Record—Senate January 31, 200, at S1390; August 17, 2005, email, and S. HRG. 109-898, p. 359.

[87] Ex. 48, S. Rep., p. 432-3.

[88] Ex. 31, p. 2.

[89] SEC Reply Memo, p. 14.

[90] June 28, 2005, email from Gary Aguirre to Robert Hanson, and others, Ex. 43; Ex. 48, p. 274.

Judiciary Committee[91] and in four other records released by the Senate.[92] Since Pequot was the world's largest hedge fund, ascertaining the identity of its head trader is not a challenging task.[93]

The SEC tacitly concedes that Dartley has no privacy interests that can be protected. On this point, Humes told Pequot's attorneys: "I have also determined that individuals who are either not mentioned at all in the Senate Report or mentioned only briefly have a privacy interest in not being identified and associated with a law enforcement investigation."[94] Dartley does not qualify for Exemption 7(C) treatment under the Humes rationale.

Dartley played a central role in Pequot's $80 million profit in the GE-Heller trades. He received the only Samberg communication regarding those trades.[95] He posted the trades to the Pequot blotter.[96] Samberg could not identify any other person with whom he had discussed the trades.[97] Inexplicably, the SEC did not take Dartley's examination, despite its high priority, until *the statute of limitations expired against Mack*.[98] This was not an inadvertent delay. More than a year earlier, Plaintiff told his supervisors that the examinations of Dartley and others should not be delayed because the statute of limitations would soon be a problem.[99] According to the SEC, Dartley had amnesia on every relevant fact, except one that helped the SEC. The case closing report states: "The head trader testified that he did not recall anything about the trades but that the size of the investment in Heller was not unusual."[100] The issue: does the Dartley testimony support the SEC's decision to close down the investigation, as it claims, or is it more evidence

---

[91] Ex. 2C to First Aguirre Decl, p. 44.

[92] *Supra* ft. 80, pp. 346, 372, 403, and 437.

[93] See: Robert Clow, *Reaping a harvest from corporate cycles: Pequot's manager has built his fund around sector specialisation and an attention to company lifecycles, reports*, Fin. Times, March 22, 2002, at 26.

[94] Ex. 1 to Third Hardy Decl., at 6.

[95] Second Aguirre Decl., ¶15, Ex. 43.

[96] *Id*.

[97] Ex. 3 to First Aguirre Decl.

[98] According to the Case Closing Report, Ex. 31, Dartley's testimony was taken on August 17, 2006. The statute of limitations expired on July 30, 2006. Ex. 48, S. Rep., p. 41.

[99] August 26, 2005, email from Aguirre to Hanson, Eichner, Jama, Ribelin and Miller. *Supra* ft. 94, p. 346.

[100] Ex. 31, p. 2.

the SEC walked away from a promising investigation? As the Senate asked about the investigation, "How hard did it try?"[101] The Dartley transcript sheds light on this issue.

The decisions cited by the SEC are inapposite to the facts. In those cases, the courts decided privacy interests outweighed minor or non-existent public interests. Other cases cited by the SEC apply the standard applicable to the release of records from a criminal file. More on point was the holding in *Trentadue v. Integrity Comm.*, 501 F.3d 1215, 1236 (10th Cir. 2007), where the court observed: **"**On balance, the important public interest in understanding how the government responded to these serious allegations outweighs any privacy interest the law enforcement officials have in the *repeated* disclosure of their identities."

In any case, portions of the transcripts that contain truly personal information can be segregated. It is of course the SEC's burden to demonstrate that no segregable information exists and it has nowhere addressed the issues. *Army Times Publishing Co. v. Department of Air Force*, 998 F.2d 1067, 1068 (D.C. Cir. 1993).

For the same reasons, Plaintiff believes the testimony of Dartley's assistant should also be released. The SEC took his testimony after the statute of limitations had run and then relied on it in its case closing report to justify closing the Pequot investigation. Did the SEC pull its shots? Were the examiners prepared? Was the witness asked the right questions? Ultimately, does the testimony support the SEC's decision to halt the case or does it indicate the SEC pulled its punches? Either way, the evidence sheds light on the handling of the Pequot investigation. Since the assistant was not mentioned in the Senate records, Plaintiff will not oppose the withholding of his name.

### F.  The transcript of the other witness identified as the analyst

---

[101] Ex. 48, p. 43.

The SEC case closing report gives a convoluted and confusing rationale why the Mack investigation was dropped after Plaintiff's departure on September 2, 2005. As soon as Plaintiff left, SEC staff started focusing "on identifying other potential tippers who could have provided Samberg information about the GE/Heller transaction."[102] For three months, SEC staff pondered this evidence and, alas, found it had no leads. The SEC then dropped the Mack investigation and shifted the focus of the Pequot investigation to Microsoft with this non-explanation: "At this same time, around December 2005, the focus of the insider trading case shifted to Microsoft, where it remained until June 2006."[103] After the statute of limitations expired against Mack, the SEC reopened its search for "other potential tippers" taking the examination "of an analyst at a brokerage firm who provided analyst coverage on Heller during the relevant time period."[104] This transcript needs sunshine. Plaintiff does not oppose withholding the name of this individual.

The notion that there were other tippers was a myth. Plaintiff and other staff had conducted an exhaustive search for other possible tippers from May through September 2005 and none had surfaced. Plaintiff advised his supervisors of the status of that search in August 2005: "I have been through the Samberg e-mails, his calendar, his credit card receipts and his phone slips. Hilton, Eric, Nancy, have been through the e-mails. No one has shown up as a possible candidate."[105] The Senate also expressed skepticism about the "other tippers" search.[106]

### G. The SEC has redacted the names of Enforcement attorneys handling Pequot

The SEC ignores the issues, evidence and case law presented in Plaintiff's opening memo on this point.[107] As the Supreme Court recognized in *Reporters Comm. for Freedom of Press*, 489

---

[102] *Id.*
[103] *Id.*
[104] *Id.*
[105] August 4, 2005, email from Plaintiff to Branch Chief Robert Hanson, Ex. 4 to First Aguirre Decl.
[106] See discussion of "*Attempts to Identify other Potential Tippers/Tippees*" S. Rep., p. 38.
[107] Plaintiff's Opening Memo, pp. 30-36.

U.S. at 773: "Official information that sheds light on an agency's performance of its statutory duties falls squarely within that statutory purpose." As the cases cited by the SEC demonstrate, it follows that the identity of a lower or mid level agency employee would shed little light on the agency's performance of its statutory duties. As conduct reaches higher and broader, it becomes the conduct of the agency itself. When that conduct involves the corruption of the agency's mission as here, vital public interests are at stake. SEC Chairman Cox spoke of the connection between the allegations in this case and the SEC mission in a letter to Congress: "The allegations of improper conduct in this matter are utterly inconsistent with the mission and professionalism of the agency ..."[108] Congress intended FOIA's light to illuminate this precise zone, as the courts have consistently held. Plaintiff seeks the minimum release of the names of Enforcement staff to achieve that objective. *Ctr. for Nat'l Sec. Studies*, 331 Fed 3rd at 946.

The SEC concedes that it must disclose the names of Plaintiff's four supervisors who initially haled the Mack investigation and fired Plaintiff. But this is only the first phase of the Pequot investigation. The misconduct went on for another fourteen months. It cannot be tracked when every name is a blank. To follow what happened requires the release of two classes of information: (1) records reflecting decisions given by senior SEC officials, such as Peter Bresnan(Bresnan) and Walter Ricciardi (Ricciardi), and (2) staff's execution of those decisions. Both demonstrate agency conduct. Hence, Plaintiff seeks the investigative records without redactions of the names of (1) the two staff attorneys (James Eichner (Eichner) and Liban Jama (Jama) who took over the Pequot investigation after Plaintiff's departure, and (2) new supervisory staff involved in the Pequot investigation after Plaintiff's departure, including Deputy Directors Bresnan and Ricciardi.

---

[108] Ex. 48, S. Rep., p. 684.

The names of Jama, Eichner, Bresnan, and Ricciardi are already linked to the Pequot investigation. The Senate Report mentions Eichner thirty times and Jama nine times,[109] includes portions of their examinations by Senate investigators,[110] and also includes at least seventy-one emails to and from Eichner and forty-four emails to and from Jama.[111] Further, any member of the public can read the entire transcripts of both attorneys at the Senate Finance offices.[112] The SEC also disclosed Eichner's involvement as the "primary staff" attorney in the case closing report.[113] See: *Trentadue,* 501 F.3d at 1236 ("[P]ublic interest in understanding how the government responded to these serious allegations outweighs any privacy interest the law enforcement officials have in the *repeated* disclosure of their identities."); See *Nation Magazine v. U.S. Customs Serv.*, 315 U.S. App. D.C. 177, 71 F.3d 885 (D.C. Cir. 1995) ("a blanket exemption for all names in law enforcement records 'would be contrary to FOIA's overall purpose of disclosure, and thus is not a permissible reading of Exemption 7(C)'"). Likewise, records publicly available indicate that the Enforcement Division's second highest officials, Deputy Directors Bresnan and Ricciardi, stepped into the case sometime in 2006.[114] This means they directed the SEC's handling of the last phases of the investigation, including the charade of the GE-Heller tipper search after the statute of limitations had expired.[115]

## V. THE SEC MAY NOT REDACT STAFF NAMES UNDER EXEMPTION 6

The SEC's brief response ignores the thrust of Plaintiff's argument. Plaintiff seeks no records relating to any personal information on any SEC employee: no disciplinary records, no performance evaluations, no salary history, and no personnel files. Rather, Plaintiff seeks the

---

[109] Second Aguirre Decl., ¶¶12 and 16.
[110] Ex. 48, pp. 222-237, 316-321, and 404-409.
[111] Second Aguirre Decl., ¶16.
[112] *Id*.
[113] Ex. 31, p. 7.
[114] Plaintiff's Opening Memo, p. 31. Ex. 48, S. Rep., p. 412, According to his memo of June 15, 2006, Ricciardi became involved in the Pequot investigation on May 24, 2006. *Id.* pp. 132 and 536.
[115] *Id*., p. 412.

records relating to *his employment and firing*. That firing was the result of the same agency misconduct addressed above. The Senate Report found: "Just as Aguirre's decision to stay at the SEC and press for Mack's testimony led directly to his negative re-evaluation, so too his continued efforts to obtain approval for questioning Mack led directly to Aguirre's termination."[116] Hence, FOIA's light draws on the same compelling public interest.

Plaintiff seeks these records without redaction to demonstrate the breadth and depth of the agency involvement in that decision. To illustrate the point, in Plaintiff compared in his opening memo the two different versions of the same record released by the Senate and the SEC.[117] The Senate version included names and thus involved different offices within the SEC in Plaintiff's firing. Nothing could be deduced from the SEC version because the names had been redacted. In its reply memo, the SEC argues Plaintiff does not need these records because the Senate has released the complete version of the same record. This is disingenuous. Many of the records relating to Plaintiff's discharge and employment have had critical names redacted and the Senate did not release same records, if it even had them.[118]

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." The SEC has yet to state a protectable privacy interest of any staff member in withholding the records. They are not "personnel and medical files and similar files" relating to any person other than Plaintiff. But even if the SEC could get over that burden, it would have to demonstrate that disclosure "would clearly constitute" an unwarranted invasion of privacy. The SEC suggests that these individuals might be contacted by the media, but the "inquiry by news media or other interested parties about any particular [individual] is not the sort of invasion of privacy envisioned by Exemption 6."

---

[116] *Id.*, p. 81.
[117] Plaintiff's Opening Memo, pp. 36-7.
[118] Plaintiff has included examples of such records. See ¶21 to Second Aguirre Decl., Ex. 44.

*Washington Post Co. v. U.S. Dep't of Agric.,* 943 F. Supp. 31, 36 (D.D.C. 1996), quoting from

*Nat'l Assn. of Atomic Veterans v. Director, Defense Nuclear Agency,* 583 F. Supp. 1483, 1487

(D.D.C. 1984). The SEC has not met its burden. *Sims,* at 471 U.S. 180.

## VI.    THE SEC MAY NOT WITHHOLD RECORDS UNDER EXEMPTION 4

The SEC has recently leaped from one prong of Exemption 4 to the other. Until December,

the SEC withheld records under Exemption 4 to the extent it "would cause substantial harm to

the company's competitive position."[119] In December, the SEC switched to the "impairment

prong" to withhold the testimony of several witnesses.   That information includes no trade

secrets, is likely seven years old, and causes the witnesses and his company no competitive

harm.[120] According to the SEC, the disclosure of this information would cause harm to the SEC

because future witnesses would choose to be evasive rather than disclose such relatively useless

information. The SEC has refused to identify the information it withholds under this

exemption,[121] so Plaintiff can only guess what it may be.

The theory that witnesses will not be forthcoming unless they testify in secret undermines a

premise of the nation's civil and criminal justice systems. It ignores the penalties for evasive and

misleading testimony. Giving those types of answers to SEC investigators poses even greater

risks to a witness, e.g., Martha Stewart was convicted of misleading SEC investigators, not for

insider trading.[122]  See also: *In the Matter of Richard P. Callipari and Thomas J. Connolly,* SEC

Release No. 48289, 2003 SEC LEXIS 1862 (August 2003) ("[F]ederal jury convicted Richard P.

Callipari of … corruptly endeavoring to obstruct and impede an SEC investigation by means of

false, misleading, evasive and deceptive testimony.) The SEC may use less drastic measures: "In

---

[119] Second Aguirre Decl., ¶16, Ex. 50, p. 2.
[120] Ex. 1 to Third Hardy Decl.
[121] Second Aguirre Decl. ¶14, Exs. 40-42.
[122] Alex Berenson, *There's a Reason Your Mother Told You Not to Lie,* N. Y. Times, March 7, 2004, at 14.

determining the size of a civil penalty, the SEC considers an individual or entity's cooperation with the SEC investigation. *SEC v. Am. Int'l Group, Inc.*, Lit. Release No. 19560. (Feb. 9, 2006)

This speculative theory has extraordinary potential to erode FOIA. Since the SEC regulates the financial markets, all its investigations deal with financial information. At the SEC's whim, it can assert Exemption 4 to withhold any "financial information" that reflects poorly on its performance. Its last minute assertion and flip flop in this case raises concerns whether the SEC is protecting its ability to collect information or withholding information that demonstrates it should not have abandoned the Pequot investigation.

The SEC produces no hard evidence to back up its theory that witnesses will fudge the truth unless they testify in secret. Nor is there any inherent logic to the notion that witnesses are more prone to speak the unvarnished truth when they testify in secret. Indeed, the contrary theory seems to make more sense; witnesses are more likely to speak the truth when they know journalists, historians, and random members of the public will be scrutinizing their testimony.

The SEC bases its speculative theory on the declaration of Deputy Director Ricciardi. It contains precisely the type of unsupported conclusions the courts have refused to accept in deciding whether a disclosure may impair an agency's function. *Washington Post Co. v. U.S. Dep't of Health & Human Services*, 690 F.2d 252, 269 (D.C. Cir. 1982) [T]he government produced no evidence except a conclusory affidavit by the HHS director of personnel policy. Thus, the government has not yet established its Exemption 4."); *Public Citizen Health Research Group v. FDA,* 227 U.S. App., 704 F.2d 1280, 1291 (D.C. Cir. 1983)*,* ([S]uch "conclusory and generalized allegations of substantial competitive harm … cannot support an agency's decision to withhold requested documents.)

The theory also assumes that witnesses believe their testimony would be held in confidence, but for the possibility of disclosure under Exemption 4. This would be an unlikely state of mind for witnesses served with an SEC subpoena, as was the case here. The SEC served the witnesses with Form 1662 simultaneously with subpoenas.[123] Form 1662 tells each witness the "routine uses which may be made of the information furnished," which include providing it to bar associations, other professional associations, witnesses, private collection agencies, consumer reporting agencies, members of Congress, other government agencies (local, state, national and foreign), the press, and the public.[124]

The SEC asks the court to skip a step in the Exemption 4 application. It argues the court should begin its analysis by balancing the extent of impairment with the public interest in disclosure. The process is not triggered by the SEC's *contention* that disclosure would impair its ability to obtain information in the future. That theory would marginalize Congress's choice of words in enacting Exemption 4. In *Public Citizen Health Research Group v. FDA***,** 185 F.3d 898, 908 (D.C. Cir. 1999), the court explained at what point the balancing process takes place:

> When the case later returned to us, we concluded that the interest the government asserted in nondisclosure--impairment of its information-gathering ability--had not been appropriately resolved. We therefore remanded the case again, instructing that "if the district court ultimately finds that disclosure will impair the government's information-gathering, it will once again be required to conduct the 'rough balancing of the extent of impairment and the importance of the information against the public interest in disclosure.'" *Washington Post II*, 865 F.2d at 326-27 (quoting *Washington Post I*, 690 F.2d at 269). And we made clear that "the only inquiry properly before the district court was the question whether disclosure of the financial information … would be likely to impair the government's ability to gather this information in the future, *and if so whether this risk outweighed the public's interest in disclosure*." 865 F.2d at 324-25 (court's emphasis)

---

[123]Second Aguirre Decl. ¶2, Ex. 32.
[124] *Id*.

Since the SEC has failed to establish that its ability to obtain information would be impaired, Plaintiff submits that the court does not reach the balancing phase of Exemption 4. However, in the event the court reaches the balancing process, Plaintiff submits that any information relating to the SEC's investigation of Pequot's trading in GE-Heller, including its suspension to investigate trading in Microsoft securities, invokes compelling public interest in disclosure.

## VII. THE SEC FAILED TO ESTABLISH IT CONDUCTED AN ADEQUATE SEARCH

The SEC recasts its failure to conduct an adequate search as a "new issue" about "records from the Commissioners and the OGC."[125] It is neither a new issue, nor limited to two SEC offices. Simply put, the SEC has failed to demonstrate any phase of its search was adequate. As with other issues, the SEC has flip flopped on the search since its Opening Memo. In this case, it has reversed itself *on the facts*. The SEC opens with a claim that Plaintiff failed to notify the SEC he would dispute the adequacy of its search. Remarkably, it makes exactly the *opposite factual contention* in its Opening Memo, where it argues for two pages that Plaintiff's challenge to the adequacy of the SEC's search was unsupported in law.[126] Even more extraordinary, the SEC has relied upon the *same* versatile letter for its two conflicting factual contentions.[127]

Aside from this, the SEC's "new issue" theory also rests on faulty factual and legal premises. It assumes the court ordered Plaintiff to inform the SEC whether he would challenge the adequacy of its search. That is incorrect.[128] The order directed Plaintiff to inform the SEC of the "specific withholdings [in the SEC's *Vaughn* index] that he plans to contest." The SEC gave no clue in its *Vaughn* index how it conducted its search. The SEC's contention that a letter from

---

[125] SEC Reply Memo, pp.4-6.

[126] "In questioning whether the Commission has properly provided responsive information, Aguirre is contesting the adequacy of the Commission's search for documents." SEC Opening Memo p. 38.

[127] The SEC's Reply Memo at ft. 2, pp. 2-3 cites its Ex. 13 as support for the theory Plaintiff failed to raise the issue, while in its Opening Memo at 38 cites Ex. 13 for exactly the reverse: "Aguirre is contesting the adequacy of the Commission's search for documents."

[128] Second Aguirre Decl. ¶17.

Plaintiff's counsel constitutes a waiver for not raising the issue is also spurious.  On waiver, the letter reads:

> This letter is intended to memorialize which issues Mr. Aguirre will withdraw at this time based on the information you have made available in the Vaughn index and the documents produced. Because of the complexity of this matter, I may overlook an issue in presenting his position. In that case, it should not be looked upon as a waiver or concession.[129]

In any case, the letter told the SEC of gaps in its index,[130] which the SEC interpreted as a challenge to the adequacy of its search.[131] The controversy over "gaps" in the SEC's Vaughn index continued from May through November 2007, when Plaintiff informed the SEC it had become a "credibility" issue.

The "new issue" theory also has a flawed legal premise. The SEC has the burden to prove it conducted an adequate search, *Weisberg v. Dep't of Justice,* 705 F.2d 1344, 1350 (D.C. Cir. 1983), as it recognized in it its Opening Memo when it stated: "Commission has properly searched for responsive documents and withheld exempt documents."

Turning to the merits, the SEC has filed the declaration of Brenda Fuller (Fuller), an SEC branch chief to "establish that it conducted a proper and adequate search." Fuller states: "The FOIA Office staff followed standard procedures in the search for documents responsive to plaintiff's request."[132] In *Laroche v. United States SEC*, 2006 U.S. Dist. LEXIS 47051 (N.D, Cal 2006), the SEC submitted the declaration of FOIA Officer Celia Winter, who described "the standard protocol employed *by the SEC's FOIA Office* in search for records at the Commission." Trial counsel in this case represented the SEC in *Laroche.* Winter works out of the same FOIA

---

[129] Ex. 13 to Second Hardy Decl., p. 1
[130] *Id.*, last paragraph, p. 2.
[131] SEC Opening Memo, pp. 38-39.
[132] See Decl. of Brenda Fuller, pp. 1-2.

Office as Fuller and was involved in FOIA's handling of this case.[133] Laroche submitted his FOIA requests in 2005, as did the Plaintiff here.

Winter's description of "standard protocol" in *Laroche* contrasts sharply from Fuller's description in this case. Winter states she sought records from the SEC's Office Information Technology (OIT), while Fuller fails to do so, even though Plaintiff stated in his FOIA request that the OIT held responsive records.[134] Winter states FOIA liaisons "replied back to the FOIA Office whether held responsive documents or not," while Fuller is silent. Winter declares the SEC followed the "standard protocol" of *the FOIA Office*, while Fuller does not link "standard protocol" to the FOIA Office. Winter specifies the search terms, while Fuller does not.[135] This failure alone renders the search inadequate. *Oglesby v. U.S. Dep't of the Army,* 920 F.2d 57, 68 (D.C. Cir. 1990). Winter attaches plaintiff's FOIA requests to her declaration, while Fuller does not. Winter tells the FOIA Office took each step, while Fuller does not. Winters says the other SEC offices delivered the records to the FOIA Office, while Fuller does not. In short, Fuller's declaration contains the barest conclusions, better called assumptions or guesses, what was done. It fails to satisfy the SEC's burdens to "demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *The Nation Magazine v. U.S. Customs Serv.*, 315 U.S. App. D.C. 177, 71 F.3d 885, 890 (D.C. Cir. 1995), or to provide a "reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials …" *Oglesby,* 920 F.2d at 68.

---

[133] See Celia Winter's Decl., Ex. 46 to Second Aguirre Decl., ¶22.

[134] See Second Aguirre Decl. ¶31.

[135] The omission by Fuller to state the search terms may not have been inadvertent. Plaintiff's statement of facts includes this factual assertion regarding his request for records relating to his employment: "SEC has failed to describe in its moving papers how it conducted its search for these records." The SEC responded: "The Commission admits it has not provided a description of its search." See SEC Reply Memo, p. 38.

The conclusions and gaps in Fuller's declaration create space for multiple factual scenarios, e. g., the OGC conducted the search, not the FOIA Office. In December 2005, Plaintiff spoke with Fuller about who actually processed his prior FOIA request. Plaintiff's email confirmed Fuller's statement about the role of the OGC in processing his request: "I understand from our telephone conference that the General Counsel delivered to you the documents that were to be produced, made the decision which documents would be produced, decided what would be redacted, and made the decision what objections would be asserted."[136]  Fuller never responded to this email.

Other evidence suggests the OGC processed the request. In its Opening Memo, the SEC argues that its search was adequate, relying on three letters of its trial counsel, Melinda Hardy, and her sworn statement. It made no reference to any search conducted by its FOIA Office. According to a declaration in another case, the SEC's co-counsel in this case, Noelle Frangipane, has processed FOIA requests: collecting information from various SEC offices and processing that information for release to the requester, in just the way Fuller stated Plaintiff's prior request was handled.

The SEC has redefined Plaintiff's requests. In its Opening Memo, the SEC understood Plaintiff sought records that "relate to [his] merit pay increase, evaluation, performance, or termination."[137] The SEC now claims Plaintiff's "actual requests regarding his termination were limited to documents 'generated in carrying out' his termination and communications relating to his termination to or from nine specific people." This reading takes one clause ("generated in carrying out") out of context from request 11, ignores the other clauses in the same request,

---

[136] December 28, 2005 email from Plaintiff to Fuller, Ex. 21 to First Aguirre Decl.
[137] SEC's Opening Memo, p. 37.

ignores the other five requests (7-10 and 12), and ignores the context of all six requests.[138] In this way, the SEC has justified its refusal to produce records described in Plaintiff's requests. This tortuous reconstruction of Plaintiff's requests does not comply with the SEC's "duty to construe a FOIA request liberally." *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir 1995).[139] Once again, the OGC's conduct suggests they are too close to this case.

## VIII.   THE COURT MAY GRANT APPROPRIATE RELEIF REGARDING PLAINTIFF'S EPF AND OPF

The SEC has represented to this court through its attorneys, that it gave Plaintiff the original of his Employee Performance File (EPF). Plaintiff has stated in concrete, detailed testimony that the SEC's statement is absolutely false. Someone is misleading the court.

Plaintiff's firing, as the Senate found, was directly related to the halting of the Mack investigation. The SEC's possible destruction of the most probative records relating to his performance during the year before his discharge raises questions looking for an answer.

The SEC claims "Aguirre has provided no reason to doubt prior representations by Commission staff informing him that he already has the original EPF." This statement is untenable in view of the evidence before this court. Plaintiff has set forth under oath and in detail when he met with the SEC, when he received copies of his EPF, exactly what was said during that encounter (that he could not see his file and he could only have copies),[140] and his efforts to

---

[138] Plaintiff's December 30, 2005, request is attached as Exhibit 1 to Second Hardy Decl.. Requests 7-12 should be read in the context of the letter's stated purpose contained in par. 2, which states Plaintiff is seeking records concerning "my employment by the SEC from September 7, 2004, through September 2, 2005, the SEC's decision to terminate my employment effective September 2, 2005, and my obligations during and after my employment regarding nonpublic information …" Second Aguirre Dec., ¶30. Items 7 through 12 read:

   7)   All records relating to the SEC's termination of Aguirre's employment to or from Christopher Cox, …"

[139] For example, the SEC has neither released nor listed on its Vaughn index the memoranda from the SEC's Office of Inspector General to the Commission which mention Plaintiff's termination, nor any other communications with the Commission. Hardy explains why in her declaration: "I have reviewed memoranda from the Office of the Inspector General ("OIG") to the Commission *that mention the termination of the employment of Gary Aguirre*. Those memoranda do *not relate to carrying out the termination* and only briefly describe Aguirre's allegations and the OIG investigation (emphasis added)." Third Hardy Decl., p. 2.

[140] First Aguirre Dec. ¶¶12.

obtain missing records, and to view the original EPF. These statements are backed up with contemporaneous emails and other records.[141] The SEC claims it gave Plaintiff his EPF, as it routinely does with departing employees. Plaintiff has learned that three other staff members, who left the Enforcement Division after Plaintiff, have not received their EPFs.[142] Plaintiff recognizes the court cannot direct the SEC to release the original EPF, when the SEC insists it no longer possesses that record, if it was either destroyed or handed over to the Plaintiff, the two conflicting theories before the court. Alternatively, Plaintiff requests the court to direct the SEC to release to Plaintiff (1) any record contained in his EPF or his Official Personnel File (OPF), including records which were removed after his discharge and were not previously provided to Plaintiff in a record with a designated SEC Bates stamp, (2) records reflecting individuals who had possession of Plaintiff's EPF and OPF since August 1, 2005, and (3) any records relating to the location or disposition of Plaintiff's EPF or OPF.

Dated: March 24, 2008                          Respectfully Submitted,


                                               _____/s/_____
                                               Scott A. Hodes, D.C. Bar #430375
                                               P.O. Box 42002
                                               Washington, D.C. 20015
                                               301-404-0502



                                               _____/s/_____
                                               Gary J. Aguirre, CA Bar#38927
                                               402 West Broadway, Suite 400
                                               San Diego, CA 92101
                                               619-595-3197

                                               Attorneys for Plaintiff

---

[141] First Aguirre Dec. ¶¶10-29.
[142] Second Aguirre Dec. ¶ 36.