UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Gary Aguirre, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: 06-1260 (ESH) |
| ) | |
| Securities and Exchange ) | |
| Commission, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**SECOND DECLARATION OF GARY J. AGUIRRE**

I, Gary J. Aguirre, declare:

1) The Securities and Exchange Commission (SEC) has never indicated in any letter, filing, or Vaughn index or any other communication with me, that it was withholding records under Exemption 3, until Associate General Counsel Richard Humes sent me copies of his four letters, dated December 18, 2007, which are attached as Exhibits 1 through 4 to the Third Declaration of Melinda Hardy.

2) The SEC has released redacted copies of the subpoenas and related documents it served on the attorneys for the seven individuals whose examinations were taken in relation to the SEC's investigation of Pequot's trading in GE and Heller. The SEC served Form 1662 on each of these witnesses. Exhibit 32 is a true and correct copy of the cover letter and Form 1662 the SEC served on John Mack's attorney with the subpoena for his testimony.

3) I have reviewed the SEC Freedom of Information Act Annual Reports for the ten years ending on September 30, 2007. Exhibit 33 is a true and correct copy of the excerpted portions of those reports to the extent they relate to the SEC's assertion of Exemption 3 over the past ten years. For this time period, Exhibit 33 indicates that the SEC has never asserted Exemption 3 as a basis for withholdin*g any* records obtained by its Enforcement Division throug*h any* investigation unde*r any* of the securities laws, including the Advisers Act. The only records the SEC has withheld under Section 210(b) in response to FOIA requests are records obtained through examinations of investment advisers conducted by the Office of Compliance Inspections and Examinations (OCIE).[1] These examinations are conducted pursuant to Section 204 of the Advisers Act, which authorizes the Commission to conduct "reasonable periodic, special, or other examinations," of "[a]ll records" maintained by investment advisers and thus include information which is highly confidential relating to proprietary all aspects of the investment adviser's business operations.

4) On August 2, 2006, CNBC reporter Charles Gasparino (Gasparino) stated on the CNBC blog (Squawkblog):

> CNBC has learned that the commission is considering the unusual, and some would say, unprecedented move of not just officially alerting Pequot and Mack that they are cleared of possible insider trading charges, but also releasing all the evidence in the probe. …
>
> But people close to the case say the commission's investigation into Pequot and Mack is reaching its final stages. CNBC was first to report this morning that Mack gave his deposition in the case on Tuesday, and the entire matter could be concluded in the coming weeks. Though the investigation is still open, these people say the evidence that Mack offered an insider tip to Pequot is sketchy at best, leading some people at the commission to believe there is not enough evidence to bring charges against the Morgan Stanley CEO. …

---

[1] See SEC website at: http://www.sec.gov/about/offices/ocie/ocie_offices.shtml.

> But if that is not the case, the SEC enforcement staff is planning to ask the full commission to give the green light to release all the evidence in the case, which includes emails and other documents developed by Aguirre. There are two reasons why the SEC enforcement staff is pushing for a complete disclosure of the evidence. First, the enforcement staff wants to clear its own name from charges that it pulled punches to protect a high-ranking CEO with close political ties to the Bush administration, these people say (Mack, notably, had contributed to the president's campaign). …[2]

Exhibit 34 is a true and correct copy of Gasparino's article. Gasparino "broke" at least one other story, the SEC's decision to take John Mack's testimony in July 21, 2006, which turned out to be true. Gasparino interviewed Director Linda Thomsen on CNBC on the same day in part regarding the Pequot investigation. (*CNBC's Charlie Gasparino and Linda Thompsen [sic] of the SEC discuss SEC indictment of Greg Reyes of Brocade for option backdating*, CNBC News Transcripts, July 21, 2006.)

5) Exhibit 35 (S. HRG. 109-898) is a copy of my "contribution statement" which I generated in connection with the SEC's 2004-2005 annual merit evaluation process. It describes my role in the SEC's investigation of Pequot for possible violation of Section 204A of the Investment Advisers as follows:

> 9) Developed the factual and legal theory for including possible violations of Section 204(A) of the Investment Advisers Act of 1940 in the formal order memorandum;
> 10) Drafted a formal order memorandum and proposed the formal order that was submitted to the commission on December 17, 2004. …

6) Exhibit 36 is a true copy of the redacted nine-page formal order memorandum (S. Rep., p. 204). It contains one sentence relating to a possible violation of Section 204A of the Advisers Act, which reads: "The number of suspicious transactions also raises questions of the adequacy of Pequot Management's compliance with the requirements of Section

---

[2] Charles Gasparino, *Will the Mack-Pequot case be dismissed free of charges,* Squawkblog, CNB, August 2, 2006. Available at http://squawkblog.spaces.live.com/blog/cns!F1B804819090AC65!5159.entry (Las visited March 20, 2008).

204A of the Advisers Act to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the misuse of material, nonpublic information."

7) The Senate Report noted that in February 2005 senior SEC officials had directed a more limited investigation of possible insider trading by Pequot. On this point, the Senate Report reads:

> [F]ollowing a meeting between Pequot's lead counsel, Audrey Strauss, and the SEC Enforcement Director Stephen Cutler, the staff was ordered to investigate only a few of the suspicious transactions identified by the self-regulatory organizations (SROs). According to Aguirre: [I]n early February 2005, less than a month after staff had obtained subpoena power and before any subpoenas had been issued. [Assistant Director Mark] Kreitman directed that the PCM investigation be narrowed to two or three matters. Kreitman had expressed his approval a few days before when the investigation was increased to include seventeen referrals. . . . It came approximately two weeks after an influential attorney representing PCM met with Enforcement Director Stephen Cutler. (Footnotes omitted) (S. Rep., p. 17).

8) By my email of April 11, 2005 (S. HRG. 109-898, p. 182) to Branch Chief Hanson, I singled out Pequot's trading in Heller Financial (Heller). The email pointed out that twelve to fifteen of Pequot's email backup tapes had vanished. The email continued:

> More than likely, these would include e-mails relating to GE's acquisition of Heller Financial, which was announced on July 1. One GE officer already went to prison for divulging insider info in this matter. Pequot's had a $6 million dollar profit on extraordinarily well timed trades. But what makes it even more interesting are the following: All trades were directed by Arthur Samberg, founder and primary principal, without help from any Pequot staff person. Samberg also claims he had no contact with GE or Heller before executing the trades, a violation what he told the media was his customary practice. GE's counsel told me last week that Fried Frank has contacted them to inquire if we had subpoenaed documents relating to this transaction.

9) GE-Heller was the subject of email communications with Branch Chief Hanson on April 22, 2005, and April 26, 2005. (S. HRG. 109-898, pp. 184-186, and 187-190) After April 26, 2005, the staff emails, as released by the Senate, focus on GE-Heller and, to a lesser extent, Pequot's trading in Microsoft securities from June 2005 forward. I can find no emails after April 26, 2005, among the Senate records describing any staff activity in relation to the investigation of possible violations of Section 204A of the Advisers Act. Attached as Exhibit 37, is a table identifying records released by the Senate relating to the SEC's insider trading investigation of Pequot after April 26, 2005. These records consistently indicate that the SEC's Pequot investigation focused on insider trading.

10) On May 3, 2005, I took the examination of Arthur Samberg. The portions of the transcript released by the Senate (S. Rep., pp. 114-131) relate exclusively to the SEC's investigation in Pequot's trading in GE-Heller. I sent an email on May 6, 2005, attached as Exhibit 38 (S. HRG. 109-898, pp. 191-192), summarizing Samberg's testimony, which related only to Pequot's trading in GE-Heller. I sent a second email on June 27, 2005, Exhibit 3 to First Aguirre Decl. (S. HRG. 109-898, pp. 602-611), which summarized Samberg's testimony, describing only facts relevant to Pequot's trading in GE-Heller.

11) The Senate Report states that "Aguirre shared one paralegal with several other staff attorneys working other cases. By contrast, one law firm representing Pequot said it had 59 attorneys and paralegals working on the case, reviewing documents six days a week and sixty hours per week." (S. Rep. 18-19) Exhibit 45 is a copy of my email of May 9, 2005, to the SEC administrator responsible for hiring and placing contract employees (in support of my application for the assignment of a contract paralegal to the Pequot case.

S. HRG. 109-898, pp. 193-104). In the email, I described in detail the scope of the investigation as of May 9, 2005. It references eighteen possible insider trading matters, but makes no reference to any investigation of a possible violation of Section 204A of the Advisers Act.

12) Records released by the Senate indicate that the Senate Banking Committee and Senate Finance Committee first contacted the SEC regarding the Pequot investigation on April 17, 2006 (S. Rep., p. 658). Another contact was made by Senator Grassley with the SEC's inspector general on May 12, 2006 (S. Rep., p. 662). Internal SEC records indicate that more senior SEC officials then became involved in the Pequot investigation. Exhibit 39 is a true and correct copy of a June 15, 2006, memorandum by Deputy Director Walter Ricciardi (S. Rep., 132-133). Ricciardi states that he had no involvement in the SEC's investigation of Pequot "prior to May 24, 2006." The memorandum summarizes his interview with "enforcement staff responsible for the [Pequot] investigation: Mark Kreitman, Assistant Director, Robert Hanson, Branch Chief, and James Eichner, the senior counsel." Ricciardi states: "according to the staff, there are two components to the investigation that appear to involve possible insider trading." Ricciardi identifies one as Pequot's trading in GE-Heller and the other as Pequot's trading in Microsoft securities.

13) Exhibit 31 is a true and correct copy of the SEC's case closing report. It was released when Director Thomsen testified before the Senate Judiciary Committee on December 5, 2006.[3] It summarizes the SEC's investigation of Pequot from its opening on January 14, 2004, through its closing on November 30, 2006.

---

[3] Available at http://judiciary.senate.gov/testimony.cfm?id=2437&wit_id=5777.

14) The letters of Associate General Counsel Richard Humes, attached as exhibits 1 and 2 to Melinda Hardy's third declaration, indicate that the SEC is withholding records under Exemption 7(C) and Exemption 4. The letters indicate that the records withheld under Exemption 7(C) are "marked in yellow" and the records being withheld under Exemption 4 are "marked in pink." To avoid presenting an unnecessary issue to the court, I requested counsel for the SEC to identify the portions of the transcript that the SEC is withholding under Exemptions 4 and 7(C). This would have allowed me to verify the SEC's statements that the withheld portions of the transcripts contain truly personal information (Exemption 7(C)) or marginally relevant, confidential information (Exemption 4). Although I possess copies of these transcripts, my use of those transcripts is severely limited by a protective order. Nothing in the protective order, however, would prevent my review of the transcripts for the purpose of deciding whether to withdraw an issue in this case. The SEC rejected my request. A copy of my letter of Feb 28, 2008, to Melinda Hardy is attached as Exhibit 40. The SEC responded with its letters of March 3, 2008, attached as Exhibit 41, and March 13, 2008, attached as Exhibit 42.

15) The Senate Report refers to my email of June 28, 2005 (S. Rep., pp. 12, 22, 26 and 63), Exhibit 43 to this declaration, and also includes it as an exhibit (S. Rep., p. 271-278). The email summarizes the importance of taking Peter Dartley's testimony as follows:

> C.  *Peter Dartley.*
>
> So far, outside of Samberg, Pequot e-mails/documents indicate only one other Pequot employee knew anything about the GE/HF trades, Peter Dartley. On July 11, 2001, Samberg wrote Dartley, "Where are we on HF?" Dartley was Samberg's chief trader in July 2001. Samberg dealt directly with him and often gave him directions to make trades. The quote above suggests that this

7

was done on HF. Dartley posted the HF trades and the GE trades to the handwritten Pequot trade blotter.

Dartley was also an intermediary when Samberg needed information about engaging in an arbitrage transaction on GE-HF after the announcement of the acquisition but before the close. Other e-mails suggest that Dartley was Samberg's confidante on investment decisions and other matters.

Pequot's employment list indicates that Dartley started work with Pequot in 1994 and never left. This is not accurate. The Chief Trader at MS told me that Dartley left (I think retired from) Pequot and later rejoined Pequot some time in 2003 in his current position as a "Managing Director." His new assignment was to restructure Pequot, an assignment that says volumes about Samberg's trust in Dartley. If any incriminating e-mails exist, I suspect they would be between Samberg and Dartley.

I think we should issue a subpoena for all e-mails to and from Dartley from January 1, 2001, to the present, as we have with 34 other Pequot employees. *He should also go to the top of the testimony list* (emphasis added).

16) The case closing report identifies James Eichner as the senior counsel handling the Pequot investigation when it was closed on November 30, 2006. The Senate report mentions Eichner's name 30 times. It also mentions Liban Jama's participation in the investigation nine times. The Senate report also includes portions of the transcripts of the examinations of Eichner and Jama taken by Senate investigators. (S. Rep., pp. 222-237, 316-321, and 404-409). The full transcripts are available for inspection and review at Senate offices. The records released by the Senate include at least seventy-one emails to and from Eichner (S. Rep., pp. 269, 391, 394, 402 and 536, and S. HRG. 109-898 pp. 203, 680-2, 340, 660,195, 199,200, 214, 241, 288, 296, 311, 312, 316, 331, 340-44, 346-50, 361, 368, 373-5, 397-401, 404-406, 427, 436, 438-9, 647, 673, 710-1, and 740-1) and at least forty-four emails to and from Jama (S. Rep., p 536, and S. HRG. 109-898

pp. 340, 660, 241, 288, 296, 311, 312, 340-44, 346, 361, 373-5, 404-6, 427, 436, 438-9, 710-1, 740-1, 799, and 804) in connection with the Pequot investigation.

17) The SEC claims that the "Aguirre Opposition also raises two issues that Aguirre had not previously informed the Commission he would raise in the summary judgment process" contrary to the court's order of August 9, 2007. The SEC identifies these two issues as the portions of my cross-motion seeking my EPF and challenging the adequacy of the SEC's search. The SEC contends that I did not comply with the court's order because my counsel did not inform its counsel that I disputed the adequacy of the SEC's search. The SEC misquotes the court's order and contradicts its earlier statements. In context, the court's order states:

> Based on a conference conducted this date, the court hereby issues the following scheduling order:
> 1. On or before August 24, 2007, defendant must provide plaintiff with a draft Vaughn index.
> 2. On or before September 7, 2007, counsel shall meet to discuss plaintiff's draft Vaughn index and plaintiff shall identify the specific withholdings that he plans to contest.

I fully complied with this order, as stated in the September 11, 2007, letter from Scott Hodes to Melinda Hardy, Exhibit 13 to Second Hardy Declaration. The SEC's Vaughn index does not describe the scope of its search, nor does it indicate that it is withholding my EPF. Nor has the SEC ever indicated that it was withholding my EPF under any exemption. The SEC acknowledges several times in its opening memorandum that I had raised the search issue. For example, the SEC argued at page 38 of its opening papers: "In questioning whether the Commission has properly provided responsive information, Aguirre is contesting the adequacy of the Commission search for documents." The SEC contends that it conducted an adequate search at the following pages of its memorandum:

9

1, 3, 38, and 39, citing the Hardy declaration in exhibits 15, 17, and 19 to establish the adequacy of its search.

18) The SEC has made a false and distracting allegation in its opposition and reply memorandum filed with the court on January 14, 2008. At footnote 24 at pages 24-25 of this memorandum, The SEC makes the following statement:

> Aguirre has provided to the Court unredacted versions of several of the documents the Commission has provided. We do now know the source of these documents and whether Aguirre has other unredacted documents that he can use in this matter. (The Commission has recently provided Aguirre unredacted versions of all the documents it provided in response to his FOIA request in connection with other litigation, but it provided those on documents subject to a confidentiality agreement that limits his use of the documents to that litigation.)

The statement implies, but does not expressly state, that I provided this court with records in violation of a protective order or from some unauthorized source. That implication is false.

19) All SEC internal records which I provided to the court came from one of three sources: (a) documents released by the SEC to me pursuant to my FOIA and Privacy Act requests or through this litigation, (b) 1,318 pages which the Senate Judiciary Committee and Finance Committee released through the Government Printing Office (S. HRG. 109-898),[4] which became public in late May 2007, and (c) 603 pages which were attached to the Senate Report of the Senate Finance Committee and Senate Judiciary Committee (*The Firing of an SEC Attorney And The Investigation Of Pequot Capital Management*), which was released to the public on the Finance Committee website on August 4, 2007.[5]

---

[4] Available at http://frwebgate.access.gpo.gov/cgibin/getdoc.cgi?dbname=109_senate_hearings&docid=f:35458.pdf.
[5] Available at http://finance.senate.gov/sitepages/leg/LEG%202007/Leg%20110%20080307%20SEC.pdf.

20) The SEC has never inquired or contacted me or my counsel regarding its concern about the source of the exhibits which I submitted to the court on December 4, 2007. The SEC did not provide any record to me or my counsel in the pending MSPB proceeding prior to December 12, 2007, *which was eight days after I submitted exhibits to the court in support of my Summary Judgment Motion.* It would therefore be impossible for me to submit records on December 4, 2007, that the SEC did not provide to me or my counsel until December 12, 2007. Further, the records provided by the SEC to my counsel on December 12, 2007, were watermarked. By my letter of March 18, 2008, attached as Exhibit 30, I provided the SEC with the following information and made the following request:

> The footnote implies that I have provided records to the court which were not properly in my possession or provided to the court in violation of a protective order. Both implications are false. Please identify exactly which exhibits you contend were provided to the court and were not properly within my possession. I will then advise you of the source of those records.
> I am also suggesting that your staff immediately check its own internal records as you should be able to determine promptly and decisively that no records were improperly provided to the court.

21) Attached hereto as Exhibit 44 are sample records produced by the SEC relating to my employment where the names have been redacted.

22) Exhibit 46 is a copy of a declaration of SEC FOIA Officer Cecilia Winter in *LaRoche v. SEC,* which I downloaded from Pacer. I received at least one email communication from Celia Winter in relation to my FOIA requests in this case.

23) Exhibit 47 is a copy of a declaration of trial counsel Noelle L. Frangipane in *Duggan v. SEC*, which I downloaded from Pacer.

24) Exhibit 48 is a true and correct copy of the Senate Report, *The Firing of an SEC Attorney and the Investigation of Pequot Capital Management,* Senate Report No.110-28 (2007).

25) Exhibit 49 is a true and correct copy of a May 14, 2007, letter from Scott Hodes to Melinda Hardy.

26) Exhibit 50 is a true and correct copy of August 21, 2007, letter from Brenda Fuller to Gary Aguirre.

27) Exhibit 51 is a true and correct copy of a June 5, 2007, letter from Scott Hodes to Melinda Hardy.

28) The SEC has produced approximately 2,832 pages of records relating to the Pequot investigation, including duplicates.

29) The penalty of perjury statement was inadvertently omitted from my December 4, 2007, declaration filed in this case. I expressly adopt that declaration herein and all of the facts stated in that declaration are true and correct and are made under penalty of perjury.

30) My request of December 30, 2005, to the SEC defined the types of records that I would be seeking throughout the letter in the opening paragraph, which reads as follows:

> In accordance with the applicable provisions of the Freedom of Information Act and the Privacy Act, I hereby request access to and copies of the documents, records, and files relating to, concerning, or the subject of my applications for employment to the Securities and Exchange Commission ("SEC") during the period from May 2003 through July 2004, *my employment by the SEC from September 7, 2004, through September 2, 2005, the SEC's decision to terminate my employment effective September 2, 2005, and my obligations during and after my employment regarding nonpublic information*. (Emphasis added).

The italicized language was intended to help explain the records sought in paragraphs 7 through 12. A complete copy of this letter is attached as Exhibit 1 to the Second Declaration of Melinda Hardy, filed in this matter by the SEC.

31) My December 30, 2005, FOIA and Privacy Act request to the SEC, Exhibit 1 to the Second Declaration of Melinda Hardy, states that records specified in the request "are believed to be in the possession of the SEC's…Office of Information Technology…" This would include all electronic mail described in paragraphs 7 through 12 of my request. None of the FOIA Request Forms, attached as Exhibit A to the Declaration of Brenda Fuller, indicate that the FOIA Office contacted the OIT in connection with Plaintiff's December 30, 2005, request for records.

32) Exhibit 52 is a true and correct copy of my October 8, 2007, email to Melinda Hardy.

33) Exhibit 53 is a true and correct copy of my November 5, 2007, email to Melinda Hardy.

34) I am resubmitting Plaintiff's Exhibits 2A, 2B, and 2C (collectively my testimony before the Senate Judiciary Committee on December 5, 2006), because some of the text became incomprehensible when its electronic format was changed from that on the Senate website. I am also resubmitting Exhibit 4 because the version originally submitted to the court inadvertently included only page 1 of that document.

35) The SEC's statements at page 8 of its Reply Memo to the effect that the SEC gave Plaintiff his Employee Performance File, his "EPF" is false. Plaintiff was specifically told by Darcel Smith on September 20, 2005, as stated in his first Declaration, that he could not see the EPF and she could only provide him with copies of its contents.

36) I have spoken directly with a former SEC staff person, who left the SEC after I did, whether they received their EPF. That person, who wishes to remain anonymous, informed me that that person had not received the EPF. I have been told by one former employee, who wishes to remain anonymous, that this person did not receive the EPF. I

have learned indirectly from a reliable source that two other SEC staff persons, who departed the SEC after I did, also did not receive their EPFs.

Executed on March 24, 2008, in San Diego, California. I declare under penalty of perjury that the foregoing is true and correct.

_____/S/_____
Gary J. Aguirre