# Exhibit 31

## to Second Aguirre Declaration

*Aguirre v. SEC*, 06-cv-01260 (D.D.C.)

# SEC DIVISION OF ENFORCEMENT
## Case Closing Report

Run on 11/30/2006

**Case No.:** HO-09818      **Case Name:** ELITE INFORMATION GROUP, INC.

The undersigned has been designated by the Director of the Division of Enforcement to exercise delegated authority to terminate and close all investigations authorized by the Commission pursuant to Section 20 of the Securities Act of 1933 [15 U.S.C. 77t], Section 21 of the Securities Exchange Act of 1934 [15 U.S.C. 78u], Section 18 of the Public Utility Holding Company Act of 1935 [15 U.S.C. 79r], Section 42 of the Investment Company Act of 1940 [15 U.S.C. 80a-41], and section 209 of the Investment Advisers Act of 1940 [15 U.S.C. 80b-9].

I hereby close this case, pursuant to delegated authority.

_Peter H. Bresnan_
Signature

_Deputy Director_
Title

_11/30/06_
Date

# SEC DIVISION OF ENFORCEMENT
## Case Closing Recommendation

Run on 11/30/2006

**Case No.:** HO-09818  **Case Name:** ELITE INFORMATION GROUP, IN

**Case Closing Recommendation Narrative:**

PEQUOT CLOSING MEMORANDUM HO-9818

This investigation involved a number of potential federal securities law violations by hedge fund adviser Pequot Capital Management ("Pequot"). In January 2005, the staff obtained a formal order of investigation from the Commission, authorizing the staff to issue subpoenas for documents and witness testimony. Thereafter, the staff issued more than 100 subpoenas requesting documents and took the testimony of 19 individuals (1). The staff also made numerous informal document requests, interviewed six individuals, and participated in two proffer sessions with the Federal Bureau of Investigation and the office of the U.S. Attorney for the Southern District of New York ("Southern District"). The potential violations investigated break down into three major categories: 1) potential insider trading by Pequot in a number of securities, including General Electric ("GE"), Heller Financial ("Heller"), Microsoft Corporation ("Microsoft"), AstraZeneca PLS ("Astra") and Par Pharmaceuticals ("Par"); 2) potential insider trading ahead of PIPE offerings; and 3) potential market manipulation. Each is addressed below.

1) Insider Trading

A.0 Trading ahead of the GE acquisition of Heller

Background: On July 30, 2001, it was publicly announced that GE had acquired Heller, causing a sharp rise in the stock price of Heller and a small decline in the stock price of GE. Pequot began accumulating Heller common stock on Monday July 2, 2001 (2) and started selling short GE stock on July 25, 2001. By closing out these positions after the merger announcement, Pequot realized a profit of nearly $17 million on Heller and approximately $1.9 million on GE (3).

In May 2005, Arthur Samberg, the head of Pequot and the individual responsible for making the trading decisions in both Heller and GE stock, initially testified to the staff that he did not remember why he decided to make the trades, but in subsequent testimony he referred to publicly available information about Heller at the time he made the trades as the basis for placing the Heller trades. However, Samberg acknowledged he was unsure whether he had actually seen this information before he made the trades.

Investigatory Steps: During the summer of 2005, the investigation focused on whether John Mack, who had a personal relationship with Samberg, as well as a number of business relationships with Pequot (4), provided Samberg with inside information about the merger ahead of the public announcement. Emails indicate that Mack and Samberg often communicated during this time and suggest that Mack spoke by telephone with Samberg about a potential investment the night of Friday, June 29, 2001, the business day before Pequot began purchasing Heller, but that the conversation related to an unrelated non-public company. Credit Suisse First Boston ("CSFB"), an investment banking firm and an adviser to Heller in the transaction, hired Mack as its CEO on July 12, 2001, ten days after Pequot began to buy Heller stock. However, counsel for CSFB advised the staff that the CFO of CSFB who met with Mack before Mack joined CSFB did not have deal information on specific pending deals on which CSFB was working. In addition, until March 2001, Mack had been the CEO of Morgan Stanley Inc., which advised GE on the transaction, but records the staff obtained show that Morgan Stanley's first contact with GE regarding a potential transaction with Heller occurred in April 2001, after Mack had already left the firm.

By November 2005, having taken the testimony of Samberg twice, interviewed Samberg's former partner, and obtained email, chronologies, documents, and information regarding Mack from several sources, including CSFB, Morgan Stanley, and Pequot, the staff had found no evidence that Mack had any information about the merger before he joined CSFB on July 12.

Starting in September 2005, the staff focused on identifying other potential tippers who could have provided Samberg information about the GE/Heller transaction. The staff reviewed Samberg's calendar to identify who he met with at the time of Pequot's trading. The staff also obtained from Pequot a list of people hired in 2001 and identified several people on that list who had connections with GE, Heller, or broker dealers involved in the merger. The staff also reviewed the emails obtained from Pequot to identify other potential tippers. The staff then compiled information about each person identified, including searching for relevant documents in the database of emails provided by Pequot.

When this research was complete, the staff evaluated whether to take the testimony of any of these potential tippers. The staff determined that while it had identified people with significant connections to Pequot or Samberg or both, there was no evidence that any knew about the merger in advance of its public announcement. Conversely, those who knew about the deal did not have sufficient connection to Pequot and/or contact with Samberg or Pequot during the relevant time period. Thus, the staff had identified a large number of potential tippers, but no likely tippers. Without any evidence suggesting that any of these people were the tipper, the staff decided taking any of their testimony would not be fruitful. At this same time, around December 2005, the focus of the insider trading case shifted to Microsoft, where it remained until June 2006.

Beginning in June 2006, the staff considered whether to take any additional investigatory steps regarding the GE/Heller trading. Ultimately, the staff took the testimony of six witnesses, and received documents requested by subpoena from each. On July 27, 2006, the staff took the testimony of two CSFB employees, a former CFO and a company lawyer, who were both involved in recruiting Mack. Both denied knowing about the merger before it was publicly announced, let alone telling Mack anything about it, and the documentary evidence did not contradict their denials. On August 1, 2006, the staff took the testimony of Mack. Mack denied knowing about the merger before he became CSFB's CEO in mid-July 2001 and denied having any discussions with Samberg or anyone else at Pequot about the merger before it was announced. He further denied having any discussions with anyone at Morgan Stanley in 2001 about GE, Heller, or the GE merger with Heller. On August 17, 2006, the staff took the testimony of the head trader at Pequot who executed the trades in both Heller and GE at Samberg's direction. The head trader testified that he did not recall anything about the trades but that the size of the investment in Heller was not unusual. On September 7, 2006, the staff took the testimony of the head trader's assistant at Pequot at the time of the transactions. The assistant testified that his role at Pequot was largely administrative at that time, and he could not remember any involvement in the GE/Heller trading. On September 8, 2006, the staff took the testimony of an analyst at a brokerage firm who provided analyst coverage on Heller during the relevant time period, appeared to have met with Pequot in June 2001 shortly before Samberg started buying Heller, and went to work at Pequot in early 2002. The analyst denied having any inside information about the merger transaction before it was announced and we have found no evidence to the contrary.

Moreover, although he was scheduled to meet with Pequot in June 2001, it appears from the analyst's personal calendar and testimony that the meeting was cancelled.

Conclusion: The staff has been unable to find any evidence that Pequot had information regarding the merger between GE and Heller before the merger was publicly announced, much less that anyone tipped Pequot or Samberg about the merger in advance of its announcement. The staff's investigation found that it is extremely unlikely that Mack tipped Samberg about the merger between GE and Heller, having found no evidence that Mack knew about the merger before Samberg started purchasing Heller stock. Moreover, emails Samberg sent evidence that Samberg did not even know about Mack joining CSFB until after it was publicly announced (5). It is unlikely that Mack told Samberg about confidential information about the merger if he learned it in connection with being recruited by CSFB, without revealing his impending employment.

There is additional evidence that casts doubt on the possibility that Pequot traded on the basis of non-public information in regard to its trading in GE and Heller. Although Pequot made a substantial profit purchasing Heller ahead of the announced merger, the size of its position in Heller was not atypical for Pequot (6) and Pequot purchased other financial stocks around the same time as the Heller purchases, clearly following the financial sector, not just Heller (7). Moreover, according to its trading records, during 2001 Pequot shorted GE stock on several different occasions (8).

B. Trading in Microsoft

Background: In April 2001, David Zilkha, a Microsoft employee, went to work as an analyst at Pequot. Even before he officially started work at Pequot, Zilkha started providing Samberg with information about Microsoft by email, including information attributed to Microsoft employees (9). Around the same time, Samberg started buying Microsoft options, which increased in price throughout this period. In emails from this time, Samberg repeatedly gave Zilkha credit for profits Pequot made in trading Microsoft, but did not identify the specific profits or trades.

Investigatory Steps: Beginning in June 2005, and continuing thereafter, the staff provided the Southern District with information about Pequot's trading in Microsoft. In the fall of 2005, the FBI located Zilkha and interviewed him twice. On December 14, 2005 the staff participated in a proffer session with the Southern District with Zilkha. Zilkha proffered that he had obtained information from Microsoft employees and provided it to Samberg, but did not believe the information was either material or confidential.

On January 23, 2006, the staff took Samberg's testimony regarding the Microsoft trading. Samberg testified that he could not remember why he placed the trades, downplayed Zilkha's role in his trading, and denied receiving any material non-public information concerning Microsoft. On February 10, 2006, the staff conducted a second joint proffer with the Southern District with Zilkha. Zilkha proffered the names of the Microsoft employees he believed provided him with information in April 2001. Also during this time, the staff reviewed the results of subpoenas issued to Zilkha and Microsoft.

By March 2006, the staff had focused on two pieces of information Zilkha provided to Samberg by email. The first email, dated April 17, 2001, stated that a Microsoft employee had told Zilkha, a few days before a Microsoft earnings announcement, both that the controller for one of Microsoft's divisions was more "relaxed" about earnings than in previous quarters and that this information suggested the earnings news would be positive. Two days later, on April 19, Samberg purchased Microsoft call options and sold short Microsoft put options. Later that day and after the market close, Microsoft announced that its earnings had significantly exceeded analysts' expectations. The following day, April 20, Pequot sold its call options and closed out its short position in the put options, realizing a profit of approximately $1.6 million. The second email, dated April 27, 2001, stated that a Microsoft employee had told Zilkha that a rumor regarding a delay in the release of a Microsoft product was untrue. The next trading day, April 30, Samberg purchased call options in Microsoft. Two days later, May 2, Microsoft stock rose and Pequot sold the purchased options, realizing a profit of approximately $530,000.

The staff interviewed by telephone the person Zilkha identified as the source of the first tip, but she denied even knowing Zilkha, and told the staff she would never have told anyone that type of information. The FBI was unable to locate the alleged source of the second tip, who had left Microsoft and was believed to be living in Brazil. The staff interviewed two other Microsoft employees identified by Zilkha as his sources for other information he provided to Samberg around the time Pequot traded in Microsoft, and both categorically denied providing him with any information. At the end of March, the staff obtained four month tolling agreements from Pequot, Samberg and Zilkha. The tolling agreement applied to all matters under investigation, including the Microsoft transactions.

In April 2006 the staff learned more about the product delay that was the subject of the second tip. First, the staff learned that other events, not related to the product delay rumor, caused a sharp increase in Microsoft's share price a few days after Zilkha provided the information to Samberg. Moreover, the staff learned that information relevant to both the earnings announcement and the product delay had been provided to Pequot by Goldman Sachs ("Goldman") in advance of Goldman publishing the information and before Pequot's trades. To examine whether Goldman's actions were themselves improper, the staff obtained information from Goldman and in early June took the testimony of two Goldman employees. Both told the staff that during this time they regularly provided research information to Goldman customers in advance of publishing this information, and that Goldman policy explicitly allowed this practice.

Conclusion: While the emails from Samberg praising Zilkha for his work on Microsoft suggest that Samberg may have used information from Zilkha to trade in Microsoft options, there is insufficient evidence to bring a case based on this conduct. The staff could only identify two tips that were related to profitable trading by Pequot in Microsoft. The first, the information about a controller being relaxed is vague, and the alleged source denies providing the information to Zilkha. Moreover, the information Pequot received from Goldman around the same time as Zilkha's tip about the same earnings announcement gives Samberg a justification for his trading. The second, the information about the product delay, did not drive the rise in Microsoft's stock price. Finally, the staff determined there was nothing illegal about Goldman giving its clients, including Pequot, information it developed internally, before that information was publicly disseminated.

**SEC DIVISION OF ENFORCEMENT**
**Case Closing Recommendation**

Run on 11/30/2006

C.A Trading in AstraZeneca and Par Pharmaceutical

Background: The staff also investigated Pequot's trading in AstraZeneca ("Astra") and Par Pharmaceutical ("Par"). On October 11, 2002, a federal district court issued an opinion upholding patents of Astra and declaring that Par infringed upon those patents. The court decision caused the shares of Astra to increase in price by 12% and the shares of Par to decrease in price by 21%. The staff's initial inquiry into the trading indicated that shortly before the court announced its decision, Pequot reversed its trading pattern in both stocks.

Investigatory Steps: The staff learned that the Southern District had conducted an investigation regarding whether a judicial law clerk had leaked the outcome of the patent case. That investigation had ended because the Southern District was unable to identify anyone who profited from the tip or whether there even was a tip. The staff reviewed the formal written statements prepared by the FBI from that investigation and reviewed Pequot emails but was unable to find any links between Pequot and the people interviewed in that investigation.

In November 2005, the staff examined Pequot's trading records and determined that the staff's initial inquiry presented an incomplete and misleading picture of Pequot's trading in the stocks of Astra and Par. Although from August 23, 2002 through September 25, 2002, Pequot did reverse a significant portion (approximately $18 million) of a short position it had established in Astra, Pequot was adding to its position in Par during part of the same time period (September 6 through September 11), purchasing approximately 200,000 shares of Par common for approximately $4.8 million. Pequot did not begin to reverse its long position in Par until September 27, 2002, after it had stopped reversing its Astra short position. Moreover, on October 11, 2002, the date the court decision was made public, Pequot still held a long position in Par (close to $2 million) and a significant short position in Astra (more than $6 million) (10). Both of these positions proved to be losing positions and it would have made no economic sense to maintain either of them if Pequot had inside information regarding the upcoming decision in the patent case. Finally, during 2002, from February on, Pequot traded in and out of Par and Astra.

Conclusion: It seems unlikely that Pequot had inside information about the court decision because it made investment decisions contrary to that information in the weeks leading up to the decision. Accordingly, we stopped pursuing this aspect of the investigation.

2) Private Investments in Public Equities ("PIPES")

Background: This aspect of the investigation concerned potential insider trading by Pequot in the common stock of companies issuing PIPES ahead of the public announcement of the PIPES. The public announcement of a PIPE often causes the price of issuer's stock price to fall, making it advantageous to sell short the stock of companies who issue PIPE securities before the transactions are publicly announced. Such trading may violate the law against insider trading. The Pequot PIPE investigation was initially opened by the SEC's Northeast Regional Office ("NERO") but during the fall of 2005 transferred to the Washington office for efficiency purposes.

Investigatory Steps: Initially, the staff evaluated and reviewed Pequot's response to a subpoena issued by NERO with respect to Pequot's PIPE transactions. The staff then examined Pequot's trading activity in 101 PIPE transactions over a four year period beginning in 2001. The staff specifically examined Pequot's trading data to determine whether Pequot sold short prior to the public announcement of any PIPE it purchased. Of the 101 PIPES purchased by Pequot, the staff found that Pequot shorted ahead of the public announcements of 11, but the stock prices for 8 of the 11 did not decline materially after the announcements of the PIPE. For the three remaining issuers, Pequot sold short the issuer ahead of the public announcement but in all three cases its short selling activity occurred more than seven weeks before the PIPE was publicly announced. This would make it difficult to show that the short selling was based on material nonpublic information concerning the PIPE offering, the trading having occurred so far in advance of the public announcement of the offering (11).

Conclusion: Because the staff was unable to find instances where Pequot short sold shares within seven weeks, ahead of a public announcement of a PIPE offering in which they participated in and in which there was a material decline in the share price of the issuer, the staff stopped pursuing this aspect of the investigation.

3) Market Manipulation

Background: During the fall of 2005 the staff began to closely evaluate two separate but similar trading practices engaged in by Pequot. The first involved Pequot's selling shares it received in numerous initial public offerings ("IPOs") and simultaneously purchasing the same number of shares soon after the shares began trading in the open market. This trading suggested that Pequot may have engaged in a manipulative trading practice because it appeared as if the trades did not involve a change in beneficial ownership (wash sales)(12). The second involved Pequot executing an agency cross trade, one side of which was a short sale and the other side was a purchase of the same security. The short sale and the buy were for the same number of shares and price and were executed simultaneously. The trade was reported as an agency cross; however, the Pequot trade blotter shows that the same Pequot funds executed both the sales and the purchases, causing no change in beneficial ownership. Again this trading was suggestive of manipulative trading.

# SEC DIVISION OF ENFORCEMENT
## Case Closing Recommendation

Run on 11/30/2006

Investigatory Steps: The staff requested a written explanation from Pequot regarding their apparent wash sale trading and sent a follow-up subpoena to Pequot for additional information on the trading practices after receiving Pequot's explanation. Pequot provided an extensive written response explaining that its trading occurred to transfer beneficial ownership of the stocks acquired in IPOs from one class of fund investors (those eligible to participate in the offering) to another class of investors (those ineligible to participate), and was specifically sanctioned under an NASD interpretation. This explanation was consistent with Samberg's testimony concerning this practice. The staff then reviewed Pequot's supporting documentation and certifications concerning Pequot's compliance with the NASD rule and found that the documentation was consistent with Pequot's assertion that it was transferring beneficial ownership of the securities from one class of investors to another.

The staff met several times with staff from the Division of Market Regulation ("Market Regulation") concerning whether Pequot's agency cross trades violated the federal securities laws. Market Regulation recommended that the staff first evaluate the market impact from Pequot's cross trading (13). The staff then analyzed the market impact from Pequot's cross trading activity in 92 securities – 5 New York Stock Exchange issuers; 7 American Stock Exchange issuers; 22 Nasdaq National Market System issuers; 29 Nasdaq Small Cap issuers; and 29 Over the Counter Bulletin Board issuers – and found that there was no significant impact on both the market price and volume for any of the stocks by the cross trading activity, making it difficult to prove market manipulation by Pequot.

Conclusion: For the reasons discussed above, the staff did not pursue further the market manipulation aspects of the investigation.

There are presently outstanding FOIA requests for this matter. In addition there was a denial of a request on November 1, 2006.
All files related to the case have been retained.

Termination letters are appropriate in this case and will be sent to Pequot Capital Management, Arthur Samberg, and John Mack.

The Branch Chief, Robert B. Hanson and the Assistant Director, Mark Kreitman, have reviewed and approved this form.

---

Footnotes:

(1) Pequot alone made available approximately 19.8 million pages of electronic email and produced 161,500 pages of hard copy documents. The staff also issued numerous document subpoenas to broker dealers, issuers, individuals, and service providers. The hard copy documents collected in the investigation fill approximately 95 banker boxes.
(2) Pequot's brokerage firm used the name "Indian Capital Management" in its internal system to refer to these trades. Pequot employees were not aware that this was done, and neither Pequot nor the brokerage firm where the trades were placed was able to provide any explanation as to why the trades were not placed using the Pequot name. The staff did not discover any reason for the use of this name, nor, since the name was used internally by the brokerage firm, any advantage Pequot derived from its use.
(3) Pequot closed out its GE short position approximately two weeks after the merger announcement. Had it closed out the position the day after the merger announcement, its profit on the GE trades would have been approximately $900,000.
(4) Mack, his wife, and a foundation Mack controlled made significant investments in a number of Pequot funds. Mack also participated with Pequot in at least two private company investments in 2001.
(5) Similarly, email traffic between Samberg and his wife evidences that Samberg did not know that Mack was going to resign from Morgan Stanley until after the resignation was publicly announced in January 2001. Approximately two months after the public announcement, Mack officially left Morgan Stanley.
(6) Pequot has publicly stated that during the period of the staff's review, it conducted over 136,000 trades. Moreover, the size of the position Pequot accumulated in Heller was equal to approximately one and a half percent of the total assets Samberg traded in 2001. Pequot records reflect that in 2001 Pequot took positions in numerous companies in percentages approximately equal to or greater than that amount.
(7) For example, on July 2, 2001, Pequot purchased 220,900 shares of stock in American Express Inc. On July 11, 2001, Pequot had trading positions in at least twelve different financial stocks.
(8) For example, from September 26 through October 5, 2001, Pequot established a short position in GE of approximately $30 million.
(9) Zilkha used the name of only one of these individuals in emails, the remaining individuals were only identified by their generic position at Microsoft.
(10) The staff initially believed that Pequot failed to list its holding of 213,000 Astra shares on its Form 13F filed for the period ended September 30, 2002. However, Pequot trading records show that Pequot purchased Astra shares to cover existing short positions, but did not in fact own any Astra shares as of September 30, 2002.
(11) Because the staff did not find any instances in which Pequot traded on material nonpublic information ahead of the PIPE offerings, it did not evaluate whether Pequot breached a duty of trust or confidence with respect to its trading ahead of the offerings.
(12) Section 9(a)(1) of the Exchange Act prohibits certain manipulative practices, including wash sales and matched orders, when such transactions are done for the purpose of creating the false or misleading appearance of active trading in a security listed on a national securities exchange, or a false or misleading appearance with respect to the market for any such security. Section 9(a)(2) prohibits the manipulation of prices of securities listed for trading on a national exchange, and makes it unlawful for a person to engage in a series of transactions that creates actual or apparent activity or depresses the stock's price when done for the purpose of inducing others to buy or sell the security. Manipulative practices under Section 9(a) also violate Section 10(b) and Rule 10b-5 of the Exchange Act for both exchange-listed securities and over-the-counter securities. To establish a violation of Sections 9(a)(1) and 9(a)(2) specific manipulative intent must be proven.
(13) The Supreme Court has stated that manipulation "connotes intentional or willful conduct designed to defraud investors by controlling or artificially affecting the price of securities." Ernst & Ernst v. Hochfelder, 425 U.S. 185, 199 (1976) (emphasis added).

# SEC DIVISION OF ENFORCEMENT
## Case Closing Recommendation

Run on 11/30/2006

### Representations

**A. FOIA**

After consultation with FOIA/PA Branch, it was determined that the FOIA status of these case files is as follows (Check one):

- [ ] No FOIA concerns exist as of _____.
- [ ] FOIA request filed on _____ is pending without decision. Category F Material will be retired with balance of file.
- [x] FOIA request was denied on 11/1/06. Category F Material will be marked to be discarded six years after decision date.
- [ ] FOIA determination was appealed and decided on _____. Category F Material will be marked to be discarded six years after decision date.

**B. Category E Records**

- [ ] The files contain no Category E Records.
- [x] A copy of the index for all designated Category E (Miscellaneous) Records is attached.

*All records for this case have been maintained by the General Counsel's office and the Division of Enforcement.*

**C. Termination Letters**

- [ ] No termination letters are required.
- [x] Termination letters will be sent to the parties listed in the case narrative.

**D.**
- The files relating to this case have been prepared for disposition in accordance with procedure in the memorandum, *Disposition of Records Upon the Closing of Cases* (August 20, 1993).
- Except as set forth, no access requests or protective orders are outstanding: _____
- No objection is made to eventual destruction of the files. [Consult with the Office of Chief Counsel concerning designation of any case files for Archival retention].

Based on the representations made above, the undersigned recommend(s) the closing of this case.

Signatures:

Attorney: _[signature]_          Date: 11/30/06

Branch Chief: _[signature]_      Date: 11/30/06

Asst Dir/Asst Reg Adm/ Asst Dist Adm: _[signature]_   Date:

Attach a copy of the Case Summary Report and submit this form to the Office of Chief Counsel.

# SEC DIVISION OF ENFORCEMENT
## Investigation Summary

Run on 11/30/2006  Page 1 of 1

| | | | |
|---|---|---|---|
| **Inv. No:** | HO-09818-A | **Inv. Name:** | TRADING IN CERTAIN SECUR |
| **Branch Chief:** | HANSON, ROBERT B | 202-551-4497 | 40423 |
| **Primary Staff:** | EICHNER, JAMES A | 202-551-4928 | 40421 |
| **Status:** | Closed | **Open Date:** | 01/14/2004 |
| **Last Event:** | 11/30/2006 | MUI/Investigation Status Change | |
| **Formal Order Date:** | 01/06/2005 | **Close Date:** | 11/30/2006 |

**Possible Violations:**

| | |
|---|---|
| 34 §10B | Fraud |
| 34 §14E | Tender Offer Fraud |
| 34 R10B-05 | Fraud |
| 34 R14E-03 | Tender Offer Insider Trading |

**Origins:**
REFRD FROM SRO-NOT V MKTSUSV

**Keywords:**
FRAUD IN OFFER/SALE/PURCHASE

**Trading Markets:**
NASDAQ

**Types of Security:**
COMMON STOCK

---

| | | | |
|---|---|---|---|
| **MUI:** | **MUI Case No.:** MHO-09818 | **MUI Case Name:** | ELITE INFORMATION GROUP, INC. |
| | **MUI Status:** Closed/Investigation Opened | **MUI Open Date:** | 11/14/2003 |
| | | **MUI Close Date:** | 01/14/2004 |