# Exhibit 36

## to Second Aguirre Declaration

*Aguirre v. SEC*, 06-cv-01260 (D.D.C.)

Privileged and Confidential

Action Memorandum Seeking
Formal Order In Insider Trading Investigation

December 16, 2004

To: The Commission

From: Division of Enforcement

Re: Trading in Certain Securities, HO-9818

Recommendation: That the Commission issue a formal order of private investigation to determine whether there have been violations of Sections 10(b), and 14(e) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 10b-5, and 14e-3 promulgated thereunder, and Section 204A of the Investment Advisers Act of 1940 ("Advisers Act").

Action Requested By: Summary Calendar

Prior
Commission Action: None

Novel, Important
Or Complex Issues: None

Other Offices
Or Divisions
Consulted:

Office of the General Counsel
Richard A. Levine
    (copy provided)

Office of Compliance,
Inspections and Examinations
Lori A. Richards
    (copy provided)

Office of Economic Analysis
Peter G. Simonyi
    (copy provided)

Office of Investment
Management
Barbara C. Chretien-Dar
    (copy provided)

Privileged and Confidential

Other Interested
Government Agencies:     The U.S. Attorney for the Southern District of New York

Source Of Case:          Referral from the NASD (August 5, 2003) and the Office of
                         Market Surveillance

Persons to Contact
                         Paul R. Berger
                         Richard W. Grime
                         Charles E. Cain
                         Gary J. Aguirre
                         

                         L. Hilton Foster
                         Eric J. Ribelin
                         Stephen P. Glascoe
                         

2

Privileged and Confidential

*Summary of Case:*

This matter involves: (1) possible insider trading by Pequot Capital Management ("Pequot Management"), a registered investment adviser, fourteen of its affiliated hedge funds and two privately owned accounts which it manages (individually and collectively "Pequot Funds"), and (2) possible violations by Pequot Management, as an investment adviser, of Section 204A of the Advisers Act.

Pequot Management advises and manages twenty-three hedge funds, including Pequot Funds, and three privately owned accounts. Currently, Pequot Management and its affiliated hedge funds comprise one of the largest hedge fund families in the nation, with approximately $4.7 billion under management.[1] All hedge funds affiliated with Pequot Management claim exemption from registration under Section 4(2) of the Securities Act of 1933 ("Securities Act") or under Rule 506 of Regulation D.[2]

Over the past 15 months, the NASD and NYSE have made several referrals to the Division of Enforcement in which one or more hedge funds affiliated with Pequot Management has been identified for possible insider trading. Two of these referrals are discussed below. Further, a director of market trading analysis with the NYSE has informed the staff that he closely monitors the hedge funds affiliated with Pequot Management because they have been "just too lucky."

The number of suspicious transactions also raises questions of the adequacy of Pequot Management's compliance with the requirements of Section 204A of the Advisers Act to establish, maintain, and enforce written policies and procedures reasonably designed to prevent the misuse of material, nonpublic information.

*Brief description of issuer and trading ranges:*
**Pequot Funds' Trading in Elite Information Group ("Elite")**

On April 3, 2003, The Thomson Corporation ("Thomson"), listed on the NYSE under the symbol TOC, made a friendly tender offer for the common stock of Elite at a price of $14.00 per share and, subsequently, acquired 98% of Elite's outstanding shares.

Before its acquisition, Elite provided business management software for law firms and professional services companies. Its common stock was registered under Section 12(g) of the Exchange Act and traded on the NASDAQ National Market System, under the symbol ELTE, with 7,890,600 shares outstanding.

---

[1] This figure was taken from Pequot Management's most recently filed Form 13F.

[2] Rule 506 of Regulation D allows an issuer, such as a hedge fund, to sell securities of unlimited value to an unlimited number of investors without complying with the registration requirements of the Securities Act, provided the offers and sales are only made to "accredited investors," i.e., institutional investors and individuals 1) whose annual income exceeds $200,000, 2) whose joint income with his or her spouse exceeds $300,000, or 3) whose individual or joint net worth with his or her spouse exceeds $1,000,000.

**Privileged and Confidential**

Between October 1, 2002, and April 2, 2003, Elite's daily trading volume was between a low of 100 shares and a high of 228,000 shares, with an average daily volume of 17,036 shares. During that period, its share price ranged from $5.80 to $10.15 per share, with a 52 week low of $4.75.

*Brief chronology: material events, relevant communications, trading and announcements:*

| | |
|---|---|
| August 20, 2002 | Thomson's CEO, during Florida conference, tells Elite's CEO of interest in acquiring Elite for between $9 and $11 per share in cash. |
| October 10, 2002 | Elite contacts Broadview International ("Broadview"), a specialist in IT mergers and acquisitions, about "informal" expressions of interest by Thomson and one other party. |
| October 10, 2002 through April 2003 | Several Broadview employees, including two working on the Elite acquisition, have numerous social and business contacts with Pequot executives. |
| November 25, 2002 | During a phone call, representatives of Morgan Stanley (M&A advisor to Thomson) tell Elite's CEO of Thomson's interest in acquiring Elite at $9.00 per share. |
| November 27-29, 2002 | Pequot Funds buy 16,500 shares of Elite. Pequot Management's Form 13F filings show no prior holdings in Elite and available data show no trading in Elite by Pequot Funds during the prior eleven months. |
| December 3-4, 2002 | Elite formally retains Broadview as its M&A adviser in negotiations with Thomson. Broadview's and Morgan Stanley's representatives discuss acquisition terms during conference call. |
| December 4-6, 2002 | Pequot Funds purchase an additional 115,000 Elite shares; Elite trading volume reaches 228,000 shares on December 6. |
| March 10 – April 1, 2003 | Elite and Thomson continue negotiating terms of the tender offer. Pequot Funds accumulate 44,100 more shares of Elite. |
| April 3, 2003 | Public announcement of Elite-Thomson agreement that Thomson will make a tender offer of $14 per share for all Elite common stock. |

4

**Privileged and Confidential**

| | |
|---|---|
| *Market reaction to announcement:* Volume surged from 15,500 shares traded on Tuesday, April 2, 2003, to 3,170,984 shares traded on Wednesday, April 3, 2003. Elite's closing share price increases from $9.97 on Tuesday, April 2, 2003, to a closing price of $13.86 on Wednesday, April 3, 2003, a 39% increase. | |
| *Name, occupation, and profits of potential violators.* | *Basis for believing trading is suspicious.* |
| Pequot Funds<br><br>Profits: $1,017,686. | • Size, timing and profitability of trades.<br><br>• No known trading activity or holding of Elite stock by any hedge fund affiliated with Pequot Management prior to the purchases in November 2002.<br><br>• Existing business relationships between Pequot executives and Broadview employees, such as: ███████, a general partner of Pequot Management, "who calls and meets with ███████ ... every few weeks, if not more," according to a Broadview staff person.<br><br>• Three former Broadview employees become Pequot executives before Elite purchases: ███████ leaves Broadview in 2000 and becomes a general partner in Pequot Ventures; ███████ leaves Broadview in 1997 and becomes a general partner of Pequot Ventures; and ███████ leaves Broadview in 1996 and becomes a general partner in Pequot Management.<br><br>• Social and business encounters between Broadview employees, some with knowledge of nonpublic information, and Pequot executives during the period of suspected insider trading. |

*Privileged and Confidential*

- Pequot Funds were an aggressive buyer of Elite stock during the period of suspected insider trading. Of the 17 days Pequot Funds bought Elite stock, its purchases were more than 20% of the buy volume for twelve days, more than 50% for three of these twelve days, more than 80% for three days, and 100% on one day.

*Insider trading theory:*

The most likely flow of information is from someone within Broadview, which advised Elite in connection with this transaction. Members of Pequot Management had personal and business ties with employees of Broadview, and several were former employees of Broadview.

**Pequot Funds' Trading in AstraZeneca PLC ("Astra") and Par Pharmaceutical Companies, Inc. ("Par")**

*Brief description of case:*

Astra and Par are discussed together in this section because a single event affected the value of Pequot Funds' holding in the stocks of both companies. That event was an October 11, 2002 decision by a federal district court upholding the validity of Astra's patents relating to Prilosec and also holding that a generic drug distributed by Par in the U.S. infringed upon those Astra patents.

Shortly before the court announced its decision, Pequot Funds reversed its trading pattern in both stocks. Between August 2, 2002, and August 22, 2002, Pequot accumulated a short position of 279,000 shares in Astra. From August 23, 2002, to September 25, 2002, Pequot closed its short position and purchased an additional 213,000 Astra shares. It also ceased buying Par shares and liquidated 452,000 shares, or 87% of its holdings, which it had recently acquired. Consequently, Pequot Funds had a combined potential profit and loss avoided of $2.6 million on its Astra trades and losses avoided of $3.1 million on its Par trades.

*Brief description of issuer and trading range:*

Astra is a UK company engaged in the development, manufacture and marketing of pharmaceutical products. Astra's American Depositary Shares are traded on the NYSE under the symbol AZN, with 127,459,929 outstanding shares.

Astra is subject to the reporting and other requirements of the Commission applicable to foreign issuers.

Between August 1, 2002, and October 10, 2002, the daily trading volume of Astra shares ranged from a low of 430,500 to a high of 3,847,600 with an average daily volume of 1,474,234 shares. During that period, the share price ranged from $29.15 to $38.00 per share, with a 52 week low of

**Privileged and Confidential**

$29.15 on August 30, 2002.

Par[3] manufactures and distributes a broad line of generic drugs. Its common stock is registered pursuant to Section 12(b) of the Exchange Act and is listed on the NYSE under the symbol PRX, with 34,992,468 shares outstanding.

Between August 1, 2002, and October 10, 2002, daily trading volume of Par shares ranged from a low of 133,800 to a high of 1,007,400 with an average daily volume of 303,842 shares. During that period, the share price ranged from $22.47 to $28.60 per share, with a 52 week low of $16.10 on February 10, 2002.

*Brief chronology: material events, relevant communications, trading and announcements*

| Date | Event |
|---|---|
| October 5, 2001 | Astra's patent on Prilosec's main chemical ingredient, omeprazole, expires. |
| November 16, 2001 | Federal Drug Administration gives another manufacturer (not Astra) a final approval for the first generic version of Prilosec. |
| December 6, 2001 | Astra and generic drug manufacturers, including Par, begin a non-jury trial in the United States District Court for the Southern District of New York over the validity of Astra's five collateral patents relating to Prilosec and whether the generic drugs, including the one distributed by Par, infringe those patents. |
| May through October 10, 2002 | Most Wall Street analysts predict the court will decide in favor of the generic manufacturers as the courts have done in the vast majority of similar disputes in the years just prior to the Prilosec-generic trial. |
| June 13, 2002 | The trial ends with the court taking the matter under submission. The trial record includes six thousand pages of trial testimony and thousands of exhibits. |
| August 2 through August 22, 2002 | Consistent with the expected outcome of the case, Pequot Funds accumulate an initial short position of 279,000 Astra shares. |
| August 23, 2002 through September 30, 2002 | Pequot Funds abruptly reverses its trading pattern in Astra. Despite the lack of any news relating to the outcome of the Prilosec-generic trial, it closes its short position and accumulates a long position of 213,000 shares. These trades are completed 12 trading days before the court's decision is released. |

---

[3] Par Pharmaceutical was previously known as Pharmaceutical Resources until its name change in May 2004.

Privileged and Confidential

| | |
|---|---|
| September 5 through 11, 2002 | Pequot Funds, as an entity, is the largest institutional buyer of Par, according to the NYSE, purchasing 291,000 shares in the week before the announcement of Par's earnings. |
| September 12, 2002 | Par raises its earnings range for its next quarter, causing its stock to increase $3.04 or 12%. Pequot Funds make a potential profit of $736,500. |
| September 27, 2002 through October 4, 2002 | Pequot Funds sells 87% of its Par shares, reducing its holdings from 518,000 shares to 66,000 shares. These trades were completed one week before the court's decision is released. |
| October 11, 2002 | In a decision announced after the market closes, the Court upholds Astra's patents and also finds the generic drug distributed by Par infringes upon those patents. The Associated Press reports, "The decision was viewed as a tremendous boon for AstraZeneca. Most Wall Street analysts had predicted the company's earnings would drop substantially when it lost the patent on its biggest selling drug." |

*Market reaction to announcement:*

Astra's trading volume surged from 829,000 shares traded on Friday, October 11, 2002, to 3,176,000 shares traded on Monday, October 14, 2002. Astra's closing share price increased from $32.55 on Friday, October 11, 2002, to a closing price of $36.60 on Monday, October 14, a 12% increase.

Par's volume surged from 235,000 shares traded on Friday, October 11, 2003, to 2,913,000 shares traded on Monday, October 14, 2002. Par's closing share price decreased from $25.61 on Friday, October 11, 2002, to a closing price of $20.05 on Monday, October 14, 2002, a 21% decrease.

| *Name, occupation, and profits of potential violators.* | *Basis for believing trading is suspicious.* |
|---|---|
| **Pequot Funds**<br><br>Profits and losses avoided:<br>$5.7 million | • Size, timing and profitability of Astra and Par trades. |

Privileged and Confidential

- Pequot Funds, as an entity, is the single largest institutional buyer of Par stock during the five days just before Par announces it is raising its earnings guidance.

- After the patent trial has been completed, Pequot Funds initially take positions in both Astra and Par which would increase in value if Astra loses, which is the expectation of most analysts.

- In the absence of any news, and shortly before the court's unexpected decision, Pequot Funds reverses its trading patterns in both stocks, buying Astra and selling Par, the correct positions to take if Astra were to win the trial.

- According to the NYSE referral, Par's CEO was informed by Prem Lachman, a manager at another hedge fund, that a court clerk had accepted a bribe from an unidentified third party in exchange for information regarding the court's decision before its public announcement.

*Insider trading theory:*

An employee of the court would be the most likely person to have provided Pequot Funds with nonpublic material information of the court's decision before its public disclosure. The U.S. Attorney's Office for the Southern District of New York has expressed an interest in this investigation and the staff intends to work with that office.

*Need for Formal Order*

A formal order is needed for subpoena authority in order to obtain phone records, bank records, compel testimony and the production of documents.