# Exhibit 43

## to Second Aguirre Declaration

*Aguirre v. SEC*, 06-cv-01260 (D.D.C.)

**From:** Aguirre, Gary J.
**Sent:** Tuesday, June 28, 2005 5:46 AM
**To:** Hanson, Robert
**Cc:** Kreitman, Mark J.; Ribelin, Eric
**Subject:** GE-Heller: Obstacles and propsed next steps

    This memo summarizes the proposed steps for advancing the investigation of the GE-HF investigation. I have other thoughts regarding how we might advance the investigation of other SRO referrals (e.g., Elite Information and Blue Coat Systems) as well as the efficient identification of other insider trading activity.

    I assume you have reviewed memo 1 which summarizes Samberg's testimony on why he traded in HF and GE. His explanation of his HF trading lacks credibility and he has none on GE. Still, we need to establish the likely path through which the material nonpublic information (MNI) flowed to Samberg. Proposed below are five avenues for establishing that path.

    **A.** *Documents-Testimony from the five investment bankers (CSFB, Morgan Stanley, JP Morgan, Lehman and Merrill Lynch) or the two principals (GE and HF).*

    I discuss these possible tip sources in ascending order, given what we know now, of probability.

    The least likely sources *at this point* are Heller, Merrill Lynch, and Lehman. We have no evidence of any Samberg-HF contacts. Samberg denied having any contacts with HF. He could not identify any of the HF employees involved in the acquisition. Merrill was consulted by Fuji Bank very early, was not hired, and was not heard from again. Yesterday, Merrill produced documents pursuant to our subpoena on a CD which I will review when they have been posted to Iconnect. Hence, its status could change if something shows up. Samberg did testify that he might have spoken with someone from Merrill. Also, there were a huge amount of hard and soft dollar commissions that went to Merrill from July 1, 2001, through June 30, 2002 (approximately $16 million). The chronologies indicate that Lehman, which had investment banking ties with Heller, did not become involved until just before the announcement of the acquisition in late July 2001. I have not as yet served a subpoena on Lehman.

    JP Morgan is up on notch as a source of a tip. It consulted with Fuji from beginning to end. However, Samberg testified he knew no one on the JP Morgan acquisition team. JP Morgan's counsel wrote that there were no e-mails between Morgan's and Pequot. Additionally, Samberg testified that he does not recall anyone having any contacts with anyone from JP Morgan in 2001. In short, we have no leads.

    Up another notch as a tip source is GE. Samberg knows two members of the GE acquisition team, John Myers and Kenneth Langone. Langone was an outside director and there are few e-mails between him and Samberg in 2001. One e-mail suggests

that Langone and Samberg met in January 2001. Samberg testified he was not certain he knew Langone in 2001. However, his testimony regarding Langone was a little suspicious (RT II p. 28, l. 20-p. 31 l. 14). Samberg has a much stronger relationship with John Myers, CEO of GE Asset Management. It dates back to the late nineties. He attends basketball games with Myers. When I asked Samberg if he ever discussed GE business with Myers in these games he responded, "What do you mean by discuss 'GE businesses?'" However, GE's chronology indicates that both Myers and Langone did not learn about the HF acquisition until just before it was announced. However, there is no accuracy warranty with the chronos; Chrysakos—the GE VP that went to prison as a tipster on GE-HF—was not even mentioned in the GE chronology to the NYSE. I have asked GE, represented by Wilmer-Cutler, to submit a more complete chrono in view of the Chysakos omission.

The second highest probability of the tip would be Morgan Stanley (MS), which consulted with GE, for two reasons. First, MS is Pequot's prime broker. Samberg rattled off about ten names of higher echelon MS people he knew in 2001, though he denied knowing any of the individuals on the acquisition team that consulted with GE. More importantly, there is the Mack connection. The rub is that Mack left MS in March or April 2001, before MS knew about GE-HF. However, Mack came from the institutional side of MS and had been expected by the media to bring many of its bankers with him to CSFB, implying the depth of his relationships with MS bankers that might have known about GE-HF. It later became public that there was a contractual prohibition in Mack's severance agreement precluding him from hiring away MS staff. Yesterday, we received a packet of Samberg-MS e-mails from MS for the period before Mack left MS. The more interesting e-mails would be those after he left and after MS learned about GE, which have not as yet arrived. I doubt we will find anything like a tip, but we find him being chummy with somebody who knew about GE-HF.

The top spot goes to CSFB, which consulted with HF, for reasons you know. This could of course change if it turned out that Mack had no significant contacts at CSFB until after July 2. As you know, we have subpoenaed communications between Mack and Pequot from June 1, 2001, until June 2004, when he left CSFB. My view is that we should broaden the subpoena to obtain (1) all communications between Mack (we now have his e-mail address just before he started with CSFB) and CSFB for the two months before he began with CSFB and (2) all documents relating to his phase in as CEO at CSFB generated during June and July 2001. Further, I think we need to take Mack's testimony and simply nail down whether he will admit that he knew about the GE/HF acquisition from any source. Obviously, he could have learned this at either CSFB or MS. Since the GE-HF info could have been communicated to him in the regular course of business from CSFB, and thus third parties would be innocently involved, he might actually tell us if this occurred. If this was the tip path, the question would be when: the closer to June 29 or the morning of July 2, the stronger the case that he was the tipster. As discussed in my first memo, please keep in mind that Samberg was a heavy purchaser of HF on July 2 and tried to buy more than twice the amount he actually executed. I have asked Tom Conroy to get BOA

Montgomery's trading tickets for July 2 so we can determine whether the trade was put in at the opening or during the day. If it was put in during the day, the tip could have come on the morning of July 2. If by any chance that is when Mack learned of the acquisition, he would look very much like the tipster.

It is also important whether Mack had his GE/HF information refreshed during July 2001. On July 9, Samberg, for some reason, only tried to buy 15,000 shares of HF. The next day, he directed his trader to purchase 455,300 shares of HF. What did he learn between his July 9 order and his July 10 order? Did Mack have his information refreshed at this time?

In short, the broadened subpoena and Mack's testimony could (1) point to Mack as the tipster or (2) eliminate Mack as the tipster and thus suggest we eliminate CSFB and look closer at the other candidates.

**B.**  *Production of additional e-mails.*

A second possible source of evidence indicating the tipster for GE/HF is the yet un-produced e-mails of Pequot. There are two possibilities. First, Pequot is holding an now unknown number of e-mails and instant messages for privilege review. Fried Frank has represented that there are no e-mails to or from Samberg for the period of April 15, 2001, through July 31, 2001, among the withheld e-mails and IMs. I do note that there are several e-mails to and from Pequot's General Counsel at the critical time relating to "investment decisions."

A second possible source, and probably the only realistic one for GE/HF, is the backup tapes. There are four classes: the Andor tapes, the missing tapes, the damaged tapes, and the non-exchange server tapes. Irvine Pollock and Larry Storch have been hired for the task of ascertaining what happened to the missing tapes, locating any other non-exchange server tapes with e-mails, and retrieving any e-mails from the damaged tapes. I see Pollack-Storch as PCM's protective wall of integrity around the tapes. Shame on anyone who suggests Pollack-Storch is not getting to the bottom of backup tape brouhaha. As you know, I have written Audrey Strauss regarding the newly discovered non-exchange server tapes and got a reply form Larry Storch, which did not respond to my questions, e.g., which Pequot employee had possession of the recently discovered non-exchange server tape from which e-mails were retrieved. I think Audrey has the best of all worlds right now regarding these three categories of tapes: the Pollock-Storch wall of integrity and my inability to press them for answers to pertinent questions. Mark's call last week to Fried Frank may get Pollack-Storch to concede they simply represent Pequot.

The circumstances involving the backup tapes may be an obstruction of justice case. How and when did dome of the tapes get damaged? How did some get lost? If I have to take this on without some guidance, it is a very big job.

That leaves us with the Andor tapes. I understand that Audrey will send me a response next week to my request from legal authorities supporting Pequot's assertion of privilege.

C.  *Peter Dartley.*

So far, outside of Samberg, Pequot e-mails/documents indicate only one other Pequot employee knew anything about the GE/HF trades, Peter Dartley. On July 11, 2001, Samberg wrote Dartley, "Where are we on HF?" Dartley was Samberg's chief trader in July 2001. Samberg dealt directly with him and often gave him directions to make trades. The quote above suggests that this was done on HF. Dartley posted the HF trades and the GE trades to the handwritten Pequot trade blotter.

Dartley was also an intermediary when Samberg needed information about engaging in an arbitrage transaction on GE-HF after the announcement of the acquisition but before the close. Other e-mails suggest that Dartley was Samberg's confidante on investment decisions and other matters.

Pequot's employment list indicates that Dartley started work with Pequot in 1994 and never left. This is not accurate. The Chief Trader at MS told me that Dartley left (I think retired from) Pequot and later rejoined Pequot some time in 2003 in his current position as a "Managing Director." His new assignment was to restructure Pequot, an assignment that says volumes about Samberg's trust in Dartley. If any incriminating e-mails exist, I suspect they would be between Samberg and Dartley.

I think we should issue a subpoena for all e-mails to and from Dartley from January 1, 2001, to the present, as we have with 34 other Pequot employees. He should also go to the top of the testimony list.

D.  *The emerging mosaic of Samberg's activities during June and July 2001*

As you know, Nancy has been working on an Excel spreadsheet that includes key e-mails to and from Samberg, including those to/from or mentioning Mack. It also contains trading info and info from the GE-HF chronologies. Relevant data from phone records and credit cards will be entered as it arrives. This mosaic, especially with input from CSFB or MS regarding Mack, could become a clearer and clearer picture of the path of the tip.

E.  *Calls to former Pequot employees*

2001 was a turbulent year at Pequot. Many people left with Dan Benton to form Andor. Others simply left. Some appear to have been fired. Eric and I have frequently discussed questioning former Pequot employees. Of course, the closer they were to Samberg in June or July 2001, the better. One obvious candidate is Wendy Chicosky Samberg's secretary in June and July of 2001. She left in mid-October 2001, which means she could have gone to Andor. Among other things, she kept his daily calendar. There is a dilemma here: if we call former Pequot employees, they may not talk because of the confidentiality agreements they signed; if we take their testimony, they may get "lawyered up" by Fried Frank selections before they testify.