# Exhibit 44

# to Second Aguirre Declaration

*Aguirre v. SEC*, 06-cv-01260 (D.D.C.)

rage i of i

**From:** [        ]
**Sent:**    Tuesday, October 11, 2005 5:38 PM
**To:**    [        ]
**Subject:** FW: Merit Pay Increase Documents

Shall I say no?

[        ]

**From:** GJAguirre@cs.com [mailto:GJAguirre@cs.com]
**Sent:** Tuesday, October 11, 2005 5:02 PM
**To:** [        ]
**Subject:** Re: Merit Pay Increase Documents

[        ]

Thanks for the reply.

How about a redacted copy of the transmittal--no refererrices to other employees--showing who sent it and to whom it was sent?

Sincerely,


Gary

AGUIRRE 000461

10/25/2005

C[        ]⊐

---

**From:**    C[        ]⊐
**Sent:**    Tuesday, October 11, 2005 3:42 PM
**To:**      C[        ]⊐
**Subject:** FW: Merit Pay Increase Documents

Fyi – Based on this message, looks like the email message you had in mind would be fine. The transmittal form should not be sent. Pls call me if you have any questions – my cell (tomorrow, after 4 pm today)C[
⊐ Just send it and be done with it.

---

**From:** C[        ]⊐
**Sent:** Tuesday, October 11, 2005 3:39 PM
**To:** C[        ]⊐
**Subject:** RE: Merit Pay Increase Documents

The transmittal forms are not given to employees.

---

**From:** C[        ]⊐
**Sent:** Tuesday, October 11, 2005 10:06 AM
**To:** C[        ]⊐
**Subject:** FW: Merit Pay Increase Documents

C[    ]⊐

When you have a moment, I'd like to run this past you.

Thanks

C[    ]⊐

---

**From:** C[        ]⊐
**Sent:** Tuesday, October 11, 2005 9:42 AM
**To:** C[        ]⊐
**Subject:** FW: Merit Pay Increase Documents

---

**From:** Hanson, Robert
**Sent:** Tuesday, October 11, 2005 9:42 AM
**To:** C[        ]⊐
**Subject:** RE: Merit Pay Increase Documents

There was a supervisory transmittal form. Did that go to Gary? Can it go to Gary?

---

**From:** C[        ]⊐
**Sent:** Tuesday, October 11, 2005 9:34 AM
**To:** Hanson, Robert
**Cc:** C[        ]⊐
**Subject:** FW: Merit Pay Increase Documents

AGUIRRE 000463

10/25/2005

Robert,

Please see below. Was there any other document as requested below?

[     ]
_____

**From:** GJAguirre@cs.com [mailto:GJAguirre@cs.com]
**Sent:** Monday, October 10, 2005 1:11 PM
**To:** [     ]
**Subject:** Merit Pay Increase Documents

[     ]

The document signed by Robert Hanson that went to the Compensation Committee was undated. Was it part of another document that had a heading, containing a date as well as the identity of the recipient? If so, could I obtain a complete copy of the document, including the heading showing the date and the identity of the recipient (s)?

Further, do I understand correctly that you have now provided me with all documents that were contained in my Employee Personnel File (EPF)?

I am puzzled by the late inclusion of Mr. Kreitman's e-mail in my file. Was there any explanation how he and Mr. Hanson overlooked its inclusion in the materials submitted to the Compensation Committee?

Sincerely,

Gary J. Aguirre

AGUIRRE 000464

10/25/2005

**From:** ⊏         ⊐
**Sent:** Tuesday, October 11, 2005 10:10 AM
**To:** ⊏            ⊐
**Subject:** FW: Merit Pay Increase Documents

⊏      ⊐

Please advise how you want me to respond. I can answer each question below as follows:

1. There was a supervisory transmittal form from the supervisor to the Compensation Committee along with the Hanson document. It is Commission policy not to release that form.

2. You now have all documents.

3. I don't know. You would need to ask Mark Kreitman.

⊏     ⊐

**From:** GJAguirre@cs.com [mailto:GJAguirre@cs.com]
**Sent:** Monday, October 10, 2005 1:11 PM
**To:** ⊏        ⊐
**Subject:** Merit Pay Increase Documents

⊏     ⊐

The document signed by Robert Hanson that went to the Compensation Committee was undated. Was it part of another document that had a heading, containing a date as well as the identity of the recipient? If so, could I obtain a complete copy of the document, including the heading showing the date and the identity of the recipient (s)?

Further, do I understand correctly that you have now provided me with all documents that were contained in my Employee Personnel File (EPF)?

I am puzzled by the late inclusion of Mr. Kreitman's e-mail in my file. Was there any explanation how he and Mr. Hanson overlooked its inclusion in the materials submitted to the Compensation Committee?

Sincerely,

Gary J. Aguirre

AGUIRRE 000467

10/25/2005

**From:** [ ]
**Sent:** Tuesday, October 11, 2005 10:06 AM
**To:** [ ]
**Subject:** FW: Merit Pay Increase Documents

**Tracking:** Recipient        Read

[ ]

When you have a moment, I'd like to run this past you.

Thanks

---

**From:** [ ]
**Sent:** Tuesday, October 11, 2005 9:42 AM
**To:** [ ]
**Subject:** FW: Merit Pay Increase Documents

---

**From:** Hanson, Robert
**Sent:** Tuesday, October 11, 2005 9:42 AM
**To:** [ ]
**Subject:** RE: Merit Pay Increase Documents

There was a supervisory transmittal form. Did that go to Gary? Can it go to Gary?

---

**From:** [ ]
**Sent:** Tuesday, October 11, 2005 9:34 AM
**To:** Hanson, Robert
**Cc:** [ ]
**Subject:** FW: Merit Pay Increase Documents

Robert,

Please see below. Was there any other document as requested below?

[ ]

---

**From:** GJAguirre@cs.com [mailto:GJAguirre@cs.com]
**Sent:** Monday, October 10, 2005 1:11 PM
**To:** [ ]
**Subject:** Merit Pay Increase Documents

[ ]

AGUIRRE 000468

10/25/2005

The document signed by Robert Hanson that went to the Compensation Committee was undated. Was it part of another document that had a heading, containing a date as well as the identity of the recipient? If so, could I obtain a complete copy of the document, including the heading showing the date and the identity of the recipient (s)?

Further, do I understand correctly that you have now provided me with all documents that were contained in my Employee Personnel File (EPF)?

I am puzzled by the late inclusion of Mr. Kreitman's e-mail in my file. Was there any explanation how he and Mr. Hanson overlooked its inclusion in the materials submitted to the Compensation Committee?

Sincerely,

Gary J. Aguirre

AGUIRRE 000469

10/25/2005

**From:**

**Sent:** Tuesday, October 11, 2005 9:42 AM

**To:**

**Subject:** FW: Merit Pay Increase Documents

---

**From:** Hanson, Robert
**Sent:** Tuesday, October 11, 2005 9:42 AM
**To:**
**Subject:** RE: Merit Pay Increase Documents

There was a supervisory transmittal form.  Did that go to Gary?  Can it go to Gary?

---

**From:**
**Sent:** Tuesday, October 11, 2005 9:34 AM
**To:** Hanson, Robert
**Cc:**
**Subject:** FW: Merit Pay Increase Documents

Robert,

Please see below.  Was there any other document as requested below?

---

**From:** GJAguirre@cs.com [mailto:GJAguirre@cs.com]
**Sent:** Monday, October 10, 2005 1:11 PM
**To:**
**Subject:** Merit Pay Increase Documents

The document signed by Robert Hanson that went to the Compensation Committee was undated. Was it part of another document that had a heading, containing a date as well as the identity of the recipient? If so, could I obtain a complete copy of the document, including the heading showing the date and the identity of the recipient (s)?

Further, do I understand correctly that you have now provided me with all documents that were contained in my Employee Personnel File (EPF)?

I am puzzled by the late inclusion of Mr. Kreitman's e-mail in my file. Was there any explanation how he and Mr. Hanson overlooked its inclusion in the materials submitted to the Compensation Committee?

Sincerely,

Gary J. Aguirre

10/25/2005

AGUIRRE 000470

**From:**

**Sent:** Tuesday, October 11, 2005 9:34 AM

**To:** Hanson, Robert

**Cc:**

**Subject:** FW: Merit Pay Increase Documents

Robert,

Please see below.  Was there any other document as requested below?

---

**From:** GJAguirre@cs.com [mailto:GJAguirre@cs.com]
**Sent:** Monday, October 10, 2005 1:11 PM
**To:**
**Subject:** Merit Pay Increase Documents

The document signed by Robert Hanson that went to the Compensation Committee was undated. Was it part of another document that had a heading, containing a date as well as the identity of the recipient? If so, could I obtain a complete copy of the document, including the heading showing the date and the identity of the recipient (s)?

Further, do I understand correctly that you have now provided me with all documents that were contained in my Employee Personnel File (EPF)?

I am puzzled by the late inclusion of Mr. Kreitman's e-mail in my file. Was there any explanation how he and Mr. Hanson overlooked its inclusion in the materials submitted to the Compensation Committee?

Sincerely,

Gary J. Aguirre

AGUIRRE 000471

10/25/2005

**From:** [   ]
**Sent:** Friday, October 07, 2005 2:22 PM
**To:** [   ]
**Subject:** did you send the docs we discussed to [         ]  Have a nice weeknd - [    ]

**Tracking:**        **Recipient** [        ]          **Read**
                                                        Read: 10/7/2005 3:33 PM

*These are the docs from (Gary's) this personnel folder so she has the complete Revised re: Gary's EEO complaint*

1

AGUIRRE 000472

## Berger, Paul

**From:**        [                    ]
**Sent:**        Friday, September 02, 2005 12:42 PM
**To:**          [                    ]
**Cc:**          [                    ]; Kreitman, Mark J.; Berger, Paul
**Subject:**     RE: Gary Aguirre Actions


[         ]

I've signed off on both actions.  Just let me know when you've returned the unused one.

Thanks,

[      ]

_____

**From:** [              ]
**Sent:** Friday, September 02, 2005 10:47 AM
**To:** [                    ]
**Cc:** [                    ] Kreitman, Mark J.; Berger, Paul
**Subject:** Gary Aguirre Actions

I just forwarded two personnel actions for Aguirre:

One is for a resignation.  As of 10:45 a.m. on Friday, September 2, 2005, I don't have a written resignation from Aguirre so it cannot be used.

The other Aguirre action is a termination which, according to the notice sent to Aguirre, is supposed to be effective as of 5:00 p.m. today if there is no written resignation notice from him before then.

We are sending both so they are available for HR's use depending upon the circumstance. [      ] please return the action you do not use.  Thanks.


[     ]

1

AGUIRRE 000538

**From:** Kreitman, Mark J.
**Sent:** Monday, October 17, 2005 1:09 PM
**To:** Berger, Paul; [          ⊐
**Subject:** RE: Integrity of my personnel files

I responded to written questions from [          ⊐ Those responses are not, to my knowledge, included in Gary's personnel file.  They are, however, part of the EEO investigation.

**From:** Berger, Paul
**Sent:** Monday, October 17, 2005 12:28 PM
**To:** [                ⊐Kreitman, Mark J.; [                    ⊐
**Subject:** FW: Integrity of my personnel files

[      ⊐

          Do you have any suggestions on how we should handle this?  Should the GC people respond to this email?  As far as I know, no documents were created in connection with [     ⊐ interview with the EEO person (other than the notes that the interviewer undoubtedly took).

          Paul

**From:** GJAguirre@cs.com [mailto:GJAguirre@cs.com]
**Sent:** Friday, October 14, 2005 2:33 PM
**To:** [              ⊐
**Cc:** Thomsen, Linda; Berger, Paul; Kreitman, Mark J.; [          ⊐Hanson, Robert; [
          ⊐
**Subject:** Integrity of my personnel files

[      ⊐

The EEO counselor, [          ⊐ informed me that [      ⊐had given a statement in connection with my termination. No such statement was included in my personnel file. This raises further questions regarding the integrity of those files.

By this e-mail, I am again requesting that all documents evaluating my work with the Commission or in connection with my termination be included in my personnel file and be made available to me immediately.

Sincerely,

Gary J. Aguirre

AGUIRRE 000564

10/21/2005

**From:** Hanson, Robert

**Sent:** Monday, October 17, 2005 11:56 AM

**To:**

**Subject:** aguirre email

---

**From:** Aguirre, Gary J.
**Sent:** Thursday, August 04, 2005 6:34 PM
**To:** Hanson, Robert
**Subject:** Mack testimony

Bob:

You have asked that I do a memo why I believe the Mack testimony should be taken as the next logical step in the Pequot investigation. I believe there are three reasons. First, a profile of the tipper was developed in this case that has multiple elements. The possibility that Mack acted as the tipper satisfies almost very element and is inconsistent with none. Second, whether or not Mack is the tipper, his testimony will advance the investigation. If he is the tipper, his testimony will likely suggest some avenues to be pursued and others to be dropped. It will pin him down to a story which we can begin to disprove. If he is not the tipper, his testimony is the likely first step to eliminating him from consideration. This would allow our limited resources to be focused on starting a new screening process to find another possible tipper.

**Mack meets each element of the profile.**

*The timing of the trading with Mack's access to possible information*
The first element is whether Mack had possible access to information that GE would make a tender offer for HF. He had access from two sources: he had been the CEO of Morgan Stanley, who advised GE, until late March. He also took over as CSFB's CEO on July 12, 2001. Samberg's trading pattern, which I can discuss in more detail if you want, suggests that he obtained information just before Monday July 2, around July 9, and around July 25. Mack coincidentally met with CSFB's CFO on June 28 or June 29, again a few days before he began work on July 12, and was CEO at the third key time. Hence, Mack had relevant contacts with CSFB at each time. Also, CSFB was "wooing" Mack away from Merrill Lynch and other investment banking firms during the period from April through July 2001. It would be consistent with this effort for someone at CSFB or CS to mention, as part of this wooing process, what inventory Mack would be taking over. Incidentally, we know how Samberg saw Mack's new role as CEO of CSFB. He and his son discussed the fact that CSFB was the second largest investment banker at that time and "it was good to have friends in high places." Of course, there is also the possibility that Mack, through his contacts at Morgan Stanley, knew about the pending GE tender offer.

Questioning Mack about this transaction could take us in several directions, each of which suggests a different focus for the investigation. First, Mack could deny that he ever knew that GE would make the offer until the public announcement. The investigation would then focus on whether this was true. Second, Mack might say he learned on June 28 or June 29. The focus would then be placed on his contacts with Samberg at that time and whether he learned that GE had bumped its offer around July 9.

10/17/2005

AGUIRRE 000607

Finally, he might give convincing testimony that he learned after July 12 for the first time and cause us to reevaluate whether his should even be considered.

Also, Samberg's trading suggests that he did not get the tip until shortly before he started trading. He would not be the largest purchaser of HF during July if he had the tip before. It also makes sense that his tipper, likely someone he trusted, got the tip just before Samberg started trading. Had the tipper had it earlier, why would he have not communicated it earlier? Further, GE made its first offer in early June. It would make sense for Samberg to start buying then if he knew about the trade. The Mack-CSFB meeting on June 28 or June 29 and the Samberg huge trading the next week fits.

Further, we are operating in the dark regarding who Mack spoke with and when he spoke with them about stepping in as CSFB's CEO. CSFB's counsel tells he he spoke with CSFB's CFO and the Credit Suisse chairman of the board. Were these the only people? Mack's testimony could point us towards the key people at CSFB. Conversely, he might tell us that he was seeing some of the people on the acquisition team as Morgan Stanley at this time. That would take the investigation in a completely different direction.

*Mack had the motive to tip Samberg*

Mack had multiple reasons for tipping Samberg about the GE tender offer for Heller.

a) *Mack got into Closed Pequot funds and special deals that Mack thought would have big returns to him during and after 2001.* Mack was getting into private deals that Pequot was putting together for its own principals, including projects with the following code names: $5 million into "Fresh-start" (Lucent spin-off bought cheap), $2 million info Baby C, and an unknown amount into Distressed Guys, which later became Pequot Special Opportunities Fund. The most interesting situation involved Fresh Start. Mack was pressing to get into this for sometime. On June 20, a Samberg e-mail said that he was with Mack and that Mack was "busting his chops" Samberg's chops because he had not got the documents on this investment. Neither the Pequot principals nor Samberg's son seemed happy about Mack getting into this Fresh Start. During the call on June 29, when the suspected tip occurred, Samberg arranged for Mack to get into Fresh Start. Mack also was getting into Pequot funds when they appear to be closed. At that time, Samberg's funds were doubling in value in less than 3 years and the Pequot Scout fund was doing even better. In general, the funds had a $5 million lower limit. E-mails show Mack putting at least $13 million into these funds. One of the spread sheets I provided to Mark on June 28 shows Mack invested in 15 different Pequot funds (but it does not show when). As a rough estimate, based on performance over 1999 and 2000, Mack could reasonable expect that his new investments in Pequot during 2001 alone would have returned something in the range of $5 million per year to Mack.

b) *Board seats* As shown on one of the spreadsheets, Samberg was promoting Mack for board seats on both Baby C and Fresh-start.

c) *Office Space* Mack was using Pequot office space intermittently during the period from March 2001 through July, 2001, when he began work for CSFB.

d) *Stock tips* Samberg was giving Mack stock tips on public companies that Mack directly invested in. "That's where were putting our money."

e) *Friendship* Mack and Samberg were close friends. Two months ago, Mack took over as CEO at Pequot. That Samberg would choose Mack in the middle of an investigation that could land Mack in jail tells much about the level of trust Samberg had in Mack. I discussed how the friendship played as a motive in my June 27 memo.

f) Mack's crossing the line for Pequot. While Mack was at CSFB, he was acting as Pequot's agent to introduce one of the companies Pequot co-owned with Lucent, to an investment banker in China. Mack's letter, written on behalf of Pequot reads, "I have not given this

AGUIRRE 000608

10/17/2005

first to CSFB (where he was then CEO) or to Morgan Stanley because I think your contacts in China are the best."

*Samberg had a relationship of trust deep friendship with Mack.*

We do not have a complete picture of Mack's financial assets, but his holdings in his Pequot funds in 2001 exceeded $400 million. He holds an engineering degree from MIT, a Masters of Science from Stanford, and an MBA from Columbia. He started with $3.5 millions and built the largest hedge fund in the world as of 2001, when the GE-HF trading took place. He has generally been very careful about his comments in his e-mails. He used AOL instant messaging, which leaves no trace in any computer, to communicate with key people. In short, he's a smart guy who took few chances. It does not fit the pattern for him to be taking big chances where he got his tip. It makes sense that he got it from someone he trusted and who also trusted him. That was Mack. Mack's e-mails to and from Samberg have a different ring about them. In one e-mail, Samberg's secretary tells Samberg Mack had called and that, "he loves you." In sum, there was a deep trust and friendship between them. It is exactly the kind of relationship that Samberg would feel comfortable calling on for a tip as big as HF and GE.

*Samberg's need for a big favor from an old friend.*

In July 2001, Samberg's company was splitting a part. [            ]was a younger and a rising star. [            ]performance was dwarfing Samberg's. [            ] was leaving with at least half the company. Samberg was looking at even bigger staff losses to [            ] He testified that he was concerned at this time that more of his executive committee "might walk." A big hit on GE-HF would illustrate that his fast ball had not slowed. Regarding GE-HF, Mack was just the guy to do his old friend a big favor, one that would also benefit him.

Regarding Samberg's situation during this time frame, he testified at the first session:

The company was about to split, it was about to split. In September '00, [            ] and I was trying to reestablish the franchise value of Pequot and the core funds. I was actively looking for help, and *I did things in a manner that was expedient at the time given my expertise in this area.*

In a similar vein, he testified at the second session:

My firm was going to split in three months. These people were my other managing director partners. *Times were fragile.* I needed their approval to do whatever I wanted to do *or they might walk* (emphasis added).

**There do not appear to be other leads in the Samberg e-mails.**

The evidence does not merely point to Mack. It points to no one else. I have been through the Samberg e-mails, his calendar, his credit card receipts and his phone slips. [            ] have been through the e-mails. No one has shown up as a possible candidate. Further, Fried Frank has stated that Samberg made the decisions alone. No one was listed with him on the Fried Frank lists of those participating in investment decisions. If we don't take a look at Mack, we start all over again looking for someone that fits the profile. Then the question would remain: if we find him or her, will there be a similar reason for not proceeding with the examination? Very possibly yes, given Samberg's circles.

AGUIRRE 000609

10/17/2005

Gary

AGUIRRE 000610

10/17/2005

# OFFICE OF THE CHAIRMAN

## Correspondence Tracking Sheet

**Date Assigned:** 09/07/2005

**Date Of Corres:** 09/02/2005

**Due Date:**

**Assigned To:** [        ]

**Action Required:** For Your Information

**Correspondent:** GARY J AGUIRRE

**Affiliation:** ENF - SENIOR COUNSEL

**Constituent:**

**Subject:** IN THE MATTER OF TRADING IN CERTAIN SECURITIES: HO-9818

**Special Instructions:** REASSIGNED FROM ES TO INSPECTOR GENERAL

**Copies To:** [        ] [        ] Thomsen

**Control #:** ES113595

**Master #:** 735448

**Contact Type:** FAX

---

### COMPLETE THIS SECTION AND RETURN TO THE EXECUTIVE CORRESPONDENCE UNIT, OFFICE OF THE CHAIRMAN, ROOM 6106, STOP 6-1

**Drafted By:**

**Division Approval:**

**Comments:**

**Phone:** ( ) -

**Date:**

[  ] x [    ]

CHAIRMAN'S OFFICE REV[

x [    = chairmans
] Correspondence

1 or more
EED cases out
there.

( [  ] ge )
[    ] vanted to respond.

o/6

to: Chairmans Corresp.

AGUIRRE 000693

FAX BANK'S FAC. BEACH                                    ☑001



# DIVISION OF ENFORCEMENT

## FACSIMILE TRANSMISSION

**Date:** 09/02/2005    **Time:**

TO: Chairman Christopher Cox

Telephone Number: (202) 551-2100        Facsimile Number: (202) 772-9200

---

FROM: Gary J. Aguirre

Telephone Number: (202) 551-4437        Facsimile Number:

TOTAL NUMBER OF PAGES: 3

REMARKS:

OFFICE OF THE CHAIRMAN    2005 SEP -7 AM 11:43    RECEIVED

If you did not receive a complete fax, please call the above number.
The main fax number for the Division of Enforcement is 202-942-9637.

AGUIRRE 000696

FEDEX KINKO'S PAC. BEACH                    @002

ES113595



UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
DIVISION OF ENFORCEMENT
100 F ST., N.E.
WASHINGTON, D.C. 20549

WRITER'S DIRECT DIAL LINE

(202) 551-4437

September 2, 2005

**Via Facsimile to 202-772-9200 and Regular Mail**

Chairman Christopher Cox
U.S. Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20037

Re: In the Matter of Trading in Certain Securities: HO-9818

Dear Chairman Cox:

I am compelled to write to you today, my last day with the Commission, out of a sense of duty to the Commission's mission—to maintain the integrity of the financial markets and to protect the investor. Unfortunately, my supervisors—as far up the chain as I can see—have lost sight of that mission in the above matter. I state the facts briefly below, though there is much more to be said.

I have been the staff attorney in the above matter from mid-September 2004 through today. It is an investigation of suspected insider trading by one of the largest hedge funds in the nation, Pequot Capital Management ("PCM"), arising out of eighteen SRO referrals. Staff who worked on this matter from the beginning—Hilton Foster, Eric Ribelin, Thomas Conroy, and I—believe that PCM engages in an institutionalized form of insider trading that corrupts the financial markets and creates an un-level playing filed for honest investors.

As the investigation progressed, one matter dwarfed all others, suspected insider trading by PCM's CEO, Arthur Samberg, during July 2001, just before the General Electric Company ("GE") acquired Heller Financial, Inc. ("Heller"). Mr. Samberg bought $44 million in Heller stock and shorted $36 million in GE stock shortly before the public announcement of the acquisition on July 30, 2001, making an $18 million profit. On the two occasions I took Mr. Samberg's testimony, he could offer no credible explanation for these trades. Everyone involved in this investigation has informed me of their belief Mr. Samberg obtained material non-public information prior to these trades. The only question is: from whom?

Only one person meets the tipper's profile: John Mack, the current CEO of Morgan Stanley. I began informing my supervisors of this evidence in early June. Later in the month, I suggested that Mr. Mack's testimony be taken. On approximately June 23, my Branch Chief, Robert Hanson, told me that it would be very difficult to obtain approval to take Mr. Mack's testimony because of his powerful political connections. Mr. Hanson later repeated the same

AGUIRRE 000694

v-/v-/vo   ir:io rnn ooo aoo oooz          FEDEX KINKO'S PAC. BEACH                    ☒003

statements to me on several other occasions. Some are confirmed by e-mails. Assistant Director Kreitman participated in one of these discussions.

Other events also suggest the decision to take Mr. Mack's testimony has not been handled in the normal course. For example, I have issued approximately 100 subpoenas in this matter and all responsive documents came directly to me. When I served a subpoena on Morgan Stanley seeking documents relating to contacts between Messrs Mack and Samberg, its counsel did not initially send them to me. Rather, she first sent them to Linda Thomsen. Likewise, Morgan Stanley's counsel, Mary Jo White, bypassed the normal protocol of dealing with the staff attorney. Instead, she dealt directly with Ms. Thomsen by correspondence and phone. Of hundreds of contacts with defense counsel, this is the first time any defense counsel began discussions at the top of the chain of command. Further, at the same time, my supervisors excluded me from the discussions involving Mr. Mack.

To avoid any misunderstanding, from late June through late August, I sent multiple e-mails to my Branch Chief Robert Hanson, Assistant Director Mark Kreitman, and Associate Director Paul Berger, as well as a brief e-mail to Linda Thomsen, expressing my concerns. I had no success in obtaining their approval to take Mr. Mack's testimony. Instead, they fired me. Immediately prior to the Mack controversy arising, my Branch Chief and Assistant Director congratulated me for the excellent job I was doing in this investigation. Indeed, Mr. Kreitman gave what he called his highest "Perry Mason award" in mid-June.

I bring these facts to your attention in hopes that you will take whatever steps are appropriate to put this investigation back on track, consistent with the Commission's mission.

I must add that other improper motives also led to my termination, but there is no productive reason to discuss them here.

Sincerely,

Gary J. Aguirre
Senior Counsel

CC:    Commissioner Paul S. Atkins
       Commissioner Roel C. Campos
       Commissioner Cynthia A. Glassman
       Commissioner Annette L. Nazareth
       (By fax and Regular Mail)

AGUIRRE 000695