# Exhibit 48

## to Second Aguirre Declaration

*Aguirre v. SEC*, 06-CV-1260 (D.D.C.)

110TH CONGRESS
"
1st Session

COMMITTEE PRINT !

S. PRT. 110–28

# THE FIRING OF AN SEC ATTORNEY AND THE INVESTIGATION OF PEQUOT CAPITAL MANAGEMENT

PREPARED BY THE MINORITY STAFF OF THE

COMMITTEE ON FINANCE
UNITED STATES SENATE

MAX BAUCUS, *Chairman*
CHARLES E. GRASSLEY, *Ranking Member*

AND THE

COMMITTEE ON THE JUDICIARY
UNITED STATES SENATE

ARLEN SPECTER, *Ranking Member*



AUGUST 2007

Printed for the use of the Committee on Finance

U.S. GOVERNMENT PRINTING OFFICE 36–960
WASHINGTON : 2007

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250 Mail: Stop SSOP, Washington, DC 20402–0001

COMMITTEE ON FINANCE

MAX BAUCUS, Montana, *Chairman*

| | |
|---|---|
| JOHN D. ROCKEFELLER IV, West Virginia | CHARLES E. GRASSLEY, Iowa |
| KENT CONRAD, North Dakota | ORRIN G. HATCH, Utah |
| JEFF BINGAMAN, New Mexico | TRENT LOTT, Mississippi |
| JOHN F. KERRY, Massachusetts | OLYMPIA J. SNOWE, Maine |
| BLANCHE L. LINCOLN, Arkansas | JON KYL, Arizona |
| RON WYDEN, Oregon | GORDON SMITH, Oregon |
| CHARLES E. SCHUMER, New York | JIM BUNNING, Kentucky |
| DEBBIE STABENOW, Michigan | MIKE CRAPO, Idaho |
| MARIA CANTWELL, Washington | PAT ROBERTS, Kansas |
| KEN SALAZAR, Colorado | JOHN ENSIGN, Nevada |

RUSSELL SULLIVAN, *Staff Director*
KOLAN DAVIS, *Republican Staff Director and Chief Counsel*

C O N T E N T S

**I. INTRODUCTION** ....................................................................................
**II. EXECUTIVE SUMMARY** ......................................................................
**III. RECOMMENDATIONS** ..........................................................................
**IV. TABLE OF NAMES** ..................................................................................
**V. KEY EVENTS** ...........................................................................................
**VI. THE PEQUOT INVESTIGATION** .........................................................
A. Pequot's Suspicious Trading Surrounding the GE-Heller Acquisition ..........................................................................................
B. The Early Stages of the Investigation ..................................................
1. The SEC's Delayed and Truncated Investigation ............................
a. Time Elapsed between Trades and Serious Investigation ......
b. Supervisors Order a Limited Inquiry .....................................
2. Other Suspicious Pequot Trading ....................................................
a. Wash Sales and Potential Stock Manipulation ......................
b. The AstraZeneca and Par Pharmaceutical Trades .................
c. The Microsoft Trades .............................................................
3. Pequot and the SEC Fight over Document Production
4. The Arthur Samberg Testimonies ....................................................
5. The SEC Briefs Criminal Prosecutors on its Investigation
C. SEC Investigators Identify a Potential Tipper
1. Investigators Suspect John Mack .....................................................
2. Others Concur in Aguirre's Request to Take John Mack's Testimony .......................................................................................
3. Morgan Stanley's Investigation and Contacts with the SEC
a. Planning a Response to Outside Inquiries .............................
b. Debevoise & Plimpton Contacts ............................................
c. Thomsen and Berger Respond to Inquiries
4. Supervisors Deny Requests to Question John Mack
a. ''Not Premature, but Prerequisite'' .......................................
b. Mack's Testimony Should Have Been Taken Earlier ...........
c. Political Clout or Prominence? ..............................................
5. The SEC Fires its Lead Investigator
D. The Investigation Shifts Focus ...........................................................
1. Attempts to Identify other Potential Tippers/Tippees
2. Dropping the Microsoft Trades ......................................................
E. The Universe Shifted: Returning to the GE-Heller Trades
1. The Decision to Finally Question John Mack
2. Unasked Questions: The Mack Transcript ....................................
F. The SEC's Case Closing Report ..........................................................
1. GE-Heller .......................................................................................
2. Microsoft .......................................................................................
3. AstraZeneca and Par Pharmaceutical ............................................
G. Conclusion ............................................................................................
**VII. GARY AGUIRRE'S EMPLOYMENT AT THE SEC** ..........................
A. Background ...........................................................................................
1. Applications for Employment and EEO Claim

Page
1
5
7 9
11
15
15
16
16
16
16
18
18
19
20
21
23
24
24
24
27
28
28
29
30
32
32
34
36
37
38
38
39
39
39
41
42
42
44
45
46
55
55
55
56
57
57
58
58
62

2. Transfer to another Branch Chief ..................................................
3. Positive Performance Evaluations .................................................
4. Merit Pay Increase .........................................................................

B. Objections to Blocking Mack Testimony ............................................
1. Supervisor's Reference to Mack's ''Powerful Political Connections'' ................................................................................
2. Notice and Withdrawal of Resignation ..........................................

Page

C. Terminating Gary Aguirre ....67
1. Accusations of a ''Coup,'' August 1, 2005 ....67
2. The Negative Re-Evaluations ....70
a. Timing ....70
b. Content of Supplemental Evaluation ....71
3. The Merit Pay Calendar and Aguirre's Raise ....74
4. The Director of Enforcement and the Termination Notice ....76
5. The Connections between the Mack Dispute and the Decision to Fire Aguirre ....78
a. The Termination Proposal ....78
b. The Termination Decision Meeting ....79
6. Paul Berger Leaves the SEC ....82
a. The Initial Story ....82
b. The Full Story ....83
c. Berger's Failure to Mention Pre-Recusal Contacts ....84
d. Berger's Failure to Recuse Himself Immediately from the Pequot Case ....85

**VIII. THE INSPECTOR GENERAL'S INVESTIGATION ....93**

A. Background ....93
B. SEC/OIG Investigation of Aguirre's Claims—A One-Sided Approach ....93
1. Investigative Plan: Don't talk to the Complainant ....94
a. The Privacy Act ....94
b. The Necessity of an Aguirre Interview ....95
2. Witness Interviews ....96
a. Hanson Denies Referring to Mack's ''Political Connections'' ....96
b. Other Interviews ....96
c. Deference and Informality ....97
3. The Failure to Obtain Key Documents ....97
4. Failures of the Office of Information Technology ....98
5. Closing Memorandum ....99
6. ''Irregularities'' Deemed Merely an Audit Issue ....100
C. Other OIG Investigations ....101
1. A More Vigorous OIG Investigation ....101
2. Geek Securities and Commissioner Cynthia Glassman ....102
D. The Reopening of the Aguirre Investigation ....102
1. Relationship to Congressional Investigations ....102
2. Attempt to Compel Disclosure of Confidential Communications with Congress ....103
E. Conclusion—Independence of the OIG ....104

**Appendix I: Exhibits ....109**

**Appendix II: Correspondence ....657**

## I. INTRODUCTION

Last year, under the leadership of then-Chairmen Charles Grassley and Arlen Specter, the staff of the Senate Committees on Finance and Judiciary (''the Committees'') conducted an extensive joint investigation into allegations of lax enforcement, improper political influence, whistleblower retaliation, and related matters involving the Securities and Exchange Commission (SEC). In this report, we detail our findings and recommendations. Our recommendations follow the review of about 10,000 pages of documents, over 30 witness interviews, three Judiciary Committee hearings, and a previously released set of interim findings.

On June 28, 2006, the Judiciary Committee held a hearing examining short selling activities of hedge funds and independent analysts. On September 26, 2006, the Committee's second hearing examined enforcement of insider trading prohibitions and insider trading by hedge funds, especially trading ahead of mergers. On December 5, 2006, the Committee's third hearing focused on allegations that (1) the SEC mishandled its investigation of a major hedge fund, Pequot Capital Management, (2) the SEC fired its lead investigator in retaliation for reporting evidence of improper political influence on the investigation, and (3) the SEC's Office of Inspector General failed to conduct a serious, credible inquiry into the fired attorney's allegations. Senators Specter and Grassley presented interim findings on the Senate floor on January 31, 2007. This report concludes the investigation.

We commend SEC Chairman Christopher Cox for his full and complete cooperation. Although the SEC initially ''circled the wagons,'' its eventual cooperation allowed us to conduct a thorough, independent review of allegations by the fired SEC attorney, Gary Aguirre. According to Aguirre, his efforts to investigate insider trading violations by Pequot were thwarted by his superiors after he focused on the current Morgan Stanley Chief Executive Officer John Mack. Aguirre alleged that requests to take Mack's testimony met resistance within the SEC and that his supervisor told him it was because of Mack's ''powerful political connections.'' Aguirre claimed this dispute ultimately led to his firing. These allegations were given short shrift by the SEC Office of Inspector General in its initial report. However, under Chairman Cox's leadership, when Senate investigators raised questions, the SEC eventually opened its investigative files. By making documents and witnesses available, Chairman Cox demonstrated a commitment to accountability and transparency. That is the first crucial step to the SEC restoring confidence in the integrity of its enforcement operations.

We also commend the SEC for increased enforcement efforts regarding insider trading, and specifically insider trading by hedge funds, following our investigation. On March 1, 2007, in announcing charges against 14 individuals in a brazen insider trading

scheme, Chairman Cox stated: ''Our action today is one of several that will make it very clear the SEC is targeting hedge fund insider trading as a top priority.'' Linda Thomsen, Director of the SEC's Division of Enforcement, recently stated that the SEC has made investigating insider trading ahead of mergers and acquisition one of its top priorities. Peter Bresnan, Deputy Director of the SEC's Division of Enforcement, stated in a CNBC interview on May 11, 2007: ''Hedge fund managers are under enormous pressure to show profits for their clients. . . . Not every hedge fund manager can get those kinds of return through legitimate trading.'' Bruce Karpati, an Assistant Regional Director in the SEC's New York office stated in May 2007 that the SEC is ''actively studying the relationships that hedge funds have both inside the hedge funds and outside'' to see how information flows around financial markets, and that the SEC is also looking at ''more complex trading strategies'' at hedge funds. Also in May 2007, when the SEC filed charges against a Hong Kong couple alleging they illegally traded ahead of News Corp.'s offer to buy Dow Jones, Cheryl Scarboro, SEC Associate Enforcement Director, stated: ''Cases like this, insider trading ahead of mergers, are a top priority and we will continue our pursuit of it, no matter where it occurs.'' Finally, in early 2007 it was widely reported that the SEC began a fact-finding study of the relationships hedge fund advisers have with brokerages to determine if those contacts could lead to insider trading, and specifically has requested information about stock and options trading by major firms, including Merrill Lynch, Morgan Stanley, UBS, and Deutsch Bank.

Linda Thomsen testified at the hearing on September 26, 2006 that ''[r]igorous enforcement of our current statutory and regulatory prohibition on insider trading is an important part of the Commission's mission.'' The SEC, a civil enforcement agency that uses civil sanctions to address insider trading, works with the Department of Justice to enforce federal criminal law prohibiting insider trading. In addition, the New York Stock Exchange's 160 member Market Surveillance branch utilizes real time trading data and specialized algorithms that generate alerts when stocks exceed preset trading limits, which may be flagged for the SEC. Since 2001, the SEC has brought more than 300 insider trading cases against several hundred individuals and entities.

Since our joint investigation commenced, the SEC and the Department of Justice have brought several high profile insider trading cases.

- In November 2006, the SEC charged the head of several San Francisco-based hedge funds with defrauding investors in the Compass West Fund, Viper Founders Fund, and Viper Investments.
- In February 2007, the SEC charged seven individuals and two hedge funds with insider trading ahead of announcements by Taro Pharmaceuticals Industries regarding earnings and FDA drug approvals.
- In March 2007, the SEC and federal prosecutors filed charges against a dozen defendants, including a Morgan Stanley compliance officer who pled guilty in May 2007 to charges that she and her husband sold information about four deals—including

Adobe Systems Inc.'s $3.4 billion purchase of Macromedia and the $2.1 billion acquisition of Argosy Gaming by Penn National Gaming, Inc.—to individuals who used the information in trading for hedge fund Q Capital Investment Partners and other accounts.

- In March 2007, the SEC charged a UBS research executive with selling information about upcoming UBS upgrades and downgrades of the stock of Caterpillar, Goldman Sachs, and other companies. The information was then used in trading on behalf of hedge funds Lyford Cay, Chelsea Capital and Q Capital Investment Partners.
- In May 2007, a Credit Suisse investment banker was charged with insider trading for leaking details of acquisitions involving nine publicly traded U.S. companies, including the $45 billion takeover of TXU Corp by a private equity firm.
- In May 2007, the SEC accused a former analyst at Morgan Stanley and her husband, a former analyst in the hedge fund group at ING, of making more that $600,000 by trading on companies advised by Morgan Stanley's real estate subsidiary.
- On May 30, 2007, the Barclays Bank and its former head trader consented to entry of a court order requiring Barclays to pay $10.94 million to settle charges of insider trading based on Barclays' authorization of trading in securities of companies while the trader had material nonpublic information about those companies because he served on bankruptcy creditor committees of those companies.
- On June 13, 2007, the SEC filed and settled a civil injunctive action against the former managing partner of a large law firm who traded in securities of a company after he learned from a job applicant that the company was about to be acquired.
- On June 13, 2007, the SEC filed an unlawful insider trading complaint against a former bank vice president who had information concerning an imminent sale of the bank.

The notion advanced by some that insider trading—unlawful trading based on material, non-public information—is a victimless crime, or that it benefits investors by more quickly introducing new information into the market, is not accepted by Congress. Three primary objectives of good securities market regulation are (1) investor protection, (2) ensuring that markets are fair, efficient and transparent, and (3) reducing systemic risk. Moreover, Congress has passed legislation intended to protect investors from misleading, manipulative, or fraudulent practices, including insider trading, front-running or trading ahead of customers, and misuse of client assets.

Maintaining transparency, public confidence in the integrity of our securities market, and a level playing field for the average investor are important goals of the SEC's enforcement practices. The booming merger and acquisitions market, lightly regulated hedge funds under pressure to deliver extraordinary returns, and increased use of complex trading strategies all present new opportunities to profit from, and hide, unlawful insider trading. The junk bond and insider trading scandals tied to the heavy corporate merger and acquisition activity in the 1980s may have contributed to the 1990 recession, and led to many successful criminal prosecu-

tions. Because those events may be forgotten by a new generation working on Wall Street, it is important for Congress to continue to ensure that regulators have an appropriate focus on preventing a recurrence of such activity and to effectively utilize the authority and tools given to them under statutes and in the funding process. Robust, but balanced, regulation is the foundation of our prosperity and growth and the reason U.S. capital markets succeed. Deterring, detecting, and eliminating fraud in an environment free of political influence is good for business.

## II. EXECUTIVE SUMMARY

**Pequot's trades in advance of the GE acquisition of Heller Financial were highly suspicious and deserved a thorough investigation.** In the weeks after a conversation with John Mack and prior to the public announcement of GE's acquisition of Heller, Pequot CEO Arthur Samberg purchased over one million shares of Heller Financial stock, and also shorted GE shares. On the day the deal was announced, Samberg sold all of the Heller stock. He also covered the short positions in GE shortly thereafter, for a total profit of about $18 million for Pequot in a matter of weeks.

**The SEC examined only a fraction of the other suspicious Pequot trading highlighted by Self-Regulatory Organizations (SROs).** GE-Heller represented just one of at least 17 sets of suspicious transactions involving Pequot brought to the SEC's attention by organizations like the NYSE and NASD. However, SEC managers ordered the staff to focus on only a few transactions. In addition to GE-Heller, the SEC investigated trades involving (1) Microsoft, (2) Astra Zeneca and Par Pharmaceutical, and (3) various ''wash sales.''

**Staff Attorney Gary Aguirre said that his supervisor warned him that it would be difficult to obtain approval for a subpoena of John Mack due to his ''very powerful political connections.''** Aguirre's claim is corroborated by internal SEC e-mails, including one from his supervisor, Robert Hanson. Hanson also told Aguirre that Mack's counsel would have ''juice,'' meaning they could directly contact the Director or an Associate Director of Enforcement.

**Attorneys for Pequot and Morgan Stanley had direct access to the Director and an Associate Director of the SEC's Enforcement Division.** In January 2005, Pequot's lead counsel met with the SEC Director of Enforcement Stephen Cutler. Shortly thereafter, SEC managers ordered the case to be narrowed considerably. In June 2005, Morgan Stanley's Board of Directors hired former U.S. Attorney Mary Jo White to determine whether prospective CEO John Mack had any exposure in the Pequot investigation. White contacted Director of Enforcement Linda Thomsen directly, and other Morgan Stanley officials contacted Associate Director Paul Berger. Soon afterward, SEC managers prohibited the staff from asking John Mack about his communications with Arthur Samberg at Pequot.

**Seeking John Mack's testimony was a reasonable next step in the investigation.** Several SEC staff wished to take Mack's testimony because they believed he: (1) had close ties to Samberg, (2) had potential access to advanced knowledge of the deal, (3) had spoken to Samberg just before Pequot started buying Heller and shorting GE, and (4) was an investor in Pequot funds and was allowed to share in a lucrative direct investment in a

start-up company along side Pequot, possibly as a reward for providing inside information.

**SEC management delayed Mack's testimony for over a year, until days after the statute of limitations expired.** After Aguirre complained about his supervisor's reference to Mack's ''political clout,'' SEC management offered conflicting and shifting explanations for blocking Mack's testimony. Although Paul Berger claimed that the SEC had always intended to take Mack's testimony, Assistant Director Mark Kreitman said that definitive proof that Mack knew about the GE-Heller deal was the ''necessary prerequisite'' for taking his testimony. The SEC eventually took Mack's testimony only after the Senate Committees began investigating and after Aguirre's allegations became public, even though it had not met Kreitman's prerequisite.

**The SEC fired Gary Aguirre after he reported his supervisor's comments about Mack's ''political connections,'' despite positive performance reviews and a merit pay raise.** Just days after Aguirre sent an e-mail to Associate Director Paul Berger detailing his allegations, his supervisors prepared a negative re-evaluation outside the SEC's ordinary performance appraisal process. They prepared a negative re-evaluation of only one other employee. Like Aguirre, that employee had recently sent an e-mail complaining about a similar situation where he believed SEC managers limited an investigation following contact between outside counsel and the Director of Enforcement.

**After being contacted by a friend in early September 2005, Associate Director Paul Berger authorized the friend to mention his interest in a job with Debevoise & Plimpton.** Although that was the same firm that contacted the SEC for information about John Mack's exposure in the Pequot investigation, Berger did not immediately recuse himself from the Pequot probe. Berger ultimately left the SEC to join Debevoise & Plimpton. When initially questioned, Berger's answers concerning his employment search were less than forthcoming.

**The SEC's Office of Inspector General failed to conduct a serious, credible investigation of Aguirre's claims.** The OIG did not attempt to contact Aguirre. It merely interviewed his supervisors informally on the telephone, accepted their statements at face-value, and closed the case without obtaining key evidence. The OIG made no written document requests of Aguirre's supervisors and failed to interview SEC witnesses whom Aguirre had identified in his complaint as likely to corroborate his allegations.

## III. RECOMMENDATIONS

The controversy over allegations of improper political influence and the firing of SEC attorney Gary Aguirre garnered considerable media attention. The public airing of evidence in support of those allegations undoubtedly had an adverse impact on public confidence in the SEC. The damage to public confidence in the SEC as a fair and impartial regulator must be repaired if the agency is to be effective and able to fulfill its mission.

However, the controversy is more than merely an issue of perception. Our investigation uncovered real failures that need real solutions. Our recommendations focus on improving the Commission's approach to the management of complex securities investigations, personnel problems, the handling of ethics issues, and the role of the Inspector General. A more standardized, professional system for dealing with these issues could have averted much of the controversy. It could also improve employee morale and confidence in management by ensuring more consistent, documented, transparent, and careful internal deliberations.

For these reasons, we offer the following recommendations for consideration:

1. **Standardized Investigative Procedures:** The SEC should draft and maintain a uniform, comprehensive manual of procedures for conducting enforcement investigations, along the lines of the United States Attorney's Manual. The manual should attempt to address situations or issues likely to recur. It should set a consistent SEC policy where possible and provide general guidance for complex issues that require individual assessment on a case-by-case basis, so that inquiries are handled as uniformly as possible throughout the Enforcement Division.
2. **Directing Resources to Significant and Complex Cases:** The SEC currently lacks a set of objective criteria for setting staffing levels and has no mechanism for designating a case as critically important. The SEC should set standards for assessing the size, complexity, and importance of cases to ensure that significant cases receive more resources. The Enforcement Division should develop and apply objective criteria for determining how many attorneys, paralegals, and support personnel should be assigned to a particular case.
3. **Transparent and Uniform External Communications:** The SEC should issue written guidance requiring supervisors to keep complete and reliable records of all outside communications regarding any investigation.* The need for a

*As a starting point for drafting such a policy, the SEC should review and consider adapting an approach similar to that of the Food and Drug Administration in 21 C.F.R. §10.65(e). How-

Continued

clear record and transparency is especially acute regarding any communications by supervisors that exclude the staff attorney assigned to the case. The SEC's guidance should generally discourage supervisors from engaging in such communications without the knowledge or participation of the lead staff attorney. The SEC needs to present one, consistent position to parties involved in its investigations.

4. **Greater Office of Inspector General (OIG) Independence and More Thorough Investigative Procedures:** The hallmarks of any good Inspector General are independence and integrity. However, the reputation of the Inspector General within the SEC appears to be that of an office closely aligned with management, lacking independence. In addition to the facts of the Aguirre case, we received numerous complaints about the OIG from both current and former SEC employees. The OIG should develop a plan to ensure independence from SEC management and the General Counsel's Office, and to ensure that its future investigations of allegations against management are thorough, fair, and credible. The SEC needs to implement a directive requiring its Office of Information Technology to provide thorough and timely responses to SEC/OIG document requests. Since the purpose of the OIG is to ensure integrity and efficiency, a document request in connection with an SEC/OIG investigation should be among the highest priorities.
5. **Timely and Transparent Recusals:** The SEC should review its guidance to employees regarding their obligations to recuse themselves immediately from any matter involving a potential employer with whom the employee has had contact, either directly or indirectly through an agent. Recusals should be communicated in writing to all SEC staff who have official contact with the recused individual, and a record of the recusals should be centrally maintained by a designated ethics officer. The appearance created by having undisclosed contacts with potential employers while still participating in an enforcement matter involving that potential employer undermines public confidence in the fairness and impartiality of the SEC.
6. **Standardized Evaluation Procedures:** Employee evaluations should be submitted in a timely manner, according to an established schedule. Evaluations should not be prepared outside or apart from the established procedure. Although it is appropriate to document performance issues and to discuss them with the employee as the issues arise, submitting a re-evaluation with substantive changes after the regularly scheduled evaluation is submitted can raise questions. Where the re-evaluation occurs just after an employee reports alleged wrongdoing by a supervisor, it tends to suggest that retaliation is driving the process rather than an honest attempt to evaluate employee performance.

ever, the current FDA regulation has its own flaw in that it only requires documentation of outside meetings when the agency ''determines that such documentation is useful.'' That exception is too broad. All material communications about an investigation between senior SEC managers and third parties should be included in the policy.

## IV. TABLE OF NAMES

| Name | Title |
|---|---|
| **U.S. Securities and Exchange Commission:** | |
| Christopher Cox | Chairman |
| *Enforcement Division:* | |
| Linda Thomsen | Director |
| Paul Berger | Associate Director (now partner at Debevoise & Plimpton) |
| Mark Kreitman | Assistant Director |
| Robert Hanson | Branch Chief |
| Gary Aguirre | Former Attorney |
| James Eichner | Attorney |
| Hilton Foster | Attorney (Ret.) |
| *Office of General Counsel:* | |
| William Lenox | Ethics Counsel |
| *Office of Inspector General:* | |
| Kelly Andrews | Associate Counsel |
| Walter Stachnik | Inspector General (Ret.) |
| Mary-Beth Sullivan | Assistant Inspector General for Investigations |
| *Office of Market Surveillance:* | |
| Joseph Cella | Chief (Ret.) |
| Thomas Conroy | Market Surveillance Specialist |
| Eric Ribelin | Branch Chief |
| **Pequot Capital Management:** | |
| Gerald Poch | Managing Director, Applied Technology |
| Arthur Samberg | Chief Executive Officer |
| David Zilkha | Former Pequot and Microsoft employee |
| **Morgan Stanley:** | |
| Eric Dinallo | Former Head of Regulatory Group |
| Gary Lynch | Chief Legal Officer |
| John Mack | Chief Executive Officer |

### Other Counsel

| Attorney | Firm | Representing |
|---|---|---|
| Irving Pollack | Fulbright & Jaworski | Pequot |
| Larry Storch | Fulbright & Jaworski | Pequot |
| Audrey Strauss | Fried Frank | Pequot |
| Mary Jo White | Debevoise & Plimpton | Morgan Stanley Board |

**Gary Aguirre's Chain of Command**

LINDA THOMSEN, DIRECTOR, DIVISION OF ENFORCEMENT

~

PAUL BERGER, ASSOCIATE DIRECTOR OF ENFORCEMENT DIVISION

~

MARK KREITMAN, ASSISTANT DIRECTOR, DIVISION OF ENFORCEMENT

~

ROBERT HANSON, BRANCH CHIEF, DIVISION OF ENFORCEMENT

~

GARY AGUIRRE, SENIOR COUNSEL

Case 1:06-cv-01260-ESH Document 39-22 Filed 03/24/2008 Page 17 of 123



## V. KEY EVENTS

### Pequot's Suspicious Trading

| Date | Event |
|---|---|
| March 2001 | John Mack leaves as CEO of Morgan Stanley. |
| April 2001 | First known contact between with between Morgan Stanley and GE regarding the Heller acquisition. |
| May 11, 2001 | Arthur Samberg tells a Pequot employee that John Mack would like to invest $5 million in Partners, a closed Pequot fund. |
| June 20, 2001 | Samberg tells another Pequot employee that Mack wants to invest in a private equity deal known as Fresh Start alongside Pequot funds. Mack is the only individual investor allowed to participate. |
| June 26–28, 2001 | Mack travels to Switzerland to meet with Senior officials from Credit Suisse, the parent company of Credit Suisse First Boston (CSFB) about becoming CSFB CEO. |
| June 29, 2001 | Immediately upon his return from Switzerland Mack contacts Samberg. |
| June 30, 2001 | Poch writes to Samberg ''Great call with John Mack last night.'' Samberg replies, ''He called here looking for you last night.'' |
| July 2, 2001 | Upon Samberg's direction, Pequot begins purchasing large amounts of Heller stock. Also in July, Samberg directs large amounts of GE stock to be shorted. |
| July 12, 2001 | Credit Suisse First Boston (CSFB), a firm working on the GE-Heller deal, hire's John Mack as its CEO. |
| July 30, 2001 | GE-Heller acquisition is announced. Pequot begins selling its Heller shares and covering shorts on GE, earning $18 million in profit in a matter of weeks. |
| January 30, 2002 | The NYSE highlights Heller trades as a matter warranting further scrutiny and surveillance. |

### Aguirre Hired at SEC

| Date | Event |
|---|---|
| May, 2003 | Gary Aguirre begins applying for positions at the Securities Exchange Commission. |
| June, 2004 | Prior to being hired at the SEC, Aguirre files an EEO complaint alleging that the SEC is discriminating against him on the basis of age. |
| September 7, 2004 | Aguirre is hired by the SEC Enforcement Division. |

### The Pequot Investigation Builds

| Date | Event |
|---|---|
| Oct/Nov, 2004 | Pequot Capital Management investigation is opened. |
| January 10, 2005 | Aguirre requests transfer via letter to Paul Berger. |
| January/February, 2005 | Lead lawyer representing Pequot meets with Director of Enforcement Stephen Cutler. Aguirre is not invited, and following the meeting is told to narrow the scope of the investigation to only the most promising referrals. |
| May-June, 2005 | Aguirre develops theory that John Mack tipped Arthur Samberg regarding General Electric acquisition of Heller Financial. |
| June 1, 2005 | Aguirre receives ''acceptable'' performance evaluation, and Hanson notes his ''unmatched dedication to [the] case.'' |
| June 1, 2005 | Hanson writes to Aguirre, remarking ''Mack is another bad guy [in my view].'' |
| June 14, 2005 | Kreitman asks Aguirre to brief him on the evidence concerning PCM's suspicious activity. |

June 15, 2005 ....................Aguirre and Ribelin meet with two FBI agents and an AUSA for the Southern District of New York to discuss the evidence.

June 20, 2005 ....................Hanson e-mails Aguirre, telling him, ''Okay Gary you've given me the bug. I'm starting to think about the case during my non work hours.''

**The Turnaround: Aguirre Attempts to Sustain Pequot Investigation**

June 23, 2005 ....................Morgan Stanley's Eric Dinallo contacts Aguirre to ask if he is ''going to proceed against Mack,'' due to concerns that an SEC investigation of Mack would affect Morgan Stanley's decision to hire him as CEO.

June 23, 2005 ....................Hanson allegedly tells Aguirre it will be difficult to subpoena Mack because of his ''very powerful political connections.''

June 23, 2005 ....................Berger states that no case will likely be filed against Mack, despite never having been briefed on the investigation, according to Aguirre.

June 26, 2005 ....................Mary Jo White, an attorney at Debevoise & Plimpton hired by Morgan Stanley to vet John Mack, contacts Thomsen. According to Thomsen, she told White that she couldn't ''tell [her] anything.'' However, a set of White's talking points indicate that Thomsen said there was ''smoke'' regarding Mack, but ''surely not fire.''

June 27, 2005 ....................Aguirre e-mails his supervisors an analysis of the evidence against PCM, alleging Samberg engaged in insider trading based on a tip from John Mack.

June 28, 2005 ....................Aguirre proposes the interview of John Mack. He and Kreitman have a ''heated discussion'' over the SEC's refusal.

June 29, 2005 ....................Hanson gives Aguirre a positive evaluation, commenting ''he has consistently gone the extra mile, and then some.''

June 29–30, 2005 .............Aguirre verbally informs Berger that he is resigning from the SEC effective July 30, 2005.

June 30, 2005 ....................Morgan Stanley hires John Mack as CEO.

July 19, 2005 .....................Compensation Committee meets and approves Aguirre's pay increase.

July 25, 2005 .....................Kreitman calls evidence of Samberg's motive ''too vague, as articulated to be meaningful.''

**Allegations of Political Considerations/Aguirre Termination**

July 27, 2005 .....................Aguirre rescinds his ''resignation of June 30, 2005'' by sending an electronic message to Berger. He reports Hanson's comment about Mack's ''political connections.''

August 1, 2005 ..................Days after Aguirre alleges to Berger that Hanson blocked Mack subpoena due to political considerations, Berger instructs Hanson to do a supplemental evaluation of Aguirre and another staff attorney in the group after Hanson told him they were ''looking to raise trouble.''

August 3, 2005 ..................Hanson and Aguirre discuss the Mack issue. Hanson again refers to Mack's ''political connections,'' according to Aguirre.

August 4, 2005 ..................Aguirre writes to Hanson about his ''political connections'' comment. Hanson replies, suggesting that ''Mack's counsel will have 'juice' as I described last night—meaning that they may reach out to Paul and Linda (and possibly others).''

**V. KEY EVENTS—Continued**

August 18, 2005 ...............Aguirre receives a merit increase based upon his performance.

August 24, 2005 ...............Kreitman proposes that Aguirre be fired. Hanson writes in an e-mail to Aguirre that ''the political clout I mentioned to you was a reason to keep Paul and possibly Linda in the loop on the testimony. As far as I know, politics are never involved in determining whether to take someone's testimony.''

September 1, 2005 ...........Aguirre is terminated from the SEC during his one-year probationary period.

September 2, 2005 ...........On his last day of employment at the SEC, Aguirre wrote to SEC Chairman Cox alleging that Mack was receiving preferential treatment because of his political connections.

**After Aguirre: Investigation Moves Away from John Mack and the GE-Heller Trades**

Fall 2005–Spring 2006 SEC abandons Mack-related aspects of the investigation.

September 8, 2005 ...........In an e-mail with the subject heading ''Debevoise,'' Lawrence West (same staff level as Berger, and not a supervisor of Aguirre's) e-mails Berger, letting him know that he mentioned Berger's ''interest'' to Mary Jo White during a call.

October 20, 2005 ..............Rumors begin to circulate that Berger is leaving the SEC to accept a partnership position at Debevoise & Plimpton.

November 29, 2005 ..........The SEC Office of Inspector General completes its investigation and concludes Aguirre's allegations lack sufficient corroborating evidence.

January 20, 2006 .............Aguirre files a lengthy 56-page confidential Office of Special Counsel Complaint against the SEC, several of its Commissioners and his superiors. He later withdraws the complaint and seeks review by the Merit Systems Protection Board (MSPB), which remains pending.

February 10, 2006 ............Berger recuses himself from any matter involving Debevoise & Plimpton and Goodwin Proctor.

April 17, 2006 ..................Finance Committee sends its first letter to the SEC requesting a briefing on the Pequot investigation, cosigned by the Banking Committee Chair.

April 28, 2006 ..................The SEC's Office of Inspector General issues its semi-annual report for the period October 1, 2005 to March 31, 2006. The OIG Report recounts an allegation of abuse of discretionary authority and the resulting investigation.

May 15, 2006 ...................Aguirre's third-level manager, Paul Berger, submits his resignation to SEC Human Resources. He becomes a partner at Debevoise & Plimpton in its D.C. office beginning June 1, 2006.

June 23, 2006 ..................The *New York Times* runs a story by Walt Bogdanich and Gretchen Morgenson titled ''S.E.C. is Reported to be Examining a Big Hedge Fund.''

June–July, 2006 ................SEC prepares to take Mack testimony, subpoenas two CSFB executives. Kreitman assigns a staff attorney to take the testimonies with only two days advanced notice. Kreitman tells attorney, ''you don't need to prepare that much for it.''

July 6, 2006 ....................... At Chairman Cox's request, OIG reopens its investigation into Aguirre's allegations.

August 1, 2006 .................The SEC questions John Mack.

V. KEY EVENTS—Continued

| | |
|---|---|
| November 30, 2006 .......... | The SEC closes the Pequot investigation. |
| December 5, 2006 ............. | Judiciary Committee holds hearing, ''Examining Enforcement of Criminal Insider Trading and Hedge Fund Activity.'' |
| January 31, 2007 ............... | Committees release interim findings. |

## VI. The Pequot Investigation

### A. Pequot's Suspicious Trading Surrounding the GE-Heller Acquisition

Pequot Capital Management (PCM or Pequot) is ''an investment advisory firm.''[1] Led by Chairman and CEO Arthur Samberg, Pequot employs numerous analysts who are charged with following various companies' stock and making investment recommendations.[2] The firm employs ''a research driven approach'' to guide its investments in publicly traded companies.''[3] The fund managers whom Samberg supervises interact with Pequot's analysts daily and make ''sure they are doing diligent work in understanding balance sheets, income statements'' and ''meeting with companies [and] assessing industry trends.''[4] At all times relevant to this report, Pequot ''was managing over $15 billion'' in stocks and other investments.[5]

In the summer of 2001, General Electric (GE) acquired Heller Financial. The deal was in progress for months, but was not announced until July 30th.[6] Before that announcement, knowledge that the deal was in progress constituted material non-public information and was therefore subject to prohibitions on insider trading. In other words, a reasonable investor contemplating a purchase or sale of either GE or Heller stock would want to know about the acquisition in assessing the companies' stock prices. When an acquisition is announced, the price of the purchasing company typically falls, and the price of the purchased company typically rises. In this case anyone with knowledge of the deal before it was announced could purchase Heller and short GE for virtually guaranteed profits.[7]

Samberg directed the purchase of ''a little over a million shares'' of Heller Financial stock in July 2001, before GE's acquisition was announced[8] at an estimated cost between $34 and $38 million.[9] He directed Pequot to short shares of GE during the same time period.[10] Just after the acquisition was announced, Samberg sold the Heller stock and covered the GE short position, resulting in approximately $18 million in profits over a period of a few weeks.

Pequot's trading in Heller and GE is summarized in **Figure 1** and **Figure 2** (*see* pps. 47-48). As illustrated in the figures, Samberg attempted to purchase many more shares of Heller than his traders could safely execute without driving up the price. On some days, he authorized purchases of well over 200% of the total daily volume of trading in Heller.

The Heller transactions were initially highlighted in an advisory from the New York Stock Exchange (NYSE) to the SEC Enforcement Division as suspicious.[11] Nearly three years later, the matter was investigated by SEC Enforcement Staff Attorney Gary Aguirre who also discovered that Pequot had shorted GE.

During the SEC investigation, Arthur Samberg testified that he decided to purchase Heller stock without any assistance, advice, or consultation with the fund managers he had hired to analyze possible investments for Pequot. [12] Though he testified generally about outside analyst reports,[13] Samberg did not ''have a clear recollection of reading any analyst's report in that time period.''[14] He could not identify even a single analyst's report upon which he relied in making the decision to purchase Heller Financial shares in July 2001. [15]

When asked how long he had been following Heller Financial stock prior to buying over one million shares, Samberg testified, ''I really had not [followed] Heller Financial closely in the way people follow stocks before it was purchased.''[16] Samberg's account described the trades in Heller and GE as being executed contrary to the regular process for investments at Pequot.[17]

Taken together, the timing of the trades, the lack of consultation or advice, the unsuccessful attempts to purchase even larger amounts of Heller stock prior to the acquisition, Samberg's evolving rationalizations for the trades, and the NYSE advisory all add up to circumstances that are, at the very least, suspicious. These transactions suggest that a thorough and wide-ranging investigation was needed.

## B. The Early Stages of the Investigation

### *1. The SEC's Delayed and Truncated Investigation*

#### *a. Time Elapsed between Trades and Serious Investigation*

The trading occurred in July 2001 when Pequot CEO Arthur Samberg began purchasing Heller and shorting GE a few weeks before the announcement that GE would purchase Heller. The NYSE highlighted some of these trades for the SEC on January 30, 2002.[18] It appears that the SEC did little to investigate these trades until after Gary Aguirre joined the Commission over two years later on September 7, 2004. In fact, it is clear that Aguirre was the driving force behind the investigation of the GE-Heller trades that had otherwise remained dormant at the SEC. The original investigation of Pequot was opened on other suspect trades that were investigated prior to Aguirre's employment. It was not until Aguirre took over the case that the investigation made real progress in examining suspect trades in GE and Heller.

#### *b. Supervisors Order a Limited Inquiry*

The staff initially believed that the key to bringing an insider trading case against a large hedge fund would be to demonstrate a pattern of suspicious behavior in a series of transactions. As retired SEC Senior Counsel Hilton Foster explained, proving a case against a hedge fund would be difficult because of the sheer volume of hedge fund transactions:

> A hedge fund is an entity that has a whole bunch of other people's money and invests in all kinds of different securities. So if you go in and say, I think, Hedge Fund A, you engaged in insider trading in IBM, they will open their files and say, we make two million trades a year, and so what if we got lucky

on IBM? It's very difficult to prove a case where they've got that kind of trading history all over the board. So what you do, from an investigative standpoint, is you see whether there's a pattern there. . . . So hedge funds are different than the ordinary investigation.

* * *

So that's why you have to go back and say, if we're going to do this investigation we can't just be looking at Heller, because no matter what we find there will be an explanation. But if you've got Heller and 12 others . . . then you've got something you can work with[.][19]

Ultimately, however, the SEC did not pursue this strategy. Instead, following a meeting between Pequot's lead counsel, Audrey Strauss, and the SEC Enforcement Director Stephen Cutler, the staff was ordered to investigate only a few of the suspicious transactions identified by the self-regulatory organizations (SROs). According to Aguirre:

[I]n early February 2005, less than a month after staff had obtained subpoena power and before any subpoenas had been issued. [Assistant Director Mark] Kreitman directed that the PCM investigation be narrowed to two or three matters. Kreitman had expressed his approval a few days before when the investigation was increased to include seventeen referrals. . . . It came approximately two weeks after an influential attorney representing PCM met with Enforcement Director Stephen Cutler.[20]

This account was corroborated by Eric Ribelin, who added that the team members working on the case were left out of the meeting between Strauss and the Director of Enforcement.[21]

SROs identified between 17 and 25 sets of suspicious trading involving Pequot. The GE-Heller trades represent only one such set of transactions. Others investigated by the SEC will be discussed briefly below. However, the SEC did not examine most of the suspicious activity in any depth. Given the SEC's limited resources, it may have been reasonable to focus on the most suspicious transactions. SEC Enforcement Division Associate Director Paul Berger and Assistant Director Mark Kreitman described the need to triage especially large cases due to limited resources.[22] However, an arbitrary restriction on investigating other transactions that could help demonstrate a pattern, as in the strategy described by Hilton Foster, simply makes an already difficult task even more so.

Even after narrowing the scope of the case, there were complex transactions to analyze and millions of documents to review. Despite the number and complexity of the remaining suspicious Pequot transactions, the SEC assigned only one staff attorney to the investigation full-time: Gary Aguirre. He had part-time assistance from just a few other staff, including some attorneys and some personnel from the Office of Market Surveillance. Aguirre shared one paralegal with several other staff attorneys working other cases. By contrast, one law firm representing Pequot said it had 59 attorneys and paralegals working on the case and reviewing docu-

ments 6 days and 60 hours per week.[23] Given the importance and size of the case, the SEC should have devoted more resources to it.

In cases of large, document intensive investigations, it appears that the core mission of the SEC could be better served by the dedication of more support staff and attorneys. Such inquiries require considerable support from administrative professionals, paralegals, and law clerks.[24] Aguirre shared one administrative assistant with many other attorneys working on dozens of other investigations. His pleas for additional assistance went largely unanswered. Without full-time assistants to focus on tasks such as document management and correspondence tracking, it is difficult to imagine how one full-time attorney could conduct a complex securities investigation effectively.

*2. Other Suspicious Pequot Trading*

*a. Wash Sales and Potential Stock Manipulation*

Wash sales occur when someone both buys and sells the same security at the same price in a short period of time. Such trades are not illegal *per se*, but are suspicious because they incur commission costs yet offer no potential profit or loss.[25] Sometimes such trades are conducted for illegitimate accounting, tax, or market manipulation purposes. Pequot engaged in a large number of wash sales that the SEC began to investigate. Pequot provided the SEC with ‘‘an extensive written response explaining that its trading occurred to *transfer beneficial ownership’’* of the stocks acquired in initial public offerings (IPOs) from one class of fund investors to another—from those eligible to participate in the offering to those ineligible to participate.[26] Pequot argued that the practice was specifically sanctioned by the National Association of Securities Dealers (NASD), one of the securities industry’s self-regulatory organizations (SROs).[27] However, the SEC did not independently determine whether Pequot’s investors met the criteria for participation or exclusion of the IPOs at issue.[28] It is therefore unclear whether the SEC, the government body responsible for overseeing SROs, sufficiently reviewed the NASD’s decision in order to make an independent judgment that such wash sales should be allowed.

On August 3, 2005, Market Surveillance analyst Tom Conroy generated a memorandum to the Pequot File in which he discusses three scenarios in which Pequot engaged in ‘‘apparent’’ wash sales.[29] The three scenarios were as follows: (1) wash sales reported as an agency cross[30] in the immediate aftermarket of an IPO, (2) wash sales reported as an agency cross in the aftermarket of a secondary offering, and (3) wash sales in which buy and short sale orders are executed against each other.[31] According to Conroy:

> We believe that in the first two scenarios above, the trades are designed to benefit Pequot by artificially inflating the volume and/or price and thus inflating the value of shares received by Pequot in the offerings. In the third, scenario, staff has noted several instances of trading following the wash sale trade in which Pequot does substantial selling, short selling and then buying and/or covering at substantially lower prices.[32]

Conroy suggested five lines of inquiry for the ongoing investigation and noted, ''[w]e are concerned that insufficient brokerage surveillance systems may be in place that allow for the execution of manipulative orders that artificially elevate or reduce the price of securities for the benefit of Pequot *and to the detriment of market integrity.* ''[33]

The market surveillance team working the Pequot investigation wrote another memorandum regarding the wash sales on November 14, 2005.[34] This memorandum was prepared by Craig Miller, Tom Conroy, and Eric Ribelin. It explores theories surrounding the intent and purpose of Pequot's trading.[35] Specifically, the memorandum highlights a specific type of trade called a ''short to buy''[36] that was ''repeated hundreds of times over a four-year period.''[37]

The ''short to buy'' transaction takes place when,

> Pequot instructs its executing broker to effect an agency cross transaction in which one side of the trade is a short sale and the other side is a buy. Both the short sale and the buy are for the same number of shares at the same price and are executed simultaneously against each other. The trade is reported to NASDAQ as an agency cross, but the Pequot trade report reflects the same Pequot funds on both sides of the trade, *thus causing no change in beneficial ownership.*[38]

According to the memorandum, Pequot was able to use this opportunity to make a profit on the short side should an opportunity present itself. Otherwise, Pequot could ''simply close out the net flat position with a journal entry in the back office.''[39]

The memorandum goes on to provide a case study with particular trades made by Pequot in the stock of Atheros Communications.[40] It also notes that there are questions surrounding the nature of borrowed stock leveraged by Pequot to short.[41] The memorandum concludes that the shorting of the borrowed shares would ''appear to decrease the amount of stock available for others to borrow for shorting purposes.''[42]

Chief of Market Surveillance Joe Cella forwarded the memo to the Division of Market Regulation .[43] In response, an Associate Director in Market Regulation indicated, ''This memo describes some wild and troubling trading. The wash sales may be manipulative or fraudulent . . . . Either case involves potential SEC or [NASD] rule violations.''[44]

Although employees within SEC's Market Surveillance branch saw potential violations, the Enforcement Division ultimately closed the case without action on the wash sales. The concerns raised by Market Surveillance warrant further attention. They raise serious questions about how prevalent these practices are among hedge funds and whether they ought to be considered legitimate. These issues go far beyond the simple question of whether the wash sales were designed to artificially inflate the volume or price of a security.

*b. The AstraZeneca and Par Pharmaceutical Trades*

In October 2002, a federal district court held that Par Pharmaceutical had infringed on drug patents held by another drug company, AstraZeneca .[45] The decision caused AstraZeneca's stock price

to rise and Par's price to fall significantly on the day the decision was announced .[46] The NYSE alerted the SEC to suspicious trading by Pequot in both AstraZeneca and Par leading up to the date of the court decision, as well as Pequot trading in Par in advance of positive earnings estimates announced about a month earlier, in September 2002. Pequot was ''the largest institutional buyer'' of Par in the week before the earnings announcement.[47] Pequot also reversed its trading positions in both AstraZeneca and Par just before the announcement of the court decision.[48]

In other words, the trading activity made it appear that Pequot may have profited or avoided losses on advance knowledge of both events—the earnings announcement (which caused Par's price to rise) and the court decision (which caused Par's price to fall and AstraZeneca's price to rise). Gary Aguirre outlined the trading early on in the investigation to his supervisors:

> On 9/12/02, one month before the court announced its decision, [Par] announced its earnings. From 8/12/02 through 9/11/02, Pequot bought 605,000 shares of [Par] for a total position of 776,600 shares on 9/12/02, the date of the earnings announcement. Sixteen days later, [Pequot] began to sell [Par] and, by 10/4/02, a week before the court decision was announced, it had a short position of 34,000 shares .[49]

Following this e-mail, Aguirre's supervisor directed him to include the AstraZeneca and Par transactions into the formal order of investigation memorandum, which was later adopted by the SEC to authorize the Pequot probe.[50] Authorities in the Southern District of New York (SDNY) also conducted a criminal investigation of whether a judicial law clerk had leaked the outcome of the patent case.[51] As of the date of this report, no charges have been filed in connection with the alleged leak.

*c. The Microsoft Trades*

Until the summer of 2006, the SEC took significant interest in Pequot's April 2001 trades in Microsoft stock. Initially, many of the SEC Enforcement Division attorneys were optimistic about the prospect of proving Pequot illegally traded on material, non-public information concerning Microsoft stock.[52] Aguirre's successor as lead counsel in the Pequot probe, James Eichner, eventually drafted an outline in preparation for a Wells notice, the formal procedure by which the SEC informs a potential defendant that it intends to file an enforcement action.[53] SEC Enforcement personnel agreed Aguirre had unearthed ''direct evidence'' of insider trading.[54] Both Eichner and Kreitman described the Microsoft aspect of the investigation as ''promising.''[55] Eichner went as far as to suggest that when Samberg traded Microsoft stock in April 2001, he did so thinking he was engaged in ''insider trading.''[56]

In its Wells notice, the SEC quotes several e-mail exchanges between Samberg and a Microsoft employee named David Zilkha. Zilkha eventually left Microsoft for employment at Pequot.

- In the same e-mail in which Samberg offered Zilkha a job, he asked whether Zilkha had any current views on Microsoft that

might be helpful. He wrote 'might as well pick your brain before you go on the [Pequot] payroll!!'

- On April 6, 2001, Samberg asked Zilkha if he had any 'tidbits' about Microsoft Zilkha responded that he would get back to Samberg about Microsoft 'ASAP'
- On April 16, 2001, Samberg asked Zilkha if he had 'any further [c]olor' on Microsoft.
- On April 17, 2001, at 8:01 p.m., after the close of the market, Zilkha informed Samberg 'I heard this afternoon from the MSN finance controller that our CFO has been more relaxed before this next earnings release than he has been in the last year. Augurs well.' . . . .[57]
- On April 19, 2001, at or right before the close of the market, Microsoft announced its quarterly earnings. (Microsoft press release). Microsoft's results beat estimates for revenues and earnings. (4/20/01 e-mail from Samberg to Zilkha). Microsoft's stock price rose 2.5 points (about 3.6%) on April 19 and another point on April 20.
- On April 20, 2001, Samberg closed out his April 19, 2001 position, realizing a profit of approximately $1.6 million. That same day Samberg wrote Zilkha, in an e-mail exchange containing the news about Microsoft's earnings, *'I shouldn't say this, but you have probably paid for yourself already!'*[58]

This sort of evidence clearly warranted a serious and thorough investigation by the SEC.

*3. Pequot and the SEC Fight over Document Production*

Pequot retained Fried, Frank, Harris, Shriver, & Jacobson (Fried Frank) to represent its interests in the SEC's investigation. Individual Pequot employees were represented by six different law firms.[59] Audrey Strauss of Fried Frank was the lead counsel and handled the document production for Pequot. On February 7, 2005, Aguirre sent the first SEC subpoena to Pequot seeking e-mails and other documents.[60] In response to a February 23 e-mail from Aguirre complaining about Fried Frank's lack of cooperation on previous requests for information, Kreitman wrote, ''Agreed. We need to continue to document this pattern of behavior with a view to possible §17(b) charge and perhaps some disciplinary action against the law firm.''[61] However, others in the SEC doubted the resolve of Aguirre's supervisors to support pressing for complete compliance with document subpoenas. In an e-mail exchange with Eric Ribelin, one wrote:

> I have seen these [SEC Enforcement] Lawyers get all huffy before. They are empty suits. When push comes to shove, no one in the SEC is going to take on [Fried Frank] or any other major player. Not going to happen. . . . When Fried Frank gets a handle on the email, they will produce them, and not before[.][62]

A second subpoena for documents was sent on March 22, 2005.[63] These subpoenas were among over 90 that the SEC issued in the Pequot investigation.[64] Pequot began producing ''significant volumes of its records'' in response to these subpoenas in April and

May of 2005.[65] This included nearly 80,000 electronic records and 300,000 pages per week.[66] However, by the middle of May 2005, production began to slow as Pequot raised claims of attorney-client privilege.[67]

In fact, Pequot withheld over 200,000 pages of documents sought by the March 22, 2005 subpoena based on claims of privilege.[68] The privilege claims continued through spring 2005 and ultimately led to a dispute between SEC employees and Pequot attorneys.[69] Mark Kreitman minimized the dispute, calling it ''the kind of ordinary resistance that we [SEC] encounter in seeking full, accurate, and complete compliance with subpoenas.''[70]

The dispute eventually focused on back-up tapes that contained e-mails from the 2001 timeframe when Pequot was making the suspect trades. Given the time elapsed between the trades and the SEC's investigation, obtaining e-mails from these tapes would seem to be a critical step. Pequot retained two outside attorneys, Irving Pollack and Larry Storch of Fulbright & Jaworski L.L.P., to review the documents that were being withheld.[71] They were friends of Mark Kreitman, who testified that Storch was ''a classmate from law school and a friend'' and that Pollack was ''a mentor.''[72]

Kreitman instructed Aguirre not to contact Pollack or Storch. Although Strauss had delegated the backup-tape issue to them, she did not officially acknowledge that Pollack and Storch represented Pequot for some time.[73] Kreitman's instruction that Aguirre not contact them because it was not clear whose interests they represented had the effect of delaying the investigation. Aguirre repeatedly attempted to deal with Straus on document production issues, only have Strauss refer him to Pollack and Storch. Yet, because Aguirre was instructed not to talk to Pollack and Storch, the document production dispute continued to linger into June 2005 with little or no clarification. As late as June 28, 2005, Aguirre described the situation this way:

> I think Audrey [Strauss] has the best of all worlds right now regarding these three categories of tapes: the Pollack-Storch wall of integrity and my inability to press them for answers to pertinent questions. . . . Mark's call last week to Fried Frank may get Pollack-Storch to concede they simply represent Pequot.[74]

This situation was eventually rectified as Strauss conceded in writing that Pollack and Storch were counsel representing Pequot sometime after July 13.[75] However, this concession came too late to have much practical effect as many of the documents sought were never produced, even after Aguirre was fired.[76] When documents were produced, they were delivered, ''on the day of, days after, and weeks after testimony'' was taken.[77]

Aguirre explained the significance of obtaining the e-mails to his supervisors: ''the second best source of proving the Samberg GE tip is from the backup tapes.''[78] Thus, the failure to produce all of the backed-up e-mails in a timely fashion represented another barrier to success in the investigation.

*4. The Arthur Samberg Testimonies*

The SEC took Arthur Samberg's testimony twice before Gary Aguirre was fired, and once afterward. In his first session of testimony on May 3, 2005, Arthur Samberg listed a number of specific reasons that he claimed motivated him to purchase Heller stock in July 2001.[79] In his second session on June 7, 2005, it became clear that each of the reasons he had previously indicated was highlighted in a Legg Mason analyst report that Samberg had reviewed in preparation for his May 3 testimony. During cross-examination by Gary Aguirre, Samberg conceded that he did not recall reviewing the report before ordering the trades and probably would not have done so because it was ''sell-side research,'' which Samberg had said publicly was not ''worth a damn.''[80] SEC investigators believed that given these circumstances, Samberg's initial story appeared to be an after-the-fact rationalization using the Legg Mason report as source material.

During our review of the SEC inquiry, we interviewed James Eichner, the SEC Staff Attorney who took over the Pequot investigation after Gary Aguirre was fired. Although Eichner criticized Aguirre's examination of Samberg in other respects, he agreed that Samberg's rationales for the trades were unpersuasive:

Mr. Eichner: [T]here was a sense that [Samberg] had . . . a chance to prepare and it seemed reasonable to think that he had sort of—I mean, spoon-fed is not . . . an inaccurate characterization.

* * *

I mean, if you ask me what I thought, I would say that Samberg was spoon-fed this information after the fact by his attorneys. I think Gary [Aguirre] was right on that, but I'm just——

Question: And in fact . . . Mr. Samberg admits that he had not seen the documents which cited those six reasons by the time he made the trades?

Mr. Eichner: Right.

* * *

I think that's entirely correct, that Mr. Samberg had a suspiciously clearer recollection in the second examination than he did in the first about Heller.

Question: And is it accurate to say that Mr. Aguirre was able to establish in that deposition that [Samberg's] lawyers had provided him with those exact rationalizations after-the-fact, after the trade—years after the trades?

Mr. Eichner: Yeah, I think . . . that was established in the second testimony[.][81]

Samberg had not reviewed analyst reports on Heller or consulted with others at Pequot before purchasing over one million shares. Even though Eichner and Aguirre disagreed on many aspects of the

Pequot investigation, it appears that Eichner agreed that Samberg's testimony added to the suspicion about Pequot's trades.

*5. The SEC Briefs Criminal Prosecutors on its Investigation*

In mid-June, Kreitman told Berger it was time to consider briefing criminal prosecutors about the case. Berger then called the chief of the Securities and Commodities Fraud Section at the U.S. Attorney's Office for the Southern District of New York.[82] On June 14, 2005, Kreitman asked Aguirre to walk him through the evidence of Pequot's suspicious trades. Aguirre prepared a tabbed binder with hundreds of pages of documents including both blue sheet data reflecting Pequot's trades and Samberg's e-mail exchanges. The following day, Aguirre, Eric Ribelin, and an SEC intern traveled to New York to meet with two FBI agents and an Assistant U.S. Attorney. Among other things, Aguirre briefed them on Pequot's suspicious trading (1) in advance of the GE acquisition of Heller, (2) in Microsoft stock, and (3) in AstraZeneca and Par Pharmaceuticals. On June 15, 2005, the SEC attempted to interest the Department of Justice in opening up a parallel proceeding to investigate Pequot. Section 21(d) of the Securities and Exchange Act[83] authorizes the SEC to furnish the DOJ with evidence of misconduct it has uncovered in its civil proceedings.[84] Congress has approved of this procedure for the past three decades.[85]

Aguirre's supervisors considered the presentation a success. After Aguirre previewed the presentation for Kreitman, he gave Aguirre a motivational award in recognition of developing the case into a potentially criminal matter. The award was a photocopied picture of Raymond Burr, which Kreitman described as ‘‘the Big Perry'' in reference to Burr's portrayal of the fictional, legendary attorney Perry Mason.[86]

## C. SEC Investigators Identify a Potential Tipper

*1. Investigators Suspect John Mack*

In a June 27, 2005 e-mail to his supervisors, Aguirre analyzed the evidence gathered in the case so far. According to Aguirre's theory of the evidence, Samberg may have engaged in insider trading based on a tip about the upcoming acquisition from John Mack.[87] At the time of the trades, John Mack was being considered for the position of Chief Executive Officer of Credit Suisse First Boston (CSFB) and had recently left Morgan Stanley. Both CSFB and Morgan Stanley were firms working on the GE acquisition of Heller, and thus possessed material, non-public information about the deal. Aguirre's e-mail summarized the trading (for a more detailed description, see **Figure 1** and **Figure 2** on pps. 47-48).

Given the appearance that the trades were made based on material, non-public information, Aguirre began to search for potential tippers. He eventually identified John Mack as a likely candidate. Mack was a close associate of Samberg and an investor in Pequot funds. Mack was thus in a position to share in any profits the funds might make by trading on inside information. Mack also had been in employment negotiations with a firm working on the deal at the time of the trades, which meant he might have had an opportunity to learn of the GE-Heller acquisition before the public an-

nouncement. Moreover, an e-mail from Samberg indicated that he had spoken to Mack on June 29, 2001.[88] Samberg began directing large purchases of Heller stock on the next trading day.

Aguirre theorized that Mack may have tipped Samberg about the acquisition in exchange for Samberg allowing Mack to invest in a ‘‘closed’’ Pequot fund or directly alongside Pequot in a private equity deal. To bolster the point, Aguirre pointed out that on May 11, 2001, Samberg wrote another Pequot employee that ‘‘John Mack would like to put $5mm into Partners at the 1st available opening. He’d also like to put more $ into Scout, if that’s possible, and would like a recap of what he has where.’’[89] On June 20, 2001, Samberg wrote to a different Pequot employee, Jerry Poch, to report, ‘‘I’m sitting here with John Mack and . . . John is busting my chops cuz he hasn’t gotten the Freshstart material yet.’’[90] ‘‘Partners’’ and ‘‘Scout’’ were two of the funds managed by Pequot. Fresh Start was not a Pequot fund, but rather a start-up company in which Mack was allowed to invest directly, alongside Pequot. On June 30, 2001, Poch wrote to Samberg, ‘‘I had a great call with John Mack last

night. He wants to go forward with Freshstart and put 5mm in.’’[91] Mack was the only individual investor allowed to participate in the deal.

Samberg responded, ‘‘As he might have mentioned, [Mack] called here looking for you. Cuz of our breakfast I remembered you were in Vail and gave him your number. Glad this is moving along, and thrilled at the $5m number.’’ On the next trading day, July 2, 2001, Samberg began aggressively acquiring as much Heller stock as possible without driving up the price. Aguirre theorized that John Mack might have first tipped Arthur Samberg about the GE acquisition of Heller during that June 29, 2001 telephone call.

Aguirre explained the significance of Mack’s interest in Fresh Start in his December 5, 2006, written testimony before the Judiciary Committee:

> Mack was admitted directly into special PCM deals. One key deal went by the code name ‘‘Fresh Start,’’ a Lucent spin-off which PCM got into extremely cheap. Mack was promised a $5 million piece of Fresh Start the same night in which he was suspected of giving Samberg the Heller tip. Just nine days earlier, according to a Samberg email, Mack was ‘‘beating [Samberg’s] chops’’ to get into Fresh Start. Neither the PCM principals nor Samberg’s son seemed happy about Mack getting into Fresh Start. SEC filings indicate Mack did extremely well on his $5 million investment.[92]

Although Hanson testified that the SEC did not independently verify how well Mack’s money performed in this private Pequot deal, Aguirre provided more information in his written testimony:

> Fresh Start became Celiant Corporation. It was initially coowned by PCM and Lucent. Mack bought 3,333,333 shares of preferred stock directly from Celiant for $5 million (See page 21, Andrew Corp Form 8-K/A for the period ending June 4, 2002), the same terms and conditions under which PCM acquired its 33,333,333 shares. On February 19, 2002, Andrews Corp filed an 8-K with the SEC stating that it would buy all

> outstanding Celient stock for $469.8 million: $203.1 million in cash and $266.6 million in stock. The merger agreement provided that Celient preferred shareholders, such as Mack and PCM, would split $119.6 million in cash and the 16.28 million shares of Andrew Corp. common stock. Mack owned 4.26% of the outstanding preferred stock. Hence, under the terms announced in the February 19, 2002, and the June 4, 2002, Form 8-K/A, the value of Mack's interest would have been approximately $16.43 million [or, *over three times his $5 million investment]*. However, the stock would not be issued until June 2002 and would not be registered until September 2002. (See Andrew[s] Corp Form 424B3).[93]

That Samberg allowed Mack to invest right around the time that Samberg began trading in Heller creates an appearance of a potential *quid pro quo* worthy of thorough investigation. Mack and Samberg were decidedly close to one another. Mack was also an investor in various Pequot funds. Mack had significant informational sources both from his former and prospective employers: Morgan Stanley and Credit Suisse First Boston. Both investment banks were advising GE and Heller in the deal. For these reasons, Aguirre and the investigators working with him believed that Mack fit the profile of a potential tipper.

Aguirre continued to explain this theory in a series of e-mails he sent to his supervisors. On June 27, 2005, in an e-mail to Hanson that copied Kreitman and Ribelin, Aguirre suggested Mack was a potential tipper because Mack ''likely had the GE-HF info sources, he had contacts with Samberg during the period, there was *quid pro quo*, mutual trust existed, and Samberg needed a huge favor.''[94] On June 28, 2005, in his ''proposed next steps'' e-mail memorandum to his superiors, Aguirre suggested that the SEC pursue the Pequot insider trading investigation by (1) pursuing ''Documents-Testimony from the five investment [banks] (CSFB, Morgan Stanley, JP Morgan, Lehman and Merrill Lynch) or the

two principals (GE and HF)''[95] and (2) taking ''Mack's testimony [to] simply nail down whether he will admit that he knew about the GE/HF acquisition from any source.''[96]

The memorandum reminded Aguirre's superiors that Mack ''could have learned this at either CSFB or MS'' presumably because he had just left Morgan Stanley in March 2001 and was being wooed by Credit Suisse First Boston at the time Samberg began trading in GE/HF.[97] Aguirre received substantial push-back from Hanson, Kreitman and Berger. They delayed Mack's testimony indefinitely, eventually taking it under public pressure almost a year after they fired Aguirre. Paul Berger left the SEC before Mack's testimony was eventually taken. Both Hanson and Kreitman continued to oppose the idea even in the summer of 2006. However, they were overruled by more senior SEC Enforcement Division officials who understood the lack of a downside to taking Mack's testimony and the high cost in public confidence by failing to take it.

*2. Others Concur in Aguirre's Request to Take John Mack's Testimony*

Aguirre was not alone in thinking the SEC should take John Mack's testimony in the summer of 2005. He was joined in this belief by at least three other senior SEC officials, including Hilton Foster, Joseph Cella, and Eric Ribelin. Hilton Foster retired shortly before Aguirre was fired. Foster's 30 years of experience in insider trading investigations were apparently valued by the SEC since Foster conducted training on a contract basis for new SEC attorneys even after retirement As a strategic matter, Foster believed it was imperative to take John Mack's testimony ''sooner rather than later.''[98] He said, ''As the SEC expert on insider trading, if people had asked me, 'When do you take [John Mack's] testimony,' I would have said take it yesterday.''[99] Foster explained that, ''As an investigator, you want to lock people in as soon as possible[.] . . . I always said you want to take testimony from these people sooner rather than later because you lock them in.''[100]

Eric Ribelin is a Branch Chief in the Office of Market Surveillance within the SEC's Division of Enforcement. He has worked there for at least 18 years.[101] Ribelin was one of the few staff members involved in the Pequot investigation from the beginning. He spent about 20 percent of his time on the investigation and was in daily contact with Aguirre. Ribelin's Market Surveillance branch assists the Enforcement Division by providing technical advice in the areas of stock manipulation and insider trading, helping analyze trading patterns, deciphering activities of stock brokers and traders, and analyzing trading positions or derivative securities.[102]

When asked about SEC Enforcement Division managers' refusal to take Mack's testimony, Ribelin said, ''the impression that I had from Berger, especially—he seemed dismissive of investigative ideas. [He] seemed disinterested in the idea of moving aggressively and assertively.''[103] With respect to taking Mack's testimony, Ribelin recalled Hanson saying that, ''Mack has connections, or he has stature, or something to that effect, and that because of that, we—that, you know, we have to be careful about taking his testimony.''[104] After Aguirre's termination, Ribelin sent Hanson an email concerning his frustrations, indicating that in his view, ''something smells rotten'' about the course of the investigation.[105] Ribelin then attempted to withdraw from the case.[106] He said that Paul Berger made the decision not to interview John Mack and that it came down as a *''fait accompli.''*[107] Ribelin agreed with Aguirre that the SEC should have taken Mack's testimony sooner rather than later but conceded that ''maybe reasonable minds could have disagreed'' about the precise timing.[108]

Joseph J. Cella, III, the Chief of the SEC Enforcement Division's Market Surveillance branch, supervised Branch Chief Eric Ribelin.[109] Cella has worked with Ribelin since 1992 and described him as conscientious and honest.[110] After Aguirre was fired, Ribelin requested that he be removed from the investigation and assigned to another case. According to Cella, this was the first time that Ribelin ever asked to be removed from an investigation.[111] When asked about his own opinion of the propriety of taking Mack's testimony, Cella said, ''I didn't think that there was anything wrong with bringing Mack in.''[112] When pressed further,

Cella said, ''It seemed to me that it was a reasonable thing to do to bring Mack in and have him testify.''[113] According to Cella, Bob Hanson and Mark Kreitman objected to questioning Mack.[114] As to whether he thought there was any downside to taking Mack's testimony, Cella said, ''In my mind there was no downside, correct.''[115] Cella said he had a ''strictly professional'' relationship with Aguirre and that he could not recall them ever having any disputes.[116] Cella had never heard ''anyone with the SEC'' describe Aguirre as a ''substandard employee'' prior to Aguirre's termination.[117] He was, nonetheless, ''skeptical'' that the SEC would give Mack a pass based upon his or Samberg's ''political connections.''[118]

*3. Morgan Stanley's Investigation and Contacts with the SEC a.*

*Planning a Response to Outside Inquiries*

Given that Aguirre and the others working on the case day-today wanted to question John Mack, why did Aguirre's supervisors resist? This question is especially perplexing in light of their initial support for Aguirre's theory. Aguirre points to a particular day on which he claims their attitudes abruptly changed, June 23, 2005. Aguirre testified:

> I received a phone call from Morgan Stanley on June 23rd, from the head of their compliance [Eric Dinallo]. He had this question: 'Are you going to proceed against Mack? Because if you proceed against Mack, we are going to have a problem in having him step in as CEO. We do not want him to step in as CEO if there is going to be a securities case brought against him by the SEC.' Until that point, this case was, as I said, supported by everyone.[119]

Aguirre alleges that on June 23, ''in a face-to-face meeting, Hanson told me that it would be very difficult to obtain authorization for issuance of these subpoenas *because Mack had very powerful political connections* and Assistant Director Kreitman 'would have to make the call.' ''[120] After this encounter with Hanson, Aguirre went to Kreitman. Aguirre reported Dinallo's call to Kreitman who, in turn, called Dinallo on the speakerphone with Aguirre in the room.[121] Kreitman confirmed Dinallo's question to Aguirre and terminated the call before responding. After hanging up, Kreitman told Aguirre, ''I think we have got to let them know we probably will [proceed against Mack].'' According to Aguirre, Kreitman followed up with, ''But, first, I am going to call Associate Director Paul Berger and let him know.''[122]

Thereafter, according to Aguirre's account, Kreitman called Berger and said, ''Paul, this case is coming along pretty well now. We got this phone call from Morgan Stanley, and I think they want to know whether we are serious about it. I think we are going to go on this, and I think we ought to say something now.'' Aguirre testified that Berger responded, ''I don't think we are, and we shouldn't say anything.''[123] Kreitman and Berger disputed some aspects of Aguirre's account of these conversations but, in essence, agreed on two key points, that: (1) Kreitman suggested warning Morgan Stanley about the SEC's interest in Mack and (2) Berger

insisted on saying nothing to Morgan Stanley while the investigation remained pending.[124]

*b. Debevoise & Plimpton Contacts*

Around the same time that Dinallo called Aguirre, a former United States Attorney for the SDNY called and e-mailed Linda Thomsen. The Morgan Stanley Board of Directors hired Debevoise & Plimpton to conduct a due diligence investigation to vet John Mack before extending an offer for him to rejoin Morgan Stanley. Mary Jo White, co-chair of the litigation section at Debevoise, was responsible for conducted the inquiry as quickly as possible. She spoke to lawyers for Morgan Stanley, Pequot, and CSFB.[125] The SEC had recently subpoenaed both Morgan Stanley and CSFB for e-mails between Mack and Samberg.[126] White indicated she was trying ''to learn whatever I could within a rather short time frame.''[127]

Only two days after being retained, White did what the SEC did not do until more than a year later. She questioned John Mack:

> The other thing that I did for the board to gather what information I could on that time frame was to interview John Mack himself.
>
> * * *
>
> [C]learly everybody went into full gear on this. You know, we worked over the weekend . . . [W]e interviewed him. I basically caused John Mack to be summoned back from wherever he was in London so we could interview him. And, you know, we accelerated getting e-mails, reviewed them, [and] looked at the other e-mails at Pequot. . . .[128]

That evening, Sunday, June 26, 2005, White sent Thomsen an email message marked ''URGENT'' and asked that Thomsen return the call ''this evening.''[129] Aguirre complained that the next day White delivered the e-mails that he had subpoenaed from Morgan Stanley directly to Linda Thomsen:

> On June 27, l learned that Mack-Samberg emails, which I had subpoenaed from Morgan Stanley, had been delivered directly to the Director of Enforcement, Linda Thomsen (Thomsen). Neither I nor other staff had heard of this happening before. Indeed, the subpoena explicitly stated that the documents were to be delivered to me.[130]

White indicated that she had the e-mails delivered to Thomsen for the purpose of determining whether the SEC could comment on whether the e-mails changed their view of Mack's role:

> So I asked whether Ms. Thomsen would be willing to have her staff, you know, look at those [e-mails used in White's questioning of Mack] and, frankly, any of the others that had been subpoenaed and give us, you know, some kind of statement, if they could, about what they considered his status to be in the investigation.

* * *

> Her response to that was, you know, send them down, you know, we'll see what we can do, taking a look at them, and then we'll see what, if anything, you know, we can say. I think I asked in that—it would have been in that call that I said, ''Where should I send them?'' And she said send them to her.[131]

For Thomsen to comment on the significance of the e-mails without first learning what the lead staff attorney's opinion of their significance would be rather unusual. However, it appears that is what she did.

*c. Thomsen and Berger Respond to Inquiries*

Thomsen said that after checking with Paul Berger (who had also not discussed the significance of the e-mails with Aguirre)[132] to see what, if anything she could say, that she told White she could not comment:

> I told her that I didn't know whether I could tell her anything, that, as I sat there, I didn't know enough one way or another to even know whether there was anything I could tell her if I could tell her and that I'll get back to her.
>
> * * *
>
> After I got off the phone I talked to Mr. Berger and learned that we just didn't have enough information one way or the other with respect to Mr. Mack . . . . [W]e didn't have anything to indicate that he had engaged in any illegal or improper behavior, . . . [but] we weren't at a stage to be confident that he hadn't . . . . [W]e weren't likely to be at that stage any time soon . . . . I then got back to Ms. White and said I can't tell you anything.[133]

Likewise, Berger described his conversation with Dinallo as consistent with his position that the SEC could not comment on the investigation.

Berger had opposed Kreitman's proposal to signal Morgan Stanley that the SEC was serious about investigating Mack. In his interviews with Committee staff, Berger left the impression that he provided Dinallo with no substantive information:

Question: After the conversation with Mr. Kreitman in which you said, ''No. I'll call Mr. Dinallo,'' or words to that effect, you called Mr. Dinallo back. What precisely did he ask you?

Mr. Berger: . . . [He] identified the fact that the Board of Directors of Morgan Stanley was considering hiring John Mack, and they were concerned about whether or not he had any issues with the SEC and its investigation.

* * *

> I don't recall saying anything with respect to Mr. Mack, other than . . . I told him that it was premature for us to evaluate. We were roughly in the middle of our investigation. I didn't

> know where it was going to go. I think I said something to the effect, ''Like any other insider trading investigation, we don't know where it's going to go until we've finished it.''
>
> * * *
>
> [T]he point of my phone call was to adhere to the Commission policy by not disclosing any information about an investigation[.][134]

However, in the course of our investigation, we obtained documentary evidence inconsistent with Thomsen's and Berger's accounts.

Debevoise & Plimpton provided a set of talking points used to brief Morgan Stanley's Board of Directors on its efforts. Those talking points provide a record of what Dinallo reported to White about his conversation with Berger. The pertinent paragraph reads:

> You will recall that last Friday, after Morgan Stanley had been subpoenaed for Mr. Mack's e-mails with Samberg, Eric Dinallo spoke to Paul Berger, a senior supervisor in the SEC's Enforcement Division, and asked him whether the SEC had any evidence of issues for Mr. Mack in their insider trading investigation of Pequot. The response was that the SEC was looking at Mr. Mack, among others, as part of their investigation, *primarily based on what they had seen in e-mail traffic*, but implied that *they did not presently have evidence of any wrongdoing* by Mr. Mack.[135]

This description of the conversation differs from Berger's. Rather than ''not disclosing any information,'' this document suggests that, in fact, Berger disclosed the specific type of evidence (i.e., e-mail traffic) on which the SEC's interest in Mack was ''primarily based.'' Moreover, it suggests that Berger signaled that the SEC ''did not presently have evidence'' of wrongdoing. It is particularly troubling that Berger would provide that sort of detail about what the SEC knew to someone so closely aligned with the interests of a potential defendant.

The talking points also provide a more detailed account of Linda Thomsen's conversation with Mary Jo White:

> Thomsen called me late on Tuesday after she and her staff had reviewed those emails and confirmed that *the emails did not change their view of Mr. Mack*. It was still ''too early'' in the investigation to tell whether Mr. Mack had any issues. She added that there is ''smoke there''—but that there was *''surely not fire.''* She said they are weeks away from knowing more and could give us no more comfort. She commented that the ''Board will have to trust him.''[136]

According to this account, Thomsen provided White with more detail than simply, ''I can't tell you anything.'' She told White what SEC staff thought about the e-mails that Morgan Stanley had just produced, indicating that the documents ''didn't change their view.'' She also indicated that, though there was smoke, there was ''surely not fire.'' Whether referencing the particular set of e-mails or the investigation as a whole, these statements go beyond a simple ''no comment.''

After Aguirre's termination, Kreitman told the Office of Inspector General that direct contacts like these with senior SEC officials were a bit unusual but not unprecedented: ''Kreitman also said that it is a little out of the ordinary for Mary Jo White to contact Linda Thomsen directly, but that White is very prestigious and it is not uncommon for someone prominent to have someone intervene on their behalf.''[137] That is precisely the problem. By providing prominent individuals selective access to senior SEC officials, the SEC allowed bits of information about its non-public investigation of Pequot to leak to a potential defendant's prospective employer.

*4. Supervisors Deny Requests to Question John Mack*

On June 23, Kreitman's initial reaction to inquiries from Morgan Stanley about John Mack's exposure was to tell Berger, ''Paul, this case is coming along pretty well now.''[138] However after contact between Morgan Stanley's representatives and the Director and Associate Director of Enforcement, Kretiman's attitude changed markedly. He denied Aguirre's request to authorize a subpoena for Mack's testimony and failed to respond to e-mails from Aguirre on the subject.[139]

*a. ''Not Premature, but Prerequisite''*

Aguirre's supervisors gave conflicting explanations for why they would not approve of questioning Mack. Mark Kreitman's initial explanation was that it wasn't necessary to ''lock-in'' Mack. When asked whether SEC investigators normally bring in potential tippers early on in an investigation to nail down their testimony, as Hilton Foster had described, Kreitman disagreed:

> In some cases, there is an advantage to nailing somebody's testimony down. . . . [I]t is different in this case when we were investigating in 2005 conduct that occurred in 2001. The chance that we benefited nailing down some of these stories when it is so remote from the events is very limited. [140]

While the trades occurred years earlier, they had only come under scrutiny by the SEC in the proceeding months. Interest in Mack's role was only a few weeks old, and document production was just under way. Accordingly, Kreitman's distinction misses the mark by failing to recognize that some benefits of ''locking-in'' a witness come at the beginning of the investigation, not just at the beginning of the events being examined. Moreover, pointing to the time that had passed since the trades can hardly be an argument for waiting even longer before questioning witnesses. That strategy merely ensures that fading memories continue to fade even further.

Kreitman eventually made it clear that he would not authorize taking Mack's testimony without definitive proof that Mack had foreknowledge of the GE acquisition of Heller in time to tip Pequot, which he referred to as being ''over the wall.''[141] Kreitman said that establishing the date that Mack learned of the acquisition was, ''the necessary pre-requisite to [issue] a subpoena to Mack.''[142]

Of course, Kreitman's view ignored the possibility that interviewing Mack might itself be an appropriate method of determining whether he had foreknowledge of the acquisition. Moreover, SEC

management did not generally impose any such hurdle to taking investigative testimony in other insider trading cases. Hilton Foster, a 30-year SEC veteran, was unaware of any such pre-requisite:

Question: [I]n your experience at the Commission, in all the insider trading cases that you have worked on before, has it ever been described to you that there should be a necessary prerequisite that you establish that a potential tipper had access to material non-public information before you take that potential tipper's testimony?

Mr. H. Foster: Well, no. But in this case that misses the point, because I think it was clear that Mack was in a position to know. Whether he did know or did not know, I don't know. But he was a player.

* * *

> [Y]ou're not going to prove your case and then go talk to these people. I don't understand the justification for waiting.[143]

Indeed, waiting until staff has established the date on which a potential tipper learned the non-public information before questioning that person might mean waiting forever, if the date is never established. Kreitman simply imposed an arbitrary requirement, which (1) was not required by any SEC policy; (2) was not endorsed by the Senior Attorney who conducted training on insider trading investigations; (3) created an artificially high bar for obtaining Mack's testimony; and (4) delayed that testimony indefinitely.

After Aguirre's allegations were under investigation, however, SEC managers (including Kreitman) claimed that the issue was not about *whether* to take Mack's testimony, but *when* to take it.[144] In other words, it was merely a question of timing, and the decision to take Mack's testimony had already been made. For example, Associate Director Paul Berger said the issue ''wasn't . . . whether we were going to take Mack's testimony or not, because we had pretty much decided we were going to take the testimony.''[145] The ''necessary pre-requisite'' and ''not whether, but when'' rationales are mutually exclusive. In the months after Aguirre was fired, when virtually no Mack-related investigative activity occurred, the ''necessary pre-requisite'' position appeared to have triumphed.

Nearly a year later, when the SEC revived the Mack inquiry following the public airing of Aguirre's allegations, the conflict re-surfaced. In July 2006, when SEC management was re-considering whether to take Mack's testimony, Aguirre's replacement as lead staff attorney, James Eichner, forwarded Kreitman's ''necessary prerequisite'' e-mail to Robert Hanson with the comment, ''I assume Walter has this—not premature, but prerequisite.''[146] When asked about the e-mail, Eichner explained that he was referring to Deputy Director of Enforcement Walter Ricciardi and that this email was in response to Ricciardi's view that Mack's testimony should be taken:

> Walter had written a memo . . . about this issue, and he had said that it had been decided during Gary [Aguirre]'s tenure that taking Mack's testimony was premature. . . . [T]o him,

premature meant we were going to do it eventually and we just hadn't done it yet.

* * *

And so he felt like one reason to take Mack's testimony was that . . . he had written this memo . . . [that said] it was premature and . . . suggested we were going to take it. And so that . . . was an argument in favor of actually going ahead and taking testimony.

* * *

The others of us, myself, Bob Hanson, and Mark Kreitman, said, no, it wasn't. . . . [O]ur recollection was that it wasn't definitely decided it was premature, but that we decided we weren't going to do it unless and until we had evidence that Mack knew about the deal. [147]

This directly contradicts what the OIG reported. According to the OIG's closing memo, ''Hanson, Kreitman, Berger and Thomsen all said that the issue was not whether to take Mack's testimony, but when to take it, because they believed that it was premature to take Mack's testimony at the time Aguirre wanted to take it.''[148]

*b. Mack's Testimony Should Have Been Taken Earlier*

Two days after Morgan Stanley's Board of Directors hired Debevoise & Plimpton to vet John Mack, Debevoise partner Mary Jo White ''summoned'' John Mack from London on June 26, 2005, to answer questions on a Sunday. Gary Aguirre's supervisors at the SEC failed to ask Mack any questions until more than a year later. When asked by then-Chairman Specter why it took so long, Hanson asserted that Mack was questioned as soon as possible:

Sen. Specter: [W]hy did you wait until after the statute of limitations had expired to take Mr. Mack's testimony?

Mr. Hanson: We took Mr. Mack's testimony, as I described in my written statement, which I will ask to be made part of the record.

Sen. Specter: But that does not tell us why you waited until after the statute of limitations had expired.

Mr. Hanson: We got to it as soon as we could. The predicate to trying to figure out whether to take Mr. Mack's testimony or not was whether he had the information. [149]

It simply isn't believable that the SEC questioned Mack, ''as soon as [it] could.'' Were it not for the Kreitman-imposed pre-requisite of proving that the he knew about the GE-Heller deal before Pequot began buying Heller on July 2, 2001, Mack's testimony could have been taken much earlier. Indeed, Kreitman was eventually overruled by more senior SEC officials. Given that his pre-requisite has no objective basis in law or practice, what then is the actual reason the SEC waited so long?

When Aguirre suggested questioning John Mack in the summer of 2005, Kreitman said that he and Aguirre's other supervisors ''in-

structed him of the need for proper foundation to invoke compulsory process and that premature testimony would likely be fruitless because Mr. Mack could simply deny any illegal activity.''[150] Kreitman's statement begs the question. What is the proper foundation for the SEC to require a witness to answer questions under oath? The purpose of investigative testimony is to gather information—not, as Kreitman claimed, to confront witnesses with evidence of wrongdoing. Therefore, the necessary pre-requisite for taking testimony is a reasonable basis to believe the witness has relevant information—not whether the SEC can prove that the witness violated the law. Seeking testimony is not an accusation.

Hanson and Kreitman implicitly admitted this basic truth by their practice in approving subpoenas issued for other witness testimony in the Pequot investigation. For example, on one occasion, Aguirre provided a list of proposed subpoenas for 27 witnesses. According to Aguirre, his supervisors did not ask for evidence that the 27 individuals had access to material, non-public information.[151]

However, when it came to Mack, Aguirre's supervisors required a much higher hurdle. There were extensive questions and deliberations. Aguirre was required to write memo after memo laying out the reasons that Mack should be questioned. This requirement appears to be extremely rare. For example, Hilton Foster couldn't recall it ever occurring:

Question: In your time with the SEC, how many subpoenas have you been involved in issuing? Thousands?

Mr. H. Foster: Hundreds. Thousands. A whole bunch.

Question: And of all those subpoenas, how frequently—what percentage of those do you think you required that there be a memo drafted to justify—and I'm talking about document subpoenas and subpoenas for testimony. That you required there be a memo drafted by the staff to justify the reason for issuing the subpoena that would go up the chain of command to managers at the SEC?

Mr. H. Foster: I can't remember any.

Question: Never?

Mr. H. Foster: That's make-work. I mean, if you have—if somebody wants to know why you need the subpoena, you go and you sit down and you talk to them. I need it because of this, this, and this.[152]

When Paul Berger was asked if he had ever required a memorandum to justify a subpoena for witness testimony, he could recall an example from another case, but it had something in common with the Mack request, which Berger noted in his answer:

Question: So you don't recall whether [a memo was required] in order to get permission to issue a testimonial subpoena?

Mr. Berger: Well, we were talking about taking some testimony from individuals fairly prominent, a Senator or a former Senator, and some other individuals, and we wanted to see what we had. So I think that—I remember reading something in ad-

vance of the testimony that would support—that supported taking their testimony.

Question: You mentioned prominence just now.

Mr. Berger: Uh-huh.

Question: Is it the case that you're more likely to require a memo such as this in a case where the proposed testimony is of someone prominent?

Mr. Berger: No, I don't think so. We've done this, we've done memos in advance of people that no one would know.

Question: Can you give us an example? Mr.

Berger: Not off the top of my head.

Question: Can you get back to us on that?

Mr. Berger: I can think about it. I mean, I was there for 14 years. I was probably involved in maybe a thousand investigations, brought 400 or so investigations. I mean, that's a lot of people.

Question: Why did you mention prominence just now, though?

Mr. Berger: I don't know why I mentioned prominence.[153]

Subsequent to his interview, Berger failed to provide any examples where he required staff to draft a memo to justify taking the testimony of a non-prominent witness.

*c. Political Clout or Prominence?*

On several occasions, Gary Aguirre cited Mack's campaign contributions when discussing how he interpreted Hanson's statement about Mack's ''powerful political connections.'' For example, in his written submission to the Judiciary Committee, Aguirre included a footnote extensively documenting Mack's fundraising for President Bush.[154] Aguirre pointed to Mack's status as a '''Bush' Ranger, meaning he raised at least $200,000 for the President during the 2004 presidential campaign.''[155] The implication that Mack's fundraising for Republicans was somehow related to the decision to block the SEC from taking Mack's testimony permeated the press coverage of Aguirre's allegations.

However, in our investigation, we found no evidence that such an explicitly partisan consideration played any role in the resistance to questioning Mack. Aguirre's supervisors testified that they were unaware of Mack's political contributions until the press published stories about Aguirre's allegations, and none of the documents we examined contradicted that testimony. While Mack has primarily donated to Republicans, he has contributed to Democrats as well. For example, over the last five yeas, he reportedly gave ''$10,000 to four Democratic congressional hopefuls, including [Hillary] Clinton.''[156] Mack is now raising money for Senator Clinton's presidential campaign. Just recently, Mack invited senior staff to a Clinton fundraiser ''on the 41st floor of Morgan Stanley's headquarters in Times Square'' and urged them to give $4,600 each, ''the maximum for the 2008 presidential campaign.''[157]

Evidence we reviewed suggests that the reluctance to question Mack represents a much more subtle and pervasive problem than an individual partisan political favor. SEC officials were overly deferential to Mack—not because of his politics—but because he was an ''industry captain'' who could hire influential counsel to represent him. Aguirre wrote to Hanson in August 2005, ''You told me that Mack was 'an industry captain,' that he had powerful contacts, that [Former U.S. Attorney] Mary Jo White, [Former Enforcement Director] Gary Lynch, and others would be representing him, that Mary Jo White could contact a number of powerful individuals, any of whom could call [Enforcement Director] Linda [Thomsen] about the examination.''[158] Hanson's e-mails confirm that he was concerned about direct contacts between senior SEC officials and influential outside counsel. He wrote to Aguirre, ''Mack's counsel will have 'juice' as I described last night—meaning that they will reach out to Paul [Berger] and Linda [Thomsen] (and possibly others).''[159]

Mack's Wall Street prominence and ability to hire prestigious counsel appears to have been the driving force behind treating him with undue deference. However, we found no evidence that Mack himself had a hand in preventing or delaying his testimony. The SEC has a duty to conduct a vigorous investigation and to treat prospective witnesses equally under the law. The evidence suggests that the bar for taking other testimony in the Pequot investigation was considerably lower than it was for Mack. If he were a mid-level trader instead of the head of Morgan Stanley, it seems likely that a subpoena would have issued in short order with little or no interference from Aguirre's supervisors. Unfortunately, we have received anecdotal reports that the sort of deference Mack received is not uncommon. It is reportedly driven by a perception within the SEC, which Hanson alluded to in his e-mail, that investigations involving prominent individuals can be slowed or halted by contacts from outsiders with direct access to the most senior SEC officials. By allowing the perception that ''going over the head'' of SEC staff attorneys yields results, the SEC undermines public confidence the integrity of its investigations and exacerbates the problems associated with ''regulatory capture.''[160]

*5. The SEC Fires its Lead Investigator*

On August 24, 2005, while Aguirre was away on vacation, Kreitman sent Paul Berger an e-mail suggesting that the SEC terminate Aguirre's employment. Kreitman captioned the e-mail, ''Gary and Pequot.'' This e-mail was appended to a series of Aguirre's earlier e-mails labeled, ''Mack Testimony.''[161]

Approximately one week later, in a memorandum dated September 1, 2005, the SEC terminated Gary Aguirre's employment.[162] The termination became effective at the close of business on September 2, 2005—a mere five days shy of the end of Aguirre's one-year probationary period. According to the memorandum, the termination was based upon Aguirre's ''demonstrated inability to work effectively with other staff members and [his] unwillingness to operate within the Securities and Exchange Commission (SEC) process.''[163] Though the memorandum represents that it is from Enforcement Director Linda Thomsen, it is initialed by Paul Berger.

## D. The Investigation Shifts Focus

*1. Attempts to Identify other Potential Tippers/Tippees*

After Aguirre's supervisors interfered with his efforts to take John Mack's testimony and fired him, the investigation changed focus. James Eichner, a staff attorney in the Enforcement Division newly assigned to the Pequot case, suggested ''broadening our focus from Samberg to Pequot as a whole.''[164] Eichner recommended searching for a potential recipient of the inside information (or tippee) other than Samberg, even though Samberg testified that he directed the trades without consulting anyone else. Eichner recommended three steps: (1) have each person who knew about the deal at the five investment banks and GE-Heller identify who they knew at Pequot at the time of the deal, (2) search all Pequot e-mail to everyone at the five investment banks and GE-Heller, and (3) try to identify anyone at Pequot who got promoted soon after the GE-Heller deal. These proposed steps failed to identify any leads suggesting other likely recipients or sources of information about the acquisition.

In addition to searching for other possible tippees, the SEC also began looking for other possible tippers. Even before Aguirre left, he drafted a subpoena to CSFB aimed at identifying other potential tippers. The SEC issued the subpoena on September 1, 2005, just as Aguirre was being fired. On October 6, 2005, the SEC issued another subpoena to Pequot, also aimed, as Eichner explained, at identifying potential sources of inside information other than John Mack:

> The purpose of that subpoena was we had started to get into the Microsoft transaction, and the person who we believed was the tipper in that was David Zilkha, and he had gone from Microsoft to Pequot. . . . [W]e had a theory that Samberg was wooing Zilkha to get information from him about Microsoft. And so it seemed that maybe there had been a similar dynamic in play in regard to GE/Heller or other companies . . . that Samberg was trying to hire people who had information about companies they came from . . . then used those to get inside information. And so we subpoenaed Pequot for all of its new hires for some period, . . . and we looked hard at the people whose names were identified to see if we could find a potential tipper for GE/Heller. [165]

As with Eichner's other proposals, this effort produced no significant leads:

Question: Did you ever take any of the testimony of any of those people, that is, suspected tippers?

Mr. Eichner: We didn't take the testimony because we couldn't find enough of a connection, but we actually—I spent a fair amount of time working up those leads and trying to find connections between those people and the entities—the entities that were involved in the deal and Pequot. . . . [W]e couldn't find anyone who—we couldn't place them with the information, and we couldn't find anything that suggested that they had provided the information. So, unfortunately, it seemed like a good idea,

> and I spent a fair amount of time on it, but it didn't pan out.[166]

These unsuccessful efforts in the fall of 2005 appear to be the end of any serious SEC attempt to pursue Pequot's suspicious trading in advance of the GE-Heller acquisition.

*2. Dropping the Microsoft Trades*

When we initially asked the SEC in early 2006 whether it was pursuing the GE-Heller aspects of the Pequot investigation after having fired Gary Aguirre, the SEC said that the investigation had shifted to focus on the Microsoft trades as more likely to lead to an enforcement action.[167] Given this statement and the draft Wells notice, the SEC appeared to be on the verge of an enforcement action. Eichner wanted to share the draft Wells notice with prospective defendants for the purpose of extracting an agreement to extend the statute of limitations.[168] The SEC, Pequot, Samberg, and Zilkha agreed to extend the statute of limitations for any SEC enforcement action.[169]

However, the SEC never filed an enforcement action. Therefore, we sought to determine what changed and why. When asked why the Microsoft case never progressed, SEC Enforcement Assistant Director Mark Kreitman said the case weakened because of two factors: (1) Zilkha was an unreliable witness, and (2) Goldman Sachs had provided some of the same information to Pequot that Zilkha had, before publishing it in an analyst report.[170] According to Kreitman, these two reasons served to dampen what had previously been pretty significant interest by the U.S. Attorney in the Microsoft trading:

> They lost interest as soon as they got a taste of Zilkha, unfortunately. They were very enthusiastic at first, and that's what Gary [Aguirre] got the big Perry [Mason award] for, his presentation to the U.S. Attorney, getting them interested in Microsoft. . . . So, we lost the support of the U.S. Attorney in the case, and I think rightfully so. I think it became a civil case you couldn't try, much less a criminal case.[171]

Moreover, Kreitman suggested that Eichner's draft Wells notice was premature and suggested that Eichner's plan to use the draft to encourage defendants to enter an agreement as to the statute of limitations was somehow inappropriate.[172]

## E. The Universe Shifted: Returning to the GE-Heller Trades

*1. The Decision to Finally Question John Mack*

After firing Aguirre, the Enforcement Division appeared to lose interest in John Mack until the Pequot investigation became public. With the exception of a single subpoena issued on the effective date of Aguirre's termination, the SEC did virtually nothing to investigate John Mack as the potential tipper in Pequot's GE and Heller Financial trading. Only after the *New York Times* printed Aguirre's allegations and he testified before the Senate Judiciary Committee did the SEC begin to re-evaluate Mack as the potential tipper in June 2006.[173]

As it became clear that the SEC would have to answer more detailed questions about its handling of the case, it took the testimony of two CSFB executives who had recruited John Mack. Taking their testimony was the SEC's first step toward preparing to take Mack's testimony in the nine months since Aguirre was fired. As Eichner described it:

Mr. Eichner: [I]n June the *Times* article came out about all of this. And so after that, there was a discussion—I mean, *the universe sort of shifted* a little bit, and so after that there were discussions about sort of . . . what more needed to be done on the case and what should be done[.]

* * *

Question: And so was that testimony [of CSFB executives] in preparation—the purpose of that testimony was to prepare for the John Mack testimony?

Mr. Eichner: It was a precursor. I mean, it was supposed to be—yes, it was supposed to help us. . . . So that was the sole purpose of those two gentlemen, was sort of to explore this issue about whether Mack got the information in their recruitment period.

The way in which the SEC approached the testimony of these CSFB executives does not suggest that it was taken very seriously. For example, Mark Kreitman did not assign an attorney to take the testimonies until less then two days before they were scheduled.

On Monday, July 24, 2006, Kreitman asked Staff Attorney Liban Jama to take the testimonies, which were scheduled for following Thursday, July 27, 2006. Jama was uncomfortable with the request and sent a carefully worded e-mail to Kreitman around noon on July 24, asking that someone else be assigned to the task:

> [G]iven the critical nature of the testimony that is to be taken, the lack of preparatory time for the testimony . . . and my lack [of] specific knowledge of the record regarding this portion of the investigation, I would not feel comfortable taking the testimony this Thursday. . . . [I]f I was given a sufficient period of time to familiarize myself with the documents . . . and sufficient preparatory time . . . I would be willing to pitch in. My goal, as always, is to do [a] complete and thorough job on any matter.[174]

In his interview with Senate staff, Jama described his conversations with his colleagues about the request:

> I don't remember who I spoke to. I know I talked to other folks just to say, in general . . . I got a request to take some testimony and I have . . . a day-and-a-half. . . . I do remember saying, ''Is a day and a half enough time, in your opinion, if you haven't been involved?'' ''No'' was the universal response.[175]

By contrast to his colleagues, Jama described Kreitman's attitude toward taking this ''critical'' testimony as oddly nonchalant:

> He said, ''You don't need to prepare that much for it,'' which I found to be strange, and I relayed that to folks. So, yeah, he didn't feel like I needed to be prepped, . . . which I thought was unusual in my mind.
>
> * * *
>
> I just thought it was an unusual request to make of me—and, quite frankly, unfair. I thought he put me in a difficult position.[176]

Following Jama's e-mail, Kreitman re-assigned the duty to James Eichner. Eichner took the testimony of the two CSFB executives and, on August 1, 2006, he took John Mack's testimony.

When asked why the Enforcement staff failed to pursue investigative leads on Mack sooner, Eichner, stated:

> After the events of the previous fall, we hadn't really focused on him as—we had not focused on him as a tipper or as a potential tipper. We were focusing on other things. So there was a—once there was a lack of evidence that he had information, he ceased to be a primary focus of the investigation.[177]

The five-year statute of limitations for any Department of Justice criminal enforcement action against Pequot, Samberg, and Mack expired on or around July 27, 2006, leaving only the potential for the SEC to obtain other remedies such as disgorgement.[178] When the SEC finally did take Mack's testimony on August 1, 2006, it did so five days *after* the statute of limitations period applicable to civil and criminal penalties expired.

*2. Unasked Questions: The Mack Transcript*

During the interview with the SEC, Mack, among other things, denied having any foreknowledge of the GE acquisition of Heller until after he began working at Credit Suisse First Boston on or around July 13, 2001—nearly two weeks after Samberg began purchasing large volumes of Heller stock, and about two weeks before the public announcement of the deal.

During his August 1, 2006 testimony, Mack claimed that Samberg had asked him to invest in an opportunity called ''Fresh Start''[179] because Pequot could not invest anymore than it already had. However, e-mail exchanges between Samberg and others at Pequot suggest that the courtship was in the other direction. In short, according to Pequot e-mails, Mack was ''busting chops'' to invest in Fresh Start and some were unhappy that Samberg allowed him to do so. Eichner did not inquire about this apparent contradiction, nor did the SEC seriously test the Aguirre's theory that investment in Fresh Start was a reward for inside information. For example, the SEC did not determine whether Mack's participation in Fresh Start diluted Pequot's profits or whether Pequot faced some limitation on the amount it could invest in the deal and genuinely needed additional capital from Mack. Although Mack testified to the SEC that he ''doubled'' his money in the Fresh Start deal,[180] it appears more accurate that he more than tripled his $5 million investment. None of the SEC investigators who testified before the Judiciary Committee or in interviews with staff have refuted this

fact which tends to suggest a potential motive for Mack to tip Samberg about the GE acquisition of Heller.

### F. The SEC's Case Closing Report

On November 30, 2006, the SEC Division of Enforcement issued a Case Closing Report (''Report'') in the Pequot investigation.[181] The seven-page Report describes the SEC's findings related to: (1) insider trading ahead of the GE acquisition of Heller, (2) insider trading in Microsoft, (3) insider trading in AstraZeneca and Par Pharmaceutical, (4) Pequot's Private Investment in Public Equities (''PIPES''), and (5) concerns about potential market manipulation through wash sales.

*1. GE-Heller*

The SEC investigation into Pequot's GE-Heller trades had three primary phases: (1) summer of 2005, (2) September 2005 through December 2005, and (3) June 2006 until the investigation was closed on November 30, 2006. During the period from December 2005 through June 2006, ''the focus of the insider trading case shifted to Microsoft, where it remained until June 2006.''

Aguirre was the lead SEC investigator on the case during the first period. The closing memo describes this period as follows:

> Emails . . . suggest that Mack spoke by telephone with Samberg about a potential investment the night of Friday, June 29, 2001, the business day before Pequot began purchasing Heller, but that the conversation related to an unrelated non-public company.[182] Credit Suisse First Boston . . . an investment adviser to Heller in the transaction, hired Mack as its CEO on July 12, 2001, ten days after Pequot began to buy Heller stock. However, counsel for CSFB advised the staff that the CFO of CSFB who met with Mack before Mack joined CSFB did not have deal information on specific pending deals on which CSFB was working.[183]

The Report indicates that Mack could not have learned about the deal from the Chief Financial Officer of CSFB and leaves the impression that the CFO was his only potential source of information. In fact, there were other potential sources of information whom the SEC never interviewed and whom the Report never mentions.

In the months after Aguirre was fired, SEC Enforcement staff took no testimony concerning the GE-Heller trades. After Aguirre's allegations were publicized in June 2006, however, the SEC Enforcement staff reversed course. Beginning in late July, ''the staff took the testimony of two CSFB employees, a former CFO and a company lawyer, who were both involved in recruiting Mack.''[184] Both witnesses denied knowing about the GE acquisition of Heller before it was publicly announced and both denied telling Mack anything about it.[185] On August 1, 2006, SEC staff took John Mack's testimony. Mack ''denied knowing about the merger before he became CSFB's CEO in mid-July 2001 and denied having any discussions with Samberg or anyone else at Pequot about the merger before it was announced.''[186] Finally, on September 8, 2006, SEC Enforcement staff ''took the testimony of an analyst at a brokerage

firm who provided . . . coverage on Heller during the relevant time period, appeared to have met with Pequot in June 2001 shortly before Samberg started buying Heller, and went to work at Pequot in early 2002.''[187] Once more, the witness denied having any inside information and the SEC found nothing to contradict him.

The case closing report concludes its analysis of the GE-Heller trades by finding, among other things, that ''it is extremely unlikely that Mack tipped Samberg about the merger between GE and Heller, having found no evidence that Mack knew about the merger before Samberg started purchasing Heller stock.''[188] How hard did the SEC look for such evidence? Significantly, the case closing report fails to mention Mack's trip to Switzerland on June 26-28, 2001, to meet with Credit Suisse officials about the prospect of Mack accepting a position as CEO of CSFB. This was the period just before he spoke with Samberg and was let in on the Fresh Start deal. During his August 1, 2006, testimony, Mack confirmed that a copy of his Swiss trip itinerary indicated that he met with other Credit Suisse personnel who may have had knowledge of the GE-Heller deal.[189] During the Judiciary Committee's December 5, 2006, hearing, then-Chairman Specter asked Mr. Hanson about Mack's trip to Switzerland:

Sen. Specter: Was Mr. Mack questioned about that, Mr. Hanson?

Mr. Hanson: Of course.

Sen. Specter: And what did he say?

Mr. Hanson: That the information that Mr. Aguirre alleged or speculated that Mr. Mack may have had was so far down in the weeds for Mr. Mack.

Sen. Specter: So far down in the weeds?

Mr. Hanson: It was so far removed from what he was doing with respect to negotiating with CS First Boston [sic] that it had no relevance to him. Not only that, but the people from CS First Boston that we talked to and received e-mails from said that there is no possible way that they had the information, let alone passed it on to Mr. Mack.

However, the SEC did not question the individuals from Credit Suisse who met with Mack during that trip. While on the trip, Mack met with numerous Credit Suisse officials and discussed various management issues.[190] Mack denied receiving any information concerning the GE-Heller deal during any of the many meetings with named Credit Suisse representatives. However, at one point during Mack's testimony he was asked the following question and gave the following answer:

Question: During that trip to Switzerland in 2001 or any of the contacts you had with representatives of Credit Suisse or First Boston, up until the time you began work, did anyone convey any information to you about a transaction involving GE and Heller?

Mr. Mack: Not that I remember.[191]

Mack was hired as the CEO of CSFB during the second week of July 2001. Shortly thereafter, Mack believes a CSFB banker named Bob Clymer must have told him about the upcoming GE-Heller deal.[192] When asked whether he knew of the deal prior to its public announcement on July 30, 2001, Mack testified, ''I'm sure I knew about the trade; yes.''[193]

The most significant aspect of the Mack testimony is his acknowledgement that he went to Switzerland to discuss becoming CSFB's CEO from July 26-28, 2001. While there, Mack met with senior representatives of Credit Suisse—CSFB's parent company. In view of the fact that Mack also spoke with Samberg immediately upon his return to the United States on July 29, 2001, the trading day before Samberg began heavily betting on Heller Financial stock, and on the same night Mack was permitted into a lucrative deal, there was more than a sufficient basis to justify taking Mack's testimony in the summer of 2005.

*2. Microsoft*

Despite the evidence, the SEC closed the Microsoft investigation and discounted the trades as unworthy of an enforcement action. Among other things, the SEC cited the unreliability of Zilkha as a witness. It is unclear, however, why a case would be harder to make rather than easier if one of the potential defendants lacked credibility. The SEC also cited the fact that other Microsoft-related information was in the marketplace and could theoretically have spurred Samberg's trades and the fact that Goldman Sachs provided Pequot early access to information on Microsoft that it later published in an analyst's report, which may have been the basis of Pequot's trading rather than information from Zilkha. Nevertheless, James Eichner indicated just before the SEC issued its Case Closing Report his continued belief that Pequot had done something improper if not technically illegal in its Microsoft trading:

> [M]y opinion was certainly that Samberg thought he was getting inside information and trading on it. That was my opinion and continues to be my opinion. . . . I think Samberg thought he was committing insider trading, but it's not clear that he was, in fact, committing insider trading.
>
> * * *
>
> [A]t the end, you know, when I was trying to get my ducks in a row on materiality and a couple other things, it kind of fell apart. But then we thought, well, they got this Goldman stuff, too, and that looks bad so let's look at that. Maybe they traded based on both the Zilkha tip and the Goldman thing. So then we did the Goldman piece, and then that turns out not to be— you know, it turns out to be Goldman policy [to provide certain clients advanced access information in unpublished analyst reports] and not illegal.
>
> * * *
>
> [I]t seems terribly unfair to me[.] . . . [W]hat I learned from this whole thing is that, you know, people at Pequot, they get a lot of good information from a lot of sources that allows them

> to make money. And, you know, it's no wonder a lot of these hedge funds do really well. I mean, they give Goldman tons of money in brokerage commissions, and Goldman gives them the best information, and the poor schmoes out there, that is a tough hurdle, but, you know, it's not against the law, and that's the limit of our authority. . . . I don't speak for the SEC on this, but, I mean, I think Samberg committed insider trading on Microsoft[.]
>
> * * *
>
> I mean, I came to agree at the end that—what I'm saying is I think if you asked me in my heart of hearts, hold a gun to my head, did he do it or not, I would say yes. But I don't— I mean, I don't think we could try this case. You know, I don't think we could win the case[.][194]

If Eichner's assessment is accurate, then perhaps these circumstances illustrate a need to consider whether changes in the law are necessary to ensure a more even playing field in our public markets. In any event, given the apparently inculpatory e-mails from Samberg telling Zilkha, (e.g. ''I shouldn't say this, but you have probably paid for yourself already!'') it is difficult to understand why the SEC would not, at bare minimum, invite Pequot, Samberg and Zilkha to respond to a Wells notice.

*3. AstraZeneca and Par Pharmaceutical*

In its closing memo, the SEC described its reasoning for ultimately deciding not to pursue further investigation into the AstraZeneca and Par Pharmaceutical trades: ''It seems unlikely that Pequot had inside information about the court decision because it made investment decisions contrary to that information in the weeks leading up to the decision.''[195] Specifically, the SEC contends that Pequot bought Par after it bought AstraZeneca, which it would not have done had it been tipped about the outcome of the patent case.

However, this contention ignores the information included in the SEC's own formal order memorandum that there were two potential insider trading events rather than just one: (1) a September earnings announcement, that caused Par stock to rise suddenly, and (2) the October court decision which caused Par stock to fall suddenly. The analysis in the SEC's closing memo neither addresses nor acknowledges the first event. Instead, the memo claims that, ''staff's initial inquiry presented an incomplete and *misleading* picture of Pequot's trading in the stocks of Astra and Par.''[196] While the description of the trades in the formal order of investigation adopted by the SEC may have been incomplete, as one would expect at the outset of an investigation, we found no evidence that the description was misleading. In fact, one could argue that the SEC's closing memo was itself misleading in its use of Pequot's September purchases of Par to excuse the October sales. The SEC does not reference the fact that the September purchase preceded a positive earning report or that it was a separate instance of potential insider trading for investigation. Nor does the SEC explain

why it presumably concluded that the September purchases were not themselves insider trading.

### G. Conclusion

The investigation of Pequot Capital Management could have been an ideal opportunity for the SEC to develop expertise and visibility into the operations of a major hedge fund while deterring institutional insider trading and market manipulation through vigorous enforcement. Instead, the SEC squandered this opportunity through a series of missteps, including (1) unnecessary delays, (2) understaffing, (3) excluding many of the suspicious transactions, (4) allowing inadequate and untimely document production, (5) disclosing case information to John Mack's prospective employer, Morgan Stanley, and (6) preventing the staff from questioning Mack until after the statute of limitations had expired.

As will be discussed in the next section, Associate Director Paul Berger contacted Debevoise & Plimpton about potential employment just days after he initialed Aguirre's termination notice. Even though Debevoise had represented Mack's employer, Morgan Stanley, Berger did not recuse himself until four months later, in early 2006. Although Robert Hanson testified that the SEC took Mack's testimony, ''as soon as we could,'' it appears that the SEC did very little to investigate Mack's potential role in the period between Aguirre's firing in September 2005 and Berger leaving the Commission in the spring of 2006.

**Figure 1**

| Date | Buy Heller or Short GE | Shares Sought | Shares Purchased | Daily Total Volume | Shares Sought as % of Daily Volume | Shares Purchased as % of Daily Volume |
|---|---|---|---|---|---|---|
| July 2 | Buy Heller | 223,700 | 118,000 | 388,900 | 57.52% | 30.34% |
| July 3 | Buy Heller | 101,100 | 77,200 | 271,800 | 37.20% | 28.40% |
| July 5 | Buy Heller | 18,100 | 10,000 | 175,400 | 10.32% | 5.70% |
| July 9 | Buy Heller | 15,000 | 15,000 | 149,000 | 10.07% | 10.07% |
| July 10 | Buy Heller | 455,300 | 110,900 | 375,600 | 121.22% | 29.53% |
| July 11 | Buy Heller | 336,500 | 91,400 | 158,200 | 212.71% | 57.77% |
| July 12 | Buy Heller | 242,300 | 101,300 | 485,100 | 49.95% | 20.88% |
| July 13 | Buy Heller | 111,900 | 50,000 | 709,900 | 15.76% | 7.04% |
| July 17 | Buy Heller | 287,500 | 187,500 | 448,300 | 64.13% | 41.82% |
| July 18 | Buy Heller | 90,100 | 50,000 | 174,600 | 51.60% | 28.64% |
| July 19 | Buy Heller | 55,600 | 30,000 | 264,700 | 21.00% | 11.33% |
| July 20 | Buy Heller | 508,100* | 75,000 | 963,700 | 52.72% | 7.78% |
| July 23 | Buy Heller | 480,400 | 60,400 | 389,800 | 123.24% | 15.50% |
| July 24 | Buy Heller | 418,500 | 38,500 | 221,600 | 188.85% | 17.37% |
| July 25 | Buy Heller | 373,300 | 73,000 | 283,600 | 131.63% | 25.74% |
| July 25 | Short GE | 766,600 | | | | |
| July 26 | Buy Heller | 302,900 | 50,000 | 416,600 | 72.71% | 12.00% |
| July 26 | Short GE | 385,200 | | | | |
| July 27 | Buy Heller | 243,900 | 10,000 | 92,700 | 263.11% | 10.79% |
| July 27 | Short GE | 385,500 | 20,000 | | | |
| July 30 | GE announces purchase of Heller Financial. | | | | | |
| July 30 | Samberg sells all holdings—1,148,200 shares—of Heller Financial. | | | | | |
| August 1 | Samberg covers his short sells of GE. | | | | | |

* Likely value. Trader notes were somewhat unclear.


Figure 2
Samberg's Trades in Heller in July 2001
GE Announces Purchase of Heller.
Samberg sells all holdings in Heller.
Percentage of Total Daily Volume
300.00%
250.00%
200.00%
150.00%
100.00%
50.00%
0.00%
July 2
July 5
July 10
July 13
July 17
July 20
July 23
July 25
July 27
July 30
Date
Shares Sought
Shares Purchased

**ENDNOTES**

1. SEC 7209, Arthur Samberg, Chief Executive Officer, Pequot Capital Management, Inc., testimony (May 3, 2005) (Exhibit 1).
2. *Id.* at SEC 7242.
3. *Id.* at SEC 7245-46, 7249.
4. *Id.* at SEC 7250
5. *Id.* at SEC 7272.
6. Nikhil Deogun, *GE Capital to Acquire Heller Financial,* WALL ST. J., July 30, 2001, at A3.
7. ''Short selling'' or ''shorting'' is a way to profit from the decline in price of a security. Usually, investors ''go long'' on an investment, meaning they purchase shares in hopes that the price will rise. To profit from the stock price going down, short sellers borrow a security and sell it, expecting that it will decrease in value so that they can buy it back at a lower price and keep the difference.
8. SEC 7267, Samberg testimony (May 3, 2005) (Exhibit 1).
9. *Id.* at SEC 7272.
10. Memorandum from Walter G. Ricciardi to file (June 15, 2006) (Exhibit 2).
11. SEC 7159-62, NYSE Advisory Memorandum to the SEC (Jan. 30, 2002) (Exhibit 3).
12. SEC 7266, Samberg testimony (May 3, 2005) (Exhibit 1).
13. *Id.* at 7268-69 (describing Heller's ten percent growth rate, ''the attractiveness of the franchise,'' and several other factors).
14. *Id.* at 7269.
15. *Id.* at 7272.
16. *Id.* at 7274.
17. Examining Enforcement of Criminal Insider Trading and Hedge Fund Activity, 2006: Hearing Before the Senate Comm. on the Judiciary, S. HRG. 109-898, at 708 (Dec. 5, 2006) (hereinafter ''S. HRG. 109-898'').
18. SEC 7159-62, NYSE Advisory Memorandum to the SEC (Jan. 30, 2002) (Exhibit 3).
19. S. HRG. 109-898, at 966 (Foster Tr.).
20. *Id.* at 544 n.182.
21. *Id.* at, at 1103-04 (Ribelin Tr.).
22. Transcribed Interview with Paul Berger, Associate Director of Enforcement Division, SEC, at 74-75 (Nov. 2, 2006) (Exhibit 4) (hereinafter ''Berger transcript (Nov. 2, 2006)''); Transcribed Interview with Mark Kreitman, Assistant Director, Division of Enforcement, SEC, at 17-18 (Sept. 6, 2006) (Exhibit 5) (hereinafter ''Kreitman transcript (Sept. 6, 2006)'').
23. S. HRG. 109-898, at 193, 314 (May 9, 2005 e-mail from Gary Aguirre, May 3, 2005 e-mail from Eric Ribelin: ''It's my strong belief that gary needs the assistance of another attorney. Hilton is on his way out fast and gary is absolutely swarmed under'').
24. *See,* General Accounting Office, *SEC Operations: Increased Workload Creates Challenges,* GAO 02-302 (Mar. 2002).
25. *See,* S. HRG. 109-898 at 337 (SEC Case Closing Report n.12) (noting, *inter alia,* ''Section 9(a)(1) of the Exchange Act prohibits certain manipulative practices, including wash sales and matched orders, when such transactions are done for the purpose of creating the false or misleading appearance of active trading in a security listed on a national securities exchange, or a false or misleading appearance with respect to the market for any such security'').
26. S. HRG. 109-898 at 337 (SEC Case Closing Report at 5) (emphasis added).
27. *See* S. HRG. 109-898, at 337 (SEC Case Closing Report at 5).
28. Transcribed Interview with Robert Hanson, Branch Chief, Division of Enforcement, SEC, at 132-34 (Nov. 9, 2006) (hereinafter ''Hanson transcript (Nov. 9, 2006)'') (Exhibit 6).
29. SEC 0753, Memorandum from Tom Conroy to file (Aug. 3, 2005) (Exhibit 7).
30. An ''agency cross'' is a trade that has only one agent acting for both the buyer and the seller.
31. SEC 0753, Conroy memo (Aug. 3, 2005) (Exhibit 7).
32. SEC 0753, Conroy memo (Aug. 3, 2005) (Exhibit 7).
33. *Id.* (emphasis added).
34. SEC 4919-23, Memorandum from Craig Miller, Tom Conroy, and Eric Ribelin to file (Nov. 14, 2005) (Exhibit 8).
35. SEC 4919-23, Miller, Conroy, and Ribelin memo (Nov. 14, 2005) (Exhibit 8).
36. *Id.* at 4919.
37. *Id.*

38. *Id.* (emphasis added).
39. *Id.*
40. *Id.* at 4920.
41. *Id.* at 4923.
42. *Id.*
43. SEC 4924, E-mail from Joseph Cella to Larry Bergmann and James Brigagliano (Nov. 4, 2005) (Exhibit 9).
44. *Id.*
45. *Court Finds that two Prilosec® Formulation Patents are Valid—3 of 4 Defendants Found to Infringe*, PR NEWSWIRE ASSOCIATION, Oct. 14, 2002.
46. S. HRG. 109-898, at 336 (SEC closing memo, Nov. 30, 2006).
47. Memorandum from the Division of Enforcement to the Commission (Dec.16, 2004) (Exhibit 10).
48. S. HRG. 109-898, at 336 (SEC closing memo, Nov. 30, 2006).
49. E-mail from Gary Aguirre to Richard Grime and Charles Cain (Nov.1, 2004), e-mail from Gary Aguirre to Hilton Foster (Nov. 2, 2004) (Exhibit 11).
50. E-mail from Charles Cain to Aguirre (Nov. 1, 2004) (Exhibit 11).
51. S. HRG. 109-898, at 336 (SEC closing memo, Nov. 30, 2006).
52. Transcribed Interview with James Eichner, Attorney, Division of Enforcement, SEC, at 48-53 (Nov. 14, 2006) (hereinafter ''Eichner transcript (Nov. 14, 2006)'') (Exhibit 12).
53. *See* SEC 2868-76 (Exhibit 13). According to one authority, ''[t]he 'Wells submission' process represents a critical phase in SEC investigations. These submissions provide prospective defendants the opportunity to dissuade the SEC from bringing formal actions against them; likewise, the Commission and its staff rely upon the arguments contained in these submissions when making their charging decisions.'' Joshua A. Naftalis, *'Wells Submissions' to the SEC as Offers of Settlement Under Federal Rules of Evidence 408 and their Protection from Third-Party Discovery*, 102 COLUM. L. REV. 1912, 1912 (2002).
54. *See* Transcribed Interview with Mark Kreitman, Assistant Director, Division of Enforcement, SEC , at 81 (Nov. 15, 2006) (hereinafter ''Kreitman transcript (Nov. 15, 2006)'') (Exhibit 14).
55. Eichner transcript, at 48-49 (Nov. 14, 2006) (Exhibit 12); Kreitman transcript, at 65-66 (Nov. 15, 2006) (Exhibit 14).
56. Eichner transcript, at 51 (Nov. 14, 2006) (Exhibit 12) (noting his ''opinion was certainly that Samberg thought he was getting inside information and trading on it. That was my opinion and continues to be my opinion.'').
57. SEC 2868-69 (internal numbering omitted) (Exhibit 13).
58. *Id.* at SEC 2871 (emphasis added, internal numbering omitted).
59. S. HRG. 109-898, at 601.
60. *Id.* at 562, 601. *See also* SEC 3875 (Exhibit 16).
61. S. HRG. 109-898, at 266. *See*, 15 U.S.C. 78q(b).
62. SEC 5653-57, e-mail to Eric Ribelin (Feb. 25, 2005) (Exhibit 15)
63. SEC 3875 (Exhibit 16).
64. S. HRG. 109-898, at 579.
65. *Id.* at 562.
66. *Id.* at 601.
67. SEC 3875 (Exhibit 16).
68. *Id.*
69. Berger transcript, at 71-73 (Nov. 2, 2006) (Exhibit 4); *see also* Kreitman transcript, at 56 (Sept. 6, 2006) (Exhibit 5).
70. Kreitman transcript, at 56 (Sept. 6, 2006) (Exhibit 5).
71. *Id.* at 60-61.
72. S. HRG. 109-898, at 30, 33.
73. Kreitman transcript, at 61-63 (Sept. 6, 2006) (Exhibit 5).
74. SEC/OIG Document Production at 0323 (Exhibit 17).
75. Kreitman transcript, at 63 (Sept. 6, 2006) (Exhibit 5); S. HRG. 109-898, at 71 n.158.
76. Kreitman transcript, at 65 (Sept. 6, 2006) (Exhibit 5); *see also*, SEC 6765-67, letter from James Eichner to Audrey Strauss (Oct.20, 2005) (Exhibit 18).
77. S. HRG. 109-898, at 1112.
78. *Id.* at 645.
79. SEC 7267-70, Samberg testimony (May 3, 2005) (Exhibit 1).
80. SEC 7579-83, Arthur Samberg, Chief Executive Officer, Pequot Capital Management, Inc., testimony (June 7, 2005) (Exhibit 19).
81. Transcribed Interview with James Eichner, Attorney, Division of Enforcement, SEC, at 61-64 (Sept. 1, 2006) (hereinafter ''Eichner transcript (Sept. 1, 2006)'') (Exhibit 20). Hilton Foster, a retired SEC attorney who has ''trained thou-

sands of people'' on how to conduct insider trading investigations, told us that he decided to use this section of Aguirre's Samberg examination in his training sessions. S. HRG. 109-898, at 1010, 1024-1025 (Foster Tr.). *See* SEC 7553-83, Samberg testimony (June 7, 2005) (Exhibit 1).

82. Berger transcript, at 75-76 (Nov. 2, 2006) (Exhibit 4).
83. 15 U.S.C. § 78u(d).
84. *See United States v. Moses*, 2005 U.S.Dist. LEXIS 40187 (Aug. 31, 2005), aff'd, *2007 U.S. App. LEXIS 178* (11th Cir. Jan. 5, 2007).
85. *See* Senate Committee Report on Foreign Corrupt Practices Act, S. Rep. No. 114, 95th Congress, 1st Session 12 (1977).
86. Kreitman transcript, at 73 (Nov. 15, 2006) (Exhibit 14). Kreitman explained to Aguirre that he typically gave three versions of the award, each of which was a different size photo to signify different levels of achievement. ''The Big Perry'' was the largest of the three. S. HRG. 109-898, at 548-49.
87. S. HRG. 109-898, at 602-611 (SEC 871-80).
88. *Id*. at 659 (SEC 3770).
89. SEC 3742 (note: capitalization has been corrected when quoting e-mails) (Exhibit 21).
90. SEC 3764 (Exhibit 22).
91. S. HRG. 109-898, at 659 (SEC 3770).
92. *Id*. at 529 (Aguirre's Written Testimony) (modification in original).
93. *Id*. at 529 n.116.
94. *Id*. at 611 (SEC 0880).
95. *Id*. at 612 (SEC 0907).
96. *Id*. at 613 (SEC 0908).
97. *Id*.
98. *Id*. at 1002.
99. *Id*. at 986.
100. *Id*. at 1008.
101. *Id*. at 1088-89.
102. *Id*. at 1089-90.
103. *Id*. at 1102.
104. *Id*. at 1118.
105. *Id*. at 1201.
106. *Id*. at 1118.
107. *Id*. at 1127.
108. *Id*. at 1125-27.
109. Transcribed Interview with Joseph Cella, Chief, Office of Market Surveillance, SEC, at 4 (Sept. 7, 2006) (hereinafter ''Cella transcript (Sept. 7, 2006)'') (Exhibit 23).
110. *Id*. at 20.
111. *Id*.
112. *Id*. at 24.
113. *Id*. at 29.
114. *Id*.
115. *Id*. at 30.
116. *Id*. at 38.
117. *Id*. at 40.
118. *Id*. at 50-52.
119. Hedge Funds and Independent Analysts: How Independent are Their Relationships?, 2006 Hearing before the Senate Comm. on the Judiciary, S. HRG. 109-696, at 34 (June 28, 2006) (hereinafter ''S. HRG. 109-696'').
120. *Id*. at 36 (''When I brought up the possibility of issuing a subpoena with [my branch chief, Hanson], he told me that Mack—that this would be very difficult, Mack had very powerful political connections. He would not authorize it and I would have to speak with Kreitman.'').
121. *Id*. at 93.
122. *Id*.
123. *Id*. at 35.
124. Compare Kreitman transcript, at 76-77 (Sept. 6, 2006) (Exhibit 5) with Berger transcript, at 103-104 (Nov. 2, 2006) (Exhibit 4).
125. Transcribed Interview with Mary Jo White, Partner, Debevoise & Plimpton, at 9-10 (Sept. 25, 2006) (hereinafter ''White transcript (Sept. 25, 2006)'') (Exhibit 24).
126. *Id*. at 10.
127. *Id*. at 9.

128. *Id.* at 9-10, 22.
129. SEC 3702 (Exhibit 25).

130. S. HRG. 109-898, at 534.
131. White transcript, at 12, 15 (Sept. 25, 2006) (Exhibit 24).
132. S. HRG. 109-898, at 535-36 (Aguirre: ''Had Thomsen or Berger directed Kreitman to block the Mack subpoena based on e-mails White had delivered to Tbomsen? If so, why was Thomsen making decisions that could unravel the investigation without a complete briefing?'').
133. Transcribed Interview with Linda Thomsen, Director, Division of Enforcement, SEC, at 86 (Sept. 8, 2006) (hereinafter ''Thomsen transcript (Sept. 8, 2006)'') (Exhibit 26).
134. Transcribed Interview with Paul Berger, Associate Director of Enforcement Division, SEC, at 25, 31 (Nov. 7, 2006) (hereinafter ''Berger transcript (Nov. 7, 2006)'') (Exhibit 27).
135. S. HRG. 109-898, at 944-52 (emphasis added).
*136. Id.*
137. SEC/OIG Document Production at 0444 (Exhibit 28).
138. S. HRG. 109-696, at 35.
*139. See* Section VII.B, *infra.*
140. Kreitman transcript, at 107-1-08 (Sept. 6, 2006) (Exhibit 5).
141. S. HRG. 109-898, at 331.
142. *Id.; see also id.* at 242 (Kreitman indicating ''I have indicated repeatedly that concrete evidence of when Mack obtained access to material nonpublic information re the GE/Heller deal is the *sine qua non* for focused investigation of Mack'').
143. S. HRG. 109-898, at 1008-09 (Foster Tr., emphasis added).
144. SEC/OIG Document Production at 0002 (Exhibit 29).
145. Berger transcript, at 97-98 (Nov. 7, 2006) (Exhibit 27).
146. SEC 2989 (Exhibit 30).
147. Eichner transcript, at 128-1-29 (Nov. 14, 2006) (Exhibit 12); *see also* Memorandum from Walter G. Ricciardi to file (June 15, 2006) (Exhibit 2).
148. SEC/OIG Document Production at 0002 (Exhibit 29).
149. S. HRG. 109-898, at 29.
150. *Id.* at 20.
151. *Id.* at 455.
152. *Id.* at 1001-02 (Foster Tr.).
153. Berger transcript, at 53-54 (Nov. 7, 2006) (Exhibit 27).
154. S. HRG. 109-898, at 510 n.3.
*155. Id.*
156. Emily Thornton and Richard S. Dunham, *John Mack Backs Clinton,* BUS. WEEK, May 7, 2007, at 13.
157. Ben White, *Ex-Bush Donor Hosts Clinton Fundraiser,* FIN. TIMES, July 16, 2007, at 5.
158. S. HRG. 109-898, at 662-66 (SEC 5749)
159. *Id.* at 662-63 (SEC 5748).
160. *See,* Mark Jickling, Congressional Research Service, *Barriers to Corporate Fraud: How They Work, Why They Fail,* at 37 (Dec. 27, 2004).
161. S. HRG. 109-898, at 830-34 (SEC/OIG 0367-74).
162. *Id.* at 828-29 (SEC 001243-121243-45).
163. *Id.* at 828 (SEC 1243).
164. SEC 3641 (Exhibit 31).
165. Eichner transcript, at 16-17 (Nov. 14, 2006) (Exhibit 12).
166. *Id.* at 17-18.
167. Memorandum from Walter G. Ricciardi to file (June 15, 2006) (Exhibit 2).
168. *See* Eichner transcript, at 46-47, 50 (Nov. 14, 2006) (Exhibit 12).
169. *See, e.g.,* unsigned tolling agreements at SEC 2888-91 (Exhibit 32).
170. Kreitman transcript, at 65-66 (Nov. 15, 2006) (Exhibit 14).); S. HRG. 109-898, at 335 (According to the SEC's Case Closing Report: ''To examine whether Goldman's actions were themselves improper, the staff obtained information from Goldman and in early June took the testimony of two Goldman employees. Both told the staff that during this time they regularly provided research information to Goldman customers [such as Pequot] in advance of publishing this information, and that Goldman policy explicitly allowed this practice.).
171. Kreitman transcript, at 73-74 (Nov. 15, 2006) (Exhibit 14).
172. *Id.* at 95-96, 98 (emphasis added).

173. Walt Bogdanich and Gretchen Morgenson, *S.E.C. is Reported to be Examining a Big Hedge Fund*, N.Y. TIMES, June 23, 2006, at A1.
174. SEC 2877 (Exhibit 33).

175. Transcribed Interview with Liban Jama, Attorney, Division of Enforcement, SEC, at 90 (Oct. 11, 2006) (hereinafter ''Jama transcript (Oct. 11, 2006)'') (Exhibit 34).
176. Jama transcript, at 94-95 (Oct. 11, 2006) (Exhibit 34).
177. Eichner transcript, at 39-40 (Nov. 14, 2006) (Exhibit 12).
178. *See United States v. O'Hagan,* 139 F.3d 641 (8th Cir. 1998) (citing 18 U.S.C. § 3282 for relevant criminal statute of limitations). Similarly, the SEC's ability to bring a case for civil penalties pursuant to 15 U.S.C. § 78u-1 was also extinguished on this date.
179. SEC 1919, John Mack, Chief Executive Officer, Morgan Stanley, testimony (Aug. 1, 2006) (Exhibit 35).
180. *Id.* at SEC 1921, Mack testimony (Aug. 1, 2006) (Exhibit 35).
181. *See* S. HRG. 109-898, at 333-38 (SEC Case Closing Report, Nov. 30, 2006).
182. The ''unrelated non-public company'' was Fresh Start—an investment in which, according to Aguirre's testimony, Mack more than tripled his $5 million investment.
183. S. HRG. 109-898, at 334 (SEC closing memo, Nov. 30, 2006) (internal notes omitted).
184. *Id.*
185. *See id.*
186. *Id.*
187. *Id.*
188. S. HRG. 109-898, at 335 (SEC closing memo, Nov. 30, 2006)
189. *See* SEC 1845-46, Mack testimony (Aug. 1, 2006) (Exhibit 35).
190. *See generally* SEC 1845-64, Mack testimony (Aug. 1, 2006) (discussing Mack's meetings with Lukas Muhlemann, Walter Kielholz, Daniel Vasella, Thomas Wellauer, Oswald Grubel, Peter Brabeck, and Aziz Syriani—all Credit Suisse managers, directors or board members) (Exhibit 35).
191. SEC 1869, Mack testimony (Aug. 1, 2006) (Exhibit 35).
192. *Id.* at SEC 1870.
193. *Id.*
194. Eichner transcript, at 51-65 (Nov. 14, 2006) (Exhibit 12)
195. S. HRG. 109-898, at 336 (SEC closing memo, Nov. 30, 2006).
196. *Id.* (emphasis added).

# VII. Gary Aguirre's Employment at the SEC

## A. Background

Prior to his application for employment with the SEC, Gary Aguirre enjoyed a long and successful career in both the public and private sectors. After earning his law degree from the University of California, Berkley in 1968, Aguirre served as a public defender in San Diego, California for several years before entering private practice. During his private sector career, Aguirre successfully argued 95 consecutive complex cases worth more than $200 million in total awards including three securities fraud class actions.[1] In the majority of these cases, he served as lead counsel.[2] During this time, Aguirre also published widely and made numerous presentations on civil litigation and advocacy law.[3] Having earned substantial sums as a partner at Aguirre & Eckmann, he later retired.[4]

Wanting to re-enter public service, at age 61, Aguirre enrolled in the Georgetown University Law Center in 2001.[5] While a student at Georgetown, Aguirre focused on financial regulation and securities law. He received numerous honors while at Georgetown, including the second place prize in a prestigious national writing competition and the top grade in his Financial Reporting and Accounting class. He was described by Professor Mark Kreitman, who later became Aguirre's supervisor at the SEC, as the ''best student he had ever had.''[6] After two years of study, Aguirre received an LLM with distinction, concentrating in securities regulation and international law. He then applied for employment at the SEC.

### *1. Applications for Employment and EEO Claim*

The SEC rejected Aguirre's first 23 applications for employment. During his application processes, Aguirre received top ratings in the categories of reasoning ability, writing ability, relevant work experience, enthusiasm for SEC, and knowledge of securities law. He also received the next-highest rating in the category of ''poise-maturity.'' Another interviewer noted Aguirre to be ''one of the most qualified candidates [he'd] interviewed.''[7] Nevertheless the SEC declined repeatedly to hire him. Aguirre then filed a complaint with the EEO office of the SEC charging discrimination.[8]

Immediately following Aguirre's EEO complaint, the SEC contacted him to set up an interview and offered to hire him as a ''superior qualifications appointment.''[9] Despite being hired, Aguirre did not withdraw his complaint. On June 14, 2006, an administrative law judge entered an Order and Judgment in favor of the SEC on Mr. Aguirre's age discrimination claims after evaluating the claims in a 19-page decision.[10]

*Transfer to another Branch Chief*

Gary Aguirre began employment at the SEC's Division of Enforcement on September 7, 2004, as a general attorney. He initially worked under Charles Cain and Richard Grimes, the branch chief and assistant director of his branch. Soon after starting, he was assigned to work on allegations of insider trading by the hedge fund Pequot Capital Management, Inc.

In October 2004, Aguirre was asked to prepare a draft formal order memorandum regarding the Pequot insider trading investigation. A formal order is the procedure by which the SEC authorizes staff to conduct a full-fledged investigation. In the prepared draft submitted to Cain on October 6, Aguirre included the language, ''over the past two years, SROs have referred or 'highlighted' at least six matters involving possible insider trading by the Pequot Management and one or more of Pequot Funds to the Division of Enforcement.''[11] The following day, Cain delivered revisions to Aguirre, removing the sentence and replacing it with, ''subsequent investigation by the staff identified at least six transactions involving possible insider trading by the Pequot Management and one or more Pequot Funds.'' In a subsequent interview, Berger described that he understood this exchange to be over ''a rather routine memorandum to the Commission on a relatively ministerial matter.''[12]

Aguirre explains the issue quite differently. Aguirre recalled, ''I told Cain that the revision about SRO referrals . . . was not accurate because it suggested that I had uncovered six insider trading matters, when in fact those had been discovered by SROs and had been referred to the SEC.''[13] According to Aguirre, Cain responded that ''the memorandum was not going to state that Joe Cella [The Director of Market Surveillance] had been informed but had failed to act'' on the SRO referrals. The following morning, on October 8, 2004, Aguirre explained his concerns in an e-mail to Cain and Grimes:

> The proposed revisions . . . [are] unsupportable. Neither I nor anyone on the staff has discovered an insider trading transaction involving Pequot. Yes, I have prepared a spreadsheet of suspected Pequot insider trading activity since 1999 . . . in each one of those 11 cases, an *SRO identified* the transaction and referred it to Enforcement (Market Surveillance), where it stopped. Under these circumstances, the quoted revision is not merely unsupportable; it could be the source of embarrassment or worse for each of us. [14]

Grimes subsequently agreed to Aguirre's changes, yet the incident contributed to Aguirre's decision to request a branch transfer two months later.

On January 10, 2005, Aguirre wrote a letter to Associate Director Paul Berger formally asking to be transferred to another branch. He requested that he be transferred to another branch.[15] Telling Berger that he would prefer to be in his former Georgetown professor's section, Aguirre wrote, ''I understand that there will be an opening in Mark Kreitman's section in the near future and I would appreciate being transferred there if possible.''[16]

After running a draft response by SEC personnel officials, Berger replied to Aguirre's request in an e-mail on January 13, writing ''Mark Kreitman's assistant director does not have an opening right now.''[17] Aguirre was transferred to Kreitman's section on January 18, 2005, notwithstanding Berger's January 13 e-mail suggesting the absence of an opening.

*3. Positive Performance Evaluations*

On June 1, 2005, Aguirre received a performance evaluation from Mark Kreitman. The evaluation covered Aguirre's performance from October 2004 to April 2005, and rated performance in four critical elements: knowledge of field or occupation, planning and organizing work, execution of duties, and communications. In each category, the rating official had the option of rating an employee ''acceptable,'' or ''unacceptable.'' On Aguirre's June 1 evaluation, his performance was rated ''acceptable'' in each of the four categories.[18] However, Kreitman claimed to Senate staff that '' 'acceptable' is a pretty low threshold . . .'' and checking ''unacceptable'' would have been ''too heavy a hammer at that point . . .''[19]

Having been evaluated at an ''acceptable level,'' Aguirre qualified for a merit pay increase. On June 29, 2005, Robert Hanson transmitted an evaluation of Aguirre to the Enforcement Division's Compensation Committee.[20] On the cover sheet, the supervisor is given four options in making recommendations: (1) made contributions of the highest quality, (2) made contributions of high quality, (3) made contributions of quality, and (4) made no significant contribution beyond an acceptable level of performance. In the June 29 evaluation, Hanson checked ''made contributions of high quality,'' and attached an evaluative narrative praising Aguirre's work ethic and performance:

> Gary worked extremely hard on one investigation during his time in the group, a significant matter involving the trading by Pequot Capital, one of the nation's largest hedge funds. Gary has an unmatched dedication to this case (often working well beyond normal work hours) and his efforts have uncovered evidence of potential insider trading and possible manipulative trading by the fund and its principals. He has been able to overcome a number of obstacles opposing counsel put in his path on the investigation. Gary worked closely with the Office of Compliance Inspections and Examinations to develop the case and worked with several self-regulatory organizations to develop a number of potential leads. He has consistently gone the extra mile, and then some.[21]

Hanson also offered a critique of Aguirre, saying that he ''can work on presenting information in a clearer and more concise manner to enhance effectiveness. . . .''[22] The evaluation recommending Aguirre for a merit pay increase was then transmitted to the Compensation Committee.

*4. Merit Pay Increase*

The decision whether to grant a merit pay increase is decided by the Compensation Committee, which consists of all the associate directors, the chief counsel, the head of regional operations, the chief

litigation counsel, and the deputy litigation counsel.[23] The Compensation Committee met on July 18, 2005. While SEC witnesses were unable to recall details of the process leading up to Aguirre's merit pay increase, the SEC has confirmed that the Compensation Committee gave its recommendations to Linda Thomsen on July 19, 2005.[24] Then, on July 27, Thomsen completed the merit pay process for the Enforcement Division, which then transmitted the final results to the Office of Human Resources on August 1, 2005. On August 21, 2005, the Associate Executive Director of the Office of Human Resources approved a Form 50-B Notification of Personnel Action raising Aguirre's total salary from $130,257 to $134,110.[25]

### B. Objections to Blocking Mack Testimony

For the reasons explained earlier, at least three experienced SEC officials believed in the summer of 2005 that questioning John Mack was an appropriate next step in the Pequot Investigation.[26] These officials included Director of Market Surveillance Joseph Cella, Market Surveillance Branch Chief Eric Ribelin, and a former Branch Chief responsible for training SEC staff attorneys on how to conduct insider trading investigations, Hilton Foster. However, none of these officials were in Aguirre's direct line of supervision. Aguirre's direct supervisor was Robert Hanson. Hanson reported to Mark Kreitman, and Kreitman reported to Paul Berger.

At first, Aguirre's supervisors did not seem overly deferential to John Mack. For example, after Aguirre's initial June 3, 2005 e-mail suggesting Mack as a potential tipper in Pequot's GE-Heller transactions, Robert Hanson replied that he believed Mack was ''another bad guy in my view.''[27] Two weeks later, on June 14, Aguirre briefed his supervisors on his progress in the investigation, including the aspects relating to John Mack.[28] Mark Kreitman gave Aguirre a ''Perry Mason Award'' in recognition of his work on the case and then instructed him to brief criminal authorities in the Southern District of New York. Following Aguirre's presentation, authorities in the Southern District opened their own investigations. On the evening of June 20, Robert Hanson again expressed approval of Aguirre's pursuit of the theory that Mack may have tipped Arthur Samberg about the GE-Heller acquisition. In an email with the subject line, ''Pequot: Connecting the dots with the CSFB-Mack-Samberg-theory,'' Hanson wrote to Aguirre, ''Okay Gary you've given me the bug. I'm starting to think about the case during my non-work hours.''[29]

However, his supervisors' attitudes shifted dramatically, beginning on June 23, 2005. That is the date when officials from Morgan Stanley began contacting the SEC to learn about the potential impact of the investigation on its prospective CEO, John Mack.[30] According to Aguirre, June 23 was also the date that his direct supervisor, Robert Hanson, first said it would be difficult to subpoena John Mack because of his ''powerful political connections.''

#### *1. Supervisor's Reference to Mack's ''Powerful Political Connections''*

As discussed earlier, it appears that the driving force behind the reluctance to question John Mack was not a partisan consideration. Rather, Aguirre's supervisors cited his prominent position on Wall

Street and the ability of his counsel to appeal directly to very senior SEC officials, bypassing staff attorneys.[31] However, in order to assess the reasonableness of Aguirre's reaction to the controversy over Mack, it is necessary to examine whether Aguirre's supervisor actually used the word ''political'' when referring to Mack's clout and connections. If so, then one might view Aguirre's reactions to be more reasonable.

An apparent admission of such a blatantly partisan political favor by the SEC might, in the view of some people, justify a more drastic reaction than indications of a more subtle form of deference to prominent witnesses. For example, Aguirre initially resigned, but later withdrew his resignation in order to resist his supervisors' decision regarding Mack. If no one told Aguirre that decisions were being made based on Mack's ''politics,'' then his resignation and withdrawal could arguably be viewed as a sign of instability. However, if someone did refer to Mack's politics, then his resignation and withdrawal should arguably be viewed in a more favorable light.

Aguirre alleged that Robert Hanson referred to Mack's political connections in several conversations about taking his testimony. Regardless of what Hanson may have meant, there is evidence suggesting he said that his concerns about questioning Mack were ''political.'' The first instance occurred on June 23. Aguirre said that ''in a face-to-face meeting'' that day, Hanson said it would be very difficult to get permission to question Mack because of Mack's ''powerful political connections.''[32]

Aguirre reported Hanson's June 23 ''political connections'' comment to Hanson's supervisors, Paul Berger and Mark Kreitman in a July 27, 2005 e-mail, marked urgent:

> I sent two e-mails to Bob during the week of June 20 (see attachments 3 and 8) proposing that we proceed with the Mack testimony and broaden the CSFB subpoena. When I did not hear back from Bob, I spoke with him directly about these proposals. Bob told me (1) that these decisions were for Mark to make and (2) *it would be an uphill battle because Mack had powerful political connections.* Bob also mentioned this concern during a meeting with Mark and me.[33]

When asked about this e-mail by Senate investigators in 2006, Hanson claimed not to remember making the comment:

Question: And what about number two, ''it would be an uphill battle because Mack had powerful political connections?''

Mr. Hanson: That doesn't sound like something I would say.

Question: So you don't think you said that?

Mr. Hanson: I don't think so, no.

Question: You don't recall saying that?

Mr. Hanson: I do not.

* * *

Question: So you never told him at any time that it would be an uphill battle to subpoena Mr. Mack?

Mr. Hanson: That doesn't sound like something I would say. It's possible, but it doesn't sound like something I would say.

Question: You don't recall saying it?

Mr. Hanson: I do not.[34]

He denied the comment more directly when questioned by the SEC Office of Inspector General in 2005.[35]

Later, in August 2005, the evidence suggests Hanson again referred to Mack's political connections during conversations about taking his testimony. For example, on the evening of Wednesday, August 3, 2005, Aguirre and Hanson discussed the issue at some length. Their e-mails the following morning provide a near contemporaneous account of what was said. Aguirre described the conversation in his August 4 e-mail as follows:

> I came to your office last night to discuss Pequot because, as I told you, I realized we would not be seeing each other for the next month.
>
> * * *
>
> I told you that Mark was not listening to the rationales for the steps I had proposed in the Pequot investigation, that this represented a major shift that occurred overnight in our relationship, that we had an excellent relationship before, [and] that I believe other people at the Commission were involved in Mark's sudden shift[.]
>
> * * *
>
> Second, I told you that the decision not to take Mack's testimony because of his powerful political connections was the event that triggered my decision [to resign]. We then discussed at some length what standard had to be met to take Mack's testimony. You told me that Mack was ''an industry captain,'' that he had powerful contacts, that [Former U.S. Attorney] Mary Jo White, [Former SEC Director of Enforcement] Gary Lynch, and others would be representing him, that Mary Jo White could contact a number of powerful individuals, any of whom could call [Director of Enforcement] Linda [Thomsen] about the examination. I told you I did not believe we should set a higher standard for a political captain than anyone else.
>
> * * *
>
> You also mentioned, *as you did last night,* that Mack's testimony would be difficult because Mack had *powerful political connections.* For that reason, the political hurdle, I spent a big chunk of my weekend preparing two lengthy memos . . . suggesting that we focus on [Mack] to eliminate him or establish it was in fact him.[36]

In Hanson's reply, he explained that part of his reticence to take Mack's testimony had to do with the ability of Mack's counsel to bypass staff attorneys at his level and appeal directly to senior SEC management:

> As a general matter I try to alert folk above me about significant developments in investigations that may trigger calls and the like so that they are not caught flat footed. I also think that Paul [Berger] and Linda [Thomsen] would want to know if and when we are planning to take Mack's testimony so that they can anticipate the response, which may include press calls that will likely follow. Mack's counsel will have ''juice'' as I described last night—meaning that they will reach out to Paul and Linda (and possibly others).[37]

It seems clear that Hanson was more reluctant to take the testimony of someone whose counsel could get the ear of the Director of Enforcement than he would be of someone whose counsel did not have that kind of ''juice.'' However, it is not clear why a discussion about the merits of taking Mack's testimony would turn on the question of keeping supervisors informed. When asked why he responded to Aguirre's concerns about improper political influence by referring to the need to keep supervisors informed, Hanson provided no clear rationale.[38]

On a third occasion, just before he was fired, Aguirre wrote to Hanson alleging that Hanson had spoken of Mack's ''political clout.'' On the morning of August 24, 2005, Aguirre's supervisors began sending e-mails about firing him.[39] With no knowledge of those e-mails, Aguirre wrote to Hanson later that day, ''before and after the Mack decision, you have told [me] several times that the problem in taking Mack's exam is his political clout, e.g., all the people that Mary Jo White can contact with a phone call.''[40] Hanson's reply appeared to admit using the phrase and then, again, attempted to explain what he meant by it:

> Most importantly *the political clout I mentioned to you* was a reason to keep Paul and possibly Linda in the loop on the testimony. As far as I know politics are never involved in determining whether to take someone's testimony. I've not seen it done at this agency. It does make sense though to have all your ducks in a row before approaching a significant witness like Mack. Hence, the reason to try and figure out a number of things about him before scheduling him up, not least of which is whether he knew about the deal.[41]

Before sending this e-mail in which he admits using the phrase, Hanson drafted a shorter, much different reply: ''My recollection is different about a couple of things. Most importantly I have not said that the problem is Mack's political clout.''[42] However, there is no indication that Hanson ever sent this reply, as it was recovered from his ''drafts'' folder.

When asked about the e-mail he did send, Hanson indicated he did not recall using the phrase:

Question: [M]y question is: do you recall using the phrase ''political clout'' in a conversation with Gary Aguirre?

Mr. Hanson: I don't. It's possible I used it, but it just doesn't sound like something I would say.

* * *

Question: So why did you use the term ''political clout'' in your response to Mr. Aguirre?

Mr. Hanson: I'm responding to his use of that term. If you look at, he responds and says political clout meaning all the people that Mary Jo White could contact with a phone call.

* * *

Question: You don't think that you independently said it previous to his using the term?

Mr. Hanson: It's possible, but it doesn't sound like something I would say. It is possible. Again, as far as I know, politics aren't involved in the decision to take someone's testimony.[43]

By contrast, in his written testimony submitted at the Judiciary Committee's December 5, 2006, hearing, Hanson reversed himself and again appears to admit using the phrase:

> Accordingly, consistent with my general practice, I made Mr. Kreitman aware that we were considering taking Mr. Mack's testimony. I explained this practice to Mr. Aguirre, perhaps inartfully *choosing the words ''juice'' and ''political clout''* to describe the fact that any influential counsel Mr. Mack chose could easily pick up the phone and call my supervisors about the case and I wanted them to be fully aware of the facts before answering any calls.[44]

Hanson's equivocation and inconsistent statements are unpersuasive. His only clear denials that he referred to Mack's political connections occurred (1) in an e-mail which was drafted, but never sent, in response to Aguirre's third written objection, and (2) in his interview with the OIG during their investigation. If Hanson did talk about Mack's political clout in connection with his testimony, then Aguirre would be justified in resisting that sort of special treatment and refusing to take part in it.

The weight of this evidence suggests that Hanson likely referenced Mack's ''political connections,'' ''political clout,'' or words to that effect. The evidence suggests Hanson did so on multiple occasions in conversations about taking Mack's testimony during the summer of 2005, beginning around the same time as Morgan Stanley's inquiries about the SEC's interest in Mack on June 23. However, the evidence also suggests Hanson was not referring to partisan political considerations, but rather to his prominence and his ability to hire counsel with direct access to senior SEC officials.

*2. Notice and Withdrawal of Resignation*

In late June, Aguirre saw his supervisors suddenly reverse themselves, putting the brakes on the Pequot investigation just after Morgan Stanley contacted senior SEC officials to inquire about John Mack's exposure. Aguirre saw himself and others involved in

the day-to-day aspects of the investigation excluded from more senior SEC contacts with Morgan Stanley. Aguirre also heard his direct supervisor explicitly state that it would be hard to take Mack's testimony because of his political connections. Aguirre's initial reaction to these circumstances was to resign on principle.

On Monday, June 27, Aguirre sent an e-mail summarizing the Pequot investigation and his reasons for suspecting that Arthur Samberg acted on material non-public information in the GE-Heller trades and that the tipper may have been John Mack .[45] On the morning of Tuesday, June 28, he sent a more detailed e-mail outlining five areas for further investigation of how Samberg may have learned information about the pending GE-Heller acquisition. The e-mail included proposed steps aimed at testing his theory that Mack may have been the tipper, as well as exploring Samberg's other possible sources of information.[46] On Tuesday, June 28, Aguirre and Kreitman had a ''heated discussion'' about Kreitman's refusal to authorize Aguirre to take John Mack's testimony.[47] Aguirre returned to his office and drafted an e-mail to Kreitman explaining specifically why he believed that taking testimony from Mack would be the next logical step. The e-mail confirms that Kreitman had denied not only Aguirre's request to take Mack's testimony, but also his request to issue a subpoena to obtain documents from CSFB:

> Your refusal to permit this testimony, along with other limitations, has significantly affected this investigation.
>
> * * *
>
> I have proposed that we obtain the documents from CSFB that would show when Mack obtained information about GE-HF. . . . Evidence that Mack learned near or on Friday June 29, [2001] the night of his call to Samberg, would tend to focus the matter more on Mack. Evidence that he did not learn until July 3 or never learned would eliminate him.
>
> * * *
>
> I understand you have denied my request to proceed with the CSFB and Mack subpoenas.[48]

Kreitman did not reply to this e-mail until nearly four weeks later. After sending the e-mail, Aguirre met with Associate Director Paul Berger. He had sent Berger an e-mail the previous day asking if Berger had an ''open door policy'' and requested a meeting.[49] At the meeting, Aguirre expressed his concerns about being prevented from taking Mack's testimony and told Berger of his intention to resign after completing the Pequot investigation. However, Aguirre did not specifically refer to Hanson's statements about Mack's political connections.[50] The next morning, Thursday, June 30, Aguirre verbally tendered his resignation notice to Paul Berger. That same day, Morgan Stanley announced it had hired John Mack. In response to requests from his supervisors for a certain departure date, Aguirre agreed to stay at the Commission through the end of September. Aguirre sent an e-mail to assure Berger that he would not neglect his duties during his remaining time at the SEC.

Aguirre wrote, ''I just want to assure you that Pequot will get 110% between now and September 30th.''[51]

Aguirre continued to work on the case during the first few weeks of July and continued to find evidence pointing to the need to question John Mack. During these weeks, Eric Ribelin encouraged Aguirre to withdraw his resignation and help pursue the investigation.[52] By late July, Aguirre had decided to stay and challenge his supervisors to follow the investigation wherever the facts led. On or around July 21, 2005, Aguirre had another conversation with Berger about the roadblocks to questioning John Mack. According to Aguirre, he ''met with Berger and told him that Hanson had informed me the Mack subpoena had been blocked because of Mack's powerful political connections.''[53]

As Aguirre describes the conversation, Berger took personal offense at the suggestion that political influence was a factor in the decision about Mack's testimony. Aguirre told Berger that the reason he was concerned about improper political influence was because he had specifically been told that Mack's political connections were an issue. Berger replied, ''Who told you that?'' Aguirre answered, ''Bob [Hanson].''[54] However, when asked about this conversation, Berger claimed not to recall Aguirre informing him of Hanson's comments:

> I had two conversations that I can remember with Gary where he mentioned Mack's influence, neither one I think he mentioned political influence. Gary presented it in terms of we were afraid to take his testimony,
>
> * * *
>
> I don't remember him talking about Bob Hanson or what Bob Hanson said, but I do remember him saying that, you know, he felt that Mark and Bob were afraid to take this guy's testimony, and I think he used the word ''afraid,'' and that Mack had a lot of influence.[55]

If the conversation occurred as Aguirre claimed, it seems unlikely that Berger would not recall an allegation as serious as the one against Hanson. Nor is it likely that he would fail to recall his own offense at the suggestion or his question about who gave Aguirre the idea that Mack's political clout was an issue. However, as was Aguirre's usual practice, he documented his allegation in an e-mail shortly thereafter.[56]

On Monday of the following week, July 25, 2005, Mark Kreitman finally replied to Aguirre's June 29 e-mail on proposed subpoenas to Mack and CSFB. On the heels of Aguirre's second, more pointed confrontation with Paul Berger over the Mack issue, Kreitman's belated reply asked Aguirre for ''greater specificity.'' Kreitman also claimed that he did not deny permission to subpoena CSFB:

> The fact of Mack's transfer from Morgan-Stanley to CSFB, without information about when he was over the wall, is insufficient justification for compelled testimony and intrusive subpoenas at this point, in my view. . . . The evidence of motive you cite may have substance, but it's too vague as articulated to be meaningful. . . . I have at no time ''denied [your] request

> to proceed with the CSFB . . . subpoena.'' To the contrary, I have indicated repeatedly that concrete evidence of when Mack obtained access to material nonpublic information re the GE-Heller deal is the *sine qua non* for focused investigation of Mack.[57]

If Kreitman had not denied Aguirre's request to subpoena CSFB for documents on July 29—when he denied the request to subpoena Mack for testimony[58]—then it is difficult to understand why he waited nearly four weeks before correcting Aguirre on that point. The most charitable conclusion from these circumstances is that Kreitman's failure to communicate in a clear and timely manner caused inordinate delay in a case where the statute of limitations would soon become a problem.[59] Another view is that the timing of Kreitman's reply was prompted by Aguirre's conversation with Berger.

Not surprisingly, Kreitman's e-mail prompted Aguirre to respond. On the morning of Wednesday, July 27, 2005, Aguirre sent an e-mail to Berger rescinding his previous resignation.[60] Then Aguirre sent a comprehensive e-mail to Berger and Kreitman. It replied to Kreitman point-by-point and supplied a comprehensive set of supporting documents. His e-mail also provided formal, written notice of his claims about what Hanson had said about Mack's political influence:

> I also believe Mack's testimony should have been taken promptly for the same reason that staff normally takes early testimony of suspected participants in an insider trading investigation—to pin them down. This is particularly true here because CFSB and Morgan Stanley are still producing e-mails. . . . Further delay allows Mack to concoct a story that is consistent with the information contained in the e-mails. On the other hand, if he did not provide information, that also may become clear. As discussed in my June 28 e-mail to Mark . . . this would allow us to focus on other possible sources for the tip.
>
> I had different and more troubling input why it was difficult to move ahead with the second CSFB subpoena and the Mack testimony. I sent two e-mails to Bob during the week of June 20 . . . proposing that we proceed with the Mack testimony and broaden the CSFB subpoena. When I did not hear back from Bob, I spoke with him directly about these proposals. Bob told me (1) that these decisions were for Mark to make and (2) *it would be an uphill battle because Mack had powerful political connections.* Bob also mentioned this concern during a meeting with Mark and me. . . . Bob also met privately with Paul about the investigation I was handling. Likewise, Mark and Bob did not invite me to participate in the meeting on June 27 when they discussed Mack's possible testimony. *This combination of events suggests to me that the issue whether Mack's testimony would be taken was being handled differently than the same issue for other witnesses in this investigation* and different from the same issue in other investigations. Further, I do not believe that treating Mack differently is consistent with the Commission's mission, at least as I understand it.[61]

When asked about this e-mail and what he did after receiving it, Berger's responses indicate that he failed to take the allegations seriously. Essentially, Berger did nothing to ensure that the allegations were thoroughly and independently reviewed:

Question: In your mind, does this constitute an allegation of wrongdoing?

Mr. Berger: If someone was preventing someone from taking testimony because of certain influence where we thought it was appropriate to take the testimony, I think it's something that is of concern, yes. But as I said, you know, I talked with Gary about it, and I talked with Mark about it. We all, you know, concluded that that's not what was happening and, in fact, we were going to take the testimony.

* * *

Question: And my question to you is: Do you believe that's an allegation of wrongdoing that needed to be brought to someone else's attention? And what, if anything, did you do to bring it to anyone else's attention?

Mr. Berger: Well, I think I've told you now several times what I did is I had a conversation with Gary about this. We talked about it.

* * *

What I did subsequent to that was I talked with Mark [Kreitman] about this again. I had more than one conversation with Mark about the influence issue. And, you know, Mark assured me there is nothing about influence that was preventing us from taking testimony.

* * *

Question: Did you forward this e-mail to Linda Thomsen?

Mr. Berger: I don't remember if I did or not.

* * *

Question: Did you refer it to the Inspector General?

Mr. Berger: No.

Question: Did you consider referring it to the Inspector General?

Mr. Berger: No.

Question: Why not?

Mr. Berger: Because I took the actions that I thought were appropriate.[62]

Apparently, Berger did not advise Hanson to stop talking about Mack's political clout because Hanson did it again just a few days later on August 3, 2005.[63]

### C. Terminating Gary Aguirre

It is unclear when the SEC supervisors first gave consideration to terminating Gary Aguirre. His decision to stay at the SEC and challenge what he believed to be inappropriate special treatment for John Mack was certainly followed by a rapid deterioration of the relationship with his supervisors. Through the month of August, Aguirre continued to make the case for taking Mack's testimony and responding to his supervisors' arguments and objections, although the pace of the investigation generally slowed because of overlapping annual leave taken that month by various staff, including Aguirre. The first record of anyone suggesting his termination is an August 24, 2005 e-mail from Kreitman to Burger. Aguirre was fired on September 2, while on vacation.

*1. Accusations of a ''Coup,'' August 1, 2005*

Just a few days after Aguirre withdrew his resignation and sent his comprehensive July 27 e-mail, Robert Hanson and Paul Berger had a conversation that would lead to an attempt to undo Aguirre's positive performance evaluations, which had already been submitted and approved by the Compensation Committee. On August 1, his supervisors drafted a negative re-evaluation of Aguirre and one other employee: John Smith.[64] Aguirre and Smith had one thing in common: they had both complained about the way Mark Kreitman managed his group. Aguirre had just complained by email on July 27 about Hanson and Kreitman blocking Mack's testimony. Smith had complained on July 21 about another case in an e-mail to his supervisor, Dave Fielder (who, like Hanson, reported to Mark Kreitman). Smith wrote to Fielder regarding a matter apparently related to a mutual fund market timing investigation involving Mario Gabelli. Smith indicated that he believed a contact may have occurred between Gabelli's counsel, Vince DiBlasi, and Director of Enforcement Linda Thomsen:

> Could you quietly find out from Mark why he over-reacted . . . last night?
>
> My sense is Vince DiBlasi—because Mario Gabelli is mad he has to answer questions—called . . . Linda [Thomsen] with some misrepresentations, which went to Paul [Berger.] . . . Since you have the e-mail, I suspect you can find out innocently. You should know that Mario Gabelli is mad because . . . he doesn't think he should have to answer our questions— even though we have e-mails showing he approved timing arrangements, involving quid pro quo exchange for timing capacity, with . . . two of the leading groups caught by Spitzer . . . and the staff isn't getting adequate support. We should be unified here, not questioning one another from within.
>
> Mark's reaction fed into DiBlasi's strategy, since it left us feeling undermined. That [is] a recurring problem here, but I want to make sure I have the right facts in this particular instance before drawing any conclusions. If it is DiBlasi he should be put in his place, not treated solicitously (for reasons we can discuss). If not, I am somewhat troubled by Mark's way of handling this. If this were the first, or the second, or the tenth

> time, I wouldn't write. Who wants to? I have better things to do, as I'm sure you do.
>
> * * *
>
> In any event, the staff just [did] not get the kind of support it needs here. *[Redacted names],* Aguirre, and perhaps others, have all become disturbed at their treatment. I do not want my name used in this breath, but it's not any fun to come to work. It's sad, because it could be a great place.[65]

Smith's complaints in this e-mail seem remarkably similar to Aguirre's. Just as in the Pequot case, it appears as if someone outside the Commission went over the staff attorney's head and contacted the Director of Enforcement. Just as in the Pequot case, the outside contact to senior SEC officials was followed by a disagreement between Kreitman and a staff attorney. And just as in the Pequot investigation, the staff attorney who objected received a negative re-evaluation shortly thereafter. Despite Smith's request to keep his concerns confidential, Fielder forwarded Smith's e-mail to Mark Kreitman at 3:42 p.m. on Monday, August 1, 2005.[66]

Paul Berger also knew about Smith's concerns. Earlier that morning, he asked Robert Hanson about them. As Hanson explained to Committee investigators:

> I met with Paul Berger that morning of August 1st. He called me probably about 8:30 or so in the morning, called me down to his office, so I went down to his office.
>
> He said I'd like to talk to you about Mark Kreitman. He said, I have heard some complaints about Mark Kreitman, his management style or something to that effect. I want you to keep this on a confidential basis, but I feel as though I need to look into this. So tell me about Mark Kreitman, what is your view on him?
>
> I said, before you go any further, I'd like to just say that there [are] two employees whose input you should heavily discount. I mentioned Gary and this other individual that also had gotten a supplemental review.
>
> We talked about, Paul and I probably talked for a half hour to 45 minutes, somewhere in that range. We talked about those individuals. Paul asked about them and he asked what their ratings were, or what I had given them for ratings. I told him, and he said— . . . I told him I gave them the second from the top.[67]

In this narrative, Hanson describes a discussion that began as an attempt to investigate complaints about a manager, which Berger quickly shifted toward a discussion about the performance evaluations of the individuals who had lodged the complaints. Hanson then went on to describe Aguirre and Smith as disloyal employees, criticizing and plotting against Mark Kreitman:

Question: What did you tell him about them as to why he should discount their input?

Mr. Hanson: At that point, which was August lst, Gary was no longer talking to Mark, and [Smith] or . . . the other individual, excuse me, was looking to raise trouble in my view with ——

Question: Is the other individual [John Smith]?

Mr. Hanson: Yes, it is. He was also clearly at odds with Mark and Mark's management style. From my vantage, it might look like they were meeting together and talking about things. I just thought it was improper that they would be *doing a coup* against Mark. I thought both of their work was not so great, and expressed those kinds of views to Paul. He asked what I evaluated them as, and I told him that it was the second from the top. . . . He said, you're [not] doing them any favors or you're not doing the Commission any favors by giving them those ratings. I agreed, and actually apologized to Paul a number of times because I agreed that my evaluations were somewhat inflated with respect to those two individuals. He suggested that we write a supplemental evaluation that was more candid than what was written in the evaluations that I had told him. That day, Mark and I drafted supplemental evaluations for those two individuals.

Question: What do you mean by ''a *coup?''*

Mr. Hanson: I think they were trying to do damage to Mark or have Mark removed as a manager, or something to that effect.

Question: Did they have complaints about him, is that what you mean? Did they have complaints about any misconduct on his part? Or what do you mean?

Mr. Hanson: I could see them, well, particularly one of the individuals, I could see him talking with other people and complaining about Mark. He complained a lot about Mark.

Question: Just to clarify, is that Mr. Aguirre, or [Mr. Smith]?

Mr. Hanson: [Mr. Smith]. I could see them in the hallways talking a lot about things, and what I suspected.

Question: About what things?

Mr. Hanson: I don't know what they were talking about, but they were certainly very vocal in their criticisms of Mr. Kreitman. . . . So in terms of the time of August, it was clear that the relationships were very poor between Mark and Gary. [Mr. Smith] was also very critical of Mr. Kreitman.[68]

Being critical of a manager or a manager's decision, however, is not necessarily the same thing as poor job performance.

The Compensation Committee had already met nearly two weeks before the conversation between Hanson and Berger. It had reviewed employee evaluations and made merit pay decisions.[69] Berger was on that Committee. He had already seen and approved merit pay decisions based on the evaluations of Aguirre and Smith. It is difficult to imagine a legitimate need at that point to re-evalu-

ate *only* these two employees. For Berger to ask about the performance evaluations of these two employees in this context is disturbing. When coupled with Hanson's allegations of a ''coup'' and their negative re-evaluations later that day, the retaliatory purpose of the re-evaluations appears evident.

*2. The Negative Re-Evaluations*

*a. Timing*

Shortly after Berger's and Hanson's confidential early morning meeting, Mark Kreitman apparently learned of Berger's desire for negative re-evaluations to be prepared. He began drafting them at 10:54 a.m., sent a first draft to Robert Hanson at 12:13 p.m., and received comments back from Hanson at 1:13 p.m.[70] A few hours later, Dave Fielder forwarded Kreitman a copy of Smith's confidential July 21 e-mail complaining about Kreitman undermining staff attorneys following outside contacts with senior officials such as Thomsen and Berger.[71] At 6:17 p.m., Kreitman sent his draft re-evaluations to Fielder. He wrote, ''Paul has asked for supplementation of these two evaluations.''[72] One minute later, Kreitman sent the negative re-evaluations to Berger. He wrote, ''My draft, Bob's comments included. Will have [Dave Fielder's], if any, tomorrow morning.''[73] It is unclear whether Fielder provided any comments. Just 13 minutes later, Kreitman sent the following e-mail to Paul Berger:

> Though I emphasize that I don't discount, indeed welcome, constructive criticism regardless of the source, my inquiries of Bob and Dave concerning their sense of the morale of the group lead me to believe that it continues to be strong, with the obvious exception of [John Smith] and Gary [Aguirre.]
>
> * * *
>
> I will of course continue to monitor the group for signs or expressions of dissatisfaction with their work environment, including but not limited to the style and substance of my management.[74]

When asked if he learned of Aguirre's and Smith's complaints directly from Berger, Kreitman said, ''I think so. I don't specifically recall, but I would assume that's the case because I addressed this e-mail to Paul [Berger].''[75] The close connections between the complaints by the employees and the negative re-evaluations that followed strongly suggests that the motivation for the latter was retaliation for the former—not a legitimate attempt to objectively assess job performance.

The re-evaluations were not an authorized part of the SEC's evaluation process.[76] SEC officials could not recall other instances of such ''supplemental evaluations'' ever being drafted for other employees.[77] Although Kreitman transmitted it to Berger on August 1, the evaluation was not immediately placed in Aguirre's personnel file. In late September, about four weeks after Aguirre was fired, Kreitman e-mailed a copy to Human Resources. However, the version he sent to Human Resources appears to be his first draft rather than the version he sent to Berger, incorporating Hanson's

comments.[78] At the time it was drafted, Berger and Kreitman had just recently learned of the complaints by Aguirre and Smith. Berger and Hanson had their ''confidential'' conversation on the morning of August 1 about the problems Aguirre and Smith were having with Kreitman. Kreitman received Smith's confidential email to Fielder that afternoon. These events were intricately intertwined with the process of drafting the supplemental evaluations. Under these circumstances, the re-evaluations appear to be improper and retaliatory because of their timing. Therefore, it is necessary to evaluate the content of the re-evaluations as well.

*b. Content of Supplemental Evaluation*

Aguirre's negative re-evaluation began by briefly acknowledging that Aguirre ''works very hard, puts in long hours,'' and ''is willing to go the extra mile.'' However, Kreitman and Hanson then claimed that Aguirre (1) was resistant to supervision; (2) was insufficiently aware of institutional protocol; (3) failed to fully and openly share information with others; (4) had difficulty explaining the significance of evidence in a clear and well-organized manner; and (5) expressed resentment at perceived attempts by supervisors to thwart his success.[79]

(1) **Resistance to Supervision:** Kreitman and Hanson did not cite any examples for their first contention, that Aguirre was ''resistant to supervision.'' Moreover, in the course of this investigation, we did not find evidence suggesting that Aguirre's ''resistance'' to his supervisors was inappropriately insubordinate. While he did voice strong disagreements with his supervisor's decisions on occasion, we found no convincing evidence that he did so unprofessionally or inappropriately. Moreover, in examining those disagreements in detail, we find no evidence that he acted in contravention of his supervisor's instructions, even when he offered persuasive arguments that they were wrong.

(2) **Unaware of Institutional Protocol:** For the second contention, that Aguirre was unaware of institutional protocol, Kreitman and Hanson cited two examples. The first example was that Aguirre retracted two of the subpoenas he had issued ''to avoid violating privacy statutes.''[80] The second example was that he ''inaccurately stated Commission policy in communication with defense counsel.''[81]

Regarding the subpoenas, Aguirre drafted subpoenas seeking email and instant message traffic for Arthur Samberg around the time of his trading of Heller. Aguirre sent the drafts to Hanson early on the morning of May 23.[82] According to Aguirre, Hanson was not responsive:

> By the afternoon of May 24, I had not received a response from Hanson to any of the emails I had sent to him on the prior day. I sent him two emails regarding the same subpoenas. In one email, I pasted the text of the document description in the body of the email; its subject was ''Urgent, Samberg subpoena.'' Hanson responded to that email. I also sent him all of the subpoenas in a second email with this text: ''These are the subpoenas that I forwarded Monday that still have not gone out.''

> Hanson did not respond to this email. Later that afternoon, I went to Hanson's office to speak with Hanson about another matter. He casually mentioned there could be ''some privacy concerns'' with the subpoenas that had gone to Bloomberg and Reuters, but he did not specify what the problem was or offer any guidance how to correct it.[83]

Aguirre quickly discovered that the subpoena did not contain a notice to the recipient that the SEC intended to comply with a statute requiring that the subscriber (i.e., Samberg) be notified of the subpoena. An example of the appropriate paragraph can be found in one of Aguirre's corrected subpoena cover letters, dated May 31, 2005:

> Certain of the records called for by the subpoena may constitute ''contents of electronic communications'' within the meaning of the Electronic Communications Privacy Act of 1986 [18 U.S.C. 2510, et. seq.] (the ''ECPA''). Pursuant to Section 2703(b) of the ECPA [18 U.S.C. 2703(b)], you may not release these records to us until I have provided the ''subscriber'' or ''customer'' with prior notice of this request. I will send you confirmation that the customer notice requirement has been complied with in approximately 14 days.[84]

Contrary to claims by Aguirre's supervisors after his firing, failure to include this paragraph in the cover letter to a subpoena does not make mere issuance of the subpoena ''illegal.'' Moreover, we found no contemporaneous documents suggesting that his supervisors thought this was a serious error when it occurred in May 2005. That contention did not arise until after Aguirre withdrew his resignation and challenged their decision not to question John Mack.

Regarding Kreitman's second example—the claim that Aguirre inaccurately described Commission policy to defense counsel—the re-evaluation does not go into detail. However, Robert Hanson later told the OIG that ''former Enforcement Director Gary Lynch called [him] about an improper request Aguirre had made to Lynch to keep information confidential, which violates Enforcement policy.''[85] While the SEC cannot require third parties to keep information about its investigative activities confidential, there is nothing inappropriate about merely requesting they do so. According to Aguirre, this conversation with Lynch occurred around June 8, 2005,[86] shortly before he faxed a subpoena to CSFB, where Lynch was General Counsel. According to Aguirre, the call began as an attempt to arrange for another CSFB attorney, Patrick Patalino, to accept service of the subpoena:

> During the call, I also requested Patalino to treat the issuance of the subpoena confidentially, as I had heard other staff do in similar situations before. Patalino replied that CSFB also desired that the matter be treated confidentially and then left the line for a moment. When he returned, Lynch was patched into the call. Lynch asked aggressively: Are you saying that I should keep this matter confidential from John Mack? I responded politely: ''No, I am just requesting that you keep the matter confidential.'' Lynch asked the same question two more times and I gave the same answer. On the fourth occasion that

> Lynch asked the same question, I replied: I have answered the question three times.'' Lynch promptly left the call.
>
> Kreitman came to my office about an hour later, said that Lynch had called Berger, and asked what happened during the call. I told him and he seemed satisfied. He never indicated that I mishandled the call in any way. He later told me that he had discussed the matter with Berger and he was fine with the manner in which I handled the call.[87]

Aguirre later e-mailed Hanson about Lynch's close ties to John Mack, pointing to evidence that Lynch had advised Mack on investing in Pequot, as a possible explanation for Lynch's call to Paul Berger.[88] As with the issue of the retracted subpoenas, there is no contemporaneous e-mail or document suggesting that his supervisors were concerned about Aguirre's interactions with Lynch at the time. The first documentation is a vague reference in the negative re-evaluation, followed by more detail in his supervisor's interviews with the OIG after his termination.

**(3) Failure to Share Information:** Hanson and Kreitman cited no example to support the claim that Aguirre failed to share information about the Pequot investigation. In interviewing staff who worked with Aguirre on the day-to-day aspects of the investigation, such as Hilton Foster, Eric Ribelin, and Liban Jama, we found that none of them described having an issue with Aguirre's willingness to share information. To the contrary, Jama told us:

> So any documents that I would need he would usually provide to me either a hard copy or an electronic e-mail. . . . Gary answered my questions. Whenever I asked him a question, he would answer the question for me. So I did not have really at that time [have] a high level of frustration.[89]

Eric Ribelin also contradicted the claim that Aguirre was unwilling to share information:

Question: Did [Aguirre] keep individuals informed about his thinking?

Mr. Ribelin: Yes.

Question: Did he—so he was not an individual who would surprise people.

Mr. Ribelin: No.

Question: So he kept everyone fully advised.

Mr. Ribelin: I—I think so. Yeah. I mean, he was frequently talking to Mark and talking to Bob and sending e-mails, and talking to me and sending e-mails. . . . I believe that he was keeping people fully informed.[90]

Moreover, a review of the documents produced to the Committees generally confirms that Aguirre provided frequent and detailed updates on the progress of the investigation via e-mail. In fact, on occasion his supervisors complained about being ''bombarded'' with too many e-mails from Aguirre.[91]

(4) **Difficulty Explaining the Significance of Evidence:** The fourth contention in the negative re-evaluation, that Aguirre had difficulty explaining the significance of evidence, is vague and subjective. Again, Hanson and Kreitman cited no specific examples of miscommunication. It is unclear whether they are referring to written, oral communication skills, or both. However, the criticism seems inconsistent with Kreitman's statement that when he taught Aguirre at Georgetown Law, ''He was the best student in the class.''[92] As a general matter, in the course of our investigation, we found that Aguirre had no trouble explaining the significance of evidence. Judging from his contemporaneous e-mails as well as submissions to the Committees and his testimony before the Judiciary Committee, his communications were generally clear, convincing, and responsive.

(5) **Resentment at Perceived Attempts to Thwart his Success:** The fifth contention in the negative re-evaluation—that Aguirre ''expressed resentment'' at his supervisors' ''perceived attempts to thwart his success''—appears to be merely a reference to his objection to blocking John Mack's testimony. There is no doubt that Aguirre voiced intense opposition to his supervisor's decision, and the stated reason for it (i.e., Mack's powerful political connections). That is not a sign of poor job performance. However, it does appear to be the primary motivation for drafting his negative reevaluation.

The content of the re-evaluation does not withstand scrutiny. For those portions that are specific enough to judge against the documentary evidence, the negative comments are unsupported. Viewed in light of the suspicious timing discussed earlier and the lack of substantiation for its claims, we find that the re-evaluation appears both improper and retaliatory.

*3. The Merit Pay Calendar and Aguirre's Raise*

Despite this negative re-evaluation, Aguirre received a merit pay increase just before he was terminated on September 2, 2005.[93] Obviously, employees who receive a negative evaluation and are about to be terminated do not ordinarily receive merit pay raises. However, this unusual outcome can be better understood by comparing the timing of the SEC's merit pay process[94] to the sequence of events in the confrontation between Aguirre and his supervisors over John Mack's testimony.

**Figure 3: Key Events in Merit Pay Calendar**

June 29, 2005—Hanson writes positive evaluation of Aguirre.

June 30, 2005—Aguirre tenders his resignation because of the Mack issue, but does not report Hanson's ''political connections'' comment.

July 18, 2005—SEC Compensation Committee Meets; Recommends two-step merit pay increase for Aguirre.

July 19, 2005—Linda Thomsen receives Compensation Committee Recommendations.

July 27, 2005—Merit Pay package is completed. Aguirre withdraws resignation and sends lengthy e-mail to Paul Berger complaining about roadblocks in the investigation, including Hanson's ''political connections'' comment.

August 1, 2005—Thomsen transmits the final merit pay results to Human Resources. Berger has Hanson and Kreitman draft negative re-evaluation.

On June 29, Robert Hanson drafted a positive evaluation of Aguirre's performance. On June 30, Aguirre tendered his resignation, effective September 30, because of his supervisors' decision to block the questioning of John Mack. The SEC's Compensation Committee met on July 18. As a member of the Compensation Committee, Berger reviewed Hanson's positive evaluation of Aguirre at that time, concurred, and recommended a two-step merit pay increase.[95] When Berger made this recommendation, he believed that Aguirre was leaving the Commission at the end of September. So, although they had already clashed about Mack's testimony, Aguirre had essentially accepted Berger's decision by deciding to leave the Commission on principle rather than stay and fight it.

Director of Enforcement Linda Thomsen received the Compensation Committee Recommendations on July 19 and completed the merit pay process for the Division of Enforcement on July 27. That same day, Aguirre withdrew his resignation and signaled his intent to challenge his supervisors by sending a comprehensive e-mail on the need to take John Mack's testimony. For the first time, his email contained written documentation of his allegation about Hanson's reference to Mack's powerful political connections.

However, Thomsen did not transmit the final merit pay results to Human Resources until August 1, the same day that Aguirre's negative re-evaluation was drafted. When asked about the timing of the re-evaluation in connection with the transmittal of the final package to Human Resources, Berger claimed not to remember whether that was a factor, but admitted that it might have been:

Question: [W]hen you were discussing the supplemental evaluations with Mr. Kreitman and Mr. Hanson, was it in your mind that you were trying to get this done by August 1st so that it could be transmitted to the Office of Human Resources along with the other evaluations?

Mr. Berger: I don't remember. I remember that we—I don't remember.

Question: Do you remember there being any sort of time pressure to get the supplemental evaluations ——

Mr. Berger: Yeah, it's possible that there was. I just—Mark would be—would know better.[96]

At 2:28 p.m. on August 1, Berger sent an e-mail saying, ''I need to make another change to the merit pay schedule.''[97] In response, he was told that unless it was merely a typo, he would have to circulate the change to all members of the Compensation Committee for approval.[98] Berger indicated that it was ''not a typo.''[99] It is unclear whether the change he wanted to make was to reverse the

merit pay increase he had recommended for Aguirre on July 18. When asked, Berger said his e-mail was unrelated to Aguirre, ''as far as I can recall[.]''[100] He then explained that evaluations should not contain words such as ''highest'' and ''high'' and that he, ''was trying to contact . . . the coordinator for the Division's Compensation Committee, to ask whether [his] changes had been incorporated into the written evaluations.'' This explanation is inconsistent with the language of the e-mail in question, which speaks of a ''need to make another change,'' not a desire to double-check changes already made. Moreover, the SEC's own forms ask supervisors to rate employees on the quality of their contributions with check boxes for quality, high quality, and highest quality, so it is unclear what Berger's explanation refers to or why the words ''high'' and ''highest'' would need to be removed from evaluations.[101]

None of Aguirre's supervisors transmitted the negative re-evaluation to the Offices of Human Resources until after Aguirre was terminated. Berger could not have shared it with the rest of the Compensation Committee as required by internal SEC procedures, because the Committee had already met and did not meet again after August 1. Moreover, there is no record that he circulated it by email. The merit pay process essentially ended on August 1 with transmittal of the final results from the Director's Office to Human Resources. Given these circumstances, the negative re-evaluation could have been part of an aborted attempt to reverse Aguirre's pay increase. That increase had been approved before he withdrew his resignation and documented Hanson's comments about Mack's political connections. Perhaps when it became clear that such a change could not be made without alerting the rest of Compensation Committee, the idea was abandoned. This would explain why the re-evaluation was not placed in the file until after Aguirre was terminated.

*4. The Director of Enforcement and the Termination Notice*

Because Aguirre was in his initial one-year probationary period, the SEC took the position that it needed no cause to fire him. In fact, the SEC took the unusual step of terminating his employment over the phone while he was on vacation. Had they waited until his return, his probationary year might have expired. Then, it might have been necessary to show cause for their action. The irregular process in drafting the negative re-evaluation and the SEC's failure to place it in his personnel file would have made it difficult for the SEC to show cause for his termination. The SEC would also have had difficulty showing cause in light of Aguirre's positive evaluation on June 29 and the approval of his pay increase on July 27.

Even though the SEC saw no requirement to show cause, his termination notice, like the re-evaluation, listed various allegations about negative aspects of Aguirre's performance and conduct.[102] The notice was sent on Thursday, September 1, 2005. The notice listed as reasons for termination included (1) Aguirre's ''inability to work effectively with other staff,'' (2) his ''unwillingness to operate within the [SEC's] process,'' (3) his ''conduct was inappropriate'' on several occasions, (4) that he ''ignored the chain of command,'' and (5) that he indicated he was ''uninterested in participating'' in the Pequot case beyond the investigatory stage.

As with the allegations in the negative re-evaluation, each of these contentions is supported only by the claims of his supervisors. The claims lack contemporaneous documentation and many of them are contradicted by other SEC employees. In particular, Eric Ribelin, Hilton Foster, and Liban Jama did not indicate that Aguirre was incapable of working effectively with them. In fact, at his retirement party, Hilton Foster made a point to introduce Aguirre to Director of Enforcement Linda Thomsen. Foster said: ''Linda, this is Gary. I don't know if you know him or not, but he's working on what I consider to be one of the most significant cases I've seen at the Commission, and he's doing a hell of a job.''[103] Foster also told us, ''I found him easy to work with. . . . [H]e's obviously a smart guy, but he's willing to listen, and he would listen to what I said.''[104] Eric Ribelin told us, ''I think Gary Aguirre is one of the smartest, most tenacious, intelligent, thoughtful lawyers that I had worked with in 18 years, and I thought he was aggressively, but appropriately, pursuing an investigation that was moving forward.''[105] For a comprehensive reply to his supervisors' various allegations, see Aguirre's answers to questions for the record posed after the December 5, 2006, Judiciary Committee hearing.[106] His responses to those allegations are generally persuasive and rely heavily on documents to corroborate and reconstruct events in greater detail than that offered by his former supervisors.

More important than what was in the termination notice, however, is what was missing from it. Specifically, it contained no explanation of how the termination could be reconciled with the merit pay increase he had just received. During the process of drafting his termination notice, one SEC labor attorney suggested explicitly addressing that issue in the notice, ''We have also discussed in our office the possibility of including in the letter a sentence explaining why he received a two step increase but is now being terminated.''[107] Although Kreitman replied, indicating that the suggestion would be implemented, the notice contains no such sentence.

In approving his termination, Linda Thomsen accepted the claims of his supervisors and the representations in the termination at face value. She had no first-hand knowledge of the matters outlined in the termination notice, and relied principally upon representations from Berger, Kreitman, and Hanson.[108] She did not get Aguirre's side of the story from Aguirre or from any of the experienced SEC staff who worked directly with Aguirre and who might have disputed his supervisor's claims, such as Eric Ribelin, Joe Cella or Hilton Foster. She failed to consult them even though she knew that Aguirre and his supervisors had a dispute about whether and when to take John Mack's testimony and even though she knew that the decision to terminate Aguirre's employment was likely to be challenged:

Question: When Mr. Aguirre was terminated . . . you are aware that he was having a dispute about taking the testimony of Mr. Mack, correct?

Ms. Thomsen: I was aware of that, yes.

Question: Were you concerned that it might appear that his termination was related to that or in reprisal for his being adamant on that?

Ms. Thomsen: Yes. Yes. We all were.

* * *

> [His supervisors] advised that they expected this to be potentially litigious given the fact that Mr. Aguirre had been litigating with us before, that he was unhappy about the Mack testimony issue.[109]

Despite these concerns, Thomsen failed to solicit or consider any independent view of the facts from anyone other than his supervisors. She even rebuffed Aguirre's attempt to contact her directly and confidentially to express his concerns. On August 4, he sent her an e-mail asking if she had ''an open door policy'' and telling her that the Pequot case was ''nearly killed 5 months ago and is now moving in circles.''[110] After forwarding Aguirre's e-mail to Paul Berger, Thomsen rejected his request for a chance to speak confidentially, ''I would be happy to meet *with the team* working on the matter.''[111]

*5. The Connections between the Mack Dispute and the Decision to Fire Aguirre*

If Aguirre was fired for refusing to accept his supervisor's decision to prevent or delay Mack's testimony, then the propriety of the termination would turn on the merits of that decision. If it was reasonable to object to the decision, and Aguirre did so appropriately, then his termination would arguably be improper.[112] However, first it is necessary to examine whether he was fired because of the Mack dispute. The timing and circumstances of the events suggest that he was. If he had not disagreed with his supervisors over their refusal to question Mack and if he had not bristled at their references to Mack's political connections as the reason for their decision— it is unlikely that he would have received a negative reevaluation and then a termination notice. The Mack dispute and Aguirre's firing are so intricately connected that it simply is not credible to assert, as his supervisors did, that the two are unrelated. The stated reasons for his termination simply do not hold up under close scrutiny, leaving the Mack dispute as the more persuasive explanation.

In addition to the timing and sequence of events already discussed in detail, two particular pieces of evidence point to a direct connection between the Mack dispute and the termination: (1) Kreitman's e-mail initially proposing termination, and (2) discussion of the Mack issue at the termination meeting.

*a. The Termination Proposal*

On Wednesday, August 24, 2005, Mark Kreitman sent an e-mail to Paul Berger and Robert Hanson, which appears to be the first recorded suggestion that Aguirre be fired.[113] Kreitman wrote, ''Bob and I both feel that it may be appropriate at this juncture, before Gary's probationary period elapses, to consider his termination.''[114]

The subject line of Kreitman's e-mail is ''Gary and Pequot.'' However, Kreitman's e-mail is actually a reply to one earlier that morning from Paul Berger, which forwarded an e-mail from Aguirre with the subject line, ''Mack Testimony.'' The attached e-mails in the chain provide Aguirre's August 4th e-mail to Hanson outlining his reason's for wanting to take Mack's testimony.

By drafting his termination proposal as a reply to this e-mail and changing the subject line from ''Mack Testimony'' to ''Gary and Pequot,'' Kreitman implicitly acknowledged that the two issues were linked. In the text of the e-mail, he does so more explicitly, ''I fear Gary's view of things here is not a healthy element for the group.''[115] Aguirre's ''view of things'' on the ''Mack testimony'' was that it should not be delayed because of his prominence or his politics. While conflict between Aguirre and his supervisors on that issue may well have been disruptive, Aguirre should not bear sole responsibility for it. His supervisors bear much of the responsibility for that conflict because of their adamant resistance in the face of persuasive arguments for taking Mack's testimony.[116]

*b. The Termination Decision Meeting*

The merits of the Mack issue were discussed during the same meeting at which Linda Thomsen approved the proposal to terminate Aguirre. This is a tacit recognition that the Mack testimony was connected to the termination decision. Robert Hanson described the conversation this way:

Question: You said you talked to Linda Thomsen about it?

Mr. Hanson: Yes.

Question: Do you recall the conversation?

Mr. Hanson: I recall parts of it. I recall saying that [Aguirre] was the proverbial loose cannon in that meeting, and that I thought he was a net negative for the Commission.

I recall Linda asking, saying something that she had gotten an email from him awhile ago about the testimony of Mack.[117] She said she had suggested that we all meet or something like that to discuss whether it made sense to take Mack's testimony. She said does it make sense to take Mack's testimony at this point?

I said something to the effect of it would be a pretty short session. There wouldn't be much to ask him, nor would there be anything to confront him with. She said something to the effect, well, don't we sometimes ask, you know, get people on the record right away.

Paul said, well, this investigation . . . is from 2001. It is not like it happened last week and we can call a bunch of people and get them on the record.

Mark said something that he had been saying for awhile, . . . that we have no information suggesting that Mack had the information to pass it onto Samberg, who is the head of Pequot.

Question: Are you describing one conversation?

Mr. Hanson: This was a meeting that we had.

Question: A meeting?

Mr. Hanson: Yes.

* * *

Question: This was in August when you were talking about the decision to fire him?

Mr. Hanson: Correct.[118]

A couple things are of note in this description of the conversation: Hanson's use of the term ''loose cannon'' to describe Aguirre, and the focus on the merits of the Mack decision in the context of deciding whether to fire Aguirre.

Hanson's use of the term ''loose cannon,'' is troubling because it is often one of the phrases used to identify whistleblowers for retaliation. When someone is identified as a ''loose cannon'' or a ''troublemaker'' it can convey a warning to others in the organization that the individual is unwilling to look the other way when it comes to evidence of misconduct or mismanagement. These terms were applied to Aguirre on several occasions. For example, in May 2005, an SEC trial attorney named Kevin O'Rourke wrote an email to Mark Kreitman saying that Aguirre, ''has shown strong signs of being a loose cannon.''[119] This followed an exchange of emails where O'Rourke criticized Aguirre for language he had circulated in a draft letter to opposing counsel, and Aguirre responded to the criticism with a detailed explanation of the issue and how it had arisen.[120] Both the tone of O'Rourke's e-mail criticizing Aguirre and the ''loose cannon'' comment may be better understood in light of an e-mail O'Rourke sent nine days earlier.[121] Unknown to Aguirre, O'Rourke had been assigned to defend the SEC against Aguirre's EEO complaint for age discrimination. In his e-mail, O'Rourke was asking another SEC official if it was okay for him to continue to work on the Pequot investigation without telling Aguirre that O'Rourke was on the opposite side in the EEO matter.[122]

When asked about the connection between questioning Mack and Aguirre's termination, Paul Berger admitted that it played ''some part'' and also referred to Hanson's ''loose cannon'' comment at the termination meeting:

Question: Do you contend, as you sit here today, that Mr. Aguirre's repeated insistence upon taking Mr. Mack's testimony did not play a role in the decision to terminate him?

Mr. Berger: I think that his inability to listen to his supervisors and, you know, make decisions based on strategy and judgment and the experience that they had played a factor. And so I think that the fact that he simply wouldn't listen with respect to Mack must have played some part in Mark and Bob's assessment of his conduct. But that went to—the issue was— and it was the primary issue—his conduct. . . . The issue was

> that he couldn't listen and he didn't want to listen, and he was, I think as you say, Bob who said it, a loose cannon.[123]

In his interview with the OIG, Hanson also described a conversation with Berger in which he told Berger to discount certain complaints about Mark Kreitman, ''if it were either Aguirre or another 'troublemaker' [Berger] should consider the source.''[124] This is an apparent reference to the August 1 conversation during which Berger suggested that Hanson and Kreitman draft the negative reevaluation of Aguirre.

Kreitman's e-mail, Hanson's comments, O'Rourke's e-mail, and Berger's admission all suggest that Aguirre would not have been terminated were it not for the Mack issue. Just as Aguirre's decision to stay at the SEC and press for Mack's testimony led directly to his negative re-evaluation, so too his continued efforts to obtain approval for questioning Mack led directly to Aguirre's termination. When combined with the circumstances reviewed earlier, the termination appears to be merely the culmination of the process of reprisal that began with the August 1 re-evaluation. Thus, in its totality, the evidence we reviewed suggests a retaliatory motive for Aguirre's dismissal.

The dangers of retaliation against good-faith efforts by employees to expose wrongdoing are clear. In this case, the actions taken against Aguirre by SEC management could very well create an atmosphere in which employees are overly averse to raising concerns regarding actions by the agency. In an effort to assist protecting against this concern, we have three suggestions.

First, the SEC should adopt clear, written whistleblower protections to safeguard all employees against adverse personnel actions in retaliation for reasonable good faith allegations or disclosures of perceived wrongdoing, even when done in the context of an employee's assigned duties. A fair hearing without fear of retaliation for internal complaints could not only increase morale and resolve disputes earlier—it could also assist the SEC in its mission by identifying problems that need attention and action from senior management.

Second, in this case, senior management's decision to terminate Aguirre was closely connected to the internal disagreement about whether to question John Mack. Before approving Aguirre's termination, Director of Enforcement Linda Thomsen relied solely on information from the supervisors who disagreed with Aguirre. When dealing with an investigator or attorney who is responsible for a major investigation, careful adherence to established procedures is necessary to ensure that the SEC considers all relevant information and avoids the appearance of impropriety. Even if the agency is not legally required to show cause for the action, as may be the case with a probationary employee or an employee who resigns, standard written procedures are needed to ensure public confidence in the integrity of the SEC's operations.

Finally, the SEC should adopt clear, written guidance establishing alternate, confidential channels of communication to resolve potential issues early and without public controversy. The SEC should encourage employees to use such procedures to raise serious issues that they cannot resolve with their managers. Complaints

should be taken seriously and considered independently, not merely referred back to the complainant's supervisor. In this case, Director of Enforcement Linda Thomsen responded to Aguirre's attempt to speak with her directly about the problems he was facing by agreeing to meet only with his supervisors present. When an employee seeks to appeal to someone other than his immediate supervisors, the employee should be given a fair and confidential opportunity to be heard.

*6. Paul Berger Leaves the SEC*

Nine months after Aguirre was fired, Paul Berger joined the law firm that contacted the SEC about John Mack on behalf of Morgan Stanley's Board of Directors. Mary Jo White, a former U.S. Attorney for the Southern District of New York and a partner at Debevoise & Plimpton, was one of the attorney's whose ''juice'' Hanson had cited as a concern in taking Mack's testimony. In June 2005, she led the effort by Debevoise to vet John Mack in advance of bringing him back to Morgan Stanley. In the course of the six days during which she represented the Morgan Stanley Board, White contacted Director of Enforcement Linda Thomsen about John Mack and produced e-mails directly to Thomsen.[125] Other representatives of Morgan Stanley also contacted Associate Director Paul Berger directly about the case.[126] However, when a friend asked Berger about Debevoise & Plimpton a few days after the termination, Berger expressed interest in working for Debevoise.

Although we found no evidence of a connection between Berger's role in the Mack controversy and his subsequent employment, Berger apparently: (1) failed to recuse himself from the Pequot investigation in a timely manner, and (2) gave incomplete answers to Senate staff when initially questioned.

*a. The Initial Story*

When the issue of Berger's employment and the appearance it created first arose, Senate staff contacted Berger by phone to question him about it, as well as other matters related to the Aguirre controversy. During the July 28, 2006, conversation, Berger said his last day at the Commission was May 31, 2006, and that he began working as a partner at Debevoise & Plimpton on June 2, 2006. When asked about why his biography was not yet on the firm's website nearly two months later, Berger said he had been on vacation and would continue to be on vacation until Labor Day. When asked when he ''started the process of leaving the SEC,'' Berger stated he began reaching out to firms and they began reaching out to him in January 2006.[127] He went on to say, in reference to his current employment and his past work on the Pequot case, ''one has nothing to do with the other.''[128]

In an effort to corroborate this version of events, Senate staff sought SEC records to determine whether and when Berger recused himself from the Pequot investigation and when he first began having discussions about employment with Debevoise & Plimpton. The SEC produced copies of e-mails in which Berger communicated his recusal on matters related to Debevoise. On January 9, 2006, Berger sent an e-mail to his immediate subordinates (four assistant directors) asking whether Debevoise had entered an

appearance in any of their matters.[129] On February 10, 2006, he sent another e-mail explicitly informing them that he was recused from any matters involving Debevoise.[130] When asked on the record about when he stopped working on the Pequot case, he said, ''in January 2006, I think.''[131]

When Director of Enforcement Linda Thomsen was asked about Berger's search for outside employment, she said she believed Berger likely began seeking outside employment sometime after the end of October 2005, after he was not selected for a deputy director position.[132] SEC counsel also argued that this was circumstantial evidence as to when Berger's first contacts with firms were likely made.[133]

*b. The Full Story*

Although Berger and the SEC initially implied that he did not start discussing the possibility of employment at Debevoise until months after Aguirre's termination, rumors circulated at the SEC that Berger's search had begun much earlier. Further investigation led to confirmation that others at the SEC were talking about Berger leaving and working for Debevoise long before he recused himself from the Pequot case.[134] One SEC attorney indicated her impression that Berger was going to Debevoise and that she believed that he was looking to leave the Commission as early as the beginning of 2005.[135]

Given this evidence, we continued to press the SEC to do more comprehensive e-mail searches. As early as September 8, 2006, the Committees formally requested records from the SEC relating to Berger's recusal and potential employment with Debevoise. We then interviewed two witnesses on the record about e-mails discussing speculation regarding Berger's eminent departure long before he recused himself.[136] Finally, on October 31, 2006, the SEC produced a key e-mail, which definitively established that Berger had expressed an interest in employment at Debevoise through an intermediary much earlier. Specifically, he communicated his interest indirectly through a friend to a partner at Debevoise just days after Aguirre was terminated. The e-mail was from Lawrence West, another SEC official who was in employment talks with Debevoise at the time. The e-mail was dated September 8, 2005 and addressed to Paul Berger with the subject line, ''Debevoise.'' The body of the message read, ''Mary Jo [White] just called. I mentioned your interest.''[137]

This raised a number of questions for staff, including why Berger failed to disclose this contact when questioned in July 2006. Berger described the events surrounding the September 8 e-mail from Lawrence West as follows:

> [O]ne of my colleagues at the Commission, Larry West, who was an Associate Director, was looking for a position to leave the Commission. And he came to me—Larry and I were good friends, still are good friends—and said that he was looking for a position, that he wanted to—was it okay if he could share information with me about his looking and get my advice, bounce ideas off me, et cetera. I said sure.

> At one point he came to me and he said, ''You know, wouldn't it be great if the two of us worked together someplace?'' And I said, ''Well, it would be great, but it's never going to happen.'' And he said, ''Why?'' And I said, ''Because no firm is going to absorb two of us without any book of business, no matter what our experience is.'' And I said, ''That's just not going to happen, Larry, so we're going to have to get comfortable with that.''
>
> And at some point he came to me and he said, ''Well, would it be okay if I told Debevoise, who I'm talking with, that you're interested in leaving?'' And I said, ''Okay. Sure.'' You know, ''It's okay to go ahead and do that.'' And then he went and did that.[138]

West did not recall sending the e-mail or his conversation with Paul Berger.[139] However, in the September 8 e-mail, West appears to be reporting back on the results of the conversation Berger had authorized him to have with Debevoise. Berger said that he got ''a little concerned'' and contacted ethics counsel for advice on whether it was appropriate, given his work on the Pequot case.[140] According to Berger, the ethics counsel advised that if the intermediary acts ''as an agent'' then it is necessary for the job seeker to recuse himself from cases involving that potential employer.[141]

*c. Berger's Failure to Mention Pre-Recusal Contacts*

During his on-the-record interview, Berger disclosed that in addition to this contact in September 2005 with Debevoise, Goodwin Proctor approached him about employment in fall 2005.[142] When asked about his earlier telephone interview and why he had not disclosed these contacts, Berger claimed alternatively that he either did not remember them or that that he did not consider the September 8 contact to be reaching out. We find it difficult to reconcile his initial statement that he began reaching out to firms and they began reaching out to him in January 2006 with the September 8 Debevoise contact and the fall 2005 Goodwin Proctor contact. However, Berger argued that neither he nor Debevoise had ''reached out'' to one another and that his earlier statements were technically true:

Question: So did you tell [Senate staff] that you began reaching out to firms and they began reaching out to you in January of 2006?

Mr. Berger: I don't remember. That would be true that I didn't start reaching out until January, but I don't remember.

Question: Well, you just told us about that Goodwin Procter reached out——

Mr. Berger: Right. They reached out.

Question: ——prior to January.

Mr. Berger: They reached out to me prior to that, right.

Question: You didn't tell [Senate staff] about that? Mr.

Berger: I don't remember.[143]

Regardless of whether Berger's initial statement was technically true, it caused the Committees and the SEC to expend unnecessary time and resources to discover the full story. We eventually learned from documents what Berger should have volunteered when first asked. In explaining why he was not more forthcoming, Berger claimed that he did not understand the SEC rules governing disclosure of non-public information and implied that the rules might prevent him from talking about his own efforts to seek outside employment:

Question: Do you have any explanation as to why you didn't tell [Senate staff] about those contacts during that call?

Mr. Berger: Well, primarily because I was very concerned about having any discussions without first talking with the SEC and getting authorization to discuss anything.

* * *

You know, I was concerned about having any kind of discussions with someone outside of the SEC at that point, and so I don't know if—you know, why I did or didn't say something. I mean, I really don't remember what I said.

* * *

Question: So do you think that you were completely honest and forthcoming with [Senate Staff] during that conversation?

Mr. Berger: Yes, I think I was completely honest.

Question: But not forthcoming?

Mr. Berger: I was concerned about providing any information without authorization from the Commission so that I would not violate any rules. . . .[144]

Commission rules do not restrict former employees from discussing when or under what circumstances they began seeking outside employment. Perhaps Berger genuinely did not remember in July 2006 that he had authorized a friend to inquire about potential employment with Debevoise in September 2005. Or, perhaps he wanted to avoid the questions raised by a contact so far in advance of the date on which he recused himself and so close to Gary Aguirre's termination.

*d. Berger's Failure to Recuse Himself Immediately from the Pequot Case*

The Commission's ethics officer, Bill Lenox, did not recall the conversation with Berger about the September contact with Debevoise.[145] However, Lenox did tell us that during their 12 years together at the SEC, Berger frequently called to ask questions and was concerned not to violate ethics rules.[146] He also indicated that the advice Berger described is consistent with the advice he would normally give.[147]

''Seeking employment'' is defined in 5 C.F.R. 2635.603:

> An employee has begun seeking employment if he has directly *or indirectly:*
>
> (i) Engaged in negotiations for employment with any person. . . . The term [negotiations] is not limited to discussions of specific terms and conditions of employment in a specific position;
>
> (ii) Made an unsolicited communication to any person, or such person's agent or intermediary, regarding possible employment with that person[;] or
>
> (iii)Made a response other than rejection to an unsolicited communication from any person, or such person's agent or intermediary, regarding possible employment with that person.[148]

By Berger's own version of events, in early September 2005, he engaged in indirect communications with Debevoise regarding possible employment through Lawrence West. Moreover, he authorized West to engage in the communications on his behalf, so West might be said to have been acting as his agent. According to West, however, he mentioned Berger's interest only to ensure that Debevoise would not be more interested in Berger than West if it learned of Berger's attempts to gain outside employment.[149] In any event, merely because Berger's efforts to seek employment did not progress beyond that initial contact until January 2006, does not necessarily mean that Berger should have continued to participate in the Pequot case for the next four months. According to a memo to all SEC staff from Ethics Counsel Bill Lenox:

> The most common error is to assume that no restrictions apply to preliminary inquiries and that no consideration need be given to disqualifying oneself until actual negotiations begin. This is not correct. An employee *may not even begin* to seek employment with any entity that has a financial or other interest in a matter in which the employee is participating.[150]

It appears Berger began seeking employment with Debevoise in early September when he authorized West to discuss Berger's employment prospects with one of the firm's partners. According to Lenox's memo, there are three options at that point: (1) recusal, (2) termination of attempts to seek employment, or (3) a waiver. Berger did not seek a waiver, and he did not recuse himself until four months later. According to the SEC's ethics counsel, discussions must be ''terminated, not just suspended.''[151] It is unclear whether Debevoise communicated a rejection to Berger, or he to them, in September 2005. The SEC ethics counsel recommends that terminations of employment discussions be committed to writing.[152] The SEC did not produce any such written termination.

However, even if Berger did not terminate employment discussions, did not have a waiver, and did not recuse himself, one might argue that given the limited duration of the Debevoise involvement in the case (June 24-30), the firm no longer had a ''financial or other interest'' in the investigation after June 2005. Under these circumstances and under the obligations described by the SEC's

ethics counsel, Berger may or may not have had an obligation to recuse himself in September 2005. However, even if he had no duty, the mere appearance of impropriety warranted a recusal if only on prudential grounds.

**ENDNOTES**

1. Memorandum from Stephen M. Cutler to Jayne Seidman (July 15, 2004) (Exhibit 36).
2. *Id.*
3. *Id.*
4. During his last three years as a partner with Aguirre & Eckman, Aguirre earned yearly income of $2,330,000, $1,961,000, and finally $25,000 as the firm was closing down its operation. *Id.*
5. Complainant's Memorandum in Opposition to Summary Judgment (Exhibit 37).
6. *Id.*
7. *Id.*
8. *Id.;* SEC 0137, EEOC No. 100-2005-00413X Decision (June 14, 2006) (Exhibit 38).
9. Complainant's Memorandum in Opposition to Summary Judgment. The SEC claims to have previously interviewed Aguirre, chose someone else, then asked him to reapply, at which time they hired him. (Exhibit 37).
10. SEC 0135, 0137, 0145, 0155, Decision and Order Entering Judgment in *Aguirre v. Donaldson,* EEOC No. 100-2005-00413X, Agency No. 155120631-48 (Exhibit 38).
11. S. HRG. 109-898, at 118, Aguirre response to QFRs at 46.
12. *Id.* at 88, Berger testimony, Dec. 5, 2006, at 8.
13. *Id.* at 89, Aguirre response to questions for the record at 46.
14. *Id.* at 712, Ex 5 to Aguirre's responses to questions for the record.
15. Aguirre response to questions for the record at 46.
16. SEC 0393, Aguirre letter to Paul Berger (Jan. 10, 2005) (Exhibit 39).
17. SEC 0592, Berger e-mail to Aguirre (Jan. 13, 2005) (Exhibit 40).
18. S. HRG. 109-898, at 692-693 (SEC 0397).
19. Kreitman transcript, at 125-26 (Nov. 15, 2006) (Exhibit 14).
20. S. HRG. 109-898, at 825 (SEC 0036).
21. *Id.* at 809.
22. *Id.*
23. Berger transcript, at 213 (Nov. 2, 2006) (Exhibit 4).
24. S. HRG. 109-898, at 857 (SEC 4939).
25. *Id.* at 691.
26. *See* Section VI.C.1, *supra.*
27. S. HRG. 109-898, at 21-22, 1217 (SEC 5688).
28. *Id.* at 55.
29. *Id.* at 651.
30. *See* Section VI.B.2., ''Morgan Stanley's Investigation and Contacts with the SEC,'' *supra.*
31. *See* Section VI.C.4.c., *supra.*
32. S. HRG. 109-696, at 36 (''When I brought up the possibility of issuing a subpoena with [my branch chief, Hanson], he told me that Mack—that this would be very difficult, Mack had very powerful political connections. He would not authorize it and I would have to speak with Kreitman.'').
33. S. HRG. 109-898, at 761 (SEC 1324) (emphasis added).
34. Transcribed Interview with Robert Hanson, Branch Chief, Division of Enforcement, SEC, at 131-33 (Sept. 5, 2006) (hereinafter ''Hanson transcript (Sept. 5, 2006)'') (Exhibit 41).
35. S. HRG. 109-898, at 898 (SEC/OIG 0087), 871 (SEC/OIG 1-7) (emphasis added).
36. *Id.* at 662-66 (SEC 5748).
37. *Id.* at 662-63 (SEC 5748).
38. Hanson transcript, at 158-64 (Sept. 5, 2006) (Exhibit 41).
39. S. HRG. 109-898, at 830 (SEC/OIG 0367).
40. *Id.* at 669.
41. *Id.* at 668 (emphasis added); *but see* SEC 5827 (Exhibit 42).
42. SEC 5827 (Exhibit 42).
43. Hanson transcript, at 181-85 (Sept. 5, 2006) (Exhibit 41).
44. S. HRG. 109-898, at 1254 (Hanson's written statement. Emphasis added).
45. *Id.* at 602.
46. *Id.* at 612.
47. *Id.* at 757. That same day, Robert Hanson signed Aguirre's positive performance evaluation. *See* Section VII.A.3., *supra.*
48. S. HRG. 109-898, at 677 (SEC 0032).
49. E-mail from Gary Aguirre to Paul Berger (Jun 28, 2005) (Exhibit 43).

50. Berger transcript, at 132:14, 134:34 (Nov. 2, 2006) (Exhibit 4).
51. SEC 3664 (Exhibit 44). This e-mail seems inconsistent with claims by Aguirre's supervisors that he refused to write an investigative summary of the case.

52. *See* S. HRG. 109-898, at 539, Aguirre's Prepared Hearing Testimony, p. 31.
53. S. HRG. 109-898, at 539.
54. Aguirre Fax to Committee, Oct. 19, 2006 (Exhibit 45); *see also* S. HRG. 109-898, at 539, Aguirre Hearing Testimony, at 33-34.
55. Berger transcript, at 68-70 (Nov. 7, 2006) (Exhibit 27).
56. S. HRG. 109-898, at 757-61 (SEC 3475).
57. *Id.* at 757-61.
58. *See* section VII.B.2.
59. *See* section VII.E.1.
60. (SEC 3669). *See also,* S. HRG. 109-898, at 61-62.
61. S. HRG. 109-898, at 760-61 (SEC 1324) (emphasis added).
62. Berger transcript, at 83-86 (Nov. 7, 2006) (Exhibit 27).
63. *See* section VII.B.1.
64. John Smith is not the employee's true name. We are using this pseudonym given the sensitive nature of the personnel information discussed and because the employee continues to be employed by the SEC.
65. E-mail from Dave Fielder to Mark Kreitman (Aug.1, 2005) (Exhibit 46).
66. *Id.*
67. Hanson transcrip t, at 35-36 (Sept. 5, 2006) (Exhibit 41).
68. *Id.* (emphasis added).
69. SEC 4939 (Exhibit 47).
70. SEC 5281 (Exhibit 48).
71. E-mail from Dave Fielder to Mark Kreitman (Aug.1, 2005) (Exhibit 46).
72. SEC 5571 (Exhibit 49). Berger's description is inconsistent with this contemporaneous record (''I think that I—I don't remember directing them to do it. You know, I rely on Bob and Mark on that, too, but my sense was I asked them to think about it[.]'' Berger transcript, at 111 (Nov. 7, 2006) (Exhibit 27)).
73. S. HRG. 109-898, at 1209 (SEC 5529).
74. SEC 5568 (Exhibit 50).
75. Kreitman transcript, at 33 (Nov. 15, 2006) (Exhibit 14).
76. SEC/OIG, *Enforcement Performance Management,* Audit No. 423 (Feb. 8, 2007) (Exhibit 51).
77. S. HRG. 109-898, at 1209-10 (SEC 5529-30).
78. *Id.* at 824.
79. *Id.* at 1209-10.
80. *Id.* at 1210.
81. *Id.*
82. E-mail from Gary Aguirre to Robert Hanson (May 23, 2005) (Exhibit 52). This document was not produced to the Committees by the SEC, although it appears to be responsive to the Aug. 1, 2006, document request. It contradicts claims by Aguirre's supervisors that he failed to provide Robert Hanson with draft subpoenas for review. Berger transcript, at 51:10-14, 59:20-21 (Nov. 2, 2006) (Exhibit 4).
83. S. HRG. 109-898, at 91; *see also* SEC 3467 (Exhibit 53).
84. Letter from Gary Aguirre to Custodian of Records, Bloomberg L.P. (May 31, 2005) (Exhibit 54).
85. S. HRG. 109-898, at 876 (SEC/OIG 0007); *see also* Berger transcript, at 204:24, 209:3-9 (Nov. 2, 2006) (Exhibit 4); Berger transcript, at 102:11-13 (Nov. 7, 2006) (Exhibit 27). Lynch was General Counsel for Credit Suisse First Boston (CSFB), which had worked on the GE-Heller acquisition.
86. The rating period covered by the re-evaluation process ended on April 30, 2005. Therefore, even if the events occurred as Aguirre's supervisor's claimed, it would be inappropriate to reference them in this evaluation because they occurred after the rating period ended.
87. S. HRG. 109-898, at 58-59 (Aguirre's answers to questions for the record at 13-14).
88. *Id.* at 619-20 (SEC 0896).
89. Jama transcript, at 12-13 (Oct. 11, 2006) (Exhibit 34).
90. S. HRG. 109-898, at 1135-36.
91. SEC 2049 (Exhibit 55); Berger transcript, at 122:8-10 (Nov. 2, 2006) (Exhibit 4); Hanson transcript, at 125 (Sept. 5, 2006) (Exhibit 41) (''I tried to answer Gary's emails, but there were so many of them that it was almost a full-time job just answering his emails'').
92. Kreitman transcript, at 10 (Sept. 6, 2006) (Exhibit 5).
93. *See* Section VII.A.4, *supra*.
94. S. HRG. 109-898, at 857 (SEC 4939).

95. Berger transcript, at 247 (Nov. 2, 2006) (Exhibit 4).
96. Berger transcript, at 234 (Nov. 2, 2006) (Exhibit 4).

97. S. HRG. 109-898, at 1208 (SEC 5333).
98. *Id.*
99. *Id.*
100. *Id.* at 445-46, Berger's answers to questions for the record.
101. *Id.* at 808.
102. Memorandum from Linda Thomsen to Gary Aguirre (Sept. 1, 2005) (Exhibit 56).
103. S. HRG. 109-898, at 978.
104. *Id.* at 984, 986.
105. *Id.* at 1101.
106. *Id.* at 44-92.
107. *Id.* at 864 (SEC 1291).
108. Thomsen transcript, at 120-24 (Sept. 8, 2006) (Exhibit 26).
109. *Id.* at 55, 118.
110. S. HRG. 109-898, at 684 (SEC 1421).
111. *Id.* at 685 (emphasis added).
112. *See* Section VI.C.3.a, *supra*.
113. S. HRG. 109-898, at 830 (SEC/OIG 0367).
114. *Id.*
115. *Id.*
116. *See* Section VI.C.4, *supra*.
117. S. HRG. 109-898, at 684 (SEC 1421) In fact, Aguirre's e-mail did not mention Mack's testimony, which suggests that Thomsen knew of the Mack controversy from another source.
118. Hanson transcript, at 59-61 (Sept. 5, 2006) (Exhibit 41).
119. SEC 1368 (Exhibit 57).
120. S. HRG. 109-898, at 69, 82-84.
121. SEC 5664 (Exhibit 58).
122. SEC 5664 (Exhibit 58). Again, a few days latter, O'Rourke sent an e-mail commenting on several employees describing Aguirre as ''very dedicated and quite skilled , but is somewhat of a loose cannon that needs to be supervised.'' SEC 5686 (Exhibit 59).
123. Berger transcript, at 97-98 (Nov. 7, 2006) (Exhibit 27).
124. SEC/OIG Document Production at 0451 (Exhibit 60).
125. *See* Section VI.C.3.b, *supra*.
126. Judith Burns, *SEC Associate Director Stepping Down*, DOW JONES NEWSWIRES (May 18, 2006) (Exhibit 61).
127. Telephone Interview with Paul Berger, Associate Director of Enforcement Division, SEC, (July 28, 2006) (hereinafter ''Berger interview (July 28, 2006)'').
128. Berger interview (July 28, 2006).
129. S. HRG. 109-898, at 858 (SEC 1670).
130. *Id.* at 861.
131. Berger transcript, at 81 (Nov. 2, 2006) (Exhibit 4).
132. Thomsen transcript, at 92 (Sept. 8, 2006) (Exhibit 26).
133. *Id.* at 201:21-24.
134. SEC 4928 (Exhibit 62), SEC 4929 (Exhibit 63).
135. Transcribed Interview with Margaret Cain, Attorney, Division of Enforcement, SEC, at 7:13-19, 20-25, 33 (Oct. 13, 2006) (Exhibit 64).
136. SEC 4988-89, E-mail from Lawrence Renbaum to Timothy P. Peterson (Feb. 15, 2006) (Exhibit 65).
137. S. HRG. 109-898, at 863 (SEC 5007).
138. Berger transcript, at 83 (Nov. 2, 2006) (Exhibit 4).
139. Telephone Interview with Lawrence West, Partner, Latham & Watkins, (Nov. 14, 2006) (hereinafter ''West interview (Nov. 14, 2006)'').
140. Berger transcript, at 84 (Nov. 2, 2006) (Exhibit 4). The SEC's ethics officer, Bill Lenox, did not recall a specific conversation with Berger on this particular issue. Telephone Interview with William (Bill) Lenox, Ethics Counsel, Office of General Counsel, SEC, (Nov. 17, 2006) (hereinafter ''Lenox interview (Nov. 17, 2006)'').
141. Berger transcript, at 84 (Nov. 2, 2006) (Exhibit 4). Berger also described a subsequent conversation with West, in which he told West that he had spoken to the ethics counsel and decided that he should not mention his name again. However, West had no memory of such a conversation. West interview, (Nov. 14, 2006).
142. Berger transcript, at 17:3-10 (Nov. 7, 2006) (Exhibit 27).

143. *Id.* at 19-20.
*144*. *Id*.
145. Lenox interview, (Nov. 17, 2006).

146. *Id.*
147. *Id.*
148. SEC 1534 (emphasis added) (Exhibit 66).
149. West interview (Nov. 14, 2006)
150. SEC 1534 (emphasis added).
151. *Id.* at SEC 1537 (Exhibit 66).
152. *Id.*

# VIII. The Inspector General's Investigation

## A. Background

Inspectors General (IGs) enjoy a unique role in federal agencies. Created by the Inspector General Act of 1978,[1] IGs are tasked with (1) conducting audits and investigations, (2) promoting economy, efficiency, and effectiveness, and (3) detecting and preventing fraud and abuse in their agency's programs and operations.[2] While IGs receive general supervision from the heads of their respective agencies, the agency head may not prevent or prohibit the IG from initiating, carrying out, or completing any audit or investigation.[3]

The SEC established its Office of the Inspector General (SEC/OIG) in March 1989. Soon after, Walter Stachnik was appointed as the first SEC Inspector General, a position he continues to hold today. Prior to this appointment, Stachnik had served in a variety of positions throughout the government. His office is charged with conducting internal audits and investigations at the SEC.

## B. SEC/OIG Investigation of Aguirre's Claims— A One-Sided Approach

On September 2, 2005, Aguirre wrote his first letter to SEC Chairman Christopher Cox detailing his allegations surrounding the Pequot case and his employment at the SEC .[4] This letter formed the basis of his allegations and detailed his employment from mid-September 2004 though September 2005.[5] Most notably, the letter contained the core allegation that Aguirre's request to interview John Mack was rebuffed by Branch Chief Robert Hanson due to Mack's ''powerful political connections.''[6]

The September 2, 2005 letter also outlined concerns Aguirre had with the Pequot investigation. The letter provided further support of his claim, including the names of other SEC employees who shared similar concerns regarding the suspect trades that made up the Pequot investigation. More specifically, Aguirre wrote, ''[s]taff who worked on this matter from the beginning—Hilton Foster, Eric Ribelin, Thomas Conroy, and I—believe that PCM engages in an institutionalized form of insider trading that corrupts the financial markets.''[7] Further, the letter detailed irregularities Aguirre observed in the investigation, including outside counsel dealing directly with his superiors outside the normal course of business, and being excluded from meetings with supervisors.[8]

While this letter contained the basis of Aguirre's allegations, it was by no means a complete description of his allegations and the evidence supporting them. Aguirre specifically noted, ''I state the facts briefly below, *though there is much more to be said.* ''[9] The Office of the Chairman forwarded the letter for review to the SEC Office of the Inspector General. The OIG ignored this admonition and

made no attempt to contact Aguirre for additional information, Aguirre sent a second letter to Chairman Cox on October 11, 2005.[10] This second letter raised new allegations surrounding the key documents related to Aguirre's termination.[11]

The OIG's investigation was riddled with inconsistencies and failed to address Aguirre's allegations thoroughly and objectively. During nearly every stage in the investigation, the OIG appeared to operate under a presumption that Aguirre's supervisors had acted appropriately, and thus, the OIG only sought evidence favorable to the agency. For example, the OIG simply accepted the assertions of Aguirre's supervisors at face value without even speaking to Aguirre for his side of the story. In this and other respects, the OIG failed to meet the most basic standards for conducting an impartial and independent review

*1. Investigative Plan: Don't talk to the Complainant*

The Investigative Plan lists the subjects of the investigation as, ''Robert Hanson, Mark Kreitman, Linda Thompsen [sic], Paul Berger.''[12] It also lists the allegations as, ''abuse of discretionary authority.''[13] The stated goal of the investigation was to, ''Determine whether Division of Enforcement management gave preferential treatment to person, thereby preventing proper and thorough investigation of matter.''[14] The allegations were categorized as ''administrative'' and the priority of the case was described as ''medium.''[15]

According to Kelly Andrews, Associate Counsel from the Office of General Counsel, it was her decision to label the investigation as ''medium'' priority, and Mary-Beth Sullivan, Assistant Inspector General for Investigations, concurred.[16] Sullivan confirmed that she concurred with Andrews at the time that the investigation was ''medium'' priority. [17] It remains unclear why the OIG did not consider serious allegations about political influence hindering an SEC Enforcement investigation a ''high priority.''

In the section of the Investigative Plan marked, ''Planned Investigative Steps (In Order of Priority),'' the first step listed is ''interview subjects.''[18] Andrews explained that by ''subjects,'' she meant those against whom the allegations had been made, namely ''Robert Hanson, Mark Kreitman, Linda Thomsen, Paul Berger.''[19] Andrews explained that the priority to conduct the interviews before obtaining documents was to, ''see what their story was'' because the OIG tries ''to interview them first, if it's not criminal.''[20] Interviewing Aguirre at a later time was considered optional. The plan noted the potential to ''possibly interview complainant for clarification of claims and/or additional information.''[21] However, the OIG eventually made an affirmative decision not to interview Aguirre at all.[22]

The OIG had two reasons for failing to interview Aguirre: (1) that it was precluded by law, and (2) that it was unnecessary. Neither is persuasive.

*a. The Privacy Act*

First, the OIG claimed its decision was required by a provision of the Privacy Act.[23] In written response to questions from Senator

Grassley following the December 5, 2006 Senate Judiciary Committee hearing, Inspector General Stachnik replied that:

> [B]ased upon the advice of OIG Counsel, that Section (e)(2) of the Privacy Act of 1974 requires the OIG, in non-criminal cases, to obtain information from the subjects of the investigation first before going to other sources to the greatest extent practicable.[24]

The provision he referred to states:

> Each agency that maintains a system of records shall . . . collect information to the greatest extent practicable directly from the subject individual when the information may result in adverse determinations about an individual's rights, benefits, and privileges under Federal programs. . . .[25]

The OIG claimed it was bound by a strict interpretation this provision and of the decision in *Dong v. Smithsonian.*[26] As described in *Dong*, ''The Privacy Act requires '[e]ach agency that maintains a system of records' to gather information about a person directly from that person, to the greatest extent practicable.''[27] It is unclear why this provision would not place an equal burden on the OIG to seek information directly from Aguirre as well as directly from his supervisors. In this context, the use of the term ''subject'' refers not to the subject of an OIG investigation, but rather to the subject of a record in a ''system of records'' as defined by the Act. Therefore, one could argue that Aguirre was himself the subject of records sought by the OIG. In its investigation, the OIG was gathering information about Aguirre just as much as it was gathering information about his supervisors. To the extent that it was storing that information in a system of records, the opposite of the OIG's claim is true. Rather than prohibiting an Aguirre interview, this Privacy Act provision arguably required one, imposing an equal duty to seek information directly from him first rather than other sources.

*b. The Necessity of an Aguirre Interview*

Second, the OIG claimed that ''it had sufficient information from Aguirre's letters'' to preclude an interview with Aguirre.[28] Andrews elaborated in an interview that the OIG, ''thought that [Aguirre's] September 2nd and October 11th letters were very clear as to the allegations he was making so we didn't feel we needed clarification as to the allegations, and we had a lot of documents and e-mails.''[29]

This claim is simply untenable. First, Aguirre's initial letter states on the first page, ''there is much more to be said.''[30] Two short letters cannot begin to scratch the surface of the evidence relevant to Aguirre's claims, especially in light of Aguirre's indication that much more information was available and the thousands of pages of documents Aguirre actually possessed. Had the OIG contacted Aguirre, it would probably have had access to many of these documents before closing its first investigation, and perhaps, could have avoided drawing conclusions at odds with the documentary record. By deciding not to interview Aguirre, the OIG closed off arguably its most important source of information.

The fact that Aguirre did have supporting evidence and that the OIG closed its case without obtaining that evidence demonstrates

rather conclusively that contacting Aguirre was a necessary step toward obtaining all the relevant evidence. Yet, the OIG's office failed to take that necessary step and has offered no credible explanation as to why. Another possible explanation for not interviewing Aguirre is that the OIG simply wanted to close the case with as few complications as possible, based on a pre -judgment that the allegations were not credible. The OIG decided not to interview Aguirre or anyone likely to support Aguirre's allegations, despite the reference in his letter to three individuals who could corroborate his claims.

*2. Witness Interviews*

*a. Hanson Denies Referring to Mack's ''Political Connections''*

Andrews conducted the first substantive interview on October 17. She spoke with Robert Hanson via telephone. Hanson outlined the investigation into Pequot Capital Management and the decision not to interview Mack, stating SEC staff agreed they should ''get their ducks in a row'' first and figure out Mack's motive before taking testimony.[31] Hanson also described his conversation with Berger discussing complaints about Kreitman from Aguirre and another employee. Hanson said Berger should ''consider the source.''[32] Berger told him to do a supplemental evaluation of Aguirre.[33] Oddly, Andrews' notes do not reflect any questions in this first interview about Aguirre's core allegation about Hanson's reference to Mack's political connections.

On October 21, 2005, Hanson called Andrews to clarify his previous interview with her, offering to expand upon the involvement Linda Thomsen had in relation to Aguirre's employment and the Pequot investigation, including contacts with counsel for Morgan Stanley about Mack's exposure in the investigation.[34] These communications are discussed at length earlier.[35] However, in this second interview, it appears that Andrews still did not ask about the ''political connections'' allegation. She did not do so until November 14. Both her handwritten notes and the OIG closing memo indicate that Hanson denied saying it would be difficult to obtain approval for Mack's testimony because of his powerful political connections.[36]

*b. Other Interviews*

On October 19, 2005, Andrews spoke with Charles ''Chuck'' Staiger of the HR Department at SEC seeking a copy of Aguirre's personnel file.[37] Andrews then made a call to interview Linda Thomsen, on October 21, 2005.[38] During the telephone interview with Thomsen they discussed Aguirre's employment and the Pequot investigation, as well as her conversation with Mary Jo White.[39] Finally, Thomsen detailed a conversation in which she discussed Aguirre's termination with ''Berger, Kreitman, and Hanson in her office.''[40] This telephone interview was the only discussion between Thomsen and Andrews.

Andrews next contacted Paul Berger on October 21.[41] First, Berger told her that he ''received lots of e-mails from Aguirre, although he did not keep most of them.''[42] He also stated that he had a meeting with Hanson during the evaluation period[43] regarding

two employees, one of whom was Aguirre, and described the ''supplemental evaluation'' of Aguirre.[44] Berger stated that he was not sure if the separate evaluation was in the file sent to the Compensation Committee, on which he served. However, he claimed that he did see the statement ''before the committee made any decision.''[45] Berger's claim is doubtful, because the evaluation was created after the last date on which the committee met. Finally, Berger discussed the decision to terminate Aguirre indicating that Kreitman proposed the idea but that Berger left the decision to Kreitman and Hanson.[46] The termination was approved in a conversation between Berger and Thomsen.[47]

On October 24, 2005 the OIG conducted a telephone interview of Mark Kreitman .[48] Kreitman's interview focused on the supplemental evaluation of Aguirre stating that he created the supplemental evaluation on August 1, 2005, because he felt that ''Hanson had not addressed problems.''[49] In fact, however, the evidence suggests that he created the negative re-evaluation at Berger's suggestion, as relayed by Robert Hanson following the latter's early morning meeting with Berger on August 1. Kreitman told OIG that he did not know if Aguirre received a copy of the supplemental rating because he was terminated by the time Kreitman would have met with staff attorneys to discuss evaluations.[50] Kreitman also discussed the Mary Jo White call, noting it was a little out of the ordinary for her to contact Thomsen directly, but not uncommon ''for someone prominent'' to have someone intervene on his behalf.[51]

*c. Deference and Informality*

The deference provided to the subjects of the OIG investigation created a serious problem. By conducting them informally, via telephone, and without transcription, the OIG squandered an important investigatory opportunity. Just as the Enforcement Division failed to ''lock-in'' a story from Mack, the OIG failed to ''lock-in'' a story from Aguirre's supervisors. Moreover, by not being in the room with the witnesses, the OIG missed out on non-verbal cues that are essential to better assessing witness credibility. The OIG's decision to conduct the interviews in such an informal manner contributes to the impression that the office did not investigate Aguirre's allegations thoroughly.

*3. The Failure to Obtain Key Documents*

The investigative plan's second step was to ''review relevant case documents.''[52] One of the key failures of the initial OIG investigation was its inability to obtain all the relevant documents. The OIG made none of its requests in writing and was incapable of describing the scope of its requests with any certainty. The OIG investigators did not attempt to obtain any documents from Aguirre until after the initial investigation was closed and the controversy became public. According to Andrews, she obtained documents merely by asking the subjects for whatever ''relevant'' documents they retained, apparently leaving it to Aguirre's supervisors to determine for themselves what they believed to be relevant.[53] Andrews also obtained Aguirre's official personnel file and conduct file.[54] These were the only clearly defined request in the investigation sought

Aguirre's official personnel file and the conduct file, which was requested in writing.[55]

Informal and ill-defined document requests caused the OIG to miss critically important documents altogether. For example, after denying that he had referenced Mack's political connections, Hanson did not provide the OIG with a copy of an e-mail in which he admits to using the term ''political clout'' in a conversation with Aguirre about the difficulty of taking Mack's testimony.[56] Despite this written admission, Hanson denied to the OIG during his interview that he ever made such a statement verbally or in an email.[57]

In another example, Mark Kreitman failed to produce an e-mail to the OIG dated September 30, 2005, in which he responded to an inquiry from Charles Staiger in human resources. Staiger asked:

> During the merit process earlier in the summer, was Gary [Aguirre] given a copy of Hanson's supervisory endorsement? If not in writing, was Gary verbally given Hanson's supervisory endorsement? Was the endorsement below [the August 1 re-evaluation] given to Gary either verbally or in writing?[58]

Kreitman replied, ''None of the above.''[59] In other words, it appears Kreitman admitted to Staiger that he failed to transmit the substance of the negative re-evaluation to Aguirre. However, in his interview with OIG, Kreitman claimed that he responded to Staiger *verbally*, rather than by e-mail, and that he told Staiger he transmitted ''the substance'' of the supplemental evaluation to Aguirre on numerous occasions.[60] While the OIG did obtain Kreitman's ''none of the above'' e-mail from Staiger, its final report failed to note or analyze these apparent contradictions.

*4. Failures of the Office of Information Technology*

One of the problems with the OIG investigators' approach to obtaining documents was its inability to rely on the Office of Information Technology (OIT) at the SEC. Even though OIT could have obtained SEC employee e-mails directly from the servers and even recovered deleted e-mails from backup tapes, the OIG did not request such assistance. We sought to determine why not. Interviews with other staff investigators at OIG provide some insight as to one possible reason. Richard Woodford, a counsel with the OIG stated that it was not uncommon for OIT requests to be backlogged and delayed significantly. He said that he could remember at least one instance where an OIG investigation had to be closed because OIT never responded to the OIG's request.[61] Due to incidents like this, the OIG staff apparently perceives assistance from OIT as an exercise in futility. That ought to be unacceptable to SEC management and the Inspector General. Because of this perception, it appears that Andrews gave no serious consideration to obtaining documents from OIT. When asked about her decision to obtain documents directly from the subjects of the investigation, she said ''Who else was I going to get the documents from?''[62]

As a result of the failure to request that OIT obtain relevant emails and documents directly from the computer servers at SEC, the OIG effectively ignored a crucial source of impartial information. For instance, we eventually obtained at least five different

versions of the August first re-evaluation. Despite the importance of the facts and circumstances surrounding the creation of that document, the OIG closed its investigation without access to all of the versions and without a clear understanding of the sequence of events on the day they were created.

*5. Closing Memorandum*

On November 29, 2005, the OIG issued its closing memorandum on the investigation into Aguirre's allegations.[63] The OIG deferred to Aguirre's supervisors' assertions that there were legitimate tactical reasons to delay John Mack's testimony. Its memo concludes, ''There is *no evidence* that Enforcement did not want to take Mack's testimony because of his 'powerful political connections.' ''[64] That statement, and Robert Hanson's denials to the OIG on which it is based, is directly contradicted by Hanson's e-mail to Aguirre.[65] The OIG did not address Hanson's e-mail because it had not seen the e-mail.

The OIG concluded that ''The evidence fails to show that [Mary Jo] White contacting Thomsen resulted in preferential treatment or affected any decision about taking Mack's testimony.''[66] The OIG provides no analysis other than to restate the information about the call relayed from Thomsen herself and note that Kreitman and Hanson were aware that such a call took place. However, as outlined earlier, Aguirre's supervisors drastically changed their attitude and behavior after the Director of Enforcement was contacted about the case.

The most perplexing portion of the OIG's closing memorandum is its conclusion that Aguirre was not excluded from any meetings on the Pequot case. The memo states, ''The evidence shows that Aguirre was involved in many, often lengthy, discussions about whether and when to take Mack's testimony.''[67] As support, the OIG notes that ''Aguirre would often work late and discuss the case with Kreitman'' and that ''Aguirre discussed the case with Berger at least four or five times and sent him e-mails regarding the case.''[68] However, just because Aguirre was included in some meetings does not mean he was not excluded from others. Both Gary Aguirre and Eric Ribelin stated that they were excluded from a meeting with Berger just after Morgan Stanley counsel started seeking information from the SEC about its intentions toward Mack.[69] Had the OIG contacted Aguirre or Ribelin, it could have asked about the specific meeting from which they were excluded.

The OIG noted, ''We found several irregularities with the supplemental evaluation.''[70] However, while noting the irregularities, the OIG did not consider them related to Aguirre's allegations. Instead, OIG referred the matter to its audit staff as an issue for general review rather than to analyze its meaning with regard to Aguirre's specific case.

The last section of the closing memorandum addresses Aguirre's alleged unlawful termination. The OIG claimed, ''The evidence failed to show that Aguirre's complaints about Mack's alleged preferential treatment had *anything* to do with his termination.''[71] To support this position, the OIG noted that Thomsen recalled discussing ''Aguirre's termination with Berger, Kreitman, and Hanson in her office.''[72] Had the OIG probed deeper, it might have learned

that one topic discussed during the meeting was Aguirre's stance toward interviewing Mack.[73] Had OIG staff examined the e-mail which first suggested Aguirre's termination, they might have noted that it began as a chain of e-mails in which Aguirre was attempting to convince his supervisors to take Mack's testimony. Moreover, Berger admitted during Committee interviews that the two issues were connected. He said, ''I think that the fact that he simply wouldn't listen with respect to Mack must have played some part'' in the assessment of his conduct.[74] These facts contradict the OIG's finding.

*6. ''Irregularities'' Deemed Merely an Audit Issue*

While the OIG's closing memorandum purportedly exonerates Aguirre's supervisors, it also noted ''deficiencies related to the performance evaluation documentation.''[75] In particular, the OIG indicated:

> We found several irregularities with the supplemental evaluation including: it was not dated or signed; it appears to have been created after the merit pay calendar deadline; it was not sent to, or considered by, the compensation committee; it was not in Aguirre's employee personnel file (EPF); and it was separate from the initial evaluation written by Aguirre's immediate supervisor, who should be the only one who prepares a summary on behalf of each employee, according to the merit pay process guidance. We are referring these issues to the audit staff.[76]

These issues are integral to Aguirre's allegations. Aguirre's October 11, 2005, letter outlined concerns regarding the records contained in his personnel file including a cover memorandum stating that the negative re-evaluation of Aguirre ''mistakenly did not go to the compensation committee. . . .''[77] Our investigation confirmed that the negative re-evaluation was prepared outside the regular process, after the Compensation Committee met, and referred to incidents outside the rating period. More importantly, we found that it was prepared at the same time and within the same document as John Smith's irregular re-evaluation. Why were they handled together? What did these two employees have in common? We learned that both had recently complained about roadblocks in their investigations following direct contacts between outside counsel and the Director of Enforcement. Determining why these two evaluations were prepared together, outside the normal processes is emphatically an investigative issue, not an audit issue.

Documents produced to the Committees show that on November 29, 2005, the same date as the closing memorandum, Andrews referred the irregularities in the personnel evaluation process to an OIG employee within the audit branch.[78] However, it was not until May 18, 2006, after we began our inquiry and sought briefings from the OIG about the case that Andrews checked to determine the status of the audit, which had not yet even begun.[79] Had the OIG addressed this matter in a timely fashion, it could have uncovered the problems with the personnel review system at SEC over six months in advance of when it finally issued the audit report. The lack of priority and urgency of this audit is illustrative of the

casual attitude toward the entire investigation and subsequent audit.

Moreover, one memo produced by the OIG details a conversation between audit staff, Inspector General Walter Stachnik, and Mary Beth Sullivan.[80] During the conversation, Stachnik and Sullivan concluded that the OIG audit staff should delete John Smith's evaluation from its sample because ''Smith's memo was the same as Aguirre's memo and any questions . . . about the memo could inadvertently apply to Aguirre as well as [Smith].''[81] The OIG's lack of investigative curiosity about those questions is disturbing.

### C. Other OIG Investigations

During the course of our inquiry, several current and former SEC employees contacted us to report information about how the SEC's OIG had handled or mishandled other investigations. While we asked the OIG about them briefly, we did not conduct extensive inquiries as the issues were not directly related to the Pequot investigation or the firing of Gary Aguirre. However, we may seek additional information about the following cases in a continuing effort to monitor the effectiveness of the OIG.

*1. A More Vigorous OIG Investigation*

Not all investigations by the OIG are as lax and informal as the one of Aguirre's supervisors. The way the OIG handled another case in late 2003 provides a stark contrast. The SEC OIG received allegations that an employee had made ''improper and inappropriate'' comments to coworkers. These allegations were investigated much more thoroughly than Aguirre's allegations.

For example, the OIG did not contact the subject of the investigation first, as the OIG had claimed was legally necessary in the Aguirre context. Instead Mary Beth Sullivan began by interviewing the two complainants.[82] So, unlike Aguirre, the complainants in this case had an opportunity to fully explain their view of the issues and provide additional corroborating information directly to the investigator. In her interview with Senate staff, Sullivan did not recall any discussion of the Privacy Act requirements before taking this action.[83] In fact, the OIG did not even inform the subject of the allegations against him until two months after the investigation was launched and a series of other witnesses had been interviewed.

Another way in which the investigation differed from Aguirre's was the more aggressive and confrontational procedures. For example, the way the subject says he learned of the investigation was that a senior SEC official summoned the subject to his office. Two armed guards stood watch while he was given a memorandum informing him of an investigation for unspecified ''bad acts.''[84] By contrast, the OIG simply called Aguirre's supervisors and interviewed them over the phone.

The number and type of witness interviews and the length of the investigative reports also differed dramatically. In all, the SEC OIG interviewed more than 18 employees during the course of this investigation, six of which were transcribed verbatim.[85] However, the OIG did not conduct as many interviews in the Aguirre matter, and it had none of them transcribed. While the closing memo in

Aguirre's case was only seven pages long, Sullivan drafted a ''pretty long report'' on the investigation with voluminous attachments.[86]

This investigation provides a stark contrast to that undertaken in response to Aguirre's allegations against Hanson, Kreitman, and Berger. These contrasts are disturbing given the nature of the allegations in each case. On the one hand, the OIG spent considerable time and resources looking into a dispute between co-workers over alleged use of inappropriate language in the workplace. On the other, the OIG gave short shrift to an allegation that the integrity of the agency's mission was being compromised by improper political influence.

*2. Geek Securities and Commissioner Cynthia Glassman*

We also learned of an allegation that was referred to the OIG involving Commissioner Cynthia Glassman. It was related to a criminal investigation involving a company called Geek Securities.[87] One of the individuals involved in the case allegedly claimed that Commissioner Glassman was his cousin and that she had provided him with advanced warning of what was supposed to be a surprise SEC examination of Geek Securities books and records.[88] Nick Sichi, a chief witness in the criminal matter, told investigators that he learned about the alleged tip off at breakfast on the morning of the examination.[89]

The OIG confirmed that it did conduct an investigation into the allegation.[90] When asked about the investigation, Mary Beth Sullivan indicated that she interviewed Commissioner Glassman, a Special Assistant U.S. Attorney, and an SEC employee who was at the interview where Sichi made the allegation. The OIG did not transcribe any of the interviews and did not interview the person claiming to be Commissioner Glassman's cousin. When asked how long the investigation took, Sullivan said, ''I think I did it pretty quickly, but I'm not sure.''[91] Sullivan could not recall many additional details.[92]

According to Sullivan, the OIG ultimately concluded that ''there appeared to be insufficient evidence to support the allegation.''[93]

### D. The Reopening of the Aguirre Investigation

On July 6, 2006, the SEC Chairman requested that the OIG reopen its investigation into Aguirre's allegations based on new information that was produced to various Committees of the United States Senate. The OIG officially reopened its investigation on the same day after it considered ''all relevant factors.''[94] These relevant factors appear to include the request of the Chairman of the SEC, new allegations that arose, and information learned from the Congressional inquiry.[95]

*1. Relationship to Congressional Investigations*

The OIG stated clearly that the reopening of the investigation was based in part on the corresponding investigation being conducted by the Committees. The investigation conducted by Committee staff generated a significant volume of information that the OIG did not have in its original investigation.

As early as May 2006 when Committee staff first reviewed the closing memorandum at SEC Headquarters, the OIG was aware of

our concerns and questions. However, it wasn't until July 2006 that the investigation was formally reopened. Further, the OIG only reopened its investigation once it was requested by the SEC Chairman. The timing of the decision to reopen the investigation may have had more to do with an attempt to limit the production of documents to the Committees. OIG cited to Committee staff an opinion by the Department of Justice regarding the sharing of information related to ongoing investigations as justification for refusal to produce certain documents.[96]

*2. Attempt to Compel Disclosure of Confidential Communications with Congress*

The most egregious problems caused by the OIG's reopened investigation involved a subpoena issued to Aguirre by the OIG on August 11, 2006. This subpoena was formally served upon Aguirre on August 14, 2006, and requested among other things confidential communications between Aguirre and Congressional committees.[97] On November 3, 2006, the Department of Justice filed a motion to show cause in the U.S. District Court for the District of Columbia seeking enforcement on behalf of the OIG.

The subpoena sought confidential communications between Aguirre and Congress. Following the issuance of the subpoena, Committee staff spoke with Mary Beth Sullivan, Counsel to the IG and inquired about the intent to obtain confidential communication from Aguirre. Sullivan affirmed that the OIG request included Aguirre's communications with Congress.

As a result of this statement, Committee staff began to prepare to litigate the issue should it arise. Through repeated negotiations, the OIG continued to state through the attorneys of the Federal Programs Branch at the Department of Justice that these documents were the subject of the subpoena and that the OIG would continue to seek these communications through judicial enforcement. It was not until after the December 5, 2006, public hearing on Aguirre's allegations raised questions about the OIG subpoena that the OIG finally agreed to a limited production from Aguirre, withholding his confidential communications with Congress.[98]

**E. Conclusion—Independence of the OIG**

The OIG investigation into Aguirre's allegations was flawed from the beginning and hindered by missteps during the entire process. Every step seems to have been based on a desire to go through the motions and close the case. How the OIG could assess Aguirre's credibility without ever speaking to him remains a mystery.

One of the major problems with the OIG seems to be the perception within the SEC regarding the independence of the office and whether or not employees who approach the OIG are treated fairly. We interviewed a number of current and former SEC employees who indicated that the OIG is not well respected and that there is a general reluctance to approach the OIG with concerns. Aguirre was no exception. Aguirre told us that he took his concerns to the Chairman rather than the OIG for just that reason. The OIG's reputation is essential to completing its mission. The SEC needs to take immediate action to restore the independence, competence, and confidence in the OIG.

One area in need of attention is the OIG's independence from SEC management. The SEC/OIG's investigation of Aguirre's allegations was conducted by Kelly Andrews, who told Committee staff, ''We don't second-guess management decisions.'' Indeed, the OIG's closing memo was based only on representations or explanations from Aguirre's supervisors and documents selectively forwarded to the OIG by those same individuals. Moreover, in its ''second'' investigation, the OIG attempted to subpoena records of Aguirre's communications with Congress and refused to explain this action at a Judiciary Committee hearing, allegedly based on instructions from the Justice Department. The IG also forwarded internal e-mails regarding Aguirre and the IG's investigation to Director of Enforcement, Linda Thomsen, a potential subject in the Committees' investigation. These facts and circumstances do not suggest a sufficient degree of independence.

Another concern of the committees is the competency of the SEC Office of Information Technology. SEC/OIG staff told us that the Office of Information Technology was extremely slow in providing e-mails requested in connection with its investigations. In fact, on at least one occasion, an investigation was closed because the OIG request went completely unanswered.[99] In its Aguirre investigation, the OIG failed to identify and obtain a key e-mail that corroborated Aguirre's account of his supervisor's reference to John Mack's ''political clout'' because it relied on the supervisors themselves to provide documents. Had the OIG been able to obtain a timely response from disinterested personnel in the Office of Information Technology, it may have obtained the e-mail and thus avoided closing the case based on findings that were inconsistent with the documentary evidence. The SEC directive should give the OIG authority to set specific deadlines for responses to its document requests and impose meaningful consequences for failure to comply with the deadlines.

The OIG has a position of enormous responsibility. Congress passed the IG Act in 1974, with the goal of ensuring that the public would have faith in government by providing an impartial arbiter tasked with independently overseeing the operations at an agency,

protecting the integrity and promoting the efficiency of government. Based on our review, the OIG at the SEC seems to have failed in its mission. Other SEC employees perceive it as a tool of management, used for retaliatory investigations against disfavored staff. The OIG's number-one priority should be to restore confidence in its ability to conduct professional investigations to ensure the highest standard of integrity at the SEC.

ENDNOTES

1. Inspector General Act of 1978, Pub. L. No. 95-452, 92 Stat. 1101 *codified as amended* at 5 U.S.C. App. 3 (2006).
2. General Accountability Office, *Highlights of the Comptroller General 's Panel on Federal Oversight and the Inspectors General*, GAO 06-931SP, at 1 (Sept. 11, 2006).
3. *Id.*
4. S. HRG. 109-898, at 689 (SEC/OIG 0493).
5. *Id.*
6. *Id.*
7. *Id.*
8. *Id.* at 690.
9. S. HRG. 109-898, at 689 (SEC/OIG 0493) (emphasis added).
10. *Id.* at 717-18.
11. *Id.*
12. *Id.* at 868-69.
13. *Id.*
14. *Id.*
15. *Id.* at 868.
16. Transcribed Interview with Kelly Andrews, Associate Counsel, Office of Inspector General, SEC, at 22 (Nov. 21, 2006) (hereinafter ''Andrews transcript (Nov. 21, 2006)'') (Exhibit 67).
17. Transcribed Interview with Mary-Beth Sullivan, Assistant Inspector General for Investigations, Counsel to the Inspector General, SEC, at 60 (Nov. 22, 2006) (hereinafter ''Sullivan transcript (Nov. 22, 2006)'') (Exhibit 68).
18. S. HRG. 109-898, at 869 (SEC/OIG 0489).
19. Andrews transcript, at 23 (Nov. 21, 2006) (Exhibit 67).
20. *Id.* at 23-24. *See also*, Sullivan transcript, at 57-58 (Nov. 22, 2006) (Exhibit 68).
21. S. HRG. 109-898, at 869 (SEC/OIG 0489).
22. Andrews transcript, at 27 (Nov. 21, 2006) (Exhibit 67).
23. Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896, *codified as amended* at 5 U.S.C. § 552a (2006).
24. S. HRG. 109-898 at 469, Responses of Inspector General Walter Stachnik to Questions from Hearing Record at 7.
25. Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896, *codified as amended* at 5 U.S.C. § 552a (2006).
26. *Dong v. Smithsonian Institution*, 943 F. Supp. 69 (D.D.C. 1996).
27. Privacy Act of 1974, Pub. L. No. 93-579, 88 Stat. 1896, *codified as amended* at 5 U.S.C. § 552a (2006).
28. S. HRG. 109-898 at 469, Response of Inspector General Walter Stachnik to Questions from Hearing Record at 7.
29. Andrews transcript, at 27 (Nov. 21, 2006) (Exhibit 67).
30. S. HRG. 109-898, at 689 (SEC/OIG 0493).
31. SEC/OIG Document Production at 0451 (Exhibit 60).
32. *Id.*
33. *Id.*
34. SEC/OIG Document Production at 0452 (Exhibit 69).
35. *See* Section VI.B.3, *supra*.
36. SEC/OIG Document Production at 0002 (Exhibit 29); S. HRG. 109-898, at 898-901.
37. S. HRG. 109-898, at 934 (SEC/OIG 0504).
38. SEC/OIG Document Production at 0447-48 (Exhibit 70).
39 *Id.* at 0447.
40. *Id.*
41. SEC/OIG Document Production at 0449-50 (Exhibit 71).
42. *Id.* at 0449.
43. This statement appears to be inconsistent with the dates that surrounded the evaluation period. While the OIG never mentioned this inconsistency in its final closing memorandum, it is important to note that this meeting took place after the evaluation period had closed. According to Hanson, this meeting took place on August 1, 2005, which was after the Compensation Committee had met and approved the merit pay increase for Aguirre. *See* Section VI.c.2 (discussing the date of the Compensation Committee meeting), *supra*.
44. SEC/OIG Document Production at 0449 (Exhibit 71).
45. *Id.*

46. *Id.* at 0450.
*47. Id.*

48. SEC/OIG Document Production at 0444 (Exhibit 28).
49. *Id.*
50. *Id.*
51. *Id.* at 0445.
52. S. HRG. 109-898, at 869 (SEC/OIG 0489).
53. Andrews transcript, at 25 (Nov. 21, 2006) (Exhibit 67).
54. *Id.*
55. *Id.* at 25-26.
56. S. HRG. 109-898, at 668 (SEC 0832).
57. *See id.* at 898 (SEC/OIG 0087) (noting Hanson's reply of ''No'' to the question, ''Did you tell Aguirre, or anyone, that it w/b very difficult to obtain approval to take Mack's testimony b/c of his powerful political connections?'').
58. S. HRG. 109-898, at 824 (SEC/OIG 0126).
59. *Id.*
60. SEC/OIG Document Production at 0443 (Exhibit 72).
61. Telephone Interview with Richard Woodford, Associate Counsel, SEC/OIG (Nov. 17, 2006).
62. Andrews transcript, at 24 (Nov. 21, 2006) (Exhibit 67).
63. S. HRG. 109-898, at 870-76 (SEC/OIG 0001-07).
64. *Id.* at 872 (emphasis added).
65. SEC 1932 (Exhibit 35).
66. S. HRG. 109-898, at 872 (SEC/OIG 0003).
67. *Id.*
68. *Id.* at 873.
69. S. HRG. 109-898, at 576, Letter from Gary J. Aguirre to Sens. Shelby and Sarbanes 23 (Aug. 21, 2006), *see also* S. HRG. 109-898, at 1150-51 (Ribelin Tr.).
70. S. HRG. 109-898, at 873 n.2.
71. *Id.* at 876 (emphasis added).
72. *Id.*
73. *See* Hanson transcript, at 59-61 (Sept. 5, 2006) (Exhibit 41).
74. *See* Section VI.C.5, *supra*.
75. S. HRG. 109-898, at 870 (SEC/OIG 0001).
76. *Id.* at 873.
77. *Id.* at 717.
78. SEC/OIG Document Production at 0543 (Exhibit 73).
79. *Id.*
80. *Id.* at 0644 (Exhibit 74).
81. *Id.*
82. Sullivan transcript, at 151 (Nov. 22, 2006) (Exhibit 68).
83. *Id.*
84. Draft letter from SEC employee, SEC, to Chairman Christopher Cox, SEC 2 (Feb. 27, 2006) (on file with the Committee).
85. Draft letter from SEC employee, SEC, to Chairman Christopher Cox, SEC Addendum pg. 1 (Feb. 27, 2006) (on file with the Committee); Sullivan transcript, at 148-49 (Nov. 22, 2006) (Exhibit 68).
86. Sullivan transcript, at 148 (Nov. 22, 2006) (Exhibit 68).
87. Telephone Interview with James Fay, Staff Attorney, SEC (Sep 28, 2006).
88. *Id.*
89. *Id.*
90. Sullivan transcript, at 152 (Nov. 22, 2006) (Exhibit 68).
91. *Id.* at 157.
92. *Id.* at 157-58.
93. *Id.* at 154. In addition to these matters, we also asked the SEC/OIG staff about two other allegations reported during the course of our investigation. One allegation related to an insider trading referral involving Gary Taffet, an aid to New Jersey Governor Jim McGreevey. A supervisor allegedly approved delaying the investigation until after the next election after receiving a memo from SEC staff that referenced polling data. The SEC/OIG staff could not recall investigating the matter. The second allegation related to an SEC employee allegedly viewing child pornography on his computer. The SEC/OIG confirmed that it did substantiate the allegation and referred the matter to the FBI for further investigation. However, the employee resigned before being terminated and authorities declined to prosecute due to an inability to identify the child in the images.

94. SEC/OIG Document Production at 1063 (Exhibit 75).
95. Andrews transcript, at 63-64 (Nov. 21, 2006) (Exhibit 67). *See also* 9/11/2006 Ltr. from W. Stachnik to Sens. Grassley and Specter at 4.
96. Letter from Walter Stachnik, Inspector General, Securities and Exchange Commission, to Sens. Charles E. Grassley and Arlen Specter 3 (Aug. 28, 2006) (cit-

ing Department of Justice Office of Legal Counsel memorandum 13 Op. O.L.C. 77 (Mar. 24, 1989), which cites DOJ's ''longstanding policy to decline to provide Congressional committees with access to open law enforcement files'') (Exhibit 76).

97. *See* Subpoena Duces Tecum (Exhibit 77).

98. *See* Settlement Agreement between Mr. Aguirre and DOJ (Exhibit 78). *See also* S. HRG. 109-898, at 39-41, 470-71, Stachnik responses to questions for the record to Dec. 5, 2006, Senate Judiciary Committee hearing at 8.

99. Interview with Richard Woodford, Associate Counsel, Office of Inspector General, SEC (Nov. 30, 2006).