# Revised
# Exhibit 2B

## to Aguirre Declaration

*Aguirre v. SEC*, 06-CV-1260 (D.D.C.)

Testimony
*United States Senate Committee on the Judiciary*
**Examining Enforcement of Criminal Insider Trading and Hedge Fund Activity**
December 5, 2006

**Mr. Gary Aguirre #2**
Former Investigator , U.S. Securities and Exchange Commission

Testimony of Gary J. Aguirre, Esq.
Before the
U.S. Senate Committee on the Judiciary

Part II
December 5, 2006
The Reasons for Taking Mack's Testimony

The reasons for taking Mack's testimony are discussed next. My lengthy emails of August 4, 2005, and August 24, 2005, again explained to Hanson and Associate Director Paul Berger (Berger) why I believed Mack's testimony was the next logical step in the investigation. The email began:

You have asked that I do a memo why I believe the Mack testimony should be taken as the next logical step in the Pequot investigation. I believe there are three reasons. First, a profile of the tipper was developed in this case that has multiple elements. The possibility that Mack acted as the tipper satisfies almost very element and is inconsistent with none. Second, whether or not Mack is the tipper, his testimony will advance the investigation. If he is the tipper, his testimony will likely suggest some avenues to be pursued and others to be dropped. It will pin him down to a story which we can begin to disprove. [Third] If he is not the tipper, his testimony is the likely first step to eliminating him from consideration. This would allow our limited resources to be focused on starting a new screening process to find another possible tipper.85

The primary reason to subpoena Mack and his records was the fact that he matched the profile of the likely tipper. This process—comparing the elements of the likely tipper's profile with the suspect's profile—was only done with Mack. The evidence implicating Mack, whose testimony was never taken, was more compelling than the evidence implicating any other suspected tippers or tippees before their subpoenas were issued. My supervisors approved the first subpoenas for these thirty or so individuals without comment.

In analyzing the evidence suggesting Mack tipped Samberg, several factors should be kept in mind. First, no evidence came from Mack. Unlike Samberg, no subpoena was served on Mack, not even a records subpoena. He therefore produced no emails, phone records, personal calendar, credit card statements or other records which are usually critical in developing an insider trading case.86 The standard SEC practice is to seek records from the suspected tipper and tippee. From these records, the case is built pebble by pebble until the mosaic becomes visible. That practice was followed in the PCM

17

investigation, except for Mack. The evidence suggesting Mack was the tipper came exclusively from Samberg, PCM and third party sources.

For the same reason, the strength of the evidence against Mack cannot be compared with the evidence against Samberg. Multiple subpoenas had been served on both PCM and Samberg seeking evidence that he had used material nonpublic information in directing the GE and Heller trades. Samberg had also testified twice. Most of the evidence against Samberg comes from the two sessions of his testimony.87

Another factor to be kept in mind was the purpose of presenting the evidence to my supervisors indicating Mack had tipped Samberg. The sole issue was whether there was enough evidence to issue a subpoena to Mack. No one suggested there was enough evidence to file a case against Mack or Samberg or that we should even consider filing a case after Mack's testimony was taken.88 Until Mack, neither Hanson nor Kreitman had required any evidentiary showing before a subpoena could be issued for the testimony of a suspected tipper or tippee. Nor had they offered a rational explanation what evidence would be required before Mack's testimony could be taken. My email-memos to them summarizing the Mack evidence went unanswered. In that void, I provided a standard: Mack met the profile of the suspected tipper.89

Finally, I discuss below the status of the evidence in August 2005. I began to inform my supervisors of the evidence involving Mack in early June. By mid-June 2005, my supervisors authorized me to present the GE-Heller matter to the FBI and US Attorney in connection with a possible criminal investigation, including Mack and Samberg's possible roles as tipper and tippee. The evidence suggesting that Mack was the tipper continued to strengthen in July and August. Yet, even with stronger facts, my supervisors would not allow an administrative subpoena to be issued for Mack, even though they were willing to seek a criminal investigation on lesser evidence two months earlier.

The Profile of the Tipper in the GE-Heller Matter

The profile of the tipper arose out of the trading that Samberg directed. It had these elements:

1) The tipper would have had potential access to information that GE would make a tender offer for Heller;
2) The tipper likely spoke with Samberg shortly before he began to trade;
3) The tipper likely obtained the information shortly before he provided it to Samberg;
4) The tipper should have had one or more motives for tipping Samberg;
5) The tipper and Samberg likely trusted each other.90

As discussed below, only Mack satisfied each element of the profile.

Mack Had Potential Access to Information that GE Intended to Acquire Heller.

Mack had potential access to information from either of two possible sources. He left

Morgan Stanley in late March 2001. Morgan Stanley advised GE on the Heller acquisition since May 2001. Mack was known to have had strong contacts with the investment bankers at Morgan Stanley.91 No investigation of Mack's communications with his contacts at Morgan Stanley was possible for several reasons. First, my supervisors blocked even a records subpoena to Mack for his emails, phone records or calendar, the customary way of ascertaining those facts. Second, Morgan Stanley made a practice of destroying emails during the period in question.92 Finally, after Mack stepped in as CEO, Morgan Stanley reversed its position that it would search through backup tapes for Mack emails.93

The evidence pointed more concretely to another source. According to Business Week, Credit Suisse (CS) had been "wooing" Mack to step in as the CEO of Credit Suisse First Boston (CSFB) since April 2001.94 But CS had competition. Merrill Lynch was also "wooing" Mack.95 That year, Merrill Lynch ranked as the top investment banker in the world and CSFB ranked third.96 In making a choice between Merrill Lynch and CSFB, Mack—known as the "dealmaker"—would likely want to know what significant deals CSFB already had in its inventory. For the same reason, CSFB had a motive to tout its significant deals, like the Heller acquisition, to help "woo" Mack away from the number one investment bank, Merrill Lynch.97 The Heller acquisition was the second largest GE had ever made.98 It could also have been mentioned by CSFB's CFO as something Mack would step into when he started with CSFB two weeks later, on July 12, since the tender offer would be announced eighteen days later, on July 30, 2001.

Mack's Contacts with Samberg

As discussed above, at Samberg's direction, PCM was the largest purchaser of Heller stock during July 2001. Samberg would likely have started his accumulation of Heller earlier than July 2, 2001, if he had got the tip earlier. Hence, Samberg likely received the tip shortly before he began trading on July 2, 2001. Accordingly, other staff and I combed through the records PCM and Samberg produced looking for someone who (1) had contact with Samberg shortly before July 2 and (2) had some reason to know about GE's efforts to acquire Heller. Working back in time from July 2, we found only one person: Mack. Samberg spoke with Mack on Friday June 29, 2001, after the close of the market.99 That matched perfectly with Samberg's decision to begin buying Heller with a vengeance the next trading day after he spoke with Mack. In searching through Samberg's emails, calendar, and phone and credit card records over the summer of 2005, I found no other leads to a possible source of the GE-Heller tip to Samberg. In August, I informed Hanson and Berger of that fact.100

Mack's Contacts with CSFB: The Right Contacts at the Right Time.

The key trading dates for Samberg were July 2, 2001, July 10, 2001, and July 25, 2001.101 On July 2, 2001, Samberg first traded Heller. Samberg increased his buy order with PCM's trader from 15,000 shares on July 9 to 455,000 on July 10. Samberg began placing his $36 million in GE shorts on July 25.102 This suggests that the tipper told Samberg about the pending Heller acquisition shortly before July 2, and then gave Samberg updates around July 9 and again around July 25.103 These trading patterns also

imply that the tipper got his information shortly before July 2, July 10, and July 25.

Mack had potential access to information about the GE-Heller acquisition through his contacts with CS and CSFB in May and June 2001. Mack dealt primarily with the CS chairman about stepping in as the CEO of CSFB. Mack could have learned about Heller from him. However, the CS chairman conducted his negotiations with Mack from CS's headquarters in Switzerland, according to a CSFB attorney,104 which was of course beyond the reach of SEC subpoenas.105 The same attorney informed me that there were also potential issues under Swiss privacy law if we were to seek the cooperation of Swiss Government in obtaining compliance with an SEC subpoena. He offered the obvious solution: "Why don't you get this stuff from Mack?"106

But Mack also had two meetings with CSFB's CFO in the US that fit nicely with Samberg's trading pattern. The first meeting was around June 28, according to the same CSFB attorney.107 Again, one topic of keen interest for Mack would have been CSFB's pending deals. On the evening of June 29, Mack phoned Samberg.108 We suspected that Mack may have tipped Samberg about Heller during this call. The next trading day, Monday, July 2, Samberg began buying huge blocks of Heller.109

Mack had the second meeting with CSFB's CFO on approximately July 9, 2001, according to the same CSFB attorney. That correlates with one of the dates GE "bumped" its offer for Heller.110 The Mack meeting with CSFB's CEO, during which Mack could have received an update on the pending acquisition, fit nicely with Samberg's dramatic move on July 10.111 Finally Mack became CEO of CSFB on July 12, 2001, two weeks before July 25, 2001, when Samberg began placing his $36 million in shorts on GE.112 As CSFB's CEO, Mack would likely have been receiving status reports on the pending GE acquisition of Heller.

I summarized this information to Hanson on August 4 and Berger on August 24:

He [Mack] also took over as CSFB's CEO on July 12, 2001. Samberg's trading pattern, which I can discuss in more detail if you want, suggests that he obtained information just before Monday July 2, around July 9, and around July 25. Mack coincidentally met with CSFB's CFO on June 28 or June 29, again a few days before he began work on July 12, and was CEO at the third key time. Hence, Mack had relevant contacts with CSFB at each time.113

Mack's Motive for Tipping Samberg

There were a number of motives for Mack to tip Samberg:

1) Mack was admitted directly into special PCM deals. One key deal went by the code name "Fresh Start," a Lucent spin-off which PCM got into extremely cheap.114 Mack was promised a $5 million piece of Fresh Start the same night in which he was suspected of giving Samberg the Heller tip. Just nine days earlier, according to a Samberg email, Mack was "beating [Samberg's] chops" to get into Fresh Start. Neither the PCM principals nor Samberg's son seemed happy about Mack getting into Fresh Start.115 SEC

filings indicate Mack did extremely well on his $5 million investment.116

2) Mack, his wife and their foundation were invested in as many as fifteen PCM funds.117 Hence, PCM's profits on insider trading also benefited Mack. For example, Samberg allocated at least $5.4 million in profits from his GE-HF trades to Pequot Partners, a fund that Mack got into shortly before the GE-Heller trades.118

3) Mack got to put at least $7 million (likely much more) into PCM funds that were already closed, except for those with "important business contacts." These funds had sensational returns at that time. For example, Samberg's emails and spreadsheet of Mack's investments indicate Mack or his wife poured millions into the Pequot Scout Fund. It had a 677% return during the eight years prior to June 20, 2002.119 Samberg's attitude toward making exceptions for well connected investors was reflected in his email of July 2, 2001: "the only fund open now is partners, and although the min is $5mm, we are always willing to make significant exceptions for important industry contacts (emphais added)."120 Mack, his wife or their foundation invested money in fifteen PCM hedge funds, which usually had a $5 million minimum.121

4) Mack and Samberg solicited and obtained stock tips from each other. One of Samberg's emails to Mack in April 2001, shortly after Mack left Morgan Stanley, asked Mack for information about Morgan Stanley's stock. Having just been its CEO, Mack would logically still have knowledge of material nonpublic information. Mack told Samberg he had just unloaded a bundle of Morgan Stanley stock.122 Samberg did not trade on this news, so far as we knew.

5) Samberg was proposing Mack as a director on two boards.123

6) They were close friends, e.g., Samberg's secretary said "Mack loves you." On this point, my August 4 email reads in part:

In July 2001, Samberg's company was splitting apart. Benton was a younger and a rising star. Benton's performance was dwarfing Samberg's. Samberg was recovering from heart surgery. Benton was leaving with at least half the company. Samberg was looking at even bigger staff losses to Benton. He testified that he was concerned at this time that more of his executive committee 'might walk.' A big hit on GE-HF would illustrate that his fast ball had not slowed. Regarding GE-HF, Mack was just the guy to do his old friend a big favor, one that would also benefit him."124

The mere relationship between Mack and Samberg was a sufficient "benefit" to Mack to establish a securities violation if he gave Samberg the Heller tip.125

Mack and Samberg Trusted Each Other

On this point, my August 4 email to Hanson and August 24 email to Berger read:

[Samberg] holds an engineering degree from MIT, a Masters of Science from Stanford,

21

and an MBA from Columbia. He started with $3.5 millions and built the largest hedge fund in the world as of 2001, when the GE-HF trading took place. He has generally been very careful about his comments in his e-mails. He used AOL instant messaging, which leaves no trace in any computer, to communicate with key people. In short, he's a smart guy who took few chances. It does not fit the pattern for him to be taking big chances where he got his tip. It makes sense that he got it from someone he trusted and who also trusted him. That was Mack. Mack's e-mails to and from Samberg have a different ring about them. In one e-mail, Samberg's secretary tells Samberg Mack had called and that, "he loves you." In sum, there was a deep trust and friendship between them. It is exactly the kind of relationship that Samberg would feel comfortable calling on for a tip as big as HF and GE.126

There is also the fact that Samberg brought in Mack as PCM's chairman in June 2001 when the insider trading investigation was clearly focused on trading directed by Samberg. My June 3, 2005 email to Hanson read in part:

John Mack, who came up on radar screen as possible GE-Heller tipper, has just become chairman of Pequot Capital, according to WSJ article below. …Is there something to this perverse logic: Mack is the only person in the world who would have as much to loose as Samberg if we could prove that he provided material-nonpublic info to Samberg. Who safer for Samberg to head Pequot and keep its secrets?127

Hanson replied twice. In the first, he said: "Mack is another bad guy (in my view)."128 In the second, Hanson observed:

They may feel they have some enterprise exposure and want to avoid an indictment of the firm by bringing in an outsider to give the appearance that things are cleaned up (audrey [sic] did this before on the case I wordked [sic]) or they may be bringing him in so they are all peeing out of the same tent so to speak.129

Taking Mack's Testimony as Soon as Possible Was Consistent
with Standard SEC Practice

In my July 27, 2005, email to Kreitman and Berger, I also noted:

I also believe Mack's testimony should have been taken promptly for the same reason that staff normally takes early testimony of suspected participants in an insider trading investigation—to pin them down. This is particularly true here because CFSB and Morgan Stanley are still producing e-mails. Further Morgan Stanley will be friendly because Mack is now its CEO. CSFB will be friendly to Mack because Gary Lynch, who is going to Morgan Stanley in a couple of months to join Mack, controls the CSFB production responsive to our subpoena. Further delay allows Mack to concoct a story that is consistent with the information contained in the e-mails. On the other hand, if he did not provide information, that also may become clear. As discussed in my June 28 e-mail to Mark (Exhibit 10), this would allow us to focus on other possible sources for the tip.130

Pinning down the suspected tipper or tippee allows the case to proceed in either of two directions: prove the insider trading case or prove the tipper or tippee gave false testimony. For example, Martha Stewart was not convicted of insider trading; she was convicted of lying to federal officers. This principle is taught at Enforcement training for new staff. It is constantly repeated by senior staff. It guided the PCM investigation until Mack became a suspect. This guideline—taking the testimony to pin down the suspect—was turned on its head for the Mack testimony. In effect, my superiors required the case against Mack be established before his testimony could be taken.131

How the Mack Investigation Was Halted So He Could Become Morgan Stanley's CEO

As discussed above, the investigation of the GE-Heller matter made significant progress during May and the first half of June 2005. On June 14, Hanson and Kreitman authorized me to present the GE-Heller matter, including Mack's and Samberg's roles as the possible tipper and tippee, to the FBI and a federal prosecutor, which I did with other staff the next day.132 On June 29, 2005, Hanson gave my 2004-2005 performance a positive evaluation based on my handling of the GE-Heller investigation, stating that I "made contributions of high quality."133

But the positive momentum of the GE-Heller investigation had just hit a roadblock. On approximately June 23, 2005, in a face-to-face meeting, Hanson told me that it would be difficult to obtain authorization for the issuance of a subpoena to Mack because he had powerful political connections and Kreitman "would have to make the call."134 Hanson repeated his statement regarding Mack's political connections in a meeting with Kreitman later that same week and again in a meeting between the two of us on August 3. I confirmed Hanson's statements about Mack's "political connections" in my emails of July 27, 2005, to Kreitman and Berger,135 August 4, 2005, to Hanson136 and August 24, 2005, to Hanson.137 By his email of August 24, Hanson admitted telling me about Mack's "political clout" in response to my request to issue a subpoena for Mack's testimony and his records.138 By his email of August 4, Hanson admitted telling me that Mack's attorneys had "juice."139

But another event in late June 2005 tells more directly why my efforts to subpoena Mack would fail. On June 23, three days after I first proposed the Mack subpoena be issued, The Wall Street Journal announced that Morgan Stanley "has weighed reconsidering former Morgan president John Mack as a candidate for [its] chief executive officer."140 That same day, Eric Dinallo (Dinallo), head of Morgan Stanley's regulatory compliance group, phoned me.141 Dinallo confirmed that Morgan Stanley was considering Mack for its CEO and, in connection with that possibility, asked if Enforcement was seriously considering Mack as a suspect in the PCM investigation. Dinallo explained that the prospect of such an action against Mack could affect Morgan Stanley's decision whether to rehire him as its CEO. I responded that I could make no statement on the subject, but would inform my supervisors of his inquiry.

Following the conversation, I informed Hanson and Kreitman of Dinallo's question. In

my presence, Kreitman called Dinallo and told him that he was following up on Dinallo's call to me. Dinallo repeated the statement he made to me. Following the call, Kreitman stated in my presence that we should tell Morgan Stanley the SEC was considering an action against Mack since that action could adversely affect the value of Morgan Stanley's stock, a publicly held company. But Kreitman said he would first discuss the issue with Associate Director Berger. That same day, Kreitman discussed Dinallo's question with Berger by speaker phone in my presence. Kreitman first informed Berger of the call from Dinallo. Then, the following exchange took place between Kreitman and Berger almost in these words:

Kreitman: I think we will likely file against Mack and…

Berger (cutting in): I don't think we are going to file and nothing should be said to Morgan Stanley.

Following the Kreitman-Berger call, there was an abrupt shift in the way the investigation was handled; that shift related exclusively to Mack. The usual routines and protocols went out the window. The next day, June 24, Hanson met alone with Berger on the evolving Mack controversy. Although Hanson initially invited Ribelin and me to the meeting, Berger told Hanson at the last moment that the meeting would involve only the two of them. Ribelin and I normally had been included in these meetings. We had firsthand knowledge of the testimony and the other evidence; I also had primary responsibility for the investigation.142 The following Monday, June 27, Hanson and Kreitman also met privately to discuss my request to issue the Mack subpoena.

On June 27, I learned that Mack-Samberg emails, which I had subpoenaed from Morgan Stanley, had been delivered directly to the Director of Enforcement, Linda Thomsen (Thomsen). Neither I nor other staff had heard of this happening before. Indeed, the subpoena explicitly stated that the documents were to be delivered to me. When I picked up the emails from Director Thomsen's office, she also gave me a fax cover letter from Mary Jo White (White), former US Attorney in New York. The fax indicated that White was forwarding the Mack-Samberg emails to Thomsen as a follow up to her conversation with Thomsen on the same subject.143 I had numerous contacts with other Morgan Stanley counsel, but never with White. It appeared that White had been retained by Morgan Stanley to deal directly with Thomsen about the Mack investigation. It is the usual protocol for a defense counsel to deal with the staff attorney first and then go further up the chain of command if he or she were dissatisfied with a decision by the staff attorney. My dealings with Morgan Stanley attorneys had always been cordial and none had expressed a desire to speak with my supervisors. White simply started at the top.

The emails that White had delivered to Thomsen were only one of the two classes of emails I had subpoenaed from Morgan Stanley: email exchanges between Samberg and Mack before Mack left Morgan Stanley in March 2001.144 These exchanges took place before Morgan Stanley became GE's consultant in May 2001 on the Heller acquisition. Accordingly, no one expected these emails to have even the most subtle clues regarding the possible tip from Mack to Samberg. Rather, this class of emails were sought to

provide background information on the Mack-Samberg relationship, e.g., how often they exchanged trading tips, and as a check on whether PCM had produced all Mack-Samberg email exchanges for this time period, which we doubted.145

The other class of emails sought, Mack's communications with Morgan Stanley staff after he left, had more relevance to the possible flow of information. Again, no one expected to find a smoking gun in these emails. As discussed below, smoking guns are rarely found in insider trading cases, particularly when the suspected tipper and tippee are highly sophisticated financial professionals.146 Rather, these emails might identify Morgan Stanley employees with whom Mack was still communicating after he left Morgan Stanley. That lead could open a new path to investigate, e.g., whether the employee was on the acquisition team, had a friend on the team, or had any other reason to know about the acquisition. White produced no emails of this class, at least none that Thomsen turned over to me.

When I picked up the emails from Thomsen, she walked out of her office, handed them to me, and made this comment: "they say what they say." I turned the emails over to an intern to review and compare with those produced by PCM; she reported back, as I recall, that there were a few new emails. This was relevant to our growing belief that PCM had withheld or destroyed 2001 Samberg emails. As expected, however, the emails merely provided background on the Samberg-Mack relationship.

In this context, Director Thomsen's comment—"they say what they say"—was troubling. As discussed above, the emails said very little. Had White suggested to Thomsen that these emails somehow demonstrated Mack had not provided the tip to Samberg? Was Thomsen going along with it? Did Thomsen think we were relying on these emails to prove Mack had tipped Samberg? To begin with, our primary theory was the tip had flowed from CSFB to Mack and then to Samberg. Over the next couple of days, as my supervisors continued to block the Mack subpoena, my concern grew. Had Thomsen or Berger directed Kreitman to block the Mack subpoena based on emails White had delivered to Thomsen? If so, why was Thomsen making decisions that could unravel the investigation without a complete briefing?

By email of June 29, 2005, I informed Kreitman that the most senior Enforcement staff had assumed unusual roles in relation to the Mack investigation: (1) Director Thomsen was receiving Mack-Samberg emails responsive to the subpoena I had served on Morgan Stanley; and (2) senior staff (who had little knowledge of the investigation) was dealing directly with Morgan Stanley's counsel. My email read:

I have been informed by Fiona Phillips, who represents Morgan Stanley, that a CD is expected here this afternoon. When I told them [her] that it could be delivered tomorrow, since the mailroom would be closed, she insisted that it be delivered today because "someone here was expecting it." That person is not me. I also understand that other documents from Morgan Stanley were sent directly to Linda Thompson [sic] and that there have been discussions between senior staff and counsel for Morgan Stanley. As I have told Bob, and stated in my memos, the most logical path of the information is from

25

CSFB to Mack to Samberg (emphasis added).147

Kreitman did not respond to this email.

Director Thomsen had reason to listen when White called her in late June to discuss the possible SEC insider trading investigation of Mack. At that time, Thomsen's job was on the line. As Director of Enforcement, she serves "at the pleasure" of the SEC Chairman. In late June 2005, the SEC was about to change its Chairman.148 President Bush had nominated Christopher Cox, who was widely perceived to be far more business friendly than his predecessor.149 The financial media openly speculated that Thomsen could lose her job.150 This new reality apparently had some effect on Thomsen; she told Newsweek in June 2005 that Enforcement would have to adapt to the new leadership.151 It was in this environment that White called Thomsen to discuss—and more than likely try to discourage—the insider trading investigation of Mack, the Wall Street titan and "elite" Bush fund raiser. Incidentally, Hanson identified White as one tentacle that Mack could use in exercising his "political clout."152

On June 27 and June 28, I sent two emails to Kreitman explaining in detail (1) the evidence indicating Samberg had acted on material nonpublic information in directing the trades in GE and Heller stocks153 and (2) why subpoenas for Mack's testimony and related records were the most logical next steps in the investigation.154 On June 27, I also prepared and delivered to Kreitman a spreadsheet summarizing Mack's ties to fifteen PCM hedge funds155 and directed an intern to prepare and deliver another spreadsheet summarizing other key Mack-Samberg contacts and business relationships.156 These emails and spreadsheets supplemented emails to Hanson earlier in June indicating that Mack was the likely tipper.157

On June 28 and 29, I spoke privately with Kreitman regarding the issuance of the Mack subpoenas. Kreitman showed no interest in the facts summarized in the emails and spreadsheets supporting my belief that the Mack subpoena should be issued. Nor would he allow me to summarize the facts in those emails and spreadsheets. He angrily refused to allow the subpoenas to be issued, but did not explain the reasons for his decision. He provided no guidelines under what circumstances he would authorize the issuance of the subpoenas. By email of June 29, I confirmed Kreitman's refusal to allow the Mack subpoena to be issued and also noted his decision would have a significantly adverse impact on the investigation. That email read in part:

As you know, I have asked to issue a subpoena to CSFB and to take the testimony of John Mack in connection with Samberg's $80 million trades in GE and Heller shortly before the public announcement of the GE's acquisition of Heller. I suggested in my e-mail to you of June 27 in summary fashion why Mack was a logical source of the tip and also suggested in my memo of June 28 that this was the next logical step in this investigation.…

Your refusal to permit this testimony, along with other limitations, has significantly affected this investigation.…158

As stated below, Kreitman did not respond to my June 29 email for almost four weeks. This was out of character for him, as it was his practice to promptly reply to emails from his subordinates. Even more out of character, he never replied to my lengthy emails of June 27 (nine pages) and June 28 (four pages) describing why Mack's testimony should be taken.

I had issued over ninety subpoenas in the course of the PCM investigation. With the exception of the delivery of the Mack-Samberg emails by Morgan Stanley's counsel to Director Thomsen, defense counsel always sent the responsive documents to me in accordance with the explicit instructions in the subpoena. Likewise, I had spoken directly with all defense counsel regarding their clients' compliance with these subpoenas. No controversy had arisen during my discussions with Morgan Stanley's counsel regarding the production of documents pursuant to the Commission subpoenas.

As mentioned above, it was even more unusual that Morgan Stanley brought in a high-powered attorney, Mary Jo White, to discuss a subpoena production with Enforcement's highest official, Director Thomsen. Thomsen and White surely discussed something more important. The likely subject of their call was Morgan Stanley's dilemma; Mack could not step in as Morgan Stanley's new CEO if he brought with him the risk of an SEC lawsuit for insider trading. Morgan Stanley's chief compliance officer called me a day or two before to discuss the same subject. No one knows what White and Thomsen discussed except them. But two events the next week give a strong clue: Kreitman barred the service of any subpoena on Mack, and, consequently, Mack was able to return to Morgan Stanley as its CEO.

The evidence indicated Kreitman had executed the decisions, but had not made them. His handling of the Mack controversy was out of character for him, e.g., giving Mack favored treatment, directing me to seek a criminal investigation and then blocking the issuance of an administrative subpoena, refusing to review my emails detailing the reasons Mack's testimony was necessary, failing to respond to multiple emails, and doing much of this with anger. It was obvious to me that he was under pressure from above. Berger's handling of the Dinallo question suggested that the pressure was coming at least from his level. The unprecedented delivery of the Mack-Samberg emails to Director Thomsen and her discussion with Mary Jo White suggest Thomsen had applied the pressure. And if Thomsen had applied the pressure, did it originate with her or was it merely passing through her from a higher level within the SEC or outside the SEC from Mack's or Morgan Stanley's "powerful political contacts"?

On June 30, one week after Dinallo's call, Morgan Stanley hired Mack as its CEO. Morgan Stanley's concern that Mack was under investigation, as expressed by Dinallo to Kreitman and me one week earlier, had been assuaged. The only way Mack could be insulated from an SEC investigation was if senior SEC officials had decided that he would not be investigated. The only way Morgan Stanley could be comfortable that Mack would not be investigated by the SEC is if a senior SEC official had given this assurance.

On the same morning Mack returned as Morgan Stanley's CEO, June 30, 2005, I tendered my resignation, effective September 30, 2005. I had returned to the practice of law in September 2004 to perform public service with the SEC. I believed, and still do, that my supervisors' decision blocking the Mack subpoena was done as a favor for Mack and Morgan Stanley and, as such, corrupted the SEC's mission. Trying to get my supervisors to adhere to the SEC's mission was not why I had come to the SEC. More to the point, I could not carry out my duties as a federal officer in the PCM investigation and yet accept the decision of my supervisors to give Mack favored treatment.

Over the next four weeks, other SEC staff encouraged me to withdraw my resignation and try to change the course of the PCM investigation. One colleague suggested that my departure guaranteed the GE-Heller investigation would end. Additionally, over the next four weeks, I continued to find more evidence suggesting that Mack was the tipper. By late July, I decided to withdraw my resignation. I would challenge my supervisors' decision giving Mack favored treatment at ever higher levels of the SEC until it was reversed.159 To that end, on July 21 or July 22, I met with Berger and told him that Hanson had informed me the Mack subpoena had been blocked because of Mack's powerful political connections. On July 27, I sent Berger two emails. One told him I was withdrawing my resignation.160 The other informed him why I believed Hanson had blocked the Mack subpoena: Mack's powerful political connections.161

The apparent favor from senior Enforcement officials to Mack and Morgan Stanley raises another troubling question: Did any of the senior officials who blocked the Mack testimony receive anything in return? That question shifts the focus to former Associate Director Berger. The most obvious internal intervention in the Mack investigation came from Berger. He was the point person who cut off Kreitman in mid-sentence to say the Mack investigation was going nowhere. Kreitman then reversed his support for the Mack investigation. The most obvious external intervention in stopping the Mack investigation came from Mary Jo White of Debevoise & Plimpton (D&B), attorneys for Morgan Stanley. In bypassing SEC protocol, she went directly to Director Thomsen, who, to the best of my knowledge, had never been briefed on the GE-Heller investigation and Mack's possible role as the tipper.

In May 2006, White announced Berger would start in June with D&P and work on securities cases, enforcement and white-collar criminal defense matters. She said Berger's wealth of experience at the SEC "will be a tremendous asset to our clients."162 Some obvious questions must be asked about Berger's courtship with D&P. Had Berger stopped the investigation and terminated my employment to curry favor with D&B? Did May Jo White participate in recruiting Berger to D&B? When were the first discussions between D&B and Berger about his personal plans? Did Berger recuse himself from the PCM investigation after he began discussions with D&B about his personal plans? Was Berger a "tremendous asset" to a D&P client before he left the SEC?

85 See my emails of August 4, 2005, to Hanson, and August 24, 2005, to Berger. Both emails have an error. A paragraph describing Samberg reads: "We do not have a

complete picture of Mack's financial assets, but his holdings in his Pequot funds in 2001 exceeded $400 million." That was the amount of Samberg's holdings in Pequot, not Mack's.

86 See infra pp. 41-42.

87 See my June 27, 2005, email to Kreitman, Hanson, and Ribelin.

88 To the contrary, I told my supervisors that Mack's testimony was a critical intermediary step in the investigation:

Questioning Mack about this transaction could take us in several directions, each of which suggests a different focus for the investigation. First, Mack could deny that he ever knew that GE would make the offer until the public announcement. The investigation would then focus on whether this was true. Second, Mack might say he learned on June 28 or June 29. The focus would then be placed on his contacts with Samberg at that time and whether he learned that GE had bumped its offer around July 9. Finally, he might give convincing testimony that he learned after July 12 for the first time and cause us to reevaluate whether his should even be considered.

See my August 4, 2005, email to Hanson

89 The elements considered in the tipper's profile are very similar to the factors typically considered in proving an insider trading case. See infra pp. 41-42.

90 See my emails of June 6, 2005, and June 20, 2005, to Hanson; my email of June 28, 2005, to Hanson, Ribelin and Kreitman; my email of July 27, 2005, to Kreitman and Berger; and my email of August 4, 2005, to Hanson.

91 Id.

92 The firm claimed it hadn't retained emails related to numerous big investigations when in fact it had. The SEC alleges the firm destroyed other emails it was required to keep. During settlement negotiations, regulators discussed but opted not to provide some recourse for small investors affected by the document problems, according to people familiar with the discussions.

Susanne Craig, New Morgan Stanley Has Old Troubles Over Emails, Investor-Lawsuit Clouds, WALL ST. J., May 24, 2006, at C1.

93 See my July 19, 2005, email to Kreitman, Hanson, Ribelin, Eichner, and Jama.

94 David Fairlamb and Emily Thornton, Is John Mack's Knife Sharp Enough? BUSINESS WEEK, July 30, 2001, at 76.

95 See my August 4, 2005, email to Hanson and Poch's June 30, 2001, email to Samberg. John The Apostle; The New Head of CSFB Preaches Teamwork and Promises to Exorcise the Bank's Demons. Can John Mack Perform a Miraculous Turnaround? FORTUNE August 13, 2001 at 30.

96 Fairlamb & Thornton, supra, note 94.

97 See my August 4, 2005, email to Hanson.

98 Nikhil Deogun and Matt Murray, GE Capital to Acquire Heller Financial—Deal Price of $5.3 Billion Means Specialty Lender Will Fetch Big Premium, WALL ST. J., July 30, 2001, at A3.

99 See Samberg's email of June 30, 2001, to Jerry Poch; my June 27, 2005, email to Kreitman, Hanson and Ribelin; the June 20, 2005, string of emails between me and

Hanson; my August 4, 2005, email to Hanson; my June 6, 2005, email to Hanson and others; and my July 27, 2005, email with attachments to Kreitman and Berger.

100 See my August 4, 2005, email to Hanson and my August 24, 2005, email to Berger.

101 See my June 27, 2005, email to Kreitman, Hanson and Ribelin.

102 Id.

103 We had not found a contact between Mack and Samberg around July 9 or July 25. However, our records from PCM and Samberg were incomplete. Samberg's personal and PCM phone records were incomplete for 2001. The same was true of PCM's production of Samberg emails for 2001. I informed Hanson by email on June 1, 2005, that I suspected PCM or its attorneys had held back Samberg emails for 2001. For example, PCM had produced 837 Samberg emails for July 2001, when PCM managed $15 billion in assets and had 250 employees and 3,337 Samberg emails in July 2002, when it was half its former size due to the Andor spin-off. Further, Samberg produced none of his instant messages for this period since it had not been saved. Of course, we had no records from Mack to check, because of the subpoena bar.

104 See my August 17, 2005, email to Kreitman and Hanson.

105 Id.

106 See my July 11, 2005, email to Hanson

107 See my August 17, 2005, email to Kreitman and Hanson and my August 4, 2005, email to Hanson. Since no subpoena could be issued for Mack's calendar or other records, the information from the CSFB attorney could not be verified. Also, this attorney reported to Gary Lynch, CSFB's General Counsel and a close business associate of Mack. I advised my supervisors about my concerns that Lynch was orchestrating the document production for CSFB relating to Mack. See my July 19, 2005, email to Kreitman, Hanson and other staff ("Lynch will thus be in a position to have orchestrated the document production from both CSFB and Morgan Stanley relating to Mack.") and my August 24, 2005, email to Hanson ("Since documents are being filtered by Lynch, and may not exit anyway, there can be no miracle leap over 9' bar."). In short, I doubted that the CSFB General Counsel had given us the full story regarding Mack's contacts with CSFB or CS during the critical period (June 27 through June 29) just before Samberg began trading in Heller. The contacts may have been far more extensive than Lynch and his subordinate told us.

108 See Samberg's June 30, 2001, email to Poch.

109 See my June 27, 2005, email to Kreitman, Hanson and Ribelin.

110 Id.

111 Id. See also my August 4, 2005, email to Hanson.

112 Id.

113 Id.

114 My June 29, 2005, email to Kreitman put in this way: "Mack was admitted directly into Pequot deals, e.g., the night that Mack is suspected of giving Samberg the tip, Samberg arranged for Mack to get a $5 million piece of a Lucent investment subsidiary that was being sold at a fire sale …"

115 See my August 4, 2005, email to Hanson; and my August 24, 2005, email to Berger.

116 Fresh Start became Celiant Corporation. It was initially co-owned by PCM and Lucent. Mack bought 3,333,333 shares of preferred stock directly from Celiant for $5 million. (See page 21, Andrew Corp Form 8-K/A for the period ending June 4, 2002), the

same terms and conditions under which PCM acquired its 33,333,333 shares. On February 19, 2002, Andrews Corp filed an 8-K with the SEC stating that it would buy all outstanding Celiant stock for $469.8 million: $203.1 million in cash and $266.6 million in stock. The merger agreement provided that Celiant preferred shareholders, such as Mack and PCM, would split $119.6 million in cash and the 16.28 million shares of Andrew Corp. common stock. Mack owned 4.26% of the outstanding preferred stock. Hence, under the terms announced in the February 19, 2002, and the June 4, 2002, Form 8-K/A, the value of Mack's interest would have been approximately $16.43 million. However, the stock would not be issued until June 2002 and would not be registered until September 2002. (See Andrew Corp Form 424B3).

117 See Excel spreadsheet with Mack and his wife's investments in PCM funds. A copy of this document was provided to Committee staff as attachment 11 to Ex. 19 to my August 21, 2006, letter to Senator Shelby.

118 See my June 27, 2005, email to Kreitman, Hanson and Ribelin; and my July 27, 2005, email with attachments to Kreitman and Berger.

119 PCM response to SEC inquiry question 5. A copy of this document was provided to Committee staff as Ex. 51 to my August 21, 2006, letter to Senator Shelby.

120 See the June 20, 2005, string of emails between Hanson and me.

121 A copy of this document was provided to Committee staff as attachment 11 to Ex. 19 to my August 21, 2006, letter to Senator Shelby.

122 I am not in possession of this email. However, I know where it can be found at the SEC.

123 See Celiant, supra, note 116.

124 See my June 27, 2005, email to Kreitman, Hanson and Ribelin; and my August 4, 2005, email to Hanson.

125 Dirks v. SEC, 463 U.S. 646, 664 (1983) ("The elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend. The tip and trade resemble trading by the insider himself followed by a gift of the profits to the recipient.")

126 See my August 4, 2005, email to Hanson; my August 24, 2005, email to Berger; my June 27, 2005, email to Kreitman, Hanson and Ribelin; my June 28, 2005, email to Kreitman, Hanson and Ribelin; and my July 27, 2005, email with attachments to Kreitman and Berger.

127 See my June 3, 2005, email to Ribelin, Foster, Eichner, Conroy, Glasco, Miller, Hanson and Kreitman. This email incorrectly stated that Mack left Morgan Stanley in late July 2001. This point was corrected by my email of June 6, 2005; Mack actually left in March 2001.

128 See Hanson June 3, 2005, email to me.

129 See Hanson's email to me also dated June 3, 2005.

130 See my July 27, 2005, email with attachments to Kreitman and Berger.

131 Kreitman required proof exist Mack "went over the wall," meaning he had knowledge GE intended to acquire Heller before he could be asked if and when he had such knowledge. See discussion infra p 37.

132 The index to the notebook was provided to Committee staff as Ex. 4 to my August 21, 2006, letter to Senator Shelby. The index also served as an outline for my presentation to Hanson and Kreitman on June 14, 2005, and to the FBI agents and U.S.

Attorney on June 15, 2005.

133 My evaluation of my own work, referred to by the SEC as a "contribution statement" was forwarded to Hanson by my email on June 17, 2005. After receiving my contribution statement, Hanson did his own evaluation of my performance, which was provided to Committee staff as Ex. 38 to my August 21, 2006, letter to Senator Shelby. Then, Hanson forwarded it to the Compensation Committee. The date of Hanson's evaluation and his transmittal date to the Compensation Committee are unknown because the SEC has refused to produce these records. Pursuant to my FOIA request, the SEC produced the "Supervisory Transmittal Form" in which Hanson stated my contributions were of "high quality."

134 This is my best recollection. However, it is possible this communication occurred as early as June 21. This discussion was memorialized in my email of July 27, 2005, to Kreitman and Berger; my email of August 4, 2005, to Hanson; my email of August 24, 2005, to Berger; as well as in Hanson's email of August 24, 2005, to me.

135 See my email with attachments of July 27, 2005, to Kreitman and Berger.

136 See my August 4, 2005, email to Hanson.

137 See my August 24, 2005, email to Hanson.

138 Id.

139 See Hanson's August 4, 2005, email to me.

140 Ann Davis, Morgan Stanley May Reconsider Mack for CEO, WALL ST. J., June 23, 2005, at C1

141 This phone call could have occurred on June 27, though June 23 is my best recollection of the date.

142 See my email with attachments of July 27, 2005, to Kreitman and Berger.

143 Id.

144 See my July 19, 2005, email to Kreitman, Hanson, Ribelin, Eichner and Jama.

145 See supra note 92.

146 Newkirk infra p. 41 and note 209.

147 See my June 29, 2005, email to Kreitman.

148 Susan Harrigan, Mutual Fund Rule Gets Nod; SEC Revote Reaffirms Measure Requiring Directors Have No Ties to Firms Managing Investors' Accounts, NEWSWEEK, June 30, 2005, at 52 ("To succeed Donaldson, President George W. Bush has appointed Rep. Christopher Cox (R-Calif.), who has been perceived as friendly to business.")

149 Id.

150 Departures May Leave a Political Imbalance, FIN. TIMES, June 29, 2005, Comment at 15 ("Cox, if approved by the Senate, would have to decide whether to retain Linda Chatham Thomsen as SEC enforcement director."); see also: Carrie Johnson, For Chief, A Chance To Shape the SEC; Cox May Choose Division Heads, WASH. POST, June 7, 2005, at D1 ("Whether Cox retains or replaces her will be watched closely as a clue to his commitment to stringent enforcement.")

151 Karen Tumulty and Mike Allen, His Search for a New Groove, TIME, December 19, 2005, at 38.

152 By my email of August 24 to Hanson, I confirmed than Hanson had stated "several times that the problem in taking Mack's exam is his political clout, e.g., all the people that Mary Jo White can contact with a phone call." Hanson responded on the same day:

"Most importantly the political clout I mentioned to you was a reason to keep Paul and possibly Linda in the loop on the testimony."

153 See my June 27, 2005, email to Kreitman, Hanson, and Ribelin.

154 See my June 28, 2005, email to Kreitman, Hanson and Ribelin.

155 See Excel spreadsheet with Mack and his wife's investments in PCM funds. A copy of this document was provided to Committee staff as attachment 11 to Ex. 19 to my August 21, 2006, letter to Senator Shelby.

156 I do not have a copy of this spreadsheet. However, an edited portion of that spreadsheet limited to the known email communications between Mack and Samberg was provided to Committee staff as attachment 12 to Ex. 19 to my August 21, 2006, letter to Senator Shelby.

157 See my June 6, 2005, email to Hanson and others; and Hanson's June 20, 2005, email to me.

158 See my June 29, 2005, email to Kreitman.

159 Federal employees are required to "disclose waste, fraud, abuse, and corruption to appropriate authorities." 5 C.F.R. 2635.101.

160 I spoke with Berger that same day and he accepted the withdrawal of my resignation. See my July 27, 2005, email to Berger.

161 See my July 27, 2005, email with attachments to Kreitman and Berger.

162 SEC Associate Enforcement Director Stepping Down, DOW JONES NEWS SERVICE, May 18, 2006.