# Revised Exhibit 2C

## to Aguirre Declaration

*Aguirre v. SEC*, 06-CV-1260 (D.D.C.)

Testimony
*United States Senate Committee on the Judiciary*
**Examining Enforcement of Criminal Insider Trading and Hedge Fund Activity**
December 5, 2006

**Mr. Gary Aguirre #3**
Former Investigator , U. S. Securities and Exchange Commission

Testimony of Gary J. Aguirre, Esq.
Before the
U.S. Senate Committee on the Judiciary

Part III
My Supervisors Gave False and Ever-Changing Reasons for Blocking
the Mack Subpoena

After senior Enforcement officials decided to block the Mack subpoena, they still had to communicate their decision to lower staff. And this would raise a sticky question: why no subpoena for Mack? One option was to tell staff the truth. That assignment would likely have fallen on Kreitman. His email would have read something like this: "Director Thomsen and Associate Director Berger have made a final decision: John Mack will not be subpoenaed for reasons they do not wish to share. Anyone who presses for those reasons will be fired." Enforcement officials wisely rejected the truth option. They did, however, come up with something similar: give a reason that sounds like the truth. This broadened the options.

Does Mack Have a Motive?

Kreitman came up with the first one on June 27: did Mack profit from Samberg's trades in GE and Heller? I said yes, explaining Samberg had allocated profits from the GE-Heller trading to at least one of the hedge funds in which Mack had invested.163 I also told Kreitman that Samberg had returned Mack's favor, assuming Mack had tipped Samberg, with numerous favors of his own to Mack.164 Two days later, I sent Kreitman an email describing Samberg's favors to Mack.165 Those favors were also addressed in my emails of July 27 and August 4.166

The issue of motive had never been raised by any of my supervisors in the PCM investigation as a reason not to issue a subpoena. Further, under established precedent, the friendship between Mack and Samberg was alone sufficient to establish illegal insider trading if Mack had tipped Samberg.167 The hunt had begun: senior Enforcement officials were looking for a reason—legitimate or not—to block the Mack subpoena.

We Need More Specificity to Approve the Mack Subpoena

Four weeks passed before Kreitman would raise another objection to Mack's testimony. By his July 25 email, Kreitman said he wanted more "specificity" before he would approve the subpoena for Mack.168 His email made no sense. First, Kreitman usually

34

responded within hours to emails from his subordinate staff. His July 25 email was a reply to my email of June 29, almost four weeks earlier. Second, Kreitman's email ignored the "specificity" set forth in the lengthy emails and spreadsheets he received on June 27 and June 28.169

I replied to Kreitman and also to Berger on July 27 in an eight-page email with fifteen attached exhibits. The exhibits were emails and spreadsheets which I had previously provided to Hanson or Kreitman.170 Referencing these exhibits, the letter addressed every contention in Kreitman's July 25 email. My email first addressed the four-week delay in Kreitman's response. I suggested that Kreitman's email had been prompted by my meeting with Associate Director Berger a few days earlier.

My July 27 email began:

This replies to Mark's e-mail of July 25, which in turn replied to mine of June 28 (attachment 13).171 I wrote and sent my e-mail immediately after a heated discussion with Mark on June 28, memorializing what had transpired. I do not understand why it would take four weeks to respond. I am also copying Paul because the timing of Mark's e-mail suggests it was triggered by my conversation with Paul on the same points late last week.

I told Berger during our meeting the prior week that Hanson had blocked the issuance of subpoenas for Mack's testimony and key documents because Mack had powerful political connections.

My July 27 email went on to point out that a suspected violator of the federal securities laws (Mack) was getting special treatment because of his powerful political connections and that "treating Mack differently is [not] consistent with the Commission's mission, at least as I understand it…." The email reads in part as follows:

I had different and more troubling input why it was difficult to move ahead with the second CSFB subpoena and the Mack testimony. I sent two e-mails to Bob during the week of June 20 (see attachments 3 and 8) proposing that we proceed with the Mack testimony and broaden the CSFB subpoena. When I did not hear back from Bob, I spoke with him directly about these proposals. Bob told me 1) that these decisions were for Mark to make and 2) it would be an uphill battle because Mack had powerful political connections. Bob also mentioned this concern during a meeting with Mark and me (emphasis added). Bob's comment about Mack's political influence became more real when I learned on June 27 that documents I had subpoenaed from Morgan Stanley were faxed by Mary Jo White (who had never represented anyone in the investigation) directly to Linda Thompson (see attachment 15), before Morgan Stanley produced them in the investigation. On the preceding Friday, June 24, Bob also met privately with Paul about the investigation I was handling. Likewise, Mark and Bob did not invite me to participate in the meeting on June 27 when they discussed Mack's possible testimony. This combination of events suggests to me that the issue whether Mack's testimony would be taken was being handled differently than the same issue for other witnesses in this

investigation and different from the same issue in other investigations. Further, I do not believe that treating Mack differently is consistent with the Commission's mission, at least as I understand it.172

In sum, I informed Berger on two occasions in less than one week that Hanson had blocked the Mack subpoena because of his powerful political connections. Blocking Mack's testimony for this reason violated multiple provisions of the Code of Federal Regulations which governs the operations of the SEC.173 Yet, Berger took no action whatsoever. He apparently did not even speak with Hanson because, exactly one week after my July 27 email, Hanson repeated the comments about Mack's political clout, which he first made on June 23. But issue is specificity?

We Need another Memo Before We Can Decide to Authorize Mack Subpoena

At a face-to-face meeting with Hanson on August 3, I again questioned the decision to block the Mack subpoena because of his political influence. At that meeting, Hanson reiterated his earlier position: it would be very difficult to take Mack's testimony because of his political influence. By my email of August 4, I confirmed further details of the exchange with Hanson on August 3:

Second, I told you that the decision not to take Mack's testimony because of his powerful political connections was the event that triggered my decision [to leave the Commission] …We then discussed at some length what standard had to be met to take Mack's testimony. You told me that Mack was "an industry captain," that he had powerful contacts, that Mary Jo White, Gary Lynch, and others would be representing him, that Mary Jo White could contact a number of powerful individuals, any of whom could call Linda about the examination. I told you I did not believe we should set a higher standard for a political captain than anyone else.174

In another email on August 4, I confirmed and continued the discussion from the night before:

Bob:

I mentioned last night that Ferdinand Pecora was chief counsel for the Senate Committee that drafted the 1933 and 1934 Acts, including the key operative language of Section 10(b)…

When the SEC declines to question "industry captains," when an investigation suggests it is the next logical step, we are granting them a pass to play the trading game by their own rules. We do the same when we set artificially high barriers to question them that do not exist for others, e.g., don't question them about going over the wall until we proved they have already made the trip.

I don't think Pecora was suggesting that regulatory scrutiny be delayed until we have another market collapse. I do not think he would have delayed a heartbeat before taking

John Mack's testimony on the record in this matter. Mack had multiple motives, Samberg's trust, contact with Samberg at the key moment, and two possible sources for the tip. He should be asked the obvious questions.175

In his next email, Hanson bypassed my characterization of his comments about Mack's political influence, but he did not deny them. He only admitted saying: "Mack's counsel will have 'juice' as I described last night—meaning that they may reach out to Paul and Linda (and possibly others)."176

Several weeks later, Hanson and I had another email exchange on "Mack's political clout." Here are our email exchanges discussing Hanson's comments to me:

Aguirre: "First, before and after the Mack decision, you have told several times that the problem in taking Mack's exam is his political clout, e.g., all the people that Mary Jo White can contact with a phone call."177

Hanson: "Most importantly the political clout I mentioned to you was a reason to keep Paul and possibly Linda in the loop on the testimony."178

Aguirre: "Bob, this is spin. You told me it would be tough to take Mack's testimony because he has political clout. An artificially high barrier has been set for his exam. I do not think this is proper. Doing so clashes with the SEC's mission. It also stops me from doing my job as a federal officer."179

The "reason" Hanson gave in his email for telling me about "Mack's political clout"—"to keep Paul and possibly Linda in the loop on the testimony"—makes no sense. When Hanson spoke about Mack's political influence during our meeting on August 3, as confirmed by my August 4 email, both Paul and Linda had been making decisions relating to Mack's testimony for six weeks. They were both clearly "in the loop."180 Further, if my supervisors withdrew their objection to the Mack subpoena, there would be plenty of time to inform both Thomsen and Berger before the subpoena hit the fax machine.

The August 4 email exchange resulted in Hanson directing me to prepare yet another memorandum explaining why Mack's testimony should be taken. Consequently I prepared and sent another lengthy email to Hanson and later to Berger explaining why the Mack testimony was the next logical step.181

We'll Check Your Facts and Then Decide whether to Authorize Mack's Testimony

After Hanson repeated his comments on August 3 about Mack's political influence, it was clear Berger had done nothing. I therefore decided to inform Director Thomsen of Mack's preferential treatment, and, if she failed to act, to inform the Commissioners. But first a little background is necessary to place in context my comments to Thomsen.

As discussed above, Foster had worked on the PCM investigation since I contacted him

in October, just after his presentation to incoming staff how to conduct an insider trading investigation. He retired from the SEC on June 30, 2005. At Foster's going away party on July 11, I was present when Foster told Thomsen that the PCM investigation was the most important matter he had worked on during his 30 years with Enforcement. Later that evening, Foster also suggested to me that I speak directly with Thomsen regarding the investigation.

Consequently, on August 4, 2005, I sent the following email to Thomsen:

Subject: Hilton's comment to you

Do you have an open door policy?
If so, do you recall Hilton Foster's comment to you about the most important case he handled in his 30 years with the Commission? He wanted me to talk to you about it. It was nearly killed 5 months ago182 and is now moving in circles.

It could change the financial markets--make them a little more hospital [hospitable] for investors, small or big, who do their home work rather than buy information with favors.183

Immediately after I sent the above email to Director Thomsen, Hanson took a more flexible position on the Mack subpoenas. His new position was this: he and I would discuss whether to issue the Mack subpoenas in September after we both returned from vacation; the facts in my latest email regarding Mack would be "nailed down."184 Based on Hanson's new flexibility, I postponed the meeting with Thomsen. My email to the Thomsen read in part:

The day following my e-mail to you, my Branch Chief said he would like to discuss in September, when all are back from vacation, the specific concern that prompted my e-mail to you. I therefore believe it makes more sense to delay discussing this matter with you until September to see if it works itself out.185

Must Show that Mack Went over the Wall

But Hanson's idea to check facts would never be implemented. Instead, two weeks later, Kreitman tossed out a new theory to block the Mack subpoena: No subpoena would be issued without proof Mack had been "brought over the wall."186

The phrase has meaning in the financial industry lexicon. It applies to someone in a securities firm who is "brought over the wall" restricting access to non-public, material information, sometimes referred to as a Chinese wall. For example, those working on an acquisition might ask an analyst to explain an esoteric point about a product the acquired company manufactures. In this way, the analyst has been "brought over the wall." He has learned material nonpublic information, i.e., that the acquisition is pending.

Kreitman had never raised this barrier for any other suspected tipper in the PCM

investigation, including those, like Mack, who were suspected of tipping a PCM portfolio manager of a pending acquisition. I could find no one at the SEC who had ever heard of this requirement as a precondition to the issuance of a subpoena. No federal court case or SEC administrative case ever held that the government had to prove that a suspected tipper "was brought over the wall" before a judgment could be entered against him or her for insider trading.

Kreitman's "over the wall" requirement set a higher standard for issuing an SEC administrative subpoena than an appellate court had set for affirming a criminal conviction of insider trading. The "brought over the wall" requirement meant I had to prove that Mack knew about the pending acquisition and exactly how he had learned about it. The First Circuit set a lower standard—"opportunity" or "access" to material, nonpublic information—in affirming an insider trading conviction in United States v. Larrabee, 240 F.3d 18, 21 (1st Cir. 2001) with these words:

The defendant argues that proof of "opportunity" or "access" to material, nonpublic information is not the same as proving actual possession. That is correct, but does not carry the day. While the defendant is correct that opportunity alone does not constitute proof of possession, opportunity in combination with circumstantial evidence of a well-timed and well-orchestrated sequence of events, culminating with successful stock trades, creates a compelling inference of possession by the tipper (emphasis added).187

Kreitman's "over the wall" obstacle was a Catch-22 that would have won praise from Joseph Heller. Stripped to its essence, Kreitman was saying this: before I could ask Mack if he knew about the pending Heller acquisition, I had to independently prove Mack already knew about it. That issue—whether Mack knew about the Heller acquisition—was the primary factual issue in the investigation. If Mack knew about the Heller acquisition, the case came together. He would have called Samberg on June 29 with knowledge. It would explain why Samberg began the next trading day to accumulate more Heller stock than anyone else in the nation and wanted to buy even more. It would explain why he shorted GE the same way. All the other elements of the tipper's profile would support a finding that Mack was in fact the tipper.188

However, Mack's knowledge of the tip would normally be proved by circumstantial evidence.189 The first step would be to subpoena him and his records, e.g., emails, personal calendar and phone records. But that was where the Kreitman catch-22 fit in. No subpoena could be issued unless other evidence proved Mack already knew about the Heller acquisition. That was a tall order. The records maintained by CS were in Switzerland, beyond the reach of SEC subpoenas.190 The only other records, if they existed, were under the control of Mack's close ally, Gary Lynch, General Counsel of CSFB, who would soon join Mack at Morgan Stanley for a $13 million pay package.191 Lynch's subordinate, another CSFB attorney, believed CSFB had no records relating to Mack's meetings with CSFB's CFO in late June and the second week of July. Kreitman's Catch-22 was also a checkmate.

When I explained to Kreitman the "over the wall" concept had no application to Mack's

situation, Kreitman seemed to drop the issue.192 Kreitman offered no further excuse why Mack's testimony should not be taken before he fired me. However, in late August, Hanson picked up the "over the wall" theme again.

"Everyone Feels We Will Take Mack's Testimony at Some Point"

By August 24, Hanson had returned from vacation and was backing away from his earlier decision to reopen the question of Mack's testimony.193 He did, however, concede: "I believe that everyone feels we will take Mack's testimony at some point-- the question is when."194 The testimony was not taken until August 1, 2006, and then only after the matter had become public and two key statutes of limitations had expired.195

Hanson and I never met to discuss Mack's testimony, as he suggested on August 5. Hanson left for vacation that day. When he returned on August 22, I was on vacation, scheduled to return on September 6. On September 1, 2005, Kreitman and Hanson called me in California to say my employment would terminate the next day or I could resign. On September 1, Thomsen sent the termination notice, initialed by Berger. On September 2, I sent a letter to each Commissioner informing them of the favored treatment senior Enforcement staff had given Mack.196

The evidence suggests that Hanson's new flexibility on August 5 was engineered to stop my disclosures to higher and higher levels of the SEC until Enforcement officials could figure how to camouflage their decision to fire me. Contrary to Hanson's statement, the facts indicating Mack tipped PCM were never vetted. Neither Hanson, nor Kreitman, nor Berger ever responded to my August 4 email, which again detailed the reasons to take Mack's testimony. By the second half of August, both Kreitman and Hanson had reverted back to a hard line on the Mack subpoenas.197 Consequently, I decided to take the propriety of Mack's special treatment beyond the SEC. On August 29, three days before I was fired, I contacted the Disclosure Unit of the Office of Special Counsel to discuss the filing of a complaint arising out of the PCM investigation.198

My Evaluations Were All Positive Until I Questioned Mack's Favored Treatment.

The completed Form 50-B (Personnel Action) records the SEC's decision on August 21, 2005, to raise my merit rating (pay scale) two-steps based on my performance.199 Director Thomsen's notice of September 1 terminated my employment eleven days later. In between these dates, I was on vacation. The obvious question: How did my performance warrant a two-step pay increase, yet also require the SEC to fire me? The SEC has offered no explanation. To the contrary, it has done its best to obscure those facts. As discussed next, I believe this mystery is solved with two words: John Mack.

I started work with the SEC on September 7, 2004. On June 1, 2005, Branch Chief Hanson and Assistant Director Kreitman did my face-to-face 2004-2005 performance evaluation. Kreitman completed SEC Form 2494 regarding my "performance assessment" in relation to four categories of "Critical Elements and Acceptable Standards."200 Kreitman had the option of checking one of two boxes ("Acceptable" or

"Unacceptable") for each of the four categories: (1) "Knowledge of Field or Occupation,"
(2) "Planning and Organizing Work," (3) "Execution of Duties," and (4)
"Communications." He checked "acceptable" for each category.201

Since my performance was acceptable in each category, I qualified for a merit step
increase.202 On June 17, 2005, I submitted my "contribution statement," a self-
evaluation describing my performance, to Hanson, thereby initiating the merit review
process.203 On June 29, 2005, Hanson sent his evaluation of my 2004-2005 performance
to the compensation committee. In the transmittal form, stated that I "made contributions
of high quality."204 His narrative evaluation of my performance read:

I supervised Gary Aguirre from January 18, 2005 through the end of the rating period. As
shown on his contribution statement, Gary worked extremely hard on one investigation
during his time with the group, a significant matter involving the trading by Pequot
Capital, one of the nation's largest hedge funds.

Gary has an unmatched dedication to this case (often working well beyond normal work
hours) and his efforts have uncovered evidence of potential insider trading and possible
manipulative trading by the fund and its principals. He has been able to overcome a
number of obstacles opposing counsel put in his path on the investigation. Gary worked
closely with the Office of Compliance, Inspections and Examinations to develop the case
and worked with several self-regulatory organizations to develop a number of potential
leads. He has gone the extra mile, and then some.

Gary can work on presenting information in a clearer and more concise manner to
enhance the effectiveness of his communications both to those he reports to and those he
works with.205

But there is more—an unofficial evaluation of my performance by my immediate
supervisors. On June 14, 2005, the day before my meeting with the US Attorney,
Kreitman instructed me to review with him and Hanson the evidence that I had collected
and intended to present to the US Attorney and the FBI the next day. Late on June 14, I
spent approximately one hour with Hanson and Kreitman going over that evidence and
answering their questions. The presentation focused on PCM's trading in GE and Heller
over the thirty days prior to the public announcement of GE's intention to acquire Heller.
Specifically, I reviewed the evidence indicating Mack and Samberg were the tipper and
tippee respectively.206 I also discussed the Samberg-Zilkha emails, which I had just
found, and the possibility that Zilkha might be willing to cooperate with the investigation.
When I finished his presentation, Kreitman explained that he sometimes gave unofficial
awards to his subordinates for excellent work and there were three levels of these awards:
all photos of the fictional attorney Perry Mason. Kreitman also stated he was unsure
whether he had ever given the highest of these awards to any staff member before. He
then presented me with his highest award—an eight by ten inch image of Perry
Mason.207 Simultaneously, Kreitman and Hanson congratulated me for the development
of the PCM investigation through that date, June 14, 2005.

For some reason, the SEC has tenaciously fought to keep me from getting the remaining records relating to my merit pay increase and termination. I first tried to get them informally. When that failed, I submitted a request to the SEC pursuant to FOIA and the Privacy Act for those records. When that failed, I filed a FOIA lawsuit. Since then, the SEC has produced Hanson's transmittal form, dated June 29, 2005, stating that I "made contributions of high quality."

There are two significant gaps in the records the SEC has thus far produced. The first covers the period from June 29, 2006, through August 18, 2006. During this period, Director Thomsen, Associate Director Berger, Assistant Director Kreitman, and the compensation committee must have approved my merit rating increase. Yet, the SEC refuses to produce any records evidencing these steps. Second, the SEC has produced nothing that would explain why it approved my two-step merit rating increase on August 21, 2006, and then fired me eleven days later. A motion to obtain these records in the FOIA case has been set for early 2007.

The Impact of Blocking the Mack Subpoenas on the GE-Heller Investigation

There is wide agreement that insider trading cases are difficult to prove. Former Associate Director Thomas Newkirk, who speaks from experience,208 explains: "Direct evidence of insider trading is rare. There are no smoking guns or physical evidence that can be scientifically linked to a perpetrator. Unless the insider trader confesses his knowledge in some admissible form, evidence is almost entirely circumstantial."209

The process of establishing an insider trading case by circumstantial evidence is tedious. Newkirk explains:

The investigation of the case and the proof presented to the fact-finder is a matter of putting together pieces of a puzzle. It requires examining inherently innocuous events – meetings in restaurants (as in the Dutch case), telephone calls, relationships between people, trading patterns – and drawing reasonable inferences based on their timing and surrounding circumstances to lead to the conclusion that the defendant bought or sold stock with the benefit of inside information wrongfully obtained.210

The Court in Larrabee also explained how circumstantial evidence may come together to prove insider trading. The Court summarized the factors that supported the jury's verdict:

We examine [a] myriad factors, including (1) access to information; (2) relationship between the tipper and the tippee; (3) timing of contact between the tipper and the tippee; (4) timing of the trades; (5) pattern of the trades; and (6) attempts to conceal either the trades or the relationship between the tipper and the tippee. The evidence presented at trial, when pieced together, painted a picture which allowed the jury to conclude beyond a reasonable doubt that Larrabee possessed material, nonpublic information about the Bank of Boston-BayBanks merger.211

The process of collecting that circumstantial evidence was going well in the GE-Heller

investigation by late June 2005. Growing evidence indicated that Samberg had likely acted on an illegal tip in making his $80 million bet that GE would acquire Heller. The evidence also defined the profile of the likely tipper, which Mack nicely fit. The elements of that profile bear an almost one-to-one relationship with the factors set out in Larrabee above for establishing an insider trading case. But there is one significant difference: Larrabee was affirming a jury trial verdict in a criminal case; I was asking my superiors to withdraw their objection to an administrative subpoena.

In terms of time, the investigation was in its infancy. The informal investigation was not underway until the fall of 2004. The Commission did not issue its formal order until January 2005. The first subpoenas were issued in February 2005. The GE-Heller investigation began to take shape in May 2005. Even though the formal investigation was only a few months old, Hanson and Kreitman authorized me on June 14 to present the GE-Heller matter, including Mack and Samberg's possible roles as tipper and tippee, to the FBI and a federal prosecutor the next day. Two weeks later, the FBI opened its complementary investigation. In short, the GE-Heller investigation was rapidly advancing, but it would take time to build the circumstantial evidence necessary to file an insider trading case.212

At this point, the case against both Samberg and Mack had been developed almost exclusively from PCM records and Samberg's testimony. But this was only half the critical records and testimony needed to complete the investigation. The case against the tipper and tippee is logically developed from evidence obtained from both. By late June 2005, it was time to obtain the records and testimony from Mack. Instead of taking this step, senior Enforcement officials blocked the subpoena for Mack's testimony and records. Once again, insider trading cases are difficult to prove under the best of circumstances. In this case, the investigation involved two of the most sophisticated investment professionals. In barring the investigation of Mack, the SEC blocked the investigation of an insider trading case against Samberg as well.

Another Charade: the SEC Reopens the IG's Investigation
And Takes Mack's Testimony

Since July 2005, the SEC has used one charade after another to cover up the fact that senior Enforcement officials gave favored treatment to Mack. After Mack returned as Morgan Stanley's CEO on June 30, 2005, my supervisors were left with the messy problem how to block the Mack subpoena in the face of compelling and growing evidence that it should be issued. This was solved by the first charade which could be called "something is missing." It went like this.

Kreitman: You cannot take Mack's testimony unless he had a motive.
Aguirre: Mack had multiple motives.
Kreitman: Well then, I need greater specificity.
Aguirre: I provided that before, but here it is again.
Kreitman: Hmmm, well then, you have to show Mack was "brought over the wall."
Aguirre: There was no wall.

Hanson: OK, then we need another memo why Mack's testimony should be taken.
Aguirre: Fine, here's another one.
Hanson: Thanks, we'll vet your facts and then decide whether to subpoena Mack.
Aguirre: Sounds good to me.
Kreitman: You're fired.

Then, new players joined the ensemble: Chairman Cox and his Inspector General (IG).
Faced with allegations that senior Enforcement staff gave Mack favored treatment and
then tampered with my personnel records,213 Chairman Cox called in his IG. The IG
promptly asked each of those charged if the allegations were true. All said no. Given that
unanimity, there was no point in asking me if I had any evidence to back up the charges.
Chairman Cox agreed and the investigation was over. The SEC gave its report to
Congress: there was nothing to the allegations.

The SEC was then forced to do an encore. This one could be called: "We promise to do it
right this time." It features the same players from past performances: Chairman Cox, his
IG, the IG attorneys, and the senior Enforcement attorneys who blocked the subpoena in
2005. The IG attorneys who did the first investigation, best called a whitewash, now
promised to broaden the investigation to include some evidence. The senior Enforcement
attorneys who pretended no grounds existed to take Mack's testimony would next pretend
to take Mack's testimony.

One key departure from standard SEC practice was the timing of Mack's testimony. The
SEC usually takes testimony in an insider trading before the statute of limitations has
expired. The SEC employed a different strategy with Mack. It allowed the primary
statutes of limitation to expire before Enforcement attorneys asked Mack a single
question. Mack's testimony was taken on August 1, 2006. The five-year statute of
limitations for any criminal charges expired on July 27, 2006.214 Hence, the testimony
was taken four days after the limitations period expired.

Likewise, the limitations period also expired on July 27, 2006, for any case under section
21A of the Securities and Exchange Act of 1934 (Civil Penalties for Insider Trading), the
most potent weapon in the SEC arsenal for pursuing those who give or trade on material
nonpublic information.215 That left the SEC with only equitable remedies against Mack
and Samberg, i.e., injunctive relief. However, equitable relief is also subject to equitable
defenses,216 including delay in filing the case.217 It was for this reason that the
investigation in 2004 only included SRO referrals involving PCM that were
approximately three years old or less. In September 2004, Assistant Director Grime gave
me this specific guidance on how far back to go: "Typically I would not go back much
further than 3-4 years for transactions given the 5 years SOL for penalties."218

Kreitman and Hanson did not merely overlook the statute of limitations; they knowingly
allowed it to expire. In August 2005, I warned both that we faced a problem completing
the investigation of PCM's trading in GE-Heller before the statute of limitations expired:

Assuming we schedule Samberg's testimony a week after Dartley's, which tactically

makes the most sense, the five year Statute of Limitations for 10b will begin to expire in eight months and will fully expire in nine…

We have miles to go before we could file a 10b action against Samberg and the investigation on these examinations and other aspects has slowed to a snail's pace.219

Conclusion

There were two forces on a collision course in late June of 2005. Running one way on the track, the PCM investigation was gathering momentum. The evidence was growing stronger that Samberg had relied on an illegal tip when he bet $80 million in July 2001 that GE would acquire Heller. The evidence had also begun to point to Mack as the likely tipper.220 The next logical step was to subpoena Mack and his records.

But a more powerful force was running in the opposite direction on the same set of tracks. Mack and Morgan Stanley had decided Mack would return as Morgan Stanley's CEO. But that was impossible if Mack faced an SEC lawsuit for insider trading arising out of the ongoing PCM investigation. That investigation had to go away. It did quite abruptly. The dirty work was done by my supervisors, but a higher office made the call. The fingerprints of Director Thomsen and Associate Director Berger were found all over that decision.

163 See my June 27, 2005, email to Kreitman, Hanson and Ribelin.
164 The favors Samberg did for Mack are described above at pp, 21-22.
165 See my June 29, 2005, email to Kreitman.
166 See my August 4, 2005, email to Hanson; my August 24, 2005, email to Berger; and my July 27, 2005 email with attachments to Kreitman and Berger.
167 See supra note 125.
168 See my July 27, 2005 email with attachments to Kreitman and Berger.
169 Id.
170 Id. The spreadsheet was an edited version of a portion of the spreadsheet previously provided to Kreitman. I do not have the spreadsheet itself. The edited spreadsheet was provided to Committee staff as attachment 12 to Exhibit 17 to my August 21, 2006, letter to Senator Shelby.
171 Attachment 13 refers to my email of June 29, 2005, to Kreitman.
172 See my July 27, 2005, email with attachments to Berger and Kreitman.
173 Supra note 4.
174 See my August 4, 2005, email to Hanson at 9:48 am.
175 See my August 4, 2005 email to Hanson at 7:25 am.
176 Supra, note 174.
177 See my August 24, 2005, email to Hanson.
178 Id.
179 Id.
180 See discussion supra pp. 26.

45

181 See my August 4, 2005, email to Hanson and my August 24, 2005, email to Berger.
182 This refers to a decision by Kreitman in early February 2005, less than a month after staff had obtained subpoena power and before any subpoenas had been issued. Kreitman directed that the PCM investigation be narrowed to two or three matters. Kreitman had expressed his approval a few days before when the investigation was increased to include seventeen referrals. Kreitman later withdrew the directive in March. Kreitman implied the directive had come from Berger. It came approximately two weeks after an influential attorney representing PCM met with Enforcement Director Steven Cutler.
183 See my August 4, 2005, email to Thomsen.
184 See Hanson's August 5, 2005, email to me. The email string is included.
185 See my August 10, 2005, email to Thomsen.
186 See my August 17, 2005, email to Hanson and Kreitman.
187 United States v. Larrabee, 240 F.3d 18, 21 (1st Cir. 2001).
188 Id
189 See infra p. 41.
190 See my August 17, 2005, email to Kreitman and Hanson.
191 See my July 27, 2005, email with attachments to Kreitman and Berger; and my July 19, 2005, email to Kreitman, Hanson, Ribelin, Eichner and Jama.
192 Id. I could find no one in Enforcement that had ever heard of the theory that the "brought over the wall" concept had any application to the issuance of a subpoena in an insider trading case.
193 See my August 24, 2005 email to Hanson.
194 Id.
195 See infra p.44.
196 See my September 2, 2005, fax to Chairman Cox.
197 See my August 4, 2005, email to Hanson; my August 24, 2005, email to Berger; and my August 17, 2005, email to Kreitman and Hanson.
198 I discussed with Office of Special Counsel attorney Mathew Glover whether nonpublic documents relating to an ongoing SEC investigation could be filed with a whistleblower complaint.
199 See my merit pay increase, which was provided to Committee staff as Exhibit 35 to my letter of August 21, 2006, to Senator Shelby.
200 A copy of the SEC Form 2494 approving the two-step merit rating increase was provided to Committee staff as Exhibit 36 to my letter of August 21, 2006, to Senator Shelby.
201 Id.
202 In November 2004, Cain explained to me that an "acceptable" performance was a precondition to eligibility for a merit step increase.
203 See email of June 17, 2005, to Hanson. It includes my "contribution statement."
204 Id. Pursuant to my FOIA request, the SEC produced the "Supervisory Transmittal Form" in which Hanson stated my contributions were of "high quality." I assumed the SEC produced this document in response to the letter of Senator Specter and Senator Grassley dated August 2, 2006.
205 A copy of Hanson's undated evaluation of my work was provided to Committee staff as Ex. 38 to my letter of August 21, 2006, to Senator Shelby.
206 The presentation followed the order of the evidence collected in a three-ring binder,

which has been provided to Committee staff.

207 A copy of this award has been provided to Committee staff as Exhibit 41 to my August 21, 2006, letter to Senator Shelby.

208Newkirk's background insider trading cases may be found conducting a word search with his name and the phrase "insider trading" in two Lexis sources: Federal Cases Combined and SEC Decisions, Orders & Releases.

209 Thomas C. Newkirk, Associate Director, Division of Enforcement, U.S. Securities and Exchange Commission, Insider Trading–A U.S. Perspective, Speech at the 16th International Symposium on Economic Crime Jesus College, Cambridge, England; available at http://www.sec.gov/news/speech/speecharchive/1998/spch221.htm.

210 Id.

211 United States v. Larrabee, 240 F.3d at 21-22.

212 Hanson understood this well. After Mack surfaced as the possible tipper, Hanson gave me The Prosecutors, by James Stewart, and asked that I read one chapter—Insider Trading at Morgan Stanley—which describes the four-year process it took to successfully build a case against Morgan Stanley investment bankers for insider trading. This chapter began with the tipper and tippee meeting at The Harvard Club where the tip was passed during a fake chess game used as a cover.

213 See my October 11, 2005, letter to Chairman Cox.

214 U.S. v. O'Hagan, 139 F.3d 641 (8th Cir. 1998) ("The proper limitations period for the criminal securities fraud counts brought against O'Hagan is the five-year statute of limitations set forth in 18 U.S.C. § 3282").

215 Civil penalties for insider trading (15 U.S.C. § 78u-1). This statute allows treble damages for insider trading. Its five year statute of limitations also expired on July 27, 2006.

216 SEC v. Egan, 856 F. Supp. 398, 401 (ND Ill. 1992) ("If Northern is to be deprived of its money (something that this Court does not now decide), that will take place only after it has had a meaningful opportunity to be heard on the merits and to present any defenses—including equitable defenses—to disgorgement.")

217 SEC v. Willis, 777 F. Supp. 1165, 1173 (SDNY 1991) ("If the remoteness in time is substantial and there have been no intervening violations, it is highly improbable that a court, in the exercise of its discretion, would grant injunctive relief." Quoting from A. Jacobs, 5C Litigation and Practice under Rule 10b-5 § 235.01, at 10-5 (2nd rev. ed. 1991)").

218 See Grime's September 17, 2004, email to me.

219 See my August 26, 2005, email to Kreitman, Hanson, Eichner, Ribelin and Jama.

220 See my July 19, 2005, email to Hanson attaching the Enforcement Monthly Report for June 2005 on the PCM investigation.