# Revised
# Exhibit 4

## to Aguirre Declaration

*Aguirre v. SEC*, 06-CV-1260 (D.D.C.)

## Hanson, Robert

**From:** Hanson, Robert
**Sent:** Friday, August 05, 2005 11:17 AM
**To:** Aguirre, Gary J.
**Subject:** RE: Mack testimony

Gary,

I forwarded this to Paul and Mark to review. I think we should meet after some of the facts in the memo are nailed down to discuss whether it makes sense to go forward. See you in a couple of weeks.

Bob

**From:** Aguirre, Gary J.
**Sent:** Thursday, August 04, 2005 6:34 PM
**To:** Hanson, Robert
**Subject:** Mack testimony

Bob:

You have asked that I do a memo why I believe the Mack testimony should be taken as the next logical step in the Pequot investigation. I believe there are three reasons. First, a profile of the tipper was developed in this case that has multiple elements. The possibility that Mack acted as the tipper satisfies almost very element and is inconsistent with none. Second, whether or not Mack is the tipper, his testimony will advance the investigation. If he is the tipper, his testimony will likely suggest some avenues to be pursued and others to be dropped. It will pin him down to a story which we can begin to disprove. If he is not the tipper, his testimony is the likely first step to eliminating him from consideration. This would allow our limited resources to be focused on starting a new screening process to find another possible tipper.

### Mack meets each element of the profile.

*The timing of the trading with Mack's access to possible information*

The first element is whether Mack had possible access to information that GE would make a tender offer for HF. He had access from two sources: he had been the CEO of Morgan Stanley, who advised GE, until late March. He also took over as CSFB's CEO on July 12, 2001. Samberg's trading pattern, which I can discuss in more detail if you want, suggests that he obtained information just before Monday July 2, around July 9, and around July 25. Mack coincidentally met with CSFB's CFO on June 28 or June 29, again a few days before he began work on July 12, and was CEO at the third key time. Hence, Mack had relevant contacts with CSFB at each time. Also, CSFB was "wooing" Mack away from Merrill Lynch and other investment banking firms during the period from April through July 2001. It would be consistent with this effort for someone at CSFB or CS to mention, as part of this wooing process, what inventory Mack would be taking over. Incidentally, we know how Samberg saw Mack's new role as CEO of CSFB. He and his son discussed the fact that CSFB was the second largest investment banker at that time and "it was good to have friends in high places." Of course, there is also the possibility that Mack, through his contacts at Morgan Stanley, knew about the pending GE tender offer.

SEC 000978

Questioning Mack about this transaction could take us in several directions, each of which suggests a different focus for the investigation. First, Mack could deny that he ever knew that GE would make the offer until the public announcement. The investigation would then focus on whether this was true. Second, Mack might say he learned on June 28 or June 29. The focus would then be placed on his contacts with Samberg at that time and whether he learned that GE had bumped its offer around July 9. Finally, he might give convincing testimony that he learned after July 12 for the first time and cause us to reevaluate whether his should even be considered.

Also, Samberg's trading suggests that he did not get the tip until shortly before he started trading. He would not be the largest purchaser of HF during July if he had the tip before. It also makes sense that his tipper, likely someone he trusted, got the tip just before Samberg started trading. Had the tipper had it earlier, why would he have not communicated it earlier? Further, GE made its first offer in early June. It would make sense for Samberg to start buying then if he knew about the trade. The Mack-CSFB meeting on June 28 or June 29 and the Samberg huge trading the next week fits.

Further, we are operating in the dark regarding who Mack spoke with and when he spoke with them about stepping in as CSFB's CEO. CSFB's counsel tells he he spoke with CSFB's CFO and the Credit Suisse chairman of the board. Were these the only people? Mack's testimony could point us towards the key people at CSFB. Conversely, he might tell us that he was seeing some of the people on the acquisition team as Morgan Stanley at this time. That would take the investigation in a completely different direction.

*Mack had the motive to tip Samberg*

Mack had multiple reasons for tipping Samberg about the GE tender offer for Heller.

a) *Mack got into Closed Pequot funds and special deals that Mack thought would have big returns to him during and after 2001.* Mack was getting into private deals that Pequot was putting together for its own principals, including projects with the following code names: $5 million into "Fresh-start" (Lucent spin-off bought cheap), $2 million info Baby C, and an unknown amount into Distressed Guys, which later became Pequot Special Opportunities Fund. The most interesting situation involved Fresh Start. Mack was pressing to get into this for sometime. On June 20, a Samberg e-mail said that he was with Mack and that Mack was "busting his chops" Samberg's chops because he had not got the documents on this investment. Neither the Pequot principals nor Samberg's son seemed happy about Mack getting into this Fresh Start. During the call on June 29, when the suspected tip occurred, Samberg arranged for Mack to get into Fresh Start. Mack also was getting into Pequot funds when they appear to be closed. At that time, Samberg's funds were doubling in value in less than 3 years and the Pequot Scout fund was doing even better. In general, the funds had a $5 million lower limit. E-mails show Mack putting at least $13 million into these funds. One of the spread sheets I provided to Mark on June 28 shows Mack invested in 15 different Pequot funds (but it does not show when). As a rough estimate, based on performance over 1999 and 2000, Mack could reasonable expect that his new investments in Pequot during 2001 alone would have returned something in the range of $5 million per year to Mack.

b) *Board seats* As shown on one of the spreadsheets, Samberg was promoting Mack for board seats on both Baby C and Fresh-start.

c) *Office Space* Mack was using Pequot office space intermittently during the period from March 2001 through July, 2001, when he began work for CSFB.

d) *Stock tips* Samberg was giving Mack stock tips on public companies that Mack directly invested in. "That's where were putting our money."

e) *Friendship* Mack and Samberg were close friends. Two months ago, Mack took over as CEO at Pequot. That Samberg would choose Mack in the middle of an investigation that

SEC 000979

could land Mack in jail tells much about the level of trust Samberg had in Mack. I discussed how the friendship played as a motive in my June 27 memo.

    f)   Mack's crossing the line for Pequot. While Mack was at CSFB, he was acting as Pequot's agent to introduce one of the companies Pequot co-owned with Lucent, to an investment banker in China. Mack's letter, written on behalf of Pequot reads, "I have not given this first to CSFB (where he was then CEO) or to Morgan Stanley because I think your contacts in China are the best."

*Samberg had a relationship of trust deep friendship with Mack.*

    We do not have a complete picture of Mack's financial assets, but his holdings in his Pequot funds in 2001 exceeded $400 million. He holds an engineering degree from MIT, a Masters of Science from Stanford, and an MBA from Columbia. He started with $3.5 millions and built the largest hedge fund in the world as of 2001, when the GE-HF trading took place. He has generally been very careful about his comments in his e-mails. He used AOL instant messaging, which leaves no trace in any computer, to communicate with key people. In short, he's a smart guy who took few chances. It does not fit the pattern for him to be taking big chances where he got his tip. It makes sense that he got it from someone he trusted and who also trusted him. That was Mack. Mack's e-mails to and from Samberg have a different ring about them. In one e-mail, Samberg's secretary tells Samberg Mack had called and that, "he loves you." In sum, there was a deep trust and friendship between them. It is exactly the kind of relationship that Samberg would feel comfortable calling on for a tip as big as HF and GE.

*Samberg's need for a big favor from an old friend.*

    In July 2001, Samberg's company was splitting a part. [     ] was a younger and a rising star. [     ] performance was dwarfing Samberg's. Samberg was [          ] [  ] was leaving with at least half the company. Samberg was looking at even bigger staff losses to [     ] He testified that he was concerned at this time that more of his executive committee "might walk." A big hit on GE-HF would illustrate that his fast ball had not slowed. Regarding GE-HF, Mack was just the guy to do his old friend a big favor, one that would also benefit him.

    Regarding Samberg's situation during this time frame, he testified at the first session:

The company was about to split, it was about to split. In September '00, I had [  ] [  ] and I was trying to reestablish the franchise value of Pequot and the core funds. I was actively looking for help, and *I did things in a manner that was expedient at the time given my expertise in this area.*

In a similar vein, he testified at the second session:

My firm was going to split in three months. These people were my other managing director partners. *Times were fragile.* I needed their approval to do whatever I wanted to do *or they might walk* (emphasis added).

### There do not appear to be other leads in the Samberg e-mails.

    The evidence does not merely point to Mack. It points to no one else. I have been through the Samberg e-mails, his calendar, his credit card receipts and his phone slips. [    ] Eric, [    ] have been through the e-mails. No one has shown up as a possible candidate. Further, Fried Frank has stated

SEC 000980

that Samberg made the decisions alone. No one was listed with him on the Fried Frank lists of those participating in investment decisions. If we don't take a look at Mack, we start all over again looking for someone that fits the profile. Then the question would remain: if we find him or her, will there be a similar reason for not proceeding with the examination? Very possibly yes, given Samberg's circles.


Gary

SEC 000981