UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Gary Aguirre, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.:  06-1260 (ESH) |
| | ) | |
| Securities and Exchange | ) | |
| Commission, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF'S SURRESPONSE TO DEFENDANT'S SURREPLY**

## I.  THE SEC'S NEW ARGUMENTS ARE AS FLAWED AS ITS OLD ONES

The SEC takes another try at three issues in its Surreply.[1] In doing so, the SEC repeatedly misstates the law and the facts to a degree that suggests other factors are at play. The SEC also argues that the court should balance the public versus privacy interests in its favor.[2] One factor now prominent in the media is whether the SEC failed to detect the subprime debt crisis.[3] In a case reminiscent of Pequot, the SEC abruptly halted an investigation of Bear Stearns, despite the fact that the SEC Miami office had decided in 2005 to file action against the bank.[4] The SEC inspector general is now investigating that case, just as he is the underlying facts in this case.[5] Both matters suggest the SEC is too cozy with Wall Street and the consequences for the capital

---

[1] Motion of the Securities and Exchange Commission for Leave to File Surreply to Aguirre's Reply Supporting His Motion for Summary Judgment (SEC Surreply).

[2] SEC Surreply at 7.

[3] Kara Scannell and Sudeep Reddy, *The Fed Hits the Street –Brokerage Firms Get Cash—and On-Site Scrutiny*, Wall St. J. April 3, 2008 at C3.

[4] Michael Siconolfi, *Did Authorities Miss a Chance To Ease Crunch?—SEC, Spitzer Probed Bear CDO Pricing in '05, Before Backing Away*, Wall St. J. Dec. 10, 2007 at C1.

[5] Kara Scannell and Sudeep Reddy, *The Fed Hits the Street –Brokerage Firms Get Cash—and On-Site Scrutiny*, Wall St. J. April 3, 2008 at C3.

markets, the economy and the public are potentially calamitous. That is the public interest at stake in this case.

## II. THE SEC'S SURREPLY ON EXEMPTION 3 MISSTATES THE LAW AND FACTS

### A. The SEC's Surreply misstates the law on Exemption 3

At the outset, the SEC claims "[T]he *Commission has properly determined* that Section 210(b) of the Investment Advisers Act is an Exemption 3 statute because it identifies 'particular types of matters to be withheld (emphasis added).'"[6] The SEC's determination is irrelevant. As the court noted in *Public Citizen, Inc. v. Mineta*, 2006 U.S. Dist. LEXIS 52786 (D.D.C. 2006), "In determining if a statute qualifies as a 'withholding statute' under Exemption 3, no weight is to be given to an agency's interpretation of the statute as 'agencies are not necessarily neutral interpreters,' citing *Ass'n of Retired R.R. Workers, Inc.,* 830 F.2d at 334."

As a warm up for its main contention, the SEC argues that Exemption 3 has three prongs with varying requirements. The SEC claims it need only satisfy one prong. Plaintiff agrees; the text of Exemption 3 so states. However, all three prongs are an expression of the same legislative intent. Each prong is intended to prevent an agency from exercising unfettered discretion in deciding whether to withhold or release information sought under FOIA. *Am. Jewish Cong. v. Kreps*, 574 F.2d. 624, 628 (D.C. Cir. 1978).

The SEC then makes a desperate effort to distinguish *Church of Scientology v. U.S. Postal Service*, 633 F.2d 1327 (9th Cir. 1980), which cannot be done without misstating either the law or the facts. The SEC chose to misstate the law and did so twice. This is the SEC's key point: "Because the Ninth Circuit found it irrelevant [in *Church of Scientology*] that the statute

---

[6] SEC's Surreply at 3.

identified "particular types of matters to be withheld" and focused only on the issue of discretion, its decision is inconsistent with the law in this circuit and is not controlling in this case."[7]

The SEC's contention that a conflict exists between the circuits on their interpretation and application of the key language in Exemption 3(B) ("refers to particular types of matters to be withheld") at issue in this case is nonsense. It is also born out of desperation. In *Church of Scientology,* the Ninth Circuit borrowed the "legal standard" developed by the D.C. Circuit in its seminal case on Exemption 3(B), *Am. Jewish Cong.* The Ninth Circuit then applied that legal standard in *Church of Scientology* step by step to facts *indistinguishable from those before this court*, just as the D.C. Circuit applied the same legal standard in *Am. Jewish Cong.* It also appears that the Ninth Circuit got it right, since two decisions from the D.C. Circuit have cited *Church of Scientology* with approval on Exemption 3(B). *Ass'n of Retired R.R. Workers, Inc. v. U.S. R.R. Retirement Bd.*, 830 F.2d 331 (D.C. Cir. 1987); *Armstrong v. Executive Office of the President* 1995 U.S. Dist. LEXIS 22216.

The primary legal issue and relevant facts in *Church of Scientology* are on all fours with the issue and facts raised by the SEC's assertion of Exemption 3 in this case. The statute in *Church of Scientology* permitted the agency (the Postal Service) "total discretion to give or restrict any or all of its investigatory files" (633 F.2d at 1333), just as the SEC claims Section 210(b) permits it to do. The Postal Service argued in *Church of Scientology* that the "investigatory files compiled for law enforcement purposes protected by [the alleged exempting statute] are '*particular types of matters to be withheld*,' and therefore satisfy subsection (B)," (*Id.*, at 1330) the same contention the SEC makes in this case (emphasis added).

The Ninth Circuit in *Church of Scientology* tracked the analysis of the D.C. Circuit in *Am. Jewish Cong.* step by step. In *Am. Jewish Cong.,* 574 F.2d. at 628-631, the D.C. Circuit first

_____

[7] *Id*. at 4.

conducted a careful review of the legislative history of FOIA and the legislative history of the statute in issue in that case (Section 7(c) of the Export Administration Act (EAA)) to decide whether Congress intended for Section 7(c) to be an exempting statute within Exemption 3.

The Ninth Circuit followed suit. It acknowledged "a court must first consider the underlying congressional intent to exempt material from FOIA." *Church of Scientology*, 633 F.2d at 1330. As did the D.C. Circuit, the Ninth Circuit surveyed legislative intent regarding the statute at issue in that case, Section 39 U.S.C. § 410(c)(6) of the Postal Reorganization Act. Likewise, the Ninth Circuit concluded there was no Congressional intent that Section 7(c) be an exempting statute within Exemption 3. The court found exactly the opposite legislative intent: "To the contrary, in amending FOIA Exemption 7, Congress made strong statements about the hazards of agencies withholding, carte blanche, any information thrust into an 'investigatory file.'" *Id*. at 1331.

The Ninth Circuit also tracked the D.C. Circuit's second step in *Am. Jewish Cong*. The court in *Am. Jewish Cong*.  explained this issue as follows:

> Decisions as to whether given "criteria" or enumerated "types of matters" are sufficiently "particularized" in any statute to represent such a congressional judgment necessarily implicate a measure of subjectivity. Congress did, however, leave some clues to the measure it contemplated, for it gave examples of provisions that it concluded would or would not fall within the amended exemption. … These and other examples imply a congressional sense that the crucial distinction lay between statutes that in some manner *told* the official what to do about disclosure and those that did not significantly inform his discretion in that regard.  (574 F.2d. at 629).

On the same point, the D.C. Circuit also explained in *Am. Jewish Cong*.:

> Subsection (B) does leave room for administrative discretion in two carefully defined situations, but its unmistakable thrust, like that of Subsection (A), is to assure that basic policy decisions on governmental secrecy be made by the Legislative rather than the Executive branch. To include within its sweep provisions reflecting no more than a vague apprehension that an agency might someday fall heir to sensitive information is obviously to frustrate that policy. Nondisclosure is countenanced by Subsection (B) if, but only if, the enactment is the product of congressional appreciation of the dangers inherent in airing particular data *and incorporates a formula whereby the administrator may*

4

*determine precisely whether disclosure in any instance would pose the hazard that Congress foresaw* (Emphasis added). *Id*. at 628-9.

In language equally applicable here, the court concluded that 7(C) did not fall within the "particular type of matter" prong for the following reason:

> The Export Administration Act contains numerous provisions authorizing the collection of data, perhaps the broadest being the power to require exporters to keep such records and submit such reports as are "necessary or appropriate to the enforcement of this Act . . . . or to the imposition of any penalty, forfeiture, or liability . . . ." This general applicability to anything that might happen to be encompassed within this array of information-gathering functions *undermines any notion that Section 7(c) represents a congressional determination of the advisability of secrecy for any "particular type[] of matter*[],"if for no other reason than that the agency had the power radically to expand the quantity and diversity of information in its files to intercept matter of a sort that Congress well might not have contemplated when considering the need for confidentiality (Footnotes omitted; emphasis added). *Id*. at 631.

Once again, the Ninth Circuit applied this same rationale in *Church of Scientology*:

> [B]ut we also conclude that section 410(c)(6) provides insufficient specificity to take it out of the impermissible range of agency discretion to make decisions rightfully belonging to the legislature. … [S]ection 410(c) permits the Postal Service total discretion to give or restrict any or all of its investigatory files. Thus, it is of no moment that (c)(6) narrows the range of documents to investigatory files "compiled for law enforcement purposes." Moreover, in amending Exemption 7 to read "investigatory records", Congress has already expressly decided that the term "investigatory files" allows too much agency discretion. Therefore, we hold that section 410(c)(6) is not an Exemption 3 statute (Footnotes omitted). (633 F.2d at 1333).

The SEC also suggests that the Ninth Circuit's statement in *Church of Scientology*, 633 F.2d at 1330, that "a court must consider the underlying congressional intent to exempt material from the FOIA" conflicts with D.C. Circuit law as stated in *Public Citizen v. Mineta*, 444 F. Supp. 2d 12, 16 (D.D.C. 2006).[8] The SEC is grabbing at straws. Indeed, four of the five cases cited by the SEC in its Closing Memo[9] on Exemption 3, including a Supreme Court decision, say precisely the opposite. *CIA v. Sims*, 471 U.S. 159, 168 (1985) ("The FOIA's legislative history confirms

---

[8] See ft. 2 at p. 4 of SEC's Surreply.

[9] Memorandum of the Securities And Exchange Commission in Opposition to Aguirre's Cross-Motion for Summary Judgment and Reply to Aguirre's Opposition to Its Motion for Summary Judgment (SEC Closing Memo).

that Congress intended § 102(d)(3) to be a withholding statute under that Exemption [Exemption 3].");  *Medina-Hincapie v. Department of State* 700 F.2d 737, 743 (D.C. Cir. 1983) ("Indeed, the one circuit court that has considered that history in great detail [found] that the legislative history indicated that 'Congress intended § 222(f) *to qualify* as an exempting statute under exemption 3(B).'");  *Seymour v. Barabba*, 559 F.2d 806, 808 (D.C. Cir. 1977) ("We are strengthened in our interpretation that the census statute prohibition against disclosure is indeed one specifically meant to be included within Exemption 3 by reference to the Congressional debates in both 1966, when the original FOIA was enacted, and in 1976, when the amended Exemption 3 was passed.");  *Times Publishing Co. v. U.S. Dep't of Commerce*, 236 F.3d 1286, 1290 (11th Cir. 2001)  ("The current version of the EAA confidentiality provision was enacted precisely to comply with the requirements of FOIA Exemption 3 …")

The conflict the SEC found in the holdings of *Church of Scientology* and *Public Citizen* has a simple solution.[10] The SEC has confused two separate phases in the Exemption 3 process. It may be helpful on this point to review the specific language of Section 552(b)(3) in context. It reads:

(b) This section does not apply to matters that are--…

(3) *specifically exempted* from disclosure by statute (other than section 552b of this title) provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld (emphasis added);

Hence, a court does not reach the issue whether a statute qualifies under either subpart A or B of Exemption 3 unless the statute "specifically exempted" matters. That was the exact issue the court was addressing in *Mineta* in the language quoted in the SEC's Surreply.[11] On that point, *Mineta*, 444 F. Supp. 2d 12, cites *Reporters Comm. for Freedom of Press v. U.S. Dep't of*

---

[10] See ft. 2 at p. 4 of SEC's Surreply.

[11] *Id*.

*Justice,* 816 F.2d 730 (D.C. Cir. 1987), (reversed on other grounds, *U.S. DOJ v. Reporters Comm. for Freedom of Press*, 489 U.S. 749 (U.S. 1989)) which, on the same point, cites *Baldrige v. Shapiro*, 455 U.S. 345, 355, 71 L. Ed. 2d 199, 102 S. Ct. 1103 (1982), which paraphrases the statute ("qualified under Exemption 3 of the Freedom of Information Act as statutes specifically exempting the disclosure of information."), again on the same point. *Reporters Comm.* 816 F.2d at 734 refers to this language as a "threshold requirement." The courts in *Sims*, *Times Publishing* and *Medina-Hincapie* looked into the legislative history of the statutes on a different issue, whether the statute satisfied the language of Exemption 3(B).

In any case, the Ninth Circuit apparently got it right in *Church of Scientology*. The D.C. Circuit cited both *Church of Scientology and Am. Jewish Cong.* back to back in *Ass'n of Retired R.R. Workers,* and next made this observation:

> Subsection (B) is in turn divided into two disjunctive parts: The first ("B-1") consists of statutes in which discretion may be exercised in favor of withholding information that would otherwise be subject to disclosure; and the second ("B-2") consists of statutes that "refer[] to particular types of matters to be withheld." *The language suggests, and the courts have held, that the latter will consist of highly specific, limited categories of information* (emphasis added)." (830 F.2d at 334).

See: *Armstrong v. Executive Office of the President* 1995 U.S. Dist. LEXIS 22216 (D.D.C. 1995)

The SEC argument, though dead wrong, sharpens the focus on how *Am. Jewish Cong.* and *Church of Scientology* bear on the central issue raised by the SEC's assertion of Exemption 3 in this case. The D.C. Circuit explained in *Am. Jewish Cong.* why the statute failed to meet the prong of Exemption 3(B) ("particular types of matters") upon which the SEC relies here:

> Section 7(c) applies to any and all "information obtained" under any portion of the enactment of which it is a part. The Export Administration Act contains numerous provisions authorizing the collection of data, perhaps the broadest being the power to require exporters to keep such records and submit such reports as are "necessary or appropriate to the enforcement of this Act . . . . or to the imposition of any penalty, forfeiture, or liability . . . ." *This general applicability to anything that might happen to be encompassed within this array of information-gathering functions undermines any*

> *notion that Section 7(c) represents a congressional determination of the advisability of secrecy for any "particular type[] of matter[],"* if for no other reason than that the agency had the power radically to expand the quantity and diversity of information in its files to intercept matter of a sort that Congress well might not have contemplated when considering the need for confidentiality. 574 F.2d. at 630.

The Ninth Circuit expressed concern about keeping investigatory files secret in *Church of Scientology*, 633 F.2d at 1332, "even if they ha(d) long since lost any requirement for secrecy."

The Investment Advisers Act, as pointed out in Plaintiff's Closing Memo,[12] is a 12,000-word enforcement statute with multiple provisions for fact gathering, just as the statute in *Am. Jewish Cong.,* 574 F.2d. at 630, had an array of information-gathering functions. To allow the SEC to extend a blanket exemption over these investigative records under the rubric of Exemption 3(B) violates Congress's intent and the D.C. Circuit's holding in *Am. Jewish Cong.* as well as its progeny, including *Church of Scientology.*

The SEC argues that Plaintiff's concern that "potentially massive" amounts of information could be withheld under Section 210(b) is irrelevant as the statutes in the cases it cites clearly cover "massive amounts of information," citing the filing of 452,633 patent applications in 2006.[13] Plaintiff's point actually reads: "Significantly, the universe of information 'obtained *as a result of any examination or investigation*' under the Advisers Act is potentially massive (emphasis added)."[14] It was to prevent agencies from extending a protective blanket over exactly this kind of broad fact gathering that Congress amended Exemption 3, as the D.C. Circuit recognized in *Am. Jewish Cong.* The collection of a large volume of information under a statute that specifies a "particular type of matter," e.g., pending patent applications, does not violate the

---

[12] Plaintiff's Reply to Defendant's Opposition to Plaintiff's Cross-Motion for Summary Judgment and Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment (Plaintiff's Closing Memo) at 6-8.

[13] The SEC overstated by approximately 200,000 the number of patent applications filed with the U.S. Patent Office.

[14] Plaintiff's Closing Memo at 7.

letter of Exemption 3(B) or Congress's intent in enacting it. Doing so under a statute that allows an agency to withhold or release information at its whim violates both.

The SEC also ignored another key point that ties *Church of Scientology* to *Am. Jewish Cong.* and ties both cases to this case. The D.C. Circuit noted that Congress had carved out other exemptions for specific classes of information which it "overtly deemed confidential—trade secrets, commercial and financial information, interagency and intergovernmental deliberations …" *Am. Jewish Cong.*, 574 F.2d at 631. The Ninth Circuit noted that "In 1974, FOIA Exemption 7 was rewritten to permit the nondisclosure of 'investigatory records compiled for law enforcement purposes, but only to the extent that producing such records' would involve one of six enumerated dangers." *Church of Scientology*, 633 F.2d at 1331-1332. In this case, the SEC has asserted a host of exemptions in withholding information, only some of which are in issue in this case. The SEC theory that Exemption 3 places a protective blanket over all investigative records runs contrary to the Congressional scheme of carving out specific exemptions where necessary to protect truly confidential information. Significantly, the SEC only asserted Exemption 3 when its FOIA appeals officer, Richard Humes, concluded that Exemption 7(C) would extend little protection to the records the SEC did not wish to release.[15]

The authorities cited by the SEC in its Surreply also recognize that a statute must have some standard guiding the agency's exercise of discretion for it to qualify under Exemption 3(B). As discussed in Plaintiff's Closing Memo,[16] two of the cases relied on by the SEC do not raise this concern because the statutes involved in those cases granted the agency no discretion. *Seymour v. Barabba*, 559 F.2d 806, 807-08 (D.C. Cir. 1977) ("We think that this statute is a clear and strongly worded prohibition against disclosure which would qualify under Exemption 3. It is a

---

[15] Ex. 1 to Third Hardy Decl.
[16] These cases are discussed at greater length in Plaintiff's Closing Memo at 10-12.

flat barrier to disclosure with no exercise of discretion permitted."); *Medina-Hincapie v. Dep't of State*, 700 F.2d 737, 741 (D.C. Cir. 1983) ("It is clear that section 222(f), by its terms, incorporates a congressional mandate of confidentiality.")

In its Surreply, the SEC claims "Aguirre's contention that the statute involved [in *Irons and Sears v. Dann*, 606 F.2d 1215, 1220 (D.C. Cir. 1979)] 'a relatively narrow scope' has no explanation or factual basis."[17] The narrow scope of course referred to the scope of the discretion the agency could exercise. Plaintiff mentioned *Irons and Sears* in his Closing Memo as one of three cases cited by the SEC where the "exempting statutes …gave the agency *no or very narrow* discretion to withhold information."[18] The FOIA requester in *Irons and Sears* sought the patent applications *before* the patents were granted, which left the patent applicants unprotected. The court distinguished between the statute in *Irons and Sears* and the one in *Robinson* on these facts:

> In sum, we are simply not faced today with the kind of blanket authorization to keep secret which was at issue in *Robertson, supra,* … Instead we are presented with a statute that (*1) affirmatively requires nondisclosure (2) of rather particular sorts of material (3) subject only to a discretionary but apparently narrow "special circumstances" exception which* (4) has not historically been used to permit anything resembling general access to the materials in suit and (5) could not be so used without doing violence to the statutory scheme. In our judgment these are precisely the sorts of factors on which Congress intended the application of Exemption 3 to turn. *Irons and Sears* 606 F.2d at 1221.

The first three factors focus on how the statute narrows the scope of discretion it grants to the Patent and Trademark Office. Section 210(b) contains no such limitations. The fourth factor is also absent here since the SEC routinely provides information obtained under the Advisers Act to multiple entities and individuals,[19] provided Plaintiff approximately 2,800 pages of Pequot

---

[17] SEC's Surreply at 6.
[18] Plaintiff's Closing Memo, at 10.
[19] *Id*. at 3 and 39.

investigative files,[20] made public releases of information about the Pequot investigation,[21] and failed to assert Exemption 3 previously as a basis for withholding investigative records.[22]

The Court also explained the fifth factor in *Irons and Sears* as follows:

> There can be little doubt that a holding permitting FOIA access to such applications would jeopardize the patent system by permitting competitors to divine or actually to secure information concerning inventions prior to the issuance of a patent. Indeed, were such access routinely to be permitted would-be applicants might be deterred from seeking patent protection in the first place. The need for confidentiality, in short, seems close to the core of the patent system. We decline to infer intent to abridge that confidentiality from legislative materials that in no way imply it. 606 F.2d at 1221.

No such contention has been made here.

In its Surreply, the SEC also cited *Times Publishing Co. v. U.S. Dep't of Commerce*, 236 F.3d 1286 (11th Cir. 2001) where Section 12(c) of the Export Administration Act (EAA) was the statute in issue. The Eleventh Circuit noted the statute's legislative history: "The current version of the EAA confidentiality provision was enacted precisely to comply with the requirements of FOIA Exemption 3 following a finding that the predecessor confidentiality provision did not qualify to exempt information from public disclosure…" (236 F.3d 1286 at 1290). Section 210(b) has no relevant legislative history since the Advisers Act was enacted sixty-eight years ago. The Court also noted that "the export license application informs applicants that 'information furnished herewith is subject to the provisions of Section 12(c) of the Export Administration Act of 1979, … and its unauthorized disclosure is prohibited by law." *Id*. at 1289. The SEC warned those who were subpoenaed in the Pequot investigation that the information they provided was routinely provided to numerous classes of entities and individuals.[23]

---

[20] *Id*., at 1-3.
[21] *Id*., at 15.
[22] *Id*., at 2-18.
[23] Second Aguirre Decl., ¶2 and SEC Form 1662, Ex. 32.

In its Surreply, the SEC states the issue in *Times Publishing* and its relevance to this case: "[T]he court considered export licensing information and a statute that protected 'information obtained for the purpose of consideration of, or concerning, license applications under this Act. This statute, like Section 210(b), applies to all 'information obtained' in connection with a significant regulatory function."[24] As before, the SEC's quote omits key language. In full context, the Eleventh Circuit quoted the statute as follows: "Specifically, section 12(c) states: 'information obtained for the purpose of consideration of, or concerning, license applications under this Act … *shall be withheld from public disclosure unless the release of such information is determined by the Secretary to be in the national interest* (language in italics omitted from SEC quote).'" *Id*., at 1289. The italicized language in *Times Publishing* above was exactly the language that the courts have relied upon in holding Section 12(c) fit within the scope of Exemption 3(B)'s third prong: "particular types of matters to be withheld." Section 210(b) has no language remotely similar to the italicized language above in Section 12(c).

The Eleventh Circuit in *Times Publishing* adopted the holding and reasoning from *Lessner v. United States Dep't of Commerce, 827 F.2d 1333 (9th Cir. 1987),* where the court carefully parsed the issues. *Lessner* found the language "determined by the Secretary to be in the national interest" brought Section 12(c) within the "**particular** types of matters" (*Id*. at 1336) prong of Exemption 3(B). In reaching that conclusion, the court cited a House of Representatives Report[25] indicating that language used in 12(c) was intended to come within the phrase "**particular t**ypes of matters." *Id*. Based on this analysis, the court held:

> We conclude that section 12(c)(1) of the EAA qualifies as an Exemption 3(B) statute. Congress expressed its intent to pass an Exemption 3 statute, the statute permits the

---

[24] SEC's Surreply at 5.
[25] H. R. Rep. No. 96-200, 96th Cong., 1st Sess. 28 (1979).

exercise of only limited discretion by the Department of Commerce, and it authorizes withholding a narrowly drawn class of materials from disclosure. *Id.* at 1337.

The same dynamics were at play in *CIA v. Sims*, 471 U.S. 159 (1985), also cited by the SEC in its Surreply. The request sought information regarding a CIA research project, code-named MKULTRA that "was established to counter perceived Soviet and Chinese advances in brainwashing and interrogation techniques." *Id.*, at 162. The CIA "made available to respondents all of the MKULTRA grant proposals and contracts." *Id.*, at 180. However, it "declined to disclose the **names of all individual researchers** and **21 institutions," (*Id.*) contending that materials could be withheld under** Section 102(d)(3) of the National Security Act. **The Supreme Court found that "**the legislative history of the FOIA confirms that Congress intended § 102(d)(3) to be a withholding statute under Exemption 3." *Id.*, at 182-3. It further held that CIA "records are protected under § 102(d)(3) only to the extent they contain 'intelligence sources and methods' or if disclosure would reveal otherwise protected information." *Id.* at 183. Again, Section 210(b) contains no such limits. *Sims* is discussed at length in Plaintiff's Closing Memo.[26]

### B. The SEC failed to establish the Pequot investigative records sought by Plaintiff were "obtained as a result" of an investigation under the Advisers Act.

As discussed in Plaintiff's Closing Memo, the SEC's assertion of Exemption 3(B) involves two steps. The SEC must first establish that Section 210(b) is an exempting statute *and* then must establish that the records are protected by Section 210(b). *Sims*, 471 U.S. at 168; *Iron & Sears*, 606 F.2d at 1221. "When seeking to rely upon **Exemption 3,** the **agency** has the **burden** of establishing that the documents sought are "specifically exempted from disclosure by statute." *Parker v. EEOC*, 534 F.2d 977, 930 (D.C. Cir. 1976).

---

[26] Plaintiff's Closing Memo at 39.

Section 210(b) only protects information "obtained as a result of any such … investigation under the Advisers Act." The undisputed, overlapping, and most credible evidence—the SEC's own internal records—establishes beyond any shadow of a doubt that the investigation of possible violations of the Advisers Act was a minor aspect of the Pequot investigation which staff discontinued by April 2005.[27] The SEC's official description of the Pequot investigation in the case closing report, provided to the Senate and released to the public, states that the investigation was conducted exclusively under the Exchange Act of 1934.[28] Plaintiff has only requested records relating to the specific examinations referred to in the case closing report. All of those examinations were taken after April 2005.[29] Hence, the SEC has not met its burden.

The SEC's argument merely highlights the fundamental flaw in its theory that Section 210(b) qualifies as an exempting statute under Exemption 3(B). The SEC relies on a sliver of evidence to support its theory that the Pequot investigative records were obtained through an investigation under the Advisers Act: two references in the Commission's order of January 6, 2005. The SEC does not merely contend that this reference in the order protects information obtained during the Pequot investigation under the Advisers Act. It also contends that it taints all information obtained during the investigation of possible violations under any other statute mentioned in the same order. This multiplies the SEC's discretion under a statute that already grants the SEC far too much discretion to come within Exemption 3(B). The Pequot investigation involved approximately twenty public companies, at least two investment banks, and Pequot itself. The SEC's theory would toss a FOIA proof blanket over the entire investigation. The formal order does not even mention Pequot. It is easy to imagine scenarios where even a tinier piece of the investigation involved the Advisers Act, e.g. where the only investment advisor settled

---

[27] See Second Aguirre Decl. ¶9.
[28] SEC Case Closing Report, Nov. 30, 2006, Ex. 31 to Second Aguirre Decl.
[29] *Id.*

immediately. In substance, the SEC contends that no matter how short and inconsequential the investigation under the Advisers Act, all records obtained relating to the possible violation of any *other* statute mentioned in the same order are beyond FOIA's reach.

All this boils down to a decision by SEC Enforcement Division staff. If the magic language is added to the proposed order, FOIA vanishes for every step the SEC takes in the investigation. Further, the FOIA proof blanket would extend to every aspect of the investigation under every statute. For example, in this case, the SEC withholds the transcript of the examination of John Mack under Section 210(b)[30] on the theory that it was taken in connection with a possible 204A violation by Pequot that was abandoned more than a year earlier. Plaintiff respectfully submits that this is not what Congress had in mind by the phrase "refers to particular types of matters to be withheld" in its amendment to Exemption 3.

## III. THE SEC HAS YET ANOTHER THEORY OF EXEMPTION 4

According to the SEC, it withholds under Exemption 4 a total 524 lines of testimony from three Samberg transcripts and the transcript of another Pequot employee believed to be Peter Dartley, Pequot's head trader during 2001. The SEC's theory of Exemption 4 continues to be a moving target, now reaching its fourth phase since August 2007.

The SEC FOIA Office notified Plaintiff in August 2007 that it was withholding records under Exemption 4 that "would cause substantial harm to [Pequot's] competitive position."[31] By December 2007, the SEC had changed its mind who would be harmed: the injury would be to the SEC, not Pequot. In this way, the SEC leaped from the "substantial harm" to the "impairment" prong of Exemption 4.

---

[30] See table at page 4 of the SEC's Supplemental Statement of Material Facts.
[31] Second Aguirre Decl., ¶16, Ex. 50, at 2.

This impairment would operate in a unique way, according to the SEC. The December 18, 2007, letter of Associate General Counsel Richard Humes (Humes),[32] explains the impairment would be a *onetime phenomenon* that would occur only if the SEC did not redact the 524 lines of testimony from the four transcripts. In his words, Humes "determined that the *extensive publicity regarding the Commission's investigation of Pequot* is likely to make persons from whom the Commission seeks information in its investigations *more reluctant to be forthcoming* in responding to Commission subpoena if they see that the Commission cannot protect detailed commercial and financial information from disclosure under FOIA (emphasis added)."[33]

In short, the Humes letter suggests the impairment theory was coined in this case. Likewise, the SEC's FOIA Office did not consider the impairment theory when it redacted the 524 lines of testimony from these four transcripts, since it made no reference to this theory in its August 2007 letter.[34] Indeed, the SEC has never contended in any reported case that it withheld financial information under Exemption 4 to protect its ability to obtain information in the future.[35]

When the SEC filed its Closing Memo in mid-January, a new "impairment" theory was in full bloom. Just three weeks after the Humes letter, Deputy Director Walter Ricciardi (Ricciardi) spun out his own impairment theory. But unlike Humes, Ricciardi did not peg his theory on Pequot's publicity. On the contrary, Ricciardi believes all financial information released by the SEC may have a detrimental effect on the testimony of future witnesses. He states:

> If witnesses believed that commercial or financial information could not be protected under the Freedom of Information Act except upon a showing of potential harm from competitors, *witnesses would likely avoid mentioning or discussing commercial or*

---

[32] Ex. 1 to Third Hardy Decl.
[33] *Id.* at 12.
[34] See Ex. 50 to Second Aguirre Decl., August 21, 2007, letter from Brenda Fuller to Gary Aguirre.
[35] The Lexis search was conducted in Federal Court Cases, Combined, using the search terms: exemption 4 and NAME securities w/2 exchange (and impair!).

*financial information, especially if there are details that the staff may not specifically inquire about* (emphasis added)."[36]

Ricciardi does not explain how a sworn witness under subpoena "would likely avoid mentioning or discussing commercial of financial information" when asked under oath to respond to a question. The Ricciardi theory also assumes SEC staff attorneys do not ask follow-up questions.

But the problem runs deeper according to Ricciardi. It is not merely witnesses who may not be forthcoming. Riccciardi explains: "Virtually every person who provides to the Commission documents or testimony containing commercial or financial information requests confidential treatment of that information pursuant to the Commission's regulations."[37] In this light, the SEC might be expected to resist efforts by third parties seeking financial information, because it would impair its ability to obtain necessary information in the future. Although the SEC never made this contention in any reported case,[38] it did resist do the reverse. It resisted efforts by those who submitted financial records during SEC investigations from obtaining protection under Exemption 4 in four reported cases.[39]

In its Surreply, the SEC has tweaked the Ricciardi theory in response to Plaintiff's point that witnesses under oath face penalties if they are evasive and misleading. It turns out Ricciardi got it wrong. The problem was not contemptuous witnesses. Rather, according to the Surreply, "the issue is whether witnesses will provide details *they were under no compulsion to provide* if they believe that regardless of the outcome of the investigation all details can be made public."[40] This freshly minted theory appeared within a week of Plaintiff's last filing.

---

[36] Ricciardi declaration, filed on January 14, 2008, ¶6.

[37] *Id.*, ¶3.

[38] *Supra*, ft. 35.

[39] *Occidental Petroleum Corp. v. SEC*, 277 U.S. App. D.C. 112 (D.C. Cir. 1989), *Alexander & Alexander Servs. v. SEC*, 1993 U.S. Dist. LEXIS 14945 (D.D.C. 1993), *Occidental Petroleum Corp. v. SEC*, 662 F. Supp. 496 (D.D.C. 1987), and *Jos. Schlitz Brewing Co. v. SEC*, 1982 U.S. Dist. LEXIS 13670 (D.D.C. 1982).

[40] SEC's Surreply at 7.

To sum up, the SEC has tossed out four differing theories over eight months how Exemption 4 protects the same 524 lines of transcript. The "competitive harm" theory morphed into the "impairment" theory over four months; the Humes "impairment" theory then spawned the Ricciardi I theory three weeks later; the Ricciardi I theory (sworn, subpoenaed witnesses refusing to give specifics) then became  Ricciardi theory II (witnesses not volunteering information) within one week of the filing of Plaintiff's Closing Memo.  Plaintiff requests the court to take a close look at this testimony in camera.

There appears to be no SEC policy regarding any of its impairment theories. This seems odd because this issue must have arisen before. According to the Surreply, the SEC conducted 776 investigations in 2006.[41] Its FOIA Office processed 12,564 requests under FOIA for the year ending September 30, 2007.[42] Yet, there is not a hint in the Humes letter, the Ricciardi declaration or any of the SEC memorandums that this theory has ever been asserted before, much less constitutes an SEC policy.

Further, there appear to be no limits to the scope of the information the SEC may be withhold under its various impairment theories. Since the SEC Enforcement Division only enforces laws involving securities, by definition financial instruments, almost all of the information the SEC obtains comes within the scope of this exemption. The SEC did explain how it chose what information to withhold: "The Commission redacted information from transcripts because it determined that witnesses would be *more forthcoming* in testimony if detailed commercial and financial information … [was] protected. (Emphasis added)"

The "more forthcoming" standard appears to be the perfect exemption from an agency's perspective. It is wholly subjective. It can be applied to virtually any information which the SEC

---

[41] *Id*. at 6.
[42] Securities and Exchange Commission Freedom of Information Act Annual Report for Fiscal Year 2007 October 1, 2006 to September 30, 2007, available at http://www.sec.gov/foia/arfoia07.htm (last visited April 6, 2008).

receives in any investigation under any statute. It has none of the pesky limits Congress built into the other Exemption. It is extraordinary that no one has ever challenged this standard in a FOIA action before. Again, Plaintiff respectfully submits that the "more forthcoming" standard was created for this case.

Even stale financial information can be protected. SEC staff questioned Samberg and Dartley about events that took place almost seven years ago. The SEC new exemption bypasses both the concern of Congress and the Supreme Court that investigative files could be held in perpetuity without sunlight. *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 230 (1978) ("Thus, the thrust of congressional concern in its amendment of Exemption 7 was to make clear that the Exemption did not endlessly protect material simply because it was in an investigatory file.")

The SEC does not explain, even in theory, why the release of the redacted testimony would impair the SEC's ability to obtain voluntary information in the future. There is no evidence that either Samberg or Dartley volunteered anything. The Senate released two partial transcripts of Samberg's testimony, but neither show Samberg being chatty. SEC staff questioned Samberg about the possibility he traded on nonpublic information in GE and Heller stock, where Pequot made an $18.9 million profit, and Microsoft options, where Pequot made a $12 million profit.[43] *Five* attorneys from two of the nation's top securities firms, including three senior partners, represented Samberg during these examinations.[44] One likely piece of guidance from these highly skilled attorneys: do not volunteer information. Samberg answered questions, but volunteered little.[45]

---

[43] Plaintiff's Opening Memo at 8.
[44] Testimony of Arthur Samberg, excerpt (May 3, 2005), Ex. 1 to *The Firing of an SEC Attorney and the Investigation of Pequot Capital Management,* Senate Report No.110-28 (2007) (Senate Report).
[45] *Id*. See also Testimony of Arthur Samberg, excerpt (June 7, 2005), Ex. 19 to Senate Report.

The SEC must establish that disclosure of the information would likely result in "significant impairment of either the effectiveness or efficiency" of the SEC. *Critical Mass Energy Project v. NRC* 931 F.2d 939, 941 (D.C. Cir. 1991). The SEC has had three opportunities to do so. This case fits squarely within *National Parks and Conservation Ass'n v. Morton,* 498 F.2d 765,770 (D.C. Cir. 1974), where the court held: "Since the concessioners are *required* to provide this financial information to the government, there is presumably **no danger that public disclosure will impair the ability of the Government to obtain this information in the future."**

**Nor can the SEC pull itself within the narrow exception carved out by** *Washington Post Co. v. U.S. Dep't of Health and Human Services*, 690 F.2d 252, 269 (D.C. Cir. 1982). There, the D.C. Circuit reversed the district court "to give the government an opportunity to provide the detailed factual justification for withholding under Exemption 4 required by *Pacific Architects & Engineers* (505 F.2d 383, 385 (D.C. Cir. 1974))" In doing so, the court also observed, in language applicable here, "[T]he government produced no evidence except a *conclusory affidavit by the HHS director of personnel policy* (emphasis added). Thus, the government has not yet established its Exemption 4 claim (emphasis added)." Nor has the SEC established its claims with the conflicting conclusions stated in the Humes letter and the Ricciardi declaration.

In *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 Fed 2nd 871, 878 (D.C. Cir. 1992), the court observed: "when information is obtained under duress the Government's interest is in ensuring its continued **reliability;** when that information is volunteered, the Government's interest is in ensuring its continued availability."  The SEC has made no showing that the release of the redacted Samberg and Dartley transcripts would in any way affect the reliability of testimony taken in the future.

## IV. THE SEC FAILED TO CONDUCT AN ADEQUATE SEARCH

### A. The SEC claims Plaintiff "confuses two separate issues in this case."

This theory is meritless for two reasons. It is irrelevant because the SEC has the burden to establish that it conducted an adequate search, *The Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995), unless Plaintiff waived the issue, which the SEC has explicitly stated it is not contending.[46] Further, Plaintiff challenged the adequacy of the SEC's search in both his Opening Memo and his Closing Memo. The SEC has had two chances to make its case on the search, but prefers to argue it is still confused.

Second, the SEC's argument is untrue. Plaintiff questioned the SEC in a flow of correspondence during the five months before the SEC filed its summary judgment motion whether it was withholding responsive records and failing to list them on its *Vaughn* index. The correspondence questioned whether the SEC was withholding records (1) sought by Plaintiff's December 30, 2005, request, relating to his employment and termination and (2) relating to the Pequot investigation.

The controversy began with the Humes letter of May 1, 2007, in which he stated the SEC withheld thousands of pages of records that it had provided the Senate, without listing them on the SEC's *Vaughn* index.[47] Like Plaintiff, the Senate had asked for records relating to Plaintiff's employment as well as the Pequot investigative records.[48] On May 14, 2007, Plaintiff's counsel, Scott Hodes (Hodes), responded with a letter to Hardy, explicitly questioning whether the SEC was withholding records responsive to Plaintiff's December 30, 2005, request relating to

---

[46] SEC Surreply, 8, ft. 4.
[47] Ex. 17 to Second Hardy Decl. Humes stated in part: "At this time the Commission is proving you with approximately 2000 pages of the 8006 page of documents it produced to the Senate."
[48] Ex. 1 to Second Hardy Decl.

Plaintiff's employment.[49]  The letter stated in part: "Mr. Humes seems to concede that the SEC has not fully complied with Mr. Aguirre's December 30 request, as incorporated into the complaint." Melinda Hardy (Hardy) responded with her letter of May 18, 2007, which was not helpful. Among the Hardy statements was the following:

> In your May 14 letter you also indicate that you would like more information about the additional withheld documents. However, it is not clear whether you would like some general information so that we could promptly engage in settlement discussion or whether whether you would like to proceed to summary judgment briefing. We can discuss the general nature of the documents at any time.

Again, Hodes responded with his letter of June 5, 2007,[50] again questioning whether or not the SEC had fully responded to Plaintiff's letter of December 30, 2005. Hodes pointed out the SEC had refused "to produce those same documents in response to Mr. Aguirre's FOIA requests of December 30, 2005." This discussion continued when Hodes pointed out in his letter of September 11, 2007, that the Vaughn index implied the existence of about 1,500 pages of documents which were not accounted for.[51] Shortly before the SEC filed its summary judgment motion, Plaintiff inquired about the SEC's response to items 7 through 12 of Plaintiff's December 30, 2005, request.[52] Finally, Plaintiff's email of November 5, 2007, to Hardy suggested there were questions of "credibility" regarding whether the SEC was withholding responsive records which were not specified in its Vaughn index.[53]

The SEC recognized in its Opening Memo that Plaintiff had challenged the adequacy of the SEC's search, but for reasons it alone knows addressed only the adequacy of the search in relation to the Pequot investigative records and items 2 through 5 of Plaintiff's December 30,

---

[49] Ex. 49 to Second Aguirre Decl.
[50] Ex. 51 to Second Aguirre Decl.
[51] Ex. 13 to Second Hardy Decl.
[52] Ex. 53 to Second Aguirre Decl.: "Regarding the italicized language above, would you kindly advise us how many of the 812 pages of documents fall into each of the following two categories: (1) "duplicates of the documents provided  in the Commission's response to items 7 through 12 of the December 30, 2005 request."
[53] Ex. 52 to Second Aguirre Decl.

2005, request (relating to other issues), but not items 7 through 12 requesting records relating to Plaintiff's employment and termination in the same letter.[54] In defending its search, the SEC pointed to two of Hardy's letters, which also discussed the same two issues (Pequot investigative records and those relating to Plaintiff's employment).[55]

### B.  The SEC has not shown whether any SEC office conducted any records search.

As discussed in Plaintiff's Closing Memo, every aspect of the SEC's search is defective. The declaration of Fuller, upon which the SEC relies, fails to state the search terms which were used, fails to state how the search was conducted, fails to state whether all non-exempt records were released, and fails to state whether anyone from the FOIA Office was involved.[56] Indeed, the evidence suggests that the entire process was handled by the SEC's Office of General Counsel (OGC), a fact the OGC does not dispute, and thus Fuller may not have sufficient personal knowledge to provide a statement how the search was conducted.

The SEC makes this point in response: "Aguirre does not identify any office that should have been queried but was not."[57] This is inaccurate. As stated in Plaintiff's Closing Memo, the SEC sent a communication to multiple offices in August 2006, but the query is meaningless since it had no search terms.[58] Further, the SEC did not query its Office of Information Technology, a request Plaintiff made in his FOIA request.[59]

### C.  The SEC has conceded it searched for only a fraction of the records sought.

The SEC argues that "Aguirre's sole issue appears to be that the Commission did not interpret his request to include all documents that mentioned the termination of his employment,

---

[54] SEC Opening Memo 3, 38-39.
[55] *Id*., Exs. 15 and 19 to Second Hardy Decl.
[56] Plaintiff's Closing Memo at 41-44.
[57] SEC Surreply at 8.
[58] *Id*., at 40-44.
[59] See Ex. 1 to Second Hardy Decl.

even if they did not relate to *carrying out the termination*."[60] Again, the SEC plays word games. The request was not limited to records "carrying out the termination." Plaintiff requested six categories of records relating to his employment and termination.[61] For its own reasons, the SEC reads Plaintiff's request to include only one paragraph and a phrase of a second.[62]

### D.  Comparing the Fuller and Winter Declarations on the FOIA standard search protocol.

The SEC passes off the differences in the Fuller declaration in this case with the Winter declaration in *Laroche v. SEC*, 2006 U.S. Dist. LEXIS 75415 (N.D. Cal. 2006) with the

---

[60] SEC Surreply at 9.

[61] The introductory language from Plaintiff's December 30, 2005, letter, and the specific requests which are included in this litigation read:

> In accordance with the applicable provisions of the Freedom of Information Act and the Privacy Act,  I hereby request access to and copies of the documents, records, and files relating to, concerning, or the subject of my applications for employment to the Securities and Exchange Commission ("SEC") during the period from May 2003 through July 2004, my employment by the SEC from September 7, 2004, through September 2, 2005, the SEC's decision to terminate my employment effective September 2, 2005, and my obligations during and after my employment regarding nonpublic information.

> The records specified below are believed to be in the possession of the SEC's Division of Employment, Office of the General Counsel, Office of Equal Employment Opportunity, Office of Human Resources, Office of Information Technology, and the SEC staff and officials identified below.

> 7) All records relating to Aguirre's merit pay increase for the 2004 through 2005 evaluation period, including (but not limited to) electronic or hard copy documents to or from his supervisors, electronic or hard copy documents to or from the committee members who authorized Aguirre's merit pay increase, transmittal letters, memorandums, emails, notes of the compensation committee, and all other documents generated in implementing such merit pay increase;

> 8) All records containing information regarding Aguirre's evaluation or performance as an employee or the purported reasons for the termination of his employment including (but not limited to) employee performance files, personnel security files, compensation review files, personnel discipline files, personnel termination files, or any other file;

> 9) All records including (but not limited to) employee performance files, personnel security files, compensation review files, personnel discipline files, personnel termination files, or any other file containing information regarding Aguirre's performance as an employee or the purported causes of his termination;

> 10) All written or electronic communications or record of any communications relating to Aguirre's merit pay increase for the 2004 through 2005 evaluation period to or from Christopher Cox, Linda Thomsen, Paul Berger, James Clarkson, Richard Humes, Deborah Balducchi, Mark Kreitman, Robert Hanson, Richard Grime, Charles Cain or any other SEC staff member of official;

> 11) All records relating to the SEC's termination of Aguirre's employment, including (but not limited to) electronic or hard copy documents to or from his supervisors, transmittal letters, memorandums, emails, notes or memorandums of any meeting during which such possibility was discussed, and all other *documents generated in carrying out such termination*;

> 12) *All records relating to the SEC's termination of Aguirre's employment to or from Christopher Cox, Linda Thomsen, Paul Berger, James Clarkson, Richard Humes, Deborah Balducchi, Mark Kreitman, Robert Hanson, Richard Grime, and Charles Cain*;

[62] The SEC's Fact 1 of its Supplemental Statement of Material Facts describes a search limited to the italicized language in note 60. It ignores requests 7 through 10 and all but one phrase of paragraph 11.

statement that the "*LaRoche* case, however, is not apposite, as the plaintiff in that case sought the creation of an electronic database." That is a half-truth. The case also included a dispute over the adequacy of the search. The court in *LaRoche* noted: "*LaRoche* also argues that the SEC failed to meet its burden of presenting evidence demonstrating the adequacy of its search for records related to his second FOIA request." Both SEC counsel in this case should know this; they both represented the SEC in *LaRoche*. Indeed, they cited the same cases in their brief in *LaRoche* on the adequacy of the search as they did in this case.[63] Only their factual representations differ.[64]

Dated: April 7, 2008                                      Respectfully Submitted,


_____/s/_____
Scott A. Hodes, D.C. Bar #430375
P.O. Box 42002
Washington, D.C. 20015
301-404-0502



_____/s/_____
Gary J. Aguirre, CA Bar#38927
402 West Broadway, Suite 400
San Diego, CA 92101
619-595-3197

Attorneys for Plaintiff

---

[63] Compare SEC Opening Memo at 38 in this case with SEC memorandum in *LaRoche*, Third Aguirre Decl., Ex. 54.

[64] Plaintiff's Closing Memo at 41-44.

25