## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                                    )
**GARY AGUIRRE,**                                   )
                                                    )
          **Plaintiff,**     )
                                                    )
      **v.**                  )          **Civil Action No. 06-1260 (ESH)**
                                                    )
**SECURITIES AND EXCHANGE**                         )
**COMMISSION,**                                     )
                                                    )
        **Defendant.**       )
_____           )

### MEMORANDUM OPINION AND ORDER

Gary Aguirre, who was formerly employed as an attorney at the Securities and Exchange Commission ("SEC"), has sued the SEC under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 *et seq*. Plaintiff seeks documents relating to his employment, his termination, and the SEC's investigation of Pequot Capital Management ("Pequot") and John Mack. Some of the documents in question have been withheld in their entirety, while others have been released with redactions. The SEC is withholding information under FOIA Exemptions 3, 4, 6, and 7(C). Plaintiff also alleges that the SEC has failed to conduct an adequate search, and in particular, he challenges defendant's failure to produce his original personnel file. Before the Court are cross-motions for summary judgment.

### BACKGROUND

The backdrop of this dispute has been thoroughly explored by the Senate Committee on the Judiciary and the Senate Committee on Finance. These Committees released a detailed report on August 3, 2007, based on an extensive joint investigation into "allegations of lax enforcement, improper political influence, whistleblower retaliation and related matters

involving" the SEC.  (S. Rep. No. 110-28 at 1 (2007) [hereinafter "Report" or "S. Rep. __"].)

The Report contains the Committees' findings and recommendations based on their review of

some 10,000 pages of documents, over 30 witness interviews and three Judiciary Committee

hearings in July, September and December 2006.[1]  This investigation was undertaken as a result

of plaintiff's complaints that he was thwarted by his superiors in his investigation of Pequot and

its relationship to the current Morgan Stanley Chief Executive Officer John Mack, and

ultimately, that he was fired in retaliation for his whistleblowing activities.  (*Id*.)  Because of the

importance of understanding the dispute between the parties, as well as plaintiff's legal argument

that the public interest in disclosure of the withheld records outweighs any privacy interest under

Exemptions 6 and 7(C), the Court must provide a detailed summary of the evidence presented to

the Senate Committees and their findings, and to begin this story, it will describe the activities of

Pequot, its Chairman and CEO Arthur Samberg and their relationship to John Mack.

## I.     Pequot

### A. *Suspicious Trading Activity Regarding General Electric and Heller Financial*

Pequot, a large investment advisory firm that manages over $15 billion in assets, is run

by Arthur Samberg, its Chairman and CEO.  (S. Rep. 15.)  Beginning on July 2, 2001, Mr.

Samberg directed his traders to aggressively buy shares of Heller Financial stock.  (*Id*. 15, 47.)

In fact, from July 2 to July 27, he "attempted to purchase many more shares of Heller than his

traders could safely execute without driving up the price."  (*Id*.)  On six days during this period,

the number of shares sought by Pequot exceeded the total volume of Heller shares traded, and on

---

[1]The Senate Report is over one-hundred pages long, but a two-page Executive Summary appears at the beginning of the Report.  (S. Rep. 5-6.)

two days, the number of shares sought was more than twice Heller's daily volume. (*Id.* 47.)

Pequot had no position in Heller at the beginning of the month, but by July 27th, it was "long"

1,148,200 shares.[2]  (*Id.*)

On July 25, 2001, at a time when Pequot had amassed a large long position in Heller, it

began selling short General Electric ("GE") stock.[3]  (*Id.* 47.)  Pequot shorted over 1.5 million

shares of GE during the three-day period from July 25 to July 27.  By the close of business on

Friday, July 27, Pequot was poised to profit if the price of Heller increased or if the price of GE

decreased.

On the following Monday, July 30, GE announced its plan to acquire Heller.  (*Id.*)  As

often happens when an acquisition is announced, the stock price of the acquiring company (GE)

decreased while that of the target company (Heller) increased.  (*Id.* 15.)  Pequot was positioned

to profit from the news of the acquisition: both its long position in Heller and its short position in

GE increased in value.  Mr. Samberg sold all of his Heller stock on the day of the announcement

by GE, and on the following day, he covered his short position in GE.  (*Id.* 47.)  Pequot made

approximately $18 million from its trades involving Heller and GE.  (*Id.* 15.)

Given this suspicious trading activity, there was reason to suspect that Mr. Samberg had

---

[2]One who owns shares of a stock is considered to be "long" in that stock and profits when the price of the stock increases.  The opposite of a long position is a short position.  *See* note 3, *infra*.

[3]Selling short is a way for investors to bet that a stock's price will decline.  There are three steps in a short trade.  First, the investor borrows from someone else a stock that he does not already own.  Second, the investor sells this borrowed stock.  Third, the investor buys back the stock and returns it to the person who lent it to him; this closes out the short position and is referred to as "covering" the short.  Someone shorting is betting that he will be able to buy the stock back for less than the price that he paid for it.

3

inside information about GE's plan to acquire Heller.  As noted in the Senate Report:

> When an acquisition is announced, the price of the purchasing
> company typically falls, and the price of the purchased company
> typically rises.  In this case anyone with knowledge of the deal
> before it was announced could purchase Heller and short GE for
> virtually guaranteed profits.

(*Id*. 15.)  If Mr. Samberg did have prior knowledge of the GE-Heller deal, he profited from

material, non-public information in violation of federal insider trading laws.[4]  (*Id*.)

In the eyes of the Senate, Mr. Samberg failed to adequately explain his motivation for

these trades.  When he first testified at a deposition at the SEC on May 3, 2005, Mr. Samberg

cited several reasons why he purchased Heller stock in July 2001.  (*Id*. 23.)  However, the SEC

soon learned that all of these purported motives had appeared in a Legg Mason analyst report,

which Mr. Samberg had only reviewed in preparation for his SEC testimony.  (*Id*.)  During his

second deposition on June 7, 2005, Mr. Samberg conceded that he had not read the Legg Mason

report, or any other analyst materials, prior to ordering the trades.  (*Id*.)  In addition, this conduct

was contrary to Pequot's regular decision-making practice of relying on a "research driven

approach" prior to making trades.  (*Id*. 16, 23.)  Yet, as explained in more detail below, the SEC

cut short its investigation into this matter.

### B. Pequot's Other Suspicious Trades

The incident involving Heller and GE was not the first time that Pequot had engaged in

suspicious trading activity.  Three months earlier, in April 2001, Mr. Samberg had a series of e-

mail exchanges with Microsoft employee David Zilkha, who was about to leave Microsoft to

---

[4]This would include possible violations of Sections 10(b) and 14(e) of the Securities
Exchange Act of 1934.  15 U.S.C. §§ 78j(b), 78n(e).

join Pequot. (*Id*. 20.) Mr. Samberg asked Mr. Zilkha if he had any "tidbits" about Microsoft,

and Mr. Zilkha replied, "I heard this afternoon from the MSN finance controller that our CFO

has been more relaxed before this next earnings release than he has been in the last year. Augurs

well." (*Id*. 21.) Two days later, Microsoft reported earnings that beat Wall Street's estimates,

and the stock rose significantly. (*Id*.) Mr. Samberg, having realized a profit of $1.6 million from

recent Microsoft trades, wrote Mr. Zilkha, "I shouldn't say this, but you have probably paid for

yourself already!" (*Id*.) Despite the seemingly damning nature of this communication, the SEC

closed its investigation into this incident, concluding that it was unworthy of an enforcement

action. (*Id*. 44.)

Pequot also engaged in suspicious trading prior to a court ruling in a drug patent case. In

October 2002, a federal district court ruled that Par Pharmaceutical had infringed the drug

patents held by AstraZeneca. (*Id*. 19.) As a result of this decision, AstraZeneca's stock price

rose significantly while Par Pharmaceutical's price fell. (*Id*.) The New York Stock Exchange

("NYSE") reported suspicious trading by Pequot in both stocks prior to the court's ruling. (*Id*.

20.) While the U.S. Attorney's Office in the Southern District of New York investigated

whether a judicial law clerk had leaked the outcome of the case (*id*.), the SEC declined to

investigate the situation (*Id*. 45).

In yet another instance of possible improprieties, the SEC's Office of Market

Surveillance investigated Pequot's use of wash sales in 2005. (*Id*. 18.) A wash sale occurs when

an investor both buys and sells the same security at the same price within a short period of time.

(*Id*.) While wash sale trades are not *per se* illegal, they are sometimes used for "illegitimate

accounting, tax, or market manipulation purposes." (*Id*.) After reading a memorandum

5

describing Pequot's wash sales activities, an Associate Director at the SEC noted, "This memo describes some wild and troubling trading. The wash sales may be manipulative or fraudulent. . . . Either case involves potential SEC or [NASD][5] rule violations." (*Id*. 19.) Despite these concerns, the SEC closed the case without action. (*Id*.)

## II.    John Mack

John J. Mack is currently the Chief Executive Officer and Chairman of the Board of Morgan Stanley, one of the world's largest financial services firms. Mr. Mack has spent most of his career at Morgan Stanley, rising up the ranks to the position of President and COO in May 1997. He left the firm in March 2001, and became CEO of Credit Suisse First Boston in July of that year. He stayed at Credit Suisse until June 2004, and in June 2005, he briefly served as Chairman of Pequot. Mr. Mack returned to Morgan Stanley in June 2005 to assume his current title of Chairman and CEO. *See* Morgan Stanley, Annual Report (Form 10-K), at 12 (Jan. 28, 2008).

### A.   John Mack's Connection to the GE-Heller Acquisition

Mr. Mack had strong ties to the two firms that were handling the GE-Heller acquisition -- Morgan Stanley and Credit Suisse First Boston. (S. Rep. 24.) At the time that Mr. Samberg ordered the Heller stock purchases, Mr. Mack had recently left Morgan Stanley, and he was being considered for the position of CEO at Credit Suisse First Boston. (*Id*.) Both of these firms would have possessed material, non-public information about the transaction prior to its public announcement. (*Id*.)

---

[5]The National Association of Securities Dealers ("NASD") is a self-regulatory organization ("SRO") in the securities industry.

### B. John Mack's Connection to Pequot

John Mack was a "close associate" of Mr. Samberg and an investor in Pequot. (*Id*. 24.)
On May 11, 2001, Mr. Samberg wrote an e-mail describing Mr. Mack's interest in making
additional investments in Pequot: "John Mack would like to put $5mm into Partners [a Pequot
fund] at the 1st available opening. He'd also like to put more $ into Scout [another Pequot fund],
if that's possible, and would like a recap of what he has where." (*Id*. 25.) On June 20, 2001, less
than two weeks before Mr. Samberg started buying Heller stock, Mr. Mack lobbied Mr. Samberg
for the opportunity to invest in a start-up company with the code name "Fresh Start." As Mr.
Samberg noted in an e-mail to a Pequot employee, "I'm sitting here with John Mack and . . .
John is busting my chops cuz he hasn't gotten the Fresh Start material yet." (*Id*.)

### C. John Mack's Phone Call to Arthur Samberg

John Mack was meeting with senior officials at Credit Suisse (Credit Suisse First
Boston's parent company) in Switzerland from June 26 to June 28, 2001. (*Id*. 11.) Upon his
return, on June 29, 2001, Mr. Mack called Mr. Samberg. (S. Rep. 25.) Two things happened
after this telephone conversation. First, Mr. Mack was allowed to invest $5 million in Fresh
Start. He was the only individual investor to be given this opportunity. (*Id*.) Second, on the
following Monday Mr. Samberg made large purchases of shares in Heller. Mr. Mack's
investment in Fresh Start proved to be very profitable; he more than tripled his money in less
than a year. (*Id*. 25-26.) Mr. Mack later claimed that it was Mr. Samberg who solicited his
investment in Fresh Start because Pequot had reached the maximum limit that it could invest in
the company. (*Id*. 41.) However, several Pequot principals, including Mr. Samberg's own son,
were unhappy about sharing the deal with Mr. Mack, and according to Mr. Samberg's e-mails,

Mr. Mack had been lobbying aggressively for the opportunity to participate in Fresh Start. (*Id*. 25.)

### D. SEC's Slow Response in Pursuing John Mack's Testimony

The Senate Report determined that there were several convincing reasons to suspect that John Mack told Arthur Samberg about the GE-Heller deal before that information became public:

> Mack was a close associate of Samberg and an investor in Pequot funds. Mack was thus in a position to share in any profits the funds might make by trading on inside information. Mack also had been in employment negotiations with a firm working on the deal at the time of the trades, which meant he might have had an opportunity to learn of the GE-Heller acquisition before the public announcement. Moreover, an e-mail from Samberg indicated that he had spoken to Mack on June 29, 2001. Samberg began directing large purchases of Heller stock on the next trading day.

(*Id*. 24-25.) Nevertheless, as explained in more detail below, the SEC resisted plaintiff's efforts to take Mr. Mack's testimony. (*Id*. 26.) In fact, it was not until this matter was publicly exposed in a front-page *New York Times* article on June 23, 2006,[6] that the SEC began to re-evaluate Mr. Mack as a potential tipper. (*Id*. 39.) Nonetheless, the SEC did not depose Mr. Mack until August 1, 2006, five days *after* the statute of limitations for civil and criminal penalties had expired. (*Id*. 41.)

## III.    Plaintiff's Role in the Pequot Investigation

### A. Plaintiff's Path to the SEC

In 1968, Gary Aguirre earned his law degree from the University of California, Berkeley.

---

[6]Walt Bogdanich and Gretchen Morgenson, *S.E.C. is Reported to be Examining a Big Hedge Fund*, N.Y. TIMES, June 23, 2006, at A1.

(*Id.* 55.)  After working as a public defender for several years, he embarked upon a long career

in private practice and ultimately became a partner at Aguirre & Eckmann.  (*Id.*)  After a brief

retirement, Mr. Aguirre enrolled in Georgetown University Law Center's LL.M. program in

2001.  (*Id.*)  Upon graduation Mr. Aguirre applied unsuccessfully for employment at the SEC

twenty-three times.  (*Id.*)  Mr. Aguirre filed a complaint with the EEO office of the SEC alleging

age discrimination.  (*Id.*)  Soon after the complaint was filed, the SEC extended a job offer.  (*Id.*)

Mr. Aguirre joined the SEC's Enforcement Division on September 7, 2004.  (*Id.* 56.)

> B.  *Plaintiff's First Disagreement with SEC Management Leads to a Branch Transfer*

Mr. Aguirre initially worked under Branch Chief Charles Cain and Assistant Director

Richard Grimes.  (*Id.* 56.)  One of his first assignments was to prepare a draft formal order

memorandum for the Pequot insider trading investigation.  (*Id.*)  The formal order is significant

because it is the document that authorizes the SEC to conduct a full-fledged investigation.  (*Id.*)

On October 6, 2004, Mr. Aguirre sent a draft order to Branch Chief Charles Cain with the

following language: "over the past two years, SROs [*i.e.*, self-regulatory organizations such as

the New York Stock Exchange] have referred or 'highlighted' at least six matters involving

possible insider trading by the Pequot Management and one or more of Pequot Funds to the

Division of Enforcement." (*Id.*)   Mr. Cain edited the draft by replacing Mr. Aguirre's language

with the following: "subsequent investigation by the staff identified at least six transactions

involving possible insider trading by the Pequot Management and one or more Pequot Funds."

(*Id.*)

Mr. Aguirre told Mr. Cain that his revision was inaccurate because the SROs, not the

SEC, had initially uncovered Pequot's suspicious activities.  According to Mr. Aguirre, Mr. Cain

responded that "the memorandum was not going to state that Joe Cella [The Director of Market

Surveillance] had been informed but had failed to act." (*Id.* 56.) Mr. Aguirre expressed his

concerns in an e-mail to Mr. Cain and Mr. Grimes:

> The proposed revisions . . . [are] unsupportable. Neither I nor
> anyone on the staff has discovered an insider trading transaction
> involving Pequot. Yes, I have prepared a spreadsheet of suspected
> Pequot insider trading activity since 1999 . . . in each one of those
> 11 cases, an SRO identified the transaction and referred it to
> Enforcement (Market Surveillance), where it stopped. Under these
> circumstances, the quoted revision is not merely unsupportable; it
> could be the source of embarrassment or worse for each of us.

(*Id.*) Mr. Grimes eventually accepted Mr. Aguirre's language, but this incident led plaintiff to

request a transfer on January 10, 2005, to the section headed by Mark Kreitman, his former

Georgetown Law professor. (*Id.* 56-57.) Mr. Aguirre was transferred approximately one week

later. (*Id.*)

### C. *Plaintiff Encounters Resistance in Investigating Pequot*

Senior management at the SEC narrowed the scope of the Pequot investigation during its

early stages. In early 2005, SEC Enforcement Director Stephen Cutler met with Pequot's lead

counsel, Audrey Strauss. (*Id.* 17.) The staff attorneys working on the case, including plaintiff,

were excluded from this meeting. (*Id.*) Later, in early February 2005, Assistant Director Mark

Kreitman ordered that the Pequot investigation be narrowed to two or three matters. (*Id.*) This

was significant because the SEC had just obtained subpoena power, but subpoenas had yet to be

issued. (*Id.*) Plus, the self-regulatory organizations ("SROs") had identified between 17 and 25

suspicious incidents involving Pequot. (*Id.*) Mr. Kreitman and his supervisor, Associate

Director Paul Berger, defended the decision as a "triage" given the SEC's limited resources.

(*Id.*) However, a retired SEC official testified before the Senate that a narrow scope makes it

difficult to demonstrate an illicit pattern, which is particularly important in hedge fund investigations:

> A hedge fund is an entity that has a whole bunch of other people's money and invests in all kinds of different securities. So if you go in and say, I think, Hedge Fund A, you engaged in insider trading in IBM, they will open their files and say, we make two million trades a year, and so what if we got lucky on IBM? It's very difficult to prove a case where they've got that kind of trading history all over the board. So what you do, from an investigative standpoint, is you see whether there's a pattern there. . . . So hedge funds are different than the ordinary investigation.

(*Id*. 16-17.) Nevertheless, the SEC declined to investigate many of the leads from the SROs, and instead, it limited its focus to the trades involving GE and Heller, Microsoft, and AstraZeneca and Par Pharmaceutical. (*Id*. 18-21, 42.)

 D. *Plaintiff Receives Positive Performance Evaluations and a Merit Pay Increase*

On June 1, 2005, Mr. Kreitman evaluated Mr. Aguirre's performance from October 2004 to April 2005. The evaluation covered four areas: knowledge of field or occupation, planning and organizing work, execution of duties, and communications. (*Id*. 57.) There were two rating choices for each category: "acceptable" or "unacceptable." (*Id*.) Mr. Kreitman gave Mr. Aguirre an "acceptable" rating in each category, which qualified him for a merit pay increase. (*Id*.)

Branch Chief Robert Hanson, who reported to Mr. Kreitman, sent a separate evaluation of Mr. Aguirre to the Enforcement Division's Compensation Committee on June 29, 2005. (*Id*. 57.) This evaluation consisted of four levels of recommendations, in decreasing order of praise: "(1) made contributions of the highest quality, (2) made contributions of high quality, (3) made contributions of quality, and (4) made no significant contribution beyond an acceptable level of

performance." (*Id.*) Mr. Hanson said that Mr. Aguirre "made contributions of high quality" and

described Mr. Aguirre's performance in glowing terms:

> Gary worked extremely hard on one investigation during his time
> in the group, a significant matter involving the trading by Pequot
> Capital, one of the nation's largest hedge funds. Gary has an
> unmatched dedication to this case (often working well beyond
> normal work hours) and his efforts have uncovered evidence of
> potential insider trading and possible manipulative trading by the
> fund and its principals. He has been able to overcome a number of
> obstacles opposing counsel put in his path on the investigation.
> Gary worked closely with the Office of Compliance Inspections
> and Examinations to develop the case and worked with several
> self-regulatory organizations to develop a number of potential
> leads. He has consistently gone the extra mile, and then some.

(*Id.*)[7] On August 21, 2005, Mr. Aguirre received a raise from $130,257 to $134,110. (*Id.* 58.)

### E. SEC Management Resists Plaintiff's Efforts to Depose John Mack

On June 27, 2005, Mr. Aguirre wrote an e-mail to Mr. Hanson identifying John Mack as

a potential tipper. (*Id.* 26.) Mr. Aguirre noted that Mr. Mack "likely had the GE-HF info

sources, he had contacts with Samberg during the period, there was *quid pro quo*, mutual trust

existed, and Samberg needed a huge favor." (*Id.*) Mr. Aguirre asked for permission to take

"Mack's testimony [to] simply nail down whether he will admit that he knew about the GE/HF

acquisition from any source." (*Id.*)

However, around the same time that Robert Hanson was praising Mr. Aguirre for his

"unmatched dedication" to the Pequot investigation, he was resisting plaintiff's efforts to depose

John Mack. In fact, Mr. Hanson's boss, Mark Kreitman, and his boss, Paul Berger, were also

---

[7] In fact, Mr. Aguirre's supervisors were so pleased with his contributions to the Pequot investigation at this time that they presented him with a motivational award – the "Big Perry." The "Big Perry" was a photocopied picture of Raymond Burr, the actor who played the fictional attorney Perry Mason. (*Id.* 24.)

opposed to the idea.  (*Id*. 26.)  Mr. Kreitman wanted definitive proof that Mr. Mack had prior

knowledge of the GE-Heller deal before proceeding with his testimony.  Mr. Kreitman said that

establishing when Mr. Mack first learned about the acquisition was "the necessary prerequisite

to [issuing] a subpoena to Mack."  (*Id*. 32.)   When the Senate Committees asked a 30-year SEC

veteran about Mr. Kreitman's position, he said, "[Y]ou're not going to prove your case and then

go talk to these people.  I don't understand the justification for waiting."  (*Id*. 33.)  The Senate

Report determined that Mr. Kreitman's prerequisite requirement was "an arbitrary requirement,

which (1) was not required by any SEC policy; (2) was not endorsed by the Senior Attorney who

conducted training on insider trading investigations; (3) created an artificially high bar for

obtaining Mack's testimony; and (4) delayed that testimony indefinitely."  (*Id*.)

       The Senate Report concluded that "SEC officials were overly deferential to Mack . . .

because he was an "industry captain" who could hire influential counsel to represent him."  (*Id*.

37.)  In particular, in June 2005, while John Mack was talking to Morgan Stanley about future

employment, the firm's Board of Directors retained the former United States Attorney for the

Southern District of New York, Mary Jo White, who was with the New York law firm of

Debevoise & Plimpton.  (*Id*. 29.)  When Ms. White called to inquire about a recent SEC

document subpoena sent to Morgan Stanley, she did not contact Mr. Aguirre, the attorney who

had issued the subpoena; rather, she went straight to the head of the Enforcement Division,

Linda Thomsen.  (*Id*.)  Mr. Aguirre objected:

>              On June 27, I learned that Mack-Samberg emails, which I had
>              subpoenaed from Morgan Stanley, had been delivered directly to
>              the Director of Enforcement, Linda Thomsen . . . .  Neither I nor
>              other staff had heard of this happening before.  Indeed, the
>              subpoena explicitly stated that the documents were to be delivered
>              to me.

(*Id*.)  When asked about this, Mr. Kreitman said, "[I]t is a little out of the ordinary for Mary Jo White to contact Linda Thomsen directly, but . . . White is very prestigious and it is not uncommon for someone prominent to have someone intervene on their behalf."  (*Id*. 32.)  Robert Hanson also recognized the importance of influence in an e-mail to Mr. Aguirre:  "Mack's counsel will have 'juice' as I described last night – meaning that they will reach out to Paul [Berger] and Linda [Thomsen] (and possibly others)."  (*Id*. 37.)

The Senate Report also determined that Paul Berger, Associate Director of Enforcement, had an apparent conflict of interest while he was overseeing the Pequot investigation.  By September 8, 2005, Paul Berger had indirectly expressed interest in working for Debevoise, the firm that had represented Morgan Stanley in the Pequot investigation.  (*Id*. 83.)  Nevertheless, Mr. Berger did not recuse himself from matters involving Debevoise until February 10, 2006.  (*Id*. 13.)  According to the SEC's ethics counsel, "[a]n employee *may not even begin* to seek employment with any entity that has a financial or other interest in a matter in which the employee is participating."  (*Id*. 86.)  Because Debevoise was formally involved in the case only from June 24 to June 30, 2005, it was arguable that the law firm did not have a "financial or other interest" in the investigation after June 2005.  (*Id*.)  The Senate Report nonetheless concluded that "even if he had no duty, the mere appearance of impropriety warranted a recusal if only on prudential grounds."  (*Id*. 87.)

### F.  SEC Fires Plaintiff

Mr. Aguirre continued to push for Mack's deposition.  He had a "heated discussion" about the issue with Mr. Kreitman on June 28, 2005, and subsequently announced his intent to resign, but a colleague persuaded him to change his mind.  (*Id*. 63-64.)  Mr. Aguirre spent much

14

of July collecting evidence in support of a subpoena and arguing the point to his superiors.  (*Id.*

64.)  On July 27, he sent an e-mail to Kreitman and Berger in which he directly challenged the

propriety of their decision:

> [T]he issue whether Mack's testimony would be taken [is] being
> handled differently than the same issue for other witnesses in this
> investigation and different from the same issue in other
> investigations. Further, I do not believe that treating Mack
> differently is consistent with the Commission's mission, at least as
> I understand it.

(*Id.* 65.)

Soon after Mr. Aguirre sent this e-mail, his supervisors starting preparing a

"supplemental evaluation" of his performance.[8]  (*Id.* 67, 70.)  This was not part of the normal

SEC process, and no one could recall other instances of supplemental evaluations.  (*Id.* 70.)  The

supplemental evaluation acknowledged that Mr. Aguirre "works very hard" and is "willing to go

the extra mile."  (*Id.* 71.)  However, it also claimed that Mr. Aguirre (1) was resistant to

supervision; (2) was unaware of institutional protocol; (3) failed to share information with

others; (4) was unclear when explaining the significance of evidence; and (5) resented

supervisors' alleged attempts to thwart his success.  (*Id.*)

After a thorough examination of the claims in the supplemental evaluation, the Senate

Report determined that it "does not withstand scrutiny."  (*Id.* 74.)  The Committee added that "in

light of the suspicious timing . . . and the lack of substantiation for its claims, we find that the

re-evaluation appears both improper and retaliatory."  (*Id.*)

Mr. Aguirre was terminated on September 1, 2005, just days before the end of his one-

---

[8]There was also a re-evaluation of another unnamed employee.  This employee had been
critical of Mr. Kreitman's handling of another investigation.  (*Id.* 67.)

year probationary period.  (*Id*. 76.)  Terminating Mr. Aguirre during the probationary period

meant that the SEC was not required to show cause for its decision.  (*Id*.)

### G.  *Pequot Investigation Shifts Focus after Plaintiff's Termination*

The investigation continued after plaintiff's termination, but its focus shifted away from

John Mack.  (*Id*. 39.)  During this period, the SEC failed to identify any other likely sources of

information about the GE-Heller transaction.  (*Id*. 38.)  However, when the *New York Times* ran

a front-page story about plaintiff's allegations in June 2006, the SEC again focused on Mr. Mack

by deposing two Credit Suisse First Boston executives.  (*Id*. 39.)  Tellingly, Mr. Kreitman did

not assign Liban Jama to take this testimony until two days before the depositions were

scheduled.  (*Id*. 40.)  Mr. Jama protested:

> [G]iven the critical nature of the testimony that is to be taken, the
> lack of preparatory time for the testimony . . . and my lack [of]
> specific knowledge of the record regarding this portion of the
> investigation, I would not feel comfortable taking the testimony
> this Thursday.

(*Id*.)  In response, Mr. Kreitman said, "You don't need to prepare that much for it."  (*Id*. 41.)  As

the Senate Report noted, "The way in which the SEC approached the testimony of these CSFB

executives does not suggest that it was taken very seriously."  (*Id*. 40.)

The subsequent examination of John Mack was also less than satisfactory.  The SEC did

not try to resolve several apparent contradictions in his testimony, nor did it inquire into

important details about Fresh Start, which was thought to have been the *quid pro quo* for the

inside information.  (S. Rep. 41.)  The Senate Report also noted that there were a "series of

missteps" in the investigation, including "unnecessary delays."  (*Id*. 46.)

IV.    **The SEC Inspector General's Investigation**

After plaintiff wrote several letters to the SEC Chairman, the SEC's Office of the

Inspector General ("OIG") investigated plaintiff's allegations.  The OIG issued its closing

memorandum on November 29, 2005.  It determined that the timing of John Mack's testimony

was not influenced by his powerful status or by Mary Jo White's outreach to Linda Thomsen.  It

also found that Aguirre had not been excluded from any SEC meetings about the Pequot case,

despite evidence to the contrary.  At the end of its closing memorandum, the OIG concluded that

''The evidence failed to show that Aguirre's complaints about Mack's alleged preferential

treatment had anything to do with his termination." (*Id*. 99.)  The Senate Report determined that

"The OIG's investigation was riddled with inconsistencies and failed to address Aguirre's

allegations thoroughly and objectively." (*Id*. 94.)  Specifically, the OIG failed to interview the

plaintiff (*id*.), it conducted informal and overly deferential interviews with plaintiff's supervisors

(*id*. 97), and it failed to obtain key documents.  (*Id*.)

V.    **The Senate Investigation**

Commencing in 2006, the Senate Committees conducted a comprehensive investigation

into this matter.  Its conclusions were based on a review of approximately 10,000 documents,

over 30 witness interviews, and three Judiciary Committee hearings.  (*Id*. 1.)  It concluded that

Pequot's trades in Heller and GE were "highly suspicious" and warranted a "thorough

investigation." (*Id*. 5.)  However, despite compelling evidence of insider trading, the SEC

narrowed its investigation prematurely and delayed its examination of John Mack, the most

likely source of the inside information.  (*Id*. 5-6.)  When plaintiff objected to management's

decision, the SEC fired him despite his positive performance reviews and recent merit pay raise.

17

(*Id*. 6.)  Lastly, the OIG "failed to conduct a serious, credible investigation" of plaintiff's claims

of preferential treatment and retaliatory termination.  (*Id*.)

## PROCEDURAL HISTORY

Plaintiff initiated this FOIA request on December 30, 2005.  (Compl ¶ 37.)  His initial

request sought documents relating to 1) communications between the SEC and the U.S. Office of

Government Ethics ("OGE"); 2) SEC rules regarding departing employees; 3) references to

plaintiff in SEC internal communications; and 4) records of plaintiff's merit pay increase,

performance evaluations, and termination.  (*Id*.)  On March 21, 2006, plaintiff requested a

second set of documents, including internal SEC communications about the Pequot investigation

and transcripts of the testimony of various witnesses.  (*Id*. ¶ 40.)  On March 29, 2006, defendant

informed plaintiff that it was withholding potentially responsive documents pursuant to 5 U.S.C.

§ 552(b)(7)(A).  (*Id*. ¶ 42.)  Plaintiff initiated an administrative appeal of defendant's decision on

April 5, 2006, which was denied on May 23, 2006.  (*Id*. ¶¶ 43-44.)  The plaintiff filed suit on

July 14, 2006, alleging FOIA and Privacy Act violations.

The parties have significantly narrowed the requests at issue, since the SEC has released

nearly 3000 page.  (Pl's Reply 2.)  For example, plaintiff no longer seeks the OGE materials.

(Pl.'s SJ Mot. 6-7.)  Nor does plaintiff seek any information relating to any individual's personal

information (*e.g.*, addresses, phone numbers), medical condition, and personal finances.  (Pl.'s

Reply 26, 35.)  Nonetheless, according to the SEC's Vaughn Index and the parties' briefs, the

SEC is still withholding approximately 1500 pages of documents under Exemption 3 alone.[9]

---

[9]Vaughn Index Nos. 2, 39-40, 68-70, 112, 260.  Additional documents are being withheld
under Exemptions 3 and 7(C) jointly.

18

This material consists of the testimony and exhibits from John Mack's deposition, and transcripts of the depositions of Arthur Samberg and several unnamed witnesses. There are also two e-mails between Linda Thomsen, head of the SEC's Enforcement Division, and Morgan Stanley's counsel.[10] Under Exemption 4, the SEC is withholding "approximately 524 lines from 4 transcripts." (Third Hardy Decl. ¶ 11.) Three of the transcripts contain Arthur Samberg's testimony, and one is the testimony of an unidentified witness. (Def.'s Reply 25.)

According to the Vaughn Index, defendant is also withholding documents, or portions thereof, under Exemptions 6 and 7(C). However, it appears that the Vaughn Index does not encompass the entire universe of documents, since according to the Second Hardy Declaration, the SEC has inexplicably, and without apparent justification, chosen not to include documents in its Vaughn Index that were produced in redacted form.[11] Based on the Vaughn Index, however, it is clear that the SEC is withholding in their entirety under Exemption 6 approximately 35 pages involving Paul Berger and the evaluations of employees other than plaintiff.[12] In addition, the SEC has released an unknown number of redacted documents that are not listed in its Vaughn Index relating to plaintiff's employment and termination.[13] (Pl.'s Reply 36.) Again,

---

[10]Vaughn Index Nos. 70, 112.

[11]"[T]he index does not list documents that were produced in part where the only redacted information is names, other personal identifying information such as addresses and phone numbers, and medical information that was redacted under Exemptions 6 and/or 7(C)." (Second Hardy Decl. ¶ 15.)

[12]Vaughn Index Nos. 1, 100-111, 113-24, 299-301.

[13]Not only did the SEC submit an incomplete Vaughn Index, but it also failed to do a segregability analysis as required by law. *See Army Times Co. V. Dep't of Air Force*, 998 F.2d 1067, 1068 (D.C. Cir. 1993) (holding that an agency "has the burden of demonstrating that no reasonably segregable information exists within the documents withheld").

according to the Vaughn Index, the SEC is withholding approximately 250 pages under

Exemption 7(C),[14] most of which are also being withheld under Exemption 3.  These materials

include transcripts of two Credit Suisse First Boston witnesses, information about John Mack's

interviews at Credit Suisse First Boston, communications between John Mack and Arthur

Samberg, internal Pequot communications, and documents prepared by plaintiff containing

information about witnesses.

The SEC has also apparently produced an unknown number of redacted documents under

Exemption 7(C), but these are not included in the Vaughn Index.  These include communications

between SEC attorneys regarding the Pequot investigation.  (Pl.'s SJ Mot. 31.)  In addition to

contesting the SEC's invocation of these FOIA exemptions, plaintiff also challenges the

adequacy of the SEC's document search.

Given this procedural history, the only matters still to be resolved are the agency's

withholdings under Exemptions 3, 4, 6 and 7(C) and the adequacy of its search.  The Court will

now turn to these issues.

## ANALYSIS

## I.  Governing Principles of Law

FOIA prescribes that "each agency, upon any request for records . . . , shall make the

records promptly available to any person" for "public inspection and copying," unless the

records fall within one of nine narrowly construed statutory exemptions.  *See* 5 U.S.C.

§§ 552(a)(2), (a)(3)(A).  As the legislative history reflects, FOIA was enacted "to establish a

general philosophy of full agency disclosure."  *EPA v. Mink*, 410 U.S. 73, 80 n.6 (1973) (quoting

---

[14]Vaughn Index Nos. 37-38, 71, 73-89, 95-96, 144, 246.

S. Rep. No. 89-813, at 3 (1965)).  Consistent with its animating philosophy, FOIA is "broadly

conceived . . . . to permit access to official information."  *Id.* at 80.  An agency bears the burden

of justifying its decision to withhold information pursuant to a FOIA exemption.  *E.g.*, 5 U.S.C.

§ 552(a)(4)(B).  Moreover, even if some of the records requested contain exempt information,

"the agency must still release 'any reasonably segregable portion' after deletion of the

nondisclosable portions."  *Oglesby v. U.S. Dep't of Army*, 70 F.2d 1172, 1176 (D.C. Cir. 1996)

(quoting 5 U.S.C. § 552(b)).  Challenges to agency decisions to withhold information are

reviewed *de novo* by the district court.  *See* 5 U.S.C. § 552(a)(4)(B).

"At the same time, of course, it must be recognized that FOIA represents a carefully

considered balance between the right of the public to know what their government is up to and

the often compelling interest that the government has in keeping certain information private,

whether to protect particular individuals or the national interest as a whole."  *ACLU v. FBI*, 429

F. Supp. 2d 179, 186–87 (D.D.C. 2006).  "As such, [FOIA] exemptions must be given

'meaningful reach and application.'"  *Id.* at 187 (quoting *John Doe Agency v. John Doe Corp.*,

493 U.S. 146, 152 (1989)).

"FOIA cases appropriately may be decided on motions for summary judgment."

*Bigwood v. U.S. Agency for Int'l Dev.*, 484 F. Supp. 2d 68, 73 (D.D.C. 2007).  "[T]he Court may

award summary judgment solely on the basis of information provided in affidavits or

declarations when the affidavits or declarations are 'relatively detailed and non-

conclusory[]' . . . ."  *Id.* (quoting *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir.

1991)).  The affidavits or declarations must "describe 'the documents and the justifications for

nondisclosure with reasonably specific detail, demonstrate that the information withheld

logically falls within the claimed exemption, and [be] . . . [un]controverted,'" whether by

"'contrary evidence in the record [or] . . . evidence of agency bad faith.'" *Id.* (quoting *Military Audit Project v. Casey,* 656 F.2d 724, 738 (D.C. Cir. 1981)). "[W]hether the Court relies on affidavits or declarations, an *in camera* review of the documents, or . . . both, an agency must demonstrate that 'each document that falls within the class requested either has been produced, is unidentifiable, or is wholly [or partially] exempt from the Act's inspection requirements.'" *Id.* (third alteration in original) (quoting *Goland v. CIA,* 607 F.2d 339, 352 (D.C. Cir. 1978)).

## II.    Exemption 3

As amended, Exemption 3 applies to a statute that either "(A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). The SEC argues that the Investment Advisers Act ("Act") is an Exemption 3 statute because it provides:

> [N]o member, officer, or employee of the Commission shall disclose to any person other than a member, officer, or employee of the Commission any information obtained as a result of any such examination or investigation [under this subchapter] except with the approval of the Commission.

15 U.S.C. § 80b-10(b). Specifically, the SEC contends that the Act falls within Exemption 3 because it "refers to particular types of matters to be withheld." (Def.'s Reply 11.)

As an initial matter, the history relating to the SEC's belated invocation of this exemption calls into question the validity of its argument. When the SEC filed its summary judgment motion, it identified 1645 pages of documents as subject to "confidential treatment requests."

22

(Def.'s SJ Mot. 7.)  Some witnesses who had been deposed by the SEC had asked the agency to withhold various transcripts and exhibits under Exemptions 3, 4, and 7(C).  (*Id*.)  When the SEC FOIA Office determined that the transcripts and exhibits were not covered by Exemption 3, these witnesses appealed to the Office of the General Counsel.  (*Id*.)  Because these appeals were still pending, defendant said that "the Commission will not address the propriety of its redactions on any of the documents subject to the confidential treatment process even though not all documents are on appeal because all the confidential treatment documents raise closely related issues, and the Commission can best address those issues after it resolves the appeals."  (*Id*.)

Richard M. Humes, Associate General Counsel of the SEC, then reversed the decision of the FOIA Office and determined that Exemption 3 protects these transcripts and exhibits.[15] (Third Hardy Decl. Exhs. 1, 3.)  However, as plaintiff notes, the SEC's rationale for withholding documents under Exemption 3 would also seem to apply to some 2800 pages that it had already released (Pl.'s Reply 1), but the SEC has failed to provide any explanation for this difference in treatment.  Plaintiff also contends, without dispute by the SEC, that the agency has not invoked Exemption 3 for at least ten years.  (*Id*. 3.)  Furthermore, the SEC's Exemption 3 litigation theory is at odds with its own Form 1662, in which the agency explicitly warns witnesses that their testimony could be released to many different types of organizations.  (*Id*.)

In addition to these damning facts, the law does not support the SEC's position that the

---

[15]In addition to deciding all FOIA appeals, Mr. Humes supervises Melinda Hardy, who filed several declarations defending the SEC's withholdings in this case. (Pl's Reply 4.) Furthermore, Mr. Humes served as the SEC's liaison during the Senate investigation.  (*Id*.) Plaintiff argues that these competing roles creates a conflict of interest for Mr. Humes.  (*Id*.)

Investment Advisers Act is an Exemption 3 statute.[16]  First, if the SEC's novel and overly

expansive interpretation of Exemption 3 were to be accepted, it would mean that the SEC would

have unbridled discretion regarding all information obtained by a subpoena.  But there is no legal

support for this approach, nor does it appear that the SEC has ever invoked this theory before.

As this Court determined in *Public Citizen, Inc. v. Mineta*, 444 F.Supp. 2d 12, 18 (D.D.C. 2006),

Exemption 3 does not apply to a statute that gives the agency wide latitude in determining which

materials may be disclosed.  "The purpose of the subsection 'is to assure that the basic policy

decisions on governmental secrecy be made by the Legislative rather than the Executive branch."

*Id.* at 16-17 (citing *Am. Jewish Cong. v. Kreps*, 574 F.2d 624, 628 (D.C. Cir. 1978)).  But under

the SEC's position, the policy decision regarding governmental secrecy under FOIA would be

left entirely to the SEC, rather than to Congress.

Moreover, the cases relied upon by the SEC do not support its position that the Act

"refers to particular types of matters to be withheld."  For example, the SEC cites *Seymour v.*

*Barabba*, 559 F.2d 806 (D.C. Cir. 1977), for the proposition that a statute can refer to particular

types of matters to be withheld despite its "all-embracing language."  *Id.* at 808.  However, the

SEC omits two key points from its analysis of *Seymour*.  First, the D.C. Circuit noted that the

statute in question was "a flat barrier to disclosure with no exercise of discretion permitted."  *Id.*

In comparison, the Investment Advisers Act gives the SEC blanket discretion regarding

disclosure of all information obtained from an examination or investigation.  Second, in *Kreps*,

---

[16]Because the Court finds that the Investment Advisers Act does not qualify as an
Exemption 3 statute, it need not consider plaintiff's arguments that defendant's Exemption 3
claim violates SEC regulations, this Court's Order, and the Local Rules, or that the records that
he seeks were obtained by the SEC under the Exchange Act and not the Investment Advisers
Act.  (Pl.'s Reply 5-6, 14.)

the D.C. Circuit clarified its holding in *Seymour*, reiterating that Congress, not the agency, must

make the policy decision regarding disclosure:

> [W]e concluded that the statute [in *Seymour*] delimited narrowly
> enough the form in which . . . [the census data] might be opened to
> public view.  This amount of attention to the problem and this
> degree of precision in addressing it convinced us that Congress had
> itself made the basic decision, and had left to the administrator
> only the task of implementation.

*Kreps*, 574 F.2d at 630.

Therefore, an Exemption 3 statute must inform the agency of which types of information

are to be disclosed and which must be withheld.  The statute must provide these instructions with

a certain "degree of precision" so that the agency is merely implementing the congressional

policy decision.  *Id.*  All of the cases cited in defendant's reply involve statutes that require the

agencies to withhold certain designated types of information.  *See CIA v. Sims*, 471 U.S. 159,

167 (1985) (CIA must preserve the secrecy of "intelligence sources and records"); *Times Pub.

Co. v. U.S. Dep't of Commerce*, 236 F.3d 1286, 1289 (11th Cir. 2001) (Commerce Department

must withhold export licensing information unless it is in the "national interest"); *Medina-

Hincapie v. Dep't of State*, 700 F.2d 737, 742 (D.C. Cir. 1983) (State Department must withhold

information "pertaining to the issuance or refusal of visas or permits to enter the United States");

*Iron & Sears v. Dann*, 606 F.2d 1215, 1220 (D.C. Cir. 1979) (Patent and Trademark Office must

preserve the confidentiality of patent applications unless disclosure is necessary to carry out the

provisions of an act of Congress, or if special circumstances apply).  Admittedly, several of these

statutes grant the agencies some discretion, but as noted by the D.C. Circuit in *Iron & Sears*, "the

mere presence of some residual administrative discretion does not take [a statute] out of

25

Exemption 3." *Id.*

However, the discretion in the Investment Advisers Act is not residual; it is effectively *carte blanche*. The Investment Advisers Act does not mandate the withholding of *any* particular type of information. Contrast this to the situation in *Iron & Sears*, where the Patent and Trademark Office was required to withhold application data unless certain exceptions applied. While the "special circumstances" language in *Iron & Sears* is somewhat vague, it is still much more narrowly tailored than that in the Investment Advisers Act, which allows *any* disclosure with the Commission's permission. Because the Investment Advisers Act gives the SEC unfettered discretion (which is exactly how it has proceeded here) as to what it can withhold, it cannot qualify as an Exemption 3 statute.

The Court will therefore not permit the SEC to withhold 1,822 pages of Pequot records under Exemption 3. As noted, the SEC has never taken this position before, and it already released some 2800 pages of similar materials to plaintiff without invoking this exemption. Thus, this practice conflicts with the defendant's routine practice of releasing information obtained during an investigation under the Advisors Act, and there is no precedent to support the SEC's overly expansive interpretation of Exemption 3. In effect, under the SEC's approach, if it were to so choose, it could evade scrutiny under FOIA and thereby frustrate FOIA's "philosophy of full agency disclosure." *Mink*, 410 U.S. at 80 n.6. This is certainly not what Congress intended.

## III.    **Exemption 4**

Defendant is also withholding under Exemption 4 portions of three transcripts of testimony by Mr. Samberg and portions of one other transcript. According to defendant, this

information consists of approximately 524 lines from the four transcripts. (Third Hardy Decl. ¶ 11.) Defendant has recently changed its position with respect to these documents, for until December 2007, the SEC took the position that the disclosure of these excerpts of deposition testimony would cause substantial harm to Pequot's competitive position, but now it invokes the impairment prong of Exemption 4 to support its withholdings. (Pl's Reply 37.)

In explaining its position, the SEC relies on the declaration of the Deputy Director of the Enforcement Division, who claims that the information from these transcripts must be withheld because "[w]itnesses who believe that the details of their testimony will become matters of public record are likely to be less candid and forthcoming with details." (Ricciardi Decl. ¶ 4.) Again, there is no legal or factual support for this novel application of Exemption 4.

Documents may be withheld under Exemption 4 if they constitute "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. 552(b)(4). Since plaintiff concedes that this testimony consists of commercial or financial information (Pl.'s Reply 38), the only contested issue is whether it is confidential. The impairment prong was first articulated in *Nat'l Parks & Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974), which considered commercial or financial information to be "confidential" when disclosure would "impair the Government's ability to obtain necessary information in the future." *Id.* at 770.

Generally, there is no impairment when the government can compel disclosure of the information. *See Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 878 (D.C. Cir. 1992) ("because the concessioners [were] *required* to provide this financial information . . . , there is presumably no danger that the public disclosure will impair the ability

27

of the Government to obtain this information in the future") (emphasis in original).  However, even in cases where disclosure is mandatory, "there are circumstances in which disclosure could affect the reliability" of the information collected.  *Id.*  In these situations, "the governmental impact inquiry will focus on the possible effect of disclosure on its quality."  *Id.*  Therefore, the first step in the impairment inquiry is to consider whether this is one of those circumstances in which disclosure could affect reliability.  Only after the Court has determined that the quality or reliability of the information could be affected does it move on to the second step: "a rough balancing of the extent of impairment and the importance of the information against the public interest in disclosure."  *Washington Post Co. v. U.S. Dep't of Health & Human Services*, 690 F.2d 252, 269 (D.C. Cir. 1982).

The SEC argues that disclosure will cause witnesses to be less forthcoming with information that they are not obliged to reveal:  "The issue is whether witnesses will provide details that they were under no compulsion to provide if they believe that regardless of the outcome of the investigation all details could be made public."  (Def.'s Surreply 7.)  In response, plaintiff notes that SEC attorneys can simply ask follow-up questions in order to get information that a witness did not voluntarily disclose.  (Pl.'s Surreply 17.)  Curiously, the SEC responds by arguing that its staff may not know enough to ask the right questions (Def.'s Reply 27), and even if they did, the questioning process is less efficient and more burdensome when witnesses are not forthcoming with details.  (*Id.* 28.)

There is, however, no basis upon which to conclude that disclosure would impact the quality or reliability of the information available to the SEC.  First, it is not at all clear that secrecy makes witnesses more forthcoming.  As plaintiff notes in his reply, a witness who cares

28

about his public perception may be *more* candid when he knows that the testimony will be scrutinized by the public.  (Pl.'s Reply 38.)

Second, the SEC assumes that witnesses who are compelled to testify will be willing to provide extra details as long as they are assured of secrecy.  The SEC tries to support this assumption with the declaration of Walter G. Ricciardi, Deputy Director of the SEC's Enforcement Division.  However, the D.C. Circuit has found that unsubstantiated declarations, such as the one proffered by Mr. Ricciardi, are too speculative to justify a withholding under Exemption 4.  *See Washington Post*, 690 F.2d at 269 ("[T]he government produced no evidence except a conclusory affidavit by the HHS director of personnel policy.  Thus, the government has not yet established its Exemption 4 claim.").

In addition, witnesses examined by the SEC have a diminished expectation of privacy. When the SEC issues a subpoena it informs witnesses that their testimony could be provided to "bar associations, other professional associations, witnesses, private collection agencies, consumer reporting agencies, members of Congress, other government agencies (local, state, national and foreign), the press, and the public."  (Pl.'s Reply 29.)  It is therefore hard to understand how disclosure under FOIA would constitute any type of impairment when the SEC informs its witnesses that their testimony could be widely disseminated.

For these reasons the SEC cannot invoke Exemption 4.  Having failed to satisfy its burden of showing impairment, the Court need not proceed with the *Washington Post* balancing test.

## IV.    Exemption 6

Exemption 6 applies to "personnel and medical files and similar files the disclosure of

which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. §

552(b)(6). The term "similar files" encompasses "detailed Government records on an individual

which can be identified as applying to that individual." *U.S. Dep't of State v. Washington Post

Co.*, 456 U.S. 595, 602 (1982). While this definition of "similar files" appears to be all

encompassing, it does have limits. For example, information that "merely identifies the names

of government officials who authored documents and received documents" does not generally

fall within Exemption 6. *VoteHemp, Inc. v. DEA*, No. 02-CV-985 (RBW), slip op. at 12 (D.D.C.

Oct. 15, 2004).

　　If documents are found to be "personnel and medical files and similar files," the next step

is to determine whether disclosure "would constitute a clearly unwarranted invasion of personal

privacy." 5 U.S.C. § 552(b)(6). This inquiry involves a two-step process. First, the Court must

decide whether disclosure "compromise[s] substantial privacy interests." *Ripskis v. Dep't of

Hous. & Urban Dev.*, 746 F.2d 1, 3 (D.C. Cir. 1984). The inquiry ends if substantial privacy

interests are not compromised; otherwise, the Court weighs "the potential harm to privacy

interests" against "the public interest in disclosure of the requested information." *Id.*

　　The SEC is withholding three categories of information under Exemption 6: (1)

documents related Paul Berger's departure from the SEC to Debevoise & Plimpton;[17] (2)

evaluations of employees other than plaintiff;[18] and (3) documents regarding plaintiff's

employment and termination, in which identifying information has been redacted.[19] The Court

---

[17]Vaughn Index Nos. 1, 100-111, 113-15.

[18]Vaughn Index Nos. 117-24, 299-301.

[19] Given the fact that the Vaughn Index does not list documents that were produced in
part, the Court cannot specify the documents which fall within this category by number. (Second

addresses each category utilizing the above legal framework.

<u>Documents Relating to Paul Berger's Employment at Debevoise & Plimpton</u>

As described above, plaintiff alleges that Paul Berger, Associate Director of the SEC's Enforcement Division, had a conflict of interest while overseeing the Pequot investigation.  This possible conflict of interest is relevant because it could demonstrate a motive for Mr. Berger's decision not to authorize the deposition of John Mack.  The documents in question consist of a form for processing Mr. Berger's resignation,[20] e-mails discussing rumors of Mr. Berger's resignation,[21] e-mails regarding Mr. Berger's replacement,[22] e-mails congratulating Mr. Berger on his new job at Debevoise,[23] and a personal e-mail about travel.[24]

The Court finds that the only documents that constitute "similar files" are the form for processing Mr. Berger's resignation and the personal e-mail about travel.  The remaining documents are not personal in nature: they are merely correspondence about Mr. Berger's relationship with Debevoise.  Correspondence does not become personal solely because it identifies government employees. *See VoteHemp*, at 12.  Furthermore, even if these documents were deemed "similar files," the Court would still require the SEC to release them because the public interest in disclosure greatly outweighs any possible privacy interest.  Mr. Berger's

_____

Hardy Decl. ¶ 15.)  However, plaintiff has provided examples of documents containing redacted identifying information in Exh. 44 to the Second Aguirre Declaration, filed on Mar. 24, 2008.

[20]Vaughn Index No. 1.

[21]Vaughn Index Nos. 100-109.

[22]Vaughn Index Nos. 110-111.

[23]Vaughn Index Nos. 113-114.

[24]Vaughn Index No. 115.

alleged conflict of interest has been covered extensively by the national press and the Senate

Report.[25]  This is not like the situation in *Isley v. Executive Office for U.S. Attorneys*, No. 98-

5098, 1999 WL 1021934, at *4 (D.C. Cir. Oct. 21, 1999), where the D.C. Circuit ruled against

disclosure because the information was no longer "'freely available' or in any 'permanent public

record.'"  The information about Mr. Berger is widely available in the Senate Report, which is a

permanent, official record.  Therefore, the privacy interest is negligible as compared to the

important public interest regarding the SEC's investigation of Pequot.  (*See* S. Rep. 6, 82-87.)

　　However, the resignation processing form (Vaughn Index No. 1) and the personal e-mail

about travel (Vaughn Index No. 115) have been properly withheld under Exemption 6.  These

documents are more personal in nature than the correspondence described above, and because

neither document addresses Mr. Berger's relationship with Debevoise, disclosure would not shed

any light on plaintiff's allegations.

<u>Evaluations of Other Employees</u>

　　The employee evaluations[26] have been properly withheld under Exemption 6 as

"personnel" files.  5 U.S.C. § 552(b)(6).  *See also Ripskis v. Dep't of Housing & Urban Dev.*,

746 F.2d 1, 3 (D.C. Cir. 1984) ("Neither party in this case disputes that the evaluation forms at

issue are contained in 'personnel' or 'similar' files."); *Lurie v. Dep't of Army*, 970 F.Supp. 19, 35

(D.D.C. 1997) ("Purely personal details pertaining to government employees, such as . . .

evaluation reports . . . fall within the scope of the files protected under Exemption 6.")

Furthermore, plaintiff has failed to demonstrate how this information is relevant to the Pequot

---

[25]*See* N.Y. TIMES, note 6, *supra*; S. Rep. 82-87.

[26]Vaughn Index Nos. 117-24, 299-301.

investigation or his employment at the SEC.

<u>Redacted Information about Plaintiff's Employment and Termination</u>

The SEC has provided plaintiff with redacted documents (mostly e-mails) concerning plaintiff's employment, merit pay increase, efforts to examine John Mack, and plaintiff's termination. In each case the names of some SEC employees referenced in the documents have been redacted. Plaintiff requests full, unredacted versions[27] of these documents so that he can "demonstrate the breadth and depth of the agency involvement in [the decision to terminate him]." (Pl.'s Reply 36.)

The redacted information does not fall within Exemption 6. First, as explained in *VoteHemp*, Exemption 6 does not cover "information merely identif[ying] the names of government officials who authored documents and received documents." *Id*. at 12. Second, even if these documents did constitute "similar files," they do not implicate the privacy interests of the individuals whose names have been redacted. The documents deal with various aspects of plaintiff's employment, including his compensation and termination. To the extent that there is any substantial privacy interest, it belongs to the plaintiff.

On the other hand, the public interest in disclosure is significant. The redactions disguise which SEC employees and offices were involved in plaintiff's termination, and the Senate Report determined that the termination was "intricately connected" to the dispute over the John Mack testimony. (S. Rep. 78.) These documents go to the heart of plaintiff's claim that he was fired in retaliation for his work on the Pequot investigation. Therefore, the public interest in

---

[27]Plaintiff submitted unredacted versions of some of these documents with his original summary judgment motion. (Pl.'s SJ Mot., Exhs. 19, 24, 29.) However, these examples may represent only a small proportion of the documents that plaintiff seeks. (Pl.'s Reply, Exh. 44.)

disclosure greatly outweighs any negligible privacy interests of the individuals whose names have been redacted.

## V.    Exemption 7(C)

Exemption 7(C) protects "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  Exemption 7(C) is similar to Exemption 6 in that both protect personal privacy; however, there are several important differences.  First, Exemption 6 deals with information generally, while 7(C) is limited to "law enforcement records."  *Id*.  Second, agencies invoking Exemption 6 must show that disclosure "*would* constitute a *clearly* unwarranted invasion of personal privacy.  *Id*. § 552(b)(6)(emphasis added).  Exemption 7(C) has a lower threshold: agencies need only demonstrate that disclosure "*could* reasonably be expected to constitute an unwarranted invasion of personal privacy."  *Id*. § 552(b)(7)(C) (emphasis added).  *See also U.S. Dep't of Justice v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 756 n.9 (1989) ("the move from the 'would constitute' standard to the 'could reasonably be expected to constitute' standard represents a considered congressional effort 'to ease considerably a Federal law enforcement agency's burden in invoking [Exemption 7]'") (internal citations omitted).

While there is a undoubtedly a strong presumption in favor of withholding law enforcement records under Exemption 7(C), information that is probative of allegations of official misconduct can rebut this presumption.  *See SafeCard Services, Inc. v. S.E.C.*, 926 F.2d 1197, 1206 (D.C. Cir. 1991) ("[U]nless access to the . . . [information] . . . appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling

evidence that the agency is engaged in illegal activity, such information is exempt from

disclosure.")  A "bare suspicion" of agency misconduct is insufficient; the FOIA requester "must

produce evidence that would warrant a belief by a reasonable person that the alleged

Government impropriety might have occurred." *Nat'l Archives & Records Admin. v. Favish*,

541 U.S. 157, 174 (2004).  If this evidentiary standard is met, the Court balances an individual's

privacy interest against the public interest in information shedding light on the alleged

impropriety. *See id.* at 174-75.

        The evidentiary standard is easily met in this case.  The Senate Report uncovered several

potential improprieties by SEC staff.  First, the Committees determined that SEC officials were

"overly deferential" to John Mack because of his prominence.  (S. Rep. 37.)  When the SEC

accords special treatment to prominent figures, it "undermines public confidence [in] the

integrity of its investigations and exacerbates the problems associated with 'regulatory capture.'"

(*Id.*)(internal citations omitted).  Second, the Committee found credible evidence suggesting that

the SEC retaliated against plaintiff for his efforts to examine John Mack.  SEC management

conducted a suspicious "re-evaluation" of plaintiff, even though his regular evaluation had just

been completed a month earlier, and according to the Senate Report, the re-evaluation "appears

both improper and retaliatory," and the negative comments were "unsupported."  (*Id.* 74.)  The

Committees concluded that plaintiff's firing was "intricately connected" to his efforts to examine

John Mack.  (S. Rep. 78.)  Third, Paul Berger failed to recuse himself from the case even though

he was seeking employment at a law firm retained by a company involved in the investigation,

and this, at the very least, raised an appearance of impropriety.[28]  (S. Rep. 86-87.)

These allegations are much more than "bare suspicion."  *Favish*, 541 U.S. at 174.  They have been thoroughly documented by two Senate Committees based on a probing investigation of the SEC's activities.  This is completely different from the situation in *Favish*, where plaintiff's accusations were wholly unfounded and had been refuted by five separate government investigations.  *Id.* at 161.  Because the allegations against the SEC are more than sufficient under *Favish*, the Court proceeds to balance the interests at stake for each category of information: 1) documents that allegedly contain  personal information; and 2) transcripts in which the names of witnesses have been redacted.  (Def.'s Reply 13.)

<u>Personal Information</u>

Exemption 7(C) protects information that is inherently personal in nature.  *See e.g.*, *Peay v. U.S. Dep't of Justice*, No. 04-CV-1859(CKK), 2006 WL 1805616, at *2 (D.D.C. June 29, 2006) (upholding redactions of ". . . social security numbers, telephone numbers, addresses, birth

---

[28]The Senate Report also clearly identified the public interest at stake:

> Maintaining transparency, public confidence in the integrity of our securities market, and a level playing field for the average investor are important goals of the SEC's enforcement practices. The booming merger and acquisitions market, lightly regulated hedge funds under pressure to deliver extraordinary returns, and increased use of complex trading strategies all present new opportunities to profit from, and hide, unlawful insider trading. The junk bond and insider trading scandals tied to the heavy corporate merger and acquisition activity in the 1980s may have contributed to the 1990 recession, and led to many successful criminal prosecutions.  Because those events may be forgotten by a new generation working on Wall Street, it is important for Congress to continue to ensure that regulators have an appropriate focus on preventing a recurrence of such activity and to effectively utilize the authority and tools given to them under statutes and in the funding process.  Robust, but balanced, regulation is the foundation of our prosperity and growth and the reason U.S. capital markets succeed. Deterring, detecting, and eliminating fraud in an environment free of political influence is good for business. (S. Rep. 3-4.)

dates, and other personal information"); *W. Ctr. for Journalism v. I.R.S.*, 116 F.Supp. 2d 1, 7

(D.D.C. 2000) ("incidental medical information" was properly withheld); *McNamera v. U.S.*

*Dep't of Justice*, 974 F.Supp. 946, 963 (W.D. Tex. 1997) ("financial matters," such as "personal

expenses, credit card charges, mortgage payments and credit history" were properly withheld).

Consistent with this authority, plaintiff does not seek any medical or personal information.  (Pl.'s

Reply 26.)

     Defendant has, nevertheless, interpreted "personal information" more expansively than is

permitted by the case law.  In fact, only a few of the items listed in the Vaughn Index appear to

actually fall within Exemption 7(C).[29]  In particular, the SEC has failed to justify its withholding

of the documents relating to John Mack's interviews at Credit Suisse First Boston (Vaughn

Index Nos. 73-74) and his business dealings with Arthur Samberg and Pequot.  (Vaughn Index

Nos. 71, 77-89).

     Defendant appears to be taking the position that because these documents reference a

person's financial or business transactions, they constitute personal financial information.  For

example, while the e-mails between Mr. Mack and Mr. Samberg may refer to Mr. Mack's

investments in Pequot, these communications are not protected.  There is no indication that these

e-mails contain information about either Mr. Samberg's or Mr. Mack's personal finances, as

would be found in bank statements or tax returns.  Mr. Mack's financial interest in Mr.

---

[29]The fax cover sheet (Vaughn Index No. 75) and Mr. Aguirre's witness lists (Vaughn
Index No. 144, 246) are properly withheld because they only contain contact information, such
as names and phone numbers.  John Mack's employment agreement (Vaughn Index No. 76) is
analogous to a personnel file, and is therefore protected under 7(C).  Furthermore, plaintiff has
not contested this specific withholding.  Finally, the Court upholds the SEC's invocation of
Exemption 7(C) with respect to Vaughn Index Nos. 95 and 96 because plaintiff has failed to cite
any public interest in either document.

Samberg's firm does not lead to protection for their business discussions about Pequot or other business ventures. On the contrary, given the circumstances of this case, there is a clear distinction between one's business dealings, which obviously have an *affect* on one's personal finances, and financial information that is *inherently* personal in nature. Moreover, the SEC has failed to provide any support for its overly generous interpretation of "personal financial information," and thus, the Court finds that communications between Mr. Mack and Pequot or Mr. Samberg are not protected.

Furthermore, even if such information could arguably be viewed as personal, the public interest in disclosure clearly outweighs any privacy interests of Mr. Mack or Pequot. On the contrary, the public interest is substantial because John Mack's investments in Pequot are at the heart of the allegations in this case. Mr. Mack's highly profitable investment in Pequot's Fresh Start is suspected to have been the *quid pro quo* in this instance of alleged insider trading. On the other hand, the privacy interests are negligible, as the documents do not convey information about Mr. Mack's financial dealings not already widely available in the Senate Report.[30]

Therefore, the SEC must disclose the documents listed in Vaughn Index Nos. 71, 73-74, 77-89, but to the extent that these documents contain personal information, as defined herein, and they have been properly segregated under *Army Times* (*see* note 30, *supra*), the personal information does not need to be disclosed.

<u>Identifying Information for Third-Party Witnesses and SEC Staff</u>

---

[30]Even if portions of the documents are rightfully protected, the SEC must segregate the personal information and disclose everything else. *See Army Times*, 998 F.2d at 1068 (holding that an agency "has the burden of demonstrating that no reasonably segregable information exists within the documents withheld"). The SEC has failed to do this, and it may have withheld many documents either in their entirety or in part in violation of *Army Times*.

The SEC is withholding the entire transcripts of two Credit Suisse First Boston employees.  (Vaughn Index Nos. 37-38.)  In addition, it is withholding identifying information from other documents that it released in redacted form.  As noted above, the SEC has inexplicably failed to include such documents in its Vaughn Index, but plaintiff has specifically requested unredacted versions of the transcripts of Arthur Samberg, John Mack, and Pequot's head trader; as well as internal SEC documents identifying the agency employees involved in the Pequot investigation and plaintiff's termination.  With respect to the transcripts of an unnamed analyst and Pequot's assistant trader, where names have been redacted, plaintiff has agreed not to seek the names or identifying information of these two individuals, so there appears to be no basis for the withholding of the remaining portions of these two transcripts.

Before addressing the specific documents, some general principles should be noted. Because this case involves allegations of official misconduct, identifying information is not given categorical protection.  *See SafeCard Services*, 926 F.2d at 1206.  Rather, the privacy interest in this information is weighed against the public interest in shedding light on the allegations.  *See Favish*, 541 U.S. at 174-75.  Given the extent to which plaintiff's allegations have been found to be credible by the Senate Report, and the strong public interest in ferreting out possible improprieties at the SEC, disclosure is clearly warranted in situations where the person has already been identified in the Senate Report.  In such instances, the privacy interest is minimal because the individual's involvement is already a matter of public record, while the public interest is substantial as long as disclosure would shed light on these allegations.

Defendant contests this view, arguing that Aguirre "does not need specific names to determine how the Commission conducted its investigation because the Senate Report contains a

39

great deal of detail about whom Mack talked to and what the Commission did with that information."  (Def.'s Reply 21.)  Again, the SEC misinterprets the law.  Whether the Senate Report is sufficiently detailed or informative is not dispositive of plaintiff's FOIA rights. Focusing solely on the Senate's work, as defendant suggests, does not excuse the SEC from producing documents that are not protected under Exemption 7(C)'s balancing test.  Therefore, in considering the following categories of documents, the Court will order disclosure when the individual in question has already been named in the Senate Report and the document can shed light on plaintiff's allegations.

The Court starts with the transcripts of the two key figures -- Arthur Samberg and John Mack.  Both are discussed extensively in the Senate Report, and thus, they enjoy only a minimal privacy interest in their testimony.  On the other hand, the public interest is significant in light of the many unanswered and "unasked questions" identified by the Senate Report.  (S. Rep. 41.) For example, the SEC failed to confront Mr. Mack when he made statements that contradicted Mr. Samberg's testimony.  (*Id*.)  It also neglected important details about Mr. Samberg's purported motive for inviting Mr. Mack to participate in Fresh Start.  (*Id*.)  While the redacted information may not resolve these specific issues, the test is not whether the information is dispositive of the ultimate question, but rather can it shed light on the allegations.  *See SafeCard*, 926 F.2d at 1206.  Therefore, the SEC must disclose both of these transcripts with the exception of "personal information."

Next, the Court turns to the transcripts of two Credit Suisse First Boston officials. (Vaughn Index Nos. 37-38.)  John Mack's communications with Credit Suisse First Boston are relevant because it is thought that he may have obtained inside information about the GE-Heller

transaction while interviewing at the firm.  (S. Rep. 24.)  However, the SEC has redacted the names of two Credit Suisse employees from their transcripts.  This makes it impossible to determine the identities of the employees who were involved in various discussions with or about Mr. Mack.  Given that the SEC has already agreed to release the names of CS First Boston officials via Mr. Mack's itinerary (Vaughn Index No. 74), withholding the names of these officials can serve no privacy interest.  The Court will order the SEC to provide unredacted versions of these two transcripts with the exception of "personal information."

     The SEC is also withholding the transcripts of two Pequot employees -- the head trader and his assistant.  The public interest in these transcripts is substantial.  It was the head trader who executed Mr. Samberg's orders in both Heller and GE.  (Pl.'s Reply 30.)  He was the only person with whom Mr. Samberg said he discussed the trades.  (*Id*. 31.)  Therefore, his testimony, as well as that of his assistant, could shed light on whether Mr. Samberg had inside information.  The privacy interest in withholding these transcripts is minimal.  First, the identity of the head trader is already known, since he is mentioned several times in the materials released by the Senate.  (Pl.'s Reply 30-31.)  Second, plaintiff does not oppose the withholding of the assistant's name given that he is not mentioned in the Senate materials.  (Pl.'s Reply 32.)  Therefore, the Court will order the SEC to release an unredacted version of the head trader's transcript and a redacted version of his assistant's transcript that deletes identifying and personal information.

     The SEC is withholding another third-party transcript -- "an analyst at a brokerage firm who provided analyst coverage on Heller during the relevant time period."  (Pl.'s Reply 33.)  Plaintiff does not oppose the withholding of this analyst's name and any identifying information.  Given plaintiff's agreement, the analyst's identity will be protected, but the remainder of the

transcript should be produced, since this witness' testimony would shed light on the latter stages of the SEC's investigation when it shifted its focus from Mr. Mack to other potential tippers. (*Id.*)  Therefore, the Court will order the SEC to release a redacted version of this transcript.

Finally, while the SEC did not redact the names of certain SEC attorneys in the documents it produced to the Senate (*i.e.*, Linda Thomsen, Paul Berger, Mark Kreitman, Robert Hanson, Eric Ribelin, and plaintiff), it redacted other names.  (Def.'s SJ Mot. 34.)  The SEC attempts to justify the distinction by noting that the above employees testified before the Senate. (*Id.*)  However, plaintiff correctly points out that two of the omitted employees -- Liban Jama and James Eichner -- also testified before the Senate, thereby undermining the SEC's explanation.  (Pl.'s SJ Mot. 31; S. Rep. 20.)  More importantly, these attorneys are critical to understanding the latter stages of the Pequot investigation.  According to plaintiff, the SEC's misconduct did not stop when he was terminated, it continued for more than a year.  (Pl.'s Reply 34; S. Rep. 39-41.)  Mr. Jama and Mr. Eichner assumed responsibility for the investigation after plaintiff's departure and could have valuable information about any potential misconduct during this period.  (*Id.*)  *See also* Section III(g), *supra*.  Other persons of interest include Walter Ricciardi and Peter Bresnan, who supervised Mr. Jama and Mr. Eichner during this period.  (*Id.*)

The SEC does not contest the facts asserted by plaintiff; instead, it argues that plaintiff "does not point to any documents the Commission provided in redacted form that he cannot understand or interpret because of the redactions."  (Def.'s Reply 24.)  Again, this argument is irrelevant to an analysis under Exemption 7(C) and also misplaces the burden of proof, which should belong to the agency, not the plaintiff.  *See* 5 U.S.C. § 552(a)(4)(B).  Therefore, the SEC shall disclose the transcripts without redacting the names of Liban Jama, James Eichner, Walter

Ricciardi, Peter Bresnan, or any other SEC employee who is identified in the Senate Report.

## VI.    Adequacy of the Search

"In order to obtain summary judgment the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990).  The agency must provide "[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Id*.  Specifically, this Court has denied the government's summary judgment motion when the declaration failed to document the search terms used. *See e.g.*, *Judicial Watch, Inc. v. U.S. Dep't of Justice*, 185 F.Supp. 2d 54, 64 (D.D.C. 2002) ("The . . . declaration fails to explain whether key words were used and if so which key words were used to search for responsive documents.  Without knowing these details regarding defendant's search, the Court cannot determine whether defendant's efforts were 'reasonably calculated' to recover the responsive records.")

Plaintiff has made two claims regarding the adequacy of defendant's search.  First, plaintiff argues that defendant's declaration is insufficient in establishing the adequacy of its search.  Second, plaintiff claims that the SEC has not provided him with his original Employee Performance File ("EPF"),[31] which allegedly contains documents that are missing from the version that was released to him.

With respect to plaintiff's first argument, there can be no doubt that the SEC has failed to

_____

[31]Plaintiff used the term "Enforcement Personnel File" in his cross-motion for summary judgment.  (Pl.'s SJ Mot. 37.)  However, this appears to have been a mistake, because in his reply he adopted the term "Employee Performance File."  (Pl.'s Reply 44.)

demonstrate the adequacy of its search.  The SEC relies on the declaration of Brenda Fuller, who

provides the following description of the search:

> To respond to items seven through twelve of Aguirre's request, the
> Commission's FOIA Office sent memoranda to FOIA liaisons in
> the Divisions and Offices of the Commission who could have
> responsive documents.  Those liaisons contacted the relevant staff
> and instructed them to review their work files (both electronic and
> paper) to determine if they had responsive documents.  The FOIA
> Office staff followed standard procedures in the search for
> documents responsive to plaintiff's request.

(Fuller Decl. ¶ 3.)  The Fuller Declaration falls far short of *Oglesby*'s standard, as it lacks detail

and it makes no reference whatsoever to the search terms or methods used.  Instead, it merely

states that SEC staff "review[ed] their work files" and "followed standard procedures."  (*Id*.)

The SEC argues that plaintiff fails to "identify any office that should have been queried

but was not."  (Def.'s Surreply 8.)  It is true that the Fuller Declaration lists the specific offices

queried for documents.  (Fuller Decl. ¶ 4.)  However, it fails to describe in detail *how* each office

conducted its search, which is the SEC's burden under *Oglesby*.  Defendant could have corrected

this deficiency by attaching an amended Fuller Declaration to its surreply, but it has inexplicably

failed to do so.  Therefore, the Court finds that the SEC's affidavit is insufficient to uphold the

adequacy of its search.

Plaintiff also requests his original EPF because he claims that records are missing from

the version that he received.  The SEC claims that it produced the original in September 2005,

(Staiger Decl. ¶ 7), and its declaration is "entitled to a presumption of good faith."  *Ground*

*Saucer Watch, Inc. v. C.I.A.*, 692 F.2d 770, 771 (D.C. Cir. 1981).  Plaintiff has failed to produce

evidence that overcomes this presumption.  (Aguirre Decl. ¶¶ 10-29.)  Furthermore, the real issue

is the adequacy of the search, not whether plaintiff received the complete, original EPF.  While

the SEC must demonstrate that its search was reasonably calculated to uncover all responsive

documents, it need not account for the whereabouts of every item that plaintiff seeks. *See, e.g.*,

*Roberts v. U.S. Dep't of Justice*, No. 92-CV-1707 (NHJ), 1995 WL 356320, at *2 (D.D.C. Jan.

29, 1993) ("Nothing in the law requires the agency to document the fate of documents it cannot

find. If a reasonable search fails to unearth a document, then it makes no difference whether the

document was lost, destroyed, stolen, or simply overlooked."); *Miller v. U.S. Dep't of State*, 779

F.2d 1378, 1385 (8th Cir. 1985) ("The fact that a document once existed does not mean that it

now exists; nor does the fact that an agency created a document necessarily imply that the

agency has retained it. Thus, the [agency] is not required by the Act to account for documents

which the requester has in some way identified if it has made a diligent search for those

documents in the places in which they might be expected to be found.")

Therefore, the Court will require the SEC to conduct another search, or in the alternative,

to prove that its prior searches meet the *Oglesby* standard. The SEC is not obligated to account

for individual items in plaintiff's request; however, a diligent search should maximize the

likelihood of uncovering all responsive materials.

## CONCLUSION

For the foregoing reasons, the Court grants plaintiff's cross-motion for summary

judgment [#29] in part and denies defendant's motion for summary judgment [#26] except as set

forth herein. Specifically, the Court grants plaintiff's motion with respect to: 1) all documents

withheld under Exemptions 3 and 4; 2) the documents withheld under Exemption 6 with the

exception of Paul Berger's resignation form (Vaughn Index No. 1), Paul Berger's personal e-

mail regarding travel (Vaughn Index No. 115), and evaluations of employees other than plaintiff

(Vaughn Index Nos. 117-24, 299-301); and 3) documents withheld under Exemption 7(C) with the exception of the items listed in note 29 of this Memorandum Opinion, and identifying information in the transcripts of Pequot's trading assistant and the unnamed analyst. If there is any personal information (*i.e.*, social security numbers, phone numbers, addresses, birth dates or other personal information as has been explicated herein (*see* Section V, *supra*)), this information may be redacted. But the SEC must ensure that it segregates the personal information and discloses the remainder of the documents, as required by *Army Times*, 998 F.2d at 1068. The documents identified herein shall be produced on or before May 23, 2008.

Furthermore, the Court grants plaintiff's motion for summary judgment with respect to the adequacy of the search. By June 13, 2008, the SEC shall conduct an adequate search of its records in accordance with the requirements of *Oglesby*, 70 F.2d at 1176,[32] or in the alternative, submit a supplemental affidavit demonstrating that its initial search was adequate. Any affidavit that it files must include a full and detailed description of the search terms and methods used.

Before May 30, 2008, the parties shall meet and confer to determine if there are any documents or portions thereof that remain in dispute, and if so, on or before June 13, 2008, the SEC shall file a supplemental Vaughn Index that describes each and every document in dispute that is being withheld in whole or in part and specify the exemption upon which it relies. As to these documents, it shall also file an affidavit that addresses segregability as required by *Army Times*.

Finally, this matter is set for a status on June 17, 2008, at 3:00 p.m. in Courtroom 14.

_____

[32]If the SEC decides to conduct additional searches, it must file an affidavit describing these searches, including the search terms and methods used.

Defendant shall bring to the status unredacted copies of all documents listed in the above

supplemental Vaughn Index that are still in dispute.


_____/s/_____

ELLEN SEGAL HUVELLE
United States District Judge


Date: April 28, 2008