UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Gary Aguirre, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.:  06-1260 (ESH) |
| | ) | |
| Securities and Exchange | ) | |
| Commission, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S STATEMENT ON THE ADEQUACY OF THE SEARCH**

**PRELIMINARY STATEMENT**

Plaintiff regrets that he was unable to file this memorandum, given its length, until three business days before the status conference. The filings submitted by the Securities and Exchange Commission (SEC) raised a number of issues that required clarification before plaintiff could prepare this memorandum. Plaintiff submitted his request for clarifications (Ex. 1) to the SEC on June 27, 2008, but did not receive a response until July 25, 2008 (Ex. 2).

**I.      INTRODUCTION**

The Court's Order of April 28, 2008, directed "the SEC to conduct another search, or in the alternative, to prove that its prior searches [met] the [*Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)] standard." The SEC's search falls far below *Oglesby's* standards. Among other things, *Oglesby* requires the SEC to make "a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." (920 F.2d at 68)

Such a search cannot be gleaned from the SEC's declarations. Those declarations are packed with convoluted explanations, ambiguities, gaps, and conclusions which put a haze over the SEC's search. When plaintiff sought clarifications, the SEC refused to provide them. When he proposed the SEC use simple, clear language to remove an ambiguity, the SEC refused to adopt it. When he asked why responsive records known to be in the SEC's possession were not released, he got back more "cockamamie" interpretations of his requests.[1] The SEC also refuses to ask the Commissioners for records known to be in their possession.

In short, the SEC has defied the Court's order and its guidance. When this happens, the judicial system breaks down. In this case, the defendant is a federal agency whose mission is to enforce the law. Its refusal to accept the Court's decision enforcing Congressional mandates that the SEC be transparent undermines the nation's system of laws and the democracy itself.

The Senate faced the same defiance when it attempted to exercise its oversight responsibility.[2] The SEC's Office of General Counsel (OGC), through Richard Humes (Humes), played games with the Senate's request for records,[3] just as it plays games with the Court's Order directing compliance with plaintiff's FOIA requests. The OGC misled the Senate, again through Humes,[4] just as it misled this Court. The SEC did not cease its defiance of the Senate's requests until: (1) Senator Grassley requested the SEC Chairman to remove Humes as the SEC's

---

[1] Compare letters plaintiff's June 27, 2008 letter, with Melinda Hardy's s July 25. 2008, letter, Exs. 1 and 2 to Plaintiff's July 31, 2008, declaration (Aguirre Decl.).

[2] Senate Report, pp. 665-700.

[3] See Senator Grassley's letter, dated August 21, 2006, to SEC Chairman Cox stating: "Reopening these investigations after Congress begins to ask questions and the citing the fact that they are active as pretext to deny or delay Congressional requests is unacceptable." Senate Report at 677

[4] Senator Grassley's letter, dated August 24, 2006, to SEC Chairman Cox stating:

> If Mr. Humes had been candid and forthcoming—as I would have expected of someone representing you in a good faith effort to fully cooperate with our inquiry—then he would have mentioned today's SEC meeting and at least discussed the possibility of presenting our requests for information to the Commission at the time.

Senate Report at 681.

liaison[5] and (2) the two Senate Chairmen called upon Chairman Cox to direct SEC staff to comply with Senate's requests. It appears the Court has now reached the same point. Plaintiff requests the Court to set contempt proceedings if the SEC does not immediately release all responsive records pursuant to the April 28, 2008, order.

## II.    THE SEC MISLED THE COURT AT THE MAY 21 HEARING

At the May 21, 2008, hearing, the Court repeatedly inquired of the SEC's counsel, Melinda Hardy, whether the SEC had withheld any responsive records. In the first exchange, the Court asked whether the SEC had "reinterpreted" plaintiff's FOIA request to seek only records "generated" in connection with his termination:

> "The Court: I don't know whether you've produced them or not, or whether you reinterpreted his request to being *only things that generated* or some -- for lack of better word, cockamamie explanation or reinterpretation (emphasis added).

> Ms. Hardy: We have not reinterpreted his request."[6]

The Court next read aloud the pertinent language from paragraphs 7 through 12 of the December 30, 2005, FOIA request[7] and again inquired of the SEC's counsel:

> "The Court: The question is, have you produced all those?

> Ms. Hardy: Yes, Your Honor we have."[8]

Still later, the Court would have a third question and answer session with SEC's counsel:

> "The Court:  After those two categories are put aside, that is, the ones you won on, and the ones that he won on, have you produced everything else that is responsive to the request subject to you need to keep looking?

> Ms. Hardy: Yes."[9]

---

[5] *Id.*, "I am writing to ask that you designate another individual [other than Mr. Humes] within the SEC to deal with my staff regarding the August 2, 2006, request for documents and interviews related to the allegations of former SEC attorney Gary Aguirre." Senate report 681.

[6] Reporter's Transcript of the May 21 hearing ("Transcript"), p. 4, ll. 4-10.

[7] *Id.*, p. 4, l. 18—p. 5, l. 13.

[8] *Id.*, p. 5, l. 14-15.

[9] *Id.*, p. 10, ll. 11-16.

On a fourth occasion, the Court used different language to inquire about the same point:

"The Court: But as to the things that are not covered by three or four, at this moment, you have produced everything you know about, that is not covered by three or four or my order where I say you win, at least in a redacted form?

Ms. Hardy: Right, I believe that that is true.

The Court: Okay. Then Mr. Aguirre, we've made great progress here. They have to comply with my order about the adequacy of the search. The law provides that they have a right to appeal. I can't cut them off at the pass. So I have to let them appeal."[10]

Still, the Court would try a fifth time. This time a slight crack appeared in the SEC's position:

"The Court: So I'll do this once more because clarity here is essential.

Ms. Hardy: I want to be clear. I think the *one e-mail* I'm thinking of there is an issue about the morale of the office. And the supervisor says well, think about where this is coming from or something to that effect."

As the exchange continued, a second crack began to form:

"The Court: Is it just one document, is that all we're talking about?

Ms. Hardy: There's that one and then *there is another one* where it is more like your first hypothetical where it is sort of two employees were discussed in different paragraphs, I think. But so far I can only think of those two." (emphasis added)

Later, plaintiff informed the Court of a third document the SEC had expressly refused to release—a memorandum from the SEC's Office of the Inspector General (OIG) to the five Commissioners discussing plaintiff's termination.[11] This prompted a sixth exchange during which the Court questioned SEC counsel about the OIG memorandum. She claimed the issue had been briefed, but the Court failed to address the issue in its April 28 order.[12] The exchange continued:

---

[10] *Id.,* p. 12, ll.1-14.
[11] *Id.*, p. 26, l. 25—p. 28, l. 16.
[12] *Id.,* p. 29, l. 18; p. 31, l. 25; and p. 33, l. 4.

"Ms. Hardy:  There was nothing in the order requiring us to produce these. Nothing in the order that said that these were responsive.

The Court:        What happened to it? It went away.

Ms. Hardy: There was nothing in the order requiring us to produce these.  Nothing in the order that said that these were responsive.[13]

The Court: I don't determine -- without a Vaughn Index, I can't figure it out."

Alternatively, Hardy argued that even if the document was responsive, the SEC was holding Exemption 5 in reserve. [Hardy: "[B]y the way, if it is responsive, we think we got an exemption."][14]  Some forethought went into the SEC's position.

Finally, during the seventh exchange between the Court and counsel, Hardy took the issue full circle—all the way back to the Court's first question. Hardy conceded the SEC had indeed interpreted plaintiff's requests to be limited to documents *generated in carrying out his termination*. The transcript reads:

"The Court:  You know, every time, let's say there are a hundred documents in the SEC that mention his termination, how do you figure out which ones are responsive and which ones are not?

Ms. Hardy:  Because of the context of his request, which was how it came up and it was generated. The ones that specifically relate to the termination, in number 11, he is focusing on documents that where, the possibility was discussed. *They were generated in carrying out such termination ...* (emphasis added)"[15]

As it turns out, the SEC was not merely withholding a document or two. It had been withholding hundreds of pages of responsive records. On June 13, 2008, the SEC released 260 pages of documents that it had been withholding.[16] It listed more than 300 pages of documents on three new Vaughn indices which it continues to withhold.[17] According to the SEC, its new

---

[13] *Id.*, p. 33, ll. 2—8.
[14] *Id.*, p. 34, ll. 7—p. 35, l. 2;
[15] *Id.,* p. 35, l. 22—p. 36, l. 2.
[16] See Aguirre Decl., ¶1.
[17] See Exs. 26 through 28 of the SEC's June 13, 2008, filings.

interpretation sprung from the Court's comments at the May 21 hearing placing some unexpected interpretation on plaintiff's FOIA requests.[18] Plaintiff does not agree. The Court gave no special guidance, other than implying that the SEC should not place a "cockamamie explanation or reinterpretation" on plaintiff's FOIA requests.[19]

The SEC, however, has barely moved. It continues to withhold an unknown number of responsive records based on equally groundless theories which violate the letter and spirit of the Court's April 28 order and May 21, 2008, instructions. The quantity, dates of creation, subject matter, and other details of these records are unknown. What is known boils down to this: (1) the SEC concedes all of these records either explicitly mention plaintiff's termination or are otherwise responsive and (2) the SEC first disclosed their existence on June 13, 2008.

### III.    WHY THE SEC PLAYS CAT AND MOUSE WITH THE COURT'S ORDER

The SEC has its own story why it halted the Pequot investigation and fired plaintiff. Since the SEC contends the two events are unconnected, it has two independent stories. The SEC's story of the Pequot investigation has been completed; it may be found in its Case Closing Report.[20] On the other hand, its story why it fired plaintiff is still evolving and expanding.

Its birth was inauspicious: a single paragraph crafted three business days after plaintiff emailed Associate Director Berger questioning John Mack's preferential treatment.[21] Within a month, it had grown into a page plus termination notice.[22] Its length grew again a month later when the OIG opened its investigation. But that was nothing in comparison with the story's growth after The N.Y. Times broke the story that Congress got involved. The SEC added new

---

[18] Melinda Hardy's Declaration (Hardy Decl.) of June 13, 2008, ¶22.
[19] Transcript, p. 4, ll. 4—8.
[20] See Ex. 31 to Second Aguirre Decl.
[21] S. HRG. 109-898, at 1209 (SEC 5529).
[22] See Ex. 56 to the joint Finance and Judiciary committees' report, *The Firing of an SEC Attorney and the Investigation of Pequot Capital Management* (Senate Report).

theories and expanded old ones from whatever source available.[23] The SEC even welcomed input from Pequot's attorneys why the SEC *should have fired plaintiff* and soon recycled these ideas into *why it did fire plaintiff.*[24] Like a vintage wine, the story has improved with age.

But the SEC's story faces credibility hurdles. Plaintiff's evaluations were uniformly positive. The SEC gave him a pay raise just ten days before firing him. The SEC placed plaintiff as lead investigator on one of its most significant cases.[25] And if that was not enough, the SEC's story would have to justify a step the Enforcement Division, according to its Director, had not taken in "in a number of years"—the firing of a new Enforcement attorney within his first year.[26]

Yet, the SEC has cobbled together its story. It combines innuendo, speculation, conclusions, and double and triple hearsay to establish that plaintiff's conduct and performance caused his firing, not his email questioning Mack's preferential treatment.[27] The SEC can ill afford having any more records fall into plaintiff's hands that might further undermine its story. And that story, jerry-built or not, may bring comfort to those senior SEC officials stung by the Senate report.

It is in this light that the SEC plays its cat and mouse game whether it has records relating to how plaintiff performed while at the SEC. Plaintiff submits there are two possible reasons why the SEC fights so hard to hang on to these records. First, the records may be inconsistent with the SEC's evolving story why it fired plaintiff. Second, the records may demonstrate how the SEC concocted its story. As discussed below, plaintiff has stumbled across one record that does exactly that, but the SEC refuses to release it, relying on one of its new "interpretations."

IV.     THE SEC CONTINUES TO APPLY PATENTLY ERRONEOUS INTERPRETATIONS OF PLAINTIFF'S REQUESTS IN PRETENDING TO CONDUCT ITS SEARCH

---

[23] Testimony of plaintiff's supervisors, December 5, 2006, at:  http://judiciary.senate.gov/hearing.cfm?id=2437
[24] Aguirre Decl., ¶4-5.
[25] Senate Report, p. 77.
[26] See Aguirre Decl., ¶6 (.quoting from Linda Thomsen's statement to Senate investigators),
[27] See Aguirre Decl., ¶2.

The SEC has dropped its "generated in connection with" interpretation of plaintiff's FOIA requests, but it has now disclosed three more equally bizarre interpretations.

*SEC interpretation No. 1: Plaintiff's requests do not include records used "merely as a means to describe something else."*

This one is a head scratcher. Despite the Court's comments at the May 21 hearing, the SEC refuses to release records containing explicit references to plaintiff's termination, evaluations, merit pay raise, or performance.[28] The SEC explains: "OGC staff did not deem references to Aguirre's termination or other personnel matters responsive where those matters were mentioned *merely as a means to describe something else*, usually a request for production of documents (emphasis added)."[29] Yet, the SEC concedes the Court said exactly the opposite. The Hardy declaration (¶24) states: "[The Court stated that *references* to Aguirre's termination … were within the scope of Aguirre's requests seeking 'All records relating to the SEC's termination of Aguirre's employment (emphasis added).'" The SEC seems to have nuanced plaintiff's requests on a theory the SEC understands the Court has rejected.

Turning to the SEC's new nuance, the fact that a reference to plaintiff's termination or performance might be included in a sentence to "describe something else" does not logically render the document less responsive. Indeed, on this theory, the SEC could be withholding a smoking gun. For example, suppose one of plaintiff's supervisors sent an email referring to the discharge of the seven US Attorneys in December 2006 with this comment: "It was an Aguirre-style termination." In this case, plaintiff's termination has been used to describe something else. Yet, the document would hardly be nonresponsive. In context, it suggests that plaintiff was terminated for reasons extraneous to his performance. It thus relates to plaintiff's termination.

---

[28] *Id.*, ¶43.
[29] Hardy Decl., ¶24.

*SEC interpretation No. 2: Plaintiff's requests are limited to records which reflect his supervisors' views of his performance, termination, evaluations, and merit pay increase.*

The SEC unveiled it adopted this "interpretation" last week in Ms. Hardy's letter of July 25, 2008. On this point, it reads: "[A] reasonable interpretation of your FOIA request does not extend to documents that do not reflect or concern how your supervisors viewed your performance during your employment with the Commission."[30] This "interpretation" violates the language of plaintiff's request. For example, paragraph 9 of the request seeks, "any other file containing information regarding Aguirre's performance as an employee *or* the purported causes of his termination."[31] The phrases are stated in the disjunctive. Neither phrase limits the request to records containing the "views" of plaintiff's supervisors regarding plaintiff's performance.

With this theory, however, the SEC gives itself license to cherry pick the records released to plaintiff. It would not have to release any records regarding plaintiff's performance, evaluations, termination, or merit raise unless *those records reflected the views of plaintiff's supervisors, the senior SEC management that fired him.* Any positive or neutral statements from any source would be screened out, e.g., positive comments from colleagues or defense counsel. On the other hand, the floodgates would be open to statements that justify the decision to fire plaintiff.

The SEC has indeed cherry picked the records it released in just this way. Ms. Hardy states in her declaration that she released documents generated by trial attorney Kevin O'Rourke.[32] He was critical of plaintiff, but did not supervise him. His views, which are supportive of the SEC, were dismissed by the Senate report for multiple reasons.[33] On the other hand, the SEC refused to search for the emails and records from other staff because, as Hardy puts it, "none of those

---

[30] Aguirre Decl., Ex. 2, ¶5(a).
[31] Aguirre Decl., Ex. 3, ¶9.
[32] Hardy Decl., ¶9.
[33] Senate Report, pp. 80-81.

persons *had any supervisory authority over you*, your former supervisors did not say that they were involved in any review of your performance or any personnel actions relating to you … (emphasis added)."[34]   Again, plaintiff's requests were not limited to records which reflect the mindset of those with "supervisory authority over [plaintiff]."

*SEC interpretation No. 3: Plaintiff's "FOIA requests sought information about [his] performance in connection with [his] evaluation and termination"[35]*

Even records authored by plaintiff's supervisors describing his performance may be nonresponsive under another SEC "interpretation." This one eliminates *performance* as a stand-alone category. A record discussing plaintiff's performance is not responsive, according to the SEC, unless it connects his performance to his "evaluation and termination." Hence, if Branch Chief Hanson wrote down that "plaintiff was a good employee," that statement would not be responsive unless Hanson also stated something like "and therefore he is receiving a merit raise."

On this theory, the SEC claims notes taken by Hanson in June 2006, describing plaintiff's handling of the Pequot investigation, are nonresponsive.[36] It points out that Hanson wrote these notes *after* plaintiff's termination and they reflect the views of a third party. Yet, nothing in plaintiff's request places a time frame when the record was created or the source of the information, so long as it relates to plaintiff's performance as an SEC employee.

The SEC's "interpretations" surface only when the right question is asked. Neither the Court nor the plaintiff is likely to have asked all the right questions. This means the SEC may still have other unveiled "interpretations" behind which sit other "nonresponsive" records. At some point, the issue becomes: how many interpretations add up to contempt?

---

[34] Aguirre Decl., Ex. 2, ¶5(b)(iii).
[35] *Id.*, ¶5(a)
[36] *Id.*

The SEC has also redacted large chunks of the records it has released on the theory that they are also "nonresponsive" or, in the alternative, protected under Exemption 5. Yet, the SEC provides no Vaughn index, a practice disapproved by the Court in its order.

## V.    THE SEC'S NEW CONTENTION THAT RESPONSIVE RECORDS ARE NOT "AGENCY RECORDS" IS DILATORY, GROUNDLESS AND IN BAD FAITH

The SEC withholds other records on the theory that they are not "agency records." These records include both handwritten notes and typed documents. They were authored by the staff of the Chairman's office and the OGC.[37] The SEC *first* disclosed the existence of these records on June 13, 2008, almost two years after this case was filed.[38]

The records are not described in any Vaughn index or mentioned in any SEC declaration or memorandums filed in the summary judgment proceedings. Even when plaintiff's summary judgment motion focused on the paucity of records from the Chairman's office and the OGC,[39] the SEC offered no clue it was withholding any records from these offices on the theory that they were not "agency records." Instead, the SEC argued that the OGC and the Chairman's office had been "queried," that both had provided documents, and that was the end of the issue, absent a showing that the "agency's search was not made in good faith."[40]

The SEC dealt with the same issue in *Bloomberg, L.P. v. SEC*, 357 F. Supp. 2d 156, 163, 167 (D.D.C. 2004), the only case cited by the SEC on this issue. Ms. Hardy also served as lead SEC counsel in *Bloomberg*. In that case, the SEC handled the "agency records" issue in quite a different fasion.  It filed a Vaughn index identifying the notes which it claimed were not "agency

---

[37] *Id.*
[38] *Id.*
[39] Memorandum in Support of Plaintiff's Cross-Motion for Summary Judgment, pp. 43-45.
[40] SEC Memorandum, Jan. 18, 2008, p. 4, "The FOIA Office queried … the Office of the Chairman …  All of those offices provided documents responsive to Aguirre's request, which were processed by the FOIA Office for release to Aguirre."

records," less than three months after it filed its answer. It later filed the declaration of the author

of the notes, the Chairman's chief of staff, stating the relevant facts.

The SEC's proof is patently deficient. Hardy makes no statement that she even spoke with

the authors of the notes.[41] Instead, her declaration merely states this conclusion: "to the best of

the author's recollection they are notes taken solely for his convenience and were not relied upon

by any other persons or integrated unto the Commission's record system or files."[42]

But even if Hardy had spoken with the authors, her declaration would still be insufficient to

meet the SEC's burden. In language equally applicable here, the court in *Grand Central*

*Partnership v. Cuomo,* 166 F.3d 473, 489 (2d Cir. 1999), observed:

> The statements in this affidavit, while helpful to HUD's cause, do not resolve the
> issue whether HUD has met its burden of proof for the reason that it is the
> function of the federal courts to distill facts and make conclusions. In this case,
> those facts have been distilled and conclusions reached not by the district court,
> but by Joseph D'Agosta, an affiant lacking personal knowledge. … Thus, the
> importance of a court's evaluation of the *use* to which such documents were and
> might be put by the agency and its staff cannot be overestimated.

Apparently, the SEC's counsel is familiar with the principles stated in *Grand Central***,** since she

applied them in *Bloomberg.*

## VI.    THE SEC HAS WITHHELD RESPONSIVE RECORDS RELATING TO PLAINTIFF'S EMPLOYMENT UNDER MISLEADING DESCRIPTIONS IN ITS VAUGHN INDEX

The SEC's original Vaughn index did not identify any records relating to plaintiff's

termination, performance, evaluation, or merit rating increase.[43] This omission is consistent with

the SEC's representations to the Court and counsel that it made a blanket withdrawal of

Exemption 5. The SEC explained in its motion papers that it took this step "because Commission

staff had testified regarding certain of their deliberations and actions with respect to Aguirre at a

---

[41] Hardy Decl., ¶26.
[42] *Id.*, ¶26.
[43] See Second Decl. of Melinda Hardy, dated October 1, 2007, Ex. 14.

December 5, 2006, hearing before the Senate Committee on the Judiciary, making it unnecessary to keep many of its predecisional deliberations confidential. …"[44] The SEC carved out several narrow exceptions to its waiver, but none apply to the issues now before the Court.[45] Hence, plaintiff had no reason to believe that the SEC had withheld responsive records relating to his employment, but tucked them away in an obscure part of its Vaughn index with misleading text.

But that is exactly what the SEC has done. It withheld records directly relating to plaintiff's performance, but listed them under the category of "Senate Production" in the Vaughn index. Under a stipulation between the parties, the SEC agreed to provide plaintiff with nonexempt records it provided to the Senate *relating to the Pequot investigation*, but not relating to his employment. Hence, plaintiff had no reason to suspect that records described as "Senate Production" on the Vaughn index actually related to his performance.

Plaintiff learned of the existence of the unreleased notes during his examination by the SEC's Inspector General (IG) on June 17, 2008. According to the IG, the notes were prepared in June 2006 during a meeting between SEC staff and Pequot's counsel.[46] This description fits with the edited description from the SEC's original Vaughn index below:

| | Date | From | Title of document | Page count | Description |
|---|---|---|---|---|---|
| 25 | 28-Jun-06 | Robert Hanson | Staff Handwritten notes | 1 | Notes of Commission staff, taken during meeting with counsel for Pequot. Contains attorney work product, reveals pre-decisional deliberative process. |

This posting gives no clue that the described record relates to plaintiff's performance.

According to the IG, Pequot's counsel spent a half hour attacking plaintiff's handling of the Pequot investigation. The IG stated that this information had not been previously provided to the

---

[44] See SEC memorandum filed on October 1, 2007, pp. 3-4; see also January 8, 2007, letter of Richard Humes, Ex. 5 to Aguirre Decl.

[45] *Id.*, Humes letter, pp. 1-2.

[46] See Aguirre Decl., ¶5.

SEC. There appear to be two sets of notes taken at this meeting: the notes in item 25 of the Vaughn index (above) and, according to the IG, a second set of notes prepared by Peter Bresnan.[47] The meeting was set up by a letter of June 20, 2006, from Pequot's counsel, which logically involves the same subject—plaintiff's performance.

But there is a reason the SEC may not wish to release these records—other than the one it gives. The notes impeach Assistant Director Mark Kreitman's testimony before the Senate Judiciary Committee in December 2006 and thus a piece of the SEC's story why it fired plaintiff. Kreitman testified to the Senate in December 2006 why the SEC fired plaintiff in September 2005. In doing so, he included allegations he heard for the first time in June 2006 from Audrey Strauss, but testified before the Senate as if those allegations were known to him when the SEC fired plaintiff in September 2005.[48] The Senate asked Plaintiff to respond. Plaintiff refuted Kreitman's testimony with internal SEC records. Still, there remained the question where Kreitman got the very specific allegation he made against plaintiff. Plaintiff is in possession of the notes but cannot provide them to the Court under the terms of the protective order, absent an order from the Court. Plaintiff requests the Court to review the notes *in camera* and compare them with Kreitman's testimony on December 5, 2006, and plaintiff's supplemental answers to Senator Grassley.

Plaintiff's inadvertent discovery of the existence of these notes raises an obvious question: how many other responsive records relating to plaintiff's employment are listed on the SEC's Vaughn indices as "Senate Production" with no clue to their contents? There is an available remedy. The SEC should segregate and release those portions of any records described in its Vaughn indices that relate to plaintiff's termination, performance, evaluations, and merit raise.

---

[47] See Aguirre Decl., ¶5.
[48] *Id.*

14

VII.    **THE SEC KNOWS HOW TO CONDUCT A FOIA SEARCH WHEN IT WANTS TO: HOW THE SEC'S OFFICE OF HUMAN RESOURCES CONDUCTED ITS SEARCH**

The search conducted by the SEC's Office of Human Resources (OHR) demonstrates how simply the SEC *could* establish it has conducted an adequate search in accordance with the *Oglesby* guidelines. The declaration of Victor Tynes (Tynes), the OHR FOIA liaison, proves this point. The Tynes declaration, with attachments, establishes when Tynes received the FOIA request, to whom he provided it, how they responded, his collection of the records, and his forwarding of all responsive records to the FOIA office (SEC Exs. 18-29). There are no gaps or troubling ambiguities in the Tynes declaration or its two exhibits. In sum, the two-page Tynes declaration sharply contrasts with most of the other SEC declarations.

VIII.    **THE "PROCESSING"BY THE SEC'S FOIA IS WINDOW DRESSING BECAUSE THE GENERAL COUNSEL'S OFFICE HANDLED PLAINTIFF'S FOIA REQUEST**

Taken by itself, the declaration of Brenda Fuller, a branch chief in the SEC's FOIA office, tells how the SEC FOIA office processed plaintiff's FOIA request.[49] In fact, the FOIA office had a marginal role in making decisions which records would actually be released, which records would be listed on Vaughn indices, and which records would be redacted.

The Fuller declaration misstates and omits key facts. In paragraphs 4 through 9, she states that plaintiff's FOIA request was simultaneously sent to all SEC offices and divisions on July 31, 2006. This is in error. The actual "FOIA Request Referrals," attached as SEC exhibits, establish that the OGC received plaintiff's requests on January 4, 2006,[50] and all other offices received the requests almost *seven months later* on July 31, 2006.[51] During those seven months, the OGC had a window of time to dream up its "interpretations" and decide how to handle plaintiff's FOIA requests before any other offices or divisions were involved.

---

[49] The Fuller declaration was filed as Ex. 7 with the SEC's June 13, 2008, filings.
[50] I*d.,* see Ex. 8.
[51] I*d.,* see Exs. 9 through 13.

The Fuller declaration fails to mention that the records from all SEC divisions and offices took a detour through the OGC before arriving at the FOIA office,[52] with one exception.[53] Hence, as they passed through the OGC for review, they were subject to the OGC's special "interpretations" of plaintiff's FOIA requests. The bottom line is this: By the time the records got to the FOIA office, they had already been culled down by the OGC's unique interpretations of plaintiff's requests. Hence, the fact that the FOIA office went through the motions of reviewing the records for responsive records was pointless. The horse had already left the barn.

Acting on OGC instructions, the FOIA office also withheld records it directly received. According to the Hardy Declaration (¶¶34 and 35), the FOIA office initially withheld 38 pages of records on the theory they were nonresponsive. But after the May 21 hearing, the OGC directed the FOIA office to release ten pages of those records.

## IX. THE SEC'S SEARCH OF THE CHAIRMAN'S OFFICE DOES NOT COMFORM TO THE *OGLESBY* GUIDELINES

The SEC has improperly withheld the following records from the Chairman's office:

1) Records which it claims are "nonresponsive" because they allegedly mention plaintiff's termination "merely as a means to describe something. [54] See discussion in Section IV;

2) Records which it claims are not "agency records.[55] See discussion in Section V.

The SEC asserts two versions of Exemption 5 in withholding records from the Chairman's office. First, it claims the eleven records listed on the Vaughn index for the Chairman's office are all exempt. Second, the SEC contends that records which it claims are nonresponsive, either in whole or in part, are also exempt under Exemption 5. This contention has two flaws.

---

[52] *Id.,* see Hardy Decl., ¶¶24 and 31 (Ex. 24); Chumley Decl., ¶15 (Ex. 2); Paver Decl., ¶8 (Ex. 14); Sullivan Decl., ¶¶6, 9. 10, and 11 (Ex. 21).
[53] *Id.,* see Tynes Decl., p. 5, Ex. 18
[54] Id., ¶¶23—24.
[55] Id., ¶26.

First, the SEC has expressly waived the deliberative process exemption available under Exemption 5. The waiver was stated in Richard Humes's letter of January 8, 2007,[56] as follows:

> Although I have no reason to believe the decisions of the FOIA Office were incorrect at the time they were made, circumstances have now changed. Because Commission staff, including Mr. Aguirre's supervisors identified below, discussed their deliberations and their actions with respect to Mr. Aguirre at the December 5, 2006 hearing before the Senate Committee on the Judiciary, the staff does not have a continuing need to keep confidential its predecisional deliberations regarding the termination of Mr. Aguirre's employment.

The Humes letter carved out narrow exceptions to the waiver which are inapplicable to the records withheld from the Chairman's office.[57]

Additionally, the SEC's new Vaughn indices, as well as the original one, do not provide sufficient information to determine whether the responsive material relating to plaintiff's employment can be segregated. The D.C. Circuit stated the applicable guidelines in *Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007) with the following language: "The FOIA requires that '[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt.' … [T]he District Court had an affirmative duty to consider the segregability issue *sua sponte* (citations omitted)." The SEC's Vaughn index merely states "Responsive portion refers to Aguirre's termination." The Hardy declaration merely states a conclusion that it cannot be segregated. The showing is insufficient to meet the SEC's burden.

And then there is the search issue. The Chairman's office is the only office or division contacted by the FOIA office for records that failed to provide a declaration describing its search. The Hardy declaration (¶18) provides the only description;

> Staff in the Office of the Chairman (Peter Uhlmann and Anil Abraham) have informed me that they gathered and asked other staff in their office to gather all

---

[56] Aguirre Decl., Ex. 5.
[57] *Id.*

paper and electronic documents they had pertaining to Aguirre in August 2006. Christopher Cox, Peter Uhlmann, Anil Abraham, and Paul Wilkinson provided documents resulting from searches of their paper and electronic files. No other staff in the Chairman's Office had been involved in any matters relating to Aguirre.

*Oglesby,* 920 F.2d at 68, requires:

> A reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched, is necessary to afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment.

Every element of *Oglesby* is missing. The entire showing is based on Hardy's conclusions from a conversation at an unspecified time about events two years ago. Was this a two-minute phone call last week? No search terms are stated. No showing was made that all files likely to contain responsive evidence were searched. No showing that all responsive records were provided to either the OGC or the FOIA office. The Chairman's office should comply with the Court's order.

## X.    THE SEC HAS VIOLATED THE COURT'S ORDER BY FAILING TO CONDUCT A SEARCH OF THE COMMISSIONER'S OFFICES

As a matter of simple logic, a search cannot comply with *Oglesby* if it is not conducted. None was done. By Hardy's letter of July 25, 2008, the SEC states for the first time that "there is not a reasonable likelihood that the Commissioners or their staffs would have responsive information." The SEC claims the Commissioners would only have a copy of the action memoranda seeking disclosure of documents relating to plaintiff's termination to the Senate.

This contention makes little sense. The Commissioners knew of plaintiff's allegations since September 2, 2005, when they received plaintiff's two-page letter describing how senior SEC officials blocked the Pequot investigation and then fired plaintiff when he questioned their decision. Later, the Senate made demands on the SEC for its Enforcement records. Enforcement

staff called upon the Commissioners to make decisions. The media generated more than five hundred media articles, many critical of the SEC's handling of the Pequot investigation and plaintiff's firing. The nature of the allegations, the Senate investigation, and the media coverage all raised questions whether the Commissioners themselves were doing their jobs in overseeing the Enforcement Division.

This very issue was discussed by Commissioner Atkins when he discussed the Pequot investigation and plaintiff's discharge during a lecture he gave before the Fordham School of Law in October 2007. He stated that the Commission's duty to ensure that Enforcement Division maintains proper policies had become a "hot topic following the recent issuance of highly critical reports by Senators Grassley and Specter and the Government Accountability Office (GAO)."[58] He went on to say that the Senate Report criticized "the SEC's firing of SEC lawyer Gary Aguirre, alleging that political considerations were behind Aguirre's dismissal."[59]

In this environment, it would be natural if not unavoidable for the Commissioners to be discussing these issues, collecting information, and communicating with staff. All of these steps likely involve the creation of records. Hence, a search of the Commissioners' offices would be "expected to produce the information requested." (*Oglesby*, 920 F.2d at 68)

There are even more compelling reasons to obtain the records of Commissioner Kathleen Casey regarding plaintiff's discharge. Commissioner Casey was counsel for the Senate Banking Committee immediately before she became an SEC commissioner. In that capacity, she received from plaintiff the records relating to his discharge and the Pequot investigation. Plaintiff also had a lengthy discussion with her regarding the underlying facts. She was the Banking Committee

---

[58] 2008 Fordham Journal of Corporate & Financial Law Fordham Journal of Corporate & Financial Law 2008  13 Fordham J. Corp. & Fin. L. 177, 197

[59] *Id.*

contact person on the Pequot matter when she was appointed Commissioner at the SEC.[60] These connections did not escape to The N.Y. Times: "But in the letter [to the Banking Committee] Mr. Aguirre said that he provided a 42-page sworn statement outlining his allegations, along with 46 supporting exhibits, to Kathleen L. Casey, a lawyer on the Senate Banking Committee. Ms. Casey has since been nominated by President Bush to be an S.E.C. commissioner."

Commissioner Casey knew more about plaintiff's allegations than anyone at the Senate or the SEC when she came to the SEC in May 2006. By the time she arrived, the SEC knew about the Senate investigation. This was approximately a month after the SEC learned that the Senate was looking into plaintiff's allegations. During the summer of 2006, the SEC made extraordinary efforts to learn what information plaintiff had regarding the Pequot investigation and in connection to his discharge, including subpoenaing plaintiff's communications with the Senate.[61] Yet, the person who knew best what plaintiff had provided Congress was a new SEC commissioner with an office down the hall. It seems probable that someone would have tried to tap that source, including other commissioners and staff. Since the fact Commissioner Casey had this information was part of the front page N.Y. Times article that broke the story on June 23, Commissioner Casey more than likely had some callers. She would have had two choices: provide the information or decline. In either case, the subject matter would have been plaintiff's discharge. Hence, the SEC should have asked Ms. Casey if she had any responsive records.

## XI.    THE SEC'S SEARCH OF THE OGC DOES NOT COMFORM TO THE *OGLESBY* GUIDELINES

The SEC also withheld records from the OGC on the same theories that it withholds records from the Chairman's Office: the key terms were used "merely as a means to describe something

---

[60] Aguirre Decl., ¶8
[61] Aguirre Decl., ¶8-9

else," the responsive documents are not agency records, and Exemption 5 applies to the release of other records. Plaintiff adopts its response from the prior section.

Plaintiff recognizes there may be disputes whether OGC records are protected by exemptions and privileges. But the SEC has no excuse for its failure to provide a complete Vaughn index of all responsive records which its OGC is withholding. That provides the Court and the plaintiff with the minimum information necessary to evaluate the SEC's contentions.

The Court has recognized that one objective of this action is to ascertain who was involved in the decision to discharge plaintiff. Multiple emails confirm that the OGC was deeply involved in that decision—both in the execution and the planning. One internal SEC email states that the OGC directed Mr. Staiger's office to "freeze" plaintiff's information technology assets. This was done with military-style execution. Plaintiff received a call while he was on vacation on the West Coast. The moment the call was over, plaintiff could not send or receive email. For her part, Hardy helped draft the termination notice, adding and withdrawing the facts constituting the alleged basis for plaintiff's termination.[62] She began participating in personnel decisions involving plaintiff in January 2005, more than seven months before his discharge.[63] The question is: how deep was she and her office involved?

A chain of emails suggests a deep involvement. A July 2006 email from David Wilson, believed to be with the Office of Information Technology (OIT), states the OGC was conducting an investigation of plaintiff at the time of his discharge. It reads in part, "I interviewed Chuck Staiger, who told me he preserved this account at the direction of Juanita Hernandez with the

---

[62] See Aguirre Decl., Ex. 7.
[63] See Aguirre Decl., Ex. 8.

Office of the General Counsel, *which launched an investigation of the user*, Gary Aguirre, prior to his departure in Sept. 2005 (emphasis added)."[64]

It is hard to imagine how the OGC could conduct an investigation of plaintiff without generating a record relating to his performance. Hardy denies knowledge of any OGC investigation that related to plaintiff's "merit pay increase, evaluation, performance, or termination." This does not resolve the issue, given the OGC's proclivity to find its own bizarre interpretations of plaintiff's FOIA request.

Plaintiff is not contending that the SEC must find all records. Rather, the point involves the adequacy of the SEC's search, its various "interpretations" of the FOIA requests, and its other theories for withholding responsive records without describing them. The existence of records suggesting the OGC had a deeper involvement merely underscores why the OGC should be ordered to put aside its pretexts and conduct an adequate search as the Court's order directs.

## XII.    THE SEC'S SEARCH OF THE OFFICE OF THE INSPECTOR GENERAL DOES NOT COMFORM TO THE *OGLESBY* GUIDELINES

The SEC makes some of the same contentions regarding the OIG's withholding of records as it did with the Chairman's office and the OGC: some records are "nonresponsive" under the OGC interpretations and Exemption 5 applies to the release of other records. Plaintiff adopts his response to those issues from the prior sections of this memorandum.

The OIG response to plaintiff's FOIA requests also involves a separate issue. The Court's order dealt with the OIG's *completed* investigation, but there is also an *ongoing* investigation which is nearing completion. The OIG has asserted Exemption 7(A) to withhold records in the ongoing investigation.  There has been little discussion of the ongoing investigation in these proceedings because the parties have been in substantial agreement how it should be handled.

---

[64] Exhibit 4, Aguirre Decl.

The SEC has recognized its assertion of Exemption 7(A) is temporary and expires when the OIG investigation was complete.[65] The SEC also proposed how the parties could resolve any issues involving the ongoing investigation:

> Also, a Vaughn index of those documents is not necessary because this Court's decisions about the categories currently at issue here will apply to the documents from the OIG investigation, which concern the same facts and circumstances as the documents already at issue in this case. This approach should address any concerns raised in *Maydak v. Dep't of Justice*, 218 F.3d 760 (D.C. Cir. 2000). [66]

Plaintiff agrees with these positions, but would like to avoid a second lawsuit if the parties should disagree on some issue. Plaintiff has been learned that the IG that his report will be completed within weeks. Accordingly, plaintiff requests that the Court retain jurisdiction over this matter for three months in order to resolve any issues that should arise.

## XIII.    THE SEC'S SEARCH OF THE DIVISION OF ENFORCEMENT DOES NOT COMFORM TO THE *OGLESBY* GUIDELINES

For plaintiff, the SEC's description of its search of Enforcement records was the most challenging to grasp. If the SEC's search of OHR records was a model, its search of Enforcement records lies at the opposite end of the spectrum. To begin with, there are the common flaws which plague the SEC's search of all its divisions and offices: its unique "interpretations" of plaintiff's requests to cherry pick records, its failure to list responsive records on its Vaughn index, and its assertion of Exemption 5, despite its express waiver of that exemption.

But there are questions and concerns unique to how the SEC conducted its search of Enforcement records. In essence, the SEC describes two searches for Enforcement records, which plaintiff will refer to s "Search A" and "Search B." The SEC through its OGC conducted Search A to locate records sought by the Senate in August 2006, but it provided some of them to plaintiff. The FOIA office *supposedly* conducted Search B for records responsive to the terms of

---

[65] Memorandum of the Securities and Exchange Commission in Support of Motion for Summary Judgment, p. 23.
[66] *Id.*

plaintiff's FOIA Request. In general, the problem with the SEC's approach is that neither search was adequate and two inadequate searches do not add up to an adequate search.

The Hardy Declaration first focuses on how the OGC conducted Search A. The key flaw in Search A is this: it only sought records related to plaintiff's *termination.* It thus does not reach three categories of records sought by plaintiff's FOIA request: records relating to his performance, evaluations, and merit raise. Secondly, it did not include records from third parties.

Search A would of course be irrelevant if Search B, the one conducted by the FOIA office, were adequate under the *Oglesby* guidelines. Search B got off to a late start: the FOIA office sent its record request to the Enforcement liaison, Donald Chumley (Chumley), almost seven months after it sent it sent "FOIA Request Referral" to the OGC. Chumley's first step was flawed: Pursuant to instructions from the FOIA office, he made no request of three staff members identified on plaintiff's request who likely possessed responsive records.

From this point, the declaration becomes vague about which records were collected and to whom they were provided. For example, Chumley states in paragraph 7 of his declaration (SEC Ex. 2) that Charles Cain, plaintiff's former branch chief, had "five inches of email material, *mostly relating to cases plaintiff worked on.*" Chumley makes no specific statement he received any materials from Cain. This contrasts with Chumley's explicit statements in paragraphs 10 and 11 that staff persons Susan Markel and Sheila Russell actually provided materials to him. In his contemporaneous note (Ex. 5), Chumley seems to make a basic distinction between records relating to cases on which plaintiff worked and other records which in Chumley's words "might relate personnel matters (sic)" as if they were mutually exclusive. His declaration also seems to make this distinction.[67] Further, his declaration is unclear which records were forwarded to the

---

[67] Plaintiff's FOIA request identified Kevin O'Rourke, James Eichner, and David Kornblau as staff members in possession of responsive records. The FOIA Referral Memo (SEC Ex.3) did not request a search of their records.

FOIA office.  He states he forwarded records "he gathered." Further, the FOIA Referral Memo only requested Chumley to "advise [the sender] of the volume" These distinctions and ambiguities would explain why so few Enforcement records were produced containing comments about plaintiff's performance. Further, the SEC tated it was withholding no responsive records relating to plaintiff's employment under any exemption.

To clarify the point, plaintiff asked Hardy to provide this statement:

> A statement from Mr. Chumley [Enforcement Division liaison] to the effect that all documents described in paragraphs 5,(about 3 inches), 6 (about four or five inches), 7 (approximately five inches), 10 (two work sheets), and 11 (a few inches) of his declaration were provided to the FOIA Office or to the OGC.

The SEC delayed its answer for a month and then declined this request.[68]

In some cases, Chumley states that the staff person provided no records, because the responsive records had been sent to the OGC. For example, Kreitman declined to provide Chumley with any records, stating that he had downloaded them on a disk and the forwarded it to OGC. (¶4).  To confirm that this step had been taken, plaintiff asked Hardy for a statement that the records described in Chumley's declaration had actually been received and reviewed by the OGC and the FOIA office. The SEC refused this clarification as well.[69]  It does not appear that either Chumley or the OGC know what happened. Hence, this search does not satisfy *Oglesby*.

Dated: August 1, 2008                              Respectfully Submitted,


_____/s/_____                    _____/s/_____
Gary J. Aguirre, CA Bar#38927                        Scott A. Hodes, D.C. Bar #430375
402 West Broadway, Suite 400                         P.O. Box 42002
San Diego, CA 92101                                  Washington, D.C. 20015

_____
[68] Ex. 2, page 1, ¶2, Aguirre Decl.
[69] Aguirre Decl., ¶8-9